IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Chapter 11, Subchapter V

SMART COMMUNICATIONS HOLDING, INC.,          Case No. 8:25-bk-09473

        Debtor.
_____/

### CREDITOR JANICE LOGAN'S EMERGENCY MOTION
### FOR RELIEF FROM AUTOMATIC STAY AND REQUEST
### FOR COMFORT ORDER AS TO CLAIMS AGAINST NON-DEBTORS

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), by and through her undersigned counsel, hereby respectfully requests that the Court (1) enter an Order granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d), and (2) provide Janice a comfort order as to her right to proceed in state-court on certain claims. In support thereof, Janice states as follows:

### INTRODUCTION

Despite this Court's admonitions that chapter 11 should not be used to resolve shareholder disputes, Smart Communications Holding, Inc. ("SmartComm") has returned to this Court in order to avoid the imminent entry of a $41 million valuation judgment against it. After a 10-day bench trial, Judge Hunter W. Carroll issued a 49-page ruling valuing Janice's shares at nearly $41 million on December 9, 2025, culminating three years of protracted litigation (the "Sarasota Action"). He also scheduled an evidentiary hearing for December 19, 2025, to set payment terms on his valuation award to facilitate entry of final judgment. Jonathan Logan ("Jon") caused SmartComm to file this bankruptcy in bad faith to avoid that evidentiary hearing and entry of a final judgment.  By filing now Jon no doubt intends to try to argue that this case is

1

a proper subchapter V filing because a judgment has not yet been entered in favor of Janice, converting her interest from that of a shareholder to that of a creditor. Such an argument is blatantly wrong because there is no question that Janice's claim is over $41 million and is not contingent and is liquidated. This Court should promptly grant Janice relief from the automatic stay to allow Judge Carroll to hold the December 19 hearing and enter a final judgment with payment terms and security.

## BACKGROUND

**I.     This Court Dismissed SmartComm from Bankruptcy in March 2025 for Improperly Using Bankruptcy to Resolve a Shareholder Dispute and Unfairly Settle Pending Litigation.**

1.     This is SmartComm's second bankruptcy filing to avoid this shareholder dispute. SmartComm filed in November 2024. *See In re Smart Communications Holding Inc.*, 8:24-bk-7106 ("SmartComm 1").

2.     SmartComm filed then to thwart trial on a disputed $60+ million insider intellectual property liability to Jon's solely owned IP holding company, HLFIP Holding, LLC. Jon directed SmartComm to seek bankruptcy protection in an effort to avoid the impending invalidation of an enormous liability that rendered SmartComm, and hence his mother's shares in SmartComm, worthless.

3.     This Court promptly granted Janice relief from the automatic stay in SmartComm 1. In doing so, the Court commented on the record at the hearing:

> At this point, I am sort of in the same position as the Delaware Chancery Court. And at least on this initial issue, I'm going to defer to the state court and I'm going to grant the motion on a very limited basis and allow the proceedings that are scheduled for February on the two issues dealing with the validity and extent of the IP agreement and the date on which the valuation should be determined.

*See* Ex. 1, Dec. 19, 2024 Tr. 66:12-19.

4.      The Court's comments at that hearing referred to Jon and SmartComm's prior effort to evade the Sarasota court's jurisdiction over the shareholder dispute by re-domesticating SmartComm and several related entities, and transferring all of SmartComm's assets, to Delaware. As this Court noted, the Delaware court stayed that litigation in favor of the Sarasota action.

5.      The parties proceeded to trial in February 2025, and Judge Carroll invalidated the then-$100+ million in insider liabilities. *See* Ex. 2.

6.      Upon receipt of the Sarasota court's Ruling from Part 1 of Phase 2, this Court dismissed SmartComm1 *sua sponte* in March of this year. *See* Ex. 3, SmartComm 1, Dkt. No. 225. This Court also denied reconsideration of that dismissal. *See* Ex. 4, SmartComm 1, Dkt. No. 226.

7.      This Court's dismissal order from March noted, "Preliminary rulings were not going well for Jon Logan in State Court, so he filed these bankruptcy cases, which stayed the litigation." Ex. 3, p. 2. This Court continued, "it is not seriously disputed that Debtors filed bankruptcy as a litigation tactic to avoid adverse rulings in State Court." *Id*. p. 5. The dismissal order also called the prior petition and proposed plan "an improper use of Subchapter V" to attempt to "cram down a 'settlement' of the shareholder litigation with Janice Logan." *Id*. p. 6.

8.      Ultimately, this Court's dismissal deferred to Judge Carroll because of his familiarity with the parties and the case,

> because the amount of Janice Logan's claims has been pending in State Court for some time, and the State Court has already heard many days of testimony, issued numerous rulings, and has managed the massive litigation in phases, ***even if this Court were inclined to not dismiss these Subchapter V cases, this Court would likely permit the State Court to complete its work and***

> ***liquidate Janice Logan's claims <u>(and would probably not</u>***
> <u>***confirm any plan until that work was completed***</u>***).***

Ex. 3, p. 9 (emphasis added).

9.      Moreover, in denying the motion for reconsideration of dismissal previously, this

Court observed,

> the Court did not simply dismiss these cases because of a corporate
> governance issue, *i.e.*, the shareholder litigation between Jon and
> Janice Logan. This was just one factor, which made the other
> conflicts of interest in these cases more problematic. But the Court
> did find that the cases were filed to gain a tactical advantage in the
> pending shareholder litigation and to effectively force a settlement
> of the litigation. It should also not be lost that Debtors are
> effectively funding Jon Logan's quest to obtain control of Debtors.

Ex. 4, p. 3.

**II.    While Jon and SmartComm Were Telling this Court Reorganization Was Necessary, They Were Telling Customers They Filed To Resolve The Shareholder Dispute.**

10.     On December 3, 2024, Jon admitted in a letter to "Valued Partner[s]",

**Business Continuity**

Smart Communications continues to operate normally, delivering the same high-quality technology solutions and superior customer support you have come to expect.

This filing was necessary to swiftly resolve a dispute between the company's two shareholders (myself and my late father's Trust) that unfortunately transpired following my father's untimely passing.

Ex. 5.

11.     That is not a permissible reason to file bankruptcy and is precisely why this Court

dismissed the filing.

**III.    After Three Years of Litigation, Judge Hunter Carroll Is on the Brink of Entering Final Judgment.**

12.    Since the dismissal of SmartComm 1 in March 2025, the parties proceeded to trial on their remaining claims (aside from a few claims that will be severed or were not ripe). The primary focus of trial was valuing Janice's 50% equity interest in SmartComm under Fla. Stat. § 607.1436.

13.    The court heard testimony from valuation and intellectual property experts for both Jon and SmartComm and for Janice. After a 10-day bench trial, Judge Carroll issued a 49-page ruling valuing Janice's shares at nearly $41 million ("Valuation Order"). *See* Ex. 6. Judge Carroll rejected SmartComm's expert's opinion that Janice's shares are worth $1.2 million; instead his decision credited Janice's expert's opinion. *Id.* at 20-21. That ruling also settled the insider IP royalty issue with HLFIP, establishing a royalty rate and base, and factoring that into the valuation of SmartComm. *Id.*, pp. 16-20.

14.    The Valuation Order requested briefing from the parties on a few discrete remaining issues: 1) proposed payment terms and security, 2) whether the court should award attorneys' fees and interest under Fla. Stat. § 607.1436 or otherwise, and 3) whether it had failed to address any pending claims.

15.    Those briefs were due yesterday by 4 PM EST ahead of a half-day evidentiary hearing set for Friday December 19, 2025 to set payment terms and security and decide the remaining issues. *See* Ex. 7 (Order Setting Hearing). Janice filed her briefs. SmartComm filed this bankruptcy.

## **LEGAL STANDARD**

Section 362 provides the following procedure and legal standard to grant relief from the automatic stay: "on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, . . . (1) for cause,

including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d).

The Bankruptcy Code does not define the term "cause," and so "cause" to lift the stay "must be decided on a case-by-case basis." *In re Murray Industries, Inc*., 121 B.R. 635, 636 (Bankr. M.D. Fla. 1990). Factors that courts generally consider in evaluating motions for relief from the automatic stay include "the prejudice to the Debtor's reorganization efforts, conservation of judicial resources, and prejudice to the movant." *Murray*, 121 B.R. at 637; *see also* S. Rep. 78-989 reprinted in (1978) U.S.C.C.A.N. 5787, 5836 ("[I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from any duties that may be handled elsewhere.").In particular, bankruptcy courts have found cause to grant relief from the automatic stay when the debtor filed for bankruptcy in bad faith to avoid an adverse result in ongoing litigation.

In *In re Dixie Broadcasting, Inc.*, the debtors petitioned for bankruptcy to avoid a judgment against it in a civil suit. The debtors had agreed to sell their radio stations to a company, WBHP, but reneged on the sale. *Id*. at 1025. WBHP commenced a state-court suit against the debtor. *Id*. After over two years of litigation, the court informed the parties that it "was ready to rule in WBHP's favor" and ordered them to participate in a settlement meeting. *Id*. During a lunch beak during the settlement meeting, the debtors filed for Chapter 11 bankruptcy. *Id*. WBHP filed a motion for relief from the automatic stay to complete the state-court litigation, and the bankruptcy court granted it because the debtors' petition "amounted to bad faith" and was "for the primary purpose of (1) avoiding the consequences of an anticipated adverse state-court decision; (2) relitigating the same controversy between the two parties in bankruptcy

forum; and (3) invoking the automatic stay provision to evade the pending state-court litigation." *Id.* at 1026. The bankruptcy court further observed that the state-court litigation was on "the verge of completion," and that the debtor had filed their Chapter 11 petition "to obtain a last-minute escape chute out of the civil litigation." *Id.*

The Eleventh Circuit affirmed the bankruptcy court's grant of the motion for relief from the automatic stay and the finding of bad faith. *Id.* The Eleventh Circuit considered several factors in assessing whether there was bad faith, such as "an intent to abuse the judicial process and the purposes of the reorganization provisions," "the timing of the filing of the petition," and "whether the petition was filed strictly to circumvent pending litigation." *Id.* at 1027 (internal quotation marks omitted). The Eleventh Circuit identified that, because the debtor had filed for bankruptcy "in eleventh-hour court ordered settlement negotiations in the state court litigation," and "to get out of its bad deal," that bad faith justified lifting the stay. *Id.* at 1026–27.

In another comparable case, the Eleventh Circuit reached the same result. *See, e.g., In re Phoenix Piccadilly Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (affirming bankruptcy court orders granting relief from the automatic stay where the Chapter 11 petition was filed "in bad faith" "the day before a hearing in the state court action" between the debtor and the creditors seeking relief from the stay, and further reasoning that in resolving a motion seeking relief from the automatic stay "courts may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions or, in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights" (internal quotation marks omitted)); *see also Collier on Bankruptcy* § 362.07 (16th ed. 2012) ("[R]elief [from the automatic stay] also may be granted when necessary

to permit litigation to be concluded in another forum, particularly if the nonbankruptcy suit involves multiple parties or is ready for trial.").

## **ARGUMENT**

### I.    **This Bankruptcy Was Not Filed For a Valid Purpose**

This bankruptcy case was not filed for a valid reorganization purpose. Indeed, SmartComm's list of 20 largest creditors evidences no liabilities over one million dollars. *See* Dkt. No. 2. SmartComm, meanwhile, is a profitable company set to exceed $95 million in revenue in 2025.

Rather, the impetus for this bankruptcy is SmartComm's looming liability to Janice for the valuation award. However, as this Court knows from *Cox Enterp., Inc. v. News Journal Corp.*, purchase orders under Fla. Stat. § 607.1436 are subject to shareholder distribution solvency requirements. The purchase order *must* comply with Fla. Stat. § 607.1436(8); in fact, the statute forbids entry of a purchase order "unless and until the award is determined by the court to be permitted under the provisions of subsection (8)." Fla. Stat. § 607.1436(6). This Court noted this requirement in its SmartComm 1 dismissal. *See* SmartComm 1, Dkt. No. 225 n. 28. Subsection 8 requires that any payment by the corporation pursuant to the purchase order—other than fees and expenses—"is subject to the provisions of Fla. Stat. § 607.06401." Fla. Stat. § 607.1436(8).

Section 607.06401 expects that distributions to shareholders will not be made that would impair the solvency of the corporation. Fla. Stat. § 607.06401(3). Judge Carroll's purchase order can easily comply with Fla. Stat. § 607.06401 by including key language from subsection (8) of this section. That subsection states,

> Indebtedness of a corporation, including indebtedness issued as a distribution, is not considered a liability for purposes of determinations under subsection (3) if the terms of the

> indebtedness provide that payment of principal and interest is made only if and to the extent that a distribution to shareholders could then be made under this section.

Fla. Stat. § 607.06401(8). The Eleventh Circuit noted that Comment 8.B to the Model Business Corporation Act notes subsection 8, "will be applicable most frequently to permit the reacquisition of shares of the corporation at a time when the deferred purchase price exceeds the net worth of the corporation." *Cox Enterprises, Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1274 (11th Cir. 2015).

Accordingly, the Florida legislature has precluded Judge Carroll from entering payment terms that would render SmartComm insolvent, and, in fact, Janice asked Judge Carroll to adopt proposed payment terms based on a percentage of net revenue that would allow it to maintain a 1.25 debt service coverage ratio ("DSCR"). In other words, Janice asked the state trial court to enter payment terms that would not just allow SmartComm to remain solvent but to have a liquidity cushion for operations.

Nevertheless, before Jon and SmartComm had even seen Janice's proposed payment terms and had any chance to determine how they might affect their solvency or financial health, they sought to strip Judge Carroll of jurisdiction for a fourth time (two bankruptcy filings, the Delaware diversion, and an unsuccessful motion to disqualify Judge Carroll after he ruled against them in Part 1 of Phase 2). This is a desperate and transparently abusive tactic deserving of swift reproach.

## II.    This Case Is Nearly Identical to *Dixie*, and Relief from the Automatic Stay Is Appropriate.

The facts here are nearly identical to those in *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir. 1989). Like *In re Dixie Broadcasting, Inc.*, the Debtor filed its Chapter 11 petition mere *days* after Jon received unfavorable rulings in the state-court proceeding—that is, a

ruling that SmartComm must pay Janice at least $41 million. *See* Ex. 6. That award does not include attorneys' fees and interest, which Judge Carroll is set to decide on Friday. Judge Carroll is also planning to determine whether he could appoint a receiver to ensure compliance with his purchase order and final judgment.

The Debtors have again made incorrect pleas about their status and the state of affairs in order to avoid another unfavorable Sarasota Action judgment. The reason for this filing is plain: the state court was about to enter a judgment requiring SmartComm to begin paying Janice. *See* Ex. 6. Jon would rather jeopardize the company than simply pay Janice fair value for her shares.

The timing of SmartComm's Chapter 11 petition establishes that SmartComm, like the debtor in *In re Dixie Broadcasting, Inc.*, filed it in bad faith "for the primary purpose of (1) avoiding the consequences of an anticipated adverse state court decision; (2) relitigating the same controversy between the two parties in bankruptcy forum; and (3) invoking the automatic stay provision to evade the pending state court litigation." *Id.* at 1026. The debtors' bad faith warrants relief from the automatic stay. This Court should not abide such gamesmanship, which flouts both Chapter 11 and the Florida Business Corporation Act.

## III.    An Evaluation of Prejudice and Conservation of Judicial Resources Also Favors a Lifting of the Stay.

Even leaving aside the bad faith parallels to *In re Dixie Broadcasting, Inc.*, there is ample alternative cause to justify granting Janice's motion for relief from the automatic stay.

Relief from the automatic stay would conserve judicial resources. Similar to *In re Dixie Broadcasting, Inc.*, the Sarasota Action has been pending since SmartComm filed it almost three years ago. After hearing three bench trials, Judge Carroll is planning to enter judgment before the end of this year. Moreover, the payment terms and security he was about to enter will be a central factor in determining whether SmartComm even needs Chapter 11 protection in the first

instance. This Court cannot assess SmartComm's liability to Janice until Judge Carroll has entered a final judgment with payment terms and security. To recreate those efforts in Bankruptcy Court would require the parties to duplicate efforts, and waste judicial and private resources. Far from prejudicing the Debtor and the estate, the lifting of the stay is in the best interests of the Debtor and creditors because it will help avoid unnecessary legal fees and costs.

On the other hand, enforcement of the automatic stay would severely prejudice Janice. Janice is a 72-year old widow whose SmartComm shares are her husband's only legacy to her and her only significant asset. She has been fighting to access the value of her shares for over three years, and has run out of money to fund this costly litigation against Jon, SmartComm, and the related entities—all of whom are using SmartComm's resources to pay their lengthy and growing roster of big firm lawyers. Jon has abused his vestigial control of SmartComm's resources by using SmartComm assets to pay twelve different law firms (13 including its new bankruptcy counsel) to represent him, SmartComm, and its related entities across the Sarasota, Delaware, appellate, and bankruptcy courts to exhaust Janice and thus deter her realization of the fair value of her shares. To force Janice to endure further litigation in Bankruptcy Court would bleed her dry. Janice's age and heart condition further weigh in favor of a speedy resolution of her state-court claims against Jon, SmartComm, and its related entities.

**IV.    This Court Should Also Confirm That Judge Carroll Is Empowered to Enter Any Payment Terms and Security He Deems Appropriate, Including Appointment of a Receiver or Custodian; and This Court Should Confirm That the Automatic Stay Does Not Apply To Janice's Claims Against The Non-Debtor Defendants (Jon, HLFIP, Loco Florida, LLC, and Smart Communications Yacht Holding, LLC).**

If this bankruptcy is not dismissed now as the patently bad faith filing it is, this Court should grant Janice relief from automatic stay that allows the State Court plenary authority to decide payment terms and security on Janice's valuation award. SmartComm's incumbent sole officer and director is clearly not acting in SmartComm's best interests. Judge Carroll is the jurist

best positioned to determine whether an independent party is necessary to run the business, preserve the assets of the corporation, and deal fairly with SmartComm's customers and creditors (including Janice).

This Court can empower the State Court to appoint a receiver to oversee payment of the valuation award but must do so expressly. *Matter of Dibbern*, 61 B.R. 730, 731 (Bankr. D. Neb. 1986). The State Court's Valuation Order plainly indicates it is considering appointing a receiver for purposes of ensuring payment of the valuation award because "given the acrimonious history and efforts by Jon Logan to avoid payment to the Trustee, the Court does not want to foreclose the ability to appoint one in the future to ensure payment." Ex. 6, p. 32. Judge Carroll is intimately familiar with the facts of this case, the parties involved, and the Florida law at issue. He is in the best position to set payment terms and security, and to empower a receiver if necessary to ensure compliance with them. A receiver appointed by Judge Carroll could also be an honest broker for SmartComm about its financial status if the bankruptcy is not dismissed. A bankruptcy court in the Eastern District of Michigan dismissed a bankruptcy because an already appointed receiver had equivalent powers to the bankruptcy court, and dismissing the case in favor of the state receiver was in the best interests of the creditors and the estate. *In re Skymark Properties II, LLC*, 597 B.R. 391, 402–03 (Bankr. E.D. Mich. 2019). The *Skymark Properties II* court also prohibited any new bankruptcy filings by the debtor for two years "to prevent any attempted evasion by anyone of the Court's decisions today." *Id.* at 403. This Court's relief from the automatic stay should expressly permit the state trial court plenary authority to set the payment terms and security it deems necessary to protect Janice's interest, and to appoint a receiver to ensure compliance with the order.

The law is clear that the automatic stay pursuant to Section 362(a) applies only to the debtor—and not to non-debtor co-defendants. *Teachers. Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *In re Melbourne Beach, LLC*, Case No. 6:17-bk-07975, 2019 WL 10734362, at *2 (Bankr. M.D. Fla., Oct. 9, 2019) ("Because 'unusual circumstances' do not exist in this case, the Court declines to extend the automatic stay to enjoin the state court actions against … a non-debtor party."). This Court should adopt the same reasoning and confirm that this action does not stay Janice's claims against Jon in his personal capacity, HLFIP, Loco Florida, LLC, or Smart Communications Yacht Holding, LLC.

Allowing Janice's claims against Jon in his personal capacity, and the related entities, to proceed would not increase the amounts for which debtors might be liable. Quite the opposite: If Janice obtains a favorable judgment against Jon, HLFIP, Loco, or Yacht it may have the effect of facilitating the solvency of SmartComm. In fact, the State Court's Valuation Order considers Smart Communications Yacht Holding, LLC's $8 million, 100-foot Riva Corsaro Yacht the property of SmartComm and further finds that Janice would prevail on her related unjust enrichment claim, and similarly considers Loco Florida's $1.4 million headquarters building property that of SmartComm and finds that Janice would have prevailed on that unjust enrichment claim as well. These rulings, which SmartComm's filing of this action seeks to avoid, would bolster SmartComm's solvency and mitigate Jon's dissipation of its assets.

WHEREFORE, Janice respectfully requests that this Court grant this motion for relief from automatic stay and permit her to proceed to plenary final judgment in the Sarasota Action pursuant to 11 U.S.C. § 362, including appointment of a receiver if the State Court deems it necessary and appropriate. Janice further requests that the Court provide a comfort order as to

her right to proceed against non-debtors in the Sarasota Court and order such other and further relief as this Court deems just and equitable.

DATED:  December 17, 2025.

/s/ Edward J. Peterson
Edward J. Peterson (FBN 014612)
BERGER SINGERMAN, LLP
101 E Kennedy Blvd Ste 1165
Tampa, FL 33602-5147
Telephone: (813) 498-3400
Email: epeterson@bergersingerman.com
*Attorney for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished on December 17, 2025, by the Court's CM/ECF system to all parties receiving electronic noticing, by e-mail to ERIC D. JACOBS, ESQ., Venable LLP, edjacobs@venable.com, and by regular U.S. Mail to the 20 Largest Creditors on the attached list.

/s/ Edward J. Peterson
Edward J. Peterson

# EXHIBIT 1

1    UNITED STATES BANKRUPTCY COURT

2    MIDDLE DISTRICT OF FLORIDA

3    Case No. 24-BK-07106

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SMART COMMUNICATIONS HOLDING, INC.,

8

9          Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    401 West Central Boulevard

13                    Orlando, FL 32801

14

15                    December 19, 2024

16                    1:17 PM

17

18

19

20

21    B E F O R E :

22    HON. ROBERTA COLTON

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  WENDY CHATHAM

1    HEARING re (1) Preliminary Hearing on Emergency Motion for

2    Relief from Stay and Request for Comfort Order as to Claims

3    Against Non-Debtors Filed by Edward J. Peterson III on

4    behalf of Creditor Janice Logan (Attachments: # 1 Exhibit #

5    2 Exhibit # 3 Exhibit # 4 Exhibit) Modified on 12/10/2024

6    (Doc #26).

7

8    HEARING re (2) Preliminary Hearing on Motion to Enforce the

9    Automatic Stay Filed by Daniel R Fogarty on behalf of Debtor

10   Smart Communications Holding, Inc, Interested Party Smart

11   Communications Holding, LLC (Doc #19)

12

13   HEARING re (3) Preliminary Hearing on Motion/Application to

14   Pay Ordinary Course Operating Expenses Filed by Daniel R

15   Fogarty on behalf of Debtor Smart Communications Holding,

16   Inc, Interested Party Smart Communications Holding, LLC (Doc

17   #17)

18

19   HEARING re (4) Preliminary Hearing on Emergency Motion for

20   Authority to Pay Critical Vendors Filed by Daniel R Fogarty

21   on behalf of Debtor (Doc #49)

22

23

24

25   Transcribed by:  Rita Weltsch

1  A P P E A R A N C E S :

2

3  STICHTER RIEDEL BLAIN & POSTLER P.A.

4       Attorney for the Debtor

5       110 E. Madison Street, Suite 200

6       Tampa, FL 33602

7

8  BY:  DANIEL FOGARTY

9

10  OFFICE OF THE UNITED STATES TRUSTEE

11       Attorney for the United States Trustee

12       501 E. Polk Street, Suite 1200

13       Tampa, FL 33602

14

15  BY:  TERESA DORR

16

17  CARLTON FIELDS

18       Attorney for HLFIP Holding

19       4221 W. Boy Scout Blvd., Suite 1000

20       Tampa, FL 33607

21

22  BY:  DONALD KIRK

23

24

25

Page 4

1   DLA PIPER LLP

2          Attorney for HLFIP Holding

3          500 Eighth Street NW

4          Washington, DC 20004

5

6   BY:  STEVE DIXON (TELEPHONICALLY)

7

8   JOHNSON POPE BOKOR RUPPEL & BURNS LLP

9          Attorney for Janice Logan

10         400 N. Ashley Drive, Suite 3100

11         Tampa, FL 33602

12

13  BY:  EDWARD PETERSON

14

15  SHOOK HARDY & BACON LLP

16         Attorney for Janice Logan

17         111 South Wacker Drive, Suite 4700

18         Chicago, IL 60606

19

20  BY:  DAVID SCHOENFELD

21

22

23

24

25

```
 1   UNDERWOOD MURRAY PAA

 2         Attorney for Swank Motion Pictures, Inc.

 3         100 North Tampa Street, Suite 2325

 4         Tampa, FL 33602

 5

 6   BY:  MEGAN MURRAY

 7

 8   AKERMAN LLP

 9         Attorneys for the Debtor

10         201 East Las Olas Blvd., Suite 1800

11         Fort Lauderdale, FL 33301

12

13   BY:  EYAL BERGER (TELEPHONICALLY)

14         DUSTIN HILLSLEY (TELEPHONICALLY)

15

16   ALSO APPEARING:

17         JONATHAN LOGAN

18         JANICE LOGAN

19         DAVID GANN

20         KATHLEEN DISANTO

21

22

23

24

25
```

1                    P R O C E E D I N G S

2               CLERK:  All rise.  The United States Bankruptcy

3    Court for the Middle District of Florida is back in session.

4    The Honorable Roberta A. Colton presiding.

5               THE COURT:  Good afternoon, everyone.  Please be

6    seated.

7               CLERK:  Calling cases from the court's 1:30

8    calendar, case 24-7106 Smart Communications Holdings, Inc.

9    with jointly administered case 24-7108 Smart Communications

10   Holdings, LLC.  The Court will take appearances in the

11   courtroom.  All interested parties please come forward and

12   enter your appearance.

13               THE COURT:  Have we forgotten how to do this?

14               MR. PETERSON:  I was trying to be polite, but --

15               MR. FOGARTY:  I'll go first.

16               THE COURT:  Go ahead.

17               MR. FOGARTY:  Good afternoon, Your Honor.  Daniel

18   Fogarty, Stichter, Riedel, Blain and Postler proposed

19   general bankruptcy counsel to the debtors.  Also present in

20   the courtroom is Jonathan Logan who's the principal of the

21   debtors.

22               MS. DORR:  Good afternoon, Your Honor.  Theresa

23   Dorr on behalf of the United States Trustee.

24               MR. KIRK:  Your Honor, Donald Kirk on behalf of

25   HLFIP, and my co-counsel Steven Dixon is on the phone.

 1                    THE COURT:  Very good.

 2                    MR. PETERSON:  Good afternoon.  Edward Peterson on

 3     behalf of Janice Logan as trustee of the James Logan Family

 4     Trust.  And with me I want to introduce David Schoenfeld,

 5     who's pro hac motion is pending.  He is my co-counsel from

 6     the Shook Hardy firm in Chicago.  And Ms. Logan is also in

 7     the courtroom.

 8                    THE COURT:  Very good.

 9                    MS. MURRAY:  Good afternoon, Your Honor.  Megan

10     Murray on behalf of Swank Motion Pictures, one of the vendor

11     content providers just for context.

12                    MS. DISANTO:  Good afternoon, Your Honor.

13     Kathleen DiSanto, the Subchapter V trustee.

14                    THE COURT:  Oh, lucky you.  Okay.  We've got a

15     number of matters set for this -- oh, we've got somebody

16     else on Zoom?  I thought the Zoom people had been

17     introduced.

18                    CLERK:  I have a Mr. Berger.

19                    MR. BERGER:  Yes, Judge.  Eyal Berger, B-E-R-G-E-

20     R, proposed special counsel to the debtors and my colleague

21     Dustin Hillsley.

22                    THE COURT:  Very good.

23                    CLERK:  And a David Gann?  Are you counsel, Mr.

24     Gann?

25                    MR. FOGARTY:  Mr. Gann is general counsel,

1    essentially in-house for the debtors --

2              THE COURT:  Okay.

3              MR. FOGARTY:  -- Your Honor.  Thank you.

4              THE COURT:  All right.  Is that everyone?  Very

5    good.  Then we've got four matters on the calendar.  Since

6    this is the very first hearing, let me start with Mr.

7    Fogarty.

8              MR. FOGARTY:  Yeah.  Thank you, Your Honor.  Glad

9    to be in front of the Court.  I think what I'd like to

10   propose just in sort of taking things up, I'd like to give

11   you kind of a brief overview what the companies are, what

12   they do, kind of table-setting, case management-type issues.

13   I'd like to go through our operational motions.  Those are

14   our ordinary course expense payment motion, and then we

15   filed a critical vendor motion.

16             I think those are agreed to, and so I won't spend

17   an inordinate amount of time.  I know that maybe we don't

18   have lots of time before the Court today.  And then I think

19   we can take up the stay relief motions, ours -- our motion

20   and the trust motion.  So if that's acceptable, I'm happy to

21   proceed, Your Honor.

22             THE COURT:  You may.

23             MR. FOGARTY:  So the two debtors before you, Your

24   Honor, Smart Communications Holding, Inc. and Smart

25   Communications Holding, LLC.  Inc. is a Florida corporation.

1    It is what I would call sort of the top line parent company.

2    LLC is a Delaware limited liability company.  It would be in

3    the nature of an intermediate type holding company.  And

4    then there are really one main operating subsidiary.  We

5    refer to it in the papers as Smart Collier, and that's where

6    a lot of kind of the day-to-day business activity takes

7    place.  So that's where the bank account sort of main

8    operating account is held.  That's where the employees are

9    housed.  That's where a lot of the activity happens.

10            Certainly there are -- these are no holding

11   companies in maybe the traditional sense.  They own more

12   than just shares or equity interests in an affiliate

13   company.  They have contracts.  They have leases, things

14   like that.  So it's -- but that's kind of the org structure,

15   org chart from a very high level.

16            The debtors, Your Honor, are a technology supplier

17   to correctional facilities across the country.  So they

18   provide to the facilities and really to the inmates in the

19   facilities, a sort of integrated suite of telecommunications

20   and other services through kind of a single platform that is

21   integrated and gives the facilities the ability to sort of,

22   you know, deploy the technology on a broad basis.

23            The debtor's current footprint is -- they have 120

24   facilities in 29 states.  And just maybe briefly on the

25   business model because I think this will be helpful, the

1    debtor is -- the debtor's essentially responsible for

2    providing the infrastructure that allows for the delivery of

3    the services.  And so they're responsible for install.

4    They're responsible for providing all of the tablets and

5    that sort of related infrastructure.  And they pay --

6    depending on the facility, they pay commissions to the

7    facility.  And so the revenue is -- as you'll see from both

8    the budget and the plan projections, the revenue is

9    significant, but the margins are tight.

10            And you know, there's I think a lot of turmoil in

11   the industry generally, and certainly the debtor's not

12   immune from that.  But that's sort of the business model.

13   So what you'll hear in the ordinary course motion is some of

14   these people that we would pay in the ordinary course.

15   They're in the nature of executory contracts because they're

16   doing built-out in new facilities.  Our critical vendor is

17   our tablet supplier.  That is basically the interface

18   through which our services are provided.  And so that's, you

19   know, just sort of a little bit of how the company is run.

20            There's approximately 100 employees that are

21   employed by the companies and they operate out of four sort

22   of office locations that would be in addition to kind of

23   onsite and sort of oversight management technology staffing

24   at the different facilities.  So they have main facilities

25   here in Seminole, one in Georgia, one in New Jersey, and one

1    in Washington.  As I mentioned, Mr. Logan, Jonathan Logan is

2    the sole officer and director of the top line parent

3    company, the Florida corporation.  He's also the manager of

4    the Delaware entity.

5              THE COURT:  So Colliers is not a debtor.

6              MR. FOGARTY:  Collier --

7              THE COURT:  And --

8              MR. FOGARTY:  -- Smart Collier --

9              THE COURT:  -- that's where all the operations and

10   the bank accounts were?

11             MR. FOGARTY:  That's where the bank accounts are.

12   That's where the employees are.  I -- hopefully I did a

13   reasonable job laying out that's not where all of the

14   activity is.  It's certainly not where all of the debt is,

15   and it's certainly not where all of the assets are.  And so

16   it's not -- but it's where certainly the activity is, the

17   employees, the bank accounts.

18             So -- and maybe for -- just to maybe clarify for

19   tax purposes, the debtor and the operating subsidiaries, the

20   Florida entity, have historically and consistently filed

21   consolidated tax returns.  They keep consolidated

22   financials.

23             Just in terms of the creditor body, we have the 20

24   largest.  That's largely made up of vendors, some of whom

25   would be subject to, certainly the largest single vendor we

1    have is the creditor that's subject to the critical vendor

2    motion.  That's our tablet supplier.  That's kind of the

3    lifeblood of the company from a hardware standpoint.

4    There's a number of contingent and unliquidated claims that

5    aren't represented here in the courtroom, and then there's,

6    you know, sort of vendors and trade creditors.

7              Obviously, the two main kind of creditor

8    constituencies we have that we have to deal with as part of

9    this case is Mr. Kirk's client HLFIP Holding.  That is the

10   affiliate entity that holds a license for the intellectual

11   property that the debtors use in providing their services.

12             THE COURT:  Is that what's referred to in some of

13   the papers as the 617 patent, the license for that?

14             MR. FOGARTY:  I think it would include that.  I

15   don't know that that's all it encompasses and I don't know

16   that that's necessarily something that we need to handle

17   today.  But it would include essentially --

18             THE COURT:  No, I just -- I read a lot of --

19             MR. FOGARTY:  Yeah, understood.

20             THE COURT:  -- a lot of stuff and I'm just trying

21   to sort out everything.

22             MR. FOGARTY:  I think if you want some light

23   reading, there'll be lot of opportunities to go through some

24   of the things.  But what we've done, Your Honor, maybe just

25   to kind of cut to the chase a little bit for what we see as

1    where this case is headed, we filed a plan this week that we

2    think gives this court --

3                THE COURT:  You file your schedules before you

4    file your plan, Mr. Fogarty.  That would be helpful.

5                MR. FOGARTY:  Understood, Your Honor.  I think the

6    -- and certainly we're not asking that the Court confirm the

7    plan today.  Schedules will be filed next week.  And -- but

8    what the plan does is it I think provides the structure for

9    this Court to resolve all of these disputes that need to be

10   resolved in order for the companies to move forward.  So we

11   -- it has a structure where the decision on what the royalty

12   fee should be made by this court in connection with the plan

13   and a lot of the other things that are at issue in the state

14   court, which has been -- you know, obviously, different

15   people have different ways of saying it, but certainly

16   disruptive to the company.

17                Without casting aspersions or anything, it's just

18   a fact of this kind of all-encompassing litigation is that

19   it's extremely expensive and it is very time-consuming and

20   it's not what the company does, which is provide services to

21   its clients and customers.  But what the plan does is

22   essentially all of that value goes into a pot and this court

23   decides how it's going to get split up in, you know, in

24   accordance with the ground rules of this case.

25                And so I think it's important to have that

1    framework in place.  Certainly we would've liked to have the

2    schedules on file, but it was fair amount of work to get to

3    where we are, and I think we're at a good spot subject to

4    having the schedules on file and things like that.  So maybe

5    I'll pause before I go into the operational stuff and ask

6    the Court if there's any questions.

7              THE COURT:  No, I've --

8              MR. FOGARTY:  Okay.

9              THE COURT:  -- I've asked the questions I had.

10   Thank you.

11             MR. FOGARTY:  Thank you, Your Honor.  I'd like to

12   turn if we could to our motion for authority to pay ordinary

13   course operating expenses.  Your Honor, that's at Docket 17.

14   And I don't know if the Court has that in front of it, but

15   I'd like to hand up two things that are the two budgets that

16   we filed so far if I may approach.

17             THE COURT:  I think I have it if that's what you

18   filed --

19             MR. FOGARTY:  Okay.

20             THE COURT:  -- with the court.

21             MR. FOGARTY:  Yeah, we filed --

22             THE COURT:  That's Docket 39.

23             MR. FOGARTY:  So one budget, Your Honor, is at

24   Docket 39.

25             THE COURT:  Okay.

1          MR. FOGARTY:  That's our, you know, kind of short-

2     term monthly budget that supports the ordinary course

3     operating expenses.  And we filed the -- the other budget is

4     the projections that are attached to the plan.  They are

5     designed as closely as possible to near each other so that

6     we're not looking at one set and stuck looking at another.

7     But what you have reflected in the budget, Your Honor, is on

8     a consolidated basis and so it gives you -- you know, again,

9     on the short term and the long term --

10          THE COURT:  So this is -- includes companies and

11    expenses that are not in bankruptcy.

12          MR. FOGARTY:  It includes the operating

13    subsidiaries, yes.  So if you -- so you'll see the salaries,

14    that line item would not be a debtor obligation.  That would

15    be an operating subsidiary obligation.  But I think it's

16    important for -- it -- A, it's the way the company has run

17    just on -- you know, on that consolidated type of a

18    financial statement.  And it's important because I think

19    really what this case comes down to is the bottom line,

20    right?

21          And there's been a lot of -- there are a lot of

22    arguments and nuances and technical legal things, but I

23    think that's what is important at the end of the day is what

24    is thrown off in terms of disposable income from these

25    operations.  And so, you know, to not have to get into which

1   one is which and things like that, it's just all here.  So

2   this is the budget, Your Honor, that we would ask for

3   approval to use in the ordinary course.  The things that are

4   not on the budget that's attached to Docket 39 are any

5   compensation for Mr. Logan.  There's no officer's salary.

6   There's no insider salary that's a part of that.

7            There is nothing on the IP royalty either owed as

8   of the petition date or going forward.  That's all folded

9   into the plan projections, again, subject to a determination

10   that this court would make on what that looks like both from

11   a cure standpoint and a going-forward standpoint.

12            THE COURT:  Is there -- isn't there an injunction

13   that precludes the debtor from making payments to the IP

14   vendor?

15            MR. FOGARTY:  There is a state court order that,

16   you know, has some restrictions and limitations that would

17   be superseded by an order of this court confirming the plan.

18            THE COURT:  Okay.

19            MR. FOGARTY:  But that's not a today issue because

20   none of those payments are -- or the debtors aren't asking

21   that any of those payments be made.

22            THE COURT:  Sure.

23            MR. FOGARTY:  So we have filed a separate critical

24   vendor motion because, at least as to that one, we need to

25   make that payment quickly and it's a debtor obligation and

1   it's pre-petition.  The rest of the expenses in this budget

2   we believe either don't fall into that category or we're not

3   there yet.  And so we may need to come back on what would I

4   think be a supplement to the critical vendor motion that

5   would identify other critical vendors that would be -- you

6   know, again, these are in the nature of sole source hardware

7   suppliers that are -- the tablets are unique --

8            THE COURT:  Is there a contract --

9            MR. FOGARTY:  -- to us.

10           THE COURT:  -- with this vendor?

11           MR. FOGARTY:  The tablet vendor, they're -- it's

12   an invoice-by-invoice basis.  So it's not a long-term supply

13   contract, which is part of the problem.  Replacing that

14   vendor is difficult to say the least just because of the

15   lead times, just because of the specifics and the design,

16   and the implementation that would have to be done as part of

17   that.  And then the lead time to get those built,

18   manufactured, shipped, received so that they could be

19   deployed both in existing and in new facilities.  So that's

20   the -- that's sort of the -- that's the rationale for the

21   need for the critical vendor as to the tablet supplier.

22           Some of the motion lays out the different

23   categories.  So for example, we have ongoing installations

24   billed out in facilities.  So again, the debtor contracts

25   with a correctional facility or a governmental unit that has

1    a number of facilities.  And what the debtor is allowed to

2    do and responsible for doing is getting the facility ready

3    to receive the debtor's hardware that goes in.  It's the

4    debtor's hardware.  It goes in --

5              THE COURT:  So the debtor buys all of the

6    hardware?  Is that how it operates?

7              MR. FOGARTY:  That's right.

8              THE COURT:  Okay.

9              MR. FOGARTY:  And the debtor pays for the

10   installation, pays for the install costs, the electricians

11   that go in, and again, outfit the -- you know, the building

12   an entertainment center in a house.  It's -- Netflix gives

13   you an iPad so that you will watch more Netflix, but Netflix

14   is paying for the iPad.  They're paying to install the iPad,

15   and then they get the subscription fees, right?  So that's

16   not exactly the debtor's business model, but a reasonable

17   approximation for -- you know, for the costs that the debtor

18   has in connection with providing the services that it does.

19             THE COURT:  So in the budget that you submitted,

20   it looks like there is a -- let's see.  I'm looking at --

21   what is the proposed payment to this vendor?

22             MR. FOGARTY:  So in the budget, Your Honor, in

23   Month 1, it's about a million one to that tablet provider.

24   That's Shenzhen E Stone.  Estone is kind of a broker.

25   Shenzhen is the manufacturer.

1              THE COURT:  And is that for tablets that have

2      already been delivered or are to be delivered?

3              MR. FOGARTY:  That line item has two components in

4      it.  It has the component for already delivered, which would

5      be the critical vendor payment, and then it has a line --

6      and it has amounts for new orders, which need to be placed

7      just because of the lead time.  But that would have new

8      orders same credit terms.  So it's, you know, very favorable

9      to the debtor in --

10             THE COURT:  So the next -- on the next month

11     that's 748, that's not the critical vendor payment?

12             MR. FOGARTY:  To the extent that the payment

13     doesn't shift right, you know, the idea would be we need to

14     pay that 750 to place the next order roughly at the same --

15             THE COURT:  I guess I'm confused.  Is the 750

16     included in the 1.1 I guess is my question?  Or is that 748

17     the critical vendor payment?

18             MR. FOGARTY:  Right.  There's two 748s --

19             THE COURT:  Okay.

20             MR. FOGARTY:  Is what I'm doing a bad job

21     articulating.

22             THE COURT:  So it's 748 a month basically and they

23     were one month's in arrear when the bankruptcy was filed?

24             MR. FOGARTY:  I don't know that it's a month, Your

25     Honor.  It's the size of the order and the percentage that

1    is due once -- you know, percentage down, a percentage in a

2    certain period of time following delivery and the balance

3    certain period of time following delivery.  So the orders

4    are similarly sized and so the 748 is both the last payment

5    for the last order and the mid payment for the next order.

6              THE COURT:  Just so I'm clear so when the debtor

7    filed, they were only one month behind in --

8              MR. FOGARTY:  That's --

9              THE COURT:  -- to this vendor.

10             MR. FOGARTY:  I think that's a fair way of saying

11   it, yes.

12             THE COURT:  And that is the debtor's largest

13   unsecured debt that's not with an insider?

14             MR. FOGARTY:  Correct.

15             THE COURT:  Okay.  So that'll go away if the

16   critical vendor is paid?

17             MR. FOGARTY:  That's correct.

18             THE COURT:  Okay.

19             MR. FOGARTY:  I think the -- Your Honor, we

20   probably talked enough about the balance of the payments

21   that we're asking to pay in the ordinary course.  I think

22   I've hopefully articulated why.

23             THE COURT:  For the most part.  I mean, the court

24   enters a typical order in every Chapter 11 case that

25   ordinary course payments can be paid.  Is the reason for

1    this motion because you're asking me to approve expenditures

2    by non-debtors?  Is that -- I don't -- I didn't understand

3    exactly what the --

4            MR. FOGARTY:  Yeah.

5            THE COURT:  -- purpose of the motion was.

6            MR. FOGARTY:  Thank you, Your Honor.  I think it's

7    realistically two-fold.  One, it's to make sure that we're

8    not running afoul of something that someone thinks is

9    outside the ordinary course, right?  That's one.  And two,

10   it's to make sure the Court has in front of it a motion that

11   has a budget attached to it so that we can articulate what

12   we're doing and make sure that we're disclosing what we're

13   doing and --

14           THE COURT:  So there are no secured creditors?

15           MR. FOGARTY:  There are not any secured creditors.

16   There's a --

17           THE COURT:  I wouldn't know that because I haven't

18   seen schedules yet, Mr. Fogarty.

19           MR. FOGARTY:  Understood.  You -- we --

20           THE COURT:  Okay.

21           MR. FOGARTY:  We didn't -- we did not file a

22   motion to use cash collateral.

23           THE COURT:  Okay.  That's why -- that's what the

24   confusion was.

25           MR. FOGARTY:  Yeah.

1           THE COURT:  Okay.

2           MR. FOGARTY:  Thank you.  Thank you, Your Honor.

3           THE COURT:  All right.  So we've got the debtor's

4    motion to approve the payment of ordinary course expenses

5    that excludes any payments for officer salaries, but may

6    include some expenditures from non-debtors and the debtor's

7    motion to pay as a critical vendor Estone I guess as agent

8    for the Chinese company that's making the tablets in the

9    amount of $748,000.  Is there anybody who wishes to speak to

10   either motion?  Yes, Mr. Peterson.

11          MR. PETERSON:  Your Honor, Edward Peterson on

12   behalf of Janice Logan as trustee.  Obviously this was filed

13   on pretty short notice.  We did have a chance right before

14   the hearing to look at the invoice.  Do you -- can I look

15   at...  And I guess Your Honor asked the question if there's

16   an executory contract.  Is that this?  Manufacturing and

17   purchase -- there's a manufacturing and purchase agreement.

18   And I guess my question is, is this -- if it's an executory

19   contract, don't they have to perform?

20          THE COURT:  I would think so unless it's rejected.

21   That's why I asked the question --

22          MR. PETERSON:  Yeah.

23          THE COURT:  -- and you said there was no contract.

24   It was just invoice to invoice.

25          MR. FOGARTY:  That's our view of it, Your Honor.

1    It's invoice to invoice.  The contract speaks in terms of

2    the one invoice that's being ordered and it has credit terms

3    for the invoice.

4              THE COURT:  And has there been any threat to this

5    continued performance?

6              MR. FOGARTY:  If we want to place the next order,

7    we need to pay the previous balance I think is the position

8    that the customer is taking.  And given the -- again, given

9    the risk because of the lead times and because these -- you

10   know, without tablets to install, we're not -- we have

11   problems going forward with new clients and we have problems

12   with existing clients because these tablets break and have

13   to be replaced.

14             That's part of our obligation, that it becomes a

15   -- I mean, it is in the nature of a sole source and it's

16   critical and key in all of that to the business operations.

17   So we think that's why it justifies that.  The way we read

18   the agreement is it's an invoice by invoice that has credit

19   terms with it.

20             MR. PETERSON:  Your Honor, we don't want to be

21   difficult, but then again it is -- and you know, what --

22   just looking at the invoices, we were okay with it.  But

23   when you -- if you -- if it -- if there is an executory

24   contract, I think this is a (indiscernible) issue.  And I

25   don't know why they wouldn't be compelled to perform, and

1    maybe the debtor assumes it and pays it later, but I haven't

2    had a chance to read this yet, so --

3              THE COURT:  I obviously don't have it in front of

4    me, so...

5              MR. FOGARTY:  And again, what we're talking about

6    is new orders, not the goods that have already been

7    delivered, right?  So that's the supply contract that has a

8    much longer term relationship that is not what this

9    agreement says.  But I can hand the Court my copy.

10             THE COURT:  Okay.  I'll take a look at it.  So

11   you're not moving to assume this contract at all at this

12   point.

13             MR. FOGARTY:  To the extent that there is -- no,

14   and we've I think tried to make clear in our underlying

15   motions that we're not asking for authority to assume.

16   Clearly this is a contract that we believe is important, but

17   we're not asking that any of those issues be determined

18   today.  All we're trying to do is make sure we can place the

19   next order.

20             THE COURT:  I don't see that there's a term or a

21   commitment to continue to produce, which I think would be

22   something that would make it more like an executory

23   contract.  You can pass that back to Mr. Peterson if he

24   wants to take a look at it.  Is there anyone else who would

25   like to speak to the debtor's motions?

1          MR. PETERSON:  Judge, we have other comments.

2          THE COURT:  On the debtor's --

3          MR. PETERSON:  On the --

4          THE COURT:  On the budget --

5          MR. PETERSON:  -- motion to pay ordinary --

6          THE COURT:  On the budget?  Okay.

7          MR. PETERSON:  Yes.

8          THE COURT:  Oh, I'm sorry.  Go ahead.

9          MR. PETERSON:  So I had informed Mr. Fogarty we're

10   okay as long as there's no payments that are benefiting any

11   insiders.  And as I look at this budget, I question the Loco

12   Florida office.  Is that who owns that?  The vessel we think

13   is the yacht operations and maintenance vessel.  There's

14   also -- are they paying insurance on the yacht?  I think

15   there's a Ferrari involved.  Is that being paid?  We just

16   want to make sure -- we'll agree to this if there's nothing

17   that is benefiting an insider right now.

18          THE COURT:  Well, let me ask Mr. Fogarty.  Why

19   would those expenditures be in the ordinary course of

20   business?

21          MR. FOGARTY:  So --

22          THE COURT:  The -- let's start with the vessels.

23          MR. FOGARTY:  Yeah.  And I think this is why it's

24   helpful to have the plan on file.  So the -- I think I

25   mentioned that the plan has the value that is subject to the

1    state court litigation coming in for the benefit of the

2    estate.  Part of the value is -- and one of the disputes is

3    there's a vessel.  There's a yacht.

4              THE COURT:  And who owns it?

5              MR. FOGARTY:  It's owned by Smart Communications

6    Yacht Holding, which is a non-debtor, which is not a wholly

7    owned subsidiary.  And the part of the plan -- that entity,

8    Your Honor, is the plan funder under the plan.  So the value

9    of the yacht is contributed to the debtor, whether the asset

10   comes in or not.  The value is contributed to the debtor and

11   distributed to creditors, including Mr. Peterson's client.

12             The -- there are costs associated with that.  It's

13   a net benefit, but there's costs associated with the yacht.

14   And in order to get the value, again, under the plan, the

15   expenses have to be paid.  I think we can move that.  Again,

16   we can move that as far as we can to the right.  So we don't

17   need to do that today.  We can do that at the next hearing.

18   We can talk about that, that maybe when there's more --

19             THE COURT:  Of the two matters --

20             MR. FOGARTY:  -- a further opportunity for people

21   to look at the plan.

22             THE COURT:  The two matters that have been raised

23   by Mr. Peterson propose zero payments in the first month.

24             MR. FOGARTY:  That's correct.

25             THE COURT:  That's why I --

1           MR. FOGARTY:  Yeah.

2           THE COURT:  -- thought if we're going to do this

3     at least on an interim basis.

4           MR. FOGARTY:  And I -- that's -- we're not -- you

5     know, I think we're not trying to have money rush out the

6     door when it doesn't need to be spent and certainly not as a

7     result of this hearing.  But you know -- and again, these

8     two entities would be plan funders under the plan, so --

9           THE COURT:  But those are not ordinary courses

10    expenditures for the debtor.

11          MR. FOGARTY:  They have historically been payments

12    that the debtor has made.  So I think in that sense they're

13    ordinary course.  To the extent that this is the purpose of

14    the ordinary course motion, again, we don't need to pay

15    those as a result of this hearing.  The budget has zeros in

16    that line item for those months.

17          THE COURT:  Okay.  Who has possession of the

18    vessels?

19          MR. FOGARTY:  It's --

20          THE COURT:  Or who uses them?

21          MR. FOGARTY:  Its docking location is in the plan.

22    It's somewhere in south Florida is my recollection.  Again,

23    the vessel's owned by essentially a single-purpose entity.

24    It's used in -- it's used by the business in client

25    development and things like that.  I think the Christmas

```
1    party, holiday party was on the yacht.  So it's used by the

2    business, but it's -- I think we were -- I -- we referred to

3    these -- some of these things as non-core business assets.

4    So different balance sheet line items.  The debtor owns a

5    couple of houses, right?

6              So things that benefit insiders, there's more than

7    one insider and it's not just a yacht.  The debtor owns a

8    house in Sarasota, Your Honor, that is not occupied by

9    anybody that is working for the debtor.  There are

10   maintenance expenses that the debtor has been paying for

11   that.  It's occupied by Mr. Peterson's client.  So --

12             THE COURT:  That's titled in the name of the

13   debtor?

14             MR. FOGARTY:  It is.

15             THE COURT:  Okay.

16             MR. FOGARTY:  So we're not asking that those

17   issues be resolved today.  Certainly we filed a plan that

18   resolves those issues, and those issues need to be resolved

19   and they're important.  But they should be resolved in

20   context under the plan on a global basis and when people

21   have had time to look at them and consider them.  So...

22             THE COURT:  Okay.  Anything else, Mr. Peterson?

23             MR. PETERSON:  Your Honor, just to verify, because

24   I'm looking at the plan, and since the argument that these

25   are valuable assets that are going to be contributed to the
```

1    plan, I want to make sure is it the Rolls Royce being paid

2    for?

3            MR. FOGARTY:  It's a -- it's part of the non-core.

4    And I want to be maybe more specific.  There are some

5    vehicles, Your Honor, that are owned by the debtor, so just

6    debtor-owned, debtor assets.  There are some vehicles that

7    are not owned by the debtor, some of which are Mr. Logan's

8    vehicle, some of which are that side's vehicles.  So the --

9    again, plan funders are contributing the value of those

10   assets, which would include a Rolls, under the plan.  So I

11   don't know whether any of that is part of this, Your Honor,

12   but --

13           THE COURT:  So these are assets that might be

14   contributed towards the plan, but the debtor needs to pay

15   for them in the interim?

16           MR. FOGARTY:  That's the idea.

17           THE COURT:  Is that the idea?

18           MR. FOGARTY:  That's the idea.  There's value.

19   The Rolls, I honestly don't know the answer to the question

20   whose insurance it's --

21           THE COURT:  So if the debtor's --

22           MR. FOGARTY:  -- covered under.

23           THE COURT:  -- making all the payments on these

24   assets, wouldn't they be assets of the estate?  I don't see

25   what would be being contributed.  If the debtor pays all the

1    expenses for this asset, why wouldn't the debtor own it?

2                MR. FOGARTY:  Now I think we're talking about

3    different things.  Debtor makes a lease payment, pays rent,

4    doesn't own the building, for example.

5                THE COURT:  Well, that's different.  That's --

6                MR. FOGARTY:  Right.

7                THE COURT:  That's --

8                MR. FOGARTY:  So I think, again, plan resolves

9    that by the asset coming in and being contributed.  So it's

10   not an issue that needs to be litigated --

11               THE COURT:  I assume it's --

12               MR. FOGARTY:  -- and decided.

13               THE COURT:  -- being contributed in return for

14   something.

15               MR. FOGARTY:  The plan funders would get releases

16   from the debtor as part of the plan.

17               THE COURT:  Okay.

18               MR. PETERSON:  They also want to take all the

19   equity under the plan.  So --

20               THE COURT:  No, I --

21               MR. FOGARTY:  Your Honor --

22               THE COURT:  I've looked at the plan.

23               MR. PETERSON:  So we -- just so I'm clear, we

24   object to the debtor paying for the Rolls Royce, the

25   Ferrari, the condo in Miami, and the boat.  It's not a boat.

1    It's a Nor-Tech.

2              MR. FOGARTY:  There's -- those are two different

3    boats.

4              MR. PETERSON:  There's a Nor-Tech and I guess a

5    yacht.

6              MR. FOGARTY:  There are two boats.

7              THE COURT:  Okay.  Anybody else?  Or are there

8    anymore comments, Mr. Peterson?

9              MR. PETERSON:  Your Honor, that's it on this

10   motion.

11             THE COURT:  Okay.

12             MR. PETERSON:  Thank you.

13             THE COURT:  All right.  Yes, Ms. Murray?

14             MS. MURRAY:  Thank you, Your Honor.  My only

15   comment is that if we're discussing here today some of these

16   issues, I'd prefer to have it be entered on an interim basis

17   as I think Your Honor suggested so that we can wrap our arms

18   around the plan and when the schedules get filed, all of

19   that together.

20             THE COURT:  Very good.  Then I was going to get to

21   Ms. DiSanto.

22             MS. DISANTO:  I echo the comments of the others.

23   Obviously, you know, we're all wrapping our arms around the

24   case and getting familiar today.  Clearly we don't want to

25   do anything that's going to impede the debtor's operations.

1    And I think, you know, Ms. Murray's comments are well taken

2    in that an interim order, you know, with the limitations

3    that Mr. Peterson suggests allows us to come back when we're

4    all better briefed on the issues and we've had a little bit

5    more opportunity to dive into the plan and decide whether,

6    you know, there's additional movement that's warranted

7    there.   Thank you, Your Honor.

8              THE COURT:  Ms. Dorr?

9              MS. DORR:  Thank you, Your Honor.  I'll echo that.

10   If there's anything done, it should be on an interim basis.

11   But also, Your Honor, these motions, you know, do raise some

12   issues that we'll get to when we get to the relief motions.

13   But I don't have schedules.  I don't have anything before

14   me.  While understand that there's a -- an allegation that

15   they have always had a consolidated tax basis, it appears

16   that most of these expenses are being paid by a non-debtor

17   entity.  And so I question how does the -- is it the non-

18   debtor entity that's receiving the income, or is it the

19   debtor that receives the income and then funds this non-

20   debtor entity?

21             THE COURT:  Yes, Mr. Fogarty.  Any response?

22             MR. FOGARTY:  No.  I mean, I think just to

23   clarify, there's no debt associated with the -- I mean,

24   there's a loan that's secured by the vessel.  Otherwise

25   there's no debt associated with these assets.  You know, I

1   think these are sort of annual carrying costs that have been

2   paid, insurance, things like that.  That's why they wouldn't

3   be in the budget.  If no insider is benefiting from any of

4   this, it's a two-way street.  I mean, the debtor pays

5   landscaping for the house in Sarasota.  That I think --

6              THE COURT:  But you said nobody lives there.

7              MR. FOGARTY:  No, Mrs. Logan --

8              THE COURT:  Oh.

9              MR. FOGARTY:  -- Mr. Peterson's client lives

10  there.  So I think what we're trying to do is, you know,

11  again, the plan brings all these things in.  You've got to

12  carry them.  Let's continue to carry them the way they've

13  been carried in the same way that's been happening for years

14  and years.  And let's focus on the plan and resolve those

15  things.

16              We're happy to do all of these things on an

17  interim basis.  Obviously we're happy to give as much

18  information as Mr. Peterson and his client need or feel they

19  need.  Happy to, you know, have all of those things done,

20  and we're happy to come back, Your Honor.  We have a status

21  conference on the 27th of January.  I'm happy to come back

22  before then if that's helpful to, you know, again, just have

23  a follow-up to touch base on where these things are.  So...

24              THE COURT:  Very good.  Anybody else wish to speak

25  to the critical vendor request, the payment of the $748,000?

1    Okay.  So on the motion to pay ordinary course expenses, the

2    Court will provide that obviously the debtor can pay all

3    ordinary course expenses associated with the business.

4    There will be no payments to insiders, no officer salaries,

5    and no payments on behalf of non-debtors at least for the

6    first month of the case.  And it doesn't look like there

7    were a lot even proposed in the first month of the case, so

8    I don't know that that's a very significant matter.  And Mr.

9    Fogarty, you can give me an order --

10             MR. FOGARTY:  Thank you, Your Honor.

11             THE COURT:  -- along those lines and we'll come

12   back -- I'm going to hold the date for a second while we

13   figure it out.

14             MR. FOGARTY:  Thank you.

15             THE COURT:  And then on the motion for authority

16   to pay critical vendors, I don't hear any objection from any

17   party.  It sounds like it's an important function.  The only

18   thing that there -- the record is a little sparse as to

19   whether or not the vendor would threaten not to perform.

20   But in looking at the contract, it appears that there's not

21   a committed term.  So that may be a realistic proposition

22   especially with a foreign manufacturer even though they --

23   it looks like the broker is located in the states.  So I'll

24   go ahead and authorize that payment.

25             MR. FOGARTY:  Thank you, Your Honor.

1              THE COURT:  And then that brings us to the

2       competing motions with respect to the automatic stay.  And

3       for that I'm going to start with Mr. Peterson since that's

4       his as filed on an emergency basis.

5              MR. PETERSON:  Your Honor, thank you.  Edward

6       Peterson on behalf of Janice Logan as trustee.  Your Honor,

7       these motions have been fully briefed.  There's a lot of

8       background.  They have Mr. Schoenfeld --

9              THE COURT:  Please don't file another motion that

10      long again or I will reject it.  I will tell you now.

11             MR. PETERSON:  Understood.  Okay.  I think part of

12      the problem is probably the exhibits, but --

13             THE COURT:  Well, it's on an emergency basis, so I

14      figured things are --

15             MR. PETERSON:  Yeah.

16             THE COURT:  -- thrown together --

17             MR. PETERSON:  Yeah.

18             THE COURT:  -- quickly, but --

19             MR. PETERSON:  We --

20             THE COURT:  -- seriously, that's too much for a

21      motion to lift stay.

22             MR. PETERSON:  I understand, Your Honor.  Thank

23      you.  So the -- we have under -- what we're here asking you

24      for is to lift the automatic stay for calls under Section

25      362 to allow the litigation that's been pending for almost

1    two years in state court in front of Judge Carroll to

2    proceed.  I think there's an argument about whether the stay

3    even applies to what is essentially a dispute between two

4    shareholders and valuation of the shares.  But even if the

5    stay does apply, there's ample calls to lift it.  And I'm

6    sure what we're going to -- what we've heard and what we're

7    going to hear is, well, judge, we filed a plan, we got it

8    all teed up.  Let's get to confirmation.  That's why we're

9    here.

10         And as someone who represents a lot of debtors,

11   I've made that argument a million times.  Judge, we're all

12   good.  We got a plan.  We got one forum for Your Honor to

13   deal with it.  That doesn't work in this case, and it

14   doesn't work in this case because of where we are right now

15   with the state court litigation.  We've got already teed up

16   in early February a -- they can call it an evidentiary

17   hearing or a trial on the amount of the liability under the

18   agreement with Mr. Kirk's client, who is also owned by the

19   principal of the debtor.  So they're on both of sides of

20   this issue.

21         And remarkably, they want that debt to be high.

22   Of course we want it to be low, and we don't think it's a

23   valid debt a set forth in the pleadings.  But that issue is

24   already teed up.  The parties have been litigating for a

25   year and half.  Judge Carroll's had several hearings.  He's

1    had a mini trial.  And so that issue is teed up, and also

2    the date of the valuation of the interest.

3              There's then a second trial set in May that will

4    resolve the issue of what is the value of the stock interest

5    and also for the buyout.  And also there are claims for

6    breach of fiduciary duty that are also set at that time.  So

7    when you look at where we are, a lot of things are going to

8    be resolved through the -- by the state court.  And then if

9    we had -- and if we win at the first part of the trial, we

10   don't think they need to be in bankruptcy.

11             And if you look at the budget that they attached

12   to the plan, it's clear they don't need to be in bankruptcy

13   if we win on the issue of the IP debt.  And that's ready to

14   go in early February.  If we lose and there is this large

15   liability, then they've got the plan ready to go and we can

16   deal -- if we lose, we're kind of back where we are.

17   Somebody still has to resolve the issue of the valuation,

18   but that issue needs to be resolved and it's already set up

19   to be resolved.

20             And when you look at what -- the factors that the

21   courts look at in terms of lifting the stay, was it filed on

22   the eve of a trial?  This case was filed on the eve of

23   trial.  Is it clear that the purpose of the filing is to

24   abuse the judicial process?  The only reason we're here is

25   because of that litigation.  And the only thing that has

1      changed in the last few years of this debtor financially is

2      the adverse rulings that they were getting from the state

3      court.  That's the only reason we're here.

4              We -- this debtor does not need to be before Your

5      Honor other than to try to use this court to resolve what is

6      essentially a shareholder dispute.  The other factors that

7      the courts look at is the balancing of harms.  We're already

8      well into this process.  Judge Carroll is intimately

9      familiar with the issues.  And to have to come back to go to

10     this court, I'm trying to envision how this would even work

11     in the context of plan confirmation.

12             You'd have to have a few different contested

13     matters teed up in terms of their motion to assume the HLFIP

14     license agreement.  They would object to our claim.  Your

15     Honor would have to figure out the value of the stock

16     interest for absolute priority rule problems.  And to have

17     to now stop and do that in this court prejudices my client,

18     and especially when we're already teed up and down the road

19     with the state court.

20             The courts also look at whether there is really a

21     financial need to file.  And again, the only reason they're

22     filing is because of this alleged liability under this IP

23     agreement.  And if we win on that, there does not appear to

24     be a reason for them to be here.

25             THE COURT:  Tell me exactly what is teed up for

1    this initial evidentiary hearing in February.

2            MR. PETERSON:  So --

3            THE COURT:  What is the issue?

4            MR. PETERSON:  So my understanding is there's two

5    issues.  One is, what is the amount of the liability under

6    the IP agreement?  And number two, what is the date for the

7    valuation for the buyout?  And we've got to keep in mind

8    also they initiated the election to buy the stock.  And so

9    there's a -- as Your Honor knows, state statute spells out

10   how this dispute is resolved.  And they don't like how

11   things are going and so now they want to come back here.

12   But there's already a process --

13           THE COURT:  But any ultimate decision by the state

14   court is an equity interest.  So --

15           MR. PETERSON:  Right.

16           THE COURT:  -- your client's interest would be,

17   even under the state statute, subordinated to any other

18   creditor in the case.

19           MR. PETERSON:  That's probably accurate, yes.

20           THE COURT:  It is.

21           MR. PETERSON:  Yeah.  So that -- it -- so that's

22   what we're talking about is as teed.  So that's the first

23   part.  And then the second part is what is the actual value

24   --

25           THE COURT:  Okay.

1           MR. PETERSON:  -- in the second part.  So Your

2      Honor --

3           THE COURT:  And so your motion is specifically

4      asking for relief from the stay in order to proceed to an

5      order on those two issues by the state court?

6           MR. PETERSON:  Yes, Your Honor.

7           THE COURT:  Okay.

8           MR. PETERSON:  Yep.

9           THE COURT:  And not the May -- you're not

10     addressing the May proceeding yet?

11          MR. PETERSON:  Well, that -- I'm sorry, and the

12     May proceeding.

13          THE COURT:  Okay.

14          MR. PETERSON:  I'm sorry.  I misunderstood when

15     you said to both of them, the January and the May.  Because

16     if you -- all those issues are going to have to be dealt

17     with before we get to confirmation.  What's the amount of

18     liability under the IP agreement?  What's the value of the

19     stock interest?  These fiduciary duty claims are going to

20     have to be dealt with.  Breach of fiduciary duty claims are

21     going to have to be dealt with in the liquidation analysis

22     and the liquidation test.

23          At that point, we know where we are in the case in

24     terms of those four main issues.  And they're ready to be

25     teed up and ready to go.  Your Honor, this case is just

1    another part of the debtor's delay to continue to avoid

2    paying my client the value of the shares.  We shouldn't be

3    here.  It smacks of bad faith, the timing of the filing.  We

4    don't have schedules yet.  They want to go to confirmation.

5    It's going in a way that is clear they just want to try to

6    railroad us through the process and avoid what is already an

7    efficient process set up for determining these issues.

8         And now they want Your Honor to determine it.

9    Obviously Your Honor's more than capable of determining it.

10   We're not saying that.  But there's no reason to be here

11   based on where we are with the state court.  And those

12   issues could be resolved by May.

13        Your Honor, we also have a motion to dismiss.

14   It's not set today, but you could abate the case pending

15   resolution of those issues, which is going to clarify a lot

16   of the issues for confirmation, and then we come back after

17   that.  We do think the case would be to -- should be

18   dismissed and we would argue that separately.  But -- so

19   that's our argument, Your Honor.

20        THE COURT:  Very good.  Thank you.

21        MR. PETERSON:  Thank you.

22        THE COURT:  Mr. Fogarty?

23        MR. FOGARTY:  Thank you, Your Honor.

24        THE COURT:  You have basically a response to his

25   motion, but you have your own motion as well.  So you can

1    proceed on that as --

2              MR. FOGARTY:  Thank you.  I don't think there is

3    or can be a dispute about the issues that were -- that are

4    being sought -- sent back to Judge Carroll are core

5    bankruptcy issues, right?  So we're talking about claims

6    against the debtor, the royalty.  We're talking about

7    whether it's property of the estate.  What is property of

8    the estate with respect to all these other assets that we've

9    talked about?

10             We're talking about assumption and cure of an

11   executory contract.  We're talking about liquidating claims

12   for purposes of confirmation, and all of those are

13   fundamental to the bankruptcy process.  And so I don't --

14   and to the extent that there are breach of fiduciary duty

15   claims, Your Honor, I mean, those are clearly property of

16   the estate.  They clearly belong to the debtor.  They're

17   clearly being pursued on a derivative basis.  And so all of

18   this stuff I think clearly is subject to the automatic stay.

19   So that's I think point one.

20             So two then, is there cause to lift the automatic

21   stay?  And there is a disagreement about where parties are

22   in the state court.  You heard two years, and that may be

23   superficially true.  It's not like a court has been

24   considering the cure and assumption issues for two years,

25   right?  Which is what we're talking about.  So it's not --

1    Judge Carroll hasn't been the judge for two years.

2              And so the fact that this morass of state court

3    litigation has been going on for a long time is true, but

4    it's not the issues that are being tried that need to be

5    determined in consideration with the plan.

6              THE COURT:  But bottom line, isn't the plan that

7    you filed just designed to address that litigation and

8    nothing else really?

9              MR. FOGARTY:  No.  I think it's --

10             THE COURT:  Which may be fine, but I'm just

11   saying, isn't that effectively what it is?

12             MR. FOGARTY:  So I think it probably depends on

13   how you look at it, Your Honor.  If --

14             THE COURT:  So we just --

15             MR. FOGARTY:  Yeah.

16             THE COURT:  -- authorized the payment of your

17   largest unsecured creditor.  That's gone.  So the only, you

18   know, creditor really is Mr. Kirk's client and maybe Ms.

19   Murray's client over here who's owed, what, about 100,000 or

20   something?

21             MS. MURRAY:  150-ish.

22             MR. FOGARTY:  The problem with the state court

23   litigation, Your Honor, is it has -- the debtor doesn't have

24   a clear and definite exit.  The benefit of the plan is the

25   debtor has a clear and definite exit that preserves all of

1     these issues to be decided but in context.  So the state

2     court dissolution action, the court will determine a

3     valuation.  But why wouldn't you have the valuation in light

4     of the projections that are necessary for the debtor to

5     confirm a plan, right?  So what the plan does is prevent the

6     situation.  For example, this is what happens when we win,

7     right?

8              What they didn't talk about is what happens when

9     we lose.  Where does that leave the debtor?  That leaves the

10    debtor right back here.  What happens if there's a valuation

11    that doesn't match economic realities?  There's a clear golf

12    between what the perception of the value of this company is.

13    Not to run the company down, but there's a clear dispute in

14    -- not dispute, but there's a difference in perception of

15    what the value is, right?

16             And state courts are not set up to do that.

17    That's what this court is designed to do.  And so what -- I

18    think what this does, Your Honor -- yeah, if you could wave

19    a magic wand and eliminate all of these disputes, the

20    underlying company is fine.  That's not what the state court

21    is going to do.  What it's going to do is after -- and I

22    don't think anybody would really say this is going to be

23    done in May, but the debtor will spend millions of dollars

24    in legal fees and potentially be right back here.

25             And the problem is you've seen the financials that

1   these guys have been living with the litigation about the

2   company.  They're -- among their, you know, reams of

3   exhibits are all of the debtors historical financial

4   information, right?  So everybody knows what this company

5   is.  But this is the way to have this -- what bankruptcy

6   courts do, right, take the value, extricate it from these

7   problems, and restructure, but -- and resolve the problems

8   in a fair and equitable manner.

9           And this is, you know, the 90/10 rule.  Not the

10  80/20 rule, it's the 90/10 rule, right?  We can get 90

11  percent of the outcome for 10 percent of the cost, right?

12  So their -- the state court has a trial on why I should use

13  one valuation date and not another.  And clearly, that's --

14  that is a piece of information that used -- that should be

15  used in determining the amount of their claim for

16  distribution under a plan.  But I don't know that the state

17  court is the most efficient way to do that given the

18  context.  So those would be -- I think that hopefully is a

19  direct answer to the question.

20          THE COURT:  Well, I guess I'm thinking, you know,

21  why would a company in bankruptcy care about the value of

22  what is essentially a stock interest?

23          MR. FOGARTY:  Yeah, because the company is a

24  litigant in all of that, and the company needs to make sure

25  that it has the ability to operate.

1              THE COURT:  But if the company doesn't pursue it,

2      then it's the stockholder who -- the other stockholder who

3      steps in and pays it if they want the stock.  I mean, why

4      would -- what does the company want its own stock?

5              MR. FOGARTY:  So if this were a building --

6              THE COURT:  Mm-hmm.

7              MR. FOGARTY:  -- Your Honor, there may be some

8      logic to that.  If this were a hotel, if this were something

9      that was being run by professional management team, there

10     may be some logic to that.  But the operations are done on

11     this side of the room, and you can't let somebody that has

12     no involvement in the operations determine the future of the

13     company when somebody's got to run it once the litigation is

14     done.  So this is a way, Your Honor, that keeps everybody

15     engaged, that preserves value for everyone, keeps the --

16             THE COURT:  Essentially what the litigation

17     provides is that the debtor company would pay the other

18     stockholder for the value.  The stock would then come into

19     the company, and then de facto Mr. Logan would be 100

20     percent.  Is that not what the purpose of this rather than

21     proceed with the dissolution which had been requested in the

22     state court action?

23             MR. FOGARTY:  Yeah, I think that's ultimately how

24     the dissolution process roughly works.

25             THE COURT:  So that benefits Mr. Logan, not

1   necessarily the debtor.

2          MR. FOGARTY:  No, it benefits the debtor because

3   it makes sure that the debtor can continue to operate and,

4   you know, continue to operate going forward, Your Honor.  I

5   think that's the difference.

6          THE COURT:  Okay.  All right.  What about your

7   motion?  Is there anything in addition that you'd like to...

8          MR. FOGARTY:  No, I -- you know, not to -- I'm

9   happy to answer questions, but I think our motion is --

10          THE COURT:  Your motion's not seeking any kind of

11   sanction for a stay violation.

12          MR. FOGARTY:  We are not seeking --

13          THE COURT:  That they --

14          MR. FOGARTY:  -- sanctions, Your Honor, at this

15   point.  I mean, clearly we'd like for the court to say to

16   the people in the courtroom, the stay applies, everything is

17   stayed.  Things happen here.  Maybe just to put a point on

18   it, right?  There's a hearing in -- on Judge Carroll's

19   February trial calendar, right?  We filed a motion to ask

20   the Court to set confirmation in February, so basically the

21   same track.

22          I think -- how do we do -- I think one of Mr.

23   Peterson's questions was, you know, how exactly do we

24   resolve that in this court, right?  It's a couple of

25   experts.  What's the royalty rate?  And then you're talking

1   about projected disposable income and best interest, and

2   those are things that this court does all the time and

3   bankruptcy lawyers do all the time.  So I don't think it's

4   significantly different.  There's depositions that were

5   scheduled that, you know, maybe people want to take, maybe

6   they don't want to take given where we are in the bankruptcy

7   case, given what the playing field is.  Again, that sort of

8   80/20 rule.

9           But we can do all those before February in front

10  of this court.  They have to get done before February anyway

11  if people are going to go to trial in front of Judge

12  Carroll.  So the timeline isn't different.  It's just this

13  is a court that can actually resolve the issues and resolve

14  it efficiently and effectively and has the whole playing

15  field in front of them.  And I'm happy to answer other

16  questions that the Court has or sort of yield time to other

17  people.

18          I'd note that state court's counsel's on.  They're

19  certainly more familiar with procedural postures and things

20  like that in the litigation.  And so if the Court has

21  specific questions about what exactly is teed up, I think

22  there is a --

23          THE COURT:  I see Mr. Kirk jumping up so he may

24  want to --

25          MR. FOGARTY:  Thank you, Your Honor.

1          THE COURT:  -- make some comments.

2          MR. KIRK:  Thank you, Your Honor.  So admittedly,

3     I am new to this case.  Just weeks.  So I --

4          THE COURT:  I think I saw somewhere your firm has

5     been involved for quite some time.

6          MR. KIRK:  Quite some time, but it wasn't me.

7          THE COURT:  Right.  I appreciate that.

8          MR. KIRK:  It wasn't me.  And none of those folks

9     are involved in this issue right now.  So I'm looking at all

10    of this stuff, and I did not read the thousands of pages

11    that were filed in front of you.  But I'm looking at all

12    this stuff, and I've seen all this stuff before, right?

13    It's messy, family dispute centered around a business.  It's

14    ugly.

15          At bottom, though, Your Honor, it's a business

16    dispute with business solutions.  I would say we've heard a

17    lot of things in the papers that I would characterize as

18    messy, right?  I would say that the debtor -- and I commend

19    Mr. Fogarty with it in writing in today in court showed

20    tremendous restraint to not do that back.  Because I think

21    our view is that you don't want to hear that.  You want to

22    hear the business issue.

23          And you know, I have been on that side of the

24    table against Mr. Fogarty saying we should go to state

25    court.  Why are were here?  A family dispute -- I think Mr.

1   Underwood was involved in that case.  Ultimately, the

2   bankruptcy court solved what appeared to be an impossible

3   gridlock that would've taken years in state court, and

4   that's because the bankruptcy code gives Your Honor some

5   unique tools that the state court may not have to resolve

6   with finality, with finality this business issue.

7          You know, what we want, Your Honor, what we want

8   is a counterparty that has a fresh start, sort of untethered

9   from what appears to be endless ugly years of agitation type

10  of litigation so it can pay us a royalty, Judge, because it

11  is a business that has real expenses.  In particular the

12  realest expense is that the IRS has told us we need to pay

13  money for a royalty that we've received even if we have

14  deferred or not paid it because of the nature between the

15  parties.  The IRS has burdened my client with significant --

16          THE COURT:  Why is that my problem if you're not a

17  debtor --

18          MR. KIRK:  Well --

19          THE COURT:  -- in this case?

20          MR. KIRK:  Why is it your problem, Judge?  And

21  I'll -- I mean, you asked why can't the state court solve

22  all of this.  Because if you sort of play it out, Judge --

23          THE COURT:  No, I didn't ask that.  I -- what --

24  and I wasn't being facetious when I said that why is it not

25  -- is it my problem.  It's because your client is an

1   affiliate and it's not in bankruptcy.  So why do I --

2           MR. KIRK:  It's -- but it's the debtor's problem

3   because if -- okay.  Let's -- you asked what would happen

4   when you go back to state court.  Look, I've been in state

5   court enough to know that if I have a trial in front of you,

6   Judge, I know it's going forward.  There's nothing else on

7   the calendar.

8           That is not so in state court either for the

9   February trial or the May trial.  So we don't know if this

10  thing is going in 2025.  That is just fact.  So this notion

11  that this will be done in February I think is unclear to

12  everybody involved, and I don't think anybody would say

13  otherwise.

14          THE COURT:  So if I may ask you the question that

15  I asked before, I don't know if I got a direct answer.  Is

16  there an order that precludes the debtor from paying your

17  client right now?

18          MR. KIRK:  There is, as I understand it, an agreed

19  stipulated agreement not to make a payment on the royalty

20  absent further court order.

21          THE COURT:  Okay.

22          MR. KIRK:  That is -- that's there, right?  That

23  was by agreement by my client.  But --

24          THE COURT:  So what the effect of the bankruptcy

25  on that?

1          MR. KIRK:  Your Honor, I think Mr. Fogarty's

2     position, and we don't disagree, is that Your Honor can

3     unwind that agreement and order that payment to start again

4     in the context of a global resolution, Your Honor.  Because

5     the issues that are in front of the state court we think are

6     core issues.  Mr. Fogarty laid them out.  They are assets of

7     the debtor.  They're claims of the debtor.  They're

8     liabilities of the debtor.

9          And Judge, I think what's important -- the point I

10    wanted to make is that, okay, we get to whenever we get to

11    the end of that phase one of the trial, and the state court

12    let's say decides the royalty is one percent, two percent,

13    three percent, something commercial.  Has to be more than

14    zero, right?  No commercial exclusive IP agreement would be

15    zero percent.  But let's say it's something like that, but

16    we are tethered with a 15 to 20 percent IRS obligation.

17         Why would we ever continue that agreement?  We

18    would terminate it.  That'd be the end of it.  And the

19    debtor would then be without any intellectual property to

20    operate its business.  And we would then be either back here

21    or in a different situation, but we could never, I think,

22    Your Honor, be sitting in a situation where we're incurring

23    massive IRS liability because that's what the IRS code says

24    and not get paid for anything.  That makes no logical sense.

25         So I think, you know, Your Honor can resolve that

1    in a plan.  Your Honor can resolve that in a consensual plan

2    that locks in some type of an agreement, commercial

3    percentages, right?  It's not a difficult dispute.  You're

4    going to have experts testifying.

5            THE COURT:  I think the operative word you just

6    said is consensual.

7            MR. KIRK:  Well, Your Honor, look, you would

8    ultimately get to confirm a plan or not.

9            THE COURT:  I agree with you that I could --

10           MR. KIRK:  Right.

11           THE COURT:  -- I could solve all of this --

12           MR. KIRK:  Solve all of this.

13           THE COURT:  -- in 30 days if it was consensual.

14           MR. KIRK:  Or 60 --

15           THE COURT:  Or faster.

16           MR. KIRK:  -- or 90 days.  Whatever the case is.

17   But I am convinced, Your Honor, after being in bankruptcy

18   court and state court for now 25 years that things happen

19   faster here because you recognize, Your Honor, as a

20   bankruptcy judge that sees what dilatory litigation looks

21   like and the cost and the burden on the debtor, right?  This

22   is a massive distraction to put all that behind us.

23           And ultimately, Judge, I remember the first day at

24   bankruptcy court.  Fresh start.  That is the purpose of

25   this, and that is what I think the debtor is asking for.

1    That is what we want, just to be untethered from this.  The

2    chips will fall where they may.  You'll tell us what the

3    royalty rate is, what a commercial rate is.  I would suggest

4    it's higher than zero since we have a massive tax liability

5    relating to it.  But you'll tell us and the chips will fall

6    where they may.  As the debtor suggested, they're throwing

7    all of the assets into a pot and you'll split them up.

8              And so I think like when I look at what the

9    purpose of bankruptcy is, it is to give a fresh start, to

10   look at the entire chess board, not just one issue on

11   February, March, April, May maybe, then come back for the

12   other issues maybe this year, maybe next year, maybe the

13   year after that.  No, you can resolve them all and look at

14   issues beyond that and try to give a debtor the fresh start.

15   So Your Honor, that's all I wanted to say.  Thank you.

16             THE COURT:  Appreciate it.  Thank you.

17             MR. DIXON:  Your Honor, if I can interject on

18   behalf of HLFIP and just to add something that Mr. Kirk

19   raised.

20             THE COURT:  Sure.  Mr. Dixon?

21             MR. DIXON:  Steve Dixon, yes.  Thank you.  So

22   there was a question -- I believe the Court asked a question

23   about whether the HLFIP's tax debt means anything to the

24   debtor.  Those -- the taxes of HLFIP and the taxes of the

25   debtor are inextricable.  HLFIP reported 40 million -- about

1    $40 million of income from the royalty license and it --

2    that leads to about a $10 million ongoing tax bill for

3    HLFIP.  Smart, the debtor, took a royalty expense in '22 and

4    '23.  If this court or the state court were to zero out the

5    royalty, then HLFIP would have no choice but to go back and

6    amend its returns for '22 and '23 reversing the income that

7    it reported.  That means that on the debtor's side, it now

8    has expense deductions to which it was not entitled.  It's

9    two sides of the same coin.

10             THE COURT:  Understood.

11             MR. DIXON:  And so there are real tax effects for

12   the debtor if HLFIP were to have to amend its return based

13   on a holding in either court.

14             THE COURT:  Very good.  Yes.  Anybody else on this

15   side?  Any comments?  Mr. -- before I go back to Mr.

16   Peterson.  And I'll give...

17             MR. FOGARTY:  Yeah, two brief ones, Your Honor.  I

18   wanted to point out there are other contingent unliquidated

19   claims that are on the 20 largest that would be resolved.  I

20   think the asserted amounts of the liability in those, which

21   the debtor would dispute, would be in excess of the

22   Shenzhen.  So there are other unsecured creditors that those

23   disputes need to be resolved that are not subject to the

24   state court litigation.  So I do want to make that point,

25   and that's in the 20 largest creditors.

1            And then just to point out the way the plan is

2      structured, it has a toggle feature.  So if the Court

3      determines that this -- as Mr. Kirk pointed out, if the

4      Court determines that transfer pricing rules under IRS,

5      there is -- there has to be some royalty rate even between

6      affiliated entities, here's what it is.  That feeds into the

7      plan.  There's an alternative if the Court says it's zero,

8      again, it feeds into the plan.

9            And so if you look at the projections, the design

10     is to account for those differences so that the Court can

11     confirm the plan and do it quickly.  You said you can do it

12     consensually in 30 days and I think you meant --

13            THE COURT:  I was --

14            MR. FOGARTY:  -- between us.

15            THE COURT:  -- exaggerating, but consensually

16     between you.

17            MR. FOGARTY:  Yeah.  I think we've -- we took time

18     and were hoping to file the plan sooner, but took time to

19     try to make sure that you have the tools, you have kind of

20     the structure in front of you to be able to resolve it even

21     non-consensually and do it quickly to get everybody to the

22     issues, right?  To get everybody focused on a resolution and

23     to do that within the 80/20 rule.

24            THE COURT:  Okay.  Mr. Peterson?

25            MR. PETERSON:  Judge, we keep hearing bankruptcy

1    is for a fresh start.  Bankruptcy is not to benefit one

2    shareholder, and that's what this whole case is about.  And

3    it's so glaringly transparent when you look at the plan that

4    they filed.  HFLIP is going to get all the equity.  Now

5    we're hearing from counsel we're concerned about HFLIP's tax

6    liability.  That's why we're here.  So at the end of the

7    day, as Your Honor pointed out, the result of the state

8    court proceedings is going to benefit Mr. Logan.  That's why

9    we're here.

10            The plan tries to resolve all of that litigation

11   in favor of Mr. Logan and his -- it's not -- it's --

12   basically HFLIP is Mr. Logan.  So this case should not be

13   here.  It's frankly kind of an insult to the process that

14   this case was filed, and there's no way that the case should

15   go forward.  I don't even know if it's a Sub V because I

16   haven't seen schedules.  So they want to go forward with a

17   plan.  The -- so that issue has to be resolved first.

18            And the notion that somehow you can undo a state

19   court injunction order, I don't understand that either.  I

20   mean, that order is in place.  They don't have to pay the

21   royalty right now.  They're not supposed to pay the royalty.

22   And I don't know how you undo that under the Rooker-Feldman

23   doctrine.  So --

24            THE COURT:  Well, that's not a final judgment, so

25   Rooker-Feldman --

1          MR. PETERSON:  I understand.

2          THE COURT:  -- wouldn't apply.  But there are

3     other concerns like --

4          MR. PETERSON:  There are other issues here, so --

5          THE COURT:  -- comity and -- yeah.

6          MR. PETERSON:  -- Your Honor, we would ask that

7     the stay be lifted.  We're ready to go to trial.  The state

8     court is ready to resolve these issues, and we think the

9     case should be dismissed.  That's not before Your Honor, but

10    thank you.

11         THE COURT:  Anything else?  Anybody -- other

12    party?  Ms. DiSanto?

13         MS. DISANTO:  Thank you, Your Honor.  Like many of

14    the other lawyers in the room, I think we've all been on

15    various sides of these type of family business disputes that

16    find their way to bankruptcy court and have overlays in

17    state court or other places.  I recognize one of the

18    challenges in this case is that things need to move quickly

19    because time's blocked off with Judge Carroll in February of

20    2025.

21         But we also are in the first couple of weeks of a

22    bankruptcy case.  We aren't operating with the benefit of

23    schedules that I think would allow the parties to further

24    evaluate the benefits and you know, even maybe some of the

25    disadvantages that might come from proceeding in this court.

1    The hallmarks of a Subchapter V case are speed,

2    transparency, and I think the opportunity for creative

3    business solutions.  And this case is here.  I think the

4    debtors expressed a willingness to move quickly so that if

5    the Court can accommodate, there's at least an opportunity

6    to stay on pace.  And Subchapter V is I think, in some ways

7    unforgiving in terms of delay.  That's just not something

8    that this process tolerates.

9            And you know, if the concern is that, you know,

10   this proceeding, the bankruptcy case, is going to cause

11   delay, I'm not sure that I see that.  I mean, we move our

12   cases through.  That's what this court does.  That's what

13   the lawyers here are very talented at doing, and I think

14   there's an opportunity for that.

15           In terms of transparency if, you know, the concern

16   is that transfers were made that maybe shouldn't have been,

17   you know, on both sides of the equation, that's something

18   that we see in family businesses.  Things are just done a

19   certain way and they continue on in that way.  And it's not

20   a problem until it is.  But I think again, this process

21   gives the opportunity to provide transparency to -- for the

22   debtor to provide potentially disclosures and additional due

23   diligence to allow all the parties, you know, to the extent

24   they don't already have it, from discovery in the state

25   court action to evaluate those potential assets of the

1    estate and pull those in.

2            You know, I also question -- the problem I think

3    sometimes when you have the duality of a bankruptcy

4    proceeding is --

5            CLERK:  Oh, you maybe have to hit okay first to

6    acknowledge that it's being recorded.

7            WOMAN:  Oh, I have...

8            THE COURT:  Okay.  Go on.

9            MS. DISANTO:  Sorry about that, Your Honor.  Is --

10   you know, is trying to manage the sequencing of issues.  I

11   do think it is important.  Maybe today isn't the day that

12   we're at the actual fork in the road where we have to make

13   that final decision about whether it's better for this court

14   to handle the issues or it's better for state court to

15   handle it.  I don't think that there's a lot of time given

16   the timelines we're talking about.

17           But I do think the parties might benefit from

18   exploring what this court can handle, you know, by consent

19   or otherwise.  And you know, I think both sides -- you know,

20   there may not be a clear path as to, you know, what could be

21   done in state court and what could be done here.  I don't

22   think proceeding on a dual track is the way it should go at

23   all.  But you know, if there's these breach of fiduciary

24   duty claims, I can already see how even the pendency of this

25   case could, you know, cause certain things to get carved out

1   of what the state court would be capable of being resolved

2   or, you know, maybe what even should be resolved there.

3            But I -- you know, I don't know how much time the

4   Court can give the parties to allow schedules to be filed so

5   that we can all operate a more full information to try to

6   determine where best these issues should be resolved.  But I

7   don't know if we have all the tools that we need to be able

8   to do that today.  Thank you, Your Honor.

9            THE COURT:  Well, I agree with that.  Mr. Fogarty?

10           MR. FOGARTY:  I'm sorry.  I didn't -- certainly

11   others should be heard before I'm heard again, so...

12           THE COURT:  All right.  Ms. Murray?

13           MS. MURRAY:  Thank you, Your Honor.  This is a

14   little unorthodox in terms of the -- what I've heard and I'm

15   obviously new to this case too.  And my client is a good

16   customer of the debtor, but having had the benefit of the

17   conversation here, I'm going to go back just a minute.  And

18   if Your Honor is willing to -- I know we just ruled on the

19   critical vendor stuff, but if we're going to set short

20   deadlines, I think that having understood what the plan is,

21   even though it was just filed two days ago, hadn't gotten

22   through it yet.  But if Your Honor would continue that for

23   even a short period of time, if it -- it sounds like the

24   plan and the --

25           THE COURT:  I don't think I've set the plan for a

1    hearing yet.  I think Mr. Fogarty filed a motion asking me

2    to set it and I didn't.  So...

3              MS. MURRAY:  Correct.  It's not set for today, but

4    --

5              THE COURT:  No, no.

6              MS. MURRAY:  All I'm saying is --

7              THE COURT:  Not even close.

8              MS. MURRAY:  -- I hadn't had the benefit of

9    getting through that lengthy document yet, and then hearing

10   the recitations of the issues today causes me to ask the

11   Court for a little more time, even if a short period of

12   time, to look at the critical vendor issue because it does

13   affect my client given what we've heard here today and the

14   top 20 issues that we've just discussed.

15             THE COURT:  All right.  So Ms. Murray's client is

16   not a critical vendor.  Is that...

17             MR. FOGARTY:  Ms. Murray's client is -- our view

18   falls under the category of executory contract counter

19   parties that we would pay in the ordinary course without

20   that constituting an order assuming the contracts.

21             THE COURT:  So just post-petition amounts due.

22             MR. FOGARTY:  We'd pay as those amounts come due.

23   So we'd be essentially paying the cure claim.  So...

24             THE COURT:  But not until it's assumed.

25             MR. FOGARTY:  I'm not sure exactly where we are in

1    that relationship.  We can pay the next post-petition

2    payment to Ms. Murray's client.  I think that's the relief

3    that we're seeking.

4              THE COURT:  If you do that, Mr. Fogarty, you're

5    going to end up having no creditors.

6              MR. FOGARTY:  I don't perceive that to be a

7    problem --

8              THE COURT:  Okay.

9              MR. FOGARTY:  -- Your Honor, for all of the

10   reasons that you've heard.  I think the thing that we can't

11   have is -- we have 120 facilities.  We have four locations.

12   This is an intensely competitive industry.  And we're trying

13   to fight off competitors that are running us down and, you

14   know, making sure that we're able to assure our clients and

15   our vendors.  I think it's important -- I think we --

16   sometimes we -- that -- you lose that in state court, right?

17   You just assume that everything is going to be great and

18   fine.

19              But this litigation is not inexpensive, Your

20   Honor.  You've seen the budget.  The margins are small,

21   right?  So I think all of that is why speed within the

22   confines of ground rules is necessary for this company in

23   particular.  I think --

24              THE COURT:  I agree with that, and that's --

25              MR. FOGARTY:  Yeah.

1          THE COURT:  -- why I'm authorizing --

2          MR. FOGARTY:  Thank you.

3          THE COURT:  -- the critical vendor and the

4    ordinary course --

5          MR. FOGARTY:  Right.

6          THE COURT:  -- expenses.  And I do believe that it

7    is in everybody's best interest that the company thrive no

8    matter which side of the room that you're on.  Here's my

9    concern, though, and that's with the issue with Mr. Kirk's

10   client.

11         MR. FOGARTY:  Yep.

12         THE COURT:  I mean, I know you are our fiduciary

13   and Mr. Logan is supposed to be a fiduciary for the estate,

14   but he's on both sides of that transaction.  And that's

15   disturbing.

16         MR. FOGARTY:  Yeah, I --

17         THE COURT:  If you're telling me, you know, you

18   want to come to bankruptcy court and have you with Mr. Logan

19   against Mr. Kirk with Mr. Logan and have me to decide the

20   issue, that's troubling.

21         MR. FOGARTY:  Understood.  That's not what we're

22   trying to do.  That's not what the plan does.  Because the

23   Court ultimately is going to make the decision about -- and

24   it's a transfer-pricing issue, right?  What's the right

25   rate?  The expert that Mr. Peterson's client is going to put

1    on in front of Judge Carroll can sit there and tell the

2    Court what a commercial royalty rate in this type of an

3    environment is.  And the Court can determine that that's the

4    amount of the cure going backwards and that's the rate going

5    forwards, right?

6            So I mean, I think maybe that's where the -- it

7    would benefit everybody reading the plan.  It would benefit

8    everybody having the schedules.  It would benefit everybody

9    having the 341 meeting.  All of that stuff happens

10   admittedly at a holiday.  So you know, my suggestion would

11   be let's come back early January.  Let's see where we are.

12           Let's -- because we can have those discovery -- we

13   can have that discovery take place in the confines of a

14   contested matter in front of this court and people can be

15   prepared for trial.  None of those depositions have taken

16   place for a trial in the state court.  So they have to

17   proceed anyway.  Let's let them proceed here.  We'll come

18   back and we can reassess.

19           THE COURT:  Okay.  Very good.  Thank you.  Ms.

20   Murray, did you have any other comments?

21           MS. MURRAY:  No, Your Honor.  Thank you.

22           THE COURT:  Okay.  Yep.  All right.  So we've

23   already addressed the two motions on Docket Number 3 and

24   Docket Number 4.  And I have before me a preliminary hearing

25   on an emergency motion for relief from stay and request for

1    comfort order, which is on our docket.  It's actually Docket

2    Number 26, the motion by Janice Logan as trustee seeking

3    relief from the stay.  I have listened to the arguments, and

4    great arguments on both sides.  I appreciate it.

5              And I've reviewed a ton, a ton of documents.

6    Orders from the Delaware Court of Chancery I reviewed.  I

7    reviewed the orders by the Tennessee District Court, the

8    federal court of appeals affirming an order from another

9    district court dealing with the patent finding them invalid

10   in fact.  And I've read the -- a lot of the state court

11   proceedings.

12             At this point, I am sort of in the same position

13   as the Delaware Chancery Court.  And at least on this

14   initial issue, I'm going to defer to the state court and I'm

15   going to grant the motion on a very limited basis and allow

16   the proceedings that are scheduled for February on the two

17   issues dealing with the validity and extent of the IP

18   agreement and the date on which the valuation should be

19   determined.

20             The state court is not permitted to appoint a

21   receiver of any type so long as the bankruptcy remains in

22   place.  The state court cannot proceed on any breach of

23   fiduciary duties that may be causes of action of the

24   corporation so long as the bankruptcy remains in place.  And

25   just for the limited purpose of deciding those two issues

1    and then it's without prejudice for the movant to come back

2    and seek further relief.

3           With respect to the debtor's motion to enforce the

4    stay, it's denied without prejudice to the extent that that

5    relief would be inconsistent with what I'm ruling in terms

6    of Docket Number 26.  And this is a mess.  And I think

7    everybody who has spoken that says that this would be a good

8    place to resolve it is correct.  Although in reading all

9    that I read, I don't see that there would be a consensual

10   basis, so we need to start picking off these issues as we

11   can and deal with it down the road.

12          For this side of the room, I would encourage you

13   to read the case of Cox Broadcasting, an 11th Circuit case

14   where a shareholder spent years and years and years pursuing

15   relief under the statute and ended up not getting a penny.

16   So it's a risk.  It's an equity interest that you're

17   pursuing, and it's going to be junior to all the other

18   creditors in the case.

19          I wish you all well, but I'm just going to lift

20   the stay for that limited purpose.  I am going to schedule a

21   hearing.  You said we had one on January 27th, Mr. Fogarty?

22          MR. FOGARTY:  I think that's the initial status

23   conference, Your Honor.

24          THE COURT:  Okay.  I do -- I think I do need to

25   address the motion to dismiss probably before that.  Mr.

1    Peterson, I was looking at January 24th for that.

2              MR. PETERSON:  That works for me, Your Honor.

3              THE COURT:  Unless we could do it on the 27th and

4    can waive the 30-day rule or whatever.

5              MR. PETERSON:  Either one's fine, Your Honor.

6              THE COURT:  Okay.  Let's do everything on the 27th

7    then.

8              MR. PETERSON:  Thank you.

9              THE COURT:  And I think that covers everything for

10   today.

11             MR. FOGARTY:  We --

12             THE COURT:  Is there something else?

13             MR. FOGARTY:  We had deferred the comeback date

14   for the other motions.

15             THE COURT:  Oh, I was going to do it the 27th.

16             MR. FOGARTY:  You're going to do it the 27th.

17             THE COURT:  27th.  We'll do everything on the

18   27th.  Is that enough -- if something comes up in between,

19   you know where we are.

20             MR. FOGARTY:  Thank you, Your Honor.  I guess just

21   in terms of the plan, we filed a motion asking the Court to

22   set confirmation on that.  Would the Court like to have the

23   27th be a preliminary hearing on that?  Would the Court like

24   -- how would the Court like to proceed?

25             THE COURT:  Oh, I want to go back and look at

1    that.

2              MR. FOGARTY:  Okay.

3              THE COURT:  I think we've got that in our ordinary

4    course.  We'll send out that order.

5              MR. FOGARTY:  Okay.

6              THE COURT:  It comes out pretty automatically and

7    it's usually about 45 days.

8              MR. FOGARTY:  Thank you, Your Honor.

9              THE COURT:  In view of this case, I don't know

10   that expediting it is prudent at this point.  So we'll

11   probably just go in the ordinary course.

12             MR. FOGARTY:  Thank you, Your Honor.

13             THE COURT:  Okay.  Very good.  Anything else?

14   Very good.  Thank you.

15             MR. PETERSON:  Thank you, Your Honor.

16             (Whereupon these proceedings were concluded at

17   3:09 PM)

18

19

20

21

22

23

24

25

1                       I N D E X

2

3                          RULINGS

4                                          Page        Line

5    Motion to Pay Ordinary Course Expenses    29          1

6    Motion to Pay Critical Vendors            29          15

7    Motion for Relief From Stay & Comfort Order  60        24

8    Motion to Enforce the Stay                62          3

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T I O N

2

3          I, Rita Weltsch, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Rita Weltsch

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  December 26, 2024

**[& - address]** Page 1

| & | | |
|---|---|---|

**&** 3:3 4:8,15
70:7

| 0 | | |
|---|---|---|

**07106** 1:3

| 1 | | |
|---|---|---|

**1** 2:1,4 18:23
70:5
**1.1** 19:16
**10** 45:11 55:2
**100** 5:3 10:20
46:19
**100,000** 43:19
**1000** 3:19
**11** 20:24
**110** 3:5
**111** 4:17
**11501** 71:23
**11th** 67:13
**12/10/2024** 2:5
**120** 9:23 63:11
**1200** 3:12
**12151** 71:6
**15** 52:16 70:6
**150** 43:21
**17** 2:17 14:13
**1800** 5:10
**19** 1:15 2:11
**1:17** 1:16

| 2 | | |
|---|---|---|

**2** 2:5,8
**20** 11:23 52:16
55:19,25 62:14
**200** 3:5
**20004** 4:4

**201** 5:10
**2024** 1:15
71:25
**2025** 51:10
58:20
**22** 55:3,6
**23** 55:4,6
**2325** 5:3
**24** 1:3 70:7
**24-7106** 6:8
**24-7108** 6:9
**24th** 68:1
**25** 53:18
**26** 2:6 66:2
67:6 71:25
**27th** 33:21
67:21 68:3,6
68:15,16,17,18
68:23
**29** 9:24 70:5,6

| 3 | | |
|---|---|---|

**3** 2:5,13 65:23
70:8
**30** 53:13 56:12
68:4
**300** 71:22
**3100** 4:10
**32801** 1:13
**330** 71:21
**33301** 5:11
**33602** 3:6,13
4:11 5:4
**33607** 3:20
**341** 65:9
**362** 35:25
**39** 14:22,24
16:4

**3:09** 69:17

| 4 | | |
|---|---|---|

**4** 2:5,19 65:24
**40** 54:25 55:1
**400** 4:10
**401** 1:12
**4221** 3:19
**45** 69:7
**4700** 4:17
**49** 2:21

| 5 | | |
|---|---|---|

**500** 4:3
**501** 3:12

| 6 | | |
|---|---|---|

**60** 53:14 70:7
**60606** 4:18
**617** 12:13
**62** 70:8

| 7 | | |
|---|---|---|

**748** 19:11,16
19:22 20:4
**748,000** 22:9
33:25
**748s** 19:18
**750** 19:14,15

| 8 | | |
|---|---|---|

**80/20** 45:10
48:8 56:23

| 9 | | |
|---|---|---|

**90** 45:10 53:16
**90/10** 45:9,10

| a | | |
|---|---|---|

**abate** 41:14

**ability** 9:21
45:25
**able** 56:20 61:7
63:14
**absent** 51:20
**absolute** 38:16
**abuse** 37:24
**acceptable**
8:20
**accommodate**
59:5
**accordance**
13:24
**account** 9:7,8
56:10
**accounts** 11:10
11:11,17
**accurate** 39:19
71:4
**acknowledge**
60:6
**action** 44:2
46:22 59:25
66:23
**activity** 9:6,9
11:14,16
**actual** 39:23
60:12
**actually** 48:13
66:1
**add** 54:18
**addition** 10:22
47:7
**additional** 32:6
59:22
**address** 43:7
67:25

addressed
65:23
addressing
40:10
administered
6:9
admittedly
49:2 65:10
adverse 38:2
affect 62:13
affiliate 9:12
12:10 51:1
affiliated 56:6
affirming 66:8
afoul 21:8
afternoon 6:5
6:17,22 7:2,9
7:12
agent 22:7
agitation 50:9
ago 61:21
agree 25:16
53:9 61:9
63:24
agreed 8:16
51:18
agreement
22:17 23:18
24:9 36:18
38:14,23 39:6
40:18 51:19,23
52:3,14,17
53:2 66:18
ahead 6:16
25:8 34:24
akerman 5:8

allegation
32:14
alleged 38:22
allow 35:25
58:23 59:23
61:4 66:15
allowed 18:1
allows 10:2
32:3
alternative
56:7
amend 55:6,12
amount 8:17
14:2 22:9
36:17 39:5
40:17 45:15
65:4
amounts 19:6
55:20 62:21,22
ample 36:5
analysis 40:21
annual 33:1
answer 29:19
45:19 47:9
48:15 51:15
anybody 22:9
28:9 31:7
33:24 44:22
51:12 55:14
58:11
anymore 31:8
anyway 48:10
65:17
appeals 66:8
appear 38:23
appearance
6:12

appearances
6:10
appeared 50:2
appearing 5:16
appears 32:15
34:20 50:9
application
2:13
applies 36:3
47:16
apply 36:5
58:2
appoint 66:20
appreciate
49:7 54:16
66:4
approach
14:16
approval 16:3
approve 21:1
22:4
approximately
10:20
approximation
18:17
april 54:11
argue 41:18
argument
28:24 36:2,11
41:19
arguments
15:22 66:3,4
arms 31:17,23
arrear 19:23
articulate
21:11

articulated
20:22
articulating
19:21
ashley 4:10
asked 14:9
22:15,21 50:21
51:3,15 54:22
asking 13:6
16:20 20:21
21:1 24:15,17
28:16 35:23
40:4 53:25
62:1 68:21
aspersions
13:17
asserted 55:20
asset 26:9 30:1
30:9
assets 11:15
28:3,25 29:6
29:10,13,24,24
32:25 42:8
52:6 54:7
59:25
associated
26:12,13 32:23
32:25 34:3
assume 24:11
24:15 30:11
38:13 63:17
assumed 62:24
assumes 24:1
assuming
62:20
assumption
42:10,24

| | | | |
|---|---|---|---|
| **assure** 63:14 | 68:25 | **behalf** 2:4,9,15 | **body** 11:23 |
| **attached** 15:4 | **background** | 2:21 6:23,24 | **bokor** 4:8 |
| 16:4 21:11 | 35:8 | 7:3,10 22:12 | **bottom** 15:19 |
| 37:11 | **backwards** | 34:5 35:6 | 43:6 49:15 |
| **attachments** | 65:4 | 54:18 | **boulevard** 1:12 |
| 2:4 | **bacon** 4:15 | **believe** 17:2 | **boy** 3:19 |
| **attorney** 3:4,11 | **bad** 19:20 41:3 | 24:16 54:22 | **breach** 37:6 |
| 3:18 4:2,9,16 | **balance** 20:2 | 64:6 | 40:20 42:14 |
| 5:2 | 20:20 23:7 | **belong** 42:16 | 60:23 66:22 |
| **attorneys** 5:9 | 28:4 | **benefit** 26:1,13 | **break** 23:12 |
| **authority** 2:20 | **balancing** 38:7 | 28:6 43:24 | **brief** 8:11 |
| 14:12 24:15 | **bank** 9:7 11:10 | 57:1,8 58:22 | 55:17 |
| 34:15 | 11:11,17 | 60:17 61:16 | **briefed** 32:4 |
| **authorize** | **bankruptcy** | 62:8 65:7,7,8 | 35:7 |
| 34:24 | 1:1,11,23 6:2 | **benefiting** | **briefly** 9:24 |
| **authorized** | 6:19 15:11 | 25:10,17 33:3 | **brings** 33:11 |
| 43:16 | 19:23 37:10,12 | **benefits** 46:25 | 35:1 |
| **authorizing** | 42:5,13 45:5 | 47:2 58:24 | **broad** 9:22 |
| 64:1 | 45:21 48:3,6 | **berger** 5:13 | **broadcasting** |
| **automatic** 2:9 | 50:2,4 51:1,24 | 7:18,19,19 | 67:13 |
| 35:2,24 42:18 | 53:17,20,24 | **best** 48:1 61:6 | **broker** 18:24 |
| 42:20 | 54:9 56:25 | 64:7 | 34:23 |
| **automatically** | 57:1 58:16,22 | **better** 32:4 | **budget** 10:8 |
| 69:6 | 59:10 60:3 | 60:13,14 | 14:23 15:2,3,7 |
| **avoid** 41:1,6 | 64:18 66:21,24 | **beyond** 54:14 | 16:2,4 17:1 |
| **b** | **base** 33:23 | **bill** 55:2 | 18:19,22 21:11 |
| **b** 1:21 7:19 | **based** 41:11 | **billed** 17:24 | 25:4,6,11 |
| **back** 6:3 17:3 | 55:12 | **bit** 10:19 12:25 | 27:15 33:3 |
| 24:23 32:3 | **basically** 10:17 | 32:4 | 37:11 63:20 |
| 33:20,21 34:12 | 19:22 41:24 | **bk** 1:3 | **budgets** 14:15 |
| 37:16 38:9 | 47:20 57:12 | **blain** 3:3 6:18 | **building** 18:11 |
| 39:11 41:16 | **basis** 9:22 15:8 | **blocked** 58:19 | 30:4 46:5 |
| 42:4 44:10,24 | 17:12 27:3 | **blvd** 3:19 5:10 | **built** 10:16 |
| 49:20 51:4 | 28:20 31:16 | **board** 54:10 | 17:17 |
| 52:20 54:11 | 32:10,15 33:17 | **boat** 30:25,25 | **burden** 53:21 |
| 55:5,15 61:17 | 35:4,13 42:17 | **boats** 31:3,6 | **burdened** |
| 65:11,18 67:1 | 66:15 67:10 | | 50:15 |

burns  4:8
business  9:6,25
  10:12 18:16
  23:16 25:20
  27:24 28:2,3
  34:3 49:13,15
  49:16,22 50:6
  50:11 52:20
  58:15 59:3
businesses
  59:18
buy  39:8
buyout  37:5
  39:7
buys  18:5

c

c  3:1 6:1 71:1,1
calendar  6:8
  8:5 47:19 51:7
call  9:1 36:16
calling  6:7
calls  35:24
  36:5
capable  41:9
  61:1
care  45:21
carlton  3:17
carried  33:13
carroll  36:1
  38:8 42:4 43:1
  48:12 58:19
  65:1
carroll's  36:25
  47:18
carry  33:12,12
carrying  33:1

carved  60:25
case  1:3 6:8,9
  8:12 12:9 13:1
  13:24 15:19
  20:24 31:24
  34:6,7 36:13
  36:14 37:22
  39:18 40:23,25
  41:14,17 48:7
  49:3 50:1,19
  53:16 57:2,12
  57:14,14 58:9
  58:18,22 59:1
  59:3,10 60:25
  61:15 67:13,13
  67:18 69:9
cases  6:7 59:12
cash  21:22
casting  13:17
categories
  17:23
category  17:2
  62:18
cause  42:20
  59:10 60:25
causes  62:10
  66:23
center  18:12
centered  49:13
central  1:12
certain  20:2,3
  59:19 60:25
certainly  9:10
  10:11 11:14,15
  11:16,25 13:6
  13:15 14:1
  27:6 28:17

48:19 61:10
certified  71:3
challenges
  58:18
chance  22:13
  24:2
chancery  66:6
  66:13
changed  38:1
chapter  20:24
characterize
  49:17
chart  9:15
chase  12:25
chatham  1:25
chess  54:10
chicago  4:18
  7:6
chinese  22:8
chips  54:2,5
choice  55:5
christmas
  27:25
circuit  67:13
claim  38:14
  45:15 62:23
claims  2:2 12:4
  37:5 40:19,20
  42:5,11,15
  52:7 55:19
  60:24
clarify  11:18
  32:23 41:15
clear  20:6
  24:14 30:23
  37:12,23 41:5
  43:24,25 44:11

44:13 60:20
clearly  24:16
  31:24 42:15,16
  42:17,18 45:13
  47:15
clerk  6:2,7
  7:18,23 60:5
client  12:9
  26:11 27:24
  28:11 33:9,18
  36:18 38:17
  41:2 43:18,19
  50:15,25 51:1
  51:23 61:15
  62:13,15,17
  63:2 64:10,25
client's  39:16
clients  13:21
  23:11,12 63:14
close  62:7
closely  15:5
code  50:4
  52:23
coin  55:9
collateral
  21:22
colleague  7:20
collier  9:5 11:6
  11:8
colliers  11:5
colton  1:22 6:4
come  6:11 17:3
  32:3 33:20,21
  34:11 38:9
  39:11 41:16
  46:18 54:11
  58:25 62:22

64:18 65:11,17
67:1
**comeback**
68:13
**comes** 15:19
26:10 68:18
69:6
**comfort** 2:2
66:1 70:7
**coming** 26:1
30:9
**comity** 58:5
**commend**
49:18
**comment**
31:15
**comments** 25:1
31:8,22 32:1
49:1 55:15
65:20
**commercial**
52:13,14 53:2
54:3 65:2
**commissions**
10:6
**commitment**
24:21
**committed**
34:21
**communicati...**
1:7 2:10,11,15
2:16 6:8,9 8:24
8:25 26:5
**companies**
8:11 9:11
10:21 13:10
15:10

**company** 9:1,2
9:3,13 10:19
11:3 12:3
13:16,20 15:16
22:8 44:12,13
44:20 45:2,4
45:21,23,24
46:1,4,13,17
46:19 63:22
64:7
**compelled**
23:25
**compensation**
16:5
**competing**
35:2
**competitive**
63:12
**competitors**
63:13
**component**
19:4
**components**
19:3
**concern** 59:9
59:15 64:9
**concerned** 57:5
**concerns** 58:3
**concluded**
69:16
**condo** 30:25
**conference**
33:21 67:23
**confines** 63:22
65:13
**confirm** 13:6
44:5 53:8

56:11
**confirmation**
36:8 38:11
40:17 41:4,16
42:12 47:20
68:22
**confirming**
16:17
**confused** 19:15
**confusion**
21:24
**connection**
13:12 18:18
**consensual**
53:1,6,13 67:9
**consensually**
56:12,15,21
**consent** 60:18
**consider** 28:21
**consideration**
43:5
**considering**
42:24
**consistently**
11:20
**consolidated**
11:21,21 15:8
15:17 32:15
**constituencies**
12:8
**constituting**
62:20
**consuming**
13:19
**content** 7:11
**contested**
38:12 65:14

**context** 7:11
28:20 38:11
44:1 45:18
52:4
**contingent**
12:4 55:18
**continue** 24:21
33:12 41:1
47:3,4 52:17
59:19 61:22
**continued** 23:5
**contract** 17:8
17:13 22:16,19
22:23 23:1,24
24:7,11,16,23
34:20 42:11
62:18
**contracts** 9:13
10:15 17:24
62:20
**contributed**
26:9,10 28:25
29:14,25 30:9
30:13
**contributing**
29:9
**conversation**
61:17
**convinced**
53:17
**copy** 24:9
**core** 28:3 29:3
42:4 52:6
**corporation**
8:25 11:3
66:24

**correct** 20:14
20:17 26:24
62:3 67:8
**correctional**
9:17 17:25
**cost** 45:11
53:21
**costs** 18:10,17
26:12,13 33:1
**counsel** 6:19
6:25 7:5,20,23
7:25 57:5
**counsel's** 48:18
**counter** 62:18
**counterparty**
50:8
**country** 9:17
71:21
**couple** 28:5
47:24 58:21
**course** 2:14
8:14 10:13,14
14:13 15:2
16:3 20:21,25
21:9 22:4
25:19 27:13,14
34:1,3 36:22
62:19 64:4
69:4,11 70:5
**courses** 27:9
**court** 1:1,11
6:3,5,10,13,16
7:1,8,14,22 8:2
8:4,9,18,22
11:5,7,9 12:12
12:18,20 13:2
13:3,6,9,12,14

13:22 14:6,7,9
14:14,17,20,20
14:22,25 15:10
16:10,12,15,17
16:18,22 17:8
17:10 18:5,8
18:19 19:1,10
19:15,19,22
20:6,9,12,15
20:18,23,23
21:5,10,14,17
21:20,23 22:1
22:3,20,23
23:4 24:3,9,10
24:20 25:2,4,6
25:8,18,22
26:1,4,19,22
26:25 27:2,9
27:17,20 28:12
28:15,22 29:13
29:17,21,23
30:5,7,11,13
30:17,20,22
31:7,11,13,20
32:8,21 33:6,8
33:24 34:2,11
34:15 35:1,9
35:13,16,18,20
36:1,15 37:8
38:3,5,10,17
38:19,25 39:3
39:13,14,16,20
39:25 40:3,5,7
40:9,13 41:11
41:20,22,24
42:22,23 43:2
43:6,10,14,16

43:22 44:2,2
44:17,20 45:12
45:17,20 46:1
46:6,16,22,25
47:6,10,13,15
47:20,24 48:2
48:10,13,16,20
48:23 49:1,4,7
49:19,25 50:2
50:3,5,16,19
50:21,23 51:4
51:5,8,14,20
51:21,24 52:5
52:11 53:5,9
53:11,13,15,18
53:18,24 54:16
54:20,22 55:4
55:4,10,13,14
55:24 56:2,4,7
56:10,13,15,24
57:8,19,24
58:2,5,8,11,16
58:17,25 59:5
59:12,25 60:8
60:13,14,18,21
61:1,4,9,12,25
62:5,7,11,15
62:21,24 63:4
63:8,16,24
64:1,3,6,12,17
64:18,23 65:2
65:3,14,16,19
65:22 66:6,7,8
66:9,10,13,14
66:20,22 67:24
68:3,6,9,12,15
68:17,21,22,23

68:24,25 69:3
69:6,9,13
**court's** 6:7
48:18
**courtroom**
6:11,20 7:7
12:5 47:16
**courts** 37:21
38:7,20 44:16
45:6
**covered** 29:22
**covers** 68:9
**cox** 67:13
**creative** 59:2
**credit** 19:8
23:2,18
**creditor** 2:4
11:23 12:1,7
39:18 43:17,18
**creditors** 12:6
21:14,15 26:11
55:22,25 63:5
67:18
**critical** 2:20
8:15 10:16
12:1 16:23
17:4,5,21 19:5
19:11,17 20:16
22:7 23:16
33:25 34:16
61:19 62:12,16
64:3 70:6
**cure** 16:11
42:10,24 62:23
65:4
**current** 9:23

**customer** 23:8
61:16
**customers**
13:21
**cut** 12:25

**d**

**d** 6:1 70:1
**daniel** 2:9,14
2:20 3:8 6:17
**date** 16:8 34:12
37:2 39:6
45:13 66:18
68:13 71:25
**david** 4:20
5:19 7:4,23
**day** 9:6,6 15:23
53:23 57:7
60:11 68:4
**days** 53:13,16
56:12 61:21
69:7
**dc** 4:4
**de** 46:19
**deadlines**
61:20
**deal** 12:8 36:13
37:16 67:11
**dealing** 66:9,17
**dealt** 40:16,20
40:21
**debt** 11:14
20:13 32:23,25
36:21,23 37:13
54:23
**debtor** 1:9 2:9
2:15,21 3:4 5:9
10:1 11:5,19

15:14 16:13,25
17:24 18:1,5,9
18:17 19:9
20:6 24:1 26:6
26:9,10 27:10
27:12 28:4,7,9
28:10,13 29:5
29:6,6,7,14,25
30:1,3,16,24
32:16,18,19,20
33:4 34:2
36:19 38:1,4
42:6,16 43:23
43:25 44:4,9
44:10,23 46:17
47:1,2,3 49:18
50:17 51:16
52:7,7,8,19
53:21,25 54:6
54:14,24,25
55:3,12,21
59:22 61:16
**debtor's** 9:23
10:1,11 18:3,4
18:16 20:12
22:3,6 24:25
25:2 29:21
31:25 41:1
51:2 55:7 67:3
**debtors** 2:3
6:19,21 7:20
8:1,23 9:16
12:11 16:20
21:2 22:6 34:5
36:10 45:3
59:4

**december** 1:15
71:25
**decide** 32:5
64:19
**decided** 30:12
44:1
**decides** 13:23
52:12
**deciding** 66:25
**decision** 13:11
39:13 60:13
64:23
**deductions**
55:8
**defer** 66:14
**deferred** 50:14
68:13
**definite** 43:24
43:25
**delaware** 9:2
11:4 66:6,13
**delay** 41:1 59:7
59:11
**delivered** 19:2
19:2,4 24:7
**delivery** 10:2
20:2,3
**denied** 67:4
**depending**
10:6
**depends** 43:12
**deploy** 9:22
**deployed** 17:19
**depositions**
48:4 65:15
**derivative**
42:17

**design** 17:15
56:9
**designed** 15:5
43:7 44:17
**determination**
16:9
**determine** 41:8
44:2 46:12
61:6 65:3
**determined**
24:17 43:5
66:19
**determines**
56:3,4
**determining**
41:7,9 45:15
**development**
27:25
**difference**
44:14 47:5
**differences**
56:10
**different** 10:24
13:14,15 17:22
28:4 30:3,5
31:2 38:12
48:4,12 52:21
**difficult** 17:14
23:21 53:3
**dilatory** 53:20
**diligence** 59:23
**direct** 45:19
51:15
**director** 11:2
**disadvantages**
58:25

disagree  52:2
disagreement
  42:21
disanto  5:20
  7:12,13 31:21
  31:22 58:12,13
  60:9
disclosing
  21:12
disclosures
  59:22
discovery
  59:24 65:12,13
discussed
  62:14
discussing
  31:15
dismiss  41:13
  67:25
dismissed
  41:18 58:9
disposable
  15:24 48:1
dispute  36:3
  38:6 39:10
  42:3 44:13,14
  49:13,16,25
  53:3 55:21
disputes  13:9
  26:2 44:19
  55:23 58:15
disruptive
  13:16
dissolution
  44:2 46:21,24
distraction
  53:22

distributed
  26:11
distribution
  45:16
district  1:2 6:3
  66:7,9
disturbing
  64:15
dive  32:5
dixon  4:6 6:25
  54:17,20,21,21
  55:11
dla  4:1
doc  2:6,11,16
  2:21
docket  14:13
  14:22,24 16:4
  65:23,24 66:1
  66:1 67:6
docking  27:21
doctrine  57:23
document  62:9
documents
  66:5
doesn't  36:14
doing  10:16
  18:2 19:20
  21:12,13 59:13
dollars  44:23
donald  3:22
  6:24
don't  29:24
  32:13 35:9
door  27:6
dorr  3:15 6:22
  6:23 32:8,9

drive  4:10,17
dual  60:22
duality  60:3
due  20:1 59:22
  62:21,22
dustin  5:14
  7:21
duties  66:23
duty  37:6
  40:19,20 42:14
  60:24

e

e  1:21,21 3:1,1
  3:5,12 6:1,1
  7:19,19 18:24
  70:1 71:1
early  36:16
  37:14 65:11
east  5:10
echo  31:22
  32:9
economic
  44:11
ecro  1:25
edward  2:3
  4:13 7:2 22:11
  35:5
effect  51:24
effectively
  43:11 48:14
effects  55:11
efficient  41:7
  45:17
efficiently
  48:14
eighth  4:3

either  16:7
  17:2 22:10
  51:8 52:20
  55:13 57:19
  68:5
election  39:8
electricians
  18:10
eliminate
  44:19
emergency  2:1
  2:19 35:4,13
  65:25
employed
  10:21
employees  9:8
  10:20 11:12,17
encompasses
  12:15
encompassing
  13:18
encourage
  67:12
ended  67:15
endless  50:9
enforce  2:8
  67:3 70:8
engaged  46:15
enter  6:12
entered  31:16
enters  20:24
entertainment
  18:12
entire  54:10
entities  27:8
  56:6

entitled 55:8
entity 11:4,20
  12:10 26:7
  27:23 32:17,18
  32:20
environment
  65:3
envision 38:10
equation 59:17
equitable 45:8
equity 9:12
  30:19 39:14
  57:4 67:16
especially
  34:22 38:18
essentially 8:1
  10:1 12:17
  13:22 27:23
  36:3 38:6
  45:22 46:16
  62:23
estate 26:2
  29:24 42:7,8
  42:16 60:1
  64:13
estone 18:24
  22:7
evaluate 58:24
  59:25
eve 37:22,22
everybody
  45:4 46:14
  51:12 56:21,22
  65:7,8,8 67:7
everybody's
  64:7

evidentiary
  36:16 39:1
exactly 18:16
  21:3 38:25
  47:23 48:21
  62:25
exaggerating
  56:15
example 17:23
  30:4 44:6
excess 55:21
excludes 22:5
exclusive 52:14
executory
  10:15 22:16,18
  23:23 24:22
  42:11 62:18
exhibit 2:4,5,5
  2:5
exhibits 35:12
  45:3
existing 17:19
  23:12
exit 43:24,25
expediting
  69:10
expenditures
  21:1 22:6
  25:19 27:10
expense 8:14
  50:12 55:3,8
expenses 2:14
  14:13 15:3,11
  17:1 22:4
  26:15 28:10
  30:1 32:16
  34:1,3 50:11

64:6 70:5
expensive
  13:19
expert 64:25
experts 47:25
  53:4
exploring
  60:18
expressed 59:4
extent 19:12
  24:13 27:13
  42:14 59:23
  66:17 67:4
extremely
  13:19
extricate 45:6
eyal 5:13 7:19

**f**

f 1:21 71:1
facetious 50:24
facilities 9:17
  9:18,19,21,24
  10:16,24,24
  17:19,24 18:1
  63:11
facility 10:6,7
  17:25 18:2
fact 13:18 43:2
  51:10 66:10
facto 46:19
factors 37:20
  38:6
fair 14:2 20:10
  45:8
faith 41:3
fall 17:2 54:2,5

falls 62:18
familiar 31:24
  38:9 48:19
family 7:3
  49:13,25 58:15
  59:18
far 14:16 26:16
faster 53:15,19
favor 57:11
favorable 19:8
feature 56:2
february 36:16
  37:14 39:1
  47:19,20 48:9
  48:10 51:9,11
  54:11 58:19
  66:16
federal 66:8
fee 13:12
feeds 56:6,8
feel 33:18
fees 18:15
  44:24
feldman 57:22
  57:25
ferrari 25:15
  30:25
fiduciary 37:6
  40:19,20 42:14
  60:23 64:12,13
  66:23
field 48:7,15
fields 3:17
fight 63:13
figure 34:13
  38:15

**figured**  35:14
**file**  13:3,4 14:2
  14:4 21:21
  25:24 35:9
  38:21 56:18
**filed**  2:3,9,14
  2:20 8:15
  11:20 13:1,7
  14:16,18,21
  15:3 16:23
  19:23 20:7
  22:12 28:17
  31:18 35:4
  36:7 37:21,22
  43:7 47:19
  49:11 57:4,14
  61:4,21 62:1
  68:21
**filing**  37:23
  38:22 41:3
**final**  57:24
  60:13
**finality**  50:6,6
**financial**  15:18
  38:21 45:3
**financially**
  38:1
**financials**
  11:22 44:25
**find**  58:16
**finding**  66:9
**fine**  43:10
  44:20 63:18
  68:5
**firm**  7:6 49:4
**first**  6:15 8:6
  26:23 34:6,7

37:9 39:22
53:23 57:17
58:21 60:5
**fl**  1:13 3:6,13
  3:20 4:11 5:4
  5:11
**florida**  1:2 6:3
  8:25 11:3,20
  25:12 27:22
**focus**  33:14
**focused**  56:22
**fogarty**  2:9,15
  2:20 3:8 6:15
  6:17,18 7:25
  8:3,7,8,23 11:6
  11:8,11 12:14
  12:19,22 13:4
  13:5 14:8,11
  14:19,21,23
  15:1,12 16:15
  16:19,23 17:9
  17:11 18:7,9
  18:22 19:3,12
  19:18,20,24
  20:8,10,14,17
  20:19 21:4,6
  21:15,18,19,21
  21:25 22:2,25
  23:6 24:5,13
  25:9,18,21,23
  26:5,20,24
  27:1,4,11,19
  27:21 28:14,16
  29:3,16,18,22
  30:2,6,8,12,15
  30:21 31:2,6
  32:21,22 33:7

33:9 34:9,10
34:14,25 41:22
41:23 42:2
43:9,12,15,22
45:23 46:5,7
46:23 47:2,8
47:12,14 48:25
49:19,24 52:6
55:17 56:14,17
61:9,10 62:1
62:17,22,25
63:4,6,9,25
64:2,5,11,16
64:21 67:21,22
68:11,13,16,20
69:2,5,8,12
**fogarty's**  52:1
**fold**  21:7
**folded**  16:8
**folks**  49:8
**follow**  33:23
**following**  20:2
  20:3
**footprint**  9:23
**foregoing**  71:3
**foreign**  34:22
**forgotten**  6:13
**fork**  60:12
**fort**  5:11
**forth**  36:23
**forum**  36:12
**forward**  6:11
  13:10 16:8,11
  23:11 47:4
  51:6 57:15,16
**forwards**  65:5

**four**  8:5 10:21
  40:24 63:11
**framework**
  14:1
**frankly**  57:13
**fresh**  50:8
  53:24 54:9,14
  57:1
**front**  8:9 14:14
  21:10 24:3
  36:1 48:9,11
  48:15 49:11
  51:5 52:5
  56:20 65:1,14
**full**  61:5
**fully**  35:7
**function**  34:17
**fundamental**
  42:13
**funder**  26:8
**funders**  27:8
  29:9 30:15
**funds**  32:19
**further**  26:20
  51:20 58:23
  67:2
**future**  46:12

---

**g**

**g**  6:1 7:19
**gann**  5:19 7:23
  7:24,25
**general**  6:19
  7:25
**generally**
  10:11
**georgia**  10:25

**getting** 18:2
31:24 38:2
62:9 67:15
**give** 8:10 33:17
34:9 54:9,14
55:16 61:4
**given** 23:8,8
45:17 48:6,7
60:15 62:13
**gives** 9:21 13:2
15:8 18:12
50:4 59:21
**glad** 8:8
**glaringly** 57:3
**global** 28:20
52:4
**go** 6:15,16 8:13
12:23 14:5
18:11 20:15
25:8 34:24
37:14,15 38:9
40:25 41:4
48:11 49:24
51:4 55:5,15
57:15,16 58:7
60:8,22 61:17
68:25 69:11
**goes** 13:22 18:3
18:4
**going** 13:23
16:8,11 23:11
27:2 28:25
31:20,25 34:12
35:3 36:6,7
37:7 39:11
40:16,19,21
41:5,15 43:3

44:21,21,22
47:4 48:11
51:6,10 53:4
57:4,8 59:10
61:17,19 63:5
63:17 64:23,25
65:4,4 66:14
66:15 67:17,19
67:20 68:15,16
**golf** 44:11
**good** 6:5,17,22
7:1,2,8,9,12,22
8:5 14:3 31:20
33:24 36:12
41:20 55:14
61:15 65:19
67:7 69:13,14
**goods** 24:6
**gotten** 61:21
**governmental**
17:25
**grant** 66:15
**great** 63:17
66:4
**gridlock** 50:3
**ground** 13:24
63:22
**guess** 19:15,16
22:7,15,18
31:4 45:20
68:20
**guys** 45:1

**h**

**hac** 7:5
**half** 36:25
**hallmarks** 59:1

**hand** 14:15
24:9
**handle** 12:16
60:14,15,18
**happen** 47:17
51:3 53:18
**happening**
33:13
**happens** 9:9
44:6,8,10 65:9
**happy** 8:20
33:16,17,19,20
33:21 47:9
48:15
**hardware** 12:3
17:6 18:3,4,6
**hardy** 4:15 7:6
**harms** 38:7
**headed** 13:1
**hear** 10:13
34:16 36:7
49:21,22
**heard** 36:6
42:22 49:16
61:11,11,14
62:13 63:10
**hearing** 2:1,1,8
2:8,13,13,19
2:19 8:6 22:14
26:17 27:7,15
36:17 39:1
47:18 56:25
57:5 62:1,9
65:24 67:21
68:23
**hearings** 36:25

**held** 9:8
**helpful** 9:25
13:4 25:24
33:22
**hflip** 57:4,12
**hflip's** 57:5
**high** 9:15
36:21
**higher** 54:4
**hillsley** 5:14
7:21
**historical** 45:3
**historically**
11:20 27:11
**hit** 60:5
**hlfip** 3:18 4:2
6:25 12:9
38:13 54:18,24
54:25 55:3,5
55:12
**hlfip's** 54:23
**hmm** 46:6
**hold** 34:12
**holding** 1:7
2:10,11,15,16
3:18 4:2 8:24
8:25 9:3,10
12:9 26:6
55:13
**holdings** 6:8,10
**holds** 12:10
**holiday** 28:1
65:10
**hon** 1:22
**honestly** 29:19
**honor** 6:17,22
6:24 7:9,12 8:3

8:8,21,24 9:16
12:24 13:5
14:11,13,23
15:7 16:2
18:22 19:25
20:19 21:6
22:2,11,15,25
23:20 26:8
28:8,23 29:5
29:11 30:21
31:9,14,17
32:7,9,11
33:20 34:10,25
35:5,6,22
36:12 38:5,15
39:9 40:2,6,25
41:8,13,19,23
42:15 43:13,23
44:18 46:7,14
47:4,14 48:25
49:2,15 50:4,7
52:1,2,4,22,25
53:1,7,17,19
54:15,17 55:17
57:7 58:6,9,13
60:9 61:8,13
61:18,22 63:9
63:20 65:21
67:23 68:2,5
68:20 69:8,12
69:15
**honor's** 41:9
**honorable** 6:4
**hopefully**
11:12 20:22
45:18

**hoping** 56:18
**hotel** 46:8
**house** 8:1
18:12 28:8
33:5
**housed** 9:9
**houses** 28:5

### i

**idea** 19:13
29:16,17,18
**identify** 17:5
**iii** 2:3
**il** 4:18
**immune** 10:12
**impede** 31:25
**implementati...**
17:16
**important**
13:25 15:16,18
15:23 24:16
28:19 34:17
52:9 60:11
63:15
**impossible**
50:2
**include** 12:14
12:17 22:6
29:10
**included** 19:16
**includes** 15:10
15:12
**including**
26:11
**income** 15:24
32:18,19 48:1
55:1,6

**inconsistent**
67:5
**incurring**
52:22
**indiscernible**
23:24
**industry** 10:11
63:12
**inexpensive**
63:19
**inextricable**
54:25
**information**
33:18 45:4,14
61:5
**informed** 25:9
**infrastructure**
10:2,5
**initial** 39:1
66:14 67:22
**initiated** 39:8
**injunction**
16:12 57:19
**inmates** 9:18
**inordinate**
8:17
**insider** 16:6
20:13 25:17
28:7 33:3
**insiders** 25:11
28:6 34:4
**install** 10:3
18:10,14 23:10
**installation**
18:10
**installations**
17:23

**insult** 57:13
**insurance**
25:14 29:20
33:2
**integrated** 9:19
9:21
**intellectual**
12:10 52:19
**intensely** 63:12
**interest** 37:2,4
38:16 39:14,16
40:19 45:22
48:1 64:7
67:16
**interested** 2:10
2:16 6:11
**interests** 9:12
**interface** 10:17
**interim** 27:3
29:15 31:16
32:2,10 33:17
**interject** 54:17
**intermediate**
9:3
**intimately** 38:8
**introduce** 7:4
**introduced**
7:17
**invalid** 66:9
**invoice** 17:12
17:12 22:14,24
22:24 23:1,1,2
23:3,18,18
**invoices** 23:22
**involved** 25:15
49:5,9 50:1
51:12

**involvement** 46:12
**ip** 16:7,13
  37:13 38:22
  39:6 40:18
  52:14 66:17
**ipad** 18:13,14
  18:14
**irs** 50:12,15
  52:16,23,23
  56:4
**ish** 43:21
**issue** 13:13
  16:19 23:24
  30:10 36:20,23
  37:1,4,13,17
  37:18 39:3
  49:9,22 50:6
  54:10 57:17
  62:12 64:9,20
  64:24 66:14
**issues** 8:12
  24:17 28:17,18
  28:18 31:16
  32:4,12 38:9
  39:5 40:5,16
  40:24 41:7,12
  41:15,16 42:3
  42:5,24 43:4
  44:1 48:13
  52:5,6 54:12
  54:14 56:22
  58:4,8 60:10
  60:14 61:6
  62:10,14 66:17
  66:25 67:10

**item** 15:14
  19:3 27:16
**items** 28:4

**j**

**j** 2:3
**james** 7:3
**janice** 2:4 4:9
  4:16 5:18 7:3
  22:12 35:6
  66:2
**january** 33:21
  40:15 65:11
  67:21 68:1
**jersey** 10:25
**job** 11:13
  19:20
**johnson** 4:8
**jointly** 6:9
**jonathan** 5:17
  6:20 11:1
**judge** 1:23
  7:19 25:1 36:1
  36:7,11,25
  38:8 42:4 43:1
  43:1 47:18
  48:11 50:10,20
  50:22 51:6
  52:9 53:20,23
  56:25 58:19
  65:1
**judgment**
  57:24
**judicial** 37:24
**jumping** 48:23
**junior** 67:17
**justifies** 23:17

**k**

**kathleen** 5:20
  7:13
**keep** 11:21
  39:7 56:25
**keeps** 46:14,15
**key** 23:16
**kind** 8:11,12
  9:6,14,20
  10:22 12:2,7
  12:25 13:18
  15:1 18:24
  37:16 47:10
  56:19 57:13
**kirk** 3:22 6:24
  6:24 48:23
  49:2,6,8 50:18
  50:20 51:2,18
  51:22 52:1
  53:7,10,12,14
  53:16 54:18
  56:3 64:19
**kirk's** 12:9
  36:18 43:18
  64:9
**know** 8:17 9:22
  10:10,19 12:6
  12:15,15 13:14
  13:23 14:14
  15:1,8,17,25
  16:16 17:6
  18:11,17 19:8
  19:13,24 20:1
  21:17 23:10,21
  23:25 27:5,7
  29:11,19 31:23
  32:1,2,6,11,25

33:10,19,22
34:8 40:23
43:18 45:2,9
45:16,20 47:4
47:8,23 48:5
49:23 50:7
51:5,6,9,15
52:25 57:15,22
58:24 59:9,9
59:15,17,23
60:2,10,18,19
60:19,20,23,25
61:2,3,3,7,18
63:14 64:12,17
65:10 68:19
69:9
**knows** 39:9
  45:4

**l**

**laid** 52:6
**landscaping**
  33:5
**large** 37:14
**largely** 11:24
**largest** 11:24
  11:25 20:12
  43:17 55:19,25
**las** 5:10
**lauderdale**
  5:11
**lawyers** 48:3
  58:14 59:13
**laying** 11:13
**lays** 17:22
**lead** 17:15,17
  19:7 23:9

**leads** 55:2
**lease** 30:3
**leases** 9:13
**leave** 44:9
**leaves** 44:9
**legal** 15:22
  44:24 71:20
**lengthy** 62:9
**level** 9:15
**liabilities** 52:8
**liability** 9:2
  36:17 37:15
  38:22 39:5
  40:18 52:23
  54:4 55:20
  57:6
**license** 12:10
  12:13 38:14
  55:1
**lifeblood** 12:3
**lift** 35:21,24
  36:5 42:20
  67:19
**lifted** 58:7
**lifting** 37:21
**light** 12:22
  44:3
**liked** 14:1
**limitations**
  16:16 32:2
**limited** 9:2
  66:15,25 67:20
**line** 9:1 11:2
  15:14,19 19:3
  19:5 27:16
  28:4 43:6 70:4

**lines** 34:11
**liquidating**
  42:11
**liquidation**
  40:21,22
**listened** 66:3
**litigant** 45:24
**litigated** 30:10
**litigating** 36:24
**litigation** 13:18
  26:1 35:25
  36:15 37:25
  43:3,7,23 45:1
  46:13,16 48:20
  50:10 53:20
  55:24 57:10
  63:19
**little** 10:19
  12:25 32:4
  34:18 61:14
  62:11
**lives** 33:6,9
**living** 45:1
**llc** 2:11,16 6:10
  8:25 9:2
**llp** 4:1,8,15 5:8
**loan** 32:24
**located** 34:23
**location** 27:21
**locations** 10:22
  63:11
**locks** 53:2
**loco** 25:11
**logan** 2:4 4:9
  4:16 5:17,18
  6:20 7:3,3,6
  11:1,1 16:5

22:12 33:7
  35:6 46:19,25
  57:8,11,12
  64:13,18,19
  66:2
**logan's** 29:7
**logic** 46:8,10
**logical** 52:24
**long** 15:9 17:12
  25:10 35:10
  43:3 66:21,24
**longer** 24:8
**look** 22:14,14
  24:10,24 25:11
  26:21 28:21
  34:6 37:7,11
  37:20,21 38:7
  38:20 43:13
  51:4 53:7 54:8
  54:10,13 56:9
  57:3 62:12
  68:25
**looked** 30:22
**looking** 15:6,6
  18:20 23:22
  28:24 34:20
  49:9,11 68:1
**looks** 16:10
  18:20 34:23
  53:20
**lose** 37:14,16
  44:9 63:16
**lot** 9:6,9 10:10
  12:18,20,23
  13:13 15:21,21
  34:7 35:7
  36:10 37:7

41:15 49:17
  60:15 66:10
**lots** 8:18
**low** 36:22
**lucky** 7:14

**m**

**made** 11:24
  13:12 16:21
  27:12 36:11
  59:16
**madison** 3:5
**magic** 44:19
**main** 9:4,7
  10:24 12:7
  40:24
**maintenance**
  25:13 28:10
**make** 16:10,25
  21:7,10,12
  24:14,18,22
  25:16 29:1
  45:24 49:1
  51:19 52:10
  55:24 56:19
  60:12 64:23
**makes** 30:3
  47:3 52:24
**making** 16:13
  22:8 29:23
  63:14
**manage** 60:10
**management**
  8:12 10:23
  46:9
**manager** 11:3
**manner** 45:8

**manufactured**
  17:18
**manufacturer**
  18:25 34:22
**manufacturing**
  22:16,17
**march** 54:11
**margins** 10:9
  63:20
**massive** 52:23
  53:22 54:4
**match** 44:11
**matter** 1:5
  34:8 64:8
  65:14
**matters** 7:15
  8:5 26:19,22
  38:13
**mean** 20:23
  23:15 32:22,23
  33:4 42:15
  46:3 47:15
  50:21 57:20
  59:11 64:12
  65:6
**means** 54:23
  55:7
**meant** 56:12
**meeting** 65:9
**megan** 5:6 7:9
**mentioned**
  11:1 25:25
**mess** 67:6
**messy** 49:13,18
**miami** 30:25
**mid** 20:5

**middle** 1:2 6:3
**million** 18:23
  36:11 54:25
  55:1,2
**millions** 44:23
**mind** 39:7
**mineola** 71:23
**mini** 37:1
**minute** 61:17
**misunderstood**
  40:14
**mm** 46:6
**model** 9:25
  10:12 18:16
**modified** 2:5
**money** 27:5
  50:13
**month** 18:23
  19:10,22,24
  20:7 26:23
  34:6,7
**month's** 19:23
**monthly** 15:2
**months** 27:16
**morass** 43:2
**motion** 2:1,8
  2:13,19 5:2 7:5
  7:10 8:14,15
  8:19,20 10:13
  12:2 14:12
  16:24 17:4,22
  21:1,5,10,22
  22:4,7,10 25:5
  27:14 31:10
  34:1,15 35:9
  35:21 38:13
  40:3 41:13,25

  41:25 47:7,9
  47:19 62:1
  65:25 66:2,15
  67:3,25 68:21
  70:5,6,7,8
**motion's** 47:10
**motions** 8:13
  8:19 24:15,25
  32:11,12 35:2
  35:7 65:23
  68:14
**movant** 67:1
**move** 13:10
  26:15,16 58:18
  59:4,11
**movement**
  32:6
**moving** 24:11
**murray** 5:1,6
  7:9,10 31:13
  31:14 43:21
  61:12,13 62:3
  62:6,8 65:20
  65:21
**murray's** 32:1
  43:19 62:15,17
  63:2

**n**

**n** 3:1 4:10 6:1
  70:1 71:1
**name** 28:12
**nature** 9:3
  10:15 17:6
  23:15 50:14
**near** 15:5
**necessarily**
  12:16 47:1

**necessary** 44:4
  63:22
**need** 12:16
  13:9 16:24
  17:3,21 19:6
  19:13 23:7
  26:17 27:6,14
  28:18 33:18,19
  37:10,12 38:4
  38:21 43:4
  50:12 55:23
  58:18 61:7
  67:10,24
**needs** 29:14
  30:10 37:18
  45:24
**net** 26:13
**netflix** 18:12
  18:13,13
**never** 52:21
**new** 10:16,25
  17:19 19:6,7
  23:11 24:6
  49:3 61:15
**non** 2:3 21:2
  22:6 26:6 28:3
  29:3 32:16,17
  32:19 34:5
  56:21
**north** 5:3
**note** 48:18
**notice** 22:13
**notion** 51:10
  57:18
**nuances** 15:22
**number** 7:15
  12:4 18:1 39:6

65:23,24 66:2
67:6
**nw**   4:3
**ny**   71:23

**o**

**o**   1:21 6:1 71:1
**object**   30:24
38:14
**objection**
34:16
**obligation**
15:14,15 16:25
23:14 52:16
**obviously**   12:7
13:14 22:12
24:3 31:23
33:17 34:2
41:9 61:15
**occupied**   28:8
28:11
**office**   3:10
10:22 25:12
**officer**   11:2
22:5 34:4
**officer's**   16:5
**oh**   7:14,15 25:8
33:8 60:5,7
68:15,25
**okay**   7:14 8:2
14:8,19,25
16:18 18:8
19:19 20:15,18
21:20,23 22:1
23:22 24:10
25:6,10 27:17
28:15,22 30:17
31:7,11 34:1

35:11 39:25
40:7,13 47:6
51:3,21 52:10
56:24 60:5,8
63:8 65:19,22
67:24 68:6
69:2,5,13
**olas**   5:10
**old**   71:21
**once**   20:1
46:13
**one's**   68:5
**ones**   55:17
**ongoing**   17:23
55:2
**onsite**   10:23
**operate**   10:21
45:25 47:3,4
52:20 61:5
**operates**   18:6
**operating**   2:14
9:4,8 11:19
14:13 15:3,12
15:15 58:22
**operational**
8:13 14:5
**operations**
11:9 15:25
23:16 25:13
31:25 46:10,12
**operative**   53:5
**opportunities**
12:23
**opportunity**
26:20 32:5
59:2,5,14,21

**order**   2:2
13:10 16:15,17
19:14,25 20:5
20:5,24 23:6
24:19 26:14
32:2 34:9 40:4
40:5 51:16,20
52:3 57:19,20
62:20 66:1,8
69:4 70:7
**ordered**   23:2
**orders**   19:6,8
20:3 24:6 66:6
66:7
**ordinary**   2:14
8:14 10:13,14
14:12 15:2
16:3 20:21,25
21:9 22:4 25:5
25:19 27:9,13
27:14 34:1,3
62:19 64:4
69:3,11 70:5
**org**   9:14,15
**orlando**   1:13
**outcome**   45:11
**outfit**   18:11
**outside**   21:9
**overlays**   58:16
**oversight**
10:23
**overview**   8:11
**owed**   16:7
43:19
**own**   9:11 30:1
30:4 41:25
46:4

**owned**   26:5,7
27:23 29:5,6,7
36:18
**owns**   25:12
26:4 28:4,7

**p**

**p**   3:1,1 6:1
**p.a.**   3:3
**paa**   5:1
**pace**   59:6
**page**   70:4
**pages**   49:10
**paid**   20:16,25
25:15 26:15
29:1 32:16
33:2 50:14
52:24
**papers**   9:5
12:13 49:17
**parent**   9:1 11:2
**part**   12:8 16:6
17:13,16 20:23
23:14 26:2,7
29:3,11 30:16
35:11 37:9
39:23,23 40:1
41:1
**particular**
50:11 63:23
**parties**   6:11
36:24 42:21
50:15 58:23
59:23 60:17
61:4 62:19
**party**   2:10,16
28:1,1 34:17
58:12

| | | | |
|---|---|---|---|
| **pass** 24:23 | 30:3 33:4 46:3 | 31:8,9,12 32:3 | 28:17,20,24 |
| **patent** 12:13 | **pendency** | 33:18 35:3,5,6 | 29:1,9,10,14 |
| 66:9 | 60:24 | 35:11,15,17,19 | 30:8,15,16,19 |
| **path** 60:20 | **pending** 7:5 | 35:22 39:2,4 | 30:22 31:18 |
| **pause** 14:5 | 35:25 41:14 | 39:15,19,21 | 32:5 33:11,14 |
| **pay** 2:14,20 | **penny** 67:15 | 40:1,6,8,11,14 | 36:7,12 37:12 |
| 10:5,6,14 | **people** 7:16 | 41:21 55:16 | 37:15 38:11 |
| 14:12 19:14 | 10:14 13:15 | 56:24,25 58:1 | 43:5,6,24 44:5 |
| 20:21 22:7 | 26:20 28:20 | 58:4,6 68:1,2,5 | 44:5 45:16 |
| 23:7 25:5 | 47:16 48:5,11 | 68:8 69:15 | 53:1,1,8 56:1,7 |
| 27:14 29:14 | 48:17 65:14 | **peterson's** | 56:8,11,18 |
| 34:1,2,16 | **perceive** 63:6 | 26:11 28:11 | 57:3,10,17 |
| 46:17 50:10,12 | **percent** 45:11 | 33:9 47:23 | 61:20,24,25 |
| 57:20,21 62:19 | 45:11 46:20 | 64:25 | 64:22 65:7 |
| 62:22 63:1 | 52:12,12,13,15 | **petition** 16:8 | 68:21 |
| 70:5,6 | 52:16 | 17:1 62:21 | **platform** 9:20 |
| **paying** 18:14 | **percentage** | 63:1 | **play** 50:22 |
| 18:14 25:14 | 19:25 20:1,1 | **phase** 52:11 | **playing** 48:7 |
| 28:10 30:24 | **percentages** | **phone** 6:25 | 48:14 |
| 41:2 51:16 | 53:3 | **picking** 67:10 | **pleadings** |
| 62:23 | **perception** | **pictures** 5:2 | 36:23 |
| **payment** 8:14 | 44:12,14 | 7:10 | **please** 6:5,11 |
| 16:25 18:21 | **perform** 22:19 | **piece** 45:14 | 35:9 |
| 19:5,11,12,17 | 23:25 34:19 | **piper** 4:1 | **pm** 1:16 69:17 |
| 20:4,5 22:4 | **performance** | **place** 9:7 14:1 | **point** 24:12 |
| 30:3 33:25 | 23:5 | 19:14 23:6 | 40:23 42:19 |
| 34:24 43:16 | **period** 20:2,3 | 24:18 57:20 | 47:15,17 52:9 |
| 51:19 52:3 | 61:23 62:11 | 65:13,16 66:22 | 55:18,24 56:1 |
| 63:2 | **permitted** | 66:24 67:8 | 66:12 69:10 |
| **payments** | 66:20 | **placed** 19:6 | **pointed** 56:3 |
| 16:13,20,21 | **peterson** 2:3 | **places** 58:17 | 57:7 |
| 20:20,25 22:5 | 4:13 6:14 7:2,2 | **plan** 10:8 13:1 | **polite** 6:14 |
| 25:10 26:23 | 22:10,11,11,22 | 13:4,7,8,12,21 | **polk** 3:12 |
| 27:11 29:23 | 23:20 24:23 | 15:4 16:9,17 | **pope** 4:8 |
| 34:4,5 | 25:1,3,5,7,9 | 25:24,25 26:7 | **position** 23:7 |
| **pays** 18:9,10 | 26:23 28:22,23 | 26:8,8,14,21 | 52:2 66:12 |
| 24:1 29:25 | 30:18,23 31:4 | 27:8,8,21 | |

| | | | |
|---|---|---|---|
| **possession** 27:17 | **priority** 38:16 | **projections** 10:8 15:4 16:9 44:4 56:9 | **pursued** 42:17 |
| **possible** 15:5 | **pro** 7:5 | | **pursuing** 67:14 67:17 |
| **post** 62:21 63:1 | **probably** 20:20 35:12 39:19 43:12 67:25 69:11 | **property** 12:11 42:7,7,15 52:19 | **put** 47:17 53:22 64:25 |
| **postler** 3:3 6:18 | | **propose** 8:10 26:23 | **q** |
| **postures** 48:19 | **problem** 17:13 35:12 43:22 44:25 50:16,20 50:25 51:2 59:20 60:2 63:7 | **proposed** 6:18 7:20 18:21 34:7 | **question** 19:16 22:15,18,21 25:11 29:19 32:17 45:19 51:14 54:22,22 60:2 |
| **pot** 13:22 54:7 | | | |
| **potential** 59:25 | | **proposition** 34:21 | |
| **potentially** 44:24 59:22 | | **provide** 9:18 13:20 34:2 59:21,22 | **questions** 14:6 14:9 47:9,23 48:16,21 |
| **pre** 17:1 | **problems** 23:11,11 38:16 45:7,7 | **provided** 10:18 | **quickly** 16:25 35:18 56:11,21 58:18 59:4 |
| **precludes** 16:13 51:16 | | **provider** 18:23 | |
| **prefer** 31:16 | **procedural** 48:19 | **providers** 7:11 | **quite** 49:5,6 |
| **prejudice** 67:1 67:4 | **proceed** 8:21 36:2 40:4 42:1 46:21 65:17,17 66:22 68:24 | **provides** 13:8 46:17 | **r** |
| **prejudices** 38:17 | | **providing** 10:2 10:4 12:11 18:18 | **r** 1:21 2:9,14 2:20 3:1 6:1 7:19,20 71:1 |
| **preliminary** 2:1,8,13,19 65:24 68:23 | **proceeding** 40:10,12 58:25 59:10 60:4,22 | **prudent** 69:10 | **railroad** 41:6 |
| **prepared** 65:15 | | **pull** 60:1 | **raise** 32:11 |
| **present** 6:19 | **proceedings** 57:8 66:11,16 69:16 71:4 | **purchase** 22:17 22:17 | **raised** 26:22 54:19 |
| **preserves** 43:25 46:15 | | **purpose** 21:5 27:13,23 37:23 46:20 53:24 54:9 66:25 67:20 | **rate** 47:25 54:3 54:3 56:5 64:25 65:2,4 |
| **presiding** 6:4 | **process** 37:24 38:8 39:12 41:6,7 42:13 46:24 57:13 59:8,20 | | |
| **pretty** 22:13 69:6 | | | **rather** 46:20 |
| **prevent** 44:5 | | | **rationale** 17:20 |
| **previous** 23:7 | **produce** 24:21 | **purposes** 11:19 42:12 | **read** 12:18 23:17 24:2 49:10 66:10 67:9,13 |
| **pricing** 56:4 64:24 | **professional** 46:9 | | |
| **principal** 6:20 36:19 | **projected** 48:1 | **pursue** 46:1 | |

reading 12:23 65:7 67:8
ready 18:2 37:13,15 40:24 40:25 58:7,8
real 50:11 55:11
realest 50:12
realistic 34:21
realistically 21:7
realities 44:11
really 9:4,18 15:19 38:20 43:8,18 44:22
reams 45:2
reason 20:25 37:24 38:3,21 38:24 41:10
reasonable 11:13 18:16
reasons 63:10
reassess 65:18
receive 18:3
received 17:18 50:13
receiver 66:21
receives 32:19
receiving 32:18
recitations 62:10
recognize 53:19 58:17
recollection 27:22
record 34:18 71:4

recorded 60:6
refer 9:5
referred 12:12 28:2
reflected 15:7
reject 35:10
rejected 22:20
related 10:5
relating 54:5
relationship 24:8 63:1
releases 30:15
relief 2:2 8:19 32:12 40:4 63:2 65:25 66:3 67:2,5,15 70:7
remains 66:21 66:24
remarkably 36:21
remember 53:23
rent 30:3
replaced 23:13
replacing 17:13
reported 54:25 55:7
represented 12:5
represents 36:10
request 2:2 33:25 65:25
requested 46:21

resolution 41:15 52:4 56:22
resolve 13:9 33:14 37:4,17 38:5 45:7 47:24 48:13,13 50:5 52:25 53:1 54:13 56:20 57:10 58:8 67:8
resolved 13:10 28:17,18,19 37:8,18,19 39:10 41:12 55:19,23 57:17 61:1,2,6
resolves 28:18 30:8
respect 35:2 42:8 67:3
response 32:21 41:24
responsible 10:1,3,4 18:2
rest 17:1
restraint 49:20
restrictions 16:16
restructure 45:7
result 27:7,15 57:7
return 30:13 55:12
returns 11:21 55:6

revenue 10:7,8
reversing 55:6
reviewed 66:5 66:6,7
riedel 3:3 6:18
right 8:4 15:20 18:7,15 19:13 19:18 21:9 22:3,13 24:7 25:17 26:16 28:5 30:6 31:13 36:14 39:15 42:5,25 44:5,7,10,15 44:24 45:4,6 45:10,11 47:6 47:18,19,24 49:7,9,12,18 51:17,22 52:14 53:3,10,21 56:22 57:21 61:12 62:15 63:16,21 64:5 64:24,24 65:5 65:22
rise 6:2
risk 23:9 67:16
rita 2:25 71:3,8
road 38:18 60:12 67:11 71:21
roberta 1:22 6:4
rolls 29:1,10,19 30:24
rooker 57:22 57:25

**room**  46:11
  58:14 64:8
  67:12
**roughly**  19:14
  46:24
**royalty**  13:11
  16:7 42:6
  47:25 50:10,13
  51:19 52:12
  54:3 55:1,3,5
  56:5 57:21,21
  65:2
**royce**  29:1
  30:24
**rule**  38:16 45:9
  45:10,10 48:8
  56:23 68:4
**ruled**  61:18
**rules**  13:24
  56:4 63:22
**ruling**  67:5
**rulings**  38:2
  70:3
**run**  10:19
  15:16 44:13
  46:9,13
**running**  21:8
  63:13
**ruppel**  4:8
**rush**  27:5

**s**

**s**  3:1 6:1
**salaries**  15:13
  22:5 34:4
**salary**  16:5,6
**sanction**  47:11

**sanctions**
  47:14
**sarasota**  28:8
  33:5
**saw**  49:4
**saying**  13:15
  20:10 41:10
  43:11 49:24
  62:6
**says**  24:9 52:23
  56:7 67:7
**schedule**  67:20
**scheduled**  48:5
  66:16
**schedules**  13:3
  13:7 14:2,4
  21:18 31:18
  32:13 41:4
  57:16 58:23
  61:4 65:8
**schoenfeld**
  4:20 7:4 35:8
**scout**  3:19
**seated**  6:6
**second**  34:12
  37:3 39:23
  40:1
**section**  35:24
**secured**  21:14
  21:15 32:24
**see**  10:7 12:25
  15:13 18:20
  24:20 29:24
  48:23 59:11,18
  60:24 65:11
  67:9

**seek**  67:2
**seeking**  47:10
  47:12 63:3
  66:2
**seen**  21:18
  44:25 49:12
  57:16 63:20
**sees**  53:20
**seminole**  10:25
**send**  69:4
**sense**  9:11
  27:12 52:24
**sent**  42:4
**separate**  16:23
**separately**
  41:18
**sequencing**
  60:10
**seriously**  35:20
**services**  9:20
  10:3,18 12:11
  13:20 18:18
**session**  6:3
**set**  7:15 15:6
  36:23 37:3,6
  37:18 41:7,14
  44:16 47:20
  61:19,25 62:2
  62:3 68:22
**setting**  8:12
**several**  36:25
**shareholder**
  38:6 57:2
  67:14
**shareholders**
  36:4

**shares**  9:12
  36:4 41:2
**sheet**  28:4
**shenzhen**
  18:24,25 55:22
**shift**  19:13
**shipped**  17:18
**shook**  4:15 7:6
**short**  15:1,9
  22:13 61:19,23
  62:11
**showed**  49:19
**side**  46:11
  49:23 55:7,15
  64:8 67:12
**side's**  29:8
**sides**  36:19
  55:9 58:15
  59:17 60:19
  64:14 66:4
**signature**  71:6
**significant**
  10:9 34:8
  50:15
**significantly**
  48:4
**similarly**  20:4
**single**  9:20
  11:25 27:23
**sit**  65:1
**sitting**  52:22
**situation**  44:6
  52:21,22
**size**  19:25
**sized**  20:4
**smacks**  41:3

small  63:20
smart  1:7 2:10
  2:10,15,16 6:8
  6:9 8:24,24 9:5
  11:8 26:5 55:3
sole  11:2 17:6
  23:15
solutions  49:16
  59:3 71:20
solve  50:21
  53:11,12
solved  50:2
somebody  7:15
  37:17 46:11
somebody's
  46:13
sooner  56:18
sorry  25:8
  40:11,14 60:9
  61:10
sort  8:10 9:1,7
  9:19,21 10:5
  10:12,19,21,23
  12:6,21 17:20
  33:1 48:7,16
  50:8,22 66:12
sought  42:4
sounds  34:17
  61:23
source  17:6
  23:15
south  4:17
  27:22
sparse  34:18
speak  22:9
  24:25 33:24

speaks  23:1
special  7:20
specific  29:4
  48:21
specifically
  40:3
specifics  17:15
speed  59:1
  63:21
spells  39:9
spend  8:16
  44:23
spent  27:6
  67:14
split  13:23 54:7
spoken  67:7
spot  14:3
staffing  10:23
standpoint
  12:3 16:11,11
start  8:6 25:22
  35:3 50:8 52:3
  53:24 54:9,14
  57:1 67:10
state  13:13
  16:15 26:1
  36:1,15 37:8
  38:2,19 39:9
  39:13,17 40:5
  41:11 42:22
  43:2,22 44:1
  44:16,20 45:12
  45:16 46:22
  48:18 49:24
  50:3,5,21 51:4
  51:4,8 52:5,11
  53:18 55:4,24

57:7,18 58:7
  58:17 59:24
  60:14,21 61:1
  63:16 65:16
  66:10,14,20,22
statement
  15:18
states  1:1,11
  3:10,11 6:2,23
  9:24 34:23
status  33:20
  67:22
statute  39:9,17
  67:15
stay  2:2,9 8:19
  35:2,21,24
  36:2,5 37:21
  40:4 42:18,21
  47:11,16 58:7
  59:6 65:25
  66:3 67:4,20
  70:7,8
stayed  47:17
steps  46:3
steve  4:6 54:21
steven  6:25
stichter  3:3
  6:18
stipulated
  51:19
stock  37:4
  38:15 39:8
  40:19 45:22
  46:3,4,18
stockholder
  46:2,2,18

stone  18:24
stop  38:17
street  3:5,12
  4:3 5:3 33:4
structure  9:14
  13:8,11 56:20
structured
  56:2
stuck  15:6
stuff  12:20
  14:5 42:18
  49:10,12,12
  61:19 65:9
sub  57:15
subchapter
  7:13 59:1,6
subject  11:25
  12:1 14:3 16:9
  25:25 42:18
  55:23
submitted
  18:19
subordinated
  39:17
subscription
  18:15
subsidiaries
  11:19 15:13
subsidiary  9:4
  15:15 26:7
suggest  54:3
suggested
  31:17 54:6
suggestion
  65:10
suggests  32:3

| | | | |
|---|---|---|---|
| **suite** 3:5,12,19 | **take** 6:10 8:19 | **telling** 64:17 | **thing** 34:18 |
| 4:10,17 5:3,10 | 24:10,24 30:18 | **tennessee** 66:7 | 37:25 51:10 |
| 9:19 71:22 | 45:6 48:5,6 | **teresa** 3:15 | 63:10 |
| **superficially** | 65:13 | **term** 15:2,9,9 | **things** 8:10 |
| 42:23 | **taken** 32:1 | 17:12 24:8,20 | 9:13 12:24 |
| **superseded** | 50:3 65:15 | 34:21 | 13:13 14:4,15 |
| 16:17 | **takes** 9:6 | **terminate** | 15:22 16:1,3 |
| **supplement** | **talented** 59:13 | 52:18 | 27:25 28:3,6 |
| 17:4 | **talk** 26:18 44:8 | **terms** 11:23 | 30:3 33:2,11 |
| **supplier** 9:16 | **talked** 20:20 | 15:24 19:8 | 33:15,16,19,23 |
| 10:17 12:2 | 42:9 | 23:1,2,19 | 35:14 37:7 |
| 17:21 | **talking** 24:5 | 37:21 38:13 | 39:11 47:17 |
| **suppliers** 17:7 | 30:2 39:22 | 40:24 59:7,15 | 48:2,19 49:17 |
| **supply** 17:12 | 42:5,6,10,11 | 61:14 67:5 | 53:18 58:18 |
| 24:7 | 42:25 47:25 | 68:21 | 59:18 60:25 |
| **supports** 15:2 | 60:16 | **test** 40:22 | **think** 8:9,16,18 |
| **supposed** | **tampa** 3:6,13 | **testifying** 53:4 | 9:25 10:10 |
| 57:21 64:13 | 3:20 4:11 5:3,4 | **tethered** 52:16 | 12:14,22 13:2 |
| **sure** 16:22 21:7 | **tax** 11:19,21 | **thank** 8:3,8 | 13:5,8,25 14:3 |
| 21:10,12 24:18 | 32:15 54:4,23 | 14:10,11 21:6 | 14:17 15:15,18 |
| 25:16 29:1 | 55:2,11 57:5 | 22:2,2 31:12 | 15:23 17:4 |
| 36:6 45:24 | **taxes** 54:24,24 | 31:14 32:7,9 | 20:10,19,21 |
| 47:3 54:20 | **team** 46:9 | 34:10,14,25 | 21:6 22:20 |
| 56:19 59:11 | **tech** 31:1,4 | 35:5,22 41:20 | 23:7,17,24 |
| 62:25 63:14 | **technical** 15:22 | 41:21,23 42:2 | 24:14,21 25:12 |
| **swank** 5:2 7:10 | **technology** | 48:25 49:2 | 25:14,23,24 |
| | 9:16,22 10:23 | 54:15,16,21 | 26:15 27:5,12 |
| **t** | **teed** 36:8,15,24 | 58:10,13 61:8 | 27:25 28:2 |
| **t** 71:1,1 | 37:1 38:13,18 | 61:13 64:2 | 30:2,8 31:17 |
| **table** 8:12 | 38:25 39:22 | 65:19,21 68:8 | 32:1,22 33:1,5 |
| 49:24 | 40:25 48:21 | 68:20 69:8,12 | 33:10 35:11 |
| **tablet** 10:17 | **telecommuni...** | 69:14,15 | 36:2,22 37:10 |
| 12:2 17:11,21 | 9:19 | **that'd** 52:18 | 41:17 42:2,18 |
| 18:23 | **telephonically** | **that's** 15:1 | 42:19 43:9,12 |
| **tablets** 10:4 | 4:6 5:13,14 | 21:9 | 44:18,22 45:18 |
| 17:7 19:1 22:8 | **tell** 35:10 38:25 | **theresa** 6:22 | 46:23 47:5,9 |
| 23:10,12 | 54:2,5 65:1 | | 47:22,22 48:3 |

48:21 49:4,20
49:25 51:11,12
52:1,5,9,21,25
53:5,25 54:8
55:20 56:12,17
58:8,14,23
59:2,3,6,13,20
60:2,11,15,17
60:19,22 61:20
61:25 62:1
63:2,10,15,15
63:21,23 65:6
67:6,22,24
68:9 69:3
**thinking** 45:20
**thinks** 21:8
**thought** 7:16
27:2
**thousands**
49:10
**threat** 23:4
**threaten** 34:19
**three** 52:13
**thrive** 64:7
**throwing** 54:6
**thrown** 15:24
35:16
**tight** 10:9
**time** 8:17,18
13:19 17:17
19:7 20:2,3
28:21 37:6
43:3 48:2,3,16
49:5,6 56:17
56:18 60:15
61:3,23 62:11
62:12

**time's** 58:19
**timeline** 48:12
**timelines** 60:16
**times** 17:15
23:9 36:11
**timing** 41:3
**titled** 28:12
**today** 8:18
12:17 13:7
16:19 24:18
26:17 28:17
31:15,24 41:14
49:19 60:11
61:8 62:3,10
62:13 68:10
**together** 31:19
35:16
**toggle** 56:2
**told** 50:12
**tolerates** 59:8
**ton** 66:5,5
**took** 55:3
56:17,18
**tools** 50:5
56:19 61:7
**top** 9:1 11:2
62:14
**touch** 33:23
**towards** 29:14
**track** 47:21
60:22
**trade** 12:6
**traditional**
9:11
**transaction**
64:14

**transcribed**
2:25
**transcript** 71:4
**transfer** 56:4
64:24
**transfers** 59:16
**transparency**
59:2,15,21
**transparent**
57:3
**tremendous**
49:20
**trial** 36:17 37:1
37:3,9,22,23
45:12 47:19
48:11 51:5,9,9
52:11 58:7
65:15,16
**tried** 24:14
43:4
**tries** 57:10
**troubling**
64:20
**true** 42:23 43:3
71:4
**trust** 7:4 8:20
**trustee** 3:10,11
6:23 7:3,13
22:12 35:6
66:2
**try** 38:5 41:5
54:14 56:19
61:5
**trying** 6:14
12:20 24:18
27:5 33:10
38:10 60:10

63:12 64:22
**turmoil** 10:10
**turn** 14:12
**two** 8:23 12:7
14:15,15 19:3
19:18 21:7,9
26:19,22 27:8
31:2,6 33:4
36:1,3 39:4,6
40:5 42:20,22
42:24 43:1
52:12 55:9,17
61:21 65:23
66:16,25
**type** 8:12 9:3
15:17 50:9
53:2 58:15
65:2 66:21
**typical** 20:24

**u**

**u.s.** 1:23
**ugly** 49:14 50:9
**ultimate** 39:13
**ultimately**
46:23 50:1
53:8,23 64:23
**unclear** 51:11
**under** 26:8,14
27:8 28:20
29:10,22 30:19
35:23,24 36:17
38:22 39:5,17
40:18 45:16
56:4 57:22
62:18 67:15
**underlying**
24:14 44:20

understand
21:2 32:14
35:22 51:18
57:19 58:1
understanding
39:4
understood
12:19 13:5
21:19 35:11
55:10 61:20
64:21
underwood 5:1
50:1
undo 57:18,22
unforgiving
59:7
unique 17:7
50:5
unit 17:25
united 1:1,11
3:10,11 6:2,23
unliquidated
12:4 55:18
unorthodox
61:14
unsecured
20:13 43:17
55:22
untethered
50:8 54:1
unwind 52:3
use 12:11 16:3
21:22 38:5
45:12
used 27:24,24
28:1 45:14,15

uses 27:20
usually 69:7

**v**

v 7:13 57:15
59:1,6
valid 36:23
validity 66:17
valuable 28:25
valuation 36:4
37:2,17 39:7
44:3,3,10
45:13 66:18
value 13:22
25:25 26:2,8
26:10,14 29:9
29:18 37:4
38:15 39:23
40:18 41:2
44:12,15 45:6
45:21 46:15,18
various 58:15
vehicle 29:8
vehicles 29:5,6
29:8
vendor 7:10
8:15 10:16
11:25 12:1
16:14,24 17:4
17:10,11,14,21
18:21 19:5,11
19:17 20:9,16
22:7 33:25
34:19 61:19
62:12,16 64:3
vendors 2:20
11:24 12:6
17:5 34:16

63:15 70:6
verify 28:23
veritext 71:20
vessel 25:12,13
26:3 32:24
vessel's 27:23
vessels 25:22
27:18
view 22:25
49:21 62:17
69:9
violation 47:11

**w**

w 3:19
wacker 4:17
waive 68:4
wand 44:19
want 7:4 12:22
23:6,20 25:16
29:1,4 30:18
31:24 36:21,22
39:11 41:4,5,8
46:3,4 48:5,6
48:24 49:21,21
50:7,7 54:1
55:24 57:16
64:18 68:25
wanted 52:10
54:15 55:18
wants 24:24
warranted
32:6
washington 4:4
11:1
watch 18:13
wave 44:18

way 15:16
20:10 23:17
33:4,12,13
41:5 45:5,17
46:14 56:1
57:14 58:16
59:19,19 60:22
ways 13:15
59:6
we've 7:14,15
8:5 12:24 22:3
24:14 32:4
36:6,15 39:7
42:8 49:16
50:13 56:17
58:14 62:13,14
65:22 69:3
week 13:1,7
weeks 49:3
58:21
weltsch 2:25
71:3,8
wendy 1:25
west 1:12
wholly 26:6
willing 61:18
willingness
59:4
win 37:9,13
38:23 44:6
wish 33:24
67:19
wishes 22:9
woman 60:7
word 53:5
work 14:2
36:13,14 38:10

| | |
|---|---|
| **working** 28:9 | **z** |
| **works** 46:24 | **zero** 26:23 |
| 68:2 | 52:14,15 54:4 |
| **would've** 14:1 | 55:4 56:7 |
| 50:3 | **zeros** 27:15 |
| **wrap** 31:17 | **zoom** 7:16,16 |
| **wrapping** | |
| 31:23 | |
| **writing** 49:19 | |
| **x** | |
| **x** 1:4,10 70:1 | |
| **y** | |
| **yacht** 25:13,14 | |
| 26:3,6,9,13 | |
| 28:1,7 31:5 | |
| **yeah** 8:8 12:19 | |
| 14:21 21:4,25 | |
| 22:22 25:23 | |
| 27:1 35:15,17 | |
| 39:21 43:15 | |
| 44:18 45:23 | |
| 46:23 55:17 | |
| 56:17 58:5 | |
| 63:25 64:16 | |
| **year** 36:25 | |
| 54:12,12,13 | |
| **years** 33:13,14 | |
| 36:1 38:1 | |
| 42:22,24 43:1 | |
| 50:3,9 53:18 | |
| 67:14,14,14 | |
| **yep** 40:8 64:11 | |
| 65:22 | |
| **yield** 48:16 | |

# EXHIBIT 2

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
   Plaintiff,

v.

          CASE NO.  2023 CA 001002 NC
          DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
   Defendant.

_____

**ORDER WITH THE COURT'S FINDINGS
FROM PART 1 OF PHASE 2 TRIAL**

   The Court conducted Part 1 of Phase 2 Trial on February 10, 2025 – February 12, 2025. The Court made findings and conclusions in open court at the conclusion of trial. Those are attached to this Order. The Court indicated it would release this Order with its core findings and attach the oral ruling. The core findings are:

   1.  Jon Logan is the 100% owner of HLFIP Holding, Inc., which he caused to be converted to HLFIP Holding, LLC on August 29, 2023.

   2.  Jon Logan is a 50% shareholder of Smart Communications Holding, Inc. The other 50% shareholder is his mother, Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021. Previously, James Logan—Janice Logan's late husband and Jon Logan's father—owned these shares. Shortly before his death on October 16, 2022, James Logan transferred his shares of Smart Communications Holding, Inc. into the James Logan Family Trust.

   3.  Jon Logan was, and is, an officer and director of Smart Communications Holding, Inc. During his life, James Logan was also an officer and director of Smart Communications

Page 1 of 7

Holding, Inc. Janice Logan has never been an officer or director of Smart Communications Holding, Inc. Prior to James Logan's death, Jon Logan and James Logan were the only two members of the board of directors of Smart Communications Holding, Inc. After James Logan's death, Jon Logan has been its only director. Janice Logan requested to become a director of Smart Communications Holding, Inc.; Jon Logan denied that request.

4.      The Court makes no findings as to the ownership of the intellectual property, as that is a valuation issue and beyond the scope of Part 1 of Phase 2 Trial and outside the Bankruptcy Court's limited relief from stay. (Parenthetically, it appeared everyone agreed that Jon Logan through HLFIP owned the original MailGuard concept.)

5.      With respect to the royalty issue, Jon Logan testified that he and his father (James Logan) agreed that Smart Communications could use HLFIP's intellectual property and that there would be a future true-up or appraisal of valuation for payment to HLFIP. There is no documentary evidence memorializing a future true-up or appraisal of valuation for payment to HLFIP agreement. And Smart Communications' senior, non-family member employees such as Lisa Eddy (Vice President of Operations) and Noreen Gunning (Director of Accounting and Finance), knew nothing of this alleged future true-up or appraisal of valuation for payment to HLFIP agreement. Mike Shreve, Smart Communications' long-term external auditor, knew nothing of it, either.

6.      The Court finds Jon Logan's testimony concerning a true-up or valuation for payment to HLFIP is not credible. The Court finds as fact there was no such agreement between Jon Logan and James Logan for a future true-up or valuation for payment to HLFIP by Smart Communications.

7.      August 29, 2023, is the date Jon Logan caused substantial corporate creation of, and reconfiguration to, subsidiaries of Smart Communications Holding, Inc. as well as related entities. Jon Logan unilaterally caused the entirety of the corporate restructuring to occur; there was no attempted discussion with, or request for assent by, Janice Logan.

8.      On August 29, 2023, Jon Logan caused the creation of Smart Communications Holding, LLC, which is a 100% owned subsidiary of Smart Communications Holding, Inc. On that date, Jon Logan caused most of the assets of Smart Communications Holding, Inc. to be assigned to Smart Communications Holding, LLC. Jon Logan did not attempt to discuss these transactions with Janice Logan or otherwise receive her consent.

9.      On August 29, 2023, Jon Logan also caused multiple transactions to occur with respect to the imposition of a purported 40% royalty to be paid by Smart Communications to HLFIP, both prospectively and retrospectively. On that day, Jon Logan signed the purported Exclusive Intercompany Intellectual Property License Agreement on behalf of both Smart Communications Holdings, LLC, on the one hand, and HLFIP Holdings, LLC, on the other hand. He also caused Smart Communications Holding, Inc. to reflect within its Consolidated Audited Financial Statements released in October 2023 for year-end December 31, 2022, an alleged long-term liability in favor of HLFIP for the prior use of HLFIP intellectual property. This is described in Footnote I to those consolidated financial statements. Those statements now reflect

a Note Payable to HLFIP. For the years 2015-2021, this is expressed as an expense then valued at $52.8M with accrued interest of $5.6M. For 2022, the accrual added $17.9M to the expense and $0.4M of accrued interest. The Court collectively will refer to the actions of signing the Exclusive Intercompany Intellectual Property License Agreement and causing Smart Communications Holding, Inc. to recognize a long-term liability in favor of HLFIP as the "Purported Royalty Transactions." Jon Logan did not attempt to discuss these Purported Royalty Transactions with Janice Logan or otherwise receive her consent.

10.     These Purported Royalty Transactions are "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes. Jon Logan and his wholly owned HLFIP Holding, LLC entity have a direct or indirect "material financial interest or other material interest" in these Purported Royalty Transactions within the meaning of section 607.0832.

11.     Jon Logan, Smart Communications Holdings, Inc, and HLFIP Holding, LLC failed to prove that these Purported Royalty Transactions were fair to Smart Communications Holdings, Inc. Separately, Janice Logan, individually and as Trustee of the James Logan Family Trust dated February 19, 2021, proved that these Purported Royalty Transactions were not fair to Smart Communications Holdings, Inc.

12.     In the light of Janice Logan's filing seeking the judicial dissolution of Smart Communications Holding, Inc. and the entity's election to purchase the Trustee's shares, section 605.0706(4), Florida Statutes, establishes the valuation date but permits "such other date as the court deems appropriate under the circumstances." Here, the Court deems it appropriate under these unique facts to establish the valuation date as August 28, 2023, the day before Jon Logan caused massive structural changes and other transactions.

13.     In the Court's oral ruling, the Court neglected to affirmatively state that the Court credited the testimony of Dr. Berneman. The Court corrects that omission now.

IT IS ORDERED:

1.     The Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, is invalid and of no legal force or effect.

2.     The long-term liability recognized by Smart Communications Holdings, Inc. in favor of HLFIP Holding, LLC purporting to impose a historic 40% royalty and as described in Note I to the Smart Communications Holdings, Inc. Consolidated Audited Financial Statements (as of December 31, 2022) is invalid and of no legal force or effect. This includes both the accrual of that liability and the accrual of the associated interest expense.

3.     The Court will value Smart Communications Holdings, Inc. as of August 28, 2023, for purposes of the company's election to purchase the shares owned by Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on February 17, 2025.

e-Signed 2/17/2025 8:24 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On February 17, 2025, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

MARK MATTHEW WALL
101 EAST KENNEDY BLVD
SUITE 3700
TAMPA, FL  33602

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL  34205

DAVID A WALLACE ESQ
783 S ORANGE AVE STE 300
SARASOTA, FL  34236

CHELSEA KOFF
200 EAST LAS OLAS BLVD
SUITE 2100

FORT LAUDERDALE, FL  33301

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

JOSEPH H III VARNER
777 S. HARBOUR ISLAND PLACE, #800
TAMPA, FL  33602

MARK JAMES BERNET
AKERMAN SENTERFITT PA
401 EAST JACKSON STREETSUITE 1700
TAMPA, FL  33602

JASON SAMUEL OLETSKY
401 E JACKSON ST STE 1700
TAMPA, FL  33602

M MARIE WILSON ESQ
2357 S TAMIAMI TRAIL #3 PMB #122
VENICE, FL  34293

JONATHAN T TORTORICI
4301 WEST BOY SCOUT BLVD STE 300
TAMPA, FL  33607

JAROD A BRAZEL
101 E. KENNEDY BLVD., SUITE 3700
TAMPA, FL  33602

JULIE NEGOVAN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

SARAH O'ROURKE
100 N TAMPA STREET STE 2900
SUITE 2900
TAMPA, FL  33602

ANDREW L FRANKLIN
111 S. WACKER DR.

STE. 4700
CHICAGO, IL  60606

DAVID E SCHOENFELD
111 SOUTH WACKER DRIVE
SUITE 4700
CHICAGO, IL  60606

ANITRA F RAIFORD
2555 GRAND BLVD
KANSAS CITY, MO  64108

JESSICA LEONA MAZZEO
6750 N ANDREWS AVE
STE. 200
FORT LAUDERDALE, FL  33309

PETER F O'NEILL
2555 GRAND BOULEVARD
KANSAS CITY, MO  64108

MICHAEL J HARWIN
200 EAST LAS OLAS BOULEVARD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

GLENN T BURHANS JR
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

MAX CORY RUDOLF
350 EAST LAS OLAS BLVD.
SUITE 1600
FT. LAUDERDALE, FL  33301

DUSTIN BRYAN HILLSLEY
AKERMAN LLP
201 EAST LAST OLAS BOULEVARD, SUITE 1800
FORT LAUDERDALE, FL  33301

CHRISTOPHER GEORGE OPRISON
DLA PIPER LLP (US)
200 SOUTH BISCAYNE BOULEVARD - SUITE 2500
MIAMI, FL  33131

BRIDGET K SMITHA
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

TAL ABUROS
200 SOUTH BISCAYNE BOULEVARD
SUITE 2500
MIAMI, FL  33131

KATRINA MARIE QUICKER
900 CIRCLE 75 PARKWAY
SUITE 100
ATLANTA, GA  30339

MICHELLE HOGAN
15952 SW 16 ST
PEMBROKE PINES, FL  33027

ERIN BERHAN
200 SOUTH BISCAYNE BLVD
SUITE 2500 / 25TH FLOOR
MIAMI, FL  33131

MICHAEL BARFIELD
1668 Oak Street, #1
Sarasota, FL 34236
michael@denovolawfl.com

# Exhibit 1

```
 1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
 2
            WEDNESDAY, FEBRUARY 12, 2025 JUDGE'S RULING
 3
     JONATHAN LOGAN and SMART
 4   COMMUNICATIONS HOLDING, INC.,

 5            Plaintiffs,
     vs.                           Case No.:  2023-CA-1002-NC
 6
     JANICE LOGAN, individually and
 7   as Trustee of the James Logan
     Family Trust, dated February 10,
 8   2021; and ALEXIS LOGAN,

 9   _____Defendants._____/   (CONSOLIDATED)
     JANICE LOGAN, as Trustee of the
10   James Logan Family Trust dated
     February 10, 2021,
11
              Counterclaim Plaintiff,
12   vs.                           Case No.:  2023-CA-1280-NC

13   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
14   SMART COMMUNICATIONS HOLDING,
     LLC, HLFIP HOLDING, INC., and
15   HLFIP HOLDING, LLC,

16   _____Counterclaim Defendants./
     JANICE LOGAN, as Trustee of the
17   James Logan Family Trust dated
     February 10, 2021, and
18   derivatively on behalf of
     Smart Communications Holdings,
19   Inc.,

20            Plaintiff,
     vs.
21   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
22   nominal defendant, SMART
     COMMUNICATIONS HOLDING, LLC,
23   HLFIP HOLDING, LLC, HLFIP HOLDING
     LLC, LOCO FLORIDA LLC and SMART
24   COMMUNICATIONS YACHT HOLDING, LLC,
              Defendants.
25
```

1

2

OFFICIAL TRANSCRIPT OF PROCEEDINGS
JUDGE'S RULING

3

4

BEFORE THE HONORABLE HUNTER W. CARROLL
held via Zoom and at the
Judge Lynn N. Silvertooth Judicial Center
2002 Ringling Boulevard, 6-C
Sarasota, Florida  34237

5

6

Wednesday, February 12, 2025

7

6:04 p.m. to 7:06 a.m.

8

Pages 1 through 37

9

10

11

12

13

14

Stenographically reported by:

15

16

17

Linda R. Wolfe
Registered Professional Reporter
Registered Merit Reporter
Federal Certified Realtime Reporter
Florida Professional Reporter-Certified

18

19

20

21

22

23

24

25

```
 1   (All participants appeared live.)

 2   APPEARANCES:
     On behalf of HLFIP Holding, LLC:
 3           CHRISTOPHER G. OPRISON, Attorney at Law
             TAL ABUROS, Attorney at Law
 4           KATIE MIESNER, Attorney at Law
             DLA PIPER, LLP (US)
 5           200 S. Biscayne Blvd., Suite 2500
             Miami, FL  33131-5340
 6           (305)423-8522
             chris.oprison@dlapiper.com
 7           erin.berhan@dlapiper.com
             katie.miesner@us.dlapiper.com
 8
             STEVE DIXON, Attorney at Law
 9           JAMES (SEAMUS) BRESNAHAN, Attorney at Law
             DLA PIPER, LLP (US)
10           500 Eighth Street, NW
             Washington, DC  20004
11           (202)799-4000
             steve.dixon@dlapiper.com
12           seamus.bresnahan@dlapiper.come

13   On behalf of Jonathan D. Logan; Smart Communications
     Holding, Inc.; Smart Communications Holding LLC; and
14   Loco Florida, LLC:

15           DUSTIN B. HILLSLEY, Attorney at Law
             MAX RUDOLF, Attorney at Law
16           MICHELLE HOGAN, Attorney at Law
             AKERMAN, LLP
17           201 E. Las Olas Blvd., Suite 1800
             Ft. Lauderdale, FL  33301-4442
18           (954)331-4129
             dustin.hillsley@akerman.com
19

20

21

22

23

24

25
```

```
 1   On behalf of Janice Logan:

 2           DAVID SCHOENFELD, Attorney at Law
             PETER O'NEILL, Attorney at Law
 3           ANDREW FRANKLIN, Attorney at Law
             KAILIN LIU, Attorney at Law
 4           SHOOK, HARDY & BACON L.L.P.
             111 S. Wacker Dr., Ste. 4700
 5           Chicago, IL  60606
             (312)704-7700
 6           dschoenfeld@shb.com
             pfoneill@shb.com
 7           afranklin@shb.com

 8           JOHN D. GARRETSON, Attorney at Law
             SHOOK, HARDY & BACON L.L.P.
 9           2555 Grand Boulevard
             Kansas City, MO  64108
10           (816)474-6550
             jgarretson@shb.com
11
             ANITRA CLEMENT, Attorney at Law
12           SHOOK, HARDY & BACON L.L.P.
             Tampa, FL
13           (813)202-7110
             aclement@shb.com
14
     On behalf of Alexis Logan and Justin Peterson:
15
             CHARLES F. JOHNSON, III
16           Attorney at Law
             BLALOCK WALTERS, P.A.
17           802 11th Street West
             Bradenton, FL  34205-7734
18           (941)748-0100
             cjohnson@blalockwalters.com
19
     ALSO PRESENT:        Jonathan Logan
20                        Janice Logan
                          Alexis Logan
21                        Dr. Louis Berneman
                          Justin Peterson
22                        Michael Barfield,
                           Observer/Press/Paralegal
23                        Claudia Lora, Akerman Paralegal
                          Chezelle McDade, DLA Piper
24                         Paralegal
                          Justin Watkins-TrialQuest Tech
25                        Marlin Galvis-Trial Tech
```

1                    JUDGE HUNTER CARROLL'S RULING

2              THE COURT:   Court has before it Part 1 of

3        Phase II in case number 2023-CA-1002.

4              I'm going to ask that the court reporter type

5        up my ruling, not the whole trial but my ruling,

6        and make sure I get a copy because my intent will

7        be to enter an order with just the core findings

8        and I'm going to attach my transcript as the

9        factual findings.

10             First thing I'm going to do is go through some

11       individuals; identify them.   Then go through a

12       timeline.   And then come back and make some factual

13       findings that kind of fill in that timeline, and

14       that address this case.

15             Now, certainly, I am here in this phase of the

16       trial as authorized by the Bankruptcy Court and the

17       Court does not anticipate and will not exceed the

18       bounds of the limited stay relief provided by the

19       Bankruptcy Court.

20             Starting with individuals.   We have James

21       Logan, also known as Jim Logan, and many times will

22       be referred to as Dad.   And he passed on

23       October 16, 2022.

24             Mr. James Logan was married to Janice Logan,

25       his wife, and they had two children, Jon Logan, and

1    Alexis Logan.

2         Jon Logan and Alexis Logan are Brother and

3    Sister.

4         I don't think it goes without saying that

5    there is family discord within the Logan family:

6    And, principally, there's problems between

7    Jon Logan and Alexis Logan, and Jon Logan and

8    Janice Logan.  I guess even under Jon Logan's

9    statements that the difficulty he has with his mom

10   is actually a little bit less than the difficulty

11   he has with his Sister.

12        We also have Lisa Eddy who is the Vice

13   President of Operations of Smart Communications.  I

14   think, technically, she's employed by Smart

15   Communications Collier.

16        We have Mike Shreve, who is the long-time

17   accountant for Smart Communications as well as

18   HLFIP.

19        We have Noreen Gunning, who now is the

20   Director of Accounting and Finance for Smart

21   Communications, a position she took on after James

22   Logan's passing.  Prior to that, she was the

23   accountant internally for Smart Communications and

24   she also provides services to HLFIP.

25        We have Justin Scott, who originally was an

1        independent contractor that was retained to assist

2        with the original idea; and then, ultimately,

3        became an employee.

4            We have a group called Marcum LLP, although

5        they have been subsequently purchased, and my notes

6        aren't as clear, but I think it's like CBIZ or

7        something like that which is a new name, but I'm

8        just going to refer to that group as "Marcum,"

9        because that's how all the documents are titled.

10           The specific engagement that we are here on,

11       the supervisor of that engagement is Ms. Voralia.

12       And I apologize for not being able to pronounce her

13       first name.

14           The primary person who was under Ms. Voralia

15       but the person who did the bulk of the work is

16       Ms. Naidu.

17           The client contact for this Marcum study was

18       Katrina Quicker, who is an attorney for HLFIP.

19           And there's Katie Vance who is in

20       Ms. Quicker's office.

21           Our timeline, generally, starts in 2008

22       although the animus and the difficulties between

23       the various members of the Logan family appear to

24       predate this time.  I don't know the source, but

25       doesn't matter for my purposes other than there is

1      this difficulty within the Logan family.

2            And for purposes of our hearing and trial for

3      the last three days, our timeline generally starts

4      in 2008 when Jon Logan did a very brief stint in a

5      county jail in Michigan, and when he was there, he

6      came up with an idea about communication with

7      family members.

8            And his grandmother kind of helped encourage

9      him along the lines.  There was some correspondence

10     back and forth between grandmom and Jon Logan.  We

11     see that at Exhibit 700.

12           And when I reference to exhibits, sometimes

13     there's multiple versions of the same exhibit.  I

14     don't think I have all of the same references, but

15     if I've got it once, that's good enough, at least

16     in my view.

17           And so Jon Logan has this idea and,

18     ultimately, creates a business plan, which is

19     Exhibit 821, in April of 2009.

20           And he, being Jon Logan, also in consultation

21     with his dad, James Logan, "Hey, let's do something

22     with this plan."

23           And, ultimately, there was the finding on

24     Craigslist of Justin Scott.  And he enters into an

25     Independent Contractor Agreement between, at that

1    time it was Justin Scott and Asset Recovery and

2    Marketing, and that's December 7, 2009, and that's

3    Exhibit 409.  And also in Exhibit 409 is an

4    amendment to that agreement where there's an

5    ovation and now Smart Communications, U.S., Inc. is

6    included.  And that was the original product, if

7    you will.  I think it was referred to as JailMail

8    here.

9         And over time there was an expansion of ideas.

10   And Jon Logan had an idea -- this is in 2015, early

11   2015 -- for what ultimately became the MailGuard.

12   And Jon Logan discussed this new idea, April 25th

13   2015, Exhibit 898.

14        And he then goes to his Dad and his Sister.

15        And at this time -- and I probably should have

16   introduced the names of the companies.

17        We have Smart Communications Holding, Inc., a

18   Florida entity.

19        My notes -- I don't know where they are with

20   all the pictures.  Here it is.

21        And we have this Florida entity.  At the time,

22   there were two 50/50 shareholders.  Well,

23   technically, the legal shareholder was

24   Alexis Logan, but the -- She was holding the shares

25   50 percent for her father, James Logan; 50 percent

1          for her brother.

2                  Her brother was on probation and there was a

3          need for Alexis Logan to hold legal title even

4          though equitable title was with Jon.  And then Dad

5          had some IRS problems himself, and so there was a

6          need for Alexis Logan to hold legal title, but Dad

7          was the equitable title of 50 percent of Smart

8          Communications Holding, the Florida corporation.

9                  So going back to our timeline, Jon Logan has

10         this idea which ultimately becomes the MailGuard

11         system, and from his perspective, he wants to

12         protect this new idea.  I think "new idea" was

13         certainly referenced in the Exhibit 898, the

14         April 25th e-mail.

15                 And then there was five days later on

16         April 30th, 2015, an e-mail that went out from

17         Jon Logan to his Sister -- actually, went to his

18         Dad and then Dad sent it to Alexis, the Sister,

19         Alexis Logan.

20                 Dad signs the April 30th, 2015 e-mail as does

21         Alexis.  Alexis Logan annotates it, referencing

22         "For new technology/patent/new IP only."  And we'll

23         come back and talk about the significance of that

24         later on.

25                 And it's clear that after the family members

1    signed on May 5th, 2015, Jon Logan goes to Justin

2    Scott with eight rudimentary schematics; that's

3    Exhibit 898.  With attachments, I think it's 893,

4    '97.

5        And following up on this, James Logan, who at

6    the time is also President of HLFIP, files

7    paperwork with the U.S. PTO -- I think that's U.S.

8    Patent and Trademark Office -- paperwork for the,

9    quote, "correctional postal mail contraband

10   elimination system," which is the reference that

11   was used in the e-mail that is from April 30th,

12   2015, which is Exhibit 711.

13       Now, I guess, technically, Dad signed this one

14   day early because May 12th, 2015 is when HLFIP was

15   established with the Florida Secretary of State.

16   That's exhibits 352 and 713.

17       Obviously, Alexis Logan knew about this

18   because Exhibit 930 shows that Alexis Logan was the

19   one who actually filed the paperwork with the

20   Secretary of State of Florida.

21       Now, let me just pause, and I probably should

22   have mentioned this earlier.  Alexis Logan, of

23   course, being the Sister and she held legal title,

24   but the testimony also indicates that because she

25   was the legal title holder, she personally had to

1      guarantee certain obligations of Smart

2      Communications.  So she had skin in the game, if

3      you will.

4           Going back to our timeline, the concept that

5      ultimately would become MailGuard was being

6      developed, and there is -- without question there

7      is references over the next few years to HLFIP

8      licensing to Smart Communications' various IP.

9           And there's various filings that say that.

10     There's definitely references throughout the years

11     post-2015 when this MailGuard concept was created

12     by Jon Logan.

13          We get to approximately late 2018,

14     September 4th, 2018, and by -- I don't want to say

15     luck because certainly the ground work had already

16     been laid -- but there was some difficulty with 25

17     employees in The Commonwealth of Pennsylvania

18     having to go to the emergency room due to drug

19     overdoses by handling inmate mail.  And that caused

20     the Governor of The Commonwealth of Pennsylvania to

21     declare an emergency, which allowed the Department

22     of Corrections in Pennsylvania to have an emergency

23     contract that was very favorable to Smart

24     Communications.

25          And, at this point, Smart Communications

1        starts to round the corner on getting new jails and

2        prisons to go to its suite of offerings.  And so

3        Smart Communications continues to expand.

4              There's the buyout of Justin Scott on

5        March 30th, 2020.  That's Exhibit 410.

6              We know that in February 10, 2021, James Logan

7        creates a Family Trust.  And, subsequently, he

8        transfers his 50 percent interest in Smart

9        Communications Holdings, the Florida entity, into

10       the Trust.

11             By that time, Alexis Logan had already

12       tendered back legal title of the 50/50 shares to

13       James Logan and Jon Logan.

14             March 11, 2020, Noreen Gunning is hired by

15       Smart Communications Collier, which is the entity

16       that handles the employees, at a salary of $80,000.

17             And in -- looks like -- April 8th, 2022,

18       Alexis Logan e-mails her dad, Jim Logan, with

19       talking points.  And it appears -- although there

20       was very little testimony, but from some of the

21       documentary evidence, there was some contemplation

22       of potentially talking to, like, Truist Bank or

23       some other banks, maybe about a merger or

24       acquisition.  It's very infancy discussions, but

25       they're going to create some paperwork which

1        implicates our story.  So I make a note of that.

2            But, certainly, Alexis Logan was helping Dad

3        with talking points that ultimately would be going

4        to these M & A entities.

5            Everything, however, is not exactly rosy.  On

6        April 25th of 2022, the Middle District of

7        Pennsylvania invalidates the '617 patent, which is

8        one of the three patents undergirding MailGuard.

9        Ultimately, the DC Court of Appeals affirmed that

10       decision, and that is Exhibit 364.

11           A couple months later, October 7, 2022,

12       another district court -- this is the Middle

13       District of Tennessee -- invalidates the '617

14       patent.  That's the same one that was invalidated

15       by the Middle District of Pennsylvania court.

16           A few days later on October 16th, 2022,

17       Jim Logan passes.

18           And we know next month in November of 2022,

19       Noreen Gunning is promoted to the Director of

20       Accounting and Finance, now with a salary of

21       $170,000.  Direct reports to Jon Logan.

22           I'm not going to rehash the trial relative to

23       the Shareholders' Agreement, but I do think we do

24       need to comment that in late 2022, early 2023,

25       there's some difficult conversations between

1      Jon Logan and Janice Logan.

2          Apparently, Jon Logan offered $20 million and

3      if she didn't -- "she" being Janice Logan -- didn't

4      take it for the 50 percent, he was going to pull

5      the patents and start a new company.  According to

6      Janice, he -- "he" being Jon Logan -- was using

7      vulgar language.  I think, ultimately, it just was

8      a difficult conversation.

9          From Janice Logan's perspective, she had some

10     sort of discussion draft from Truist Merger and

11     Acquisitions, which is Exhibit 335, where the

12     thought process of a potential value -- not that

13     that is the value.  I'm not saying that at all.

14     And certainly would never assume a piece of paper

15     on a possible, 'Hey, let's talk about mergers and

16     acquisitions' is anywhere close to reality.  But at

17     least that was a concept that was out there.

18         We also know at this time on January 5th,

19     2023, President Biden signs Public Law 117338,

20     which is known as the Martha Wright-Reed Just and

21     Reasonable Communication Act of 2022.

22         Because there appeared to have been some

23     difficult conversations in late 2022, early 2023,

24     between Janice Logan and Jon Logan, Janice Logan

25     makes her first demand upon Jon Logan -- that's

1       January 20th, 2023; that's at Exhibit 260 -- where

2       Janice is alleging mismanagement by Jon Logan, and

3       also makes a demand for records.

4           February 27th, 2023, Jon Logan responds by

5       filing a lawsuit -- Exhibit 430 is that exhibit --

6       where Jon Logan and Smart Communications Holding,

7       Inc. sues Janice Logan, individually, and as

8       trustee.

9           Paragraph 21 references the 2021 audited

10      financial statements showing shareholder equity of

11      approximately 15 million as of December 31st, 2021.

12          Now, in the time after Dad dies, Jon did

13      start -- Jon Logan did start a $100,000 salary draw

14      for mom, Janice Logan.

15          On May 10th, 2023 that was cut off.  That's at

16      Exhibit 303.  A few weeks later on May 23, 2023,

17      Noreen Gunning cancels the generator project.

18      That's at Exhibit 301.

19          We know on June 13, 2023 at Exhibit 432,

20      Jon Logan causes Smart Communications Holding, Inc.

21      to sue Janice Logan for replevin of the Cadillac

22      Escalade.

23          Janice Logan makes another demand for books

24      and records on June 23rd, 2024 -- that's Exhibit

25      365 -- because the prior demand for records under

1        Florida law had not been complied with.

2              In response, Jon Logan, a few days later on

3        June 29, 2023, sends a 30-day notice for

4        Janice Logan to vacate the home that she's living

5        in, which, of course, is in the name of Smart

6        Communications.  And that's at Exhibit 302.

7              With respect to the records, on July 1st,

8        2023, Jon Logan only provides a partial response

9        for records and, basically, takes the position that

10       due to the Shareholders' Agreement that there is no

11       authority for the demand.  That's at Exhibit 366.

12             A predecessor judge, Judge Williams, conducted

13       a temporary injunction and entered a temporary

14       injunction.  We all know that it has since been

15       invalidated by the Second District, but at the time

16       starting on July 25th, 2023, that went into effect.

17       That's Exhibit 584, Exhibit 2, also at Exhibit 589.

18             July 26, 2023, Mike Shreve prepares

19       consolidated financials.  Now, these are prior to

20       the August 29th, 2023 transaction that shows

21       long-term liabilities for Smart Communications

22       Holdings of Florida of approximately $3.6 million,

23       but no long-term liability associated with any

24       purported royalty or any sort of ongoing current

25       obligation for ongoing payments.

1          We know on August 9th, 2023 is the date that

2      Marcum's engagement letter is signed by

3      Katrina Quicker on behalf of HLFIP, and that is the

4      date that Marcum begins the transactional pricing

5      study.

6          April 18th, 2023 is the date that the DC

7      Circuit Court of Appeals affirmed the invalidity of

8      the '617 patent, and that's at Exhibit 364.

9          The Transfer Pricing Study, as I indicated,

10      begun on August 9th, 2023, but was functionally and

11      substantially completed prior to August 29th, 2023,

12      a span of less than three weeks.

13          August 29th, 2023 is a substantial date in the

14      life of Smart Communications Holdings.  There is a

15      lot of corporate activity that occurs.  I don't

16      really need to get into a lot of the details of it.

17          From Jon Logan's perspective it's all revenue

18      neutral and it was designed to clean up the

19      accounting records that he contends Dad was

20      somewhat asleep at the switch having occurred.

21          There is, however, no evidence that Jon Logan

22      consulted with the other shareholder.  Now, at the

23      time Jon Logan was the only officer or director and

24      I should have backed up.

25          When James Logan was alive, James Logan was an

1     officer and a director and a shareholder of Smart

2     Communications until such time as he put his shares

3     into Trust and he was an officer and director and

4     the trustee, himself, owned the shares.

5         Jon Logan also was an officer, director,

6     shareholder of Smart Communications Holdings, Inc.,

7     the Florida entity.

8         After Dad dies, Jon Logan does not invite Mom

9     to become a director.  Does not invite Mom to

10    become an officer.  And at no time did

11    Janice Logan, either individually or as trustee,

12    ever become an officer or director of Smart

13    Communications Holding, Inc.

14        We know on August 29th, 2023 a lot of the

15    assets of Smart Communications Holding, Inc. were

16    assigned to various entities, which -- and I have

17    not gone into it, doesn't need to -- which

18    Jon Logan contends all are subsidiaries of Smart

19    Communications.

20        What we also have on that date is the HLFIP

21    Holding, Inc. a Florida corporation, converts to

22    HLFIP Holding, LLC, a Delaware limited liability

23    company, at DIN -- or sorry, not DIN -- at

24    Exhibit 345.

25        We have Smart Communications Holding, LLC, a

1        Delaware liability company, is formed and it

2        becomes a subsidiary of Smart Communications

3        Holding, Inc., a Florida corporation.

4            And August 29th 2023 is when the Delaware

5        entity starts operating.

6            That is the date, August 29th, 2023 -- and

7        this is Exhibits 306, same again at 771 -- that

8        Jon Logan signs the Exclusive Intercompany

9        Intellectual Property License Agreement with an

10       effective date of August 29th, 2023.

11           Again, at no point prior to signing this did

12       Jon Logan or anyone else at Smart Communications or

13       HLFIP reach out and discuss this, talk to

14       Janice Logan, ask for assent or otherwise let her

15       know this was happening.

16           And, in fact, we know this also because a

17       couple of days later, on August 31st, 2023,

18       Janice Logan is still talking about the records

19       demand, and this is Exhibit 367, which, of course,

20       that demand doesn't reference the new entities

21       because she doesn't know about 'em.

22           The final U.S. Transfer Pricing Documentation

23       Study is not complete until October of 2023.

24           And in October 2023 -- on October 23rd,

25       Jon Logan, individually, up in Delaware sued Loco

1        Florida, LLC.  That's the entity that owns title to

2        the building that Smart Communications operates out

3        of.  And also sued Smart Communications Yacht

4        Holdings, LLC; that's the entity that holds the

5        yacht that Jon Logan has.

6             And that suit was filed in Delaware and,

7        again, no reference or knowledge to Janice Logan or

8        Smart Communications.

9             I will note that Loco Florida, LLC, a Delaware

10        entity, there previously was a Florida entity --

11        that's another August 29th, 2023 transfer -- just

12        like the Smart Communications Yacht Holdings, LLC,

13        previously was a Florida entity.

14             We also know on October 25th, 2023 audited

15        financials of Smart Communications, the Florida

16        corporation, are published -- this is

17        Exhibit 379 -- which for the first time shows a

18        long-term liability of HLFIP -- or a long-term

19        liability to HLFIP of 52.8 million under a note

20        payable with, at that time, 5.6 million approximate

21        of accrued interest.

22             And we will come back and talk about that

23        note.  But let me finish out the timeline.

24             About a month later, on December 6, 2023, me,

25        as the current-assigned judge, holds a hearing in

1      the case, and that led to an agreement amongst the

2      parties that precluded the payment of any licensing

3      fee, royalty fee, and also no payments outside the

4      ordinary course.  That was Exhibit 435.

5          And then the Court entered an Order on that

6      October -- sorry -- on December 15th, 2023.

7          We then come into 2024.  And we have the trial

8      on Phase I where the Court found no Shareholders'

9      Agreement.  And that Final Judgment was entered on

10     February 7, 2024.

11         After the Court confirmed Janice Logan as

12     trustee's ownership of 50 percent of shares, she

13     demanded a meeting.  That is Exhibit 443.  That's

14     on March 15, 2024.

15         And, certainly, none of the requests that

16     Janice Logan, as Trustee, as 50 percent shareholder

17     of Smart Communications, Inc., was agreed to by the

18     other 50 percent shareholder.

19         On March 20th, 2024, the Delaware court stayed

20     the Delaware action that had been filed on

21     October 23rd in favor of this Florida action.

22         A couple of weeks later, on March 15, 2024,

23     Jon Logan, on behalf of HLFIP, demands payment of

24     the royalties from Smart Communications in full by

25     December 31, 2024 or he'll terminate the purported

1     license.

2          He also indicates that there was a material

3     term of the agreement, is Jon Logan's exclusive

4     control over Smart Communications.  And that's

5     Exhibit 357.

6          The Court, of course, pauses and questions how

7     that could have been done after Jon Logan had

8     agreed not to do anything outside the ordinary

9     course in December of 2023, but, be that as it may,

10    Jon Logan did it.

11         On May 29, 2024, Janice Logan files for

12    judicial dissolution.  That's Exhibit 437.

13         And, in response, what we have, just days

14    later, is Jon Logan going to Noreen Gunning and at

15    Smart Communications where Jon Logan requested that

16    Noreen Gunning reclassify the Rolls Royce, the

17    Ferrari Spider, the Miami condo, all that had been

18    considered shareholders' loans to Jon Logan and

19    have them -- have Smart Communications assume

20    ownership as well as recognizing rent relating to

21    Loco Florida and for Smart Communications, for the

22    office building.

23         Jon Logan, also at that time, raises his

24    salary in June of 2024 from $120,000 a year to

25    $1.2 million a year, again, without any contact

1     with, approval of, discussion, assent from

2     Janice Logan as trustee, the other 50 percent

3     shareholder.

4          Now, certainly, Jon Logan indicated that upon

5     the filing in November -- of bankruptcy of

6     November 2024, he discontinued his salary, but,

7     certainly, that's approximately $600,000 that

8     Jon Logan took from Smart Communications out of

9     salary.  Certainly, that was a transaction that was

10    outside the ordinary course, even though he had

11    previously agreed not to do things outside the

12    ordinary course.

13         June 20, 2024, Jon Logan causes Smart

14    Communications to elect to purchase Janice Logan,

15    as Trustee, shares.

16         July 22, 2024, the proposed rules under the

17    Martha Wright-Reed Act were proposed by the FCC,

18    with the final regulations coming out on

19    September 20, 2024 with effective date of

20    November 19, 2024.

21         And we all know about the bankruptcy at this

22    point in time.

23         So that is the overarching timeline.  And I

24    always like doing timelines because it helps me, in

25    my mind, figure out how things happened, why things

1    happened, and, certainly, I use that in conjunction

2    with the documentary evidence, the testimony, the

3    credibility determinations.

4         There are only a couple of core issues that

5    the Court can decide in today's proceeding.

6         One is the date of valuation of the company;

7    and then the other is reference to the royalty

8    issue.

9         Now, as framed, the parties are basically

10   asserting two different things.

11        The Judge's right side of the room, the Smart

12   Communications and HLFIP side, talk about that

13   there is an agreement in 2015, and the context and

14   the explanation is that Jon Logan is the inventor

15   of all future intellectual property that is ever

16   used by Smart Communications, and he has assigned

17   that to HLFIP.

18        And that Jon Logan testified that during his

19   father's life, that he and his father agreed that

20   there would be a license -- or the agreement was

21   that there would be a license for Smart

22   Communications and its subsidiaries to be able to

23   use the HLFIP intellectual property and that there

24   would be a true-up later in time and it would

25   either be an agreement true-up or that they would

1       retain an appraiser.

2               There was no further details provided by

3       Jon Logan relative to that agreement and,

4       certainly, there is scant documentary evidence that

5       seem to memorialize that transaction.

6               The other issue is the August 2023 agreement

7       that Jon Logan signed on behalf of HLFIP as well as

8       on behalf of Smart Communications Holdings, Inc.

9       that indicated that there was a 40 percent royalty

10      rate and then using that 40 percent royalty rate on

11      an ongoing forward basis, and then to

12      retrospectively look and show that on the books of

13      Smart Communications all the way back to 2015, even

14      though it previously had not existed on the books.

15              The transaction is, by definition, under

16      Florida law Section 607.0832, a Directors Conflict

17      of Interest Transaction.  Jon Logan, individually,

18      and through HLFIP had a material financial interest

19      in that transaction.

20              There are instances, and the statute talks to

21      us, about how a transaction such as this can be

22      approved, and then who holds the burden of proof.

23              In this particular case, because there was no

24      assent by the other shareholder, there is no other

25      director, there was no attempt for any sort of

1      discussion with his Mother, Jon Logan and Smart

2      Communications now is left with the burden to prove

3      the validity of the fairness in this proceeding.

4          Jon Logan, Smart Communications, and HLFIP

5      assert that they can show the fairness through the

6      Marcum Transfer Pricing Study.

7          The Transfer Pricing Study is a study that

8      seeks to comply with 26 U.S.C. 482.  The purpose of

9      a Transfer Pricing Study is to provide a taxpayer

10     protection from the IRS from having to pay

11     penalties if the taxpayer has a Transfer Pricing

12     Study in its file prior to filing a tax filing that

13     would have an intercompany transaction.

14         This Transfer Pricing Study does not prevent

15     the Internal Revenue Service from disagreeing with

16     the Transfer Pricing Study, coming up with a

17     different one, or saying that it's just wrong.

18         What it does is if the Transfer Pricing Study

19     is in the file and it's provided to the IRS within

20     30 days after the request, it eliminates the IRS's

21     ability, under the Treasury regulations, from

22     assessing a penalty.  That's its point.

23         And the concept of the Transfer Pricing Study

24     is you have a intercompany transaction and its

25     concept is to, supposed to come up with what would

1    an arm's length transaction be.  And that is why

2    Mr. Jon Logan and his side are saying, 'Well, that

3    shows that this transaction is fair.'

4        The Court cannot agree.

5        The Court is going to find that the Transfer

6    Pricing Study and that -- I'm going to find several

7    things.

8        One, that the Judge's left side -- so the

9    Janice Logan as Trustee, plus Alexis Logan -- have

10   demonstrated, and Jon Logan, Smart Communications,

11   and HLFIP have failed to demonstrate, that this

12   transaction was remotely fair to Smart

13   Communications Holding.  That's actually a pretty

14   easy decision.  It's not close by any stretch of

15   imagination.

16       We know that when Marcum was hired, Marcum

17   expressly told Jon Logan and HLFIP several things.

18       One, that this is a Transfer Pricing Study.

19   It is not a fairness opinion and it cannot be used

20   and should not be used as one.  It is not a proxy

21   for one.  Those are my words.  "Proxy" is my word.

22   That's not what was testified to.

23       But both Ms. Voralia and Ms. Naidu testified

24   that they had a specific conversation with

25   Jon Logan as well as Katrina Quicker that this

1      should not be used in litigation, they knew

2      litigation was there, and that its purpose was to

3      provide the taxpayer protection.  And that's it.

4          And within the less than three weeks that

5      Marcum worked on this Transfer Pricing Study, they

6      did not do anything to independently verify any of

7      the information that was provided to it by anyone

8      on the Jon Logan side of the equation.

9          They did nothing to independently verify the

10     assertions of ownership of intellectual property.

11     They just accepted everything at face value.

12         Smart Communications and HLFIP's own expert,

13     Mr. Schuette, criticized Marcum's selection of

14     eight of the ten comparables that were selected,

15     and they were selected after Marcum had

16     commissioned a group out of Argentina to do some

17     research on comparables and they came back with

18     comparables that are more than two decades old,

19     which perhaps might be okay for IRS purposes, but

20     has nothing to do with the validity and fairness of

21     the transaction.

22         The Court will find as fact that the

23     August 29, 2023 exclusive intercompany intellectual

24     company license is voidable and, therefore,

25     ineffective because it violate -- that that

1      agreement never was fair to the company, "the

2      company" being Smart Communications.

3            This agreement, and it's consistent with what

4      the Court has seen and that I've kind of gone

5      through the timeline, is Jon Logan here has spite

6      and animus towards his mother and his sister, and

7      that's what's driving decisions, not business

8      judgment, not what's good for the company, not

9      what's good for the 120 families that are, or their

10     employees and whose family are at jeopardy because

11     of the bankruptcy filing, but spite and animus.

12           I also find that the purported, long-term note

13     payable for the historic 2015 forward until the

14     August 29, 2023 is also invalid for the same

15     reason.

16           The fact that Smart Communications is even

17     here today advocating for something that saddles

18     the company to make it legally insolvent is

19     mystifying to me, but right now because Jon Logan

20     was the incumbent management and has continued on

21     as the incumbent management, he has saddled the

22     company with those debts.  I will go ahead and

23     invalidate that transaction.

24           Now, we need to also talk about March of 2015.

25     And I want to be clear that I'm only going to talk

1          limited about whatever agreement, if any, there

2          was.  I find, as fact, that the alleged agreement

3          articulated by Jon Logan is not credible.

4               I find, as fact, there was no such agreement

5          under the terms that Jon Logan has testified to

6          this Court.

7               Certainly, the Court finds that there was

8          instances where Jim Logan signed things on behalf

9          of HLFIP, but there was no agreement in 2015 for a

10          true-up relative to the royalty.

11               Now, I agree with Mr. Johnson that I am not

12          here to determine who owns the IP.

13               It seems that everyone agrees that the

14          MailGuard concept was Jon Logan's.  There's

15          evidence on both sides of the equation about what

16          was done with that and whether Smart Communications

17          contributed financially or idea-wise or employees

18          on a going-forward basis.  That's an open question,

19          and I think it's a valuation question.

20               If I'm the one that ever -- if the state court

21          is the one ever doing valuation, I would expect to

22          see discussions about the ownership of it.  If the

23          Bankruptcy Court does it -- and I am totally fine

24          if the Bankruptcy Court wants to take and go

25          forward -- I don't care.  I get paid regardless.

1          But I want to be clear:  I am not making any

2     findings, one way or the other, about the ownership

3     other than to say that the proffered agreement by

4     Jon Logan here in court is not credible and I find

5     as fact it did not and does not exist.

6          That takes us to the question of when I should

7     evaluate if the state court is the entity that is

8     going to be doing the valuation.  This actually is

9     a more difficult question in the Court's mind than

10    the invalidity of the August 2023 transaction.

11         On the one hand, there is a significant

12    history of Jon Logan trying to keep Mom from

13    getting any information and taking actions that

14    cause the company financial difficulty; for

15    instance, you know, increasing his salary

16    substantially, taking $600,000 approximately out of

17    the company right before you declare bankruptcy,

18    approximately six months after you do that, that

19    kind of suggests that it was planned.  Putting on

20    notes on to your financial statements that make the

21    company insolvent indicate this, and is symptomatic

22    of this spite that Jon Logan has towards Mom.

23         So that suggests an earlier-in-time valuation.

24         The Court's also cognizant that the Martha

25    Wright-Reed Act may be impacting the business of

1    Smart Communications which I think would be a

2    special circumstance.

3         Where I come out on this is at a date that

4    neither side has articulated, but I think is the

5    one that I feel most comfortable and I find under

6    the facts of this case, under the family dynamic in

7    this case, under what was known or knowable as of

8    the date that I'm going to determine, because

9    certainly we know the Martha Wright-Reed Act was

10   signed by President Biden in January of 2023, I'm

11   going to conclude that the date that we're going to

12   value the company is August 28th, 2023, which is

13   the day prior to all of the corporate changes

14   occurred.

15        At that date, the Martha Wright-Reed was known

16   or knowable, storm clouds were on the horizon.

17        It also reflects an earlier-in-time date than

18   when the judicial dissolution was filed, but it's

19   clear that by that date -- and, actually, by

20   earlier than that date, there was a deadlock, and

21   Jon Logan was doing what he could to prevent

22   Janice Logan from any access to the company in

23   taking steps to make Smart Communications Holding a

24   lot less valuable so that what he ultimately would

25   have to pay out to Mom on the valuation was less.

1          So I'm going to choose April 28th -- sorry --
2     August 28th, 2023.
3          So, again, I'm going to want this all typed up
4     and sent to me.  I will enter a very short order
5     with just the core findings and staple this.
6          I'm going to start on the Judge's right if
7     there are any points or clarifications.
8          Mr. Hillsley.
9          MR. HILLSLEY:  No, Your Honor.
10         THE COURT:  Mr. Oprison.
11         MR. OPRISON:  No, Your Honor.
12         THE COURT:  Going to Judge's left.
13    Mr. Schoenfeld.
14         MR. SCHOENFELD:  No, Your Honor.
15         THE COURT:  Mr. Johnson.
16         MR. JOHNSON:  No, Your Honor.
17         THE COURT:  Thank you very much.  I will see
18    you all next week and's.
19         MR. DIXON:  Sorry, Your Honor, earlier in your
20    discussion you mentioned something about the
21    handwritten note at the bottom of the 2015 license
22    and its effect.
23         THE COURT:  Oh, thank you.  My apologies.  Let
24    me continue.
25         The note in Alexis Logan's comment

1      specifically reference what became MailGuard.  And

2      I think when you look at that, the timing of that

3      e-mail plus the Dad signing the HLFIP paperwork

4      with the Patent and Trademark Office just a few

5      days later, that goes to the MailGuard.

6          I cannot find that that note means every

7      single future invention is 100 percent exclusively

8      Jon's.  But I don't need to get into who owns all

9      of these products, because I think that's a

10     valuation issue.

11         I expressly don't think I have authority from

12     the Bankruptcy Court to get there, and I am not

13     going there other than to say:  I see there's

14     evidence; it's conflicting evidence on both sides.

15         Okay.  Anything else?

16         MR. HILLSLEY:  Your Honor, should we deal with

17     the confidentiality issue?

18         THE COURT REPORTER:  I'm sorry.  Could you say

19     that again?  I had this on.

20         THE COURT:  Did you give the Clerk the exhibit

21     numbers?

22         MR. HILLSLEY:  We have been preparing them

23     including getting the recitation, so.

24         THE COURT:  I need to give that to the Clerk

25     to give her the direction to keep those

1        confidential because the other ones will not be

2        confidential.  So do you have that list yet?

3            MS. LIU:  We can write it down on one piece of

4        paper, Your Honor.

5            THE COURT:  She needs that very soon because

6        she's going to want to go home very soon.

7            MS. LIU:  I understand, Your Honor.  We'll be

8        quick.

9            THE COURT:  Anything else?

10           MR. HILLSLEY:  No, Your Honor.

11           THE COURT:  Best of luck to everybody and I

12       will see everybody next week.

13           (Trial concluded at 7:06 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    JUDGE'S RULING CERTIFICATE
2       STATE OF FLORIDA   )
3       COUNTY OF SARASOTA)
4            I, Linda R. Wolfe, AAS, RPR, RMR, FCRR, FPR-C,
5       Certified Stenographic Court Reporter, certify that
6       I was authorized to and did stenographically report
7       the foregoing Judge's Ruling; and that the
8       transcript is a true record of the Ruling.
9            I further certify that I am not a relative,
10      employee, attorney, or counsel of any of the
11      parties, nor am I a relative or employee of any of
12      the parties' attorney or counsel connected with the
13      action, nor am I financially interested in the
14      action.
15           Dated this 14th day of February, 2025.
16
17
18      _____
19      LINDA R. WOLFE, AAS, RPR, RMR, FCRR, FPR-C
        Certified Stenographic Court Reporter
20      Registered Professional Reporter
        Registered Merit Reporter
21      Federal Certified Realtime Reporter
        Florida Professional Reporter
22
23
24
25
```

# EXHIBIT 3

ORDERED.

**Dated:  March 06, 2025**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:
SMART COMMUNICATIONS                                Chapter 11, Subchapter V
HOLDING, INC.,                                      Case No. 8:24-bk-07106-RCT

and

SMART COMMUNICATIONS
HOLDING, LLC.,                                       Jointly Administered with
                                                    Case No. 8:24-bk-07108-RCT

        Debtors.
_____/

## ORDER DISMISSING JOINTLY ADMINISTERED CASES
## WITHOUT PREJUDICE

These jointly administrated cases were considered at a hearing on February 26, 2025, on the Court's Order to Show Cause Why These Jointly Administered Cases Should Not be Dismissed.  (Doc. 191).  Three responses were filed (Docs. 208, 209, 216), and the Court heard argument from all parties that wanted to be heard at the hearing and considered the documents proffered by Debtors.  For the reasons stated on the record at the hearing, and those set forth below, the Court finds that these jointly administered cases should be dismissed, without prejudice.

Debtors Smart Communications Holding, Inc. ("Smart-INC") and Smart Communications Holding, LLC ("Smart-LLC") are effectively owned 50% by Jon Logan and 50% by his mother

Janice Logan, as Trustee of the James Logan Family Trust ("Janice Logan").[1]   Since 2023, Jon

and Janice Logan have been involved in protracted litigation in the Circuit Court of Sarasota.[2]

Although Janice Logan attempted to become a director of Smart-INC on her husband's death, Jon

Logan apparently denied the request. As a result, Jon Logan acts as the sole director of Smart-INC

and by extension, he controls Smart-LLC.

In the State Court litigation, Jon Logan seeks to have Smart-INC pay Janice Logan for her

stock, so that he can control 100% of both Debtors.  This process is brought under Florida Statute

§ 607.1430(1)(b) and § 607.1436 and involves a valuation of the companies to determine the

amount of the payout due to Janice Logan for her shares.  In his effort to reduce the value of

Debtors, and in turn the amount payable to Janice Logan, Jon Logan argues that Debtors

(presumably Smart-INC but maybe Smart-LLC) owe HLFIP Holding, LLC ("HLFIP") more than

$67 million.   HLFIP is wholly owned by Jon Logan.

Preliminary rulings were not going well for Jon Logan in State Court, so he filed these

bankruptcy cases, which stayed the litigation.  Because the overwhelming debt is allegedly owed

to "insiders," Debtors elected to file under Subchapter V of the Bankruptcy Code, which is a

speedy process designed for small businesses with debt less than $3,024,725.

After the bankruptcy cases were filed, Jon Logan filed a claim against Smart-INC for

approximately $67 million on behalf of HLFIP.[3]  No written agreement is attached to the proof of

claim other than what appears to be two emails from Jon Logan to himself.  Jon Logan then filed

---

[1] Smart-INC is the lead case, and it includes information on non-debtor subsidiaries in its operating reports.
Smart-LLC does not purport to have any business operations. (Docs. 91, 199).  According to its bankruptcy
schedules, Smart-LLC is the 100% owner of Smart Communications Collier, Inc., Smart Communications
Pasco, Inc., and Smart Communications US, Inc. (Case No. 8:24-bk-7108-RCT, Doc. 16).  Smart-INC owns
100% of Smart-LLC. (Case No. 8:24-bk-7108-RCT, Doc. 3).
[2] *Logan v. Logan*, Case No. 2023 CA 001002 NC (12th Jud. Circuit, Sarasota County, FL).
[3] POC 2-2.

2

a contingent claim for himself against Smart-INC for $2,990,462.22 if he has to return the Rolls Royce, Ferrari, and 45' fishing boat he claims was compensation from Smart-INC.[4] And finally, Jon Logan filed a claim for $916,500 against Smart-INC on behalf of another company that he wholly owns, Loco Florida, Inc., for "rent."[5] No lease is attached to Loco Florida's proof of claim. The *only* proof of claim filed against Smart-LLC is by Janice Logan for $110 million for her ownership interest.[6]

Shortly after the bankruptcy cases were filed, Janice Logan moved to lift the stay to continue the proceedings in State Court.[7] Janice Logan also filed a motion to dismiss these cases on grounds that they amount to a two-party dispute between warring shareholders, and, if the $67 million insider claim of HLFIP is disregarded, Debtors are solvent.[8] This Court ultimately modified the automatic stay to permit the State Court to try and decide the issue of HLFIP's claim and to determine the appropriate date to value Debtors for purposes of buying Janice Logan's stock.[9] The trial on these specific issues took place in State Court on February 10-12, 2025.

Meanwhile, Jon Logan continued to operate Debtors in bankruptcy. Although operations were mostly smooth, Smart-INC reported a payment of approximately $60,000 for the maintenance of a boat that is not owned by either Debtor, but rather by a non-debtor entity, Smart Communications Yacht Holdings, LLC. The payment was made without approval of this Court.[10] Smart-INC also reported paying at least two prepetition unsecured creditors—Swank Motion

---

[4] POC 12-1.
[5] POC 13-1.
[6] Janice Logan also filed a proof of claim against Smart-INC for the same amount.
[7] Doc. 26.
[8] Doc. 45.
[9] Doc. 83.
[10] Doc. 95, p. 4. In fairness, the payments were likely made by Smart Communications Collier, Inc., a non-debtor operating subsidiary of Smart-LLC and authorization may or may not have been required, as discussed below.

Pictures ($292,729.91[11]) and a credit card with Truist Bank—without approval of this Court. As a result of these unauthorized payments, as well as authorized critical vendor payments, the remaining proofs of claim filed by unsecured creditors (who are not insiders or attorneys) are CDW ($36,572 for invoices[12]) and Correct Solutions ($1.15 million for unliquidated litigation costs and attorney's fees[13]). Debtors have no secured creditors.

Before Debtors even filed schedules of assets and liabilities, Debtors filed a Chapter 11 joint plan that essentially seeks to cancel Janice Logan's stock and issue all of Debtors' new stock to HLFIP.[14] In addition, the plan allows a $50,250,000 claim in favor of HLFIP and obligates Debtors to pay HLFIP 40% of gross revenues going forward. This Court scheduled a trial to consider confirmation of Debtors' plan for March 10, 2025.[15]

On February 17, 2025, the Sarasota Circuit Court issued an order on the matters heard pursuant to this Court's order lifting the stay. The State Court found as follows:

> The long-term liability recognized by Smart Communications Holdings, Inc. in favor of HLFIP Holding, LLC purporting to impose a historic 40% royalty and as described in Note I to the Smart Communications Holdings, Inc. Consolidated Audited Financial Statements (as of December 31, 2022) is invalid and of no legal force or effect. This includes both the accrual of that liability and the accrual of the associated interest expense.[16]

In response to the State Court's order, HLFIP did not withdraw or reduce its $67 million

---

[11] Docs. 92, 198.

[12] Smart-INC reported two checks to CDW on January 3, 2025, for $57,657.87 and $75.00, so it is possible that even this claim has been paid. (Doc. 198 at p. 8).

[13] Smart-INC's bankruptcy schedules are not much help. (Doc. 65). In addition to the proofs of claim, eight trade creditors are listed as having undisputed unsecured claims, but it is difficult to determine if they have received payments on account of their pre-petition claims. If any were paid, they were paid by the operating company, Smart Communications Collier, Inc., a non-debtor. The Court did approve payment of critical vendor ShenZhen Meridian Technology Co. Ltd.'s prepetition claim of $748,000. (Doc. 65, p. 19; Doc. 140).

[14] Doc. 46.

[15] Doc. 104.

[16] Doc. 175, p. 6.

proof of claim.  And, to date, Smart-INC, with an obvious conflict of interest, has not objected to HLFIP's claim.  Instead, Debtors amended the plan,[17] under which HLFIP would still receive 100% of Debtors' equity and a royalty of up to 35% of Debtors' gross revenues, "in a specific amount to be recommended by the Subchapter V Trustee on behalf of the Debtors' estates and accepted by HLFIP."[18]

At a hearing on February 20, 2025, at which all parties discussed the implications of the State Court ruling, this Court stated its intent to issue an Order to Show Cause why the cases should not be dismissed and offered all parties an opportunity to respond.[19]  Debtors and HLFIP respond that the cases should not be dismissed; Janice Logan responds that the cases should be dismissed.[20]

After hearing all sides, this Court is of the view that the cases should be dismissed.

First, it is not seriously disputed that Debtors filed bankruptcy as a litigation tactic to avoid adverse rulings in State Court.  This is not always evidence of bad faith, particularly if the litigation is with a creditor and one creditor is likely to advance ahead of other creditors.  Here, however, Debtors filed bankruptcy as a litigation tactic to avoid State Court rulings implicating the relationship between two shareholders and insider transactions that clearly involve conflicts of interest.

Second, the obvious conflicts of interest that permeated Jon Logan's operation of Debtors prepetition, permeate in these Subchapter V cases.  Smart-INC cannot be expected to fairly object to the claims of HLFIP, Jon Logan, or Loco Florida.  Objecting to claims is also not the principal role of a Subchapter V trustee, whose primary goal is to facilitate a consensual reorganization and

---

[17] Doc. 183.
[18] Doc. 183, p. 4.  The liquidation analysis presented with the amended plan references Smart Collier, but it does not reference any other entities that Debtors own.  (Doc. 183, p. 33).
[19] Doc. 191.
[20] Docs. 208, 209, 216.

report to the Court. There are many things that a Subchapter V trustee can do to facilitate a small business reorganization, and the Court certainly may expand the powers of a Subchapter V trustee, even to the point of assuming control of business operations. But, *absent shareholder consent*, the use of a Subchapter V trustee to effectively serve as an independent director (to review and negotiate insider transactions), seems to conflict with state corporate law and with a Subchapter V trustee's duties to the Court and all parties to a Subchapter V case. But Debtors want even more— they want the Subchapter V Trustee for Smart-INC and Smart-LLC to effectively address a director/conflict arrangement for the use of the intellectual property by the operating non-debtor subsidiaries. Ironically, Debtors filed a persuasive paper outlining why the Subchapter V Trustee should not assume Debtors' operations.[21]

Third, Debtors seeks to use Subchapter V to effectively cram down a "settlement" of the shareholder litigation with Janice Logan. The amended plan is a somewhat better settlement proposal than the original plan, and the Court is not saying that the proposal is bad, just that it is unacceptable to Janice Logan and thus not really a settlement. This seems an improper use of Subchapter V where the State Court has already considered many of the contested issues and has already determined that the asserted (40%) arrangement with HLFIP is invalid. It makes sense for the State Court to continue its work and determine whether any arrangement is appropriate for purposes of determining Janice Logan's claim. Moreover, if Janice Logan's stock is purchased under Florida Statute § 607.1436, then the issues and the inherent conflicts may be moot.

As discussed at the Order to Show Cause hearing, if this was a regular Chapter 11 case, the Court could conceivably appoint an independent Chapter 11 trustee to operate Debtors.[22] Also,

---

[21] Doc. 186.

[22] *See, e.g., In re Sirius Systems, Inc.,* 112 B.R. 50 (Bankr. D.N.H. 1990) (warring shareholders agreed to the appointment of a Chapter 11 trustee).

in a regular Chapter 11 case, the appointment of a Chapter 11 trustee terminates a debtor's exclusive right to file a Chapter 11 plan.[23]  Creditors could evaluate alternative plans proposed by each of the 50% shareholders or even file their own plan.  A regular Chapter 11 case offers far more disclosure and a fairer process when two 50% owners disagree about the need for bankruptcy protection.  But Debtors made the tactical decision to file two small business Subchapter V cases, where Debtors will always have the exclusive right to file a plan of reorganization, and the Court is precluded from appointing a Chapter 11 trustee.[24]  Debtors also made the tactical decision not to file bankruptcy for the operating subsidiaries (mainly, Smart Communications Collier, Inc.).

The Court has expressed many times from the bench that, notwithstanding the fact that the Bankruptcy Code intends to leave state corporate laws largely untouched, consensual arrangements can be approved, and the Court encouraged the parties (Jon Logan and Janice Logan) to work together.  As explained by one court:

> This does not mean that a bankruptcy court should automatically abstain from approving *consensual* resolutions to governance disputes that avoid the time and expense of litigation or the need to appoint a chapter 11 trustee. Bankruptcy courts should not, however, take sides in corporate governance disputes. . . .[25]

No such consent or cooperation exists in these cases.  Indeed, the two 50% shareholders expressly disagree about the need for bankruptcy in the first instance, there are no secured creditors, and the few prepetition unsecured creditors have already been paid or are bit players in the main event between the shareholders.

As a last-ditch effort to establish that Debtors' Subchapter V cases are more than a shareholder dispute, Debtors filed a mountain of documents and now argue that there are

---

[23] 11 U.S.C. § 1121(c)(1).
[24] *See generally In re ComedyMX, LLC*, 647 B.R. 457 (Bankr. D. Del. 2022).
[25] *In re Ampal-American Israel Corp.*, 2013 WL 1400346, at *5 (Bankr. S.D.N.Y. April 5, 2013 ).

difficulties making payroll and paying outstanding payables during the bankruptcy case. Debtors'

documents, however, are unclear at best. This is because Debtors' complex corporate structure

operates through several non-debtor affiliates that pay or do not pay expenses, presumably at the

direction of Jon Logan. Significant non-debtors include Smart Communications Collier, Inc.

("Smart Collier"), Smart Communications Pasco, Inc., and Smart Communications US, Inc. As

explained by Debtors:

> As part of Smart Communications' corporate cash management
> system and overall corporate structure, Smart Collier is the account
> holder on the operating account, manages and pays payroll for the
> employees employed by Smart Collier and who provide services to
> the clients and customers, and it performs other functions as the
> operating entity….As their name implies, the Debtors act primarily
> as holding companies ([Smart-INC] is the parent company and sole
> member of [Smart-LLC], which in turn is the owner of the non-
> debtor subsidiaries). In addition to holding the interests in the
> operating subsidiaries, the Debtors, either directly or through the
> operating subsidiaries as a designee or assignee, are parties to
> various agreements with clients and customers. However, those
> services are generally provided directly by the operating
> subsidiaries, and primarily by Smart Collier.[26]

Although Debtors and its subsidiaries file consolidated tax returns, that does not collapse

the underlying separate corporate entities. Debtors' main operating entity, presumably Smart

Collier, is technically not in bankruptcy, arguably not subject to the automatic stay, and not subject

to this Court's jurisdiction, except with respect to reports required to value Smart-LLC's interest

in this subsidiary. Smart Collier also, presumably, is not itself in need of bankruptcy protection

since it did not file its own bankruptcy petition and does not seem to be a party to the State Court

ligation.

Debtors' cash management system and corporate structure is not unusual for complex

businesses or necessarily improper. It just cautions that the payables data cannot be taken at face

---

[26] Doc. 17, ¶ 5-6.

value when the operating entities are not in bankruptcy. The Court has little confidence that the alleged claims in the documents submitted in response to the Order to Show Cause are direct claims against Debtors (both represented to the Court to be holding companies) or whether they are claims against non-debtor operating subsidiaries. Indeed, most of the documents filed by Debtors in response to the Order to Show Cause relate to Smart Collier, a non-debtor.

Debtors' Subchapter V cases were filed to stop the State Court shareholder litigation with Janice Logan and to impose a non-consensual settlement of the shareholder litigation. Janice Logan now has filed a claim against both Debtors for $110 million.[27] At this time, the Court has no opinion about which shareholder should prevail in the shareholder dispute. But, because the amount of Janice Logan's claims has been pending in State Court for some time, and the State Court has already heard many days of testimony, issued numerous rulings, and has managed the massive litigation in phases, even if this Court were inclined to not dismiss these Subchapter V cases, this Court would likely permit the State Court to complete its work and liquidate Janice Logan's claims (and would probably not confirm any plan until that work was completed). In the meantime, any non-insider creditors are well protected under the Florida Statutes at issue in the State Court ligation.[28]

It is therefore **ORDERED**:

    1.   These jointly consolidated cases are dismissed, without prejudice.

---

[27] POC 11-1.

[28] Florida Statute § 607.1436(8) states that any payments by a corporation under this statute for a shareholder's stock are subject to Florida Statute § 607.060401(3) ("No distribution may be made if, after giving it effect: (a) The corporation would not be able to pay its debts as they become due in the usual course of the corporation's activities and affairs; or (b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved and wound up at the time of the distribution, to satisfy the preferential rights upon dissolution and winding up of shareholders whose preferential rights are superior to those receiving the distribution."). *See generally Cox Enterprises, Inc. v. Pension Ben. Guar. Corp.*, 666 F.3d 697, 702 (11th Cir. 2012).

2. The Court will reserve jurisdiction to consider any fee applications on file or filed within 30 days after the entry of this order.

3. The Subchapter V Trustee is directed to submit any reports necessary to wind up the case, after which she shall be discharged from further duties in this case.

Clerk's Office to serve.

10

# EXHIBIT 4

ORDERED.

**Dated:  March 06, 2025**

_[signature]_

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:
SMART COMMUNICATIONS                          Chapter 11, Subchapter V
HOLDING, INC.,                                Case No. 8:24-bk-07106-RCT

and

SMART COMMUNICATIONS
HOLDING, LLC.,                                Jointly Administered with
                                             Case No. 8:24-bk-07108-RCT

        Debtors.
_____/

**ORDER DENYING DEBTORS' MOTION**
**FOR RECONSIDERATION OF DISMISSAL**

        This matter came before the Court, without a hearing, on Debtors' Motion for

Reconsideration of Dismissal.  (Doc. 219).  The motion was filed after the Court issued its oral

ruling dismissing the case, but before the Court issued its written order.  Michael Cave, on behalf

of creditor Florida Custom Mold, Inc., filed a declaration in support of Debtors' motion.  (Doc.

223).  As explained below, Debtors' motion is denied.

**I.  Background**

        These jointly administrated Subchapter V cases have been pending since November 30,

2024.  The Court issued an Order to Show Cause Why These Jointly Administered Cases Should

Not be Dismissed[1] and held a hearing on the matter on February 26, 2025.

The Court dismissed these cases for many reasons, including: (1) Debtors' 50-50 shareholders (Jon and Janice Logan) were warring over the valuation of Janice Logan's interest in Debtors in connection with a buyout under Florida Statute § 607.1436; (2) the protracted shareholder litigation had been pending in state court since 2023, and the filing of these bankruptcies by Jon Logan on behalf of Debtors was a litigation tactic to avoid adverse rulings in state court; (3) Jon and Janice Logan disagree as to Debtors' need for bankruptcy protection; (4) the overwhelming claims in the cases are asserted on behalf of insiders or attorneys, and there are no secured creditors; (5) three claims, totaling almost $71 million, have been asserted against Debtors by John Logan (on his own behalf and on behalf of his two wholly-owned companies—HLFIP Holding, LLC and Loco Florida LLC) implicating significant conflicts and interest; (6) Janice Logan has filed claims for $110 million; and (7) Debtors' operating subsidiaries are not even in bankruptcy. A more detailed discussion of the Court's reasoning is in the written order dismissing the case. (Doc. 225).

## II.  Standard of Review

Motions for reconsideration are governed by Federal Rule of Bankruptcy Procedure 9023, which incorporates Rule 59 of the Federal Rules of Civil Procedure.  Relief under Rule 59(e) is limited to the following circumstances: "(1) an intervening change in controlling law; (2) newly discovered evidence; or (3) clear error or manifest injustice."[2]  "[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly."[3]

---

[1] Doc. 191.

[2] *Woide v. Fed. Nat'l Mortg. Ass'n (In re Woide)*, No. 6:16–cv–1484–Orl–37, 2017 WL 549160, at *1 (M.D. Fla. Feb. 9, 2017), *aff'd*, 730 Fed. Appx. 731 (11th Cir. 2018).

[3] *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp.2d 1366, 1370 (S.D. Fla. 2002) (citation omitted).

## III.  Reconsideration

Debtors argue that reconsideration is necessary to prevent clear error or manifest injustice. Specifically, they argue: (1) the Court erred in concluding the cases raise primarily a corporate governance issue; (2) the Court erred in concluding that it does not have the ability to approve a related-party intellectual property license agreement between Debtors and HLFIP; and (3) reconsideration is necessary to prevent manifest injustice.  The Court is not persuaded by these arguments.

First, the Court did not simply dismiss these cases because of a corporate governance issue, *i.e.,* the shareholder litigation between Jon and Janice Logan.  This was just one factor, which made the other conflicts of interest in these cases more problematic.  But the Court did find that the cases were filed to gain a tactical advantage in the pending shareholder litigation and to effectively force a settlement of the litigation.  It should also not be lost that Debtors are effectively funding Jon Logan's quest to obtain control of Debtors.  The Court also focused on Debtors' need for bankruptcy. That need is belied somewhat by the fact that Debtors' operating subsidiaries, although reporting post-petition operations in Debtors' cases, continued to operate outside of bankruptcy.  Also, several of Debtors' unsecured creditors have also received payments on their prepetition claims without Court authorization,[4] and a $60,000 payment was made for maintenance of a yacht not owned by either Debtor, also without Court authorization.

Second, the Court did not conclude that it lacked the ability to approve a license agreement between Debtors and HLFIP.  The Court concluded that the amended plan was an effort to cram down an unaccepted settlement proposal to a 50% shareholder. The Court also questioned the

---

[4] As a payment update, Debtors' schedule of creditors lists the "undisputed" claim of Florida Custom Mold, Inc. at $107,846.30. (Doc. 65, p. 17).  But Mr. Cave's declaration filed in support of Debtors' Motion for Reconsideration states that the prepetition amount currently due is only $30,220.01. (Doc. 223).

proposed non-consensual use of the Subchapter V Trustee to serve effectively as an independent director, over the objection of the other 50% shareholder, particularly when the operating entity that would use the licensed intellectual property is not even in bankruptcy.

Third, Debtors argue reconsideration is necessary to prevent manifest injustice, because they can propose a confirmable plan (attached to the reconsideration motion). Debtors fail to offer any reason why the "new plan" could not have been filed sooner or any reason it could not have been proffered at the Order to Show Cause hearing. In any event, the Court will briefly address the "new" plan.

No doubt, the "new" plan is much improved over the original plan and the amended plan, and, if it were consensual, the Court would seriously reconsider dismissal. However, the proposed second amended plan is just a better version of the original plan and the amended plan, and it offers more to Janice Logan for her shareholder claim than the prior plans. As rulings have gone against Debtors, it is not surprising that settlement offers have improved. But the Court questions whether any non-consensual plan for these two "holding" companies can be confirmed until Janice Logan's and Jon Logan's shareholder claims are resolved. Moreover, because of the extensive state court litigation, the state court is better positioned to resolve the disputes between the two shareholders. As the Court's order dismissing the cases states, the Court takes comfort in the fact that creditors are protected in the state court litigation because distributions to shareholders (even those ordered under Florida Statute § 607.1436) are effectively subordinated under state law.

The "new" plan's use of an independent director is good idea in corporate conflict situations. However, the second amended plan provides that the independent director will be selected by Jon Logan. It is hard to know whether the applicable corporate law or controlling documents would permit one shareholder to appoint two directors and the other shareholder,

4

presumably, to appoint none?  Again, the state court has dealt extensively with these issues, as well as Debtors' corporate documents.  As such, the state court is better suited to address this governance issue.

Finally, Debtors point out that the proposed second amended plan eliminates the three claims, totaling almost $71 million, that have been asserted against Debtors by John Logan, HLFIP, and Loco Florida.  Of course, in exchange for foregoing these claims, HLFIP (wholly owned by Jon Logan) will be given 51% interest in, and thus control of, the reorganized Debtors and all the non-debtor subsidiaries.  In addition, a quick review of the claims reveals that (1) HLFIP's prepetition claim is in serious doubt after the state court's recent ruling; (2) Jon Logan's claim is a contingent claim for compensation arising only if he returns assets that may or may not have been diverted from Debtors in the first instance (*i.e.,* the boat, the Ferrari, and the Rolls Royce); and (3) Loco Florida's claim appears to be based on an unwritten real estate lease, for an unknown term, with an entity owned by Debtors' sole director.

## IV.  Conclusion

Based on the above, the Court finds that Debtors have failed to satisfy the extraordinary standard necessary to warrant reconsideration.

Accordingly, Debtors' Motion for Reconsideration of Dismissal (Doc. 219) is **DENIED.**

It is **SO ORDERED.**

Attorney Daniel Fogarty is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file proof of service within three days of its entry.

# EXHIBIT 5



**CORRECTIONS SIMPLIFIED.**    www.smartcommunications.us    888-253-5178    10491 72ⁿᵈ St. | Seminole, FL  33777

December 3, 2024

Dear Valued Partner,

I am writing to share important news about Smart Communications' future growth and strategic direction. Our company has initiated a financial restructuring process through a voluntary Chapter 11 filing in the U.S. Bankruptcy Court for the Middle District of Florida.

**Business Continuity**

Smart Communications continues to operate normally, delivering the same high-quality technology solutions and superior customer support you have come to expect.

This filing was necessary to swiftly resolve a dispute between the company's two shareholders (myself and my late father's Trust) that unfortunately transpired following my father's untimely passing.

**What This Means**

- All operations, services, and customer support continue without interruption
- Product quality and service delivery remain unchanged
- Our commitment to innovation and excellence stays firmly in place
- We maintain full operational control as debtor in possession

**Moving Forward**

This restructuring strengthens our position for future growth and expansion of our national footprint. We remain focused on our mission of providing innovative corrections technology solutions while maintaining our industry leadership position.

**Contact Information**

For any questions, please reach out to:

- Jon Logan (Owner/Founder/CEO): (517) 896-1822
- Lisa Eddy (VP of Operations): (912) 674-4150

Sincerely,

Jon Logan
Owner, Founder and CEO
Smart Communications

CONFIDENTIAL

# EXHIBIT 6

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
        Plaintiff,

v.

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
        Defendant.

CASE NO.  2023 CA 001002 NC
DIVISION C CIRCUIT

_____

### ORDER WITH FINDINGS AND CONCLUSIONS OF LAW
### FROM PART 2 OF PHASE 2 TRIAL

      After years of intense litigation, the Court conducted the trial on the valuation of Smart Communications Holdings, Inc. as of August 28, 2023, together with most of the remaining issues. The Court and the parties referred to this trial as "Part 2, Phase 2."

      The Court understands the mediation on payment terms and security is scheduled for later this week. Because the Court is endeavoring to release this decision as quickly as possible, the Court did not have time to substantially proofread to fix all errors, for which the Court apologizes in advance.

      In summary:

      •    The value of Smart Communications Holding, Inc. as of August 28, 2023, before a 5% lack of marketability discount is **$88,254,918**. This amount incorporates a 5% Royalty Rate applied against a 40.5% Royalty Base, effective August 28, 2023.

- No further royalty is due HLFIP from Smart Communications for revenue earned before August 28, 2023. The amount Smart Communications paid on behalf of HLFIP through August 28, 2023, exceeded the royalty amount due. HLFIP will not need to repay the at least $1.2M overage.

- After application of the 5% lack of marketability reduction, the value of the Trustee's shares as of August 28, 2023, is **$41,921,086**. The Court elected not to apply a lack of control reduction.

- The Trustee will need to repay shareholders loans totaling **$1,339,778**. The Trustee will also need to repay all expenses associated with the Ranch Club home that occurred after August 28, 2023, and the amounts associated with the wrongful injunction. Both amounts will be setoff from the amount due the Trustee for the value of her shares.

- The Court is requesting additional briefing on the issue of attorney fees and application of interest relating to the valuation proceeding. The Court is also requesting briefing on the issue of the authority of the Court to appoint a receiver under the authority to provide security for payment of the Trustee's shares under section 607.1436(5), Florida Statutes, should one become necessary in the future. The Court is also requesting a memorandum from each side relating to that side's view of payment terms and provisions for security for payment.

- Count 1 of the Trustee's Second Amended Answer with Counterclaims [DIN 775], filed on October 2, 2024, was not tried and is being severed.

- Neither Jon Logan nor Smart Communications prevailed in Counts 1-18 of their Second Amended Complaint [DIN 891], filed December 4, 2024. The Court is requesting additional briefing as to Counts 19 and 20.

- Count 1 of Alexis Logan's Counterclaims [DIN 1790], filed on August 4, 2025, for malicious prosecution/abuse of process was not tried and is being severed. Count 2 was voluntarily dismissed. In Count 3, the Court finds entitlement to indemnification and will have a separate hearing on the amounts.

- HLFIP did not prevail on its Counterclaim [DIN 1863], filed on August 15, 2025.

- The Court will conduct a hearing on December 19, 2025, to address payment terms and security as well as the other issues identified in this Order.

There are several parties that have the Logan last name. For that reason, the Court will address Logan family members by their first and last name. Additionally, Janice Logan is a party to this action in three separate capacities: individually; as Trustee of the James Logan Family Trust dated February 10, 2021; and as Personal Representative of the Estate of James Logan. References to "Janice Logan," "Trustee," and "Personal Representative" means to those three capacities, respectively.

The Court notes that Jonathan Logan and Smart Communications filed the first lawsuit on February 28, 2023, which case was assigned Case Number 2023-CA-1002. In what would become the derivative lawsuit, the Trustee sued Jonathan Logan and Smart Communications as a nominal defendant on March 10, 2023, which case was assigned Case Number 2023-CA-1280. The then presiding judge consolidated the cases and directed all actions to occur within the -1002 case. For that reason, the reader will note multiple complaints that appear to have the same nomenclature within the -1002 case.

**1.**
**BACKGROUND**
**THE PATH TO PART 2, PHASE 2 TRIAL**

This case presents an unfortunate intra-family fight, which now concerns the valuation of Smart Communications Holdings, Inc. as of August 28, 2023. The Court tried "Part 2, Phase 2" over the course of 10 trial days: October 6-10, 2025; October 13-October 16, 2025; and November 12, 2025.

The Part 2, Phase 2 trial was the third trial phase between the parties. Getting to this point, the Court and the parties walked a long and winding path. The Court details only the most relevant items to orient the reader of how we arrived here.

There were two 50% shareholders of Smart Communications in 2022: Jonathan Logan and his father, James "Jim" Logan. In addition to being the shareholders, both Jon Logan and Jim Logan were Smart Communications' directors and senior executives. Smart Communications was growing rapidly, including its revenue base.

Jim Logan died October 16, 2022.

As later discussed, both Jon Logan and James Logan withdrew funds from Smart Communications, some of which were identified then identified, or later recharacterizes, as shareholder loans. Neither Jon Logan nor Jim Logan was particularly fond of paper trails, expense reports, or corporate formalities.

Shortly before his death, Jim Logan transferred his shares into the James Logan Family Trust ("the Trust"). His wife (and Jon Logan's mother)—Janice Logan—became Trustee of that Trust when Jim Logan.

Since that time, Jon Logan took steps to exclude his mother from the Company even though she as Trustee was now the other 50% shareholder. Jon Logan's action went further than that—he openly, actively, and unilaterally attempted to minimize, or eliminate, all value of the Trustee's ownership in Smart Communications. Jon Logan believed that his sister, Alexis Logan, was manipulating her mother to allow both Alexis Logan and Janice Logan to live off Jon Logan's efforts.

As this litigation grew, so did its complexity. There was a preliminary gating issue that needed to be resolved: whether the then recently discovered "shareholders agreement" following Jim Logan's death was valid. The Court severed that issue and tried it in the Phase 1 trial. The Phase 1 trial involved the declaratory judgment action and was tried over three trial days in January 2024. At its core, the Court declared in the Phase 1 trial:

- The purported Shareholders Agreement was invalid and unenforceable;

- There was no shareholders agreement between the two 50% shareholders of Smart Communications Holding, Inc.'s stock at the time of James Logan's death;

- The two 50% shareholders of Smart Communications Holdings, Inc.'s stock are: (1) Jonathan D. Logan; and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

On February 7, 2024, the Court entered a final judgment on those issues [DIN 652]. There was no appeal of that decision.

Initially, the Court scheduled the remaining claims to be tried in January 2025 in a Phase 2 trial. However, in the lead up to that trial, there were changes in the nature of the claims presented.

Of note, on May 29, 2024, Janice Logan as Trustee filed a pleading alleging shareholder deadlock, and she sought judicial dissolution of Smart Communications Holding, Inc. pursuant to sections 607.1430(1)(b)(2)-(4) and 607.1431, Florida Statutes [DIN 680]. In response Jon Logan, as incumbent management, caused Smart Communications Holding, Inc. to elect an option under section 607.1436, Florida Statutes, to purchase the Trustee's shares at fair value [DIN 696]. In fact, the parties agreed that Smart Communications could make this election [DIN 691]. This election changed the focus of Phase 2 to valuation, although there were still some claims that would survive the valuation process.

Section 607.1436(4) directs the valuation date to be "the day before the date on which [the judicial dissolution petition] was filed or such other date as the court deems appropriate under the circumstances." Unless the "such other date" was selected, the default statutory valuation date would be May 28, 2024.

The Trustee advocated for the Court to exercise its discretion and select "such other date," which the Trustee posited should be February 27, 2023, the date the initial lawsuit was

filed. The Trustee contended that the Court could determine the issue either without evidence or based on the trial record from the Phase 1 trial.

In contrast, Jon Logan and Smart Communications contended that either the Court should use the statutory default date or a later date in the light of the enactment of the federal Martha Wright-Reed Just and Reasonable Communications Act of 2022, or its proposed regulations, which they contend negatively impacts Smart Communications' ability to generate revenue. They opposed any argument that the Court could determine this issue without taking evidence.

The Court determined that it would need evidence to decide whether to use the default statutory valuation date or "such other date." And because the Phase 1 trial did not focus on valuation, the Court concluded use of the Phase 1 trial record would not provide a sufficient basis for this decision.

There was another variable that needed to be considered. Before the Trustee sought judicial dissolution, Jon Logan caused there to be significant, unilateral corporate activity that implicated valuation. On August 29, 2023, Jon Logan caused Smart Communications Holdings, Inc. and several related entities to undergo a sweeping corporate change. Included in this was the creation of a Delaware entity, Smart Communications Holdings, LLC. Jon Logan then purported to cause most of the assets of Smart Communications Holding, Inc. to be assigned to Smart Communications Holdings, LLC, without value. There were numerous other corporate changes that day, too. All of this was done without knowledge by, or consent from, the Trustee, as a 50% shareholder. And he would later attempt go to the courts in Delaware to use the new corporate structure against the Trustee's interests, again consist with his efforts to minimize or eliminate the Trustee's interest.

Also on August 29, 2023, Jon Logan took another unilateral action that purported to either eliminate or minimize the Trustee's value in Smart Communications. On that day he signed the purported Exclusive Intercompany Intellectual Property License Agreement on behalf of both Smart Communications, Holdings, LLC, on the one hand, and HLFIP Holdings, LLC, on the other hand. HLFIP Holdings, LLC is an entity Jon Logan owns 100%.

In doing so, Jon Logan for the first time imposed a purported 40% royalty to be paid by Smart Communications (which he only owned 50%) to HLFIP (which he owned 100%). In connection with that transaction, he also caused a long-term liability in favor of HLFIP to be recognized for the first time on the Consolidated Audited Financial Statements of Smart Communications. Released in October 2023 for year-end December 31, 2022, Footnote I expressed this royalty liability as an expense for years 2015-2021 then valued at $52.8M with accrued interest of $5.6M, and for 2022, an additional accrued expenses of $17.9M and $0.4 of accrued interest. The Court ultimately referred to these actions as the Purported Royalty Transactions [DIN 1189].

The parties at the time had a sharp disagreement over these Purported Royalty Transactions. The Trustee attacked the Purported Royalty Transactions as a "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes. It quickly became apparent to the Court that either the Phase 2 trial would either have to be bifurcate the

Phase 2 trial or the Court would have to accept expert testimony relating to a wide range of potential valuation dates under multiple scenarios, including differing scenarios based on how the Court handled by Purported Royalty Transactions.

The Court concluded proceeding with all remaining issues to be tried in Phase 2 would be more cumbersome and unwieldy, even in a nonjury format. The Court, therefore, elected the bifurcation path and separated Phase 2 into two parts [DIN 870]. In Part 1, Phase 2, the Court limited that trial to (1) the proper valuation date; (2) the license/royalty issue; and (3) any issue the parties agreed to be heard during Part 1.

Prior to the February 2025, Part 1, Phase 2 trial, Jon Logan (and without the Trustee's knowledge or consent) placed Smart Communications into bankruptcy in furtherance of his efforts to eliminate the Trustee's share value. The Bankruptcy Court granted relief from the automatic stay to the extent the Bankruptcy Court authorized the Court to proceed with the Part 1, Phase 2 trial as previously set [DIN 928].

The Part 1, Phase 2 trial and was tried over three trial days in February 2025. At its core, the Court decided in Part 1, Phase 2 of the trial:

- The Purported Royalty Transactions constituted "director's conflict of interest transactions" within the meaning of section 607.0832. The Court found that Jon Logan failed to prove these transactions were fair to Smart Communications, and the Court further found that the Trustee proved the Purported Royalty Transactions were not fair to Smart Communications.

- The Court invalidated the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I.

- Under the unique circumstances presented in the case, the Court determined that the Court would value Smart Communications Holding, Inc. as of August 28, 2023, the date immediately before Jon Logan's substantial corporate activity on August 29. In doing so, the Court noted the authority in section 605.0706(4), that permits the Court to determine valuation on "such other date as the court deems appropriate under the circumstances."

Order with the Court's Findings from Part 1 of Phase 2 Trial, signed February 17, 2025 [DIN 1189].

As Phase 2 was bifurcated, the Court did not enter final judgment. The Jon Logan affiliated parties (Jon Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; and HLFIP Holding, LLC) sought certiorari review at the Second District in 2D2025-0700. The Jon Logan parties ultimately sought to dismiss their petition, which was granted on November 5, 2025 [DIN 2228].

Following the Part 1, Phase 2 trial, the Court set the balance of the case for trial in Part 2, Phase 2.

In the lead up to Part 2, Phase 2, the parties agreed some claims would not survive valuation, some claims would survive, and a few others would be tried separately.

## 2.
## FACTUAL FINDINGS

The Court tried Part 2, Phase 2 over ten days. In paper format, there are hundreds of exhibits spanning more than 20 banker's boxes.

The Court continues with its factual findings from Part 1, Phase 2 of the trial. Nothing in the additional evidence presented during Part 2, Phase 2 of the trial alters the Court's prior findings. Further, the Court continues with its rulings from Part 1, Phase 2, including the rulings relating to the Purported Royalty Transactions, the invalidation of the Exclusive Intercompany Intellectual Property License Agreement, the invalidation of the recognition of the purported long-term liability in footnote I, and the August 28, 2023, valuation date.

The Court now makes additional, overarching factual findings. The Court will then supplement those factual findings throughout this Order.

In large part, this case is driven by credibility. Had this been a jury case, the Court would have given the jury instruction 601.2 concerning believability of witnesses:

> Let me speak briefly about witnesses. In evaluating the believability of any witness and the weight you will give the testimony of any witness, you may properly consider the demeanor of the witness while testifying; the frankness or lack of frankness of the witness; the intelligence of the witness; any interest the witness may have in the outcome of the case; the means and opportunity the witness had to know the facts about which the witness testified; the ability of the witness to remember the matters about which the witness testified; and the reasonableness of the testimony of the witness, considered in the light of all the evidence in the case and in the light of your own experience and common sense.

Florida Standard Jury Instruction 601.2a. Even though this was a bench trial and jury instructions are not read, the Court is tasked with determining what testimony and evidence is to be believed, just as is the case for juries. And the Court takes instruction 601.2 to heart.

The Court found Jon Logan's testimony, for the most part, not credible. The Court will explain why this is the case by addressing two main themes from his testimony and then contrasting it with other evidence in the case. *First*, Jon Logan testified that he did not know

what was occurring with the finances of the company during Jim Logan's life. *Second*, Jon Logan testified that Alexis Logan provided no meaningful services to the company.

As it relates to financial information, Jon Logan testified that he and Jim Logan "talked daily about our budget that I would be able to work with." (Transcript p. 709). Yet, just 9 transcript pages earlier, Jon Logan testified that Jim Logan and Alexis Logan *hid* their funding efforts from him: "This did this all behind my back and without any consent." (Transcript p. 700).

Interestingly, though, on **March 2,2016**, Jim Logan emailed Jon Logan all the bank passwords when Jon Logan was complaining about funds going to either Jim Logan or Alexis Logan. Because Jon Logan effectively was accusing his father of stealing from Jon Logan, Jim Logan writes: "Check out anything you like I have nothing to hide." (Ex. 8001). Nothing was hidden from Jon Logan, and Jon Logan's statements to the contrary simply are not true.

Further to Jon Logan's knowledge of the details of the financial condition of Smart Communications are emails Jon Logan sent to Jim Logan or Alexis Logan over the years. For instance, on **April 26, 2015**, Jim Logan responded to an uncharitable email from Jon Logan, and discussed matters involving efforts to secure financing for Smart Communications, including personal guarantees that Alexis Logan and Jim Logan gave—but not Jon Logan:

> The debt? I borrowed over 200k from grandpa and thru [sic] it in the pot in addition to the 225k we owe the bank. **Your guarantee seems to be absent on those loans.** If I were willing to accept your ridiculous offer which I am not, how would you assume the debt and relief those who have personally guaranteed the loans?
>
> In your email you state you only need my help with the financing. Well no shit! This company is at a critical phase. We are on the edge of great growth and profits. Wednesday I meet with Gateway bank regarding a million dollar line of credit. If you think a pretty smile and a good credit score will get the job done then get out there and get it done. **If you think that I or your sister** will place what little we have on the line for someone who cant stop motherfucking us to further his "idea" you have truly lost your shit.
>
> . . .
>
> The trade show. I was not there but I find it hard to believe all has changed since the Long Beach Show. You once again mention funding. How is this possible? **I know you are aware your sister is the guarantor on the loans. Two weeks ago you threatened to kill her! Do you really expect people you threaten to kill to pledge their assets for your business ventures?**

[Ex. 8121].

Over the years, there are other emails that irrefutably demonstrate Jon Logan had concurrent knowledge of inflows into, and outflows from, Smart Communications. From a **May 21,2018**, email, Jon Logan wrote to both Jim Logan and Alexis Logan:

- "Alexis is still living off this company taking funds";

- "you fund her life and lifestyle";

- "she is freeloading off this company and taking funds";

- "You two have fucked me harder than any stranger ever has".

(Ex. 8003).

From a **December 25, 2018**, email, Jon Logan wrote Jim Logan:

- "Do not dare ever being [sic] Alexis into my business ever again!"

- "Get that low life fucking mooch so far away from me and my business and my employees, she is not allowed near that fucking building."

(Ex. 8004).

From a **March 21, 2019**, email, Jon Logan wrote Alexis Logan and another person:

- "Alexis, you transferred $20k to yourself out of my business."

- "You both [Alexis Logan and Jim Logan] have blank checks belonging to my business you use at your own will without my permission."

- "You stealing from my company is causing me not to be able to pay our employees."

- "You ignorant fool. I have over $350k in bills I have to pay and I have $400k in new equipment I have to order right now this month. Yet you wire transfer money out of my business to yourself."

(Ex. 8005).

Not only did Jon Logan disavow knowledge of financial activity within Smart Communications, he in his personal lawsuit, through Smart Communications, and through HLFIP, alleged that his father was stealing from Jon Logan, and otherwise breaching fiduciary duties. In many cases, the basis of the alleged fiduciary duty was the fact that Jim Logan was Jon Logan's father!

The documentary evidence, though, indicates that for at least a decade Jon Logan knew about how he and Jim Logan were handling Smart Communications' finances. And Jon Logan knew about some of the very expenditures he now complains about. If Jon Logan's email statements to his family are to be believed, Jon Logan almost a decade ago should have acted to address his concerns.

The reality is, and the Court finds as fact, that Jon Logan knew exactly what was occurring in Smart Communications during Jim Logan's life, including its financial situation. Jon Logan and Jim Logan agreed that each were entitled to withdraw funds from Smart Communications, and the other shareholder knew it and knew when it was done. As a 50% shareholder, chief executive officer, and director, Jon Logan had full access to Smart Communication's books and records. Additionally, for at least the last decade, he also has had passwords to the bank accounts. Jon Logan's testimony that Jim Logan hid financial matters from Jon Logan is not credible.

Instead of accepting responsibility for his personal role, though Jon Logan seeks to fault his father under themes of breach of fiduciary duty, corporate mismanagement, and related concepts. Jon Logan also complains about not documenting the shareholders' expectations and limitations of authority. But Jon Logan cannot plausibly visit on his father Jon Logan's failure to do so when Jon Logan knew in real time how both Jon Logan and Jim Logan were handling expenditures.

Another major theme of Jon Logan's testimony visibly at odds with the documentary and other evidence is his contention that Alexis Logan provided no meaningful service to Smart Communications. The Court understands that brother and sister do not get along. At all. But the testimony concerning Alexis Logan's alleged lack of involvement is stunning.

Alexis Logan graduated law school in 2006 and began her career as an Assistant Public Defender in Hillsborough County, Florida. A couple of years later, she opened her own law firm, the Law Office of Alexis K. Logan, PLLC ("Law Office"). She also was involved, both early on and during the development of the inmate communication concept. In fact, part of the original inmate communication concept occurred based on Alexis Logan's work as a Public Defender going into jails to speak to her clients. Like Jon Logan and Jim Logan, she was not paid in the early days.

In 2009, when the jail communications concept was first developed by Jon Logan and Jim Logan, Jim Logan asked Alexis Logan for help develop the concept. (At this time, Smart Communications was not formed; Alexis Logan would form it in December 2014). This was done with Jon Logan's begrudging knowledge. Alexis Logan assisted her father with administrative tasks. She performed legal services. And she provided independent executive type services for her father, including conducting industry and market research. She acquired insurance and necessary bonds for work in various jails. As the concept grew, so did her involvement.

Alexis Logan also opened bank accounts and, critically, personally guaranteed Smart Communication's bank debt. She delivered valuable personal items as collateral that the bank

held. She also personally guaranteed Smart Communications' credit cards, sometimes where there were charges exceeding $150,000 a month.

Jon Logan did not have creditworthiness and did not provide any personal guarantee for almost the entire first decade. Alexis Logan remained as a personal guarantor of the American Express card during this litigation, even though Jon Logan was causing Smart Communications to sue her. In mid-2023, Alexis Logan terminated Smart Communications' ability to use the American Express backed by her, which annoyed Jon Logan greatly.

Relating to legal services, Alexis Logan incorporated the first Smart entity in 2010. She incorporated Smart Communications Holding, Inc. in December 2014, and she formed the other Smart entities, too. She also formed the original HLFIP entity. She drafted legal memoranda analyzing potential risks of new product offerings. She monitored lawsuits and communicated with outside counsel and provided typical in-house counsel type work. Alexis Logan also assisted with hiring Smart Communications Holdings, Inc.'s current in-house attorney, David Gann. As there was no guarantee that the business would be successful, especially in the early days, she was not asked to, and she did not keep time records relating to her work as an attorney.

Jon Logan knew of Alexis Logan's involvement from the beginning. Given Jon Logan's legal troubles and Jim Logan's IRS troubles, early on Alexis Logan was asked to hold legal title of the stock in her name. And she did. This was a continuing source of frustration to Jon Logan, who believed that Alexis Logan was taking "his" company from him. In fact, he continually complained that she would not return "his" stock to him.

Further to Jon Logan's knowledge of Alexis Logan's involvement, the April 26, 2015, email quoted above demonstrates her involvement. There are other examples of Jon Logan's knowledge of Alexis Logan's corporate involvement, too. From a December 19, 2016, email, Jon Logan wrote to Jim Logan:

- "Fucking stop involving her lazy ass";

- "time and time again [you] keep injecting her into my business";

- "IF YOU THINK OF HER NAME AND THIS BUSINESS…JUST STOP!!!!!!!!!!"

(Ex. 8002).

From a May 21, 2018, email, Jon Logan wrote to both Jim Logan and Alexis Logan:

- "Alexis is still living off this company taking funds";

- "you fund her life and lifestyle";

- "she is freeloading off this company and taking funds";

- "You two have fucked me harder than any stranger ever has".

(Ex. 8003).

From a December 25, 2018, email, Jon Logan wrote Jim Logan:

- "Do not dare ever being [sic] Alexis into my business ever again!"

- "Get that low life fucking mooch so far away from me and my business and my employees, she is not allowed near that fucking building."

(Ex. 8004).

To be fair, Jon Logan did not think that Alexis Logan did a good job with those tasks assigned to her. But doing a poor job (which there is scant credible evidence demonstrating) is different than Jon Logan's position that she was not involved at all. For Jon Logan to say Alexis Logan was not involved simply is wrong. And this can be gleaned simply on documentary evidence. That conflict was further pronounced when viewing Jon Logan's testimony. Mr. Johnson's cross-examination of Jon Logan was highly effective, especially related to Alexis Logan's personal guarantees, as it spotlighted that Jon Logan could not answer simple and direct questions because the answer would require him to acknowledge that her sister helped Smart Communications. That evasiveness in his testimony further undermined his credibility.

The Court finds as fact that Jon Logan had contemporaneous knowledge of Alexis Logan's involvement and, for the most part, those funds flowing to her directly or indirectly. This includes Jon Logan's knowledge that Alexis Logan personally guaranteed bank loans and credit cards and physically surrendered to the bank collateral to secure various loans—all to allow Smart Communications an opportunity to survive and to grow, especially in its earlier years.

During Part 1, Phase 2, the Court found as fact that Jon Logan's spite and animus towards his sister and mother drove decisions, not business judgment. The Court continues with that finding based on Jon Logan's testimony in Part 2, Phase 2.

The Court agrees with the concept advanced by Mr. Johnson that Jim Logan was stuck between his two children. Jon Logan was developing this inmate communication idea. But, given his troubling past, he could not successfully develop the concept. Jim Logan had entrepreneurial talents himself. Jim Logan used those, and he harnessed the talents of both of his children to launch Smart Communications into a successful company.

But because Jon Logan and Alexis Logan did not get along, Jim Logan had to operate as the bridge. All knew it. The Court finds Smart Communications would not have succeeded without Alexis Logan's assistance and creditworthiness.

The Court has dedicated substantial attention to these two themes because they help explain why the Court does not credit Jon Logan's testimony. Credibility is critical here,

especially regarding claims where there is little to no documentary evidence about many of the inflection points in this case.

It comes as no surprise to either side that when it came to withdrawing funds from Smart Communications, neither Jon Logan nor Jim Logan followed corporate best practices. Generally, neither filled out expense reports nor made concurrent written justifications for their withdrawals, whether denominated as a draw, a shareholder's loan, a reimbursement, or simply as a corporate expense. This practice was known by, and approved by, both Jon Logan and Jim Logan. And with Jim Logan unable to provide testimony as to the questioned transactions, in many instances the Court is left with Jon Logan's testimony to support a claim or defense.

Indeed, there are many decisions relating to valuation as well as most of the affirmative claims brought by Jon Logan, Smart Communications, or HLFIP against Janice Logan, the Trustee, the Personal Representative, Alexis Logan, or her husband Justin Peterson that rest in part on Jon Logan's testimony. And that foundation is shaky.

Further, as demonstrated by the evidence, Jon Logan at every turn in this case has taken action to either eliminate or substantially minimize the value of the Trustee's shares. The exorbitant "legal spend" in this case is, in part, directly tied to Jon Logan's actions, not Jim Logan's actions.

The Court will now turn to its analysis. But the Court will make other factual findings throughout this Order, especially when addressing specific claims.

### 3.
### ANALYSIS

The main issue in this portion of Part 2, Phase 2 trial involves the determination of fair value for the Trustee's 50% interest in Smart Communications Holding, Inc., a Florida entity, as of August 28, 2023.

For ease of reference, the Court will refer to Smart Communications Holding, **Inc.** and its related entities as "Smart Communications." As a reminder, effective August 29, 2023, Jon Logan caused the creation of Smart Communications Holding, **LLC**, a Delaware entity, along with a host of other entities. It was on August 29, 2023, that Jon Logan then executed the massive corporate restructuring, with assets being transferred between entities. As the Court established valuation on August 28, 2023, the Court for valuation purposes can disregard the corporate restructuring and related transfers occurring without value.

When the Court addresses payment terms and security, the Court may need to more directly address the corporate restructuring.

On paper, the Court's valuation assignment is simple. Knowing precisely what is being tried, though, is more nuanced as the parties have raised many claims. A good number of the Trustee's affirmative claims will be subsumed within the analysis of valuation, as those claims

will not survive the valuation process. Some claims against the Trustee, Personal Representative, and Janice Logan remain, but any damages will be addressed as setoff to the valuation of the Trustee's share ownership. There are other claims against Alexis Logan and Justin Peterson that could result in a money judgment. Finally, a few claims were not addressed during Part 2, Phase 2 trial, and the Court presumes they will be severed to allow entry of a final judgment.

The Court first addresses valuation and those claims that will be subsumed within the valuation of Smart Communications.

## A.
## INTRODUCTION TO VALUATION

The valuation of Smart Communications Holdings, Inc. is formally pled within the Trustee's Second Amended Verified Complaint [DIN 680]. The defendants in that case include Jon Logan; Smart Communications Holding, LLC; HLFIP Holding, Inc.; HLFIP Holding, LLC; Smart Communications Yacht Holding, LLC; and Loco Florida, LLC. The Trustee included Smart Communications Holding, Inc., the entity being valued, as a nominal defendant.

There is a separate affirmative pleading that impacts valuation. That is contained within the Trustee's Second Amended Answer with Counterclaims [DIN 775]. In that pleading, the Trustee sued Jon Logan; Smart Communications Holdings, Inc.; Smart Communications Holding, LLC; HLFIP Holding, Inc.; and HLFIP Holding, LLC.

Based on the parties' joint filing dated October 1, 2025, entitled "Joint Notice of Filing Regarding Survival of Claims Post-Valuation," the parties agreed certain claims would not survive the Court's valuation. The discussion of those claims, if any discussion is necessary, will occur within Section C involving valuation. Before addressing valuation, though, the Court must address the issue of royalty.

## B.
## LICENSE/ROYALTY ISSUE

A component that impacts Smart Communications' valuation is the application, if any, of a commercially reasonable royalty for an exclusive license to MailGuard and MailGuardLegal intellectual property. For ease of reference, the Court will simply refer to these products as MailGuard.

Recall the Court made several factual findings and conclusions during Part 1, Phase 2 of the trial relating to license/royalty issue. Those findings included:

- Jon Logan's testimony concerning a true-up or valuation for payment to HLFIP was not credible. [DIN 1189, p. 2, ¶6]

- There was no agreement between Jon Logan and James Logan for a future true-up or valuation for payment to HLFIP by Smart Communications relating to Smart Communications' use of intellectual property.

- Jon Logan's actions on behalf of Smart Communications of signing the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the first-time recognition of a long-term liability relating to the purported 40% royalty due HLFIP from Smart Communications as described in footnote I of Smart Communications Consolidated Audited Financial Statements (for year end 2022) constituted "director's conflict of interest transactions" within the meaning of section 607.0832.

- Jon Logan failed to prove the fairness of those transactions, and the Trustee proved those transactions were not fair to Smart Communications.

- The Court invalidated both the Exclusive Intercompany Intellectual Property License and the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I that was based on the Exclusive Intercompany Intellectual Property License.

Nothing in Part 2, Phase 2 causes the Court to alter those factual findings. The Court continues with those findings.

Adding the evidence from Part 2, Phase 2, the Court notes there was no factual dispute raised that Jon Logan originally owned the idea that became MailGuard and MailGuard Legal. (For ease of reference, the Court will simply state "MailGuard"). Further, there was no factual dispute raised that HLFIP currently owns the MailGuard intellectual property, however denominated (such as patents and trademarks). Jon Logan transferred the MailGuard intellectual property into HLFIP, an entity that Jon Logan owns 100%.

For purposes of this valuation trial, MailGuard is the only intellectual property that Jon Logan, HLFIP, and Smart Communications sought to apply any value or royalty. That is not surprising.

In April 2015, Jon Logan sent an email that Jon Logan intended to be a contract relating to intellectual property associated with "postal mail contraband elimination system." In fact, that phrase or a derivative of that phrase was used three times. The "postal mail contraband elimination system" is MailGuard.

The contract also references three additional times "this service invention" or "this service, model, business plan, or technology." This email contract indicates that Jon Logan would "exclusively own[] and will retain exclusive ownership of this service invention . . . ."

Jim Logan signed the email. In May 2015, Alexis Logan (then holding legal title to Smart Communications' shares) also signed, and she annotated "For new technology/patent/new IP

only." Alexis Logan was not convinced this was patentable, and she wanted to ensure Smart Communications' existing intellectual property remained in Smart Communications' possession.

From a factual standpoint, the Court finds this contract applies to the MailGuard intellectual property only. Because the parties only sought to value the MailGuard intellectual property, the Court will focus on that intellectual property.

The Court finds that beginning in 2016 through the date of valuation (August 23, 2023), Smart Communications used the MailGuard intellectual property. The known practice to both Jon Logan and Jim Logan during his life was that Smart Communications paid for all engineering and development costs as well as all costs associated with securing and enforcing HLFIP intellectual property. Smart Communications also assumed all business risks associated with the MailGuard intellectual property. For the time-period 2019-2023 (thus excluding 2015-2018), Smart Communications paid at least $4.8 million on behalf of HLFIP relating to this intellectual property. Smart Communications, though, did not separately pay to HLFIP an amount for a royalty, as Smart Communications was paying all of HLFIP's expenses.

The three main experts addressing the royalty issue were Dr. Sean Sheridan, Ph.D. and Mr. Mark Schuelte, for HLFIP, and Dr. Louis Berneman, Ed.D., for the Trustee. The Court credits Dr. Berneman's testimony in most respects.

Before diving deeper, the Court notes the intellectual property experts on both sides generally agreed on a basic formula to determine a commercially reasonable royalty. The Court finds this formula to be appropriate in this case. That formula is:

**(Royalty Rate  x  Royalty Base)  -  Deductions  =  Royalty**

The experts, though, disagree on the values to input into that formula. The Court will next address each component of this formula to address the ultimate royalty in this case.

### 1.    *Royalty Rate.*

Dr. Berneman's main conclusion is that no additional compensation obligation is due HLFIP from Smart Communications for the use of the HLFIP intellectual property. Dr. Berneman arrived at this by way of Smart Communication's payment of engineering and development costs, securing and enforcing HLFIP IP, and assuming all business risks. For instance, Dr. Berneman pointed to the $4.8 million paid on behalf of HLFIP between 2019-2023. (Again, this excludes costs Smart Communications paid between 2015-2018.)

Alternatively, Dr. Berneman testified based on comparable agreements that if a royalty rate needed to be applied, a commercially reasonably Royalty Rate would be between 2% to 5%, but in this case should be no more than 2%.

Dr. Sheridan, one of HLFIP's experts, testified that a reasonable Royalty Rate based on comparable agreements would be 10% to 17% of net revenue from accounts in which MailGuard services are provided. Mr. Schuelte, another HLFIP expert, testified that a reasonable royalty rate

from comparable agreements would be between 13.5% to 50%, with a 34% median of the interquartile range of other agreements he selected as comparison.

In review of the experts' testimony based on the underlying facts and data in this case, the Court finds Dr. Berneman's analysis and selection of comparable situations to be the most realistic and persuasive. The Court, though, cannot agree that the bottom of his range is appropriate. Instead, the Court finds the top of Dr. Berneman's range—5%—to be appropriate under the facts of this case.

The Court finds that **5%** is the proper commercially reasonable Royalty Rate for Smart Communications to pay HLFIP for an exclusive license for the use of HLFIP's intellectual property.

### 2. *Royalty Base.*

HLFIP expert Dr. Sheridan testified as to Royalty Base. HLFIP's other expert, Mr. Schuelte, did not express an opinion as to the Royalty Base.

Dr. Sheridan testified by implication that the Royalty Base should be 81% of Smart Communications' revenues. Dr. Sheridan derived that percentage by using the percentage of facilities in 2023 that deploy the MailGuard product because, with exception of the Commonwealth of Pennsylvania's contract, none of the other facility contracts provides for a quantifiable revenue component for the MailGuard service. The reality is MailGuard is one of multiple services provided by Smart Communications to a facility.

Dr. Sheridan testified that the number of Smart Communications' serviced facilities receiving MailGuard services increased from 1% in 2016 to 81% by 2023. He also explained that after implementation of MailGuard in a facility, the average messages per inmate per day increased from 1.37 to 1.77, resulting in an increase of daily message revenue per inmate from $0.69 to $0.89. Just from messages, then, Smart Communications saw a 29% increase in revenue, which Dr. Sheridan attributes to MailGuard.

To get to his 81% opinion, though, Dr. Sheridan assumed that "MailGuard is required to get these contracts." (Trans. 1104-1105). In other words, Dr. Sheridan attributed 100% of all revenue from a facility that uses MailGuard as resulting from, and attributable too, the MailGuard intellectual property.

Dr. Sheridan testified that between 2016—the first year in which MailGuard was introduced—and the August 2023 valuation date, Smart Communications' revenue associated with the MailGuard product was $137.3 million. Using math, the Court notes that $137.3M is 81% of Smart Communications' total revenue of $169.5M from the beginning of the first contract involving MailGuard product until the valuation date. (Expressed as a formula: $169.5M = $137.3M ÷ 0.81) Separately, Mr. Sly testified the revenues from January 2016 to valuation date were $167.7M.

On cross-examination, Dr. Sheridan conceded that he did not exclude revenues that appear to derive from other technology such as the Lattice intellectual property Smart Communications acquired and owned (meaning, not HLFIP ownership). The evidence demonstrates that Smart Communications (not HLFIP) purchased Lattice technology related to telephone-related services and SmartEvo ITS. Like MailGuard, that technology also drives Smart Communications revenues.

Dr. Sheridan also conceded that there are revenue streams for other Smart Communications' products, such as photo income, entertainments, visitation income, and commissary transfer credits, all of which are outside the MailGuard technology. Despite those revenue drivers, Dr. Sheridan simply assumed *all revenue* in a facility offering MailGuard existed because, without MailGuard, Smart Communications would not have the contract.

The Trustee and the Trustee's expert Dr. Berneman criticized the use of 81% of facilities using MailGuard as a valid proxy for the royalty base. Dr. Berneman explained that there is no nexus or linkage between MailGuard and the claimed 81% royalty base. Dr. Berneman, though, did not offer a competing model.

The Court simply cannot agree—nor can the Court find—that 100% of the revenues derived from a facility that has MailGuard as a service are attributable to the MailGuard intellectual property. There was credible testimony that some facilities were more focused on telephone-based services and did not care whether it had MailGuard or not. Having said that, the Court agrees with the testimony of Chief Allen from Polk County, who is a long-term director of a jail and whose testimony the Court placed great weight, that the MailGuard product is an important, attractive, and value-added component of the suite of products Smart Communications offers.

In the Court's review of the financials, the various suite of Smart Communications products, the commission rates, the exhibits, testimony of fact and expert witnesses, the Court agrees generally that using facilities that utilize the MailGuard service is a sufficient proxy to determine Royalty Base. The Court finds use of this proxy provides sufficient linkage and is not too speculative. As noted above, though, the Court cannot find 100% of all revenues from a facility utilizing MailGuard is appropriate to attribute to the MailGuard intellectual property. Instead, the Court finds a very healthy percentage of those revenues generated from facilities using the MailGuard service—50%—is appropriate as part of the Royalty Base calculation.

The Court pauses to note that if the Court is in error in using the 81% facilities that has MailGuard because it is too speculative, the Court would note that Smart Communications and HLFIP presented no other means for the Court to calculate the Royalty Base. The only exception is the Commonwealth of Pennsylvania contract, which 100% of the revenue from that contract is due to MailGuard. Thus, if the Court were in error in using 81% of facilities using MailGuard, then the Court would alternatively only be able to find 100% of the revenues from the Commonwealth of Pennsylvania to form the basis of the Royalty Base. Having made that alternative finding, the Court returns to its primary finding.

The Royalty Base is 50% multiplied by 81.00% (percentage of facilities using MailGuard), which equals 40.5% of Smart Communications' net revenues.

The Court finds that **40.5%** of Smart Communications' net revenue is the proper Royalty Base.

### 3. *Deductions.*

The parties disagree with how to apply deductions, if any, to the royalty formula. Recall that Smart Communications paid at least $4.8 million on behalf of HLFIP between 2019 and the 2023 valuation date. The Court first addresses deductions prior to the valuation date. The Court then addresses deductions after the valuation date.

Dr. Sheridan opined there were $137.3M in net Smart Communications revenues to which the Royalty Rate would apply. As explained above, $137.3M constituted 81% of Smart Communications' net revenues between 2016-2023. Applying math tells us this means Smart Communications' total net revenue for this period is $169.5M. (169.5M = $137.3M ÷ 0.81).

The Court will use this $169.5M net revenue amount, even though it slightly overstates the revenue because it appears Dr. Sheridan used revenue that went through December 31, 2023, not August 28, 2023. In this case, though, that difference is not material.

For the period before August 28, 2023, the Court first applies the 40.5% the total net revenue of $169.5M, resulting in a Royalty Base of $68.6475M. The Court then multiplies that Royal Base by 5%, the Royalty Rate. The product of these amounts is $3.432M, rounded to **$3.4M.**

In other words, applying the commercially appropriate **5%** royalty rate to **40.5%** of all net revenue would mean that Smart Communications would owe HLFIP **$3.4M** for 2016-August 28, 2023.

Smart Communications, though, paid at least **$4.8M** on behalf of HLFIP between 2019 and 2023. Obviously, this excludes those costs paid by Smart Communications on behalf of HLFIP prior to 2019. $4.8M paid by Smart Communications exceeds $3.4M due HLFIP. ***In other words, there is no further royalty due HLFIP for Smart Communications' use of HLFIP's/Jon Logan's intellectual property under the exclusive license through August 28, 2023.***

Because the Court previously found that the Smart Communications shareholders never agreed to a true-up relating to the royalty, the Court will not apply the difference in determining value. The Smart Communications shareholders tacitly agreed to pay those costs on behalf of HLFIP. The Court, therefore, does not need to address further the question of royalty through August 28, 2023.

The Court will address the proper discounted cash flow Royalty amount in the Valuation section. ***It should be noted that because the value of Smart Communications is being impacted***

*by the application of the Royalty, it would be highly inequitable if Smart Communications continued paying all expenses of HLFIP in any amount above what would otherwise be due HLFIP. This includes HLFIP's attorney fees in this proceeding. This will need to be addressed in the security of payment of the value of the Trustee's shares, and consideration should be given whether these expenditures should actually be characterized as shareholder loans to Jon Logan.*

That leaves only the issue of Deductions that will apply, if any, in the formula. As found as fact, the Smart Communications' shareholders agreed that Smart Communications would fund the development of HLFIP's intellectual property. Based on that factual finding, the Court concludes there will be no Deductions applied on the formula associated with the intellectual property.

## C.
## VALUATION OF
## SMART COMMUNICATIONS HOLDING, INC.
## AS OF AUGUST 28, 2023

To say the parties have wildly different valuations of Smart Communications in this case would be the understatement of the year.

### 1.    *The approaches.*

There were two experts addressing value. Both generally used a sum-of-the-parts approach by separately valuing the operating assets using a discounted cash flow to present value and then adding in nonoperating assets. Despite that similarity, each expert included multiple different assumptions, with each assumption impacting the ultimate value.

Jon Logan and Smart Communications' expert, Robert Sly, testified that the value of the Trustee's shares on August 28, 2023, was $1.2M, after applying a 10% royalty consistent with Dr. Sheridan's analysis. Mr. Sly's opinion of the Trustee's share value without application of the royalty was $7.1M.

Mr. Sly testified that Smart Communication's value on a "marketable, control basis" as of August 28, 2023, was $20.2M. He then applied a 12% discount for "lack of control," resulting in a value of $17.8M. He then applied a 20% reduction to this amount for "lack of marketability," resulting in a value of $14.2M. From that number, Mr. Sly derived the Trustee's 50% value as $7.1M.

The Trustee's expert, Mark Berberian utilized two separate models. The difference of those models involved forecasts of the effect of then unknown but impending regulations the FCC would be issuing associated with the Martha Wright-Reed Act that was then known or knowable. Mr. Berberian's Model 1 assumed a more benign impact of regulations from Smart Communication's perspective. His Model 2 assumed a more negative impact on Smart

Communications' profitability based on those future regulations, again, from Smart Communications' perspective.

Mr. Berberian testified the value of the Trustee's shares on August 28, 2023, was $65.3M under Model 1, and $51.9M under Model 2. Mr. Berberian did not apply either a lack of control or lack of marketability reductions. Further, and initially, Mr. Berberian did not include any royalty, assuming Dr. Berneman's no further royalty position was correct. Based on a question by the Court concerning the application of a royalty, Mr. Berberian created a dynamic model that would allow the user of his dynamic model to input the determined Royalty Rate and Royalty Base into his model that would then result, based on Mr. Berberian's methodology, the value of Trustee's shares (again, otherwise assuming the validity of Mr. Berberian's model).

As the Court permitted Mr. Berberian to create a dynamic model, the Court permitted Mr. Sly to do the same as well, and he did so. In fact, Mr. Sly's dynamic model allowed additional inputs. Both Mr. Berberian and Mr. Sly reviewed the other's dynamic models and testified as to those dynamic models.

The Court appreciates the additional effort by the experts. Their efforts in this regard was most helpful to the Court.

### 2. _The Court credits Mr. Berberian's opinion of value._

Overall, the Court credits Mr. Berberian's approach. From his two models, the Court primarily agrees with Model 2. The Court found Mr. Berberian's selection of inputs and explanations why he selected what he did to be more plausible and appropriate in this case. The Court also found Mr. Berberian's evaluation of the financials of Smart Communications as well as the known comments to the FCC and potential development of regulations authorized by the Martha Wright-Reed Act to be by far the most credible. The Court also was impressed with how forthrightly Mr. Berberian handled cross-examination demonstrating potential weaknesses of certain of his assumptions.

The Court is aware of some criticism that Mr. Berberian's Model 2 looked at news stories after the valuation date to assist with what was known or knowable as of August 28, 2023. But the Court credits Mr. Berberian's explanation that those news story show what was being anticipated about the regulations in August 2023. Further, the Court notes that Mr. Berberian based his assumptions on filed comments to the FCC concerning potential Martha Wright-Reed regulations that _predated_ the August 28, 2023, valuation date.

The Court continues to agree with Model 2, with some tweaks discussed below. The Court pauses to note that if the Court were in error on basing its decision on Mr. Berberian's Model 2, this does not mean the Court would then agree with Mr. Sly. Instead, the Court would revert to Mr. Berberian's Model 1.

### 3. _Are reductions appropriate?_

The experts disagree on the application of reductions to the overall value of the Trustee's shares. The two reductions the experts disagreed with involve lack of control and lack of marketability.

Mr. Berberian determined there should be no reduction for lack of control applied in this case. In contrast, Mr. Sly testified there should be a 12% reduction. Both Jon Logan and the Trustee own 50%. While Jon Logan may be incumbent management, as a shareholder he does not control Smart Communications. Yet, the net effect of Smart Communications purchasing the Trustee's 50% interest will result in Jon Logan with 100% control over Smart Communication. (Perhaps the argument that the Trustee's 50% shares will become treasury shares is plausible, but the net effect of the purchase of the Trustee's shares is Jon Logan will exercise total control over Smart Communications.) In other words, the reality of this transaction is that Jon Logan is purchasing control, and those purchasing control normally pay a control premium. The Court credits Mr. Berberian's discussion concerning the nature of the transaction and the acquisition of control by Jon Logan as a justifiable basis not to include a reduction for lack of control to the value of the Trustee's shares.

The Court in a separate valuation case determined that reductions for such items as lack of control or marketability are discretionary based on the facts of each case. SMG Companies Holdings, LLC v. Matthes, 2021-CA-5092 (Fla. 12th Jud. Cir. Ct. Jan. 9, 2023). The Court based that holding on review of cases including Cox Enterprises, Inc. v. News-Journal Corp., 469 F. Supp. 2d 1094, 1108 (M.D. Fla. June 30, 2006); Munshower v. Kolbenheyer, 732 So. 2d 385, 386 (Fla. 3d DCA 1999); Erp v. Erp, 976 So. 2d 1234, 1237-1240 (Fla. 2d DCA 2008); and Agnelli v. Lennox Miami Corp., 2022 WL 2788875 (S.D. Fla. July 15, 2022). The Court continues to conclude that it has the discretion whether to apply one or more reductions based on the unique facts of each case.

The Court agrees with Mr. Berberian that under the facts of this case there should be no reduction based on "lack of control." The Court, therefore, in its discretion will not apply a lack of control reduction.

The closer question for the Court is whether to apply a lack of marketability reduction in this case. Admittedly, this was the Court's most difficult decision it made in Part 2, Phase 2, and the decision the Court struggled with the most.

Mr. Sly contends the Court should apply a 20% reduction to the enterprise value to reflect that as a private, closely held company it will take longer and require more money to sell it. Mr. Berberian testified that no reduction should apply because there is a willing buyer as evidenced by the statutory notice of election to purchase.

As the Second District discussed in a dissolution of marriage case a situation involving corporate deadlock:

> There admittedly is a significant debate about when marketability
> discounts are appropriate in any proceeding requiring the valuation of a
> closely held corporation. It seems that the debate is sometimes led astray

by the application of broad generalizations that do not differentiate
between the types of proceedings within which valuations are required,
nor acknowledge that the appropriate analysis for the valuation of a
business may change depending upon the specific legal and factual context
presented. What is appropriate in the oppressed shareholder or minority
appraisal rights cases may not necessarily be desirable in a judicial
dissolution of a corporation or in an action for dissolution of marriage
involving equitable distribution.

        In the context of judicial dissolution of corporations, the context
perhaps most analogous to the scenario presented in this particular action
for dissolution of marriage, Florida courts have generally accorded
discretion to the trial court to determine, based upon the evidence and
circumstances presented, whether a marketability discount should be
applied in the valuation of a closely held corporation.

Erp v. Erp, 976 So. 2d 1234, 1239 (Fla. 2d DCA 2008) (internal citations omitted). In other
words, the Court has discretion.

        Here, the Court cannot totally agree with Mr. Berberian's analysis on this point because,
taken literally, there always is a willing buyer due to the statutory election of purchase. If that
position were correct, it would seem the Court should never exercise any discretion in applying a
reduction for lack of marketability because the election must be made to trigger the valuation
process. That position is at odds with case law providing the Court with discretion.

        The Third District in Munshower concluded the trial court in its discretion may properly
consider a lack of marketability reduction. 732 So. 2d at 386 (explaining the "discount for lack of
marketability is properly factored into the equation because the shares of a closely held
corporation cannot be readily sold on a public market."). The Middle District in Cox, cited to
Munshower, and found on the facts of that case no lack of marketability discount would be
applied. In Cox, Judge Antoon found there was no reliable methodology had been provided to
the court to apply, which is why the court declined to apply one in that case. 469 F. Supp. 2d at
1108-1109.

        In the current case, there is evidence that Smart Communications is not the only company
in the jail inmate communication space. In fact, Smart Communications believes itself to be one
of the smaller competitors. And we know Smart Communications holds valuable contracts with
many jail and prison institutions throughout the country, which contracts produce a reliable and
growing revenue stream. During Jim Logan's life, Jon Logan and Jim Logan discussed Smart
Communications as a potential acquisition target with merger and acquisition specialists at UBS
and Truist. This evidence suggests that Smart Communications could one day be acquired.

        Mr. Sly testified that he based his 20% determination on two separate methodologies.
First, he relied on the Stout restricted stock study, in which Mr. Sly testified, measures an
implied discount on restricted stock to fully marketable stock. That delta, according to Mr. Sly, is
19.8%. There was no determination, though, whether the restricted stock were from companies

functionally equivalent or otherwise an appropriate comparison. Instead, this appears to run directly into Judge Antoon's criticism in Cox that a generic contention that shares of a closely held corporation are less liquid, and therefore less marketable than shares of a publicly traded corporation, as justification to apply this reduction. 469 F. Supp. 2d at 1108.

Mr. Sly also testified that he used a Quantitative Marketability Discount Study that is based on using an income approach. The QMDM amount was between 21.3% to 31.7%. Of course, Mr. Sly's opinion of the value of Smart Communications using an income approach was **negative $12.4M**, with the Trustee's value of her shares as a **negative $6.2M**—this is *before* the application of any lack of marketability discount! Mr. Sly rejected the use of the income approach for valuation purposes given that it resulted in no value. Reliance on the QMDM based on an income approach under this circumstance is dubious at best. The Court cannot credit that approach in this case.

Mr. Sly made a further comment concerning the lack of marketability that continues to bother the Court:

> Q.     What else did you consider in estimating a discount for lack of marketability?
>
> A.     Well, I considered the fact that SmartComm is a closely-held entity. So if they were to sell a 50% interest or they were to sell even 100 percent interest, that would take a lot of time and a lot of money to sell.

(Trans. 1387).

The Court sees no principled basis, explanation, or foundation for this statement. This is nothing tying "a lot of time" or "a lot of money" to the realities of this company. Again, Smart Communications is a smaller player in the existing inmate communication space, with valuable contracts. In other words, there are existing players that makes Smart Communications a potential acquisition target.

The Court specifically rejects Mr. Sly's conclusion that a 20% reduction is appropriate here under these facts. With respect to the restricted stock study, there simply is no credible evidence that the implied value of restricted stock sales has any connectively to the facts and circumstances of this case. With respect to the QMDM based on an income approach, Mr. Sly rejected his own income approach due to the nonsensical negative value of Smart Communications as an enterprise, even before the application of a reduction. The Court, too, dismisses this opinion based on an income approach as not credible.

Having said all of that, the Court believes there should be some recognition of a lack of marketability. But it is nowhere close to 20%, and the Court has no credible evidence suggesting it is. Instead, under the facts of this case, the Court finds that a 5% reduction to the enterprise value is appropriate. The Court believes that, with existing valuable contracts, being a smaller player in the inmate communication space, and prior favorable consideration by merger and

acquisition bankers, Smart Communications would be a viable target for acquisition. The Court acknowledges that out of all rulings made in this Order, though, the Court has the least confidence in this determination because this percentage is not firmly rooted in expert testimony (although it is between the range set by the two experts). Instead, it is based on the Court's assessment of all evidence in the case.

If the Court were in error at 5%, the Court would follow Judge Antoon's lead in Cox and find that Smart Communications failed to supply the Court with credible tools to evaluate a lack of marketability discount and therefore would not apply one. Again, though, that is an alternative ruling only if the Court is in error in its application of a 5% lack of marketability reduction.

### 4.    *Nonoperating assets.*

The parties spent much time discussing how Jon Logan and Jim Logan decided to run Smart Communications. Included in this discussion involved the acquisition of several valuable nonoperating assets. At trial, much attention was spent on the various claims of unjust enrichment, conversion, breach of fiduciary duty, fraudulent transfer, director liability, conspiracy, and related theories. The Court as part of the valuation does not need to address each claim; however, the Court's discussion will be informed by those claims that do not survive valuation.

Before proceeding further, the Court agrees with the values Mr. Berberian assigned to nonoperating assets as of the date of valuation. Thus, the Court will not get into a discussion of competing valuation of each of those nonoperating assets. Instead, the focus will be on whether to include it within Smart Communications' assets and its disposition. The answer for these nonoperating assets is yes. The Court included them as presented by Mr. Berberian.

*a.*
### *Homes and Condominium*

On the valuation date, Smart Communications owned two homes and one condominium. Those properties are the Tierra Verde home on the water in Pinellas County, valued at $4,060,333; the Ranch Club home in Sarasota, valued at $2,591,000; and the Brickell Avenue condominium in Miami-Dade County, valued at $1,882,667. The Brickell Avenue condominium has since been sold with a small gain, and those sale proceeds were deposited into Smart Communications accounts. The Court finds all three of these homes are appropriately valued and includable as Smart Communications assets as of August 28, 2023.

Jon Logan and Jim Logan agreed that the company would pay for a home for each. At all relevant times, Jon Logan lived in the Tierra Verde waterfront home, and he continues to live there today. Jim Logan and Janice Logan lived in the Ranch Club home, although there were times he stayed elsewhere. Janice Logan today continues to live in the Ranch Club home. Smart Communications paid all expenses with the upkeep and repair of both home.

Based on the practice of Jon Logan and Jim Logan, the Court will not require any adjusting entries relating to their personal use (and the Trustee's use) of either the Tierra Verde

or Ranch Club home through August 28, 2023. Each shareholder will be allowed to receive the home. For all expenses for those two homes occurring *after* August 28, 2023, they will be the responsibility of each shareholder.

The Trustee at her election within 30 days of the entry of final judgment may require Smart Communications to distribute the Ranch Club to her. This election will reduce the amount Smart Communications owes the Trustee by $2,591,000. Regardless of whether the Trustee elects to receive the Ranch Club home, all expenses that Smart Communications paid for the Ranch Club beginning on August 29, 2023, through the date it deeds ownership to the Trustee (or the date the Trustee moves out and returns possession to Smart Communications) are to be paid by the Trustee to Smart Communications by means of setoff against the value of the shares. The final amount still needs to be calculated. The Court anticipates the parties to address this during the December 19 hearing. (Within this category, the Court also would include those amounts attributable to wrongful injunction, such as the health insurance premiums.)

Jon Logan at his election within 30 days may require Smart Communications to distribute the Tierra Verde to him without further liability to Jon Logan. However, all expenses Smart Communications has paid for the Terrie Verde beginning on August 29, 2023, and continuing will be carried on the books of Smart Communications as a shareholder's loan to Jon Logan. This requirement to categorize as a shareholder's loan any funds Smart Communications expends for upkeep or repair of the Tierra Verde home will remain until Smart Communications completes payment to the Trustee of the value of her shares.

That leaves the Brickell Avenue condominium, paid for by Smart Communications funds. The Court cannot find this condominium to be compensation to Jon Logan. The evidence is that title was transferred back to Smart Communications and sold, with the proceeds being deposited into Smart Communications accounts. Smart Communications already removed reference to a shareholder's loan from Jon Logan's column. No further action is necessary with respect to this already sold condominium. No adjustment is necessary to Mr. Berberian's model.

*b.*
*The Yacht*

Smart Communications purchased a new 2020 100' Riva Corsaro ("the Yacht") for approximately $9.6M. ($5M down; financed $4.6M.) Smart Communications paid the downpayment and pays all debt associated with the Yacht. Smart Communications pays all on-going expenses associated with the Yacht. At the valuation date, the value of the Yacht was $7,950,000, with $4,800,000 in then existing debt. (Since valuation, there has been a restructuring of the debt, but the annual payments for debt service is $1M a year. This is before the first penny is paid to dock the Yacht or its upkeep.)

The Yacht, though, is not titled in Smart Communications' name. The evidence, though, firmly establishes that the Yacht was for Smart Communications' corporate use. In December 2021, Jim Logan wrote in search of financing: "Jon Logan, the President of Smart Communications Holding, Inc. is seeking financing to acquire a yacht for corporate endeavors. In the regular course of business, we bring in clients from around the country to our corporate

office in Florida for training and research purposes. This vessel will aid in the rounding of the total experience." (Ex. 5373). Despite all of this, Smart Communications pays Yacht Holdings rent to allow Smart Communications to use the Yacht occasionally.

There is no credible evidence that the Yacht was to be a personal asset of Jon Logan, however it would be titled.

At a minimum, an action by Smart Communications against Yacht Holding for unjust enrichment would be successful. (The Trustee filed a derivate action against Yacht Holdings and Jon Logan.) The elements of unjust enrichment are:

> An action for unjust enrichment exists to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity. The elements of such a claim are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Essentially, the doctrine operates to imply a contract where none otherwise exists so as to ensure equity between the parties.

Kenf, L.L.C. v. Jabez Restorations, Inc., 303 So. 3d 229, 231 (Fla. 2d DCA 2019) (internal citations and quotations omitted).

Here, Yacht Holding is paying nothing, and Smart Communications is paying everything. It is entirely inequitable for Yacht Holdings to retain the Yacht in its name under these circumstances. In this section, the Court does not need to address a transfer of title to the Yacht, as the Court can simply include the value of the Yacht in Smart Communications' assets. No adjustment is necessary to Mr. Berberian's model due to the Yacht.

The Court notes that because the Court concludes the Trustee would have prevailed on an unjust enrichment claim behalf of Smart Communications relative to the Yacht, the Court does not need to address the other theories raised by Trustee relative to the Yacht.

The Court makes one further observation. The Court will address the Yacht again in the discussion of security for payment of the Trustees' shares. Spoiler alert: the Yacht needs to be sold. (The Court retains the ability under its authority to provide security the ability to direct Smart Communications to pursue Yacht Holdings for return of the Yacht, should it become necessary to do so.)

*c.*
*The Nor-Tech 450 Center Console boat*

Smart Communications also bought a $939,000 Nor-Tech 450 Center Console boat, which is docked at the Tierra Verde home. At the date of valuation, that vessel is worth $887,500.

The Court finds this purchase was not substitute salary for Jon Logan. The vessel belongs to the Company. The Court will include this vessel within Smart Communication's value at the value on the date of the purchase price. No adjustment is necessary to Mr. Berberian's model.

The Court will give Jon Logan 30 days from the entry of the final judgment to elect whether he wishes to purchase this vessel from the Company for the amount identified on the valuation date. If Jon Logan wishes to purchase this vessel, he may do so either in cash or by shareholders loan from the Company. Otherwise, this vessel needs to be sold in a commercial reasonable means at the first opportunity to a bona fide third-party purchaser. At least 50% of those proceeds will be used to reduce the Company's outstanding obligation to the Trustee.

*d.*
*Exotic Cars*

Smart Communications has purchased several exotic cars, which are garaged at the Tierra Verde home and under Jon Logan's exclusive control.

- 2020 Lamborghini Huracan – purchase price $356,931; the value at valuation date $130,000

- 2017 Ferrari 488 Spider $354,990; the value at valuation date $265,000.

- 2015 Rolls Royce Wraith – purchase price $239,579; the value at valuation date $140,000.

The Court finds these purchases were not substitute salary for Jon Logan. The vehicles belong to the Company. The Court will include those nonoperating assets within Smart Communication's value at the value on the date of the purchase price. No adjustment is necessary to Mr. Berberian's model due to the exotic cars.

With respect to the Corvette that went to Jim Logan, the Court notes its reclassification as a shareholder loan by Jim Logan. As the Court is requiring the Trustee to repay the shareholders loan, title to this vehicle can remain in the Trustee or Personal Representative's name, and its ultimately disposition is of no concern to the Court as the Trustee is paying the value for it.

As for the Lamborghini, Ferrari, and Rolls Royce, the Court will give Jon Logan 30 days from the entry of the final judgment to elect whether he wishes to purchase one, two, or all three of those vehicles from the Company for the amount identified on the valuation date. If Jon Logan wishes to purchase those vehicles, he may do so either in cash or by shareholders loan from the Company.

If Jon Logan does not make the election within 30 days, the Court directs the remaining exotic cars to be sold in a commercial reasonable means at the first opportunity to a bona fide third-party purchaser. At least 50% of those proceeds will be used to reduce the Company's outstanding obligation to the Trustee.

*e.*
*Everyday Cars*

Jon Logan daily drives a Land Rover. The Trustee daily drives a Cadillac Escalade. At the option of each shareholder, each shareholder may require the Company to distribute the vehicle they currently drive into their personal possession without further accounting adjustment or payment.

### 5.    *Corporate headquarters building.*

The Court finds that the source of the $1.4M in funds for Smart Communications' corporate headquarters was Smart Communications. When the building was purchased, it was titled into a separate entity, Loco Florida, LLC, a Florida limited liability company. The Court further finds the ownership structure mirrored Smart Communications—i.e., 50%/50%.

On August 29, 2023, Jon Logan without any knowledge by, or consent of, the Trustee, purported to convert the Florida entity into a Delaware entity.

Mr. Sly's model relating to Loco Florida was that Smart Communications was not entitled to any recovery of the $1.4M purchase price of the building and that Smart Communications was obligated to also pay rent to Loco. Mr. Berberian disagreed with Mr. Sly relating to the value Smart Communications paid for the building. Mr. Berberian credibly explained how Smart Communications should be repaid by Loco Florida for the building cost while at the same time acknowledging rent payments to Loco Florida.

Mr. Berberian's model zeroed out these transactions without having to separately value the Trustee's interest in a receivable from Loco Florida relating to the building expense. Mr. Berberian further credibly testified that "the economics are the same either way." (Trans. 2023). He agreed, though, that use of his model means the Trustee's further ownership claim involving Loco Florida would be extinguished. (Trans. 2023).

The Court agrees with Mr. Berberian's handling of, and accounting for, the corporate headquarters and any receivable Smart Communications has relating to the purchase of the building.

### 6.    *Shareholders loans.*

As explained above, neither Jon Logan nor Jim Logan were particularly fond of creating paper trails or filling out expense reports. There was much testimony—from both sides—about use of corporate funds for personal reasons. The Court need not detail those, suffice it to say both shareholders took full advantage of the Company, and then some.

The general ledger in many respects is vague with expenditures, and corporate justification is lacking. Not unsurprising, Jon Logan's side presented Joint Exhibit 1, which was an effort lead by Noreen Gunning—Smart Communications Director of Accounting and

Finance—to quantify each shareholder's personal expenditures. Ms. Gunning began with the company in March 2022 as a bookkeeper but after Jim Logan's death took on her current, increased role.

The Court makes clear that most of the general ledger entries occurred before Ms. Gunning's involvement with the Company, and the source information from which she has had to retrospectively recharacterize as personal expenses (shareholder loans) is sparse, if it exists at all. The Court does not criticize her or her efforts. After all, in creating Joint Exhibit 1, she did not have access to Jim Logan due to his death, but she did have access to Jon Logan. This means that any questionable expense, i.e., personal or corporate, she could rely on Jon Logan's explanation. And Jon Logan has done everything in his power to eliminate any perceived value flowing to the Trustee.

It is not surprising, then, that Joint Exhibit 1 shows recharacterized shareholders loans attributable to Jim Logan/the Trustee collectively at $1,339,778.37. And at the same time showing a negligible negative shareholder balance in favor of Jon Logan.

Jim Logan's shareholder loans include such things as the Corvette, the $60,000 Jim then lent to Mr. Peterson, and the significant expenses for Alexis Logan's medical issues.

Again, the Court believes that there are substantial personal expenditures to Jon Logan hidden within the general ledger. Absent a forensic evaluation, the Court is not sure how to meaningfully address this disparity. Even if there were such a forensic evaluation, the absence of contemporaneous records may impact the utility of such an investigation. Regardless, the evidence before the Court is the Trustee has a $1.3M shareholder balance that needs to be addressed in valuation.

There certainly is evidence that the shareholders did not anticipate a true-up as between them. And had Jim Logan still been alive today, the Court suspects we would not be here. But this proceeding is a statutory proceeding to determine the fair value of the Trustee's shares. And the Court does not believe it equitable to excuse the Trustee from paying the shareholder's loans on the Trustee's side of the ledger, even if Jon Logan's personal expenditures as shareholder loans seem to be not readily visible on Smart Communication's books and records.

The Court finds that the **$1.3M** in shareholders loans to the Trustee's side will act as a setoff against the value of the Trustee's shares.

### 7.    *Valuation.*

The Court finds that Mr. Berberian's Model 2 is the appropriate methodology, with certain adjustments.

Mr. Berberian's Model 2 values Smart Communications Holding, Inc. as of August 28, 2023, at **$103,872.668**. This enterprise value does not reflect any royalty reduction for future royalties or reduction for lack of marketability. That would mean the Trustee's 50% share, before reductions, is **$51,936,334**.

Using Mr. Berberian's dynamic model, the Court applied a 40.5% Royalty Base and a 5% Royalty Rate, with the start date of the Royalty on August 28, 2023. (Recall, the Court found no further Royalty was due HLFIP from Smart Communications pre-valuation). This results in a total Royalty reduction of $15,617,750, with the Trustee's portion being $7,808,875.

This results in an adjusted value of Smart Communications Holding, Inc. as of August 28, 2023, as **$88,254,918**. That means the Trustee's 50% share, after Royalty but *before* the lack of marketability reduction, is **$44,127,459**.

The Court, though, determined a 5% lack of marketability reduction should be applied. That reduction is **$2,206,373** to the Trustee's share value. This results in the value of the Trustee's shares in Smart Communications Holding, Inc. as of August 28, 2023, to be **$41,921,086**.

From this number, the Court subtracts the Trustee's combined shareholders loans totally **$1,339,778** from this amount.

**The amount Smart Communications Holding, Inc. owes the Trustee for the value of her shares as of August 28, 2023, is $40,581,308.**

The Court notes that the amount Smart Communications paid since August 28, 2023, relating to the Ranch Club home will need to be setoff from this amount as well as the other amounts from the wrongful injunction. As that amount continues to accrue, if the parties are unable to address that amount during mediation, the Court will address it during the December 19, 2025, hearing.

### 8.    *Attorney fee claim.*

The Court will reserve on the claim for attorney fees and interest until the December 19, 2025, hearing.

Prior to that hearing, the Court requests a targeted memorandum from each side, limited to no more than 10 pages each, discussing the legal authority as well as the evidence supporting or opposing an award of attorney fees and interest relating to a valuation proceeding. The Court is particularly interested in focusing on the authority for attorney fees for the statutory valuation proceeding, together with the limits of that authority. (Specifically, as the judicial dissolution count that led to the statutory election to purchase occurred after Phase 1 trial, does the valuation attorney fee statute authorize fees associated with Phase 1 trial.)

### 9.    *Resolution of claims.*

Having determined the value of the Trustee's shares, the Court notes the disposition of the following claims.

From Janice Logan's (as Trustee) Second Amended Verified Complaint, filed
May 29, 2024 [DIN 680]:

- Count 1, relating to intellectual property transactions, will not
survive. But the Court will need to enter final judgment relating to
Part 1, Phase 2 trial, invalidating the transactions identified in that
Order.

- Count 2, relating to the appointment of a Receiver. The Court
would like further briefing on this issue. It seems to the Court that
under its authority in section 607.1436(5), a remedy the Court
retains to ensure security to assure payment of the purchase price is
the ability to appoint a receiver, if that is what the Court believes
appropriate. At present, the Court does not believe a receiver
appropriate but given the acrimonious history and efforts by Jon
Logan to avoid payment to the Trustee, the Court does not want to
foreclose the ability to appoint one in the future to ensure payment.

- Counts 3, 5-8, 10-12, relating to director liability, breach of
fiduciary duty, aiding and abetting breach of fiduciary duty, fraud,
unjust enrichment, and conversion.

- The parties agree to the involuntary dismissal of Counts 4 and 9.
Even if they are not involuntary dismissed, they would not survive
valuation.

From Janice Logan (as Trustee) Counterclaims, filed October 2, 2024 [DIN 775]:

- Count 1, relating to malicious prosecution and abuse of process was not
tried and remains pending. The parties shall discuss the appropriate way to
sever to ensure a final judgment can be entered without delay on
everything else.

- Count 2, relating to fraudulent transfers relating to IP transactions, will not
survive. But the Court will need to enter final judgment relating to Part 1,
Phase 2 trial, invalidating the transactions identified in that Order

- Counts 4-6, relating to breach of fiduciary duty, civil conspiracy, and
aiding and abetting breach of fiduciary duty.

- The parties agree to the involuntary dismissal of Count 3.

## D.
## THE SECOND AMENDED COMPLAINT [DIN 891]
## FILED BY

**JON LOGAN AND SMART COMMUNICATIONS HOLDINGS, INC.**
**(December 4, 2024)**

Jon Logan and Smart Communications Holdings, Inc. sued Janice Logan, individually, as Trustee, and as the Personal Representative of the Estate of James Logan; Alexis Logan; and Justin Peterson.

Jon Logan and Smart Communications' Second Amended Complaint sounds in 20 separate counts and more than 200 separate paragraphs of allegations. These counts range over multiple matters, although some overlap. For some matters, Jon Logan and Smart Communications raise alternative theories of liability in separate counts. For ease of understanding, the Court attempts to group similar matters together.

The parties agree that if the Court were to find liability, some of these counts operate as a set-off while other counts would lead to entry of judgment in favor of Jon Logan or Smart Communications or both.

### 1.   _Counts 1 and 2 – Unjust Enrichment re: various withdrawals_.

Smart Communications sued the Personal Representative in Count 1 for unjust enrichment and Janice Logan individually in Count 2 for unjust enrichment. Plaintiffs' contention is that James Logan during his life withdrew various funds from Smart Communications that did not benefit Smart Communications. Instead, according to these plaintiffs, those funds personally benefitted James Logan (Count 1) or his wife, Janice Logan (Count 2).

> An action for unjust enrichment exists to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity. The elements of such a claim are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Essentially, the doctrine operates to imply a contract where none otherwise exists so as to ensure equity between the parties.

Kenf, L.L.C. v. Jabez Restorations, Inc., 303 So. 3d 229, 231 (Fla. 2d DCA 2019) (internal citations and quotations omitted).

The funds to which these counts apply were either classified in the first instance or were reclassified as shareholder loans. The Court in its valuation has directed the Trustee to repay the outstanding $1.3M in shareholder loans.

Under these circumstances, the Court finds that this plaintiff failed to establish, at a minimum, element 3. Both Jon Logan and Jim Logan, the then shareholders, regularly used Smart Communications' funds for personal matters. The entire value relating to Jim Logan and

Janice Logan is being repaid by the Trustee by way of set-off from the value of the Trustee's shares. There is nothing inequitable under these circumstances.

As plaintiff is not able to show element 3, the Court does not need to address the other elements of this cause of action.

The Personal Representative and Janice Logan is entitled to judgment.

### 2. _Count 3 – Unjust Enrichment re: the Ranch Club home._

Smart Communications in Count 3 sued the Trustee for unjust enrichment relating to various expenses associated with the Ranch Club home, which is and has always been titled in the name of Smart Communications.

As the Court previously found, the then shareholders of Smart Communications—Jon Logan and James Logan—had an agreement as shown through historic practice that Smart Communications would pay for a home for each shareholder. There is nothing inequitable about the situation in this case where the two shareholders agreed that each could use a home owned by Smart Communications without personal payment. Thus, Smart Communications failed to demonstrate the third element of the unjust enrichment cause of action, at least for payments through August 28, 2023.

The Court reminds that it did not require any adjustment to Smart Communications' books relative to the Tierra Verde home (through August 28, 2023) or the Ranch Club home (through August 28, 2023). However, the Court agrees that all carrying costs paid by Smart Communications relating to the upkeep of the Ranch Club home after August 28, 2023, through the date Smart Communications deeds that home to the Trustee will the responsibility of the Trustee. The Court further agrees this amount is to be setoff from the value the Court found of the Trustee's interest in Smart Communications. (Parenthetically, the Court is also requiring certain actions relative to the Tierra Verde home, but that is for post-valuation expenses. That issue does not impact this claim.)

No separate judgment will be entered on Count 3 as this will be handled by setoff.

### 3. _Count 4 – Unjust Enrichment re: Alexis Logan distributions._

Smart Communications in Count 4 sued Alexis Logan for unjust enrichment relating to credit card charges she incurred, and it also referenced a vacation home in Lake Michigan that either was purchased or was to be purchased. At trial, there was also discussion of various funds paid on Alexis Logan's behalf for medical care. If successful, this count would result in a judgment against Alexis Logan.

At trial, there was insufficient information relating to that Michigan home for Smart Communications to succeed as to any Michigan home. And as found above, the medical care matters were shareholder's loans to Jim Logan. Jim Logan then gifted those medical payments to Alexis Logan.

Repayment of Jim Logan's shareholder's loan relating to these medical payments is being handled as a set-off on the value of Trustee's shares. Even if they were not, those payments were gifts by Jim Logan to Alexis Logan, and Smart Communication's recourse would have been against Jim Logan or the Personal Representative or the Trustee. In any event, Alexis Logan is not responsible to Smart Communications for these matters and is entitled to judgment relating to that portion of the claim.

The remaining unjust enrichment claims in Count 4 against Alexis Logan involves approximately $416,912.11 in credit card and bank charges. Smart Communications presented summaries of funds that it contends were provided to Alexis Logan:

- Exhibit 5185, showing $311,572 of various bank transactions between August 3, 2015, and February 19, 2019;

- Exhibit 5186A, showing a net of $98,845.19 in American Express credit card charges ($110,848.06 less $12,002.87 in credits) between July 25, 2016, and July 20, 2023 (with the vast majority occurring in 2016-2018; and

- Exhibit 5187, showing $6,494.92 in Englewood Bank credit card charges between February 23, 2019, and May 18, 2019.

Before proceeding further, the Court finds three facts that implicate the validity of the summaries.

*First*, Alexis indisputably acted as an attorney for Smart Communications (and other entities), and from time to time, there were transfers to Alexis' Law Firm. The Court finds there is no evidence that the Law Firm did not perform the legal services for which it received payment from time to time. Putting that more directly, Alexis Logan credibly testified that the Law Firm received payment for legal services. As those payments were to the Law Firm, they should not have been included. The Law Firm is not a defendant here.

*Second*, the Court finds that multiple employees within Smart Communications had use of, and did use, Alexis Logan's credit cards. And Alexis Logan credibly testified that sizeable charges Smart Communications now seeks from Alexis Logan on these summaries were, in fact, not made by her but presumably by Smart Communications' employees for Smart Communications' business.

*Third*, there is credible evidence that some of the charges were made by or, at the direction of Jim Logan, and had nothing to do with Alexis Logan.

These facts undercut the confidence the Court places in the summaries.

Even without those three facts, there is another compelling fact that persuades the Court as to why Count 4 fails. Alexis Logan personally guaranteed this business from the beginning of

the idea until mid-2023. She physically delivered her property to the bank for collateral. If the business failed in the earlier years, there was no recourse to Jon Logan—after all, he did not execute any personal guarantee until 2017 at the earliest. It would have been Alexis Logan that would have been left personally responsible for the debt had the Logans swung and missed.

Under these circumstances, the Court finds that Smart Communications failed to prove the third element of unjust enrichment: "the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." Kenf, L.L.C., 303 So. 3d at 231. The Court finds that *it is equitable* for Alexis Logan to retain whatever portion of the $417,000 in bank and credit card charges that were personal to her. (Again, Smart Communications also failed to prove to the greater weight of the evidence the actual amount of those bank and credit card charges were benefits Alexis Logan, individually, received.)

Count 4 fails.

Even if the Court erred in its findings and conclusions with respect to Count 4, there are two separate alternate and independent bases that would preclude most of Smart Communications' unjust enrichment claims against Alexis Logan. Those are statute of limitation and release.

A four-year statute of limitation applies to an unjust enrichment claim. Flatirons Bank v. Alan W. Steinberg Limited Partnership, 233 So. 3d 1207, 1213 (Fla. 3d DCA 2017). "The statute of limitations for an unjust enrichment claim begins to run at the time the alleged benefit is conferred and received by the defendant." Id. Smart Communications first sued Alexis Logan on February 27, 2023. (Arguably, the original claim was not based on the same set of facts, conduct, or occurrence upon the action tried in Part 2, Phase 2, to allow the relation-back doctrine could apply to an amended complaint. Kopel v. Kopel, 229 So. 3d 812, 817 (Fla. 2017). Given the low dollar amount that remains, the Court did not engage in any further analysis as to relation-back and simply assumes relation-back exists here.)

The invocation of the statute of limitation to Smart Communications' Count 4 against Alexis Logan means any benefit Alexis Logan receive before February 27, 2019, is beyond the limitation period and cannot be recovered by Smart Communications under an unjust enrichment claim. That wipes away almost all Smart Communications' claims of unjust enrichment against Alexis Logan, leaving less than $21,000 in charges against her. Assuming relation-back to February 27, 2023, the only claims that could remain are:

- **$14,926.94** in American Express charges ($1,398.12 in 2019; $2,696.18 in 2020; $6,196.71 in 2021; $4,164.51 in 2022; and ($471.42 in 2023).

- **$5,945.64** in Englewood Bank charges.

In addition to the prior factual findings relating to unjust enrichment, the Court would specifically find there is nothing inequitable about Alexis Logan retaining less than $21,000 over the four-year period beginning February 27, 2019, forward. Recall, some of these charges came

from others who had access to the credit cards, and some charges were to benefit Jim Logan. And, even if all the charges were attributable to Alexis Logan, she continued to personally guaranteed hundreds of thousands of dollars in ongoing transactions for Smart Communications through mid-2023.

Even if the delayed discovery doctrine applied here—which it legally does not, seeFlatirons Bank, 233 So. 3d at 1213, n.14—that doctrine could not be successfully or factually invoked here because Smart Communications by looking at its own books and records knew or should have known precisely any charge or benefit to Alexis Logan. The credible evidence before the Court is that Jon Logan knew precisely what was occurring from a financial standpoint. As his own emails tell us, Jon Logan knew of funds flowing to Alexis in the lead up to 2019. In fact, Jon specifically complained to Alexis in March 2019 about funds being transferred to her. (Ex. 5005). He knew, and he had full access to Smart Communications books and records, so Smart Communications cannot credibly assert any coverup.

There is yet another reason why most of Smart Communications' unjust enrichment claims in Count 4 fails. They were released by Smart Communications.

In August 2017, Alexis Logan, Jon Logan, and Jim Logan began the process of transferring title of the stock of Smart Communications Holding, Inc. to Jon Logan (50%) and Jim Logan (50%). As part of the corporate paperwork signed to effectuate the share transfer, these parties signed a Mutual General Release: (1) Smart Communications Holdings, Inc.; (2) Smart Communications US, Inc.; (3) Jim Logan; (4) Jon Logan; (5) Alexis Logan; and (6) Law Office of Alexis Logan, PLLC. (JX-40). The Carlton Fields law firm represented the Company and drafted the documents. Alexis Logan was represented by separate counsel. There were some follow-up matters that did not get resolved into early 2018.

The recitals to the Mutual General Release reflected that Alexis Logan had been involved in the ownership, management, and/or operation of the companies and that she and her law firm performed legal service for the companies. Additionally, the parties acknowledged that Alexis Logan remained parties to then pending litigation concerning the companies. The recitals also reflected the parties' intent to "broadly release each other" and to "indemnify" them. The Court notes those recitals because within the body of the Mutual General Release each party acknowledged that the "background recitals are true and correct and are incorporated in this Release as a material and substantive part hereof." (JX-40).

The effective portion of the release provided:

> **2.** **Mutual General Release.** Effective upon their receipt of a copy of this Release fully executed by all Parties hereto, the Parties, on behalf of themselves and their agents, employees, members, managers, officers, directors, attorneys, insurers, predecessors, successors, heirs and assigns, are hereby deemed to release, waive, acquit, forever discharge, and to covenant never to sue any of the other Parties, or any of their lawyers, agents, employees, members, managers, officers, directors, insurers, privies, predecessors, successors, heirs or assigns, for, from and

> against any and all claims, actions, causes of action, demands, damages,
> suits, costs, expenses, liabilities or other losses, of any kind whatsoever,
> whether known or unknown, foreseen or unforeseen, direct or
> consequential, legal or equitable, matured or unmatured, under any theory
> in contract, statute, tort or otherwise, including, but not limited to breach
> of fiduciary duty and professional negligence, which exists or may exist
> from the beginning of time up to and including the date of the last Party's
> execution of this Release, which in any way arise from, grow out of, or are
> related to the Parties' conduct and services with respect to the ownership,
> management, and/or operation of the Companies and with respect to
> services provided to the Companies.

(JX-40, pp. 1-2, ¶2).

The application of that Mutual General Release means that Smart Communications released any claim it had against Alexis Logan for anything occurring before August 31, 2017. Because the statute of limitation period expired after the release date, the Court did not go back and determine the precise dollar amount that was not released. But that amount is not much more than the $21,000 that remained after the limitation period expired.

Count 4 fails. Alexis Logan is entitled to judgment in her favor.

### 4.   _Count 5 – Unjust Enrichment against Mr. Peterson._

In Count 5 of the Second Amended Complaint, Smart Communications Holdings, Inc. sued Mr. Peterson for unjust enrichment. If successful, this count would result in a judgment against Mr. Peterson.

The operative complaint alleged that on or about June 23, 2022, approximately $109,070 of Smart Communications funds were used to purchase a 2019 BMW. That vehicle was then registered in Mr. Peterson's name and primarily used by him.

The Court finds that Mr. Peterson in June 2022 purchased a 2019 BMW. As part of that purchase, Jim Logan obtained a $60,000 countercheck from a local bank drawn on a Smart Communications' account. Jim Logan then personally paid the dealership directly $60,000 towards the purchase price of the vehicle. Smart Communications booked this transaction as a $60,000 shareholder's loan to Jim Logan.

The Court further finds that Jim Logan personally loaned Mr. Peterson $60,000 for the purchase of the vehicle. While the funds may have originated from Smart Communications, Jim Logan took a shareholder's loan from Smart Communications.

Mr. Peterson agrees that he still owes the $60,000 but to the Personal Representative. He testified that he and the Personal Representative will address the loan made between Jim Logan and Mr. Peterson after this lawsuit is concluded. There was no lawsuit by the Personal Representative against Mr. Peterson.

As noted above, the first prong of an unjust enrichment claim is that plaintiff—here, Smart Communications—conferred a benefit on the defendant—here, Mr. Peterson. Smart Communications failed to show that first element. Jim Logan, individually, not Smart Communications, lent Mr. Peterson the $60,000. Further, Smart Communications failed to prove either elements 2 or 3 as well. Smart Communications' Count 5 fails.

The Court specifically denies the request for constructive trust.

Mr. Peterson is entitled to judgment in his favor on this count.

**5.      *Count 6 – Constructive fraud re: Jim Logan's withdrawals* against the Personal Representative.**

In Count 6, Jon Logan sued the Personal Representative relating to withdrawals made by Jim Logan from Smart Communications. As previously found, Jon Logan knew precisely Jim Logan's activities, and Jon Logan personally participated in them, too.

Jon Logan failed to prove this claim or any special injury to him as a shareholder. Jon Logan is not entitled to any relief on this claim.

The Personal Representative is entitled to judgment.

**6.      *Count 7 – Conversion re: Jim Logan's withdrawals against the* Personal Representative.**

In Count 7, Jon Logan and Smart Communications sued the Personal Representative alleging that Jim Logan converted Smart Communications' corporate funds for various personal purchases, including purchases James Logan made for others. This is yet another repackaging of prior claims rejected.

"Conversion occurs when a person asserts a right of dominion over chattel which is inconsistent with the right of the owner and deprives the owner of the right of possession. The question of whether [an item] has been the subject of a conversion is a factual one based on the distinct circumstances of each individual case." Estate of Villanueva ex rel. Villanueva v. Youngblood, 927 So. 2d 955, 959 (Fla. 2d DCA 2006) (internal quotation, citation, and alternation omitted); Hannah v. Malk Holdings, LLC, 368 So. 3d 1087, 1091 (Fla. 6th DCA 2023) ("The elements of conversion are: 1) a taking of chattels; 2) with intent to exercise ownership over them an ownership inconsistent with the real owner's right of possession.").

"The tort may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." Seymour v. Adams, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994). Money removed from a bank account can be the subject of conversion if the money is specific and identifiable. Allen v. Gordon, 429 So. 2d 369, 371 (Fla. 4th DCA 1983). "In Florida, an action for conversion is regarded as a possessory action and the plaintiff must have a present

or immediate right of possession of the property in question." <u>Page v. Matthews</u>, 386 So. 2d 815, 816 (Fla. 5th DCA 1980).

This count fails as to both Jon Logan and Smart Communications.

As it relates to Jon Logan, Jon Logan personally did not own Smart Communications' corporate funds. Jon Logan did not prove an entitlement to immediate possession of Smart Communications' funds. Additionally, as Jon Logan and Jim Logan knew and allowed the other to take loans from the company, there was specific authorization for those loans. Jon Logan's claim also fails because he failed to demonstrate that those funds were traceable to specific items.

Smart Communications' conversion claims also fails. With Jon Logan and Jim Logan authorizing the shareholders to take shareholder loans, any action by Jim Logan in taking a loan is not an action inconsistent with Smart Communications' right of possession. After all, those loans were booked, and the Trustee is having to pay the loan.

The Court also notes that the Trustee is paying Jim Logan's shareholder loans as setoff. Thus, even if the Court erred on the conversion finding relative to Smart Communications, Smart Communications cannot be compensated twice for the same distributions.

The Personal Representative is entitled to judgment.

7.    ***Count 8 – Conspiracy to Commit Conversion against the Janice Logan, the Personal Representative, Alexis Logan, and <u>Mr. Peterson</u>.***

In Count 8, Jon Logan sued Janice Logan, the Personal Representative, Alexis Logan, and Mr. Peterson for conspiracy to commit conversion. The basis for this count are the same withdrawals by Jim Logan discussed above.

"A cause of action for conspiracy requires showing (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts performed pursuant to the conspiracy." <u>Olson v. Johnson</u>, 961 So. 2d 356, 359 (Fla. 2d DCA 2007) (internal citation, quotation, and alteration omitted).

This count fails for multiple reasons.

*First*, Jon Logan is not the proper plaintiff for a conversion claim of Smart Communications' property. That would have been Smart Communications.

*Second*, the Court already determined that both Jon Logan's and Smart Communication's conversion claim based on Jim Logan's withdrawals from Smart Communications failed factually.

*Third*, there is no credible evidence of any conspiracy sufficient for the Court to find the first element—a conspiracy between two or more parties.

*Fourth*, there is no unlawful act or lawful act by unlawful means. Jim Logan had the authority to take shareholder loans.

*Fifth*, Jon Logan is not damaged. The fact that the Trustee as a matter of setoff is repaying Jim Logan's shareholder loans means Jon Logan can show no damage.

Each of these defendants is entitled to judgment.

> **8.**       ***Counts 9, 10, and 12 – breach of fiduciary duty against the <u>Personal Representative (9 and 10) and Everyone (12)</u>.***

Both Jon Logan and Smart Communications sued the Personal Representative for breach of statutory fiduciary duty (Count 9) and breach of common law fiduciary duty (Count 10). In Count 11, Smart Communications sued Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson for a claim of aiding and abetting breach of fiduciary duty.

In Counts 9 and 10, Jon Logan and Smart Communications repackage the Jim Logan withdrawal claims, which Jon Logan knew about and approved. The Court finds these plaintiffs failed as a matter of fact to prove the elements as to either count.

As this claim continues to get repackaged, the Court also states that there can be no breach of fiduciary duty when Jon Logan knew about, consented to, and participated in the shareholder's loans. Also, those Jim Logan's shareholders' loans are being repaid.

In Count 12, Smart Communications attempts to further pursue a breach of fiduciary duty claim as an aiding and abetting claim. However, not only is there no evidence of a breach of fiduciary duty, but there is also no duty that any of these defendants aided or abetted Jim Logan in breaching any of his fiduciary duties. Further, there is no damage.

The Personal Representative is entitled to judgment on Counts 9 and 10. Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson are entitled to judgment on Count 12.

> **9.**       ***Count 11 – conspiracy to commit unjust enrichment against <u>Everyone</u>.***

In Count 11, Smart Communications sued Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson for conspiracy to commit unjust enrichment.

This claim also fails. Not only did Smart Communications fail to prove unjust enrichment relating to Jim Logan's withdrawals against any of the defendants, but Smart Communications also failed to prove the existence of the first element of conspiracy—i.e., a conspiracy between two or more parties. Further, it also failed to demonstrate any unlawful act or lawful act by

unlawful means. Jim Logan had the authority to take shareholder loans. This claim fails based on the plaintiff's failure to prove it factually.

Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson are entitled to judgment on Count 11.

### 10.    *Count 13 – negligence against the Personal Representative.*

Both Jon Logan and Smart Communications in Count 13 next attempt to repackage the Jim Logan withdrawal claims as a negligence claim brought against the Personal Representative.

Both plaintiffs failed to establish any element of negligence, including damage.

The Personal Representative is entitled to judgment.

### 11.    *Count 14 – breach of fiduciary duty re: tax liabilities against the Personal Representative.*

In Count 14, Jon Logan and Smart Communications shift their focus. They now claim that Jim Logan's conduct relative to not causing Smart Communications to pay royalties to HLFIP as accrued may result in tax liability to Smart Communications. This was discussed in both Part 1 and Part 2 of Phase 2.

As it relates to Jon Logan, the Court questions whether he really is a proper plaintiff. The theoretical tax liability as presented would be to either of, or both of, Smart Communications or HLFIP. The Court in the abstract can see that Jon Logan through his 100% ownership of HLFIP may be able to claim some injury distinct from Smart Communications. For that reason, the Court will not conclude that Jon Logan is an improper plaintiff.

Having said that, though, the Court finds a failure of proof. The Court finds that Jon Logan participated equally in the decision to have Smart Communications pay all HLFIP's expenses in lieu of distributing funds and having HLFIP paying its own expenses. As found as fact, Smart Communications through the date of valuation has actually paid expenses on behalf of HLFIP in an amount that is *more than* the royalty that otherwise would have been paid to HLFIP.

Further, both Jon Logan and HLFIP failed to prove the fact that Jim Logan breached any fiduciary duty owed to Jon Logan or Smart Communications. The theory seems to be that Jim Logan either knew or should have known that the structure that Jon Logan and Jim Logan jointly set up could expose Smart Communications and HLFIP to taxes on the royalty payment. At best for plaintiffs, Jim Logan did not know or understand this nuance of tax law. But that does not translate to a breach of a fiduciary duty. In essence, Jon Logan and Smart Communications seek to transform Jim Logan and his Estate into an insurer for any error made in business judgment under the guise of a breach of fiduciary duty. That simply is not the case.

Further, there simply has been a total failure of proof on their alternative theory that Jim Logan's actions were intentional or so grossly negligent that they constitute a conscious disregard or indifference to plaintiffs' rights.

The Personal Representative is entitled to judgment.

### 12.    *Counts 15 and 17 – breach of fiduciary duty and fraudulent inducement re: compensation, against the Personal Representative.*

In Count 15, Jon Logan sued the Personal Representative for breach of common law fiduciary duty by Jim Logan relating to Jon Logan's compensation. In Count 17, Jon Logan repackaged this claim against the Personal Representative as a fraudulent inducement claim.

Fundamentally, Count 15 fails because Jon Logan failed to demonstrate as fact that Jim Logan was a fiduciary to Jon Logan relating to how the two shareholders structured Smart Communications and what that entity would or would not pay. Failing to demonstrate the existence of a fiduciary relationship defeats this claim. This count is also defeated for other reasons, too.

As it relates to his compensation, Jon Logan seems to contend that he is entitled to all nonproductive assets of the company as compensation. That simply is not correct or the agreement between Jon Logan and Jim Logan. Jon Logan has failed to demonstrate any failed compensation or damage. For that reason, Count 15 for breach of fiduciary duty also fails.

Count 17 also fails for fraudulent inducement relating to compensation. Jon Logan has failed to demonstrate any false statement about compensation made by Jim Logan. Jon Logan also failed to demonstrate Jim Logan knew any statement Jim Logan made about compensation was false. Count 17 fails

The Court also needs to address a separate allegation in Count 15 that Jon Logan also contended in Count 15 that Jim Logan breached a fiduciary duty because his father "misrepresented to Jon that Jon would be compensated for use of his IP." [DIN 891, p. 34, ¶183.]

As it relates to IP, the Court already found the amount Smart Communications paid on behalf of HLFIP through the date of valuation *is more than* HLFIP was entitled to receive from Smart Communications for MailGuard. Jon Logan's claim is factually disproved. The Court also points to its discussion in the next section concerning Count 16 that there was no misrepresentation.

The Personal Representative is entitled to judgment as to both Counts 15 and 17.

### 13.    *Count 16 and 18 – misrepresentation re: IP against the Personal Representative.*

In Count 16, Jon Logan sues the Personal Representative for misrepresentation relating to the intellectual property. In Count 18, Jon Logan sued the Personal Representative for the same

conduct under a fraudulent inducement theory. In essence, Jon Logan contends that he was to own the intellectual property.

The Court previously made factual findings relating to the IP. Jon Logan has failed to demonstrate any false statement about IP made by Jim Logan. Jon Logan also failed to demonstrate Jim Logan knew any statement Jim Logan made about IP was false. (To the extent these claims could be construed as negligent misrepresentation, the Court finds Jon Logan failed to demonstrate any statement Jim Logan made that Jim Logan believed to be true but was, in fact was false, and that he should have known to be false.) And because the Court found that HLFIP through the valuation date had Smart Communications pay more on HLFIP's behalf than any accrued royalty, Jon Logan failed to prove damage.

Jon attempts to revitalize the 40% royalty the Court invalidated in Part 1, Phase 2 due to Jon Logan's director's conflict of interest transaction. The Court continues with its earlier factual findings. There was no "independent valuation" that found a 40% royalty was appropriate.

The Personal Representative is entitled to judgment on Counts 16 and 18.

### 14.    Counts 19 and 20 – indemnification and breach of fiduciary duty relating to broker commission against the Personal <u>Representative.</u>

As it relates to Counts 19 and 20, there was not much discussion concerning these counts. The Court would like further briefing on these counts.

Prior to the December 19, 2025, hearing, the Court requests a targeted memorandum from each side, limited to no more than 10 pages each, discussing the legal authority as well as the evidence supporting or opposing the claims relating to the yacht broker agreement.

### E.
### ALEXIS LOGAN'S COUNTERCLAIMS [DIN 1790]
### (August 4, 2025)

Alexis Logan filed a three-count Counterclaim against Jon Logan and Smart Communications [DIN 1790]. Before trial, she voluntarily dismissed Count 2 for civil conspiracy [DIN 1920].

In Count 1, Alexis Logan sued Jon Logan and Smart Communications Holding, Inc. for malicious prosecution and abuse of process. Before the Part 2, Phase 2 trial, these parties agreed that this claim should be severed and tried later. Thus, the Court makes no rulings as to this claim.

In Count 3, Alexis Logan sued Smart Communications Holding, Inc. for breach of the August 30, 2017, a release and indemnification agreement. That agreement at paragraph 3 entitled "Defense and Indemnification" provides in relevant part that Smart Communications agreed to indemnify Alexis Logan broadly relating to her "conduct and services with respect to

the ownership, management, and/or operation of the Companies; [and] (b) any services provided to the Companies[.]" (JX 40, 41). The Court concludes that the claims against Alexis Logan triggered the indemnity provision. In other words, the Court finds liability against Smart Communications.

By the agreement of the parties, the amount due under this indemnity will be tried separately.

## F.
## HLFIP'S COUNTERCLAIMS [DIN 1863]
## (August 15, 2025)

HLFIP Holding, LLC filed a two-count Counterclaim against Janice Logan, the Trustee, and Alexis Logan [DIN 1863]. In Count 1, HLFIP sued these three for unjust enrichment. In Count 2, HLFIP sued these three for quantum meruit.

The basis of HLFIP's affirmative claims were its allegations that Janice Logan, Jim Logan (prior to his death), and Alexis Logan would take revenues from Smart Communications, while HLFIP was not receiving a royalty from Smart Communications. HLFIP contended that Jon Logan as Smart Communications' management was forced to reinvest royalty payments otherwise due HLFIP because his family members were raiding the company. In other words, HLFIP's theory seemed to be that these three indirectly benefited from HLFIP based on Smart Communication's success in capitalizing on HLFIP's intellectual property. Certainly, there is no evidence that HLFIP provided any of these three with any direct benefits.

The Court's finds HLFIP's underlying indirect delivery of a benefit premise is flawed. The Court already found as fact that a commercially reasonable royalty due HLFIP from Smart Communications for the period 2016-August 28, 2023, to be $3.6M. Between 2019-2023, Smart Communications paid at least $4.8M on behalf of HLFIP. There simply is no further royalty due HLFIP for Smart Communications' use of HLFIP intellectual property through August 28, 2023. If anything, HLFIP would owe Smart Communications more than $1.2M, which the Court already concluded need not be returned to Smart Communications.

Further, the Court already determined the present value of the post-August 28, 2023, royalty due HLFIP resulted in a $15.6M reduction in Smart Communication's enterprise value. Of that amount, the Trustee is responsible for $7.8M. Jon Logan—through his 100% ownership of HLFIP—certainly is receiving substantial value for Smart Communication's use of HLFIP intellectual property.

The Court finds it not credible that Jon Logan on the one hand claimed ignorance of Smart Communications' financial position but asserting through HLFIP that he (Jon Logan) had to reinvest HLFIP royalties in Smart Communications to fund Smart Communication's growth. Not only was Jon Logan aware of Smart Communication's financial position during his father's life, but Jon Logan agreed with his father to have Smart Communications pay HLFIP expenses without a true up.

As a reminder, the elements of unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Kenf, 303 So. 3d at 231.

The Court finds that HLFIP failed to demonstrate that HLFIP conferred any benefit—either direct or indirect—on any of the individuals named or that it sued in Count 1. The Court also finds HLFIP failed to demonstrate the second or third prongs of the unjust enrichment cause of action as well. HLFIP failed to meet its burden. Janice Logan, the Trustee, and Alexis Logan are entitled to judgment in their favor on Count 1.

HLFIP in Count 2 repackaged its unjust enrichment claim using the alternative theory of quantum meruit. "The distinction between quantum meruit and unjust enrichment is often blurred by the potential for both theories to apply to the same factual setting. The doctrine of quantum meruit, also called a contract implied in fact, imposes liability, in the absence of an express agreement, based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." F.H. Paschen, S.N. Nielsen & Associates LLC v. B&B Site Dev., Inc., 311 So. 3d 39, 48 (Fla. 4th DCA 2021).

"To satisfy the elements of quantum meruit, the plaintiff must prove that the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it." Id.

As with unjust enrichment, HLFIP failed to demonstrate that it provided Janice Logan, the Trustee, or Alexis Logan any benefit whatsoever. HLFIP also failed to demonstrate the other prong of this claim. Janice Logan, the Trustee, and Alexis Logan are entitled to judgment in their favor on Count 2.

### G.
### Security to Guarantee Payment of Trustee's

The Court has scheduled a hearing on December 19, 2025, to address payment terms and security, as contemplated by section 607.1436(5), Florida Statutes.

The Court purposely is not detailing much at this time in the light of the upcoming mediation. The Court does, though, provide some preliminary thoughts on a few issues for the type of security the Court is currently envisioning, subject to the parties' discussions and arguments. This is not an exhaustive list. Nor is it a final ruling.

Even though the Court has listed these, the parties, though, are free to agree to different terms.

### 1.      _Jon Logan Salary._

Until all payments to the Trustee have been made, Jon Logan's base salary will be $120,000 per year. On July 1 of each year, the base salary may be increased by the same percentage increase the Florida Legislature provides for state employees. (Note, this is general state employees and not any specific classification receiving a pay adjustment.) For instance, in fiscal year 2025-2026, the Legislature authorized a 2% pay increase.

The Court authorizes Smart Communications to retroactively provide the 2% pay increase to Jon Logan's salary effective July 1, 2025.

The Court notes that the Yacht was recently refinanced, and the debt service appears to be $1M per year, paid quarterly. There is also either $100,000 or $130,000 monthly expense relating to dockage. That means there is at least $183,333 in monthly expenses for the Yacht. Before any upkeep.

**Smart Communications' current payments with respect to the Yacht need to end. Soon.**

The Court believes it appropriate that when those significant expenses cease, each shareholder should realize some portion of those savings.

With respect to Jon Logan, effective the month after those payments end completely, the Court will authorize his base salary to increase by up to $50,000 per month (assuming a 25% drag due to benefits, this would cost Smart Communications about $62,500 per month). Jon Logan may elect to forego that salary increase, but it cannot be taken as a distribution. As this amount is being added to the base, the yearly pay increase provided to state employees would apply to this amount.

With respect to the Trustee, effective the month after those payments end completely, the Court will direct that, at a minimum, an additional $62,500 payment towards the outstanding amount due the Trustee be paid. This amount will supplement any additional payments Smart Communications is making to the Trustee.

If Jon Logan increases his salary by the maximum permitted, and the parties only pay the Trustee the minimum supplement, that should be at least an additional $58,000 per month available to Smart Communications for corporate purposes.

### 2.      *Use of Expense Reports.*

Effective immediately, any payments made to Jon Logan or that benefit Jon Logan must be accompanied by detailed expense reports with receipts justifying the corporate purpose.

### 3.      *Car usage.*

Effective immediately, Smart Communications may only provide one vehicle for Jon Logan's company use, which currently is a Land Rover. A replacement car may occur every 5

years. If the company finances or leases a future vehicle, the maximum monthly payment is limited to $1,250.

### 4. *Tierra Verde home.*

The Court is providing Jon Logan a 30-day window within which he can cause Smart Communications to distribute the Tierra Verde home into his private ownership. As previously noted, any payments made by Smart Communications towards the upkeep or repair of that house made after August 28, 2023, will need to be recharacterized as a shareholder's loan. If Jon Logan elects to continue to live in the Tierra Verde home, the Court will allow Smart Communications to continue to make similar payments towards the upkeep and repair of that home, so long as those amounts do not materially change from historical expenses. Those expenses will also need to be characterized as a shareholder's loan.

### 5. *Trustee access to records.*

Until all payments due the Trustee are made, the Court will allow the Trustee comprehensive access to Smart Communications books and records. The Court will need to structure a process to address the corporate changes and transfer of assets without value. Of course, the Trustee and her advisors will have to agree to a confidentiality agreement.

### 6. *Memorandum on payment terms and security.*

In preparation for the December 19 hearing, the Court would like the parties to provide proposed terms for payment as well as security for payment that each side is requesting, and if necessary, the legal authority for the request.

*****************************************************************

IT IS ORDERED:

1.      In preparation for the hearing on Friday, December 19, 2025, the Court has requested from each side three legal memos as well as a memo outlining proposed terms for payment as well as security for payment. The Court would request these be filed on or before 4:00 p.m. on Tuesday, December 16, 2025.

2.      The parties are advised the Court likely will be requesting the parties the draft a final judgment that effectuates this Order, the payment terms and security, and severs those malicious prosecution/abuse of process and attorney fee issues. Kindly begin working on it so that final judgment can be entered expeditiously.

3.      In the event a party believes the Court has not addressed a pending claim, kindly outline that for the Court in a short memorandum to be filed on or before 4:00 p.m. on Tuesday, December 16, 2025.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on December 09, 2025.

e-Signed 12/9/2025 7:55 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On December 09, 2025, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

Counsel of Record.

# EXHIBIT 7

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
        Plaintiff,

v.

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
        Defendant.

CASE NO.  2023 CA 001002 NC
DIVISION C CIRCUIT

_____

## <u>ORDER SETTING HEARING</u>

    **YOU ARE NOTIFIED** that a Court hearing is scheduled in this case before the Honorable Hunter W. Carroll, as follows:

| | |
|---|---|
| **Date & Time:** | December 19, 2025 at 08:30 a.m. |
| **Time Reserved:** | All-day |
| **Matter(s):** | To determine payment terms and payment security (if not resolved at mediation). |
| **Is hearing evidentiary?** | **Yes** |

    Judge Carroll has a "hybrid courtroom," which will allow participants to either appear "in person" or via Zoom.

**Filed 10/17/2025 02:04 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

➢ For all non-evidentiary hearings and for evidentiary hearings one hour or less, each participant has the discretion to determine how that participant will appear.

➢ For evidentiary hearings exceeding one hour, the participants must appear in person unless the Court orders otherwise.

Please do ***not*** call the Court's Judicial Assistant to advise how the participant will appear. Instead, Judge Carroll expects the participants to appear on-time, either in person or via Zoom.

| | |
|---|---|
| **Courthouse location:** | Lynn N. Silvertooth Judicial Center - 2002 Ringling Blvd. - Sarasota - FL 34237 |
| **Courtroom:** | 6-C |
| **Zoom Credentials:** | https://www.zoom.us/ Click "Join A Meeting" **Meeting ID:** 353 234 4884 **Password:** 756433 **Audio only:** 1.253.215.8782 and use the same Meeting ID |

There are no fees for attending this court hearing via the Zoom platform. You may access the Zoom platform at https://www.zoom.us. Please select the "Join A Meeting" link and then enter the Meeting ID and Password to access the hearing. You may also join the court hearing from Judge Carroll's Zoom Video Conference Access Information page at https://www.jud12.flcourts.org/Public-Information/Public-Court-Hearings.

Court proceedings are open to the public. Members of the public may appear live or use the Zoom credentials to access the hearing. Judge Carroll will "host" the videoconference. When you sign on, you be placed in a waiting room. The Court will admit you at the beginning of the hearing. Please name your video feed with your first and last name.

### Expectations for All Participants Attending Zoom Hearings

Please see the expectations for all participants on the Twelfth Judicial Court Website: https://www.jud12.flcourts.org/Public-Information/Public-Court-Hearings.

### Court Reporters and Digital Court Recording

The Court does not provide a court reporter. If a party wishes to have a court reporter present, that party must arrange for the court reporter's attendance and must notify all other parties before the hearing.

You are advised that the Court may record this proceeding via the Court's Digital Court Recording Department. Not all hearings are digitally recorded, however. Those hearings before Judge Carroll that generally are recorded using Digital Court Recording include termination of parental rights; certain guardianship proceedings (appointment of a guardian; adjudication,

modification, termination, or revocation of adjudication of incapacity; and restoration of rights); Uniform Child Custody Jurisdiction and Enforcement Act hearings; and Temporary Restraining Order hearings.

## No Recording Proceedings

By court rule and court order, you are not authorized to make your own audio or visual recording of a court proceeding. No one may take "screenshots" or other audio or visual depictions of a court proceeding. Recording a court proceeding is strictly prohibited unless approved by the Judge. If you violate these rules, you may be held in contempt of court. Members of the media must comply with rule 2.450 and administrative order 2020-23.2 regarding media coverage. Please contact the Court's Public Information Officer for further information.

## Late entry or Technical Difficulties

If you are not logged in when the hearing begins, the judge may not interrupt the proceedings to admit you to the hearing. If you have trouble logging in, and you wish to participate in the hearing, contact the Court's judicial assistant immediately at (941) 861-7946.

## ADA Notice

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Sarasota County Jury Office, P.O. Box 3079, Sarasota, Florida 34230-3079, (941) 861-8000, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.

## Interpreters

The Twelfth Judicial Circuit provides spoken language court interpreters to limited-English-proficient persons in accordance with Title VI of the Civil Rights Act of 1964, section 90.606, Florida Statutes, and Rule 2.560, Florida Rules of Judicial Administration. If you require the assistance of an interpreter, please submit your request to: https://www.jud12.flcourts.org/Programs/Court-Interpreters/Interpreter-Request or please call 941-749-3659. Please submit your request as early as possible, requests made with less than 5 business days' notice may not be accommodated.

El Duodécimo Circuito Judicial provee intérpretes judiciales de la lengua hablada a personas con dominio limitado del inglés de acuerdo con el Título VI de la Ley de Derechos Civiles de 1964, la sección 90.606, los Estatutos de la Florida y la Regla 2.560 de las Reglas de Administración Judicial de la Florida. Si requiere la ayuda de un intérprete, por favor envíe su solicitud a http://www.jud12.flcourts.org/Home/Public/InterpreterRequestForm.aspx o llame al 941-749-3659. Por favor, envíe su solicitud lo antes posible, las solicitudes hechas con menos de 5 días hábiles no pueden ser garantizadas.

**DONE AND ORDERED** in Sarasota, Sarasota County, Florida, on October 17, 2025.

e-Signed 10/17/2025 2:04 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

Counsel of Record

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Smart Communications Holding, Inc.** |
| United States Bankruptcy Court for the: | **MIDDLE DISTRICT OF FLORIDA** |
| Case number (if known): | 8:25-bk-9473 |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Akerman LLP<br>P.O. Box 4906<br>Orlando, FL 32802** | | | | | | $415,360.83 |
| **Baker Hostetler LLP<br>312 Walnut Street<br>Suite 3200<br>Cincinnati, OH 45202** | | | | | | $54,404.14 |
| **Bartko Pavia<br>1100 Sansome Street<br>San Francisco, CA 94111** | | | | | | $137,656.68 |
| **Cents LLC<br>663 Buckskin Road<br>Dayton, NV 89403** | | | | | | $54,006.73 |
| **CML Security<br>1785 West 160th Avenue<br>Suite 700<br>Broomfield, CO 80023** | | | | | | $4,080.00 |
| **Compliance Solutions, Inc.<br>242 Rangeline Road<br>Longwood, FL 32750** | | | | | | $243,328.99 |
| **County of Fairfax<br>Dept of Tax Administration<br>PO Box 10203<br>Fairfax, VA 22035** | | | | | | $10,898.16 |
| **CypherWorx, Inc.<br>3400 Monroe Avenue<br>Suite 119<br>Rochester, NY 14618** | | | | | | $7,500.00 |

| Debtor | Smart Communications Holding, Inc. | | Case number *(if known)* | 8:25-bk-9473 |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Florida Custom Mold, Inc.<br>1806 Gunn Hwy<br>Odessa, FL 33556 | | | | | | $187,670.39 |
| Interstate Welding<br>1939 Sherwood Street<br>Clearwater, FL 33765 | | | | | | $95,875.11 |
| JAM Commuications LLC<br>107 Claredon Place<br>Hendersonville, TN 37075 | | | | | | $39,950.00 |
| Jerome Anderson<br>814 1st Street N.<br>Apt 305<br>Jacksonville Beach, FL 32250 | | | **Contingent Disputed** | | | $21,506.97 |
| ShenZhen Meridian Technology<br>Room 2809, West Bldg.<br>Qui Shi Bldg,, Zhu Zi Ling<br>Fu Tian District, Shenzhen<br>CHINA  51804 | | | | | | $787,684.80 |
| Stearns Weaver Miller<br>150 W. Flagler Street<br>Suite 2200<br>Miami, FL 33130 | | | | | | $23,296.50 |
| VLEX - Fastcase, Inc.<br>729 15th Street NW<br>Suite 500<br>Washington, DC 20005 | | | | | | $23,209.34 |