IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| SMART COMMUNICATIONS HOLDING, INC. | Case No. 8:25-bk-09473 |
| SMART COMMUNICATIONS COLLIER, INC. | *Jointly Administered with* Case No. 8:26-bk-00146 |
| Debtors. | |

_____/

**JANICE LOGAN'S**
**MOTION FOR DERIVATIVE STANDING**

Creditor Janice Logan, as Trustee of the James Logan Family Trust, dated February 20, 2021 (the "Trust"), moves for entry of an Order granting her derivative standing to pursue cash proceeds of the sale of a 100 foot Riva Corsaro yacht (the "Yacht"), purchased by Smart Communications Holding, Inc. (the "Debtor"), but titled in the name of its non-debtor affiliate Smart Communications Yacht Holding, LLC ("SCYH"). The Trust also seeks derivative standing to have at least one other substantial asset purchased by the Debtors—real property used as the Debtor's corporate headquarters ("Smart Comm's Headquarters")—but titled in the name of another non-debtor affiliate—retitled in the name of the Debtor. In support of this Motion, the Trust states:

**PRELIMINARY STATEMENT**

Despite not being included in Item 48 of the Debtor's Statement of Financial Affairs (Doc. No. 47), as amended (Doc. No. 147), the Yacht is property of the estate under 11 U.S.C. § 541(a)(1). Indeed, State Court Judge Hunter Carroll found that the Debtor used *its* funds to purchase the Yacht, including paying debt service on a $4.8 million note it issued as part of the sale transaction and for expenses related to staffing, docking, insuring, fueling, and maintaining

1

35998900-6

the Yacht. That the Debtor caused the Yacht to be titled in the name of non-debtor affiliate SCYH does not change the fact that the Yacht was property of the Debtor. "Under 28 U.S.C. § 1334(e), the … [C]ourt has exclusive jurisdiction over property of the estate." *In re Sticky Holsters, Inc.,* No. 2:23-bk-00962-FMD, 2024 WL 3359368, at *6 (Bankr. M.D. Fla. July 10, 2024).

Upon information and belief, SCYH – whose sole owner is Jon Logan – sold the Yacht in or about May 2026. Neither the Debtor nor SCYH notified the Trust of the sale. The Debtor has refused to take action to recover the sale proceeds despite Judge Carroll's extensive findings, including that the Debtor would have prevailed on an unjust enrichment claim as to the Yacht and Smart Comm's Headquarters building. The Trust therefore has more than a "colorable claim" for the recovery of the same, warranting derivative standing. *See Maxfield v. Quarles & Brady LLP (In re Jennings),* 378 B.R. 678, 684 (Bankr. M.D. Fla. 2006). Accordingly, the Court should grant the Trust derivative standing to prosecute claims to recover property of the estate for the benefit of the Debtors and their creditors.

**BACKGROUND**

1. The Debtor filed its Subchapter V case on December 16, 2025 (Doc. No. 1) and on January 8, 2026, removed the Subchapter V designation (Doc. No. 51).

2. For years, the Trust, the Debtors, various Logan family members, and related corporate entities have litigated extensively before the Honorable Hunter Carroll in Consolidated Case No. 2023 CA 001002 NC in (the "State Court Case").

3. Judge Carroll entered three Orders in the State Court Case: (i) *Order With Findings and Conclusions of Law From Part 2 of Phase 2 Trial,* entered December 9, 2025 (the "First Order"); (ii) *Final Judgment Phase 2*, entered February 5, 2026 (the "Second Order"); and (iii) *Purchase Order With Payment Terms and Security* (the "Third Order," and collectively with

35998900-6

the First Order and Second Order, the "State Court Orders"). True and correct copies of the State Court Orders are attached hereto as **Composite Exhibit A**.

4.      Judge Carroll valued the Trust's shares in the Debtor (under Fla. Stat. § 607.1436(4)) as of August 28, 2023, at $40,581,308. First Order at 31, ¶ 3(C)(7) ("The amount [the Debtor] owes the Trustee for the value of her shares as of August 28, 2023, is $40,581,308.").

5.      In determining the value of the Trust's shares, Judge Carroll considered and included in his valuation certain property not titled to the Debtor.

6.      Specifically, Judge Carroll found that the Debtor paid for the Yacht and all debts associated with it:

> **[The Debtor] purchased** a new 2020 100' Riva Corsaro **("the Yacht") for approximately $9.6M ($5M down**; financed $4.6). **[The Debtor] paid the downpayment and pays all the debt associated with the Yacht. [The Debtor] pays all ongoing expenses associated with the Yacht.** At the valuation date [August 28, 2023], **the value of the Yacht was $7,950,000 with $4,800,000 in then existing debt.**

*Id.* at 26, ¶ 3(C)(4)(b) (emphasis supplied).

Thus, as of August 28, 2023, after deducting the then-existing debt of $4.8 million, the Yacht had a value of $3.15 million. *See id.*

7.      In his First Order, Judge Carroll also found that the Debtor purchased real property used for Smart Comm's Headquarters, despite that the property was titled in the name of non-debtor affiliate Loco Florida, LLC. First Order at 29, ¶ 3(C)(5); Third Order at 5, ¶7(c) ("[The Debtor] shall additionally pledge [Smart Comm's Headquarters], **which it purchased, but which is held by Loco Florida, LLC**….") (emphasis supplied).

8.      In his Third Order, after finding that the Debtor paid for the Yacht and Smart Comm's Headquarters, Judge Carroll stated:

35998900-6

> The Court is not requiring [the Debtor] to seek to cause those assets to be retitled at this time. However, the Court retains the right to direct [the Debtor] to institute and pursue legal proceedings to have those assets returned to [the Debtor] as those assets **indisputably were paid [for] by [the Debtor]** and it would be inequitable under the circumstances to allow Loco Florida, LLC and [SCYH] to retain those assets without paying full value for those assets.

Third Order at 5, ¶ 7(d) (emphasis supplied).

9.      Judge Carroll noted that one week after entry of the First Order, the Debtor filed the instant Chapter 11 case. Second Order at 3. Judge Carroll noted that he previously found the value of the Trust's shares in the Debtor was $40,581,308, *id.* at 4, and then, after adjustments, revised the value of the Trust's shares to $44,905,967.10. *Id.* at 8, ¶ 1.E. *Accord* Third Order at 3, ¶ 2 (Valuation Award; same).

10.     Judge Carroll Ordered the Yacht to be sold to a bona fide third-party purchaser. Third Order at 7, ¶ 8(d).

11.     On February 24, 2026, the Trust filed three (3) claims against the estate. *See* Claim Nos. 16-1, 17-1, and 18-1 (collectively, the "Trust's Claims").

12.     To date, the Debtor has not objected to the Trust's Claims.

13.     The Debtor's sole owner, Jon Logan, is also the sole owner of both SCYH and Loco Florida, LLC by virtue of the Orders extinguishing the Trust's interest in the entities in exchange for realizing the value of assets the Debtor paid for via the valuation judgment.

14.     On May 11, 2026, the Trust filed its complaint seeking substantive consolidation of Loco Florida, LLC, and SCYH (among others) with the Debtors' estate. (Adv. Pro. 26-00148, the "Adversary Proceeding," at Doc. 1). Before the filing, the Trust asked the Debtors if they would join the Trust as plaintiffs, but they declined to do so.

15.     Despite the Yacht's being subject to both the State Court judgment and litigation in the Adversary Proceeding, upon information and belief, SCYH sold the Yacht *after* the Trust filed

its original complaint in the Adversary Proceeding. Several trade publication articles noted the sale of the Yacht in mid-May of this year. *See, e.g.*, Ann Yabut, "30m Riva motor yacht Convict sold", Super Yacht Times (May 15, 2026), https://www.superyachttimes.com/yacht-news/riva-motor-yacht-convict-sold.  **Exhibit B.**

16.     The Trust repeatedly inquired with counsel for Debtors and counsel for Debtor affiliates seeking details of the sale and confirmation that sale proceeds would be escrowed/protected for the benefit of the Debtors' estate. No such confirmation was received.

17.     On June 12, 2026, undersigned counsel for the Trust sent a letter to Debtor's counsel, reciting Judge Carroll's findings that the Debtor paid for the Yacht and its maintenance, as well as paying for debt service on the $4.8 million note (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit C**. Undersigned counsel relayed his understanding that the Yacht had been sold, and noted that he had received no response to his prior inquiry regarding the circumstances of the sale and the whereabouts of the sale proceeds. Undersigned counsel stated that his request for assurances that the sale proceeds had been escrowed went unanswered and, therefore, absent confirmation by June 17, 2026 at 5:00 p.m., that the estate would commence a proceeding to recover the sale proceeds (and seek retitling of any other assets paid for by the Debtor), the Trust would file a motion seeking derivative standing to do so. Hence, the filing of this Motion.

## ARGUMENT

18.     Derivative standing is appropriately granted where, like here, the Debtor is incapable of prosecuting, or refuses to prosecute, "colorable claims" that would be beneficial to a bankruptcy estate. In *In re Jennings,* Judge Glenn explained that (i) "courts have… authorized individual creditors to pursue claims on behalf of the estate under certain circumstances," 378 B.R.

at 862; (ii) that the claims to be brought must be "colorable claims" that the debtor has refused to prosecute which would benefit the estate, if successful, *id.*, at 864; and (iii) that there must be express authorization by the court and the claim must be brought solely for the benefit of the estate. *Id.* In *Jennings*, Judge Glenn found that there might be inherent conflicts in the debtor pursuing legal malpractice claims himself and there would be no effective remedy if he failed to pursue the claims in a timely or diligent fashion. *Id.*

19.     As sole owner of SCYH and Loco Florida, LLC, Jon Logan remains the sole beneficiary of any property retained in either entity's name.

20.     To date, despite multiple requests, there is no evidence that the Debtor, as a fiduciary to the estate, has taken any action to recover the proceeds of the sale of the Yacht (including escrowing them as requested by the Trust).

21.     Indeed, when asked about the status of proceeds from the sale of the Yacht, Debtor's counsel responded that they "stopped having anything involvement with" SCYH when the Trust refused to assent to the estate's postpetition financing of the Yacht.   **Exhibit D.**

22.     Considering the Debtor's inaction, the Court should grant the Trust derivative standing to seek to recover the sale proceeds of the Yacht for the benefit of the estate. The Court should also grant the Trust derivative standing to take any actions necessary to retitle Smart Comm's Headquarters in the name of the Debtor, real property that, like the Yacht sale proceeds, constitutes property of the estate. These actions, if successful, would benefit the estate.

WHEREFORE, the Trust respectfully requests entry of an Order granting its derivative standing to pursue the cash proceeds of the sale of the Yacht and to take any action necessary to retitle Smart Comm's Headquarters in the name of the Debtors and granting further relief as may be just and proper.

6

35998900-6

DATED:  June 25, 2026.

/s/ Edward J. Peterson

Edward J. Peterson
Florida Bar No. 0014612
BERGER SINGERMAN LLP
101 E. Kennedy Boulevard, Suite 1165
Tampa, FL 33602
813.498.3400
epeterson@bergersingerman.com
*Attorneys for Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 25, 2026, by the Court's CM/ECF system upon all parties registered to receive electronic noticing as noted below:

John A Anthony on behalf of Creditor Melvin Engelke
janthony@anthonyandpartners.com,
efilings@anthonyandpartners.com;cfosdick@anthonyandpartners.com;eleith@anthonyandpartners.com

Brad F. Barrios on behalf of Debtor Smart Communications Holding, Inc.
bbarrios@tcb-law.com

Paul J Battista on behalf of Debtor Smart Communications Holding, Inc.
pjbattista@venable.com,
cascavone@venable.com;IMalcolm@venable.com;jnunez@venable.com;hburke@venable.com

Eyal Berger on behalf of Debtor Smart Communications Holding, Inc.
eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com

Teresa Marie Dorr on behalf of U.S. Trustee United States Trustee - TPA
teresa.dorr@usdoj.gov,
brandy.gasaway@usdoj.gov;Dionne.Rumper@usdoj.gov;Juanita.Diaz@usdoj.gov

James W Elliott on behalf of Creditor Timothy W. Webb
james@mcintyrefirm.com, rmaldonado@mcintyrefirm.com

Michael J. Harwin on behalf of Debtor Smart Communications Holding, Inc.
mharwin@stearnsweaver.com

7

35998900-6

Eric D Jacobs on behalf of Debtor Smart Communications Holding, Inc.
edjacobs@venable.com, btraina@venable.com;b mtraina@venable.com;
bmtraina@ecf.courtdrive.com;ipmalcolm@venable.com;tmpetrie@venable.com;imalcolm@ecf.
courtdrive.com;brhand@venable.com

Anne Krache on behalf of Creditor Janice Logan
akrache@shb.com, anne-krache-9629@ecf.pacerpro.com;rdevaney@shb.com

John W Landkammer on behalf of Creditor Melvin Engelke
jlandkammer@anthonyandpartners.com, efilings@anthonyandpartners.com,
crodriguez@anthonyandpartners.com

Marc L. Levine on behalf of Creditor Janice Logan
mlevine@bergersingerman.com

Anthony P. Marzocca on behalf of Creditor Florida Custom Mold, Inc.
amarzocca@trenam.com, amarzocca@ecf.courtdrive.com; cminott@trenam.com;
amatos@ecf.courtdrive.com;mmosbach@trenam.com;mmosbach@ecf.courtdrive.com;cminott@
ecf.courtdrive.com

Megan Wilson Murray on behalf of Creditor Swank Motion Pictures, Inc.
mmurray@underwoodmurray.com, dstrand@underwoodmurray.com;
mmurray@ecf.courtdrive.com;euzonwanne@underwoodmurray.com;vburbano@underw
oodmurray.com;jpatterson@underwoodmurray.com

Peter Francis O'Neill on behalf of Creditor Janice Logan
pfoneill@shb.com

Todd Ruskamp on behalf of Creditor Janice Logan
truskamp@shb.com, tpistora@shb.com;todd-ruskamp-9657@ecf.pacerpro.com

R Scott Shuker on behalf of Interested Party Jon Logan
rshuker@shukerdorris.com, mfranklin@shukerdorris.com; lstricker@shukerdorris.com;
mdorris@shukerdorris.com;atillman@shukerdorris.com;wtownsend@shukerdorris.com

United States Trustee - TPA
USTPRegion21.TP.ECF@USDOJ.GOV

Kimberly A Walsh on behalf of Creditor Texas Comptroller of Public Accounts, Revenue
Accounting Division bk-kwalsh@oag.texas.gov, sherri.Simpson@oag.texas.gov


*/s/ Edward J. Peterson*
Edward J. Peterson

8

35998900-6

EXHIBIT A

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
      Plaintiff,

v.

                                 CASE NO.  2023 CA 001002 NC
                                 DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
      Defendant.

_____

**ORDER WITH FINDINGS AND CONCLUSIONS OF LAW**
**FROM PART 2 OF PHASE 2 TRIAL**

After years of intense litigation, the Court conducted the trial on the valuation of Smart Communications Holdings, Inc. as of August 28, 2023, together with most of the remaining issues. The Court and the parties referred to this trial as "Part 2, Phase 2."

The Court understands the mediation on payment terms and security is scheduled for later this week. Because the Court is endeavoring to release this decision as quickly as possible, the Court did not have time to substantially proofread to fix all errors, for which the Court apologizes in advance.

In summary:

- The value of Smart Communications Holding, Inc. as of August 28, 2023, before a 5% lack of marketability discount is **$88,254,918**. This amount incorporates a 5% Royalty Rate applied against a 40.5% Royalty Base, effective August 28, 2023.

Page 1 of 49

- No further royalty is due HLFIP from Smart Communications for revenue earned before August 28, 2023. The amount Smart Communications paid on behalf of HLFIP through August 28, 2023, exceeded the royalty amount due. HLFIP will not need to repay the at least $1.2M overage.

- After application of the 5% lack of marketability reduction, the value of the Trustee's shares as of August 28, 2023, is **$41,921,086**. The Court elected not to apply a lack of control reduction.

- The Trustee will need to repay shareholders loans totaling **$1,339,778**. The Trustee will also need to repay all expenses associated with the Ranch Club home that occurred after August 28, 2023, and the amounts associated with the wrongful injunction. Both amounts will be setoff from the amount due the Trustee for the value of her shares.

- The Court is requesting additional briefing on the issue of attorney fees and application of interest relating to the valuation proceeding. The Court is also requesting briefing on the issue of the authority of the Court to appoint a receiver under the authority to provide security for payment of the Trustee's shares under section 607.1436(5), Florida Statutes, should one become necessary in the future. The Court is also requesting a memorandum from each side relating to that side's view of payment terms and provisions for security for payment.

- Count 1 of the Trustee's Second Amended Answer with Counterclaims [DIN 775], filed on October 2, 2024, was not tried and is being severed.

- Neither Jon Logan nor Smart Communications prevailed in Counts 1-18 of their Second Amended Complaint [DIN 891], filed December 4, 2024. The Court is requesting additional briefing as to Counts 19 and 20.

- Count 1 of Alexis Logan's Counterclaims [DIN 1790], filed on August 4, 2025, for malicious prosecution/abuse of process was not tried and is being severed. Count 2 was voluntarily dismissed. In Count 3, the Court finds entitlement to indemnification and will have a separate hearing on the amounts.

- HLFIP did not prevail on its Counterclaim [DIN 1863], filed on August 15, 2025.

- The Court will conduct a hearing on December 19, 2025, to address payment terms and security as well as the other issues identified in this Order.

There are several parties that have the Logan last name. For that reason, the Court will address Logan family members by their first and last name. Additionally, Janice Logan is a party to this action in three separate capacities: individually; as Trustee of the James Logan Family Trust dated February 10, 2021; and as Personal Representative of the Estate of James Logan. References to "Janice Logan," "Trustee," and "Personal Representative" means to those three capacities, respectively.

The Court notes that Jonathan Logan and Smart Communications filed the first lawsuit on February 28, 2023, which case was assigned Case Number 2023-CA-1002. In what would become the derivative lawsuit, the Trustee sued Jonathan Logan and Smart Communications as a nominal defendant on March 10, 2023, which case was assigned Case Number 2023-CA-1280. The then presiding judge consolidated the cases and directed all actions to occur within the -1002 case. For that reason, the reader will note multiple complaints that appear to have the same nomenclature within the -1002 case.

# 1.
## BACKGROUND
## THE PATH TO PART 2, PHASE 2 TRIAL

This case presents an unfortunate intra-family fight, which now concerns the valuation of Smart Communications Holdings, Inc. as of August 28, 2023. The Court tried "Part 2, Phase 2" over the course of 10 trial days: October 6-10, 2025; October 13-October 16, 2025; and November 12, 2025.

The Part 2, Phase 2 trial was the third trial phase between the parties. Getting to this point, the Court and the parties walked a long and winding path. The Court details only the most relevant items to orient the reader of how we arrived here.

There were two 50% shareholders of Smart Communications in 2022: Jonathan Logan and his father, James "Jim" Logan. In addition to being the shareholders, both Jon Logan and Jim Logan were Smart Communications' directors and senior executives. Smart Communications was growing rapidly, including its revenue base.

Jim Logan died October 16, 2022.

As later discussed, both Jon Logan and James Logan withdrew funds from Smart Communications, some of which were identified then identified, or later recharacterizes, as shareholder loans. Neither Jon Logan nor Jim Logan was particularly fond of paper trails, expense reports, or corporate formalities.

Shortly before his death, Jim Logan transferred his shares into the James Logan Family Trust ("the Trust"). His wife (and Jon Logan's mother)—Janice Logan—became Trustee of that Trust when Jim Logan.

Since that time, Jon Logan took steps to exclude his mother from the Company even though she as Trustee was now the other 50% shareholder. Jon Logan's action went further than that—he openly, actively, and unilaterally attempted to minimize, or eliminate, all value of the Trustee's ownership in Smart Communications. Jon Logan believed that his sister, Alexis Logan, was manipulating her mother to allow both Alexis Logan and Janice Logan to live off Jon Logan's efforts.

As this litigation grew, so did its complexity. There was a preliminary gating issue that needed to be resolved: whether the then recently discovered "shareholders agreement" following Jim Logan's death was valid. The Court severed that issue and tried it in the Phase 1 trial. The Phase 1 trial involved the declaratory judgment action and was tried over three trial days in January 2024. At its core, the Court declared in the Phase 1 trial:

- The purported Shareholders Agreement was invalid and unenforceable;

- There was no shareholders agreement between the two 50% shareholders of Smart Communications Holding, Inc.'s stock at the time of James Logan's death;

- The two 50% shareholders of Smart Communications Holdings, Inc.'s stock are: (1) Jonathan D. Logan; and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

On February 7, 2024, the Court entered a final judgment on those issues [DIN 652]. There was no appeal of that decision.

Initially, the Court scheduled the remaining claims to be tried in January 2025 in a Phase 2 trial. However, in the lead up to that trial, there were changes in the nature of the claims presented.

Of note, on May 29, 2024, Janice Logan as Trustee filed a pleading alleging shareholder deadlock, and she sought judicial dissolution of Smart Communications Holding, Inc. pursuant to sections 607.1430(1)(b)(2)-(4) and 607.1431, Florida Statutes [DIN 680]. In response Jon Logan, as incumbent management, caused Smart Communications Holding, Inc. to elect an option under section 607.1436, Florida Statutes, to purchase the Trustee's shares at fair value [DIN 696]. In fact, the parties agreed that Smart Communications could make this election [DIN 691]. This election changed the focus of Phase 2 to valuation, although there were still some claims that would survive the valuation process.

Section 607.1436(4) directs the valuation date to be "the day before the date on which [the judicial dissolution petition] was filed or such other date as the court deems appropriate under the circumstances." Unless the "such other date" was selected, the default statutory valuation date would be May 28, 2024.

The Trustee advocated for the Court to exercise its discretion and select "such other date," which the Trustee posited should be February 27, 2023, the date the initial lawsuit was

filed. The Trustee contended that the Court could determine the issue either without evidence or based on the trial record from the Phase 1 trial.

In contrast, Jon Logan and Smart Communications contended that either the Court should use the statutory default date or a later date in the light of the enactment of the federal Martha Wright-Reed Just and Reasonable Communications Act of 2022, or its proposed regulations, which they contend negatively impacts Smart Communications' ability to generate revenue. They opposed any argument that the Court could determine this issue without taking evidence.

The Court determined that it would need evidence to decide whether to use the default statutory valuation date or "such other date." And because the Phase 1 trial did not focus on valuation, the Court concluded use of the Phase 1 trial record would not provide a sufficient basis for this decision.

There was another variable that needed to be considered. Before the Trustee sought judicial dissolution, Jon Logan caused there to be significant, unilateral corporate activity that implicated valuation. On August 29, 2023, Jon Logan caused Smart Communications Holdings, Inc. and several related entities to undergo a sweeping corporate change. Included in this was the creation of a Delaware entity, Smart Communications Holdings, LLC. Jon Logan then purported to cause most of the assets of Smart Communications Holding, Inc. to be assigned to Smart Communications Holdings, LLC, without value. There were numerous other corporate changes that day, too. All of this was done without knowledge by, or consent from, the Trustee, as a 50% shareholder. And he would later attempt go to the courts in Delaware to use the new corporate structure against the Trustee's interests, again consist with his efforts to minimize or eliminate the Trustee's interest.

Also on August 29, 2023, Jon Logan took another unilateral action that purported to either eliminate or minimize the Trustee's value in Smart Communications. On that day he signed the purported Exclusive Intercompany Intellectual Property License Agreement on behalf of both Smart Communications, Holdings, LLC, on the one hand, and HLFIP Holdings, LLC, on the other hand. HLFIP Holdings, LLC is an entity Jon Logan owns 100%.

In doing so, Jon Logan for the first time imposed a purported 40% royalty to be paid by Smart Communications (which he only owned 50%) to HLFIP (which he owned 100%). In connection with that transaction, he also caused a long-term liability in favor of HLFIP to be recognized for the first time on the Consolidated Audited Financial Statements of Smart Communications. Released in October 2023 for year-end December 31, 2022, Footnote I expressed this royalty liability as an expense for years 2015-2021 then valued at $52.8M with accrued interest of $5.6M, and for 2022, an additional accrued expenses of $17.9M and $0.4 of accrued interest. The Court ultimately referred to these actions as the Purported Royality Transactions [DIN 1189].

The parties at the time had a sharp disagreement over these Purported Royality Transactions. The Trustee attacked the Purported Royality Transactions as a "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes. It quickly became apparent to the Court that either the Phase 2 trial would either have to be bifurcate the

Phase 2 trial or the Court would have to accept expert testimony relating to a wide range of potential valuation dates under multiple scenarios, including differing scenarios based on how the Court handled by Purported Royality Transactions.

The Court concluded proceeding with all remaining issues to be tried in Phase 2 would be more cumbersome and unwieldy, even in a nonjury format. The Court, therefore, elected the bifurcation path and separated Phase 2 into two parts [DIN 870]. In Part 1, Phase 2, the Court limited that trial to (1) the proper valuation date; (2) the license/royalty issue; and (3) any issue the parties agreed to be heard during Part 1.

Prior to the February 2025, Part 1, Phase 2 trial, Jon Logan (and without the Trustee's knowledge or consent) placed Smart Communications into bankruptcy in furtherance of his efforts to eliminate the Trustee's share value. The Bankruptcy Court granted relief from the automatic stay to the extent the Bankruptcy Court authorized the Court to proceed with the Part 1, Phase 2 trial as previously set [DIN 928].

The Part 1, Phase 2 trial and was tried over three trial days in February 2025. At its core, the Court decided in Part 1, Phase 2 of the trial:

- The Purported Royalty Transactions constituted "director's conflict of interest transactions" within the meaning of section 607.0832. The Court found that Jon Logan failed to prove these transactions were fair to Smart Communications, and the Court further found that the Trustee proved the Purported Royalty Transactions were not fair to Smart Communications.

- The Court invalidated the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I.

- Under the unique circumstances presented in the case, the Court determined that the Court would value Smart Communications Holding, Inc. as of August 28, 2023, the date immediately before Jon Logan's substantial corporate activity on August 29. In doing so, the Court noted the authority in section 605.0706(4), that permits the Court to determine valuation on "such other date as the court deems appropriate under the circumstances."

Order with the Court's Findings from Part 1 of Phase 2 Trial, signed February 17, 2025 [DIN 1189].

As Phase 2 was bifurcated, the Court did not enter final judgment. The Jon Logan affiliated parties (Jon Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; and HLFIP Holding, LLC) sought certiorari review at the Second District in 2D2025-0700. The Jon Logan parties ultimately sought to dismiss their petition, which was granted on November 5, 2025 [DIN 2228].

Following the Part 1, Phase 2 trial, the Court set the balance of the case for trial in Part 2, Phase 2.

In the lead up to Part 2, Phase 2, the parties agreed some claims would not survive valuation, some claims would survive, and a few others would be tried separately.

## 2.
## FACTUAL FINDINGS

The Court tried Part 2, Phase 2 over ten days. In paper format, there are hundreds of exhibits spanning more than 20 banker's boxes.

The Court continues with its factual findings from Part 1, Phase 2 of the trial. Nothing in the additional evidence presented during Part 2, Phase 2 of the trial alters the Court's prior findings. Further, the Court continues with its rulings from Part 1, Phase 2, including the rulings relating to the Purported Royalty Transactions, the invalidation of the Exclusive Intercompany Intellectual Property License Agreement, the invalidation of the recognition of the purported long-term liability in footnote I, and the August 28, 2023, valuation date.

The Court now makes additional, overarching factual findings. The Court will then supplement those factual findings throughout this Order.

In large part, this case is driven by credibility. Had this been a jury case, the Court would have given the jury instruction 601.2 concerning believability of witnesses:

> Let me speak briefly about witnesses. In evaluating the believability of any witness and the weight you will give the testimony of any witness, you may properly consider the demeanor of the witness while testifying; the frankness or lack of frankness of the witness; the intelligence of the witness; any interest the witness may have in the outcome of the case; the means and opportunity the witness had to know the facts about which the witness testified; the ability of the witness to remember the matters about which the witness testified; and the reasonableness of the testimony of the witness, considered in the light of all the evidence in the case and in the light of your own experience and common sense.

Florida Standard Jury Instruction 601.2a. Even though this was a bench trial and jury instructions are not read, the Court is tasked with determining what testimony and evidence is to be believed, just as is the case for juries. And the Court takes instruction 601.2 to heart.

The Court found Jon Logan's testimony, for the most part, not credible. The Court will explain why this is the case by addressing two main themes from his testimony and then contrasting it with other evidence in the case. *First*, Jon Logan testified that he did not know

what was occurring with the finances of the company during Jim Logan's life. *Second*, Jon Logan testified that Alexis Logan provided no meaningful services to the company.

As it relates to financial information, Jon Logan testified that he and Jim Logan "talked daily about our budget that I would be able to work with." (Transcript p. 709). Yet, just 9 transcript pages earlier, Jon Logan testified that Jim Logan and Alexis Logan *hid* their funding efforts from him: "This did this all behind my back and without any consent." (Transcript p. 700).

Interestingly, though, on **March 2,2016**, Jim Logan emailed Jon Logan all the bank passwords when Jon Logan was complaining about funds going to either Jim Logan or Alexis Logan. Because Jon Logan effectively was accusing his father of stealing from Jon Logan, Jim Logan writes: "Check out anything you like I have nothing to hide." (Ex. 8001). Nothing was hidden from Jon Logan, and Jon Logan's statements to the contrary simply are not true.

Further to Jon Logan's knowledge of the details of the financial condition of Smart Communications are emails Jon Logan sent to Jim Logan or Alexis Logan over the years. For instance, on **April 26, 2015**, Jim Logan responded to an uncharitable email from Jon Logan, and discussed matters involving efforts to secure financing for Smart Communications, including personal guarantees that Alexis Logan and Jim Logan gave—but not Jon Logan:

> The debt? I borrowed over 200k from grandpa and thru [sic] it in the pot in addition to the 225k we owe the bank. **Your guarantee seems to be absent on those loans.** If I were willing to accept your ridiculous offer which I am not, how would you assume the debt and relief those who have personally guaranteed the loans?
>
> In your email you state you only need my help with the financing. Well no shit! This company is at a critical phase. We are on the edge of great growth and profits. Wednesday I meet with Gateway bank regarding a million dollar line of credit. If you think a pretty smile and a good credit score will get the job done then get out there and get it done. **If you think that I or your sister** will place what little we have on the line for someone who cant stop motherfucking us to further his "idea" you have truly lost your shit.
>
> . . .
>
> The trade show. I was not there but I find it hard to believe all has changed since the Long Beach Show. You once again mention funding. How is this possible? **I know you are aware your sister is the guarantor on the loans. Two weeks ago you threatened to kill her!Do you really expect people you threaten to kill to pledge their assets for your business ventures?**

[Ex. 8121].

Over the years, there are other emails that irrefutably demonstrate Jon Logan had concurrent knowledge of inflows into, and outflows from, Smart Communications. From a **May 21,2018**, email, Jon Logan wrote to both Jim Logan and Alexis Logan:

- "Alexis is still living off this company taking funds";

- "you fund her life and lifestyle";

- "she is freeloading off this company and taking funds";

- "You two have fucked me harder than any stranger ever has".

(Ex. 8003).

From a **December 25, 2018**, email, Jon Logan wrote Jim Logan:

- "Do not dare ever being [sic] Alexis into my business ever again!"

- "Get that low life fucking mooch so far away from me and my business and my employees, she is not allowed near that fucking building."

(Ex. 8004).

From a **March 21, 2019**, email, Jon Logan wrote Alexis Logan and another person:

- "Alexis, you transferred $20k to yourself out of my business."

- "You both [Alexis Logan and Jim Logan] have blank checks belonging to my business you use at your own will without my permission."

- "You stealing from my company is causing me not to be able to pay our employees."

- "You ignorant fool. I have over $350k in bills I have to pay and I have $400k in new equipment I have to order right now this month. Yet you wire transfer money out of my business to yourself."

(Ex. 8005).

Not only did Jon Logan disavow knowledge of financial activity within Smart Communications, he in his personal lawsuit, through Smart Communications, and through HLFIP, alleged that his father was stealing from Jon Logan, and otherwise breaching fiduciary duties. In many cases, the basis of the alleged fiduciary duty was the fact that Jim Logan was Jon Logan's father!

The documentary evidence, though, indicates that for at least a decade Jon Logan knew about how he and Jim Logan were handling Smart Communications' finances. And Jon Logan knew about some of the very expenditures he now complains about. If Jon Logan's email statements to his family are to be believed, Jon Logan almost a decade ago should have acted to address his concerns.

The reality is, and the Court finds as fact, that Jon Logan knew exactly what was occurring in Smart Communications during Jim Logan's life, including its financial situation. Jon Logan and Jim Logan agreed that each were entitled to withdraw funds from Smart Communications, and the other shareholder knew it and knew when it was done. As a 50% shareholder, chief executive officer, and director, Jon Logan had full access to Smart Communication's books and records. Additionally, for at least the last decade, he also has had passwords to the bank accounts. Jon Logan's testimony that Jim Logan hid financial matters from Jon Logan is not credible.

Instead of accepting responsibility for his personal role, though Jon Logan seeks to fault his father under themes of breach of fiduciary duty, corporate mismanagement, and related concepts. Jon Logan also complains about not documenting the shareholders' expectations and limitations of authority. But Jon Logan cannot plausibly visit on his father Jon Logan's failure to do so when Jon Logan knew in real time how both Jon Logan and Jim Logan were handling expenditures.

Another major theme of Jon Logan's testimony visibly at odds with the documentary and other evidence is his contention that Alexis Logan provided no meaningful service to Smart Communications. The Court understands that brother and sister do not get along. At all. But the testimony concerning Alexis Logan's alleged lack of involvement is stunning.

Alexis Logan graduated law school in 2006 and began her career as an Assistant Public Defender in Hillsborough County, Florida. A couple of years later, she opened her own law firm, the Law Office of Alexis K. Logan, PLLC ("Law Office"). She also was involved, both early on and during the development of the inmate communication concept. In fact, part of the original inmate communication concept occurred based on Alexis Logan's work as a Public Defender going into jails to speak to her clients. Like Jon Logan and Jim Logan, she was not paid in the early days.

In 2009, when the jail communications concept was first developed by Jon Logan and Jim Logan, Jim Logan asked Alexis Logan for help develop the concept. (At this time, Smart Communications was not formed; Alexis Logan would form it in December 2014). This was done with Jon Logan's begrudging knowledge. Alexis Logan assisted her father with administrative tasks. She performed legal services. And she provided independent executive type services for her father, including conducting industry and market research. She acquired insurance and necessary bonds for work in various jails. As the concept grew, so did her involvement.

Alexis Logan also opened bank accounts and, critically, personally guaranteed Smart Communication's bank debt. She delivered valuable personal items as collateral that the bank

held. She also personally guaranteed Smart Communications' credit cards, sometimes where there were charges exceeding $150,000 a month.

Jon Logan did not have creditworthiness and did not provide any personal guarantee for almost the entire first decade. Alexis Logan remained as a personal guarantor of the American Express card during this litigation, even though Jon Logan was causing Smart Communications to sue her. In mid-2023, Alexis Logan terminated Smart Communications' ability to use the American Express backed by her, which annoyed Jon Logan greatly.

Relating to legal services, Alexis Logan incorporated the first Smart entity in 2010. She incorporated Smart Communications Holding, Inc. in December 2014, and she formed the other Smart entities, too. She also formed the original HLFIP entity. She drafted legal memoranda analyzing potential risks of new product offerings. She monitored lawsuits and communicated with outside counsel and provided typical in-house counsel type work. Alexis Logan also assisted with hiring Smart Communications Holdings, Inc.'s current in-house attorney, David Gann. As there was no guarantee that the business would be successful, especially in the early days, she was not asked to, and she did not keep time records relating to her work as an attorney.

Jon Logan knew of Alexis Logan's involvement from the beginning. Given Jon Logan's legal troubles and Jim Logan's IRS troubles, early on Alexis Logan was asked to hold legal title of the stock in her name. And she did. This was a continuing source of frustration to Jon Logan, who believed that Alexis Logan was taking "his" company from him. In fact, he continually complained that she would not return "his" stock to him.

Further to Jon Logan's knowledge of Alexis Logan's involvement, the April 26, 2015, email quoted above demonstrates her involvement. There are other examples of Jon Logan's knowledge of Alexis Logan's corporate involvement, too. From a December 19, 2016, email, Jon Logan wrote to Jim Logan:

- "Fucking stop involving her lazy ass";

- "time and time again [you] keep injecting her into my business";

- "IF YOU THINK OF HER NAME AND THIS BUSINESS…JUST STOP!!!!!!!!!!"

(Ex. 8002).

From a May 21, 2018, email, Jon Logan wrote to both Jim Logan and Alexis Logan:

- "Alexis is still living off this company taking funds";

- "you fund her life and lifestyle";

- "she is freeloading off this company and taking funds";

- "You two have fucked me harder than any stranger ever has".

Page 11 of 49

(Ex. 8003).

From a December 25, 2018, email, Jon Logan wrote Jim Logan:

- "Do not dare ever being [sic] Alexis into my business ever again!"

- "Get that low life fucking mooch so far away from me and my business and my employees, she is not allowed near that fucking building."

(Ex. 8004).

To be fair, Jon Logan did not think that Alexis Logan did a good job with those tasks assigned to her. But doing a poor job (which there is scant credible evidence demonstrating) is different than Jon Logan's position that she was not involved at all. For Jon Logan to say Alexis Logan was not involved simply is wrong. And this can be gleaned simply on documentary evidence. That conflict was further pronounced when viewing Jon Logan's testimony. Mr. Johnson's cross-examination of Jon Logan was highly effective, especially related to Alexis Logan's personal guarantees, as it spotlighted that Jon Logan could not answer simple and direct questions because the answer would require him to acknowledge that her sister helped Smart Communications. That evasiveness in his testimony further undermined his credibility.

The Court finds as fact that Jon Logan had contemporaneous knowledge of Alexis Logan's involvement and, for the most part, those funds flowing to her directly or indirectly. This includes Jon Logan's knowledge that Alexis Logan personally guaranteed bank loans and credit cards and physically surrendered to the bank collateral to secure various loans—all to allow Smart Communications an opportunity to survive and to grow, especially in its earlier years.

During Part 1, Phase 2, the Court found as fact that Jon Logan's spite and animus towards his sister and mother drove decisions, not business judgment. The Court continues with that finding based on Jon Logan's testimony in Part 2, Phase 2.

The Court agrees with the concept advanced by Mr. Johnson that Jim Logan was stuck between his two children. Jon Logan was developing this inmate communication idea. But, given his troubling past, he could not successfully develop the concept. Jim Logan had entrepreneurial talents himself. Jim Logan used those, and he harnessed the talents of both of his children to launch Smart Communications into a successful company.

But because Jon Logan and Alexis Logan did not get along, Jim Logan had to operate as the bridge. All knew it. The Court finds Smart Communications would not have succeeded without Alexis Logan's assistance and creditworthiness.

The Court has dedicated substantial attention to these two themes because they help explain why the Court does not credit Jon Logan's testimony. Credibility is critical here,

especially regarding claims where there is little to no documentary evidence about many of the inflection points in this case.

It comes as no surprise to either side that when it came to withdrawing funds from Smart Communications, neither Jon Logan nor Jim Logan followed corporate best practices. Generally, neither filled out expense reports nor made concurrent written justifications for their withdrawals, whether denominated as a draw, a shareholder's loan, a reimbursement, or simply as a corporate expense. This practice was known by, and approved by, both Jon Logan and Jim Logan. And with Jim Logan unable to provide testimony as to the questioned transactions, in many instances the Court is left with Jon Logan's testimony to support a claim or defense.

Indeed, there are many decisions relating to valuation as well as most of the affirmative claims brought by Jon Logan, Smart Communications, or HLFIP against Janice Logan, the Trustee, the Personal Representative, Alexis Logan, or her husband Justin Peterson that rest in part on Jon Logan's testimony. And that foundation is shaky.

Further, as demonstrated by the evidence, Jon Logan at every turn in this case has taken action to either eliminate or substantially minimize the value of the Trustee's shares. The exorbitant "legal spend" in this case is, in part, directly tied to Jon Logan's actions, not Jim Logan's actions.

The Court will now turn to its analysis. But the Court will make other factual findings throughout this Order, especially when addressing specific claims.

## 3.
## ANALYSIS

The main issue in this portion of Part 2, Phase 2 trial involves the determination of fair value for the Trustee's 50% interest in Smart Communications Holding, Inc., a Florida entity, as of August 28, 2023.

For ease of reference, the Court will refer to Smart Communications Holding, **Inc.** and its related entities as "Smart Communications." As a reminder, effective August 29, 2023, Jon Logan caused the creation of Smart Communications Holding, **LLC**, a Delaware entity, along with a host of other entities. It was on August 29, 2023, that Jon Logan then executed the massive corporate restructuring, with assets being transferred between entities. As the Court established valuation on August 28, 2023, the Court for valuation purposes can disregard the corporate restructuring and related transfers occurring without value.

When the Court addresses payment terms and security, the Court may need to more directly address the corporate restructuring.

On paper, the Court's valuation assignment is simple. Knowing precisely what is being tried, though, is more nuanced as the parties have raised many claims. A good number of the Trustee's affirmative claims will be subsumed within the analysis of valuation, as those claims

will not survive the valuation process. Some claims against the Trustee, Personal Representative, and Janice Logan remain, but any damages will be addressed as setoff to the valuation of the Trustee's share ownership. There are other claims against Alexis Logan and Justin Peterson that could result in a money judgment. Finally, a few claims were not addressed during Part 2, Phase 2 trial, and the Court presumes they will be severed to allow entry of a final judgment.

The Court first addresses valuation and those claims that will be subsumed within the valuation of Smart Communications.

### A.
### INTRODUCTION TO VALUATION

The valuation of Smart Communications Holdings, Inc. is formally pled within the Trustee's Second Amended Verified Complaint [DIN 680]. The defendants in that case include Jon Logan; Smart Communications Holding, LLC; HLFIP Holding, Inc.; HLFIP Holding, LLC; Smart Communications Yacht Holding, LLC; and Loco Florida, LLC. The Trustee included Smart Communications Holding, Inc., the entity being valued, as a nominal defendant.

There is a separate affirmative pleading that impacts valuation. That is contained within the Trustee's Second Amended Answer with Counterclaims [DIN 775]. In that pleading, the Trustee sued Jon Logan; Smart Communications Holdings, Inc.; Smart Communications Holding, LLC; HLFIP Holding, Inc.; and HLFIP Holding, LLC.

Based on the parties' joint filing dated October 1, 2025, entitled "Joint Notice of Filing Regarding Survival of Claims Post-Valuation," the parties agreed certain claims would not survive the Court's valuation. The discussion of those claims, if any discussion is necessary, will occur within Section C involving valuation. Before addressing valuation, though, the Court must address the issue of royalty.

### B.
### LICENSE/ROYALTY ISSUE

A component that impacts Smart Communications' valuation is the application, if any, of a commercially reasonable royalty for an exclusive license to MailGuard and MailGuardLegal intellectual property. For ease of reference, the Court will simply refer to these products as MailGuard.

Recall the Court made several factual findings and conclusions during Part 1, Phase 2 of the trial relating to license/royalty issue. Those findings included:

- Jon Logan's testimony concerning a true-up or valuation for payment to HLFIP was not credible. [DIN 1189, p. 2, ¶6]

- There was no agreement between Jon Logan and James Logan for a future true-up or valuation for payment to HLFIP by Smart Communications relating to Smart Communications' use of intellectual property.

- Jon Logan's actions on behalf of Smart Communications of signing the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the first-time recognition of a long-term liability relating to the purported 40% royalty due HLFIP from Smart Communications as described in footnote I of Smart Communications Consolidated Audited Financial Statements (for year end 2022) constituted "director's conflict of interest transactions" within the meaning of section 607.0832.

- Jon Logan failed to prove the fairness of those transactions, and the Trustee proved those transactions were not fair to Smart Communications.

- The Court invalidated both the Exclusive Intercompany Intellectual Property License and the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I that was based on the Exclusive Intercompany Intellectual Property License.

Nothing in Part 2, Phase 2 causes the Court to alter those factual findings. The Court continues with those findings.

Adding the evidence from Part 2, Phase 2, the Court notes there was no factual dispute raised that Jon Logan originally owned the idea that became MailGuard and MailGuard Legal. (For ease of reference, the Court will simply state "MailGuard"). Further, there was no factual dispute raised that HLFIP currently owns the MailGuard intellectual property, however denominated (such as patents and trademarks). Jon Logan transferred the MailGuard intellectual property into HLFIP, an entity that Jon Logan owns 100%.

For purposes of this valuation trial, MailGuard is the only intellectual property that Jon Logan, HLFIP, and Smart Communications sought to apply any value or royalty. That is not surprising.

In April 2015, Jon Logan sent an email that Jon Logan intended to be a contract relating to intellectual property associated with "postal mail contraband elimination system." In fact, that phrase or a derivative of that phrase was used three times. The "postal mail contraband elimination system" is MailGuard.

The contract also references three additional times "this service invention" or "this service, model, business plan, or technology." This email contract indicates that Jon Logan would "exclusively own[] and will retain exclusive ownership of this service invention . . . ."

Jim Logan signed the email. In May 2015, Alexis Logan (then holding legal title to Smart Communications' shares) also signed, and she annotated "For new technology/patent/new IP

only." Alexis Logan was not convinced this was patentable, and she wanted to ensure Smart Communications' existing intellectual property remained in Smart Communications' possession.

From a factual standpoint, the Court finds this contract applies to the MailGuard intellectual property only. Because the parties only sought to value the MailGuard intellectual property, the Court will focus on that intellectual property.

The Court finds that beginning in 2016 through the date of valuation (August 23, 2023), Smart Communications used the MailGuard intellectual property. The known practice to both Jon Logan and Jim Logan during his life was that Smart Communications paid for all engineering and development costs as well as all costs associated with securing and enforcing HLFIP intellectual property. Smart Communications also assumed all business risks associated with the MailGuard intellectual property. For the time-period 2019-2023 (thus excluding 2015-2018), Smart Communications paid at least $4.8 million on behalf of HLFIP relating to this intellectual property. Smart Communications, though, did not separately pay to HLFIP an amount for a royalty, as Smart Communications was paying all of HLFIP's expenses.

The three main experts addressing the royalty issue were Dr. Sean Sheridan, Ph.D. and Mr. Mark Schuelte, for HLFIP, and Dr. Louis Berneman, Ed.D., for the Trustee. The Court credits Dr. Berneman's testimony in most respects.

Before diving deeper, the Court notes the intellectual property experts on both sides generally agreed on a basic formula to determine a commercially reasonable royalty. The Court finds this formula to be appropriate in this case. That formula is:

**(Royalty Rate  x  Royalty Base)  -  Deductions  =  Royalty**

The experts, though, disagree on the values to input into that formula. The Court will next address each component of this formula to address the ultimate royalty in this case.

### 1.   *Royalty Rate.*

Dr. Berneman's main conclusion is that no additional compensation obligation is due HLFIP from Smart Communications for the use of the HLFIP intellectual property. Dr. Berneman arrived at this by way of Smart Communication's payment of engineering and development costs, securing and enforcing HLFIP IP, and assuming all business risks. For instance, Dr. Berneman pointed to the $4.8 million paid on behalf of HLFIP between 2019-2023. (Again, this excludes costs Smart Communications paid between 2015-2018.)

Alternatively, Dr. Berneman testified based on comparable agreements that if a royalty rate needed to be applied, a commercially reasonably Royalty Rate would be between 2% to 5%, but in this case should be no more than 2%.

Dr. Sheridan, one of HLFIP's experts, testified that a reasonable Royalty Rate based on comparable agreements would be 10% to 17% of net revenue from accounts in which MailGuard services are provided. Mr. Schuelte, another HLFIP expert, testified that a reasonable royalty rate

from comparable agreements would be between 13.5% to 50%, with a 34% median of the interquartile range of other agreements he selected as comparison.

In review of the experts' testimony based on the underlying facts and data in this case, the Court finds Dr. Berneman's analysis and selection of comparable situations to be the most realistic and persuasive. The Court, though, cannot agree that the bottom of his range is appropriate. Instead, the Court finds the top of Dr. Berneman's range—5%—to be appropriate under the facts of this case.

The Court finds that **5%** is the proper commercially reasonable Royalty Rate for Smart Communications to pay HLFIP for an exclusive license for the use of HLFIP's intellectual property.

### 2. *Royalty Base.*

HLFIP expert Dr. Sheridan testified as to Royalty Base. HLFIP's other expert, Mr. Schuelte, did not express an opinion as to the Royalty Base.

Dr. Sheridan testified by implication that the Royalty Base should be 81% of Smart Communications' revenues. Dr. Sheridan derived that percentage by using the percentage of facilities in 2023 that deploy the MailGuard product because, with exception of the Commonwealth of Pennsylvania's contract, none of the other facility contracts provides for a quantifiable revenue component for the MailGuard service. The reality is MailGuard is one of multiple services provided by Smart Communications to a facility.

Dr. Sheridan testified that the number of Smart Communications' serviced facilities receiving MailGuard services increased from 1% in 2016 to 81% by 2023. He also explained that after implementation of MailGuard in a facility, the average messages per inmate per day increased from 1.37 to 1.77, resulting in an increase of daily message revenue per inmate from $0.69 to $0.89. Just from messages, then, Smart Communications saw a 29% increase in revenue, which Dr. Sheridan attributes to MailGuard.

To get to his 81% opinion, though, Dr. Sheridan assumed that "MailGuard is required to get these contracts." (Trans. 1104-1105). In other words, Dr. Sheridan attributed 100% of all revenue from a facility that uses MailGuard as resulting from, and attributable too, the MailGuard intellectual property.

Dr. Sheridan testified that between 2016—the first year in which MailGuard was introduced—and the August 2023 valuation date, Smart Communications' revenue associated with the MailGuard product was $137.3 million. Using math, the Court notes that $137.3M is 81% of Smart Communications' total revenue of $169.5M from the beginning of the first contract involving MailGuard product until the valuation date. (Expressed as a formula: $169.5M = $137.3M ÷ 0.81) Separately, Mr. Sly testified the revenues from January 2016 to valuation date were $167.7M.

On cross-examination, Dr. Sheridan conceded that he did not exclude revenues that appear to derive from other technology such as the Lattice intellectual property Smart Communications acquired and owned (meaning, not HLFIP ownership). The evidence demonstrates that Smart Communications (not HLFIP) purchased Lattice technology related to telephone-related services and SmartEvo ITS. Like MailGuard, that technology also drives Smart Communications revenues.

Dr. Sheridan also conceded that there are revenue streams for other Smart Communications' products, such as photo income, entertainments, visitation income, and commissary transfer credits, all of which are outside the MailGuard technology. Despite those revenue drivers, Dr. Sheridan simply assumed *all revenue* in a facility offering MailGuard existed because, without MailGuard, Smart Communications would not have the contract.

The Trustee and the Trustee's expert Dr. Berneman criticized the use of 81% of facilities using MailGuard as a valid proxy for the royalty base. Dr. Berneman explained that there is no nexus or linkage between MailGuard and the claimed 81% royalty base. Dr. Berneman, though, did not offer a competing model.

The Court simply cannot agree—nor can the Court find—that 100% of the revenues derived from a facility that has MailGuard as a service are attributable to the MailGuard intellectual property. There was credible testimony that some facilities were more focused on telephone-based services and did not care whether it had MailGuard or not. Having said that, the Court agrees with the testimony of Chief Allen from Polk County, who is a long-term director of a jail and whose testimony the Court placed great weight, that the MailGuard product is an important, attractive, and value-added component of the suite of products Smart Communications offers.

In the Court's review of the financials, the various suite of Smart Communications products, the commission rates, the exhibits, testimony of fact and expert witnesses, the Court agrees generally that using facilities that utilize the MailGuard service is a sufficient proxy to determine Royalty Base. The Court finds use of this proxy provides sufficient linkage and is not too speculative. As noted above, though, the Court cannot find 100% of all revenues from a facility utilizing MailGuard is appropriate to attribute to the MailGuard intellectual property. Instead, the Court finds a very healthy percentage of those revenues generated from facilities using the MailGuard service—50%—is appropriate as part of the Royalty Base calculation.

The Court pauses to note that if the Court is in error in using the 81% facilities that has MailGuard because it is too speculative, the Court would note that Smart Communications and HLFIP presented no other means for the Court to calculate the Royalty Base. The only exception is the Commonwealth of Pennsylvania contract, which 100% of the revenue from that contract is due to MailGuard. Thus, if the Court were in error in using 81% of facilities using MailGuard, then the Court would alternatively only be able to find 100% of the revenues from the Commonwealth of Pennsylvania to form the basis of the Royalty Base. Having made that alternative finding, the Court returns to its primary finding.

The Royalty Base is 50% multiplied by 81.00% (percentage of facilities using MailGuard), which equals 40.5% of Smart Communications' net revenues.

The Court finds that **40.5%** of Smart Communications' net revenue is the proper Royalty Base.

### 3.    *Deductions.*

The parties disagree with how to apply deductions, if any, to the royalty formula. Recall that Smart Communications paid at least $4.8 million on behalf of HLFIP between 2019 and the 2023 valuation date. The Court first addresses deductions prior to the valuation date. The Court then addresses deductions after the valuation date.

Dr. Sheridan opined there were $137.3M in net Smart Communications revenues to which the Royalty Rate would apply. As explained above, $137.3M constituted 81% of Smart Communications' net revenues between 2016-2023. Applying math tells us this means Smart Communications' total net revenue for this period is $169.5M. (169.5M = $137.3M ÷ 0.81).

The Court will use this $169.5M net revenue amount, even though it slightly overstates the revenue because it appears Dr. Sheridan used revenue that went through December 31, 2023, not August 28, 2023. In this case, though, that difference is not material.

For the period before August 28, 2023, the Court first applies the 40.5% the total net revenue of $169.5M, resulting in a Royalty Base of $68.6475M. The Court then multiplies that Royal Base by 5%, the Royalty Rate. The product of these amounts is $3.432M, rounded to **$3.4M.**

In other words, applying the commercially appropriate **5%** royalty rate to **40.5%** of all net revenue would mean that Smart Communications would owe HLFIP **$3.4M** for 2016-August 28, 2023.

Smart Communications, though, paid at least **$4.8M** on behalf of HLFIP between 2019 and 2023. Obviously, this excludes those costs paid by Smart Communications on behalf of HLFIP prior to 2019. $4.8M paid by Smart Communications exceeds $3.4M due HLFIP. ***In other words, there is no further royalty due HLFIP for Smart Communications' use of HLFIP's/Jon Logan's intellectual property under the exclusive license through August 28, 2023.***

Because the Court previously found that the Smart Communications shareholders never agreed to a true-up relating to the royalty, the Court will not apply the difference in determining value. The Smart Communications shareholders tacitly agreed to pay those costs on behalf of HLFIP. The Court, therefore, does not need to address further the question of royalty through August 28, 2023.

The Court will address the proper discounted cash flow Royalty amount in the Valuation section. ***It should be noted that because the value of Smart Communications is being impacted***

*by the application of the Royalty, it would be highly inequitable if Smart Communications continued paying all expenses of HLFIP in any amount above what would otherwise be due HLFIP. This includes HLFIP's attorney fees in this proceeding. This will need to be addressed in the security of payment of the value of the Trustee's shares, and consideration should be given whether these expenditures should actually be characterized as shareholder loans to Jon Logan.*

That leaves only the issue of Deductions that will apply, if any, in the formula. As found as fact, the Smart Communications' shareholders agreed that Smart Communications would fund the development of HLFIP's intellectual property. Based on that factual finding, the Court concludes there will be no Deductions applied on the formula associated with the intellectual property.

## C.
## VALUATION OF
## SMART COMMUNICATIONS HOLDING, INC.
## AS OF AUGUST 28, 2023

To say the parties have wildly different valuations of Smart Communications in this case would be the understatement of the year.

### 1.    *The approaches.*

There were two experts addressing value. Both generally used a sum-of-the-parts approach by separately valuing the operating assets using a discounted cash flow to present value and then adding in nonoperating assets. Despite that similarity, each expert included multiple different assumptions, with each assumption impacting the ultimate value.

Jon Logan and Smart Communications' expert, Robert Sly, testified that the value of the Trustee's shares on August 28, 2023, was $1.2M, after applying a 10% royalty consistent with Dr. Sheridan's analysis. Mr. Sly's opinion of the Trustee's share value without application of the royalty was $7.1M.

Mr. Sly testified that Smart Communication's value on a "marketable, control basis" as of August 28, 2023, was $20.2M. He then applied a 12% discount for "lack of control," resulting in a value of $17.8M. He then applied a 20% reduction to this amount for "lack of marketability," resulting in a value of $14.2M. From that number, Mr. Sly derived the Trustee's 50% value as $7.1M.

The Trustee's expert, Mark Berberian utilized two separate models. The difference of those models involved forecasts of the effect of then unknown but impending regulations the FCC would be issuing associated with the Martha Wright-Reed Act that was then known or knowable. Mr. Berberian's Model 1 assumed a more benign impact of regulations from Smart Communication's perspective. His Model 2 assumed a more negative impact on Smart

Communications' profitability based on those future regulations, again, from Smart Communications' perspective.

Mr. Berberian testified the value of the Trustee's shares on August 28, 2023, was $65.3M under Model 1, and $51.9M under Model 2. Mr. Berberian did not apply either a lack of control or lack of marketability reductions. Further, and initially, Mr. Berberian did not include any royalty, assuming Dr. Berneman's no further royalty position was correct. Based on a question by the Court concerning the application of a royalty, Mr. Berberian created a dynamic model that would allow the user of his dynamic model to input the determined Royalty Rate and Royalty Base into his model that would then result, based on Mr. Berberian's methodology, the value of Trustee's shares (again, otherwise assuming the validity of Mr. Berberian's model).

As the Court permitted Mr. Berberian to create a dynamic model, the Court permitted Mr. Sly to do the same as well, and he did so. In fact, Mr. Sly's dynamic model allowed additional inputs. Both Mr. Berberian and Mr. Sly reviewed the other's dynamic models and testified as to those dynamic models.

The Court appreciates the additional effort by the experts. Their efforts in this regard was most helpful to the Court.

### 2. *The Court credits Mr. Berberian's opinion of value.*

Overall, the Court credits Mr. Berberian's approach. From his two models, the Court primarily agrees with Model 2. The Court found Mr. Berberian's selection of inputs and explanations why he selected what he did to be more plausible and appropriate in this case. The Court also found Mr. Berberian's evaluation of the financials of Smart Communications as well as the known comments to the FCC and potential development of regulations authorized by the Martha Wright-Reed Act to be by far the most credible. The Court also was impressed with how forthrightly Mr. Berberian handled cross-examination demonstrating potential weaknesses of certain of his assumptions.

The Court is aware of some criticism that Mr. Berberian's Model 2 looked at news stories after the valuation date to assist with what was known or knowable as of August 28, 2023. But the Court credits Mr. Berberian's explanation that those news story show what was being anticipated about the regulations in August 2023. Further, the Court notes that Mr. Berberian based his assumptions on filed comments to the FCC concerning potential Martha Wright-Reed regulations that *predated* the August 28, 2023, valuation date.

The Court continues to agree with Model 2, with some tweaks discussed below. The Court pauses to note that if the Court were in error on basing its decision on Mr. Berberian's Model 2, this does not mean the Court would then agree with Mr. Sly. Instead, the Court would revert to Mr. Berberian's Model 1.

### 3. *Are reductions appropriate?*

The experts disagree on the application of reductions to the overall value of the Trustee's shares. The two reductions the experts disagreed with involve lack of control and lack of marketability.

Mr. Berberian determined there should be no reduction for lack of control applied in this case. In contrast, Mr. Sly testified there should be a 12% reduction. Both Jon Logan and the Trustee own 50%. While Jon Logan may be incumbent management, as a shareholder he does not control Smart Communications. Yet, the net effect of Smart Communications purchasing the Trustee's 50% interest will result in Jon Logan with 100% control over Smart Communication. (Perhaps the argument that the Trustee's 50% shares will become treasury shares is plausible, but the net effect of the purchase of the Trustee's shares is Jon Logan will exercise total control over Smart Communications.) In other words, the reality of this transaction is that Jon Logan is purchasing control, and those purchasing control normally pay a control premium. The Court credits Mr. Berberian's discussion concerning the nature of the transaction and the acquisition of control by Jon Logan as a justifiable basis not to include a reduction for lack of control to the value of the Trustee's shares.

The Court in a separate valuation case determined that reductions for such items as lack of control or marketability are discretionary based on the facts of each case. SMG Companies Holdings, LLC v. Matthes, 2021-CA-5092 (Fla. 12th Jud. Cir. Ct. Jan. 9, 2023). The Court based that holding on review of cases including Cox Enterprises, Inc. v. News-Journal Corp., 469 F. Supp. 2d 1094, 1108 (M.D. Fla. June 30, 2006); Munshower v. Kolbenheyer, 732 So. 2d 385, 386 (Fla. 3d DCA 1999); Erp v. Erp, 976 So. 2d 1234, 1237-1240 (Fla. 2d DCA 2008); and Agnelli v. Lennox Miami Corp., 2022 WL 2788875 (S.D. Fla. July 15, 2022). The Court continues to conclude that it has the discretion whether to apply one or more reductions based on the unique facts of each case.

The Court agrees with Mr. Berberian that under the facts of this case there should be no reduction based on "lack of control." The Court, therefore, in its discretion will not apply a lack of control reduction.

The closer question for the Court is whether to apply a lack of marketability reduction in this case. Admittedly, this was the Court's most difficult decision it made in Part 2, Phase 2, and the decision the Court struggled with the most.

Mr. Sly contends the Court should apply a 20% reduction to the enterprise value to reflect that as a private, closely held company it will take longer and require more money to sell it. Mr. Berberian testified that no reduction should apply because there is a willing buyer as evidenced by the statutory notice of election to purchase.

As the Second District discussed in a dissolution of marriage case a situation involving corporate deadlock:

> There admittedly is a significant debate about when marketability discounts are appropriate in any proceeding requiring the valuation of a closely held corporation. It seems that the debate is sometimes led astray

by the application of broad generalizations that do not differentiate
between the types of proceedings within which valuations are required,
nor acknowledge that the appropriate analysis for the valuation of a
business may change depending upon the specific legal and factual context
presented. What is appropriate in the oppressed shareholder or minority
appraisal rights cases may not necessarily be desirable in a judicial
dissolution of a corporation or in an action for dissolution of marriage
involving equitable distribution.

In the context of judicial dissolution of corporations, the context
perhaps most analogous to the scenario presented in this particular action
for dissolution of marriage, Florida courts have generally accorded
discretion to the trial court to determine, based upon the evidence and
circumstances presented, whether a marketability discount should be
applied in the valuation of a closely held corporation.

Erp v. Erp, 976 So. 2d 1234, 1239 (Fla. 2d DCA 2008) (internal citations omitted). In other
words, the Court has discretion.

Here, the Court cannot totally agree with Mr. Berberian's analysis on this point because,
taken literally, there always is a willing buyer due to the statutory election of purchase. If that
position were correct, it would seem the Court should never exercise any discretion in applying a
reduction for lack of marketability because the election must be made to trigger the valuation
process. That position is at odds with case law providing the Court with discretion.

The Third District in Munshower concluded the trial court in its discretion may properly
consider a lack of marketability reduction. 732 So. 2d at 386 (explaining the "discount for lack of
marketability is properly factored into the equation because the shares of a closely held
corporation cannot be readily sold on a public market."). The Middle District in Cox, cited to
Munshower, and found on the facts of that case no lack of marketability discount would be
applied. In Cox, Judge Antoon found there was no reliable methodology had been provided to
the court to apply, which is why the court declined to apply one in that case. 469 F. Supp. 2d at
1108-1109.

In the current case, there is evidence that Smart Communications is not the only company
in the jail inmate communication space. In fact, Smart Communications believes itself to be one
of the smaller competitors. And we know Smart Communications holds valuable contracts with
many jail and prison institutions throughout the country, which contracts produce a reliable and
growing revenue stream. During Jim Logan's life, Jon Logan and Jim Logan discussed Smart
Communications as a potential acquisition target with merger and acquisition specialists at UBS
and Truist. This evidence suggests that Smart Communications could one day be acquired.

Mr. Sly testified that he based his 20% determination on two separate methodologies.
First, he relied on the Stout restricted stock study, in which Mr. Sly testified, measures an
implied discount on restricted stock to fully marketable stock. That delta, according to Mr. Sly, is
19.8%. There was no determination, though, whether the restricted stock were from companies

functionally equivalent or otherwise an appropriate comparison. Instead, this appears to run directly into Judge Antoon's criticism in <u>Cox</u> that a generic contention that shares of a closely held corporation are less liquid, and therefore less marketable than shares of a publicly traded corporation, as justification to apply this reduction. 469 F. Supp. 2d at 1108.

Mr. Sly also testified that he used a Quantitative Marketability Discount Study that is based on using an income approach. The QMDM amount was between 21.3% to 31.7%. Of course, Mr. Sly's opinion of the value of Smart Communications using an income approach was **negative $12.4M**, with the Trustee's value of her shares as a **negative $6.2M**—this is *before* the application of any lack of marketability discount! Mr. Sly rejected the use of the income approach for valuation purposes given that it resulted in no value. Reliance on the QMDM based on an income approach under this circumstance is dubious at best. The Court cannot credit that approach in this case.

Mr. Sly made a further comment concerning the lack of marketability that continues to bother the Court:

> Q. What else did you consider in estimating a discount for lack of marketability?
>
> A. Well, I considered the fact that SmartComm is a closely-held entity. So if they were to sell a 50% interest or they were to sell even 100 percent interest, that would take a lot of time and a lot of money to sell.

(Trans. 1387).

The Court sees no principled basis, explanation, or foundation for this statement. This is nothing tying "a lot of time" or "a lot of money" to the realities of this company. Again, Smart Communications is a smaller player in the existing inmate communication space, with valuable contracts. In other words, there are existing players that makes Smart Communications a potential acquisition target.

The Court specifically rejects Mr. Sly's conclusion that a 20% reduction is appropriate here under these facts. With respect to the restricted stock study, there simply is no credible evidence that the implied value of restricted stock sales has any connectively to the facts and circumstances of this case. With respect to the QMDM based on an income approach, Mr. Sly rejected his own income approach due to the nonsensical negative value of Smart Communications as an enterprise, even before the application of a reduction. The Court, too, dismisses this opinion based on an income approach as not credible.

Having said all of that, the Court believes there should be some recognition of a lack of marketability. But it is nowhere close to 20%, and the Court has no credible evidence suggesting it is. Instead, under the facts of this case, the Court finds that a 5% reduction to the enterprise value is appropriate. The Court believes that, with existing valuable contracts, being a smaller player in the inmate communication space, and prior favorable consideration by merger and

acquisition bankers, Smart Communications would be a viable target for acquisition. The Court acknowledges that out of all rulings made in this Order, though, the Court has the least confidence in this determination because this percentage is not firmly rooted in expert testimony (although it is between the range set by the two experts). Instead, it is based on the Court's assessment of all evidence in the case.

If the Court were in error at 5%, the Court would follow Judge Antoon's lead in Cox and find that Smart Communications failed to supply the Court with credible tools to evaluate a lack of marketability discount and therefore would not apply one. Again, though, that is an alternative ruling only if the Court is in error in its application of a 5% lack of marketability reduction.

### 4.    *Nonoperating assets.*

The parties spent much time discussing how Jon Logan and Jim Logan decided to run Smart Communications. Included in this discussion involved the acquisition of several valuable nonoperating assets. At trial, much attention was spent on the various claims of unjust enrichment, conversion, breach of fiduciary duty, fraudulent transfer, director liability, conspiracy, and related theories. The Court as part of the valuation does not need to address each claim; however, the Court's discussion will be informed by those claims that do not survive valuation.

Before proceeding further, the Court agrees with the values Mr. Berberian assigned to nonoperating assets as of the date of valuation. Thus, the Court will not get into a discussion of competing valuation of each of those nonoperating assets. Instead, the focus will be on whether to include it within Smart Communications' assets and its disposition. The answer for these nonoperating assets is yes. The Court included them as presented by Mr. Berberian.

#### a.
#### Homes and Condominium

On the valuation date, Smart Communications owned two homes and one condominium. Those properties are the Tierra Verde home on the water in Pinellas County, valued at $4,060,333; the Ranch Club home in Sarasota, valued at $2,591,000; and the Brickell Avenue condominium in Miami-Dade County, valued at $1,882,667. The Brickell Avenue condominium has since been sold with a small gain, and those sale proceeds were deposited into Smart Communications accounts. The Court finds all three of these homes are appropriately valued and includable as Smart Communications assets as of August 28, 2023.

Jon Logan and Jim Logan agreed that the company would pay for a home for each. At all relevant times, Jon Logan lived in the Tierra Verde waterfront home, and he continues to live there today. Jim Logan and Janice Logan lived in the Ranch Club home, although there were times he stayed elsewhere. Janice Logan today continues to live in the Ranch Club home. Smart Communications paid all expenses with the upkeep and repair of both home.

Based on the practice of Jon Logan and Jim Logan, the Court will not require any adjusting entries relating to their personal use (and the Trustee's use) of either the Tierra Verde

or Ranch Club home through August 28, 2023. Each shareholder will be allowed to receive the home. For all expenses for those two homes occurring *after* August 28, 2023, they will be the responsibility of each shareholder.

The Trustee at her election within 30 days of the entry of final judgment may require Smart Communications to distribute the Ranch Club to her. This election will reduce the amount Smart Communications owes the Trustee by $2,591,000. Regardless of whether the Trustee elects to receive the Ranch Club home, all expenses that Smart Communications paid for the Ranch Club beginning on August 29, 2023, through the date it deeds ownership to the Trustee (or the date the Trustee moves out and returns possession to Smart Communications) are to be paid by the Trustee to Smart Communications by means of setoff against the value of the shares. The final amount still needs to be calculated. The Court anticipates the parties to address this during the December 19 hearing. (Within this category, the Court also would include those amounts attributable to wrongful injunction, such as the health insurance premiums.)

Jon Logan at his election within 30 days may require Smart Communications to distribute the Tierra Verde to him without further liability to Jon Logan. However, all expenses Smart Communications has paid for the Terrie Verde beginning on August 29, 2023, and continuing will be carried on the books of Smart Communications as a shareholder's loan to Jon Logan. This requirement to categorize as a shareholder's loan any funds Smart Communications expends for upkeep or repair of the Tierra Verde home will remain until Smart Communications completes payment to the Trustee of the value of her shares.

That leaves the Brickell Avenue condominium, paid for by Smart Communications funds. The Court cannot find this condominium to be compensation to Jon Logan. The evidence is that title was transferred back to Smart Communications and sold, with the proceeds being deposited into Smart Communications accounts. Smart Communications already removed reference to a shareholder's loan from Jon Logan's column. No further action is necessary with respect to this already sold condominium. No adjustment is necessary to Mr. Berberian's model.

*b.*
*The Yacht*

Smart Communications purchased a new 2020 100' Riva Corsaro ("the Yacht") for approximately $9.6M. ($5M down; financed $4.6M.) Smart Communications paid the downpayment and pays all debt associated with the Yacht. Smart Communications pays all on-going expenses associated with the Yacht. At the valuation date, the value of the Yacht was $7,950,000, with $4,800,000 in then existing debt. (Since valuation, there has been a restructuring of the debt, but the annual payments for debt service is $1M a year. This is before the first penny is paid to dock the Yacht or its upkeep.)

The Yacht, though, is not titled in Smart Communications' name. The evidence, though, firmly establishes that the Yacht was for Smart Communications' corporate use. In December 2021, Jim Logan wrote in search of financing: "Jon Logan, the President of Smart Communications Holding, Inc. is seeking financing to acquire a yacht for corporate endeavors. In the regular course of business, we bring in clients from around the country to our corporate

office in Florida for training and research purposes. This vessel will aid in the rounding of the total experience." (Ex. 5373). Despite all of this, Smart Communications pays Yacht Holdings rent to allow Smart Communications to use the Yacht occasionally.

There is no credible evidence that the Yacht was to be a personal asset of Jon Logan, however it would be titled.

At a minimum, an action by Smart Communications against Yacht Holding for unjust enrichment would be successful. (The Trustee filed a derivate action against Yacht Holdings and Jon Logan.) The elements of unjust enrichment are:

> An action for unjust enrichment exists to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity. The elements of such a claim are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Essentially, the doctrine operates to imply a contract where none otherwise exists so as to ensure equity between the parties.

Kenf, L.L.C. v. Jabez Restorations, Inc., 303 So. 3d 229, 231 (Fla. 2d DCA 2019) (internal citations and quotations omitted).

Here, Yacht Holding is paying nothing, and Smart Communications is paying everything. It is entirely inequitable for Yacht Holdings to retain the Yacht in its name under these circumstances. In this section, the Court does not need to address a transfer of title to the Yacht, as the Court can simply include the value of the Yacht in Smart Communications' assets. No adjustment is necessary to Mr. Berberian's model due to the Yacht.

The Court notes that because the Court concludes the Trustee would have prevailed on an unjust enrichment claim behalf of Smart Communications relative to the Yacht, the Court does not need to address the other theories raised by Trustee relative to the Yacht.

The Court makes one further observation. The Court will address the Yacht again in the discussion of security for payment of the Trustees' shares. Spoiler alert: the Yacht needs to be sold. (The Court retains the ability under its authority to provide security the ability to direct Smart Communications to pursue Yacht Holdings for return of the Yacht, should it become necessary to do so.)

*c.*
*The Nor-Tech 450 Center Console boat*

Smart Communications also bought a $939,000 Nor-Tech 450 Center Console boat, which is docked at the Tierra Verde home. At the date of valuation, that vessel is worth $887,500.

Page 27 of 49

The Court finds this purchase was not substitute salary for Jon Logan. The vessel belongs to the Company. The Court will include this vessel within Smart Communication's value at the value on the date of the purchase price. No adjustment is necessary to Mr. Berberian's model.

The Court will give Jon Logan 30 days from the entry of the final judgment to elect whether he wishes to purchase this vessel from the Company for the amount identified on the valuation date. If Jon Logan wishes to purchase this vessel, he may do so either in cash or by shareholders loan from the Company. Otherwise, this vessel needs to be sold in a commercial reasonable means at the first opportunity to a bona fide third-party purchaser. At least 50% of those proceeds will be used to reduce the Company's outstanding obligation to the Trustee.

*d.*
*Exotic Cars*

Smart Communications has purchased several exotic cars, which are garaged at the Tierra Verde home and under Jon Logan's exclusive control.

- 2020 Lamborghini Huracan – purchase price $356,931; the value at valuation date $130,000

- 2017 Ferrari 488 Spider $354,990; the value at valuation date $265,000.

- 2015 Rolls Royce Wraith – purchase price $239,579; the value at valuation date $140,000.

The Court finds these purchases were not substitute salary for Jon Logan. The vehicles belong to the Company. The Court will include those nonoperating assets within Smart Communication's value at the value on the date of the purchase price. No adjustment is necessary to Mr. Berberian's model due to the exotic cars.

With respect to the Corvette that went to Jim Logan, the Court notes its reclassification as a shareholder loan by Jim Logan. As the Court is requiring the Trustee to repay the shareholders loan, title to this vehicle can remain in the Trustee or Personal Representative's name, and its ultimately disposition is of no concern to the Court as the Trustee is paying the value for it.

As for the Lamborghini, Ferrari, and Rolls Royce, the Court will give Jon Logan 30 days from the entry of the final judgment to elect whether he wishes to purchase one, two, or all three of those vehicles from the Company for the amount identified on the valuation date. If Jon Logan wishes to purchase those vehicles, he may do so either in cash or by shareholders loan from the Company.

If Jon Logan does not make the election within 30 days, the Court directs the remaining exotic cars to be sold in a commercial reasonable means at the first opportunity to a bona fide third-party purchaser. At least 50% of those proceeds will be used to reduce the Company's outstanding obligation to the Trustee.

*e.*
*Everyday Cars*

Jon Logan daily drives a Land Rover. The Trustee daily drives a Cadillac Escalade. At the option of each shareholder, each shareholder may require the Company to distribute the vehicle they currently drive into their personal possession without further accounting adjustment or payment.

**5.** *__Corporate headquarters building__.*

The Court finds that the source of the $1.4M in funds for Smart Communications' corporate headquarters was Smart Communications. When the building was purchased, it was titled into a separate entity, Loco Florida, LLC, a Florida limited liability company. The Court further finds the ownership structure mirrored Smart Communications—i.e., 50%/50%.

On August 29, 2023, Jon Logan without any knowledge by, or consent of, the Trustee, purported to convert the Florida entity into a Delaware entity.

Mr. Sly's model relating to Loco Florida was that Smart Communications was not entitled to any recovery of the $1.4M purchase price of the building and that Smart Communications was obligated to also pay rent to Loco. Mr. Berberian disagreed with Mr. Sly relating to the value Smart Communications paid for the building. Mr. Berberian credibly explained how Smart Communications should be repaid by Loco Florida for the building cost while at the same time acknowledging rent payments to Loco Florida.

Mr. Berberian's model zeroed out these transactions without having to separately value the Trustee's interest in a receivable from Loco Florida relating to the building expense. Mr. Berberian further credibly testified that "the economics are the same either way." (Trans. 2023). He agreed, though, that use of his model means the Trustee's further ownership claim involving Loco Florida would be extinguished. (Trans. 2023).

The Court agrees with Mr. Berberian's handling of, and accounting for, the corporate headquarters and any receivable Smart Communications has relating to the purchase of the building.

**6.** *__Shareholders loans__.*

As explained above, neither Jon Logan nor Jim Logan were particularly fond of creating paper trails or filling out expense reports. There was much testimony—from both sides—about use of corporate funds for personal reasons. The Court need not detail those, suffice it to say both shareholders took full advantage of the Company, and then some.

The general ledger in many respects is vague with expenditures, and corporate justification is lacking. Not unsurprising, Jon Logan's side presented Joint Exhibit 1, which was an effort lead by Noreen Gunning—Smart Communications Director of Accounting and

Page 29 of 49

Finance—to quantify each shareholder's personal expenditures. Ms. Gunning began with the company in March 2022 as a bookkeeper but after Jim Logan's death took on her current, increased role.

The Court makes clear that most of the general ledger entries occurred before Ms. Gunning's involvement with the Company, and the source information from which she has had to retrospectively recharacterize as personal expenses (shareholder loans) is sparse, if it exists at all. The Court does not criticize her or her efforts. After all, in creating Joint Exhibit 1, she did not have access to Jim Logan due to his death, but she did have access to Jon Logan. This means that any questionable expense, i.e., personal or corporate, she could rely on Jon Logan's explanation. And Jon Logan has done everything in his power to eliminate any perceived value flowing to the Trustee.

It is not surprising, then, that Joint Exhibit 1 shows recharacterized shareholders loans attributable to Jim Logan/the Trustee collectively at $1,339,778.37. And at the same time showing a negligible negative shareholder balance in favor of Jon Logan.

Jim Logan's shareholder loans include such things as the Corvette, the $60,000 Jim then lent to Mr. Peterson, and the significant expenses for Alexis Logan's medical issues.

Again, the Court believes that there are substantial personal expenditures to Jon Logan hidden within the general ledger. Absent a forensic evaluation, the Court is not sure how to meaningfully address this disparity. Even if there were such a forensic evaluation, the absence of contemporaneous records may impact the utility of such an investigation. Regardless, the evidence before the Court is the Trustee has a $1.3M shareholder balance that needs to be addressed in valuation.

There certainly is evidence that the shareholders did not anticipate a true-up as between them. And had Jim Logan still been alive today, the Court suspects we would not be here. But this proceeding is a statutory proceeding to determine the fair value of the Trustee's shares. And the Court does not believe it equitable to excuse the Trustee from paying the shareholder's loans on the Trustee's side of the ledger, even if Jon Logan's personal expenditures as shareholder loans seem to be not readily visible on Smart Communication's books and records.

The Court finds that the **$1.3M** in shareholders loans to the Trustee's side will act as a setoff against the value of the Trustee's shares.

### 7.    *Valuation.*

The Court finds that Mr. Berberian's Model 2 is the appropriate methodology, with certain adjustments.

Mr. Berberian's Model 2 values Smart Communications Holding, Inc. as of August 28, 2023, at **$103,872.668**. This enterprise value does not reflect any royalty reduction for future royalties or reduction for lack of marketability. That would mean the Trustee's 50% share, before reductions, is **$51,936,334**.

Using Mr. Berberian's dynamic model, the Court applied a 40.5% Royalty Base and a 5% Royalty Rate, with the start date of the Royalty on August 28, 2023. (Recall, the Court found no further Royalty was due HLFIP from Smart Communications pre-valuation). This results in a total Royalty reduction of $15,617,750, with the Trustee's portion being $7,808,875.

This results in an adjusted value of Smart Communications Holding, Inc. as of August 28, 2023, as **$88,254,918**. That means the Trustee's 50% share, after Royalty but *before* the lack of marketability reduction, is **$44,127,459**.

The Court, though, determined a 5% lack of marketability reduction should be applied. That reduction is **$2,206,373** to the Trustee's share value. This results in the value of the Trustee's shares in Smart Communications Holding, Inc. as of August 28, 2023, to be **$41,921,086**.

From this number, the Court subtracts the Trustee's combined shareholders loans totally **$1,339,778** from this amount.

**The amount Smart Communications Holding, Inc. owes the Trustee for the value of her shares as of August 28, 2023, is $40,581,308.**

The Court notes that the amount Smart Communications paid since August 28, 2023, relating to the Ranch Club home will need to be setoff from this amount as well as the other amounts from the wrongful injunction. As that amount continues to accrue, if the parties are unable to address that amount during mediation, the Court will address it during the December 19, 2025, hearing.

### 8.    *Attorney fee claim.*

The Court will reserve on the claim for attorney fees and interest until the December 19, 2025, hearing.

Prior to that hearing, the Court requests a targeted memorandum from each side, limited to no more than 10 pages each, discussing the legal authority as well as the evidence supporting or opposing an award of attorney fees and interest relating to a valuation proceeding. The Court is particularly interested in focusing on the authority for attorney fees for the statutory valuation proceeding, together with the limits of that authority. (Specifically, as the judicial dissolution count that led to the statutory election to purchase occurred after Phase 1 trial, does the valuation attorney fee statute authorize fees associated with Phase 1 trial.)

### 9.    *Resolution of claims.*

Having determined the value of the Trustee's shares, the Court notes the disposition of the following claims.

From Janice Logan's (as Trustee) Second Amended Verified Complaint, filed May 29, 2024 [DIN 680]:

- Count 1, relating to intellectual property transactions, will not survive. But the Court will need to enter final judgment relating to Part 1, Phase 2 trial, invalidating the transactions identified in that Order.

- Count 2, relating to the appointment of a Receiver. The Court would like further briefing on this issue. It seems to the Court that under its authority in section 607.1436(5), a remedy the Court retains to ensure security to assure payment of the purchase price is the ability to appoint a receiver, if that is what the Court believes appropriate. At present, the Court does not believe a receiver appropriate but given the acrimonious history and efforts by Jon Logan to avoid payment to the Trustee, the Court does not want to foreclose the ability to appoint one in the future to ensure payment.

- Counts 3, 5-8, 10-12, relating to director liability, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, unjust enrichment, and conversion.

- The parties agree to the involuntary dismissal of Counts 4 and 9. Even if they are not involuntary dismissed, they would not survive valuation.

From Janice Logan (as Trustee) Counterclaims, filed October 2, 2024 [DIN 775]:

- Count 1, relating to malicious prosecution and abuse of process was not tried and remains pending. The parties shall discuss the appropriate way to sever to ensure a final judgment can be entered without delay on everything else.

- Count 2, relating to fraudulent transfers relating to IP transactions, will not survive. But the Court will need to enter final judgment relating to Part 1, Phase 2 trial, invalidating the transactions identified in that Order

- Counts 4-6, relating to breach of fiduciary duty, civil conspiracy, and aiding and abetting breach of fiduciary duty.

- The parties agree to the involuntary dismissal of Count 3.

**D.**
**THE SECOND AMENDED COMPLAINT [DIN 891]**
**FILED BY**

Page 32 of 49

## JON LOGAN AND SMART COMMUNICATIONS HOLDINGS, INC.
### (December 4, 2024)

Jon Logan and Smart Communications Holdings, Inc. sued Janice Logan, individually, as Trustee, and as the Personal Representative of the Estate of James Logan; Alexis Logan; and Justin Peterson.

Jon Logan and Smart Communications' Second Amended Complaint sounds in 20 separate counts and more than 200 separate paragraphs of allegations. These counts range over multiple matters, although some overlap. For some matters, Jon Logan and Smart Communications raise alternative theories of liability in separate counts. For ease of understanding, the Court attempts to group similar matters together.

The parties agree that if the Court were to find liability, some of these counts operate as a set-off while other counts would lead to entry of judgment in favor of Jon Logan or Smart Communications or both.

### 1.        *Counts 1 and 2 – Unjust Enrichment re: various withdrawals.*

Smart Communications sued the Personal Representative in Count 1 for unjust enrichment and Janice Logan individually in Count 2 for unjust enrichment. Plaintiffs' contention is that James Logan during his life withdrew various funds from Smart Communications that did not benefit Smart Communications. Instead, according to these plaintiffs, those funds personally benefitted James Logan (Count 1) or his wife, Janice Logan (Count 2).

> An action for unjust enrichment exists to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity. The elements of such a claim are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Essentially, the doctrine operates to imply a contract where none otherwise exists so as to ensure equity between the parties.

Kenf, L.L.C. v. Jabez Restorations, Inc., 303 So. 3d 229, 231 (Fla. 2d DCA 2019) (internal citations and quotations omitted).

The funds to which these counts apply were either classified in the first instance or were reclassified as shareholder loans. The Court in its valuation has directed the Trustee to repay the outstanding $1.3M in shareholder loans.

Under these circumstances, the Court finds that this plaintiff failed to establish, at a minimum, element 3. Both Jon Logan and Jim Logan, the then shareholders, regularly used Smart Communications' funds for personal matters. The entire value relating to Jim Logan and

Janice Logan is being repaid by the Trustee by way of set-off from the value of the Trustee's shares. There is nothing inequitable under these circumstances.

As plaintiff is not able to show element 3, the Court does not need to address the other elements of this cause of action.

The Personal Representative and Janice Logan is entitled to judgment.

**2.** _**Count 3 – Unjust Enrichment re: the Ranch Club home.**_

Smart Communications in Count 3 sued the Trustee for unjust enrichment relating to various expenses associated with the Ranch Club home, which is and has always been titled in the name of Smart Communications.

As the Court previously found, the then shareholders of Smart Communications—Jon Logan and James Logan—had an agreement as shown through historic practice that Smart Communications would pay for a home for each shareholder. There is nothing inequitable about the situation in this case where the two shareholders agreed that each could use a home owned by Smart Communications without personal payment. Thus, Smart Communications failed to demonstrate the third element of the unjust enrichment cause of action, at least for payments through August 28, 2023.

The Court reminds that it did not require any adjustment to Smart Communications' books relative to the Tierra Verde home (through August 28, 2023) or the Ranch Club home (through August 28, 2023). However, the Court agrees that all carrying costs paid by Smart Communications relating to the upkeep of the Ranch Club home after August 28, 2023, through the date Smart Communications deeds that home to the Trustee will the responsibility of the Trustee. The Court further agrees this amount is to be setoff from the value the Court found of the Trustee's interest in Smart Communications. (Parenthetically, the Court is also requiring certain actions relative to the Tierra Verde home, but that is for post-valuation expenses. That issue does not impact this claim.)

No separate judgment will be entered on Count 3 as this will be handled by setoff.

**3.** _**Count 4 – Unjust Enrichment re: Alexis Logan distributions.**_

Smart Communications in Count 4 sued Alexis Logan for unjust enrichment relating to credit card charges she incurred, and it also referenced a vacation home in Lake Michigan that either was purchased or was to be purchased. At trial, there was also discussion of various funds paid on Alexis Logan's behalf for medical care. If successful, this count would result in a judgment against Alexis Logan.

At trial, there was insufficient information relating to that Michigan home for Smart Communications to succeed as to any Michigan home. And as found above, the medical care matters were shareholder's loans to Jim Logan. Jim Logan then gifted those medical payments to Alexis Logan.

Repayment of Jim Logan's shareholder's loan relating to these medical payments is being handled as a set-off on the value of Trustee's shares. Even if they were not, those payments were gifts by Jim Logan to Alexis Logan, and Smart Communication's recourse would have been against Jim Logan or the Personal Representative or the Trustee. In any event, Alexis Logan is not responsible to Smart Communications for these matters and is entitled to judgment relating to that portion of the claim.

The remaining unjust enrichment claims in Count 4 against Alexis Logan involves approximately $416,912.11 in credit card and bank charges. Smart Communications presented summaries of funds that it contends were provided to Alexis Logan:

- Exhibit 5185, showing $311,572 of various bank transactions between August 3, 2015, and February 19, 2019;

- Exhibit 5186A, showing a net of $98,845.19 in American Express credit card charges ($110,848.06 less $12,002.87 in credits) between July 25, 2016, and July 20, 2023 (with the vast majority occurring in 2016-2018; and

- Exhibit 5187, showing $6,494.92 in Englewood Bank credit card charges between February 23, 2019, and May 18, 2019.

Before proceeding further, the Court finds three facts that implicate the validity of the summaries.

*First*, Alexis indisputably acted as an attorney for Smart Communications (and other entities), and from time to time, there were transfers to Alexis' Law Firm. The Court finds there is no evidence that the Law Firm did not perform the legal services for which it received payment from time to time. Putting that more directly, Alexis Logan credibly testified that the Law Firm received payment for legal services. As those payments were to the Law Firm, they should not have been included. The Law Firm is not a defendant here.

*Second*, the Court finds that multiple employees within Smart Communications had use of, and did use, Alexis Logan's credit cards. And Alexis Logan credibly testified that sizeable charges Smart Communications now seeks from Alexis Logan on these summaries were, in fact, not made by her but presumably by Smart Communications' employees for Smart Communications' business.

*Third*, there is credible evidence that some of the charges were made by or, at the direction of Jim Logan, and had nothing to do with Alexis Logan.

These facts undercut the confidence the Court places in the summaries.

Even without those three facts, there is another compelling fact that persuades the Court as to why Count 4 fails. Alexis Logan personally guaranteed this business from the beginning of

the idea until mid-2023. She physically delivered her property to the bank for collateral. If the business failed in the earlier years, there was no recourse to Jon Logan—after all, he did not execute any personal guarantee until 2017 at the earliest. It would have been Alexis Logan that would have been left personally responsible for the debt had the Logans swung and missed.

Under these circumstances, the Court finds that Smart Communications failed to prove the third element of unjust enrichment: "the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." Kenf, L.L.C., 303 So. 3d at 231. The Court finds that *it is equitable* for Alexis Logan to retain whatever portion of the $417,000 in bank and credit card charges that were personal to her. (Again, Smart Communications also failed to prove to the greater weight of the evidence the actual amount of those bank and credit card charges were benefits Alexis Logan, individually, received.)

Count 4 fails.

Even if the Court erred in its findings and conclusions with respect to Count 4, there are two separate alternate and independent bases that would preclude most of Smart Communications' unjust enrichment claims against Alexis Logan. Those are statute of limitation and release.

A four-year statute of limitation applies to an unjust enrichment claim. Flatirons Bank v. Alan W. Steinberg Limited Partnership, 233 So. 3d 1207, 1213 (Fla. 3d DCA 2017). "The statute of limitations for an unjust enrichment claim begins to run at the time the alleged benefit is conferred and received by the defendant." Id. Smart Communications first sued Alexis Logan on February 27, 2023. (Arguably, the original claim was not based on the same set of facts, conduct, or occurrence upon the action tried in Part 2, Phase 2, to allow the relation-back doctrine could apply to an amended complaint. Kopel v. Kopel, 229 So. 3d 812, 817 (Fla. 2017). Given the low dollar amount that remains, the Court did not engage in any further analysis as to relation-back and simply assumes relation-back exists here.)

The invocation of the statute of limitation to Smart Communications' Count 4 against Alexis Logan means any benefit Alexis Logan receive before February 27, 2019, is beyond the limitation period and cannot be recovered by Smart Communications under an unjust enrichment claim. That wipes away almost all Smart Communications' claims of unjust enrichment against Alexis Logan, leaving less than $21,000 in charges against her. Assuming relation-back to February 27, 2023, the only claims that could remain are:

- **$14,926.94** in American Express charges ($1,398.12 in 2019; $2,696.18 in 2020; $6,196.71 in 2021; $4,164.51 in 2022; and ($471.42 in 2023).

- **$5,945.64** in Englewood Bank charges.

In addition to the prior factual findings relating to unjust enrichment, the Court would specifically find there is nothing inequitable about Alexis Logan retaining less than $21,000 over the four-year period beginning February 27, 2019, forward. Recall, some of these charges came

from others who had access to the credit cards, and some charges were to benefit Jim Logan. And, even if all the charges were attributable to Alexis Logan, she continued to personally guaranteed hundreds of thousands of dollars in ongoing transactions for Smart Communications through mid-2023.

Even if the delayed discovery doctrine applied here—which it legally does not, seeFlatirons Bank, 233 So. 3d at 1213, n.14—that doctrine could not be successfully or factually invoked here because Smart Communications by looking at its own books and records knew or should have known precisely any charge or benefit to Alexis Logan. The credible evidence before the Court is that Jon Logan knew precisely what was occurring from a financial standpoint. As his own emails tell us, Jon Logan knew of funds flowing to Alexis in the lead up to 2019. In fact, Jon specifically complained to Alexis in March 2019 about funds being transferred to her. (Ex. 5005). He knew, and he had full access to Smart Communications books and records, so Smart Communications cannot credibly assert any coverup.

There is yet another reason why most of Smart Communications' unjust enrichment claims in Count 4 fails. They were released by Smart Communications.

In August 2017, Alexis Logan, Jon Logan, and Jim Logan began the process of transferring title of the stock of Smart Communications Holding, Inc. to Jon Logan (50%) and Jim Logan (50%). As part of the corporate paperwork signed to effectuate the share transfer, these parties signed a Mutual General Release: (1) Smart Communications Holdings, Inc.; (2) Smart Communications US, Inc.; (3) Jim Logan; (4) Jon Logan; (5) Alexis Logan; and (6) Law Office of Alexis Logan, PLLC. (JX-40). The Carlton Fields law firm represented the Company and drafted the documents. Alexis Logan was represented by separate counsel. There were some follow-up matters that did not get resolved into early 2018.

The recitals to the Mutual General Release reflected that Alexis Logan had been involved in the ownership, management, and/or operation of the companies and that she and her law firm performed legal service for the companies. Additionally, the parties acknowledged that Alexis Logan remained parties to then pending litigation concerning the companies. The recitals also reflected the parties' intent to "broadly release each other" and to "indemnify" them. The Court notes those recitals because within the body of the Mutual General Release each party acknowledged that the "background recitals are true and correct and are incorporated in this Release as a material and substantive part hereof." (JX-40).

The effective portion of the release provided:

> **2.** **Mutual General Release.** Effective upon their receipt of a copy of this Release fully executed by all Parties hereto, the Parties, on behalf of themselves and their agents, employees, members, managers, officers, directors, attorneys, insurers, predecessors, successors, heirs and assigns, are hereby deemed to release, waive, acquit, forever discharge, and to covenant never to sue any of the other Parties, or any of their lawyers, agents, employees, members, managers, officers, directors, insurers, privies, predecessors, successors, heirs or assigns, for, from and

against any and all claims, actions, causes of action, demands, damages, suits, costs, expenses, liabilities or other losses, of any kind whatsoever, whether known or unknown, foreseen or unforeseen, direct or consequential, legal or equitable, matured or unmatured, under any theory in contract, statute, tort or otherwise, including, but not limited to breach of fiduciary duty and professional negligence, which exists or may exist from the beginning of time up to and including the date of the last Party's execution of this Release, which in any way arise from, grow out of, or are related to the Parties' conduct and services with respect to the ownership, management, and/or operation of the Companies and with respect to services provided to the Companies.

(JX-40, pp. 1-2, ¶2).

The application of that Mutual General Release means that Smart Communications released any claim it had against Alexis Logan for anything occurring before August 31, 2017. Because the statute of limitation period expired after the release date, the Court did not go back and determine the precise dollar amount that was not released. But that amount is not much more than the $21,000 that remained after the limitation period expired.

Count 4 fails. Alexis Logan is entitled to judgment in her favor.

### 4.    *Count 5 – Unjust Enrichment against Mr. Peterson.*

In Count 5 of the Second Amended Complaint, Smart Communications Holdings, Inc. sued Mr. Peterson for unjust enrichment. If successful, this count would result in a judgment against Mr. Peterson.

The operative complaint alleged that on or about June 23, 2022, approximately $109,070 of Smart Communications funds were used to purchase a 2019 BMW. That vehicle was then registered in Mr. Peterson's name and primarily used by him.

The Court finds that Mr. Peterson in June 2022 purchased a 2019 BMW. As part of that purchase, Jim Logan obtained a $60,000 countercheck from a local bank drawn on a Smart Communications' account. Jim Logan then personally paid the dealership directly $60,000 towards the purchase price of the vehicle. Smart Communications booked this transaction as a $60,000 shareholder's loan to Jim Logan.

The Court further finds that Jim Logan personally loaned Mr. Peterson $60,000 for the purchase of the vehicle. While the funds may have originated from Smart Communications, Jim Logan took a shareholder's loan from Smart Communications.

Mr. Peterson agrees that he still owes the $60,000 but to the Personal Representative. He testified that he and the Personal Representative will address the loan made between Jim Logan and Mr. Peterson after this lawsuit is concluded. There was no lawsuit by the Personal Representative against Mr. Peterson.

As noted above, the first prong of an unjust enrichment claim is that plaintiff—here, Smart Communications—conferred a benefit on the defendant—here, Mr. Peterson. Smart Communications failed to show that first element. Jim Logan, individually, not Smart Communications, lent Mr. Peterson the $60,000. Further, Smart Communications failed to prove either elements 2 or 3 as well. Smart Communications' Count 5 fails.

The Court specifically denies the request for constructive trust.

Mr. Peterson is entitled to judgment in his favor on this count.

### 5.      *Count 6 – Constructive fraud re: Jim Logan's withdrawals <u>against the Personal Representative</u>.*

In Count 6, Jon Logan sued the Personal Representative relating to withdrawals made by Jim Logan from Smart Communications. As previously found, Jon Logan knew precisely Jim Logan's activities, and Jon Logan personally participated in them, too.

Jon Logan failed to prove this claim or any special injury to him as a shareholder. Jon Logan is not entitled to any relief on this claim.

The Personal Representative is entitled to judgment.

### 6.      *Count 7 – Conversion re: Jim Logan's withdrawals against the <u>Personal Representative</u>.*

In Count 7, Jon Logan and Smart Communications sued the Personal Representative alleging that Jim Logan converted Smart Communications' corporate funds for various personal purchases, including purchases James Logan made for others. This is yet another repackaging of prior claims rejected.

"Conversion occurs when a person asserts a right of dominion over chattel which is inconsistent with the right of the owner and deprives the owner of the right of possession. The question of whether [an item] has been the subject of a conversion is a factual one based on the distinct circumstances of each individual case." <u>Estate of Villanueva ex rel. Villanueva v. Youngblood</u>, 927 So. 2d 955, 959 (Fla. 2d DCA 2006) (internal quotation, citation, and alternation omitted); <u>Hannah v. Malk Holdings</u>, LLC, 368 So. 3d 1087, 1091 (Fla. 6th DCA 2023) ("The elements of conversion are: 1) a taking of chattels; 2) with intent to exercise ownership over them an ownership inconsistent with the real owner's right of possession.").

"The tort may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." <u>Seymour v. Adams</u>, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994). Money removed from a bank account can be the subject of conversion if the money is specific and identifiable. <u>Allen v. Gordon</u>, 429 So. 2d 369, 371 (Fla. 4th DCA 1983). "In Florida, an action for conversion is regarded as a possessory action and the plaintiff must have a present

or immediate right of possession of the property in question." Page v. Matthews, 386 So. 2d 815, 816 (Fla. 5th DCA 1980).

This count fails as to both Jon Logan and Smart Communications.

As it relates to Jon Logan, Jon Logan personally did not own Smart Communications' corporate funds. Jon Logan did not prove an entitlement to immediate possession of Smart Communications' funds. Additionally, as Jon Logan and Jim Logan knew and allowed the other to take loans from the company, there was specific authorization for those loans. Jon Logan's claim also fails because he failed to demonstrate that those funds were traceable to specific items.

Smart Communications' conversion claims also fails. With Jon Logan and Jim Logan authorizing the shareholders to take shareholder loans, any action by Jim Logan in taking a loan is not an action inconsistent with Smart Communications' right of possession. After all, those loans were booked, and the Trustee is having to pay the loan.

The Court also notes that the Trustee is paying Jim Logan's shareholder loans as setoff. Thus, even if the Court erred on the conversion finding relative to Smart Communications, Smart Communications cannot be compensated twice for the same distributions.

The Personal Representative is entitled to judgment.

### 7.    Count 8 – Conspiracy to Commit Conversion against the Janice Logan, the Personal Representative, Alexis Logan, and Mr. Peterson.

In Count 8, Jon Logan sued Janice Logan, the Personal Representative, Alexis Logan, and Mr. Peterson for conspiracy to commit conversion. The basis for this count are the same withdrawals by Jim Logan discussed above.

"A cause of action for conspiracy requires showing (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts performed pursuant to the conspiracy." Olson v. Johnson, 961 So. 2d 356, 359 (Fla. 2d DCA 2007) (internal citation, quotation, and alteration omitted).

This count fails for multiple reasons.

*First*, Jon Logan is not the proper plaintiff for a conversion claim of Smart Communications' property. That would have been Smart Communications.

*Second*, the Court already determined that both Jon Logan's and Smart Communication's conversion claim based on Jim Logan's withdrawals from Smart Communications failed factually.

*Third*, there is no credible evidence of any conspiracy sufficient for the Court to find the first element—a conspiracy between two or more parties.

*Fourth*, there is no unlawful act or lawful act by unlawful means. Jim Logan had the authority to take shareholder loans.

*Fifth*, Jon Logan is not damaged. The fact that the Trustee as a matter of setoff is repaying Jim Logan's shareholder loans means Jon Logan can show no damage.

Each of these defendants is entitled to judgment.

### 8. *Counts 9, 10, and 12 – breach of fiduciary duty against the <u>Personal Representative (9 and 10) and Everyone (12)</u>.*

Both Jon Logan and Smart Communications sued the Personal Representative for breach of statutory fiduciary duty (Count 9) and breach of common law fiduciary duty (Count 10). In Count 11, Smart Communications sued Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson for a claim of aiding and abetting breach of fiduciary duty.

In Counts 9 and 10, Jon Logan and Smart Communications repackage the Jim Logan withdrawal claims, which Jon Logan knew about and approved. The Court finds these plaintiffs failed as a matter of fact to prove the elements as to either count.

As this claim continues to get repackaged, the Court also states that there can be no breach of fiduciary duty when Jon Logan knew about, consented to, and participated in the shareholder's loans. Also, those Jim Logan's shareholders' loans are being repaid.

In Count 12, Smart Communications attempts to further pursue a breach of fiduciary duty claim as an aiding and abetting claim. However, not only is there no evidence of a breach of fiduciary duty, but there is also no duty that any of these defendants aided or abetted Jim Logan in breaching any of his fiduciary duties. Further, there is no damage.

The Personal Representative is entitled to judgment on Counts 9 and 10. Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson are entitled to judgment on Count 12.

### 9. *Count 11 – conspiracy to commit unjust enrichment against <u>Everyone</u>.*

In Count 11, Smart Communications sued Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson for conspiracy to commit unjust enrichment.

This claim also fails. Not only did Smart Communications fail to prove unjust enrichment relating to Jim Logan's withdrawals against any of the defendants, but Smart Communications also failed to prove the existence of the first element of conspiracy—i.e., a conspiracy between two or more parties. Further, it also failed to demonstrate any unlawful act or lawful act by

unlawful means. Jim Logan had the authority to take shareholder loans. This claim fails based on the plaintiff's failure to prove it factually.

Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson are entitled to judgment on Count 11.

### 10. Count 13 – negligence against the Personal Representative.

Both Jon Logan and Smart Communications in Count 13 next attempt to repackage the Jim Logan withdrawal claims as a negligence claim brought against the Personal Representative.

Both plaintiffs failed to establish any element of negligence, including damage.

The Personal Representative is entitled to judgment.

### 11. Count 14 – breach of fiduciary duty re: tax liabilities against the Personal Representative.

In Count 14, Jon Logan and Smart Communications shift their focus. They now claim that Jim Logan's conduct relative to not causing Smart Communications to pay royalties to HLFIP as accrued may result in tax liability to Smart Communications. This was discussed in both Part 1 and Part 2 of Phase 2.

As it relates to Jon Logan, the Court questions whether he really is a proper plaintiff. The theoretical tax liability as presented would be to either of, or both of, Smart Communications or HLFIP. The Court in the abstract can see that Jon Logan through his 100% ownership of HLFIP may be able to claim some injury distinct from Smart Communications. For that reason, the Court will not conclude that Jon Logan is an improper plaintiff.

Having said that, though, the Court finds a failure of proof. The Court finds that Jon Logan participated equally in the decision to have Smart Communications pay all HLFIP's expenses in lieu of distributing funds and having HLFIP paying its own expenses. As found as fact, Smart Communications through the date of valuation has actually paid expenses on behalf of HLFIP in an amount that is *more than* the royalty that otherwise would have been paid to HLFIP.

Further, both Jon Logan and HLFIP failed to prove the fact that Jim Logan breached any fiduciary duty owed to Jon Logan or Smart Communications. The theory seems to be that Jim Logan either knew or should have known that the structure that Jon Logan and Jim Logan jointly set up could expose Smart Communications and HLFIP to taxes on the royalty payment. At best for plaintiffs, Jim Logan did not know or understand this nuance of tax law. But that does not translate to a breach of a fiduciary duty. In essence, Jon Logan and Smart Communications seek to transform Jim Logan and his Estate into an insurer for any error made in business judgment under the guise of a breach of fiduciary duty. That simply is not the case.

Further, there simply has been a total failure of proof on their alternative theory that Jim Logan's actions were intentional or so grossly negligent that they constitute a conscious disregard or indifference to plaintiffs' rights.

The Personal Representative is entitled to judgment.

**12.     Counts 15 and 17 – breach of fiduciary duty and fraudulent inducement re: compensation, against the Personal Representative.**

In Count 15, Jon Logan sued the Personal Representative for breach of common law fiduciary duty by Jim Logan relating to Jon Logan's compensation. In Count 17, Jon Logan repackaged this claim against the Personal Representative as a fraudulent inducement claim.

Fundamentally, Count 15 fails because Jon Logan failed to demonstrate as fact that Jim Logan was a fiduciary to Jon Logan relating to how the two shareholders structured Smart Communications and what that entity would or would not pay. Failing to demonstrate the existence of a fiduciary relationship defeats this claim. This count is also defeated for other reasons, too.

As it relates to his compensation, Jon Logan seems to contend that he is entitled to all nonproductive assets of the company as compensation. That simply is not correct or the agreement between Jon Logan and Jim Logan. Jon Logan has failed to demonstrate any failed compensation or damage. For that reason, Count 15 for breach of fiduciary duty also fails.

Count 17 also fails for fraudulent inducement relating to compensation. Jon Logan has failed to demonstrate any false statement about compensation made by Jim Logan. Jon Logan also failed to demonstrate Jim Logan knew any statement Jim Logan made about compensation was false. Count 17 fails

The Court also needs to address a separate allegation in Count 15 that Jon Logan also contended in Count 15 that Jim Logan breached a fiduciary duty because his father "misrepresented to Jon that Jon would be compensated for use of his IP." [DIN 891, p. 34, ¶183.]

As it relates to IP, the Court already found the amount Smart Communications paid on behalf of HLFIP through the date of valuation *is more than* HLFIP was entitled to receive from Smart Communications for MailGuard. Jon Logan's claim is factually disproved. The Court also points to its discussion in the next section concerning Count 16 that there was no misrepresentation.

The Personal Representative is entitled to judgment as to both Counts 15 and 17.

**13.     Count 16 and 18 – misrepresentation re: IP against the Personal Representative.**

In Count 16, Jon Logan sues the Personal Representative for misrepresentation relating to the intellectual property. In Count 18, Jon Logan sued the Personal Representative for the same

conduct under a fraudulent inducement theory. In essence, Jon Logan contends that he was to own the intellectual property.

The Court previously made factual findings relating to the IP. Jon Logan has failed to demonstrate any false statement about IP made by Jim Logan. Jon Logan also failed to demonstrate Jim Logan knew any statement Jim Logan made about IP was false. (To the extent these claims could be construed as negligent misrepresentation, the Court finds Jon Logan failed to demonstrate any statement Jim Logan made that Jim Logan believed to be true but was, in fact was false, and that he should have known to be false.) And because the Court found that HLFIP through the valuation date had Smart Communications pay more on HLFIP's behalf than any accrued royalty, Jon Logan failed to prove damage.

Jon attempts to revitalize the 40% royalty the Court invalidated in Part 1, Phase 2 due to Jon Logan's director's conflict of interest transaction. The Court continues with its earlier factual findings. There was no "independent valuation" that found a 40% royalty was appropriate.

The Personal Representative is entitled to judgment on Counts 16 and 18.

### 14. Counts 19 and 20 – indemnification and breach of fiduciary duty relating to broker commission against the Personal Representative.

As it relates to Counts 19 and 20, there was not much discussion concerning these counts. The Court would like further briefing on these counts.

Prior to the December 19, 2025, hearing, the Court requests a targeted memorandum from each side, limited to no more than 10 pages each, discussing the legal authority as well as the evidence supporting or opposing the claims relating to the yacht broker agreement.

### E.
### ALEXIS LOGAN'S COUNTERCLAIMS [DIN 1790]
(August 4, 2025)

Alexis Logan filed a three-count Counterclaim against Jon Logan and Smart Communications [DIN 1790]. Before trial, she voluntarily dismissed Count 2 for civil conspiracy [DIN 1920].

In Count 1, Alexis Logan sued Jon Logan and Smart Communications Holding, Inc. for malicious prosecution and abuse of process. Before the Part 2, Phase 2 trial, these parties agreed that this claim should be severed and tried later. Thus, the Court makes no rulings as to this claim.

In Count 3, Alexis Logan sued Smart Communications Holding, Inc. for breach of the August 30, 2017, a release and indemnification agreement. That agreement at paragraph 3 entitled "Defense and Indemnification" provides in relevant part that Smart Communications agreed to indemnify Alexis Logan broadly relating to her "conduct and services with respect to

the ownership, management, and/or operation of the Companies; [and] (b) any services provided to the Companies[.]" (JX 40, 41). The Court concludes that the claims against Alexis Logan triggered the indemnity provision. In other words, the Court finds liability against Smart Communications.

By the agreement of the parties, the amount due under this indemnity will be tried separately.

**F.**
**HLFIP'S COUNTERCLAIMS [DIN 1863]**
**(August 15, 2025)**

HLFIP Holding, LLC filed a two-count Counterclaim against Janice Logan, the Trustee, and Alexis Logan [DIN 1863]. In Count 1, HLFIP sued these three for unjust enrichment. In Count 2, HLFIP sued these three for quantum meruit.

The basis of HLFIP's affirmative claims were its allegations that Janice Logan, Jim Logan (prior to his death), and Alexis Logan would take revenues from Smart Communications, while HLFIP was not receiving a royalty from Smart Communications. HLFIP contended that Jon Logan as Smart Communications' management was forced to reinvest royalty payments otherwise due HLFIP because his family members were raiding the company. In other words, HLFIP's theory seemed to be that these three indirectly benefited from HLFIP based on Smart Communication's success in capitalizing on HLFIP's intellectual property. Certainly, there is no evidence that HLFIP provided any of these three with any direct benefits.

The Court's finds HLFIP's underlying indirect delivery of a benefit premise is flawed. The Court already found as fact that a commercially reasonable royalty due HLFIP from Smart Communications for the period 2016-August 28, 2023, to be $3.6M. Between 2019-2023, Smart Communications paid at least $4.8M on behalf of HLFIP. There simply is no further royalty due HLFIP for Smart Communications' use of HLFIP intellectual property through August 28, 2023. If anything, HLFIP would owe Smart Communications more than $1.2M, which the Court already concluded need not be returned to Smart Communications.

Further, the Court already determined the present value of the post-August 28, 2023, royalty due HLFIP resulted in a $15.6M reduction in Smart Communication's enterprise value. Of that amount, the Trustee is responsible for $7.8M. Jon Logan—through his 100% ownership of HLFIP—certainly is receiving substantial value for Smart Communication's use of HLFIP intellectual property.

The Court finds it not credible that Jon Logan on the one hand claimed ignorance of Smart Communications' financial position but asserting through HLFIP that he (Jon Logan) had to reinvest HLFIP royalties in Smart Communications to fund Smart Communication's growth. Not only was Jon Logan aware of Smart Communication's financial position during his father's life, but Jon Logan agreed with his father to have Smart Communications pay HLFIP expenses without a true up.

As a reminder, the elements of unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Kenf, 303 So. 3d at 231.

The Court finds that HLFIP failed to demonstrate that HLFIP conferred any benefit—either direct or indirect—on any of the individuals named or that it sued in Count 1. The Court also finds HLFIP failed to demonstrate the second or third prongs of the unjust enrichment cause of action as well. HLFIP failed to meet its burden. Janice Logan, the Trustee, and Alexis Logan are entitled to judgment in their favor on Count 1.

HLFIP in Count 2 repackaged its unjust enrichment claim using the alternative theory of quantum meruit. "The distinction between quantum meruit and unjust enrichment is often blurred by the potential for both theories to apply to the same factual setting. The doctrine of quantum meruit, also called a contract implied in fact, imposes liability, in the absence of an express agreement, based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." F.H. Paschen, S.N. Nielsen & Associates LLC v. B&B Site Dev., Inc., 311 So. 3d 39, 48 (Fla. 4th DCA 2021).

"To satisfy the elements of quantum meruit, the plaintiff must prove that the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it." Id.

As with unjust enrichment, HLFIP failed to demonstrate that it provided Janice Logan, the Trustee, or Alexis Logan any benefit whatsoever. HLFIP also failed to demonstrate the other prong of this claim. Janice Logan, the Trustee, and Alexis Logan are entitled to judgment in their favor on Count 2.

## G.
## Security to Guarantee Payment of Trustee's

The Court has scheduled a hearing on December 19, 2025, to address payment terms and security, as contemplated by section 607.1436(5), Florida Statutes.

The Court purposely is not detailing much at this time in the light of the upcoming mediation. The Court does, though, provide some preliminary thoughts on a few issues for the type of security the Court is currently envisioning, subject to the parties' discussions and arguments. This is not an exhaustive list. Nor is it a final ruling.

Even though the Court has listed these, the parties, though, are free to agree to different terms.

*1.    **Jon Logan Salary.***

Page 46 of 49

Until all payments to the Trustee have been made, Jon Logan's base salary will be $120,000 per year. On July 1 of each year, the base salary may be increased by the same percentage increase the Florida Legislature provides for state employees. (Note, this is general state employees and not any specific classification receiving a pay adjustment.) For instance, in fiscal year 2025-2026, the Legislature authorized a 2% pay increase.

The Court authorizes Smart Communications to retroactively provide the 2% pay increase to Jon Logan's salary effective July 1, 2025.

The Court notes that the Yacht was recently refinanced, and the debt service appears to be $1M per year, paid quarterly. There is also either $100,000 or $130,000 monthly expense relating to dockage. That means there is at least $183,333 in monthly expenses for the Yacht. Before any upkeep.

**Smart Communications' current payments with respect to the Yacht need to end. Soon.**

The Court believes it appropriate that when those significant expenses cease, each shareholder should realize some portion of those savings.

With respect to Jon Logan, effective the month after those payments end completely, the Court will authorize his base salary to increase by up to $50,000 per month (assuming a 25% drag due to benefits, this would cost Smart Communications about $62,500 per month). Jon Logan may elect to forego that salary increase, but it cannot be taken as a distribution. As this amount is being added to the base, the yearly pay increase provided to state employees would apply to this amount.

With respect to the Trustee, effective the month after those payments end completely, the Court will direct that, at a minimum, an additional $62,500 payment towards the outstanding amount due the Trustee be paid. This amount will supplement any additional payments Smart Communications is making to the Trustee.

If Jon Logan increases his salary by the maximum permitted, and the parties only pay the Trustee the minimum supplement, that should be at least an additional $58,000 per month available to Smart Communications for corporate purposes.

### 2. *Use of Expense Reports.*

Effective immediately, any payments made to Jon Logan or that benefit Jon Logan must be accompanied by detailed expense reports with receipts justifying the corporate purpose.

### 3. *Car usage.*

Effective immediately, Smart Communications may only provide one vehicle for Jon Logan's company use, which currently is a Land Rover. A replacement car may occur every 5

years. If the company finances or leases a future vehicle, the maximum monthly payment is limited to $1,250.

### 4. *Tierra Verde home.*

The Court is providing Jon Logan a 30-day window within which he can cause Smart Communications to distribute the Tierra Verde home into his private ownership. As previously noted, any payments made by Smart Communications towards the upkeep or repair of that house made after August 28, 2023, will need to be recharacterized as a shareholder's loan. If Jon Logan elects to continue to live in the Tierra Verde home, the Court will allow Smart Communications to continue to make similar payments towards the upkeep and repair of that home, so long as those amounts do not materially change from historical expenses. Those expenses will also need to be characterized as a shareholder's loan.

### 5. *Trustee access to records.*

Until all payments due the Trustee are made, the Court will allow the Trustee comprehensive access to Smart Communications books and records. The Court will need to structure a process to address the corporate changes and transfer of assets without value. Of course, the Trustee and her advisors will have to agree to a confidentiality agreement.

### 6. *Memorandum on payment terms and security.*

In preparation for the December 19 hearing, the Court would like the parties to provide proposed terms for payment as well as security for payment that each side is requesting, and if necessary, the legal authority for the request.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IT IS ORDERED:

1.    In preparation for the hearing on Friday, December 19, 2025, the Court has requested from each side three legal memos as well as a memo outlining proposed terms for payment as well as security for payment. The Court would request these be filed on or before 4:00 p.m. on Tuesday, December 16, 2025.

2.    The parties are advised the Court likely will be requesting the parties the draft a final judgment that effectuates this Order, the payment terms and security, and severs those malicious prosecution/abuse of process and attorney fee issues. Kindly begin working on it so that final judgment can be entered expeditiously.

3.    In the event a party believes the Court has not addressed a pending claim, kindly outline that for the Court in a short memorandum to be filed on or before 4:00 p.m. on Tuesday, December 16, 2025.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on December 09, 2025.

e-Signed 12/9/2025 7:55 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

### SERVICE CERTIFICATE

On December 09, 2025, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

Counsel of Record.

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
       Plaintiff,

v.

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY TRUST
DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
       Defendant.

CASE NO. 2023 CA 001002 NC
DIVISION C CIRCUIT

_____

**FINAL JUDGMENT**
**<u>PHASE 2</u>**

This action came before the Court for a bifurcated nonjury trial held on February 10, 11, and 12, 2025 ("Part 1 of Phase 2"), and October 6 through October 16, 2025, and November 12, 2025 ("Part 2 of Phase 2"). Additionally, on January 12, 2026, the Court heard argument and received additional evidence as to entitlement to interest, attorneys' fees and costs, and payment terms and security relating to the purchase of the Trustee's shares.

**The briefest of background and other court proceedings**

This case presents an unfortunate intra-family fight. There are many affirmative claims brought by many parties and related entities resolved by this Final Judgment. There are a few claims that have been severed that still pend before this Court.

There have been many visits to other courts throughout the life of this case. The Court only details those most directly relevant, but in doing so, does not mean to suggest there were no other proceedings in other courts.

In Phase 1, the Court resolved a preliminary gating issue: whether the then recently discovered "shareholders agreement" following Jim Logan's death was valid. The Court severed

Page 1 of 15

that issue and tried it over three days in January 2024. At its core, the Court declared as a result of the Phase 1 trial:

- The purported Shareholders Agreement was invalid and unenforceable;

- There was no shareholders agreement between the two 50% shareholders of Smart Communications Holding, Inc.'s stock at the time of James Logan's death;

- The two 50% shareholders of Smart Communications Holding, Inc.'s stock are: (1) Jonathan D. Logan; and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

On February 7, 2024, the Court entered final judgment from Phase 1 trial [DIN 652]. There was no appeal of that final judgment.

Initially, the Court scheduled the remaining claims to be tried in January 2025 in a Phase 2 trial. However, in the lead up to that trial, there was a newly pled count for judicial dissolution, which resulted in Smart Communications Holding, Inc. electing an option to purchase the shares. This changed the nature of the claims presented. As a result, the Court elected to bifurcate the Phase 2 trial into two parts [DIN 870]. The Court directed Part 1 of Phase 2 to be limited to three issues: (1) the proper valuation date; (2) the license/royalty issue; and (3) any issue all parties agree to be heard during Part 1. [DIN 870].

A few weeks before the Part 1 of Phase 2 trial was set to begin, on November 30, 2024, Smart Communications Holding, Inc., and Smart Communications Holding, LLC, each filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Middle District of Florida, in cases *In re: Smart Communications Holding, Inc.*, Case No. 8:24-bk-07106-RCT, and *In re: Smart Communications Holding, LLC*, Case No. 8:24-bk-07108-RCT. The Court will refer to those cases collectively as "the First Bankruptcy Proceeding."

The Bankruptcy Court in the First Bankruptcy Proceeding authorized this Court to proceed in trying the Part 1 of Phase 2 trial, as limited to "the two issues dealing with the validity and extent of the IT agreement and the date on which the valuation should be determined[.]" *In re Smart Communications Holding, Inc.* No. 8:24-bk-07106 (jointly administered with 8:24-bk-07108) (Bankr. M.D. Fla. Jan. 13, 2025) [DIN 928].

As permitted by the Bankruptcy Court in the First Bankruptcy Proceeding, this Court tired Part 1 of Phase 2 on February 10, 2025 – February 12, 2025. At its core, the Court decided in Part 1, Phase 2 of the trial:

- The Purported Royalty Transactions constituted "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes. The Court found that Jon Logan failed to prove these transactions were fair to Smart Communications, and the Court further found the Trustee proved the Purported Royalty Transactions were not fair to Smart Communications.

Page 2 of 15

- The Court invalidated the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I to the financial statements.

- Under the unique circumstances presented in the Court, the Court determined that the Court would value Smart Communications Holding, Inc. as of August 28, 2023, the date immediately before Jon Logan's substantial corporate activity on August 29. In doing so, the Court noted the authority in section 605.0706(4), Florida Statutes, that permits the Court to determine valuation on "such other date as the court deems appropriate under the circumstances."

Order with the Court's Findings from Part 1 of Phase 2 Trial, signed February 17, 2025 [DIN 1189] ("Part 1, Phase 2 Order"). The Court would later enter a partial reconsideration order, signed April 2, 2025 [DIN 1284].

Following the entry of the Court's Order from Part 1 of Phase 2 Trial, the Bankruptcy Court dismissed the First Bankruptcy Proceeding. This Court set the Part 2 of Phase 2 Trial and tried it October 6-October 16, 2025, and November 12, 2025. On December 9, 2025, the Court entered its Order with Findings and Conclusions of Law from Part 2 of Phase 2 Trial [DIN 2254] ("Part 2, Phase 2 Order"). The Court made a host of rulings and requested follow up briefing and evidence relating to issues such as attorney fees, application of interest, and security for payment for the Trustee's shares. (The Court recently entered a limited reconsideration order [DIN 2331].)

On December 16, 2025—one week after entering the Part 2, Phase 2 Order—Smart Communications Holding, Inc., again filed for Chapter 11 bankruptcy relief in the Bankruptcy Court for the Middle District of Florida. (The "Second Bankruptcy Proceeding"). The Bankruptcy Court entered an order partially lifting the stay to permit the Court to conduct the hearing contemplated by the Court's Part 2 of Phase 2 Trial and "hold an evidentiary hearing on payment terms and security, attorneys' fees and interest, and all other evidentiary issues discussed in the State Court's" Part 2 of Phase 2 Order. *In re Smart Communications Holding, Inc.*, 8:25-bk-9473-RCT, Agreed Am. Order Modifying the Automatic Stay (the "Lift Stay Order"), Dkt. No. 55 (Bankr. M.D. Fla. Jan. 9, 2026) [DIN 2301]. The Lift Stay Order further authorized this Court to:

> enter a complete final judgment (i) on the amount of the claim for the election to purchase the Trust's shares, (ii) the parties' respective claims of entitlement to attorneys' fees and interest, (iii) the awarded amount of attorneys' fees and interest, if any, and (iv) on all other pending claims in the State Court Case adjudicated during Phase 2. The State Court may, if it elects, to include as part of its judgment proposed findings as to payment terms and security.

*Id.* While the Lift Stay Order permits the Court to enter a Final Judgment and to recommend the terms of a Purchase Order, the Lift Stay Order does not permit current enforcement of the Final Judgment, as that remains subject to the bankruptcy stay.

Based on the Lift Stay Order, the Court on January 12, 2026, conducted the further evidentiary hearing.

The Court now enters Final Judgment as outlined in this judgment. The Second Bankruptcy Proceeding remains pending before the Bankruptcy Court.

Before proceeding further, the Court makes one other note. There have been at least 7 proceedings at the Second District Court of Appeal during the pendency of this case: 2D23-1798; 2D20-2430; 2D25-0262; 2D25-0327; 2D25-0365; 2D25-0700; and 2D25-0843. As relevant to this Final Judgment, a predecessor judge entered a temporary injunction at the beginning of the case imposing certain continuing obligations on Smart Communications Holdings, Inc., which was reversed. *Logan v. Logan*, 397 So. 3d 1144 (Fla. 2d DCA 2024). As part of the Final Judgment, the Court addresses the impact of, and damages from, the reversal of that temporary injunction.

The Court now turns to entry of judgment. The Court will address each operative complaint separately.

The Court incorporates into this judgment the Court's judgment its Part 1, Phase 2 Order, and its Part 2, Phase 2 Order, together with their reconsideration Orders.

## 1.
## VALUATION
## ADDITIONAL FINDINGS AND RULINGS

The Court in its Part 2, Phase 2 Order determined after application of the discount for future Royalty future payments, the adjusted value of Smart Communications Holding, Inc. as of August 28, 2023, was $88,254,918. The value of the Trustee's 50% interest after lack of marketability reduction is $41,921,086. At the time of the Part 2, Phase 2 Order, the Court identified a total of $1,339,778 in shareholder loans that needed to be repaid that would operate as a setoff.

Thus, as of August 28, 2023, Smart Communications Holding, Inc owes the Trustee **$40,581,308** for the Trustee's shares. This amount, though, was subject to additional changes for which the Court requested additional briefing. And there was additional evidence adduced. The Court now addresses those issues and makes its rulings.

## A.
## Ranch Club Home Expenses

The Court in its Part 2, Phase 2 Order determined that the Trustee is responsible for the Ranch Club home expenses beginning on August 29, 2023, and continuing until the date the Trustee either accepts the deed or, if the Trustee does not elect distribution of the Ranch Club home, until the Trustee vacates the premises.

The evidence demonstrates this amount currently stands at $272,348.18, plus 2026 property taxes and ongoing expenses paid by Smart Communications.

The Trustee seeks to offset this amount for the post August 28, 2023, expenses Smart Communications paid on behalf of Jon Logan for the Tierra Verde home. Those expenses, however, do not offset. The Court's valuation was as of August 28, 2023. While the Tierra Verde expenses paid by Smart Communications must be characterized as a shareholder's loan to Jon Logan, those payments do not impact the value as of August 28, 2023. Thus, there is no offset as proposed by the Trustee.

The Trustee's valuation award will be reduced by **$272,348.18**. The Court notes that, technically, there will be a prorated amount of the 2026 property taxes (estimated at $2,500 per month) plus any expenses paid by Smart Communications since the last evidentiary submission. Assuming that the Purchase Order can be effectuated in the near term, and assuming there is no deviation from historical expenditures, the Court would find this amount to be *de minimis* and will not be further addressed or applied as setoff.

One last note. The Court declines to award this amount as injunction damage but instead is the amount the Trustee would have had to pay since August 28, 2023, for the upkeep of the home in which the Trustee has been living.

**B.**
**Wrongful Injunction**

The Court awards Smart Communications salary and health benefits in the amount of $130,182.11 related to wrongful injunction. The Court awards Smart Communications the amount of Ranch Club expenses from the date of the temporary injunction through August 28, 2023, in the amount of $12,889.89. The Court also awards Smart Communications attorney fees and costs relating to the temporary injunction in the amount of $144,697.00.

The Trustees valuation award will be reduced by the summation of these amounts in the total amount of **$287,769**. The Court notes that this amount exceeds the $65,000 bond. However, the Court exercises its discretion in awarding the full amount of Smart Communications' damages as the entire point of the valuation is to arrive at the fair value of the shares, despite the length of time this case remained pending. Further, there was no additional bond hearing to address ongoing potential damage during the life of this case.

**C.**
**Attorney Fees and Costs**

There are a number of claims for attorney fees or costs or both sought by multiple parties. As a reminder, there were two phases and three trials: (1) Phase 1; (2) Part 1 of Phase 2; and (3) Part 2 of Phase 2. The Court will address entitlement. To the extent the Court finds entitlement, the Court will need to conduct further proceedings to determine the amount. The Court, though, would not be offended in the slightest if the Bankruptcy Court proceeded to liquidate the amounts, subject to its jurisdiction. The Bankruptcy Court may be able to do this more quickly

than the Court. However, the Court will adjudicate these amounts subject to permission from the Bankruptcy Court in due course and availability on the Court's calendar.

The Court makes one further observation. The Court would exclude any award of attorney fees or costs associated with proceedings before the Bankruptcy Court for either the First Bankruptcy Proceeding or the Second Bankruptcy Proceeding. Award of those amounts, if any, are within the Bankruptcy Court's jurisdiction.

1. **DIN 834 – Motion by the Trustee and Personal Representative.** The Court previously awarded the Trustee costs associated with Phase 1 [DIN 878] against both Jon Logan and Smart Communications Holding, Inc. The Court understands that amount has not been liquidated and will need to be liquidated. Those parties are jointly and severally liable for that amount.

The Court now finds both the Trustee and Personal Representative is entitled to attorney fees from Smart Communications Holding, Inc. for Phase 2 (both Parts 1 and 2) attorney fees and costs, pursuant to section 607.0854, Florida Statutes.

2. **DIN 1597 – Motion by the Trustee.** The Court grants the motion and finds the Trustee is entitled to costs for Part 1, Phase 2. The Court notes, though, that since no final judgment was entered following Part 1, Phase 2, there was no need for this motion as the proper time to file this motion is the filing of this Final Judgment governing all of Phase 2.

3. **DIN 2263 – Motion by Janice Logan, individually, the Trustee, and the Personal Representative.** Janice Logan, the Trustee, and the Personal Representative move for attorney fees and costs. The Court grants costs to each of Janice Logan, individually, the Trustee, and the Personal Representative, against those persons and entities that sued them: Jon Logan, Smart Communications Holding, Inc., HLFIP Holding, Inc., and HLFIP Holding, LLC.

*a.*
*§607.1436(5), Fla. Stat.*

With respect to attorney fees, the Court finds the Trustee is entitled to an award of attorney fees and costs pursuant to section 607.1436(5) against Smart Communications Holding, Inc., relating to Phase 2 attorney fees commencing on the date of the Smart Communications Holding, Inc's election to purchase the shares. There was evidence presented by both sides concerning how the negotiations relating to determining the valuation amount. To be sure, Jon Logan on behalf of Smart Communications initially offered the Trustee $20M. While this certainly is a significant amount, the Trustee had probable grounds for relief under section 607.1430(1)(b). Further, the evidence convinces the Court that it was Jon Logan, not the Trustee, who engaged in unnecessary and highly destructive litigation. Jon Logan at almost every chance attempted to frustrate, reduce, or eliminate the Trustee's value in Smart Communications as well as to avoid turn over of financial documents to assist the Trustee in evaluating the value of the Trustee's shares. And it was Jon Logan who caused this litigation to be much more aggressive and unnecessarily litigious than necessary. Under these circumstances, the Court exercises its discretion and awards the Trustee her attorney fees and expert costs from the date identified above.

*b.*
*§607.0746(1), Fla. Stat.*

The Trustee also moved for attorney fees and costs pursuant to her derivative claims pursuant to section 607.0746(1). The Court grants entitlement to the Trustee for her attorney fees for both Part 1, Phase 2 and Part 2, Phase 2 under this statute, against Smart Communications Holding, Inc. The Court, though, notes this statute requires this to be paid "from the amount recovered in the derivative proceeding by the corporation." Here, this amount at best for the Trustee would seem to be limited to the amount of Jon Logan's new shareholder loans and, potentially, the nonoperating asset value that ultimately were included within the valuation award. The Court will leave it to the evidentiary hearing to determine the maximum amount available under authority of this statute.

The Court, though, specifically rejects the contention that this statute gives authority for Phase 1 attorney fees. While the motion was timely by virtue of the enlargement of time [DIN 653], the Court would not be able to conclude the determination in Phase 1 of the existence of a shareholder's agreement constituted a return of assets or damage award in favor of Smart Communications Holding, Inc.

4.      **DIN 2291.** Alexis Logan seeks her attorney fees and costs against Smart Communications Holding, Inc. and Jon Logan.

*a.*
*§736.1004, Fla. Stat.*

The Court denies the motion in part to the extent it seeks attorney fees or costs associated with Phase 1 under section 736.1004, Florida Statutes. While the motion was timely by virtue of the enlargement of time [DIN 654], the nature of the declaratory judgment in Phase 1 does not give the Court authority under section 736.1004 to award attorney fees or costs associated with Phase 1. Even if it did, the Court would exercise its discretion and not award Phase 1 attorney fees or costs.

*b.*
*contractual basis*

The Court has already concluded that the Release and Indemnification Agreement Attorney fees and costs applies and that Smart Communications Holding, Inc. is responsible. The Court, therefore, grants the motion in part. The Court concludes entitlement is for both Part 1, Phase 2 and Part 2, Phase 2. The Court has severed the liquidation of the amount of attorney fees and costs to permit finality to this Final Judgment.

5.      **Conclusion on attorney fees and costs.** The Court notes that the issue of attorney fees and costs may not yet be closed, as the parties do have 30 days from the date of entry of judgment to file their motions.

**D.**
**Interest**

Page 7 of 15

A matter of substantial disagreement between the parties involves the application of interest. Under section 607.1436(5), an award of interest is discretionary, unless the Trustee's refusal to accept an offer was arbitrary or not in good faith. Section 607.1436(5) provides in pertinent part:

> Interest may be allowed at the rate and from the date determined by the court to be equitable; however, if the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, no interest shall be allowed.

Jon Logan and Smart Communications make a full throated argument that the Trustee acted unreasonably and arbitrarily. The evidence demonstrates that Jon Logan, on behalf of Smart Communications Holding, Inc., initially offered $20M for the shares. The Court finds the Trustee's rejection of this amount was not arbitrary, and it was not done in bad faith. The Trustee initially had information that suggested a much higher valuation.

After those initial discussions, Jon Logan began an aggressive campaign to eliminate all value of the Trustee's shares. He also actively worked to prevent the Trustee from receiving information to analyze valuation. While Jon Logan suggests that towards the end that he may have been willing to be flexible on valuation, the reality is the length and substantial legal spend in this case is directly attributable to Jon Logan's actions, not the Trustee.

The Court concludes that an award of interest is appropriate in this case, and the Court will impose interest in two parts. First, the Court will award interest beginning August 29, 2023, through the date of the Final Judgment. Second, the Court will award interest on the outstanding amount.

The Court, though, for the most part will not use statutory interest. The Court believes the equities require the Court to impose a lesser rate under these circumstances.

The Court concludes that, except for Default Interest Rate defined in the Purchase Order, the Court will set the interest rate at **5.00%**, calculated using a daily rate as a decimal of **0.000136986**.

### E.
### Conclusion of Valuation Award

Based on the above, the Court now calculates the Valuation Award.

From the Part 2, Phase 2 Order, the valuation amount is $40,581,308. From that amount, the Court sets off the Ranch Club home expenses ($272,348.18) and Wrongful Injunction damage ($287,769.00). This results in **$40,021,190.82**. Accrued interest on this amount at 5.00% since August 28, 2023 through the date of this Final Judgment is **$4,884,776.28**.

The summation of these two amounts is **$44,905,967.10**. This is the amount the Court will include in the Purchase Order as the net value of the Trustee's shares as of August 28, 2023. This amount will accrue interest at 5.00%, unless the Default Interest Rate applies as reflected in

the Purchase Order. The Purchase Order is attached to, and incorporated into, this Final Judgment.

**Based on the evidence and testimony presented—**

IT IS ADJUDGED that:

Pursuant to section 607.1436, Florida Statutes, the Court enters judgment that **SMART COMMUNICATIONS HOLDING, INC.**, whose address is 10491 72nd Street North, Seminole, Florida 33777; owes to, and shall pay to, **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; according to the terms of the Purchase Order, the total amount of **$44,905,967.10**, which amount will bear interest at **5.00%** (and calculated using the daily rate as a decimal of **0.000136986**), until paid, for the fair value of her 50% equity interest in Smart Communications Holding, Inc. as of August 28, 2023, for which let execution issue. The Purchase Order is attached to, and incorporated into, this Final Judgment. Pursuant to section 607.1436(6), Florida Statutes, the Purchase Order "shall be enforceable in the same manner as any other judgment."

Pursuant to the terms of the Bankruptcy Court's Lift Stay Order, enforcement of this Final Judgment is not permitted during the existence of the existing automatic bankruptcy stay.

**2.**
**SECOND AMENDED VERIFIED COMPLAINT [DIN 680]**
**FILED BY**
**JANICE LOGAN, AS TRUSTEE**
**(May 29, 2024)**

Based upon the evidence and testimony presented—

IT IS ADJUDGED that:

1.    **Count 1 (§86.011, Fla. Stat. Declaratory Judgment).** The Court concludes the Trustee is entitled to entry of declaratory judgment against Jon Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; HLFIP Holding, Inc.; and HLFIP Holding, LLC. The Court declares the Purported Royalty Transactions are "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes, and that they are invalid and of no legal force or effect. This declaration also includes declaring the accrual of the liability and associated interest expense as invalid.

2.    **Count 2 (§607.0748, Action to Appoint a Custodian or Receiver).** The Court notes that contained with the Purchase Order is the authority for the Court to appoint a Custodian or Receiver. Bases on the history in this case, the Court remains concerned that Jon Logan will operate outside of business judgment in a manner that adversely impacts Smart Communications Holding, Inc.'s ability to pay the Trustee according to the Purchase Order.

In the light of the Purchase Order, though, the Court dismisses this count without prejudice.

3.      **Count 3 (§607.1430, Action for Judicial Dissolution).** Upon entry of the Purchase Order contemplated by section 607.1436(5), Florida Statutes, the Court is required by section 607.1436(6) to "dismiss the petition to dissolve the corporation . . . ." Attached to this Final Judgment is the Court's proposed Purchase Order, which, but for the automatic bankruptcy stay.

Because there is no further judicial labor by the Court associated with the Purchase Order, though, the Court dismisses Count 3 in compliance with section 607.1436(6)

4.      **Count 4 (§607.0831, Director Liability) and Count 9 (Unjust Enrichment).** The parties agreed to the involuntary dismissal of these counts with prejudice.

5.      **Count 5 (Breach of Fiduciary Duty), Count 6 (Aiding and Abetting Breach of Fiduciary Duties), Count 7 (Fraud), Count 8 (Aiding and Abetting Fraud), Count 10 (Unjust Enrichment – Headquarters Building), Count 11 (Conversion - Yacht), and Count 12 (Unjust Enrichment - Yacht).**

The Court concludes these claims do not survive the valuation together with the Purchase Order. The Court dismisses these claims with prejudice.

The Court notes, though, that it expressly determined in its Part 2, Phase 2 Order that the Trustee would have prevailed on at least Count 12 relating to the Yacht. The Court further notes that while it did not expressly reference the same regarding the headquarters building, the Court now expressly states that the Trustee would have prevailed against Loco Florida, as the entity holding title to the building, despite all payments for that building coming from Smart Communications. The Court included the value of those assets in the valuation order.

The Court in making these references relating to the Yacht and Headquarters Building should not be read as an indication the other defendants to these counts would have prevailed. They would not.

**3.**
**TRUSTEE'S COUNTERCLAIMS [DIN 775]**
**FILED BY**
**THE TRUSTEE**
**(October 2, 2024)**

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

**Count 1 (Malicious Prosecution and Abuse of Process).** The Court by separate Order severed Count 1 [DIN 2330]. This Final Judgment does not address that Count, and it remains pending against Jon Logan and Smart Communications, Inc.

**Count 2 (§726.105(1)(a) and (1)(b), Fla. Stat., Uniform Fraudulent Transfer Act).** The Court's Declaration in Count 1 of the Trustee's Second Amended Verified Complaint resolved this issue favorable to the Trustee. The Court, therefore, dismisses this Count.

**Count 3 (§607.0831, Director Liability).** The parties agreed to the involuntary dismissal of this count with prejudice.

**Count 4 (Breach of Fiduciary Duty), Count 5 (Civil Conspiracy), and Count 6 (Aiding and Abetting Breach of Fiduciary Duties).** The Court concludes these claims do not survive the valuation together with the Purchase Order. The Court dismisses these claims with prejudice.

## 4.
## THE SECOND AMENDED COMPLAINT [DIN 891]
## FILED BY
## JON LOGAN AND SMART COMMUNICATIONS, HOLDING, INC.
### (December 4, 2024)

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1. **Count 1 (Unjust Enrichment v. the Personal Representative and Count 2 (Unjust Enrichment v. Janice Logan, individually)**. Smart Communications Holdings, Inc. sued the Personal Representative (Count 1) and Janice Logan, individually (Count 2) for unjust enrichment. Smart Communications failed to prove these counts, and the Court enters judgment in favor of the Personal Representative (Count 1) and Janice Logan, individually (Count 2).

2. **Count 3 (Unjust Enrichment).** The Court addressed this matter in the valuation award by setoff. No separate judgment is entered. The Court dismisses this count with prejudice.

3. **Count 4 (Unjust Enrichment – Alexis Logan distributions).** Smart Communications Holdings, Inc. sued Alexis Logan for unjust enrichment relating to various distributions. Smart Communications failed to prove this count, and the Court enters judgment in favor of Alexis Logan.

4. **Count 5 (Unjust Enrichment – Justin Peterson re BMW).** Smart Communications Holdings, Inc. sued Justin Peterson relating to funds associated with the purchase of a BMW. Smart Communications failed to prove this count, and the Court enters judgment in favor of Justin Peterson.

5. **Count 6 (Constructive Fraud).** Jon Logan sued the Personal Representative relating to withdrawals made by Jim Logan. Jon Logan failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

6.     **Count 7 (Conversion – Jim Logan's withdrawals).** Jon Logan and Smart Communications Holding, Inc. sued the Personal Representative relating to withdrawals of corporate funds made by Jim Logan. Jon Logan and Smart Communications failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

7.     **Count 8 (Conspiracy to Commit Conversion).** Jon Logan sued Janice Logan, individually, the Personal Representative, Alexis Logan, and Justin Peterson for conspiracy to commit conversion. Jon Logan failed to prove this count, and the Court enters judgment in favor of Janice Logan, individually, the Personal Representative, Alexis Logan, and Justin Peterson.

8.     **Count 9 (Breach of Fiduciary Duty), Count 10 (Breach of Fiduciary Duty), and Count 12 (Breach of Fiduciary Duty).** Jon Logan and Smart Communications Holdings, Inc. sued the Personal Representative for breach of statutory fiduciary duty in Count 9 and for common law breach of fiduciary duty in Count 10. Jon Logan and Smart Communications failed to prove these counts, and the Court enters judgment in favor of the Personal Representative.

9.     **Count 11 (Conspiracy to Commit Unjust Enrichment).** In Count 11, Smart Communications Holding, Inc. sued Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson for conspiracy to commit unjust enrichment. Smart Communications failed to prove this count, and the Court enters judgment in favor of Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson.

10.    **Count 12 (Aiding and Abetting Breach of Fiduciary Duty).** In Count 12, Jon Logan and Smart Communications Holding, Inc. sued Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson for aiding and abetting breach of fiduciary duty. Smart Communications failed to prove this count, and the Court enters judgment in favor of Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson.

11.    **Count 13 (Negligence).** Jon Logan and Smart Communications Holding, Inc. sued the Personal Representative relating to withdrawals of corporate funds made by Jim Logan in a negligence claim. Jon Logan and Smart Communications failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

12.    **Count 14 (Breach of Fiduciary Duty re: Tax Liabilities).** Jon Logan and Smart Communications Holding, Inc. sued the Personal Representative for breach of fiduciary duty relating to exposing Smart Communications to potential tax liabilities. Jon Logan and Smart Communications failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

13.    **Count 15 (Breach of Fiduciary Duty re: Compensation) and Count 17 (Fraudulent Inducement re: Compensation).** Jon Logan sued the Personal Representative relating to Jon Logan's compensation (Count 15, for breach of fiduciary duty; and Count 17 for fraud in the inducement). Jon Logan failed to prove these counts, and the Court enters judgment in favor of the Personal Representative.

14. **Count 16 (Misrepresentation re: IP) and Count 18 (Fraudulent Inducement re: IP)**. Jon Logan sued the Personal Representative relating to intellectual property (Count 16, for misrepresentation; and Count 18 for fraud in the inducement). Jon Logan failed to prove these counts, and the Court enters judgment in favor of the Personal Representative.

15. **Count 19 (Indemnification – Yacht Broker) and Count 20 (Breach of Fiduciary Duty re: Yacht Broker)**. Based on the agreement of the parties [DIN 2274], the Court previously dismissed these counts without prejudice.

16. **JONATHAN LOGAN**, whose address is 10491 72nd Street North, Seminole, Florida 33777; and **SMART COMMUNICATIONS HOLDING, INC.**, whose address is 10491 72nd Street North, Seminole, Florida 33777; shall take nothing by this action and that each of **JANICE LOGAN, individually**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **JANICE LOGAN, as Personal Representative of the Estate of JAMES LOGAN**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **ALEXIS LOGAN**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; and **JUSTIN PETERSON**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; shall go hence without day.

17. The Court reserves jurisdiction to award attorney fees or costs or both, if any, upon a timely filed motion.

## 5.
## JON LOGAN'S COUNTERCLAIM [DIN 1861]
## FILED BY
## JON LOGAN AND SMART COMMUNICATIONS, HOLDING, INC.
## (August 15, 2025)

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1. **Count 1 (§86.011, Fla. Stat. Declaratory Judgment)**. Jon Logan and Smart Communications Holding, Inc. sued Janice Logan, individually, and the Trustee for declaratory relief that the interest is not available under section 607.1436(5), where the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, then no interest shall be allowed. In the Additional Findings section above in this Final Judgment, the Court resolved this issue against Jon Logan and Smart Communications Holding, Inc. The Court found the Trustee did not arbitrarily refuse to accept an offer of payment, and the Court further found the Trustee acted in good faith. The Court exercised its discretion to and awarded interest. The Court declares that the Trustee's refusal to accept the offer of payment was not arbitrary, and the Trustee operated in good faith.

2. **JONATHAN LOGAN**, whose address is 10491 72nd Street North, Seminole, Florida 33777; and **SMART COMMUNICATIONS HOLDING, INC.**, whose address is 10491 72nd Street North, Seminole, Florida 33777; shall take nothing by this action and that

Page 13 of 15

each of **JANICE LOGAN, individually**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; and **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; shall go hence without day.

3.      The Court reserves jurisdiction to award attorney fees or costs or both, if any, upon a timely filed motion.

## 6.
## ALEXIS LOGAN COUNTERCLAIMS [DIN 1790]
## FILED BY
## ALEXIS LOGAN
## (August 4, 2025)

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1.      **Count 1 (Malicious Prosecution and Abuse of Process).** The Court by separate Order severed Count 1 [DIN 2330]. This Final Judgment does not address that Count, and it remains pending against Jon Logan and Smart Communications, Inc.

2.      **Count 2 (Conspiracy).** Before trial, Alexis Logan voluntarily dismissed Count 2 [DIN 1920]. Thus, that Count was not tried and no longer pends.

3.      **Count 3 (Contractual Indemnity).** In Count 3, Alexis Logan sued Smart Communications, Inc. for contractual indemnity. The Court found in Part 2, Phase 2 that Smart Communications, Inc. breached its indemnity obligation. The Court concludes that Alexis Logan is entitled to recover her attorney fees pursuant to the contract. The amount of attorney fee damage due to Alexis Logan will be tried separately. To the extent necessary to ensure the finality of this Final Judgment, the Court would sever the attorney fee matter in Count 3. Generally, attorney fees are collateral and do not affect the finality of the judgment. The Court will enter a separate final judgment as to Count 3 attorney fees following the determination of those amounts.

## 7.
## HLFIP'S COUNTERCLAIMS [DIN 1863]
## FILED BY
## HLFIP HOLDING, LLC
## (August 15, 2025)

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1.      **Count 1 (Unjust Enrichment).** In Count 1, HLFIP Holding, LLC sued Janice Logan, individually, the Trustee, and Alexis Logan for unjust enrichment. The Court concluded that HLFIP failed to prove this count.

2.      **Count 2 (Quantum Meruit).** In Count 2, HLFIP sued Janice Logan, individually, the Trustee, and Alexis Logan for quantum meruit. The Court concluded that HLFIP failed to prove this count.

3.      **HLFIP HOLDING, LLC**, whose address is 10491 72nd Street North, Seminole, Florida 33777; shall take nothing by this action and that each of **JANICE LOGAN, individually**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; and **ALEXIS LOGAN**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; shall go hence without day.

4.      The Court reserves jurisdiction to award attorney fees or costs or both, if any, upon a timely filed motion.

**THE COURT RETAINS JURISDICTION TO ENFORCE
THIS FINAL JUDGMENT AS WELL AS THE PURCHASE ORDER**

DONE AND ORDERED in Sarasota County, Florida, on February 05, 2026.

e-Signed 2/5/2026 4:03 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

**SERVICE CERTIFICATE**

On February 05, 2026, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individual who do not have an email address on file with the Clerk of Court.

Counsel of Record.

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
   Plaintiff,

v.

             CASE NO.  2023 CA 001002 NC
             DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
   Defendant.

_____

**PURCHASE ORDER**
**WITH PAYMENT TERMS AND SECURITY**


**This Purchase Order is \*Proposed\***
**due to the scope of the Lift Stay Order**
**but are the terms the Court would impose in its**
**Purchase Order contemplated by section 607.1436(5), Florida Statutes**


   Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "Trustee" and "Trust," respectively) filed a Second Amended Complaint [DIN 680] seeking, among other things, judicial dissolution under section 607.1430, Florida. The Trustee is a 50% shareholder of Smart Communications Holding, Inc. ("Smart Communications"). In response, Smart Communications filed an election to purchase the Trustee's shares pursuant to section 607.1436, Florida Statues [DIN 696/TX438]. The parties were unable to reach agreement on the fair value of the shares pursuant to section 607.1436(3). Therefore, this Court held a ten-day bench trial, the focus of which was determining the fair value of the Trustee's shares.


Page 1 of 15

That trial was preceded by a previous bench trial that addressed other matters that served as gatekeeping issues for the valuation trial.

In its Order with Findings and Conclusions of Law from Part 2 of Phase 2 Trial [DIN 2254] ("Part 2 of Phase 2 Order"), the Court determined that the fair value of the Trustee's shares in Smart Communications as of August 28, 2023, was $41,921,086. After applying an offset, the Court determined the Trust is ultimately owed $40,581,308 for the fair value of its shares, subject to various adjudgments outlined within Part 2 of Phase 2 Order. The Court directed the parties to submit memoranda setting forth their positions as to reasonable terms of purchase. The parties submitted these memoranda. The Court then received evidence and oral argument regarding the payment terms on January 12, 2026.

The Court pauses to note that Smart Communications filed for Chapter 11 bankruptcy on December 16, 2025, following the entry of the Part 2 of Phase 2 Order. The Bankruptcy Court for the Middle District of Florida modified the automatic stay to allow this Court to "hold an evidentiary hearing on payment terms and security, attorneys' fees and interest, and all other evidentiary issues discussed in the State Court's" Part 2 of Phase 2 Order. *In re Smart Communications Holding, Inc.*, 8:25-bk-09473-RCT, Agreed Am. Order Modifying the Automatic Stay (the "Lift Stay Order"), Dkt. No. 55 (Bankr. M.D. Fla. Jan. 9, 2026) [DIN 2301]. The Lift Stay Order further authorized this Court to:

> enter a complete final judgment (i) on the amount of the claim for the election to purchase the Trust's shares, (ii) the parties' respective claims of entitlement to attorneys' fees and interest, (iii) the awarded amount of attorneys' fees and interest, if any, and (iv) on all other pending claims in the State Court Case adjudicated during Phase 2. The State Court may, if it elects, to include as part of its judgment proposed findings as to payment terms and security.

*Id.*

Returning to the issue of set-off and valuation, the Court now finds there should be a total further set-off of $560,117.18. This reduced the valuation as of August 23, 2023, to **$40,021,190.82**.

The Court then applied a 5.00% interest rate to this new amount, resulting in accrued interest from August 23, 2023, through and inclusive of February 5, 2026, of **$4,884,776.28**.

The Valuation Award as of February 5, 2026, is **$44,905,967.10** for the fair value of her 50% equity interest in Smart Communications Holding, Inc. as of August 28, 2023. This amount will accrue interest at **5.00%** (and calculated using the daily rate as a decimal of **0.000136986**) until paid, unless Default Interest Rate applies.

Based on the evidence, testimony, and arguments of the parties, the Court notes Jon Logan's substantial history in attempting to evade payment of any value to the Trustee for the Trustee's shares. This includes taking actions that are inconsistent with ordinary business judgment. The Court includes additional provisions in this Purchase Order to guard against Jon Logan attempting to use Smart Communications or any of its subsidiaries, affiliates, or related entities in which Jon Logan

owns a 10% or greater legal or beneficial interest to avoid payment to the Trustee. Even with those additional measures, the Court remains concerned that he will attempt to evade payment.

Although no receiver or custodian is currently recommended, the Court will not hesitate to appoint a receiver or custodian (or if the case remains in Bankruptcy Court, to recommend to the Bankruptcy Court to appoint a receiver or custodian) should it be found that Jon Logan is attempting to avoid paying the Trustee according to the Final Judgment and Purchase Order or otherwise operating outside of normal business judgment.

**IT IS ORDERED AND ADJUDGED** that:

The findings, analysis, and conclusions of law from the Part 1 of Phase 2 Order [DIN 1189] and Part 2 of Phase 2 Order [DIN 2254] with limited reconsideration [DIN 2331] are incorporated into this order as if fully set forth. Pursuant to section 607.1436, the Court directs the purchase by Smart Communications of the Trustee's Smart Communications shares on the following terms:

1. **Definition.**

   a. "HLFIP" means HLFIP Holding, Inc. and HLFIP Holding, LLC.

   b. "Smart Communications" means Smart Communications Holding, Inc.

   c. "Subsidiaries, Affiliates, and Related Entities" means the subsidiaries, affiliates, and related entities of Smart Communications Holding, Inc., including but not limited to Smart Communications Holdings, LLC; Smart Communications DeSoto, Inc.; Smart Communications Lee, Inc.; Smart Communications West, Inc.; Smart Communications Collier, Inc.; Smart Communications Pasco, Inc.; Smart Communications Yacht Holdings, LLC; Loco Florida, LLC; and Smart Communications US, Inc. The definition specifically excludes HLFIP

2. **Valuation Award.** The Court determines the value of the Trustee's 50% interest in Smart Communications Holding, Inc., as of August 28, 2023, after all set-offs, is $40,021,190.82. Accrued interest since that date through February 5, 2026, is $4,884,776.28, making the total Valuation Award on February 5, 2026, to be **$44,905,967.10**. This amount will accrue interest at **5.00%**(and calculated using the daily rate as a decimal of **0.000136986**) until paid, unless Default Interest Rate applies.

3. **Share Transfer.** The Trustee shall transfer the Trustee's 50% equity interest in Smart Communications within 10 days after the date the Purchase Order becomes final.

4. **Installment Payments Subject to Distribution Solvency Analysis.** The Court finds it equitable and necessary to direct the payment of the Value Award, interest, and attorney fees and costs in installments under section 607.1436(5), Florida Statutes. Each installment payment will be made only if, and to the extent of, Smart Communications' ability to make a distribution to a shareholder under section 607.0641, Florida Statutes, as required by section 607.1436(8).

5.      **Shareholder Rights Extinguished.** Pursuant to section 607.1436(6): "Upon entry of an order under subsection (3) or subsection (5), the court shall dismiss the petition to dissolve [Smart Communications] under section 607.1430(1)(b) and the petitioning shareholder shall no longer have any rights or status as a shareholder of the [Smart Communications], except the right to receive the amounts awarded by the order of the court, which shall be enforceable in the same manner as any other judgment." Although the Trustee's rights and status of a shareholder, the Court finds the terms and conditions of the Purchase Order are necessary to protect the Trustee's interests and are appropriate under the facts of this case.

6.      **Payments.**

    a.      **Start Date.** The first payment must be made within 10 days of entry of the Purchase Order or other date directed by the Bankruptcy Court.

    b.      **Frequency.** Payments shall be made monthly.

    c.      **Amount.** 3.2% of annual net revenue, plus the additional amounts required once the Yacht is sold. ($750,000 yearly, payable $62,500 per month, effective the first month after the Yacht is sold and all recurring expenses end). For the avoidance of doubt, the $750,000 (payable $62,5000 monthly) is in addition to the 3.2% annual net revenue amount, payable monthly.

    d.      **True-up.** Within 45 days after issuance of Smart Communications' consolidated audited year-end financials, 80% of available cash flows (excluding extraordinary expenses and transactions) less that year's net revenue amount will be devoted for the true-up. In the event the true-up payment would result in a violation of section 607.06401, Smart Communications will pay only that portion of the true-up amount that would not result in a section 607.06401 violation.

    e.      **Compliance with section 607.06401.** If Smart Communications contends a monthly payment or true-up would violate section 607.06401, Smart Communications must still pay that portion of principal, interest, and attorneys' fees due each month or the true-up that it contends does not violate section 607.0641. The remainder of that monthly payment or true-up is deferred (not waived) and accrues interest at the Default Interest Rate and immediately triggers Enhanced Protections.

    f.      **Default Interest Rate.** The Default Interest Rate will be the greater of 5.00% or the then current statutory interest rate as determined by Florida's Chief Financial Officer by section 55.03, Florida Statutes, then in effect on the date of default, and that rate will remain the same until the default is cured. There may be separate defaults from time to time, and each separate default will bear the Default Interest Rate at the statutory interest rate then in effect.

g.   **Enhanced Protections.** If Enhanced Protections are triggered, Smart Communications shall immediately provide an officer's certificate and auditor/reviewer attestation to the Trustee demonstrating the specific section 607.06401 impediment and a plan to cure (e.g., identified asset sales and timing). A payment, either in part or totally, that is not made due to a section 607.0641 concern does not constitute a payment default initially. If the inability to pay the balance of the payment together with accrued interest persists for more than 90 days (the Cure Period), it triggers a default and the accompanying remedies provided below.

7.   **Security.**

a.   **Lien.** A lien (of highest priority permissible by law) exists in favor of the Trustee on all tangible and intangible assets and equity interests of Smart Communications and its Subsidiaries, Affiliates, and Related Entities used or held for use in the business, including, without limitation, revenue, cash flow, chattel, inventory, and intellectual property. For the avoidance of doubt, this includes the nonoperating assets discussed in the Valuation Order unless and until disposed in a manner authorized by the Part 2 of Phase 2 Order or Purchase Order. Further, the Court specifically rejects Smart Communications' position that the Trustee becomes an unsecured creditor with no priority.

b.   **Equity Pledge.** Smart Communications shall pledge 100% of its equity and 100% of the equity it holds in its Subsidiaries, Affiliates, and Related Entities as collateral until the Purchase Order is paid in full.

c.   **Asset Pledge.** Smart Communications shall additionally pledge its headquarters building, which it purchased, but which is held by Loco Florida, LLC; the Riva Corsaro Yacht, which it purchased, but which is held by Smart Communications Yacht Holding, LLC; and the promissory notes relating to any assets Jon Logan elects to receive in exchange for shareholder loans (until such loans are paid off) pursuant to the Purchase Order as collateral until the Purchase Order is paid in full.

d.   **Requirement to retitle assets.** The Court notes that the headquarters building and the Yacht were paid for by Smart Communications, and the value of that building and Yacht has been included in the Valuation Award. The Court is not requiring Smart Communications to seek to cause those assets to be retitled at this time. However, the Court retains the right to direct Smart Communications to institute and pursue legal proceedings to have those assets returned to Smart Communications as those assets indisputably were paid by Smart Communications and it would be inequitable under the circumstances to allow Loco Florida, LLC and Smart Communications Yach Holding, LLC to retain those assets without paying full value for the assets.

8.    **Nonoperating Asset Disposition.**

    a.    **Tierra Verde Property.** Within 30 days of entry of the Final Judgment, as provided in Part 2 of the Phase 2 Order, Jon Logan is permitted to require Smart Communications to distribute the Tierra Verde home in Pinellas County to Jon Logan. If Jon Logan timely elects distribution of the Tierra Verde home, he will not need to pay Smart Communications the $4,060,333 in value. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not timely elect distribution of the Tierra Verde home, Jon Logan would then need to vacate the Tierra Verde home immediately, and Smart Communications will then proceed to sell it immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. Note: all expenses for upkeep and repair associated with the Tierra Verde home beginning August 29, 2023, through the date the deed is delivered to Jon Logan or Jon Logan vacates the home is the responsibility of Jon Logan, even if Smart Communications paid for the expense in the first instance. Jon Logan may either repay Smart Communications for these expenses or they must be carried on the books of Smart Communications as a shareholder loan and must remain on the books until either paid by Jon Logan or Smart Communications completes payment to the Trustee of the value of the Trustee's shares. If Jon Logan elects to continue to live in the Tierra Verde home, Smart Communications may continue to make ordinary course upkeep and repair payments so long as those amounts do not materially change from historical expenses. Those expenses will also need to be characterized, or recharacterized, as shareholder loans.

    b.    **Ranch Club Property.** Within 30 days of entry of the Final Judgment, as provided in the Part 2 of the Phase 2 Order, the Trustee is permitted to require Smart Communications to distribute the Ranch Club home in Sarasota County to the Trustee. If the Trustee timely elects distribution of the Ranch Club home, the election will reduce the amount Smart Communications owes the Trustee by $2,591,000. If the Trustee does not timely elect distribution of the Ranch Club home, the Trustee would then need to vacate the Ranch Club home immediately, and Smart Communications shall then proceed to sell it immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. Note: all expenses for upkeep and repair associated with the Ranch Club home beginning August 29, 2023, through the date the deed is delivered to the Trustee or the Trustee vacates the home is the responsibility of the Trustee, even if Smart Communications paid for the expense.

c.      **Brickell Avenue Condominium.** The evidence is that the title was transferred back to Smart Communications, which then sold the Brickell Avenue condominium. Smart Communications received the proceeds from sale and then used them for company purposes. No further action or adjustment is necessary.

d.      **Riva Corsaro Yacht.** Smart Communications shall cause the Yacht to be sold immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell the Yacht soon. After retiring the debt and paying broker commission, at least 50% of the net proceeds will be paid to the Trustee. Effective the first month after the Yacht is sold and the recurring expenses for the Yacht cease: (1) Smart Communications will pay the Trustee a minimum of $62,500 additional per month, which is in addition to the 3.2% of annual net revenue; and (2) Smart Communications may increase Jon Logan's base salary by up to $50,000 per month.

e.      **Nor-Tech Center Console Boat.** Within 30 days of entry of the Final Judgment, Jon Logan may elect to purchase the Nor-Tech Center Console Boat for $887,500. If he does so, he may pay Smart Communications in cash or via shareholder loan, with a signed promissory note in favor of Smart Communications repayable over 6 years (72 monthly payments) in even amortized payments at 5% interest annually. Smart Communications will have a first position lien on that vessel until the promissory note is satisfied. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not make this election, the vessel needs to be sold in a commercially reasonable manner at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell that vessel in a timely manner. At least 50% of the proceeds from the sale of the vessel will be used to reduce Smart Communications' outstanding obligation to the Trustee. In the event Smart Communications made a promissory note, at least 50% of the monthly payments received by Smart Communications must be provided to the Trustee. This amount is in addition to 3.2% of annual net revenue as well as any additional amounts authorized by the Part 2 of Phase 2 Order or the Purchase Order. There will be no docking fees or charges or any kind associated with the vessel being docked or kept at the Tierra Verde home.

f.      **The Exotic Cars.** Within 30 days of entry of the Final Judgment, Jon Logan may elect to purchase any or all of the following exotic cars: (1) the 2020 Lamborghini Huracan for $130,000; (2) the 2017 Ferrari 488 Spider; or (3) 2015 Rolls Royce Wraith for $140,000. If he elects to

purchase one, two, or all three of these exotic cars, he may pay Smart Communications in cash or via shareholder loan, with a signed promissory note in favor of Smart Communications repayable over 6 years (72 monthly payments) in even amortized payments at 5% interest annually. Smart Communications will have a first position lien on each exotic car for which it made a promissory note until the promissory note is satisfied. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not make this election, or if he only elects to purchase only one of two exotic cars, the remaining exotic car or cars need to be sold in a commercially reasonable manner at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell the remaining exotic car or cars. At least 50% of the proceeds from the sale of the exotic cars will be used to reduce Smart Communications' outstanding obligation to the Trustee. In the event Smart Communications made a promissory note, at least 50% of the monthly payments received by Smart Communications must be provided to the Trustee. This amount is in addition to 3.2% of annual net revenue as well as any additional amounts authorized by the Part 2 of Phase 2 Order or the Purchase Order. There will be no garage fees or charges or any kind associated with the exotic cars being garaged or kept at the Tierra Verde home.

g. **Everyday Cars.** Jonathan Logan and the Trustee may require Smart Communications to distribute the vehicle they currently drive into their personal possession without further accounting adjustment or payment. For Jon Logan, this is the Land Rover. For the Trustee, this is the Cadillac Escalade.

9. **Headquarters Building.** The Trustee's 50% interest in Loco Florida, LLC is extinguished for the reasons stated in the Part 2 of Phase 2 Order. No further rent is owed to Loco Florida, LLC.

10. **Jon Logan's salary.** Until all payments to the Trustee have been made, Jonathan Logan's base salary will be $120,000 per year, subject to adjustment as detailed in the Part 2 of Phase 2 Order and the Purchase Order. On July 1 of each year, Jon Logan's base salary may be increased by the same percentage increase the Florida Legislature provides for state employees. Note this is general state employees and not any specific classification receiving a pay adjustment. For instance, in fiscal year 2025-2026, the Legislature authorized a 2% pay increase. The Court authorizes Smart Communications to retroactively provide the 2% pay increase to Jonathan Logan's salary effective July 1, 2025. As provided above, effective the month after the last of all payments associated with the Yacht are made, Smart Communications may increase Jon Logan's base the salary term by an additional $600,000 per year maximum (payable $50,000 monthly maximum).

11. **Payment of HLFIP Expenses.** Smart Communications and its Subsidiaries, Affiliates, and Related Entities shall pay to HLFIP, from August 29, 2023, through the date of the Purchase Order a Royalty payment using the formula identified in the Part 2 of Phase 2 Order. Thereafter, Smart Communications and its Subsidiaries, Affiliates, and Related Entities shall pay to HLFIP, a Royalty each month, using the same formula. However, no cash will be provided to HLFIP until all "due froms" incurred by HLFIP beginning August 29, 2023, have been satisfied. Smart Communications and its Subsidiaries, Affiliates, and Related Entities ***must immediately*** discontinue paying HLFIP (or on HLFIP's behalf) any amount that exceeds the then current Royalty due.

Smart Communications and its Subsidiaries, Affiliates, and Related Entities ***may not*** accelerate Royalty payments, and Smart Communications and its Subsidiaries, Affiliates, and Related Entities may not pay HLFIP the amount the Court reduced Smart Communications' valuation based on discounted future payments to HLFIP (as referenced on pages 30-31, and 45 of the Part 2 of Phase 2 Order). The Court specifically rejects HLFIP's position that the discounted future payment amount the Court used to reduce the value of Smart Communications as of August 28, 2023, is currently due HLFIP or that Smart Communications currently owes HLFIP that amount.

To the extent Smart Communications or any of its Subsidiaries, Affiliates, and Related Entities have paid any HLFIP expenses, including attorneys' fees and costs in this proceeding, beginning August 29, 2023, those expenses must be accounted for as shareholder loans taken by Jon Logan and are to be considered as additional security for repayment of the Purchase Order and Final Judgment, and that sum will act as a setoff against any going-forward royalty obligation.

To the extent HLFIP needs cash to pay current creditors, including tax payments, Smart Communications may provide that cash to (or pay on behalf of) HLFIP only with the consent of the Trustee. The Trustee shall not unreasonably withhold the consent where HLFIP's outstanding obligations, especially where the withholding of paying those creditors may adversely impact Smart Communications' operations, including the loss of intellectual property, if not paid.

12. **Positive Covenants.** Unless the Trustee expressly consents in writing (with such consent not unreasonably withheld by the Trustee) or the Court orders otherwise—until the Trustee has received all payments—Smart Communications and its Subsidiaries, Affiliates, and Related Entities will:

    a.    comply with all applicable laws and governmental regulations.

    b.    maintain in effect its corporate existence and good standing in all jurisdictions.

    c.    discharge on a timely basis all ordinary course taxes and material business contract obligations and continue all material contracts in full force and effect.

    d.    do all things necessary to obtain, preserve and renew any permits or licenses used, held for use or necessary for the conduct of business.

    e.    maintain and preserve all property necessary to the conduct of business.

f.     maintain insurance with financially sound and reputable insurers in such amounts and against such risks as is customary for its business.

g.     maintain books and records in accordance with GAAP.

h.     record in writing all actions taken by the board of directors or shareholder of Smart Communications, and provide copies of such records to the Trustee within seven (7) days of the action.

i.     deliver to the Trustee via email monthly a copy of all expense reports submitted by Jon Logan as well as confirmation of all amounts paid to, or on behalf of Jon Logan, each month. To the extent the report would show any private medical information, that information can be redacted. This submission will be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge

j.     deliver to the Trustee via email monthly unaudited consolidated financial statements. Statements reflecting the preceding month shall be delivered no later than thirty (30) days following the end of that month and be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge.

k.     deliver to the Trustee via email quarterly unaudited consolidated financial statements. Statements reflecting the preceding quarter shall be delivered no later than forty-five (45) days following the end of that quarter and be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge.

l.     deliver to the Trustee via email annual audited consolidated financial statements. Annual audited financial statements shall be provided within forty-five (45) days of the finalization of such statements by Smart Communications' third-party accountant.

m.     subordinate any debt of their debt to this Purchase Order and Final Judgment after entry of the Purchase Order and Final Judgment.

n.     notify the Trustee within seven calendar days of the filing of any litigation, breach or alleged breach of any material contracts, defaults or alleged defaults of any material indebtedness, any asserted or alleged violations of law, or any

event that may materially impact the ability to pay any payment to the Trustee when due.

o.     require and maintain detailed expense reports for any payments made to Jon Logan or that benefit Jon Logan with receipts justifying the corporate purpose of the expense.

13.     **Negative Covenants.** Unless the Trustee expressly consents in writing (with such consent not unreasonably withheld by the Trustee) or the Court orders otherwise—until the Trustee has received all payments—Smart Communications and its Subsidiaries, Affiliates, and Related Entities will not:

a.     change its name, identity, organizational structure, state of organization, business, or fiscal year.

b.     make any payment to or on behalf of HLFIP in any manner other than provided in the Purchase Order.

c.     enter into any transactions with or make any payments or transfers to any affiliates or entities in which Jon Logan possesses an equity or beneficial interest greater than 5% (specifically including without limitation Smart Communications Yacht Holding, LLC; Loco Florida, LLC; and HLFIP Holding, LLC) other than on an arms-length basis except as specifically authorized by the Valuation Order or Purchase Order.

d.     effect any sales or issuances of equity interests or any warrants, options, or other securities convertible into, or exercisable for, any equity interests, or such other transactions in respect of equity interests.

e.     merge or consolidate with any person or entity.

f.     acquire or be acquired by another person or entity.

g.     sell all or substantially all of the assets used or held for use in business, or sell or license any of such assets, outside the ordinary course of business unless authorized by the Valuation Order or Purchase Order.

h.     sell lease, assign, transfer, or otherwise dispose of any material portion of its properties and assets to any person or entity in any transaction without unless authorized by the Valuation Order or Purchase Order.

i.     sell, discount, or otherwise dispose of any notes receivable, accounts receivable, shareholders loan, or other right to receive payment other than in the ordinary course of business consistent with past practice. The "other than in the ordinary course of business consistent with past practice" specifically excludes the ability to sell, discount, or otherwise dispose of any notes

Page 11 of 15

receivable, shareholders loan, or other right to receive payment from Jon Logan or from any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest, and there is no authority to sell, discount, or otherwise dispose of those assets.

j.    subordinate the Purchase Order to any indebtedness.

k.    grant any new liens on their assets to secure any indebtedness.

l.    guarantee the obligations of any other person or entity unless authorized by the Valuation Order or Purchase Order.

m.    incur any new debt for borrowed money where the total amount owed exceeds more than $500,000, cumulatively, at any given time. This amount excludes: (1) on-going or one-time credit card charges or ordered items incurred in the ordinary course that are to be paid in full within 30 days of receipt of the purchased item or received bill; and (2) the existing debt associated with the Yacht.

n.    authorize, create, or issue any securities.

o.    redeem, acquire, or purchase any equity interests unless authorized by the Valuation Order or Purchase Order.

p.    pay or declare any dividend or other distribution on any equity interests.

q.    pay or cause to be made any dividends, redemptions, management fees, or related-party payments unless authorized by the Valuation Order or Purchase Order.

r.    create any non-wholly owned subsidiary.

s.    amend, repeal, or alter the articles of incorporation, bylaws, or other governance documents.

t.    liquidate, dissolve, or wind up unless authorized by the Valuation Order or Purchase Order.

u.    make any material change in accounting policies.

v.    make any material change to the nature of its business.

w.    provide replacement vehicles for Jon Logan's company use more than once every five years, but in all events, such replacement car cannot exceed the type or quality of the existing Land Rover. In the event of a finance or lease of

a future vehicle, the maximum monthly payment is limited to $1,250, adjusted annually by the same percentage used to increase Jon Logan's base salary.

    x.    decline to preserve any or all claims for right to payment, under contract or otherwise, against any third party, or settle or compromise any such claims, except in the ordinary course of business and based on good business judgment. For purposes of this covenant, Jon Logan and any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest is not considered a third party.

    y.    settle any litigation against Jon Logan or against any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest.

    z.    settle any litigation (other than against Jon Logan or any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest) outside of the ordinary course.

    aa.    engage in any act, or refrain from engaging in any act, whose purpose or effect is to materially impair or prevent the ability to pay the Trustee of any payment when due or otherwise to defeat the Purchase Order or the Final Judgment.

14.    **Acceleration for Liquidity Events.**  If at any time before Smart Communications pays the Trustee the full amount due under the Purchase Order, the Trustee or the Court approves of the sale of all or substantially all of Smart Communications' assets; Smart Communications merges or consolidates with another entity; Smart Communications is acquired; or Smart Communications otherwise undergoes a change of control (any of which shall be a "Liquidity Event"), then the entire principal amount of the Purchase Order, together with all accrued interest thereon and all other amounts payable under the Purchase Order, shall become immediately due and payable, and Smart Communications shall pay such amounts to the Trustee.

15.    **Default.**  Events of default include without limitation:

    a.    any payment block on section 607.06401 grounds not cured within 90 days;

    b.    breach of any term of this Purchase Order, specially including but in no way limited to breach of any positive or negative covenant;

    c.    default under other secured obligations;

    d.    incurrence of a judgment in excess of $100,000;

    e.    unauthorized liens or transfers;

    f.    false representations to the Trustee or the Trustee's agents;

g.    termination or impairment of any lien or guarantee; or

h.    insolvency events.

16.    **Default remedies.** Remedies for an event of default include without limitation:

a.    appointing a custodian or receiver empowered to oversee Smart Communications and its Subsidiaries, Affiliates, and Related Entities until the Purchase Order and Final Judgment are paid in full.

b.    directing the continued imposition of interest at the Default Interest Rate or any other interest rate provided in the Purchase Order or Final Judgment.

c.    directing of specific performance of the Purchase Order and Final Judgment.

d.    awarding injunctive relief necessary to restore payments under the Purchase Order and Final Judgment.

e.    awarding attorney fees and costs to the Trustee associated with vindicating the Purchase Order or Final Judgment.

f.    directing the turnover of collateral to the Trustee, including pledged equity.

17.    **Entry of confidentiality agreement.** Smart Communications and the Trustee shall enter into a confidentiality agreement that will prohibit the Trustee from making public any Smart Communications information that Smart Communications reasonably designates as confidential. In the event the Trustee seeks Court intervention relating to the Final Judgment or Purchase Order, the Trustee will use the Trustee's best efforts to maintain the confidentiality of the material so designated and request the court to maintain the confidentiality, too. However, this provision does not prohibit the Trustee from seeking court relief even if the court declines to maintain the confidentiality of the designated information.

18.    **Retention of jurisdiction.** The Court retains jurisdiction to enforce the Final Judgment and the Purchase Order until each is fully satisfied.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on February 05, 2026.

e-Signed 2/5/2026 4:01 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

Page 14 of 15

## SERVICE CERTIFICATE

Counsel of Record

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
       Plaintiff,

v.

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
       Defendant.

CASE NO.  2023 CA 001002 NC
DIVISION C CIRCUIT

_____

**PURCHASE ORDER**
**WITH PAYMENT TERMS AND SECURITY**

**This Purchase Order is \*Proposed\***
**due to the scope of the Lift Stay Order**
**but are the terms the Court would impose in its**
**Purchase Order contemplated by section 607.1436(5), Florida Statutes**

    Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "Trustee" and "Trust," respectively) filed a Second Amended Complaint [DIN 680] seeking, among other things, judicial dissolution under section 607.1430, Florida. The Trustee is a 50% shareholder of Smart Communications Holding, Inc. ("Smart Communications"). In response, Smart Communications filed an election to purchase the Trustee's shares pursuant to section 607.1436, Florida Statues [DIN 696/TX438]. The parties were unable to reach agreement on the fair value of the shares pursuant to section 607.1436(3). Therefore, this Court held a ten-day bench trial, the focus of which was determining the fair value of the Trustee's shares.

That trial was preceded by a previous bench trial that addressed other matters that served as gatekeeping issues for the valuation trial.

In its Order with Findings and Conclusions of Law from Part 2 of Phase 2 Trial [DIN 2254] ("Part 2 of Phase 2 Order"), the Court determined that the fair value of the Trustee's shares in Smart Communications as of August 28, 2023, was $41,921,086. After applying an offset, the Court determined the Trust is ultimately owed $40,581,308 for the fair value of its shares, subject to various adjudgments outlined within Part 2 of Phase 2 Order. The Court directed the parties to submit memoranda setting forth their positions as to reasonable terms of purchase. The parties submitted these memoranda. The Court then received evidence and oral argument regarding the payment terms on January 12, 2026.

The Court pauses to note that Smart Communications filed for Chapter 11 bankruptcy on December 16, 2025, following the entry of the Part 2 of Phase 2 Order. The Bankruptcy Court for the Middle District of Florida modified the automatic stay to allow this Court to "hold an evidentiary hearing on payment terms and security, attorneys' fees and interest, and all other evidentiary issues discussed in the State Court's" Part 2 of Phase 2 Order. *In re Smart Communications Holding, Inc.*, 8:25-bk-09473-RCT, Agreed Am. Order Modifying the Automatic Stay (the "Lift Stay Order"), Dkt. No. 55 (Bankr. M.D. Fla. Jan. 9, 2026) [DIN 2301]. The Lift Stay Order further authorized this Court to:

> enter a complete final judgment (i) on the amount of the claim for the election to purchase the Trust's shares, (ii) the parties' respective claims of entitlement to attorneys' fees and interest, (iii) the awarded amount of attorneys' fees and interest, if any, and (iv) on all other pending claims in the State Court Case adjudicated during Phase 2. The State Court may, if it elects, to include as part of its judgment proposed findings as to payment terms and security.

*Id.*

Returning to the issue of set-off and valuation, the Court now finds there should be a total further set-off of $560,117.18. This reduced the valuation as of August 23, 2023, to **$40,021,190.82**.

The Court then applied a 5.00% interest rate to this new amount, resulting in accrued interest from August 23, 2023, through and inclusive of February 5, 2026, of **$4,884,776.28**.

The Valuation Award as of February 5, 2026, is **$44,905,967.10** for the fair value of her 50% equity interest in Smart Communications Holding, Inc. as of August 28, 2023. This amount will accrue interest at **5.00%** (and calculated using the daily rate as a decimal of **0.000136986**) until paid, unless Default Interest Rate applies.

Based on the evidence, testimony, and arguments of the parties, the Court notes Jon Logan's substantial history in attempting to evade payment of any value to the Trustee for the Trustee's shares. This includes taking actions that are inconsistent with ordinary business judgment. The Court includes additional provisions in this Purchase Order to guard against Jon Logan attempting to use Smart Communications or any of its subsidiaries, affiliates, or related entities in which Jon Logan

owns a 10% or greater legal or beneficial interest to avoid payment to the Trustee. Even with those additional measures, the Court remains concerned that he will attempt to evade payment.

Although no receiver or custodian is currently recommended, the Court will not hesitate to appoint a receiver or custodian (or if the case remains in Bankruptcy Court, to recommend to the Bankruptcy Court to appoint a receiver or custodian) should it be found that Jon Logan is attempting to avoid paying the Trustee according to the Final Judgment and Purchase Order or otherwise operating outside of normal business judgment.

**IT IS ORDERED AND ADJUDGED** that:

The findings, analysis, and conclusions of law from the Part 1 of Phase 2 Order [DIN 1189] and Part 2 of Phase 2 Order [DIN 2254] with limited reconsideration [DIN 2331] are incorporated into this order as if fully set forth. Pursuant to section 607.1436, the Court directs the purchase by Smart Communications of the Trustee's Smart Communications shares on the following terms:

1.    **Definition.**

   a.    "HLFIP" means HLFIP Holding, Inc. and HLFIP Holding, LLC.

   b.    "Smart Communications" means Smart Communications Holding, Inc.

   c.    "Subsidiaries, Affiliates, and Related Entities" means the subsidiaries, affiliates, and related entities of Smart Communications Holding, Inc., including but not limited to Smart Communications Holdings, LLC; Smart Communications DeSoto, Inc.; Smart Communications Lee, Inc.; Smart Communications West, Inc.; Smart Communications Collier, Inc.; Smart Communications Pasco, Inc.; Smart Communications Yacht Holdings, LLC; Loco Florida, LLC; and Smart Communications US, Inc. The definition specifically excludes HLFIP

2.    **Valuation Award.** The Court determines the value of the Trustee's 50% interest in Smart Communications Holding, Inc., as of August 28, 2023, after all set-offs, is $40,021,190.82. Accrued interest since that date through February 5, 2026, is $4,884,776.28, making the total Valuation Award on February 5, 2026, to be **$44,905,967.10**. This amount will accrue interest at **5.00%**(and calculated using the daily rate as a decimal of **0.000136986**) until paid, unless Default Interest Rate applies.

3.    **Share Transfer.** The Trustee shall transfer the Trustee's 50% equity interest in Smart Communications within 10 days after the date the Purchase Order becomes final.

4.    **Installment Payments Subject to Distribution Solvency Analysis.** The Court finds it equitable and necessary to direct the payment of the Value Award, interest, and attorney fees and costs in installments under section 607.1436(5), Florida Statutes. Each installment payment will be made only if, and to the extent of, Smart Communications' ability to make a distribution to a shareholder under section 607.0641, Florida Statutes, as required by section 607.1436(8).

5.      **Shareholder Rights Extinguished.** Pursuant to section 607.1436(6): "Upon entry of an order under subsection (3) or subsection (5), the court shall dismiss the petition to dissolve [Smart Communications] under section 607.1430(1)(b) and the petitioning shareholder shall no longer have any rights or status as a shareholder of the [Smart Communications], except the right to receive the amounts awarded by the order of the court, which shall be enforceable in the same manner as any other judgment." Although the Trustee's rights and status of a shareholder, the Court finds the terms and conditions of the Purchase Order are necessary to protect the Trustee's interests and are appropriate under the facts of this case.

6.      **Payments.**

   a.      **Start Date.** The first payment must be made within 10 days of entry of the Purchase Order or other date directed by the Bankruptcy Court.

   b.      **Frequency.** Payments shall be made monthly.

   c.      **Amount.** 3.2% of annual net revenue, plus the additional amounts required once the Yacht is sold. ($750,000 yearly, payable $62,500 per month, effective the first month after the Yacht is sold and all recurring expenses end). For the avoidance of doubt, the $750,000 (payable $62,5000 monthly) is in addition to the 3.2% annual net revenue amount, payable monthly.

   d.      **True-up.** Within 45 days after issuance of Smart Communications' consolidated audited year-end financials, 80% of available cash flows (excluding extraordinary expenses and transactions) less that year's net revenue amount will be devoted for the true-up. In the event the true-up payment would result in a violation of section 607.06401, Smart Communications will pay only that portion of the true-up amount that would not result in a section 607.06401 violation.

   e.      **Compliance with section 607.06401.** If Smart Communications contends a monthly payment or true-up would violate section 607.06401, Smart Communications must still pay that portion of principal, interest, and attorneys' fees due each month or the true-up that it contends does not violate section 607.0641. The remainder of that monthly payment or true-up is deferred (not waived) and accrues interest at the Default Interest Rate and immediately triggers Enhanced Protections.

   f.      **Default Interest Rate.** The Default Interest Rate will be the greater of 5.00% or the then current statutory interest rate as determined by Florida's Chief Financial Officer by section 55.03, Florida Statutes, then in effect on the date of default, and that rate will remain the same until the default is cured. There may be separate defaults from time to time, and each separate default will bear the Default Interest Rate at the statutory interest rate then in effect.

g. **Enhanced Protections.** If Enhanced Protections are triggered, Smart Communications shall immediately provide an officer's certificate and auditor/reviewer attestation to the Trustee demonstrating the specific section 607.06401 impediment and a plan to cure (e.g., identified asset sales and timing). A payment, either in part or totally, that is not made due to a section 607.0641 concern does not constitute a payment default initially. If the inability to pay the balance of the payment together with accrued interest persists for more than 90 days (the Cure Period), it triggers a default and the accompanying remedies provided below.

7. **Security.**

a. **Lien.** A lien (of highest priority permissible by law) exists in favor of the Trustee on all tangible and intangible assets and equity interests of Smart Communications and its Subsidiaries, Affiliates, and Related Entities used or held for use in the business, including, without limitation, revenue, cash flow, chattel, inventory, and intellectual property. For the avoidance of doubt, this includes the nonoperating assets discussed in the Valuation Order unless and until disposed in a manner authorized by the Part 2 of Phase 2 Order or Purchase Order. Further, the Court specifically rejects Smart Communications' position that the Trustee becomes an unsecured creditor with no priority.

b. **Equity Pledge.** Smart Communications shall pledge 100% of its equity and 100% of the equity it holds in its Subsidiaries, Affiliates, and Related Entities as collateral until the Purchase Order is paid in full.

c. **Asset Pledge.** Smart Communications shall additionally pledge its headquarters building, which it purchased, but which is held by Loco Florida, LLC; the Riva Corsaro Yacht, which it purchased, but which is held by Smart Communications Yacht Holding, LLC; and the promissory notes relating to any assets Jon Logan elects to receive in exchange for shareholder loans (until such loans are paid off) pursuant to the Purchase Order as collateral until the Purchase Order is paid in full.

d. **Requirement to retitle assets.** The Court notes that the headquarters building and the Yacht were paid for by Smart Communications, and the value of that building and Yacht has been included in the Valuation Award. The Court is not requiring Smart Communications to seek to cause those assets to be retitled at this time. However, the Court retains the right to direct Smart Communications to institute and pursue legal proceedings to have those assets returned to Smart Communications as those assets indisputably were paid by Smart Communications and it would be inequitable under the circumstances to allow Loco Florida, LLC and Smart Communications Yach Holding, LLC to retain those assets without paying full value for the assets.

8.    **Nonoperating Asset Disposition.**

    a.    **Tierra Verde Property.** Within 30 days of entry of the Final Judgment, as provided in Part 2 of the Phase 2 Order, Jon Logan is permitted to require Smart Communications to distribute the Tierra Verde home in Pinellas County to Jon Logan. If Jon Logan timely elects distribution of the Tierra Verde home, he will not need to pay Smart Communications the $4,060,333 in value. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not timely elect distribution of the Tierra Verde home, Jon Logan would then need to vacate the Tierra Verde home immediately, and Smart Communications will then proceed to sell it immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. Note: all expenses for upkeep and repair associated with the Tierra Verde home beginning August 29, 2023, through the date the deed is delivered to Jon Logan or Jon Logan vacates the home is the responsibility of Jon Logan, even if Smart Communications paid for the expense in the first instance. Jon Logan may either repay Smart Communications for these expenses or they must be carried on the books of Smart Communications as a shareholder loan and must remain on the books until either paid by Jon Logan or Smart Communications completes payment to the Trustee of the value of the Trustee's shares. If Jon Logan elects to continue to live in the Tierra Verde home, Smart Communications may continue to make ordinary course upkeep and repair payments so long as those amounts do not materially change from historical expenses. Those expenses will also need to be characterized, or recharacterized, as shareholder loans.

    b.    **Ranch Club Property.** Within 30 days of entry of the Final Judgment, as provided in the Part 2 of the Phase 2 Order, the Trustee is permitted to require Smart Communications to distribute the Ranch Club home in Sarasota County to the Trustee. If the Trustee timely elects distribution of the Ranch Club home, the election will reduce the amount Smart Communications owes the Trustee by $2,591,000. If the Trustee does not timely elect distribution of the Ranch Club home, the Trustee would then need to vacate the Ranch Club home immediately, and Smart Communications shall then proceed to sell it immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. Note: all expenses for upkeep and repair associated with the Ranch Club home beginning August 29, 2023, through the date the deed is delivered to the Trustee or the Trustee vacates the home is the responsibility of the Trustee, even if Smart Communications paid for the expense.

c.      **Brickell Avenue Condominium.** The evidence is that the title was transferred back to Smart Communications, which then sold the Brickell Avenue condominium. Smart Communications received the proceeds from sale and then used them for company purposes. No further action or adjustment is necessary.

d.      **Riva Corsaro Yacht.** Smart Communications shall cause the Yacht to be sold immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell the Yacht soon. After retiring the debt and paying broker commission, at least 50% of the net proceeds will be paid to the Trustee. Effective the first month after the Yacht is sold and the recurring expenses for the Yacht cease: (1) Smart Communications will pay the Trustee a minimum of $62,500 additional per month, which is in addition to the 3.2% of annual net revenue; and (2) Smart Communications may increase Jon Logan's base salary by up to $50,000 per month.

e.      **Nor-Tech Center Console Boat.** Within 30 days of entry of the Final Judgment, Jon Logan may elect to purchase the Nor-Tech Center Console Boat for $887,500. If he does so, he may pay Smart Communications in cash or via shareholder loan, with a signed promissory note in favor of Smart Communications repayable over 6 years (72 monthly payments) in even amortized payments at 5% interest annually. Smart Communications will have a first position lien on that vessel until the promissory note is satisfied. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not make this election, the vessel needs to be sold in a commercially reasonable manner at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell that vessel in a timely manner. At least 50% of the proceeds from the sale of the vessel will be used to reduce Smart Communications' outstanding obligation to the Trustee. In the event Smart Communications made a promissory note, at least 50% of the monthly payments received by Smart Communications must be provided to the Trustee. This amount is in addition to 3.2% of annual net revenue as well as any additional amounts authorized by the Part 2 of Phase 2 Order or the Purchase Order. There will be no docking fees or charges or any kind associated with the vessel being docked or kept at the Tierra Verde home.

f.      **The Exotic Cars.** Within 30 days of entry of the Final Judgment, Jon Logan may elect to purchase any or all of the following exotic cars: (1) the 2020 Lamborghini Huracan for $130,000; (2) the 2017 Ferrari 488 Spider; or (3) 2015 Rolls Royce Wraith for $140,000. If he elects to

purchase one, two, or all three of these exotic cars, he may pay Smart Communications in cash or via shareholder loan, with a signed promissory note in favor of Smart Communications repayable over 6 years (72 monthly payments) in even amortized payments at 5% interest annually. Smart Communications will have a first position lien on each exotic car for which it made a promissory note until the promissory note is satisfied. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not make this election, or if he only elects to purchase only one of two exotic cars, the remaining exotic car or cars need to be sold in a commercially reasonable manner at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell the remaining exotic car or cars. At least 50% of the proceeds from the sale of the exotic cars will be used to reduce Smart Communications' outstanding obligation to the Trustee. In the event Smart Communications made a promissory note, at least 50% of the monthly payments received by Smart Communications must be provided to the Trustee. This amount is in addition to 3.2% of annual net revenue as well as any additional amounts authorized by the Part 2 of Phase 2 Order or the Purchase Order. There will be no garage fees or charges or any kind associated with the exotic cars being garaged or kept at the Tierra Verde home.

g.   **Everyday Cars.** Jonathan Logan and the Trustee may require Smart Communications to distribute the vehicle they currently drive into their personal possession without further accounting adjustment or payment. For Jon Logan, this is the Land Rover. For the Trustee, this is the Cadillac Escalade.

9.   **Headquarters Building.** The Trustee's 50% interest in Loco Florida, LLC is extinguished for the reasons stated in the Part 2 of Phase 2 Order. No further rent is owed to Loco Florida, LLC.

10.   **Jon Logan's salary.** Until all payments to the Trustee have been made, Jonathan Logan's base salary will be $120,000 per year, subject to adjustment as detailed in the Part 2 of Phase 2 Order and the Purchase Order. On July 1 of each year, Jon Logan's base salary may be increased by the same percentage increase the Florida Legislature provides for state employees. Note this is general state employees and not any specific classification receiving a pay adjustment. For instance, in fiscal year 2025-2026, the Legislature authorized a 2% pay increase. The Court authorizes Smart Communications to retroactively provide the 2% pay increase to Jonathan Logan's salary effective July 1, 2025. As provided above, effective the month after the last of all payments associated with the Yacht are made, Smart Communications may increase Jon Logan's base the salary term by an additional $600,000 per year maximum (payable $50,000 monthly maximum).

11.    **Payment of HLFIP Expenses.** Smart Communications and its Subsidiaries, Affiliates, and Related Entities shall pay to HLFIP, from August 29, 2023, through the date of the Purchase Order a Royalty payment using the formula identified in the Part 2 of Phase 2 Order. Thereafter, Smart Communications and its Subsidiaries, Affiliates, and Related Entities shall pay to HLFIP, a Royalty each month, using the same formula. However, no cash will be provided to HLFIP until all "due froms" incurred by HLFIP beginning August 29, 2023, have been satisfied. Smart Communications and its Subsidiaries, Affiliates, and Related Entities ***must immediately*** discontinue paying HLFIP (or on HLFIP's behalf) any amount that exceeds the then current Royalty due.

Smart Communications and its Subsidiaries, Affiliates, and Related Entities ***maynot*** accelerate Royalty payments, and Smart Communications and its Subsidiaries, Affiliates, and Related Entities may not pay HLFIP the amount the Court reduced Smart Communications' valuation based on discounted future payments to HLFIP (as referenced on pages 30-31, and 45 of the Part 2 of Phase 2 Order). The Court specifically rejects HLFIP's position that the discounted future payment amount the Court used to reduce the value of Smart Communications as of August 28, 2023, is currently due HLFIP or that Smart Communications currently owes HLFIP that amount.

To the extent Smart Communications or any of its Subsidiaries, Affiliates, and Related Entities have paid any HLFIP expenses, including attorneys' fees and costs in this proceeding, beginning August 29, 2023, those expenses must be accounted for as shareholder loans taken by Jon Logan and are to be considered as additional security for repayment of the Purchase Order and Final Judgment, and that sum will act as a setoff against any going-forward royalty obligation.

To the extent HLFIP needs cash to pay current creditors, including tax payments, Smart Communications may provide that cash to (or pay on behalf of) HLFIP only with the consent of the Trustee. The Trustee shall not unreasonably withhold the consent where HLFIP's outstanding obligations, especially where the withholding of paying those creditors may adversely impact Smart Communications' operations, including the loss of intellectual property, if not paid.

12.    **Positive Covenants.** Unless the Trustee expressly consents in writing (with such consent not unreasonably withheld by the Trustee) or the Court orders otherwise—until the Trustee has received all payments—Smart Communications and its Subsidiaries, Affiliates, and Related Entities will:

a.    comply with all applicable laws and governmental regulations.

b.    maintain in effect its corporate existence and good standing in all jurisdictions.

c.    discharge on a timely basis all ordinary course taxes and material business contract obligations and continue all material contracts in full force and effect.

d.    do all things necessary to obtain, preserve and renew any permits or licenses used, held for use or necessary for the conduct of business.

e.    maintain and preserve all property necessary to the conduct of business.

f.  maintain insurance with financially sound and reputable insurers in such amounts and against such risks as is customary for its business.

g.  maintain books and records in accordance with GAAP.

h.  record in writing all actions taken by the board of directors or shareholder of Smart Communications, and provide copies of such records to the Trustee within seven (7) days of the action.

i.  deliver to the Trustee via email monthly a copy of all expense reports submitted by Jon Logan as well as confirmation of all amounts paid to, or on behalf of Jon Logan, each month. To the extent the report would show any private medical information, that information can be redacted. This submission will be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge

j.  deliver to the Trustee via email monthly unaudited consolidated financial statements. Statements reflecting the preceding month shall be delivered no later than thirty (30) days following the end of that month and be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge.

k.  deliver to the Trustee via email quarterly unaudited consolidated financial statements. Statements reflecting the preceding quarter shall be delivered no later than forty-five (45) days following the end of that quarter and be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge.

l.  deliver to the Trustee via email annual audited consolidated financial statements. Annual audited financial statements shall be provided within forty-five (45) days of the finalization of such statements by Smart Communications' third-party accountant.

m.  subordinate any debt of their debt to this Purchase Order and Final Judgment after entry of the Purchase Order and Final Judgment.

n.  notify the Trustee within seven calendar days of the filing of any litigation, breach or alleged breach of any material contracts, defaults or alleged defaults of any material indebtedness, any asserted or alleged violations of law, or any

Page 10 of 15

event that may materially impact the ability to pay any payment to the Trustee when due.

    o.    require and maintain detailed expense reports for any payments made to Jon Logan or that benefit Jon Logan with receipts justifying the corporate purpose of the expense.

13.    **Negative Covenants.** Unless the Trustee expressly consents in writing (with such consent not unreasonably withheld by the Trustee) or the Court orders otherwise—until the Trustee has received all payments—Smart Communications and its Subsidiaries, Affiliates, and Related Entities will not:

    a.    change its name, identity, organizational structure, state of organization, business, or fiscal year.

    b.    make any payment to or on behalf of HLFIP in any manner other than provided in the Purchase Order.

    c.    enter into any transactions with or make any payments or transfers to any affiliates or entities in which Jon Logan possesses an equity or beneficial interest greater than 5% (specifically including without limitation Smart Communications Yacht Holding, LLC; Loco Florida, LLC; and HLFIP Holding, LLC) other than on an arms-length basis except as specifically authorized by the Valuation Order or Purchase Order.

    d.    effect any sales or issuances of equity interests or any warrants, options, or other securities convertible into, or exercisable for, any equity interests, or such other transactions in respect of equity interests.

    e.    merge or consolidate with any person or entity.

    f.    acquire or be acquired by another person or entity.

    g.    sell all or substantially all of the assets used or held for use in business, or sell or license any of such assets, outside the ordinary course of business unless authorized by the Valuation Order or Purchase Order.

    h.    sell lease, assign, transfer, or otherwise dispose of any material portion of its properties and assets to any person or entity in any transaction without unless authorized by the Valuation Order or Purchase Order.

    i.    sell, discount, or otherwise dispose of any notes receivable, accounts receivable, shareholders loan, or other right to receive payment other than in the ordinary course of business consistent with past practice. The "other than in the ordinary course of business consistent with past practice" specifically excludes the ability to sell, discount, or otherwise dispose of any notes

receivable, shareholders loan, or other right to receive payment from Jon Logan or from any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest, and there is no authority to sell, discount, or otherwise dispose of those assets.

j.  subordinate the Purchase Order to any indebtedness.

k.  grant any new liens on their assets to secure any indebtedness.

l.  guarantee the obligations of any other person or entity unless authorized by the Valuation Order or Purchase Order.

m.  incur any new debt for borrowed money where the total amount owed exceeds more than $500,000, cumulatively, at any given time. This amount excludes: (1) on-going or one-time credit card charges or ordered items incurred in the ordinary course that are to be paid in full within 30 days of receipt of the purchased item or received bill; and (2) the existing debt associated with the Yacht.

n.  authorize, create, or issue any securities.

o.  redeem, acquire, or purchase any equity interests unless authorized by the Valuation Order or Purchase Order.

p.  pay or declare any dividend or other distribution on any equity interests.

q.  pay or cause to be made any dividends, redemptions, management fees, or related-party payments unless authorized by the Valuation Order or Purchase Order.

r.  create any non-wholly owned subsidiary.

s.  amend, repeal, or alter the articles of incorporation, bylaws, or other governance documents.

t.  liquidate, dissolve, or wind up unless authorized by the Valuation Order or Purchase Order.

u.  make any material change in accounting policies.

v.  make any material change to the nature of its business.

w.  provide replacement vehicles for Jon Logan's company use more than once every five years, but in all events, such replacement car cannot exceed the type or quality of the existing Land Rover. In the event of a finance or lease of

a future vehicle, the maximum monthly payment is limited to $1,250, adjusted annually by the same percentage used to increase Jon Logan's base salary.

x.  decline to preserve any or all claims for right to payment, under contract or otherwise, against any third party, or settle or compromise any such claims, except in the ordinary course of business and based on good business judgment. For purposes of this covenant, Jon Logan and any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest is not considered a third party.

y.  settle any litigation against Jon Logan or against any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest.

z.  settle any litigation (other than against Jon Logan or any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest) outside of the ordinary course.

aa.  engage in any act, or refrain from engaging in any act, whose purpose or effect is to materially impair or prevent the ability to pay the Trustee of any payment when due or otherwise to defeat the Purchase Order or the Final Judgment.

14.  **Acceleration for Liquidity Events.**  If at any time before Smart Communications pays the Trustee the full amount due under the Purchase Order, the Trustee or the Court approves of the sale of all or substantially all of Smart Communications' assets; Smart Communications merges or consolidates with another entity; Smart Communications is acquired; or Smart Communications otherwise undergoes a change of control (any of which shall be a "Liquidity Event"), then the entire principal amount of the Purchase Order, together with all accrued interest thereon and all other amounts payable under the Purchase Order, shall become immediately due and payable, and Smart Communications shall pay such amounts to the Trustee.

15.  **Default.**  Events of default include without limitation:

a.  any payment block on section 607.06401 grounds not cured within 90 days;

b.  breach of any term of this Purchase Order, specially including but in no way limited to breach of any positive or negative covenant;

c.  default under other secured obligations;

d.  incurrence of a judgment in excess of $100,000;

e.  unauthorized liens or transfers;

f.  false representations to the Trustee or the Trustee's agents;

    g.     termination or impairment of any lien or guarantee; or

    h.     insolvency events.

16.    **Default remedies.** Remedies for an event of default include without limitation:

    a.     appointing a custodian or receiver empowered to oversee Smart Communications and its Subsidiaries, Affiliates, and Related Entities until the Purchase Order and Final Judgment are paid in full.

    b.     directing the continued imposition of interest at the Default Interest Rate or any other interest rate provided in the Purchase Order or Final Judgment.

    c.     directing of specific performance of the Purchase Order and Final Judgment.

    d.     awarding injunctive relief necessary to restore payments under the Purchase Order and Final Judgment.

    e.     awarding attorney fees and costs to the Trustee associated with vindicating the Purchase Order or Final Judgment.

    f.     directing the turnover of collateral to the Trustee, including pledged equity.

17.    **Entry of confidentiality agreement.** Smart Communications and the Trustee shall enter into a confidentiality agreement that will prohibit the Trustee from making public any Smart Communications information that Smart Communications reasonably designates as confidential. In the event the Trustee seeks Court intervention relating to the Final Judgment or Purchase Order, the Trustee will use the Trustee's best efforts to maintain the confidentiality of the material so designated and request the court to maintain the confidentiality, too. However, this provision does not prohibit the Trustee from seeking court relief even if the court declines to maintain the confidentiality of the designated information.

18.    **Retention of jurisdiction.** The Court retains jurisdiction to enforce the Final Judgment and the Purchase Order until each is fully satisfied.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on February 05, 2026.

e-Signed 2/5/2026 4:01 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

Counsel of Record

EXHIBIT B



NewsPremiumYachts          Yachts for Sale          Publications          TravelEvents          Companies | SYT iQ | 🔍

## USED SALES

# 30m Riva motor yacht Convict sold



**Written by Ann Yabut**

Fri, May 15, 2026 | 07:30

The 30-metre <u>Riva</u> motor yacht _Convict_ has been sold. Eddie Montserrat of <u>Autograph Yacht Group</u> represented the buyer, while Andy Simmons of <u>Off The Hook Yachts</u> represented the seller in the transaction.

ADVERTISEMENT

Delivered in 2019 by the Italian shipyard, _Convict_ forms part of the <u>Riva</u> 100 Corsaro series and was previously known as _Silverstreak_. She features both exterior and interior design by <u>Officina Italiana Design</u>, with naval architecture developed in-house by <u>Riva</u>.

Constructed with a GRP hull and superstructure, the flybridge yacht has a beam of 6.7-metres and a draft of 2.26-metres.

Outside, the yacht is recognised for her sporty <u>Riva</u> 100 Corsaro profile, defined by elongated glazing and expansive outdoor lounge areas, well-suited for high-speed cruising on the Mediterranean sea.

At an interior volume of 171 GT, _Convict_ comfortably accommodates up to 10 guests across a five-stateroom configuration. Dedicated quarters are provided for as many as five crew members, including her captain.

In terms of performance, _Convict_ is powered by twin MTU engines, delivering a cruising speed of 24.5 knots and a top speed of 27.5 knots.

At the time of her sale, _Convict_ had a last known asking price of $6,995,000.

(Image courtesy of Riva.)

---

## Related Yachts See All .



**Convict**

30m | 171 GT | 2019

Riva S.p.A.

---

## Related Companies See All ›



**Riva S.p.A.**

Italy ᴵᵀ



**Autograph Yacht Group**
United States us

**Off The Hook Yachts**
United States us

**Officina Italiana Design (Mauro Micheli)**
Italy IT

**MTU**
Germany DE

## Latest News See All.

   

**UILD UPDATES**

**ONBOARD**

**NEW TO MARKET**

**PHOTO OF THE DAY**

**USED SALES**

**FLEET UP**

3m Dutch Design's "wellness-first" yacht ea Rover in-build

Onboard the 48m Feadship superyacht Princess Too

48m Perini Navi sailing yacht Belle Brise for sale

Newly-converted yacht support vessel U-81 in Villefranche-sur-Mer

61m Hakvoort superyacht Just J's sold and renamed...

Energy Amels of the P

Wed, Jun 24, 2026 | 07:00

Wed, Jun 24, 2026 | 04:15

Wed, Jun 24, 2026 | 03:45

Wed, Jun 24, 2026 | 02:00

Tue, Jun 23, 2026 | 09:15

Tue, Jun 2

## Featured Listings









**Raja²**

55.30m | 499 GT | 2025

Admiral

€35,000,000

**Passage**

30.78m | 133 GT | 1971

Feadship

P.O.A.

**Philosophy**

44.20m | 499 GT | 2015

Feadship

€25,500,000

## Latest from Used Sales See All

    

1m Hakvoort uperyacht Just J's old and renamed...

24m Azimut motor yacht Ayla sold

31m Custom Line motor yacht Infinitas sold

55m Admiral superyacht Silver Star sold

26m Custom Line yacht All We Need For Today sold

25m P yacht N

ue, Jun 23, 2026 | 09:15

Mon, Jun 22, 2026 | 04:00

Fri, Jun 19, 2026 | 10:55

Fri, Jun 19, 2026 | 07:00

Thu, Jun 18, 2026 | 07:45

Wed, Jun 1

**Newsletters**

The SYT Newsletter (daily)

Yacht Charter Market (weekly)

Marina World (weekly)

How to Build It (weekly)

email@superyachttimes.com

Yachts  See All  >

Sailing Yachts

Motor Yachts
By Shipyard

Feadship

Benetti

Azimut

Lürssen

Sanlorenzo

Westport

For Sale  See All  >

Sailing Yachts

Motor Yachts
By Shipyard

Feadship

Benetti

Azimut

Lürssen

Sanlorenzo

Westport

SYT Products

SYT iQ

Market Reports

Partner Content

Sign Up

**Follow Us**

Heesen

SilverYachts

Abeking & Rasmussen

By Type

Explorer

Sport Fishermen

Flybridge

Trawler

Sport

Heesen

SilverYachts

Abeking & Rasmussen

By Type

Explorer

Sport Fishermen

Flybridge

Trawler

Sport

About|Team|Careers|Contact|Disclaimer|Website T&C|iQ T&C|Privacy Policy| ✓ ✗ Your Privacy Choices

© SuperYacht Times B.V. // All rights reserved.

# EXHIBIT C

# BERGER SINGERMAN

Edward J. Peterson
(813) 498-3400
epeterson@bergersingerman.com

June 12, 2026

**VIA EMAIL**

Paul J. Battista, Esq.
Venable LLP
801 Brickell Avenue, Suite 1500
Miami, FL 33131-4901
pjbattista@venable.com

Eric D. Jacobs, Esq.
Venable LLP
100 N Tampa Street, Suite 2600
Tampa, FL 33602-5810
ejacobs@venable.com

Re:   *Demand that the Debtors-in-Possession Pursue and Protect Property of the Estate*

Dear Paul and Eric:

We represent Creditor and former 50% Smart Communications Holding, Inc. ("SmartComm") shareholder Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice").

You will recall that, just a few months ago, Judge Hunter Carroll of the 12th Judicial Circuit, Sarasota County, found in conclusions of law and a final judgment that SmartComm paid for certain property titled to SmartComm affiliate, non-debtor entities Smart Communications Yacht Holding, LLC ("Yacht") and Loco Florida, LLC ("Loco"). *See* Ex. 1 (DIN 2254, Findings and Conclusions of Law from Part 2 of Phase 2 Trial); *see also* Ex. 2 (DIN 2333, Final Judgment). As a result, Judge Carroll found that Janice would have prevailed on derivative unjust enrichment claims on behalf of SmartComm as to such entities.  Rather than requiring SmartComm retitle the assets, the Court included their value in Janice's valuation award.

Specifically, SmartComm paid $9.6 million for a 100' Riva Corsaro yacht titled to Yacht, $940,000 for a Nor-Tech Center Console boat titled to Yacht and paid $1.4 million for the headquarters building titled to Loco. *See* Ex. 1, pp. 26–29. Additionally, SmartComm paid for debt service on the Riva Corsaro's $4.8 million note, and all or virtually all the maintenance, improvement, and upkeep for these assets.

35981093-1

June 12, 2026
Page 2

We understand the Riva Corsaro was recently sold. We have asked about the circumstances of the sale and the whereabouts of the proceeds of sale. We have received no response.

A court of competent jurisdiction found the Riva Corsaro and the other assets listed above were paid for by SmartComm. Now that SmartComm has availed itself of the protections and obligations of Chapter 11, it has a fiduciary duty as the debtor in possession under 11 U.S.C. § 1107 to pursue and collect the property of the estate for the benefit of its creditors.

We have informally sought information and assurance from you and from Scott Shuker that the proceeds from the sale of the Riva Corsaro have been escrowed. We have received no information or assurance of same. Therefore, we intend to act on an expedited basis on behalf of the estate and to otherwise prevent irreparable harm.

We therefore demand that you respond by 5:00 p.m. ET on Wednesday, June 17, 2026, confirming that you will initiate a proceeding by the estate to seek the funds from the sale of the Riva Corsaro and to seek the retitling of any other assets paid for by SmartComm, including the headquarters building and the Nor-Tech. If you do not confirm you will initiate such proceedings by then, we will promptly file a motion for derivative authority to initiate them on the estate's behalf.

We are available to discuss before the deadline.

Sincerely,

*Edward J. Peterson*

Edward J. Peterson

EJP/jgc
cc:     R. Scott Shuker, Esq.

35981093-1



EXHIBIT 1

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
          Plaintiff,

v.                                              CASE NO.  2023 CA 001002 NC
                                                DIVISION C CIRCUIT


JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
          Defendant.

_____


**ORDER WITH FINDINGS AND CONCLUSIONS OF LAW
FROM PART 2 OF PHASE 2 TRIAL**

        After years of intense litigation, the Court conducted the trial on the valuation of Smart
Communications Holdings, Inc. as of August 28, 2023, together with most of the remaining
issues. The Court and the parties referred to this trial as "Part 2, Phase 2."

        The Court understands the mediation on payment terms and security is scheduled for later
this week. Because the Court is endeavoring to release this decision as quickly as possible, the
Court did not have time to substantially proofread to fix all errors, for which the Court
apologizes in advance.

    In summary:

        •       The value of Smart Communications Holding, Inc. as of August 28, 2023,
                before a 5% lack of marketability discount is **$88,254,918**. This amount
                incorporates a 5% Royalty Rate applied against a 40.5% Royalty Base,
                effective August 28, 2023.

**Filed 12/09/2025 07:55 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

- No further royalty is due HLFIP from Smart Communications for revenue earned before August 28, 2023. The amount Smart Communications paid on behalf of HLFIP through August 28, 2023, exceeded the royalty amount due. HLFIP will not need to repay the at least $1.2M overage.

- After application of the 5% lack of marketability reduction, the value of the Trustee's shares as of August 28, 2023, is **$41,921,086**. The Court elected not to apply a lack of control reduction.

- The Trustee will need to repay shareholders loans totaling **$1,339,778**. The Trustee will also need to repay all expenses associated with the Ranch Club home that occurred after August 28, 2023, and the amounts associated with the wrongful injunction. Both amounts will be setoff from the amount due the Trustee for the value of her shares.

- The Court is requesting additional briefing on the issue of attorney fees and application of interest relating to the valuation proceeding. The Court is also requesting briefing on the issue of the authority of the Court to appoint a receiver under the authority to provide security for payment of the Trustee's shares under section 607.1436(5), Florida Statutes, should one become necessary in the future. The Court is also requesting a memorandum from each side relating to that side's view of payment terms and provisions for security for payment.

- Count 1 of the Trustee's Second Amended Answer with Counterclaims [DIN 775], filed on October 2, 2024, was not tried and is being severed.

- Neither Jon Logan nor Smart Communications prevailed in Counts 1-18 of their Second Amended Complaint [DIN 891], filed December 4, 2024. The Court is requesting additional briefing as to Counts 19 and 20.

- Count 1 of Alexis Logan's Counterclaims [DIN 1790], filed on August 4, 2025, for malicious prosecution/abuse of process was not tried and is being severed. Count 2 was voluntarily dismissed. In Count 3, the Court finds entitlement to indemnification and will have a separate hearing on the amounts.

- HLFIP did not prevail on its Counterclaim [DIN 1863], filed on August 15, 2025.

- The Court will conduct a hearing on December 19, 2025, to address payment terms and security as well as the other issues identified in this Order.

There are several parties that have the Logan last name. For that reason, the Court will address Logan family members by their first and last name. Additionally, Janice Logan is a party to this action in three separate capacities: individually; as Trustee of the James Logan Family Trust dated February 10, 2021; and as Personal Representative of the Estate of James Logan. References to "Janice Logan," "Trustee," and "Personal Representative" means to those three capacities, respectively.

The Court notes that Jonathan Logan and Smart Communications filed the first lawsuit on February 28, 2023, which case was assigned Case Number 2023-CA-1002. In what would become the derivative lawsuit, the Trustee sued Jonathan Logan and Smart Communications as a nominal defendant on March 10, 2023, which case was assigned Case Number 2023-CA-1280. The then presiding judge consolidated the cases and directed all actions to occur within the -1002 case. For that reason, the reader will note multiple complaints that appear to have the same nomenclature within the -1002 case.

## 1.
## BACKGROUND
## THE PATH TO PART 2, PHASE 2 TRIAL

This case presents an unfortunate intra-family fight, which now concerns the valuation of Smart Communications Holdings, Inc. as of August 28, 2023. The Court tried "Part 2, Phase 2" over the course of 10 trial days: October 6-10, 2025; October 13-October 16, 2025; and November 12, 2025.

The Part 2, Phase 2 trial was the third trial phase between the parties. Getting to this point, the Court and the parties walked a long and winding path. The Court details only the most relevant items to orient the reader of how we arrived here.

There were two 50% shareholders of Smart Communications in 2022: Jonathan Logan and his father, James "Jim" Logan. In addition to being the shareholders, both Jon Logan and Jim Logan were Smart Communications' directors and senior executives. Smart Communications was growing rapidly, including its revenue base.

Jim Logan died October 16, 2022.

As later discussed, both Jon Logan and James Logan withdrew funds from Smart Communications, some of which were identified then identified, or later recharacterizes, as shareholder loans. Neither Jon Logan nor Jim Logan was particularly fond of paper trails, expense reports, or corporate formalities.

Shortly before his death, Jim Logan transferred his shares into the James Logan Family Trust ("the Trust"). His wife (and Jon Logan's mother)—Janice Logan—became Trustee of that Trust when Jim Logan.

Since that time, Jon Logan took steps to exclude his mother from the Company even though she as Trustee was now the other 50% shareholder. Jon Logan's action went further than that—he openly, actively, and unilaterally attempted to minimize, or eliminate, all value of the Trustee's ownership in Smart Communications. Jon Logan believed that his sister, Alexis Logan, was manipulating her mother to allow both Alexis Logan and Janice Logan to live off Jon Logan's efforts.

As this litigation grew, so did its complexity. There was a preliminary gating issue that needed to be resolved: whether the then recently discovered "shareholders agreement" following Jim Logan's death was valid. The Court severed that issue and tried it in the Phase 1 trial. The Phase 1 trial involved the declaratory judgment action and was tried over three trial days in January 2024. At its core, the Court declared in the Phase 1 trial:

- The purported Shareholders Agreement was invalid and unenforceable;

- There was no shareholders agreement between the two 50% shareholders of Smart Communications Holding, Inc.'s stock at the time of James Logan's death;

- The two 50% shareholders of Smart Communications Holdings, Inc.'s stock are: (1) Jonathan D. Logan; and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

On February 7, 2024, the Court entered a final judgment on those issues [DIN 652]. There was no appeal of that decision.

Initially, the Court scheduled the remaining claims to be tried in January 2025 in a Phase 2 trial. However, in the lead up to that trial, there were changes in the nature of the claims presented.

Of note, on May 29, 2024, Janice Logan as Trustee filed a pleading alleging shareholder deadlock, and she sought judicial dissolution of Smart Communications Holding, Inc. pursuant to sections 607.1430(1)(b)(2)-(4) and 607.1431, Florida Statutes [DIN 680]. In response Jon Logan, as incumbent management, caused Smart Communications Holding, Inc. to elect an option under section 607.1436, Florida Statutes, to purchase the Trustee's shares at fair value [DIN 696]. In fact, the parties agreed that Smart Communications could make this election [DIN 691]. This election changed the focus of Phase 2 to valuation, although there were still some claims that would survive the valuation process.

Section 607.1436(4) directs the valuation date to be "the day before the date on which [the judicial dissolution petition] was filed or such other date as the court deems appropriate under the circumstances." Unless the "such other date" was selected, the default statutory valuation date would be May 28, 2024.

The Trustee advocated for the Court to exercise its discretion and select "such other date," which the Trustee posited should be February 27, 2023, the date the initial lawsuit was

filed. The Trustee contended that the Court could determine the issue either without evidence or based on the trial record from the Phase 1 trial.

In contrast, Jon Logan and Smart Communications contended that either the Court should use the statutory default date or a later date in the light of the enactment of the federal Martha Wright-Reed Just and Reasonable Communications Act of 2022, or its proposed regulations, which they contend negatively impacts Smart Communications' ability to generate revenue. They opposed any argument that the Court could determine this issue without taking evidence.

The Court determined that it would need evidence to decide whether to use the default statutory valuation date or "such other date." And because the Phase 1 trial did not focus on valuation, the Court concluded use of the Phase 1 trial record would not provide a sufficient basis for this decision.

There was another variable that needed to be considered. Before the Trustee sought judicial dissolution, Jon Logan caused there to be significant, unilateral corporate activity that implicated valuation. On August 29, 2023, Jon Logan caused Smart Communications Holdings, Inc. and several related entities to undergo a sweeping corporate change. Included in this was the creation of a Delaware entity, Smart Communications Holdings, LLC. Jon Logan then purported to cause most of the assets of Smart Communications Holding, Inc. to be assigned to Smart Communications Holdings, LLC, without value. There were numerous other corporate changes that day, too. All of this was done without knowledge by, or consent from, the Trustee, as a 50% shareholder. And he would later attempt go to the courts in Delaware to use the new corporate structure against the Trustee's interests, again consist with his efforts to minimize or eliminate the Trustee's interest.

Also on August 29, 2023, Jon Logan took another unilateral action that purported to either eliminate or minimize the Trustee's value in Smart Communications. On that day he signed the purported Exclusive Intercompany Intellectual Property License Agreement on behalf of both Smart Communications, Holdings, LLC, on the one hand, and HLFIP Holdings, LLC, on the other hand. HLFIP Holdings, LLC is an entity Jon Logan owns 100%.

In doing so, Jon Logan for the first time imposed a purported 40% royalty to be paid by Smart Communications (which he only owned 50%) to HLFIP (which he owned 100%). In connection with that transaction, he also caused a long-term liability in favor of HLFIP to be recognized for the first time on the Consolidated Audited Financial Statements of Smart Communications. Released in October 2023 for year-end December 31, 2022, Footnote I expressed this royalty liability as an expense for years 2015-2021 then valued at $52.8M with accrued interest of $5.6M, and for 2022, an additional accrued expenses of $17.9M and $0.4 of accrued interest. The Court ultimately referred to these actions as the Purported Royalty Transactions [DIN 1189].

The parties at the time had a sharp disagreement over these Purported Royalty Transactions. The Trustee attacked the Purported Royalty Transactions as a "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes. It quickly became apparent to the Court that either the Phase 2 trial would either have to be bifurcate the

Phase 2 trial or the Court would have to accept expert testimony relating to a wide range of potential valuation dates under multiple scenarios, including differing scenarios based on how the Court handled by Purported Royality Transactions.

The Court concluded proceeding with all remaining issues to be tried in Phase 2 would be more cumbersome and unwieldy, even in a nonjury format. The Court, therefore, elected the bifurcation path and separated Phase 2 into two parts [DIN 870]. In Part 1, Phase 2, the Court limited that trial to (1) the proper valuation date; (2) the license/royalty issue; and (3) any issue the parties agreed to be heard during Part 1.

Prior to the February 2025, Part 1, Phase 2 trial, Jon Logan (and without the Trustee's knowledge or consent) placed Smart Communications into bankruptcy in furtherance of his efforts to eliminate the Trustee's share value. The Bankruptcy Court granted relief from the automatic stay to the extent the Bankruptcy Court authorized the Court to proceed with the Part 1, Phase 2 trial as previously set [DIN 928].

The Part 1, Phase 2 trial and was tried over three trial days in February 2025. At its core, the Court decided in Part 1, Phase 2 of the trial:

- The Purported Royalty Transactions constituted "director's conflict of interest transactions" within the meaning of section 607.0832. The Court found that Jon Logan failed to prove these transactions were fair to Smart Communications, and the Court further found that the Trustee proved the Purported Royalty Transactions were not fair to Smart Communications.

- The Court invalidated the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I.

- Under the unique circumstances presented in the case, the Court determined that the Court would value Smart Communications Holding, Inc. as of August 28, 2023, the date immediately before Jon Logan's substantial corporate activity on August 29. In doing so, the Court noted the authority in section 605.0706(4), that permits the Court to determine valuation on "such other date as the court deems appropriate under the circumstances."

Order with the Court's Findings from Part 1 of Phase 2 Trial, signed February 17, 2025 [DIN 1189].

As Phase 2 was bifurcated, the Court did not enter final judgment. The Jon Logan affiliated parties (Jon Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; and HLFIP Holding, LLC) sought certiorari review at the Second District in 2D2025-0700. The Jon Logan parties ultimately sought to dismiss their petition, which was granted on November 5, 2025 [DIN 2228].

Following the Part 1, Phase 2 trial, the Court set the balance of the case for trial in Part 2, Phase 2.

In the lead up to Part 2, Phase 2, the parties agreed some claims would not survive valuation, some claims would survive, and a few others would be tried separately.

**2.**
**FACTUAL FINDINGS**

The Court tried Part 2, Phase 2 over ten days. In paper format, there are hundreds of exhibits spanning more than 20 banker's boxes.

The Court continues with its factual findings from Part 1, Phase 2 of the trial. Nothing in the additional evidence presented during Part 2, Phase 2 of the trial alters the Court's prior findings. Further, the Court continues with its rulings from Part 1, Phase 2, including the rulings relating to the Purported Royalty Transactions, the invalidation of the Exclusive Intercompany Intellectual Property License Agreement, the invalidation of the recognition of the purported long-term liability in footnote I, and the August 28, 2023, valuation date.

The Court now makes additional, overarching factual findings. The Court will then supplement those factual findings throughout this Order.

In large part, this case is driven by credibility. Had this been a jury case, the Court would have given the jury instruction 601.2 concerning believability of witnesses:

> Let me speak briefly about witnesses. In evaluating the believability of any witness and the weight you will give the testimony of any witness, you may properly consider the demeanor of the witness while testifying; the frankness or lack of frankness of the witness; the intelligence of the witness; any interest the witness may have in the outcome of the case; the means and opportunity the witness had to know the facts about which the witness testified; the ability of the witness to remember the matters about which the witness testified; and the reasonableness of the testimony of the witness, considered in the light of all the evidence in the case and in the light of your own experience and common sense.

Florida Standard Jury Instruction 601.2a. Even though this was a bench trial and jury instructions are not read, the Court is tasked with determining what testimony and evidence is to be believed, just as is the case for juries. And the Court takes instruction 601.2 to heart.

The Court found Jon Logan's testimony, for the most part, not credible. The Court will explain why this is the case by addressing two main themes from his testimony and then contrasting it with other evidence in the case. *First*, Jon Logan testified that he did not know

what was occurring with the finances of the company during Jim Logan's life. *Second*, Jon Logan testified that Alexis Logan provided no meaningful services to the company.

As it relates to financial information, Jon Logan testified that he and Jim Logan "talked daily about our budget that I would be able to work with." (Transcript p. 709). Yet, just 9 transcript pages earlier, Jon Logan testified that Jim Logan and Alexis Logan *hid* their funding efforts from him: "This did this all behind my back and without any consent." (Transcript p. 700).

Interestingly, though, on **March 2,2016**, Jim Logan emailed Jon Logan all the bank passwords when Jon Logan was complaining about funds going to either Jim Logan or Alexis Logan. Because Jon Logan effectively was accusing his father of stealing from Jon Logan, Jim Logan writes: "Check out anything you like I have nothing to hide." (Ex. 8001). Nothing was hidden from Jon Logan, and Jon Logan's statements to the contrary simply are not true.

Further to Jon Logan's knowledge of the details of the financial condition of Smart Communications are emails Jon Logan sent to Jim Logan or Alexis Logan over the years. For instance, on **April 26, 2015**, Jim Logan responded to an uncharitable email from Jon Logan, and discussed matters involving efforts to secure financing for Smart Communications, including personal guarantees that Alexis Logan and Jim Logan gave—but not Jon Logan:

> The debt? I borrowed over 200k from grandpa and thru [sic] it in the pot in addition to the 225k we owe the bank. **Your guarantee seems to be absent on those loans.** If I were willing to accept your ridiculous offer which I am not, how would you assume the debt and relief those who have personally guaranteed the loans?
>
> In your email you state you only need my help with the financing. Well no shit! This company is at a critical phase. We are on the edge of great growth and profits. Wednesday I meet with Gateway bank regarding a million dollar line of credit. If you think a pretty smile and a good credit score will get the job done then get out there and get it done. **If you think that I or your sister** will place what little we have on the line for someone who cant stop motherfucking us to further his "idea" you have truly lost your shit.
>
> . . .
>
> The trade show. I was not there but I find it hard to believe all has changed since the Long Beach Show. You once again mention funding. How is this possible? **I know you are aware your sister is the guarantor on the loans. Two weeks ago you threatened to kill her!Do you really expect people you threaten to kill to pledge their assets for your business ventures?**

[Ex. 8121].

Over the years, there are other emails that irrefutably demonstrate Jon Logan had concurrent knowledge of inflows into, and outflows from, Smart Communications. From a **May 21,2018**, email, Jon Logan wrote to both Jim Logan and Alexis Logan:

- "Alexis is still living off this company taking funds";

- "you fund her life and lifestyle";

- "she is freeloading off this company and taking funds";

- "You two have fucked me harder than any stranger ever has".

(Ex. 8003).

From a **December 25, 2018**, email, Jon Logan wrote Jim Logan:

- "Do not dare ever being [sic] Alexis into my business ever again!"

- "Get that low life fucking mooch so far away from me and my business and my employees, she is not allowed near that fucking building."

(Ex. 8004).

From a **March 21, 2019**, email, Jon Logan wrote Alexis Logan and another person:

- "Alexis, you transferred $20k to yourself out of my business."

- "You both [Alexis Logan and Jim Logan] have blank checks belonging to my business you use at your own will without my permission."

- "You stealing from my company is causing me not to be able to pay our employees."

- "You ignorant fool. I have over $350k in bills I have to pay and I have $400k in new equipment I have to order right now this month. Yet you wire transfer money out of my business to yourself."

(Ex. 8005).

Not only did Jon Logan disavow knowledge of financial activity within Smart Communications, he in his personal lawsuit, through Smart Communications, and through HLFIP, alleged that his father was stealing from Jon Logan, and otherwise breaching fiduciary duties. In many cases, the basis of the alleged fiduciary duty was the fact that Jim Logan was Jon Logan's father!

The documentary evidence, though, indicates that for at least a decade Jon Logan knew about how he and Jim Logan were handling Smart Communications' finances. And Jon Logan knew about some of the very expenditures he now complains about. If Jon Logan's email statements to his family are to be believed, Jon Logan almost a decade ago should have acted to address his concerns.

The reality is, and the Court finds as fact, that Jon Logan knew exactly what was occurring in Smart Communications during Jim Logan's life, including its financial situation. Jon Logan and Jim Logan agreed that each were entitled to withdraw funds from Smart Communications, and the other shareholder knew it and knew when it was done. As a 50% shareholder, chief executive officer, and director, Jon Logan had full access to Smart Communication's books and records. Additionally, for at least the last decade, he also has had passwords to the bank accounts. Jon Logan's testimony that Jim Logan hid financial matters from Jon Logan is not credible.

Instead of accepting responsibility for his personal role, though Jon Logan seeks to fault his father under themes of breach of fiduciary duty, corporate mismanagement, and related concepts. Jon Logan also complains about not documenting the shareholders' expectations and limitations of authority. But Jon Logan cannot plausibly visit on his father Jon Logan's failure to do so when Jon Logan knew in real time how both Jon Logan and Jim Logan were handling expenditures.

Another major theme of Jon Logan's testimony visibly at odds with the documentary and other evidence is his contention that Alexis Logan provided no meaningful service to Smart Communications. The Court understands that brother and sister do not get along. At all. But the testimony concerning Alexis Logan's alleged lack of involvement is stunning.

Alexis Logan graduated law school in 2006 and began her career as an Assistant Public Defender in Hillsborough County, Florida. A couple of years later, she opened her own law firm, the Law Office of Alexis K. Logan, PLLC ("Law Office"). She also was involved, both early on and during the development of the inmate communication concept. In fact, part of the original inmate communication concept occurred based on Alexis Logan's work as a Public Defender going into jails to speak to her clients. Like Jon Logan and Jim Logan, she was not paid in the early days.

In 2009, when the jail communications concept was first developed by Jon Logan and Jim Logan, Jim Logan asked Alexis Logan for help develop the concept. (At this time, Smart Communications was not formed; Alexis Logan would form it in December 2014). This was done with Jon Logan's begrudging knowledge. Alexis Logan assisted her father with administrative tasks. She performed legal services. And she provided independent executive type services for her father, including conducting industry and market research. She acquired insurance and necessary bonds for work in various jails. As the concept grew, so did her involvement.

Alexis Logan also opened bank accounts and, critically, personally guaranteed Smart Communication's bank debt. She delivered valuable personal items as collateral that the bank

held. She also personally guaranteed Smart Communications' credit cards, sometimes where there were charges exceeding $150,000 a month.

Jon Logan did not have creditworthiness and did not provide any personal guarantee for almost the entire first decade. Alexis Logan remained as a personal guarantor of the American Express card during this litigation, even though Jon Logan was causing Smart Communications to sue her. In mid-2023, Alexis Logan terminated Smart Communications' ability to use the American Express backed by her, which annoyed Jon Logan greatly.

Relating to legal services, Alexis Logan incorporated the first Smart entity in 2010. She incorporated Smart Communications Holding, Inc. in December 2014, and she formed the other Smart entities, too. She also formed the original HLFIP entity. She drafted legal memoranda analyzing potential risks of new product offerings. She monitored lawsuits and communicated with outside counsel and provided typical in-house counsel type work. Alexis Logan also assisted with hiring Smart Communications Holdings, Inc.'s current in-house attorney, David Gann. As there was no guarantee that the business would be successful, especially in the early days, she was not asked to, and she did not keep time records relating to her work as an attorney.

Jon Logan knew of Alexis Logan's involvement from the beginning. Given Jon Logan's legal troubles and Jim Logan's IRS troubles, early on Alexis Logan was asked to hold legal title of the stock in her name. And she did. This was a continuing source of frustration to Jon Logan, who believed that Alexis Logan was taking "his" company from him. In fact, he continually complained that she would not return "his" stock to him.

Further to Jon Logan's knowledge of Alexis Logan's involvement, the April 26, 2015, email quoted above demonstrates her involvement. There are other examples of Jon Logan's knowledge of Alexis Logan's corporate involvement, too. From a December 19, 2016, email, Jon Logan wrote to Jim Logan:

- "Fucking stop involving her lazy ass";

- "time and time again [you] keep injecting her into my business";

- "IF YOU THINK OF HER NAME AND THIS BUSINESS…JUST STOP!!!!!!!!!!"

(Ex. 8002).

From a May 21, 2018, email, Jon Logan wrote to both Jim Logan and Alexis Logan:

- "Alexis is still living off this company taking funds";

- "you fund her life and lifestyle";

- "she is freeloading off this company and taking funds";

- "You two have fucked me harder than any stranger ever has".

(Ex. 8003).

From a December 25, 2018, email, Jon Logan wrote Jim Logan:

- "Do not dare ever being [sic] Alexis into my business ever again!"

- "Get that low life fucking mooch so far away from me and my business and my employees, she is not allowed near that fucking building."

(Ex. 8004).

To be fair, Jon Logan did not think that Alexis Logan did a good job with those tasks assigned to her. But doing a poor job (which there is scant credible evidence demonstrating) is different than Jon Logan's position that she was not involved at all. For Jon Logan to say Alexis Logan was not involved simply is wrong. And this can be gleaned simply on documentary evidence. That conflict was further pronounced when viewing Jon Logan's testimony. Mr. Johnson's cross-examination of Jon Logan was highly effective, especially related to Alexis Logan's personal guarantees, as it spotlighted that Jon Logan could not answer simple and direct questions because the answer would require him to acknowledge that her sister helped Smart Communications. That evasiveness in his testimony further undermined his credibility.

The Court finds as fact that Jon Logan had contemporaneous knowledge of Alexis Logan's involvement and, for the most part, those funds flowing to her directly or indirectly. This includes Jon Logan's knowledge that Alexis Logan personally guaranteed bank loans and credit cards and physically surrendered to the bank collateral to secure various loans—all to allow Smart Communications an opportunity to survive and to grow, especially in its earlier years.

During Part 1, Phase 2, the Court found as fact that Jon Logan's spite and animus towards his sister and mother drove decisions, not business judgment. The Court continues with that finding based on Jon Logan's testimony in Part 2, Phase 2.

The Court agrees with the concept advanced by Mr. Johnson that Jim Logan was stuck between his two children. Jon Logan was developing this inmate communication idea. But, given his troubling past, he could not successfully develop the concept. Jim Logan had entrepreneurial talents himself. Jim Logan used those, and he harnessed the talents of both of his children to launch Smart Communications into a successful company.

But because Jon Logan and Alexis Logan did not get along, Jim Logan had to operate as the bridge. All knew it. The Court finds Smart Communications would not have succeeded without Alexis Logan's assistance and creditworthiness.

The Court has dedicated substantial attention to these two themes because they help explain why the Court does not credit Jon Logan's testimony. Credibility is critical here,

especially regarding claims where there is little to no documentary evidence about many of the inflection points in this case.

It comes as no surprise to either side that when it came to withdrawing funds from Smart Communications, neither Jon Logan nor Jim Logan followed corporate best practices. Generally, neither filled out expense reports nor made concurrent written justifications for their withdrawals, whether denominated as a draw, a shareholder's loan, a reimbursement, or simply as a corporate expense. This practice was known by, and approved by, both Jon Logan and Jim Logan. And with Jim Logan unable to provide testimony as to the questioned transactions, in many instances the Court is left with Jon Logan's testimony to support a claim or defense.

Indeed, there are many decisions relating to valuation as well as most of the affirmative claims brought by Jon Logan, Smart Communications, or HLFIP against Janice Logan, the Trustee, the Personal Representative, Alexis Logan, or her husband Justin Peterson that rest in part on Jon Logan's testimony. And that foundation is shaky.

Further, as demonstrated by the evidence, Jon Logan at every turn in this case has taken action to either eliminate or substantially minimize the value of the Trustee's shares. The exorbitant "legal spend" in this case is, in part, directly tied to Jon Logan's actions, not Jim Logan's actions.

The Court will now turn to its analysis. But the Court will make other factual findings throughout this Order, especially when addressing specific claims.

### 3.
### ANALYSIS

The main issue in this portion of Part 2, Phase 2 trial involves the determination of fair value for the Trustee's 50% interest in Smart Communications Holding, Inc., a Florida entity, as of August 28, 2023.

For ease of reference, the Court will refer to Smart Communications Holding, **Inc.** and its related entities as "Smart Communications." As a reminder, effective August 29, 2023, Jon Logan caused the creation of Smart Communications Holding, **LLC**, a Delaware entity, along with a host of other entities. It was on August 29, 2023, that Jon Logan then executed the massive corporate restructuring, with assets being transferred between entities. As the Court established valuation on August 28, 2023, the Court for valuation purposes can disregard the corporate restructuring and related transfers occurring without value.

When the Court addresses payment terms and security, the Court may need to more directly address the corporate restructuring.

On paper, the Court's valuation assignment is simple. Knowing precisely what is being tried, though, is more nuanced as the parties have raised many claims. A good number of the Trustee's affirmative claims will be subsumed within the analysis of valuation, as those claims

will not survive the valuation process. Some claims against the Trustee, Personal Representative, and Janice Logan remain, but any damages will be addressed as setoff to the valuation of the Trustee's share ownership. There are other claims against Alexis Logan and Justin Peterson that could result in a money judgment. Finally, a few claims were not addressed during Part 2, Phase 2 trial, and the Court presumes they will be severed to allow entry of a final judgment.

The Court first addresses valuation and those claims that will be subsumed within the valuation of Smart Communications.

## A.
## INTRODUCTION TO VALUATION

The valuation of Smart Communications Holdings, Inc. is formally pled within the Trustee's Second Amended Verified Complaint [DIN 680]. The defendants in that case include Jon Logan; Smart Communications Holding, LLC; HLFIP Holding, Inc.; HLFIP Holding, LLC; Smart Communications Yacht Holding, LLC; and Loco Florida, LLC. The Trustee included Smart Communications Holding, Inc., the entity being valued, as a nominal defendant.

There is a separate affirmative pleading that impacts valuation. That is contained within the Trustee's Second Amended Answer with Counterclaims [DIN 775]. In that pleading, the Trustee sued Jon Logan; Smart Communications Holdings, Inc.; Smart Communications Holding, LLC; HLFIP Holding, Inc.; and HLFIP Holding, LLC.

Based on the parties' joint filing dated October 1, 2025, entitled "Joint Notice of Filing Regarding Survival of Claims Post-Valuation," the parties agreed certain claims would not survive the Court's valuation. The discussion of those claims, if any discussion is necessary, will occur within Section C involving valuation. Before addressing valuation, though, the Court must address the issue of royalty.

## B.
## LICENSE/ROYALTY ISSUE

A component that impacts Smart Communications' valuation is the application, if any, of a commercially reasonable royalty for an exclusive license to MailGuard and MailGuardLegal intellectual property. For ease of reference, the Court will simply refer to these products as MailGuard.

Recall the Court made several factual findings and conclusions during Part 1, Phase 2 of the trial relating to license/royalty issue. Those findings included:

- Jon Logan's testimony concerning a true-up or valuation for payment to HLFIP was not credible. [DIN 1189, p. 2, ¶6]

- There was no agreement between Jon Logan and James Logan for a future true-up or valuation for payment to HLFIP by Smart Communications relating to Smart Communications' use of intellectual property.

- Jon Logan's actions on behalf of Smart Communications of signing the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the first-time recognition of a long-term liability relating to the purported 40% royalty due HLFIP from Smart Communications as described in footnote I of Smart Communications Consolidated Audited Financial Statements (for year end 2022) constituted "director's conflict of interest transactions" within the meaning of section 607.0832.

- Jon Logan failed to prove the fairness of those transactions, and the Trustee proved those transactions were not fair to Smart Communications.

- The Court invalidated both the Exclusive Intercompany Intellectual Property License and the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I that was based on the Exclusive Intercompany Intellectual Property License.

Nothing in Part 2, Phase 2 causes the Court to alter those factual findings. The Court continues with those findings.

Adding the evidence from Part 2, Phase 2, the Court notes there was no factual dispute raised that Jon Logan originally owned the idea that became MailGuard and MailGuard Legal. (For ease of reference, the Court will simply state "MailGuard"). Further, there was no factual dispute raised that HLFIP currently owns the MailGuard intellectual property, however denominated (such as patents and trademarks). Jon Logan transferred the MailGuard intellectual property into HLFIP, an entity that Jon Logan owns 100%.

For purposes of this valuation trial, MailGuard is the only intellectual property that Jon Logan, HLFIP, and Smart Communications sought to apply any value or royalty. That is not surprising.

In April 2015, Jon Logan sent an email that Jon Logan intended to be a contract relating to intellectual property associated with "postal mail contraband elimination system." In fact, that phrase or a derivative of that phrase was used three times. The "postal mail contraband elimination system" is MailGuard.

The contract also references three additional times "this service invention" or "this service, model, business plan, or technology." This email contract indicates that Jon Logan would "exclusively own[] and will retain exclusive ownership of this service invention . . . ."

Jim Logan signed the email. In May 2015, Alexis Logan (then holding legal title to Smart Communications' shares) also signed, and she annotated "For new technology/patent/new IP

only." Alexis Logan was not convinced this was patentable, and she wanted to ensure Smart Communications' existing intellectual property remained in Smart Communications' possession.

From a factual standpoint, the Court finds this contract applies to the MailGuard intellectual property only. Because the parties only sought to value the MailGuard intellectual property, the Court will focus on that intellectual property.

The Court finds that beginning in 2016 through the date of valuation (August 23, 2023), Smart Communications used the MailGuard intellectual property. The known practice to both Jon Logan and Jim Logan during his life was that Smart Communications paid for all engineering and development costs as well as all costs associated with securing and enforcing HLFIP intellectual property. Smart Communications also assumed all business risks associated with the MailGuard intellectual property. For the time-period 2019-2023 (thus excluding 2015-2018), Smart Communications paid at least $4.8 million on behalf of HLFIP relating to this intellectual property. Smart Communications, though, did not separately pay to HLFIP an amount for a royalty, as Smart Communications was paying all of HLFIP's expenses.

The three main experts addressing the royalty issue were Dr. Sean Sheridan, Ph.D. and Mr. Mark Schuelte, for HLFIP, and Dr. Louis Berneman, Ed.D., for the Trustee. The Court credits Dr. Berneman's testimony in most respects.

Before diving deeper, the Court notes the intellectual property experts on both sides generally agreed on a basic formula to determine a commercially reasonable royalty. The Court finds this formula to be appropriate in this case. That formula is:

**(Royalty Rate   x   Royalty Base)  -  Deductions  =  Royalty**

The experts, though, disagree on the values to input into that formula. The Court will next address each component of this formula to address the ultimate royalty in this case.

### 1.      *Royalty Rate.*

Dr. Berneman's main conclusion is that no additional compensation obligation is due HLFIP from Smart Communications for the use of the HLFIP intellectual property. Dr. Berneman arrived at this by way of Smart Communication's payment of engineering and development costs, securing and enforcing HLFIP IP, and assuming all business risks. For instance, Dr. Berneman pointed to the $4.8 million paid on behalf of HLFIP between 2019-2023. (Again, this excludes costs Smart Communications paid between 2015-2018.)

Alternatively, Dr. Berneman testified based on comparable agreements that if a royalty rate needed to be applied, a commercially reasonably Royalty Rate would be between 2% to 5%, but in this case should be no more than 2%.

Dr. Sheridan, one of HLFIP's experts, testified that a reasonable Royalty Rate based on comparable agreements would be 10% to 17% of net revenue from accounts in which MailGuard services are provided. Mr. Schuelte, another HLFIP expert, testified that a reasonable royalty rate

from comparable agreements would be between 13.5% to 50%, with a 34% median of the interquartile range of other agreements he selected as comparison.

In review of the experts' testimony based on the underlying facts and data in this case, the Court finds Dr. Berneman's analysis and selection of comparable situations to be the most realistic and persuasive. The Court, though, cannot agree that the bottom of his range is appropriate. Instead, the Court finds the top of Dr. Berneman's range—5%—to be appropriate under the facts of this case.

The Court finds that **5%** is the proper commercially reasonable Royalty Rate for Smart Communications to pay HLFIP for an exclusive license for the use of HLFIP's intellectual property.

### 2. *Royalty Base.*

HLFIP expert Dr. Sheridan testified as to Royalty Base. HLFIP's other expert, Mr. Schuelte, did not express an opinion as to the Royalty Base.

Dr. Sheridan testified by implication that the Royalty Base should be 81% of Smart Communications' revenues. Dr. Sheridan derived that percentage by using the percentage of facilities in 2023 that deploy the MailGuard product because, with exception of the Commonwealth of Pennsylvania's contract, none of the other facility contracts provides for a quantifiable revenue component for the MailGuard service. The reality is MailGuard is one of multiple services provided by Smart Communications to a facility.

Dr. Sheridan testified that the number of Smart Communications' serviced facilities receiving MailGuard services increased from 1% in 2016 to 81% by 2023. He also explained that after implementation of MailGuard in a facility, the average messages per inmate per day increased from 1.37 to 1.77, resulting in an increase of daily message revenue per inmate from $0.69 to $0.89. Just from messages, then, Smart Communications saw a 29% increase in revenue, which Dr. Sheridan attributes to MailGuard.

To get to his 81% opinion, though, Dr. Sheridan assumed that "MailGuard is required to get these contracts." (Trans. 1104-1105). In other words, Dr. Sheridan attributed 100% of all revenue from a facility that uses MailGuard as resulting from, and attributable too, the MailGuard intellectual property.

Dr. Sheridan testified that between 2016—the first year in which MailGuard was introduced—and the August 2023 valuation date, Smart Communications' revenue associated with the MailGuard product was $137.3 million. Using math, the Court notes that $137.3M is 81% of Smart Communications' total revenue of $169.5M from the beginning of the first contract involving MailGuard product until the valuation date. (Expressed as a formula: $169.5M = $137.3M ÷ 0.81) Separately, Mr. Sly testified the revenues from January 2016 to valuation date were $167.7M.

On cross-examination, Dr. Sheridan conceded that he did not exclude revenues that appear to derive from other technology such as the Lattice intellectual property Smart Communications acquired and owned (meaning, not HLFIP ownership). The evidence demonstrates that Smart Communications (not HLFIP) purchased Lattice technology related to telephone-related services and SmartEvo ITS. Like MailGuard, that technology also drives Smart Communications revenues.

Dr. Sheridan also conceded that there are revenue streams for other Smart Communications' products, such as photo income, entertainments, visitation income, and commissary transfer credits, all of which are outside the MailGuard technology. Despite those revenue drivers, Dr. Sheridan simply assumed *all revenue* in a facility offering MailGuard existed because, without MailGuard, Smart Communications would not have the contract.

The Trustee and the Trustee's expert Dr. Berneman criticized the use of 81% of facilities using MailGuard as a valid proxy for the royalty base. Dr. Berneman explained that there is no nexus or linkage between MailGuard and the claimed 81% royalty base. Dr. Berneman, though, did not offer a competing model.

The Court simply cannot agree—nor can the Court find—that 100% of the revenues derived from a facility that has MailGuard as a service are attributable to the MailGuard intellectual property. There was credible testimony that some facilities were more focused on telephone-based services and did not care whether it had MailGuard or not. Having said that, the Court agrees with the testimony of Chief Allen from Polk County, who is a long-term director of a jail and whose testimony the Court placed great weight, that the MailGuard product is an important, attractive, and value-added component of the suite of products Smart Communications offers.

In the Court's review of the financials, the various suite of Smart Communications products, the commission rates, the exhibits, testimony of fact and expert witnesses, the Court agrees generally that using facilities that utilize the MailGuard service is a sufficient proxy to determine Royalty Base. The Court finds use of this proxy provides sufficient linkage and is not too speculative. As noted above, though, the Court cannot find 100% of all revenues from a facility utilizing MailGuard is appropriate to attribute to the MailGuard intellectual property. Instead, the Court finds a very healthy percentage of those revenues generated from facilities using the MailGuard service—50%—is appropriate as part of the Royalty Base calculation.

The Court pauses to note that if the Court is in error in using the 81% facilities that has MailGuard because it is too speculative, the Court would note that Smart Communications and HLFIP presented no other means for the Court to calculate the Royalty Base. The only exception is the Commonwealth of Pennsylvania contract, which 100% of the revenue from that contract is due to MailGuard. Thus, if the Court were in error in using 81% of facilities using MailGuard, then the Court would alternatively only be able to find 100% of the revenues from the Commonwealth of Pennsylvania to form the basis of the Royalty Base. Having made that alternative finding, the Court returns to its primary finding.

The Royalty Base is 50% multiplied by 81.00% (percentage of facilities using MailGuard), which equals 40.5% of Smart Communications' net revenues.

The Court finds that **40.5%** of Smart Communications' net revenue is the proper Royalty Base.

### 3.    *Deductions.*

The parties disagree with how to apply deductions, if any, to the royalty formula. Recall that Smart Communications paid at least $4.8 million on behalf of HLFIP between 2019 and the 2023 valuation date. The Court first addresses deductions prior to the valuation date. The Court then addresses deductions after the valuation date.

Dr. Sheridan opined there were $137.3M in net Smart Communications revenues to which the Royalty Rate would apply. As explained above, $137.3M constituted 81% of Smart Communications' net revenues between 2016-2023. Applying math tells us this means Smart Communications' total net revenue for this period is $169.5M. ($169.5M = $137.3M ÷ 0.81).

The Court will use this $169.5M net revenue amount, even though it slightly overstates the revenue because it appears Dr. Sheridan used revenue that went through December 31, 2023, not August 28, 2023. In this case, though, that difference is not material.

For the period before August 28, 2023, the Court first applies the 40.5% the total net revenue of $169.5M, resulting in a Royalty Base of $68.6475M. The Court then multiplies that Royal Base by 5%, the Royalty Rate. The product of these amounts is $3.432M, rounded to **$3.4M.**

In other words, applying the commercially appropriate **5%** royalty rate to **40.5%** of all net revenue would mean that Smart Communications would owe HLFIP **$3.4M** for 2016-August 28, 2023.

Smart Communications, though, paid at least **$4.8M** on behalf of HLFIP between 2019 and 2023. Obviously, this excludes those costs paid by Smart Communications on behalf of HLFIP prior to 2019. $4.8M paid by Smart Communications exceeds $3.4M due HLFIP. ***In other words, there is no further royalty due HLFIP for Smart Communications' use of HLFIP's/Jon Logan's intellectual property under the exclusive license through August 28, 2023.***

Because the Court previously found that the Smart Communications shareholders never agreed to a true-up relating to the royalty, the Court will not apply the difference in determining value. The Smart Communications shareholders tacitly agreed to pay those costs on behalf of HLFIP. The Court, therefore, does not need to address further the question of royalty through August 28, 2023.

The Court will address the proper discounted cash flow Royalty amount in the Valuation section. ***It should be noted that because the value of Smart Communications is being impacted***

*by the application of the Royalty, it would be highly inequitable if Smart Communications continued paying all expenses of HLFIP in any amount above what would otherwise be due HLFIP. This includes HLFIP's attorney fees in this proceeding. This will need to be addressed in the security of payment of the value of the Trustee's shares, and consideration should be given whether these expenditures should actually be characterized as shareholder loans to Jon Logan.*

That leaves only the issue of Deductions that will apply, if any, in the formula. As found as fact, the Smart Communications' shareholders agreed that Smart Communications would fund the development of HLFIP's intellectual property. Based on that factual finding, the Court concludes there will be no Deductions applied on the formula associated with the intellectual property.

**C.**
**VALUATION OF**
**SMART COMMUNICATIONS HOLDING, INC.**
**AS OF AUGUST 28, 2023**

To say the parties have wildly different valuations of Smart Communications in this case would be the understatement of the year.

### 1.    *The approaches.*

There were two experts addressing value. Both generally used a sum-of-the-parts approach by separately valuing the operating assets using a discounted cash flow to present value and then adding in nonoperating assets. Despite that similarity, each expert included multiple different assumptions, with each assumption impacting the ultimate value.

Jon Logan and Smart Communications' expert, Robert Sly, testified that the value of the Trustee's shares on August 28, 2023, was $1.2M, after applying a 10% royalty consistent with Dr. Sheridan's analysis. Mr. Sly's opinion of the Trustee's share value without application of the royalty was $7.1M.

Mr. Sly testified that Smart Communication's value on a "marketable, control basis" as of August 28, 2023, was $20.2M. He then applied a 12% discount for "lack of control," resulting in a value of $17.8M. He then applied a 20% reduction to this amount for "lack of marketability," resulting in a value of $14.2M. From that number, Mr. Sly derived the Trustee's 50% value as $7.1M.

The Trustee's expert, Mark Berberian utilized two separate models. The difference of those models involved forecasts of the effect of then unknown but impending regulations the FCC would be issuing associated with the Martha Wright-Reed Act that was then known or knowable. Mr. Berberian's Model 1 assumed a more benign impact of regulations from Smart Communication's perspective. His Model 2 assumed a more negative impact on Smart

Communications' profitability based on those future regulations, again, from Smart Communications' perspective.

Mr. Berberian testified the value of the Trustee's shares on August 28, 2023, was $65.3M under Model 1, and $51.9M under Model 2. Mr. Berberian did not apply either a lack of control or lack of marketability reductions. Further, and initially, Mr. Berberian did not include any royalty, assuming Dr. Berneman's no further royalty position was correct. Based on a question by the Court concerning the application of a royalty, Mr. Berberian created a dynamic model that would allow the user of his dynamic model to input the determined Royalty Rate and Royalty Base into his model that would then result, based on Mr. Berberian's methodology, the value of Trustee's shares (again, otherwise assuming the validity of Mr. Berberian's model).

As the Court permitted Mr. Berberian to create a dynamic model, the Court permitted Mr. Sly to do the same as well, and he did so. In fact, Mr. Sly's dynamic model allowed additional inputs. Both Mr. Berberian and Mr. Sly reviewed the other's dynamic models and testified as to those dynamic models.

The Court appreciates the additional effort by the experts. Their efforts in this regard was most helpful to the Court.

### 2. *The Court credits Mr. Berberian's opinion of value.*

Overall, the Court credits Mr. Berberian's approach. From his two models, the Court primarily agrees with Model 2. The Court found Mr. Berberian's selection of inputs and explanations why he selected what he did to be more plausible and appropriate in this case. The Court also found Mr. Berberian's evaluation of the financials of Smart Communications as well as the known comments to the FCC and potential development of regulations authorized by the Martha Wright-Reed Act to be by far the most credible. The Court also was impressed with how forthrightly Mr. Berberian handled cross-examination demonstrating potential weaknesses of certain of his assumptions.

The Court is aware of some criticism that Mr. Berberian's Model 2 looked at news stories after the valuation date to assist with what was known or knowable as of August 28, 2023. But the Court credits Mr. Berberian's explanation that those news story show what was being anticipated about the regulations in August 2023. Further, the Court notes that Mr. Berberian based his assumptions on filed comments to the FCC concerning potential Martha Wright-Reed regulations that *predated* the August 28, 2023, valuation date.

The Court continues to agree with Model 2, with some tweaks discussed below. The Court pauses to note that if the Court were in error on basing its decision on Mr. Berberian's Model 2, this does not mean the Court would then agree with Mr. Sly. Instead, the Court would revert to Mr. Berberian's Model 1.

### 3. *Are reductions appropriate?*

The experts disagree on the application of reductions to the overall value of the Trustee's shares. The two reductions the experts disagreed with involve lack of control and lack of marketability.

Mr. Berberian determined there should be no reduction for lack of control applied in this case. In contrast, Mr. Sly testified there should be a 12% reduction. Both Jon Logan and the Trustee own 50%. While Jon Logan may be incumbent management, as a shareholder he does not control Smart Communications. Yet, the net effect of Smart Communications purchasing the Trustee's 50% interest will result in Jon Logan with 100% control over Smart Communication. (Perhaps the argument that the Trustee's 50% shares will become treasury shares is plausible, but the net effect of the purchase of the Trustee's shares is Jon Logan will exercise total control over Smart Communications.) In other words, the reality of this transaction is that Jon Logan is purchasing control, and those purchasing control normally pay a control premium. The Court credits Mr. Berberian's discussion concerning the nature of the transaction and the acquisition of control by Jon Logan as a justifiable basis not to include a reduction for lack of control to the value of the Trustee's shares.

The Court in a separate valuation case determined that reductions for such items as lack of control or marketability are discretionary based on the facts of each case. SMG Companies Holdings, LLC v. Matthes, 2021-CA-5092 (Fla. 12th Jud. Cir. Ct. Jan. 9, 2023). The Court based that holding on review of cases including Cox Enterprises, Inc. v. News-Journal Corp., 469 F. Supp. 2d 1094, 1108 (M.D. Fla. June 30, 2006); Munshower v. Kolbenheyer, 732 So. 2d 385, 386 (Fla. 3d DCA 1999); Erp v. Erp, 976 So. 2d 1234, 1237-1240 (Fla. 2d DCA 2008); and Agnelli v. Lennox Miami Corp., 2022 WL 2788875 (S.D. Fla. July 15, 2022). The Court continues to conclude that it has the discretion whether to apply one or more reductions based on the unique facts of each case.

The Court agrees with Mr. Berberian that under the facts of this case there should be no reduction based on "lack of control." The Court, therefore, in its discretion will not apply a lack of control reduction.

The closer question for the Court is whether to apply a lack of marketability reduction in this case. Admittedly, this was the Court's most difficult decision it made in Part 2, Phase 2, and the decision the Court struggled with the most.

Mr. Sly contends the Court should apply a 20% reduction to the enterprise value to reflect that as a private, closely held company it will take longer and require more money to sell it. Mr. Berberian testified that no reduction should apply because there is a willing buyer as evidenced by the statutory notice of election to purchase.

As the Second District discussed in a dissolution of marriage case a situation involving corporate deadlock:

> There admittedly is a significant debate about when marketability discounts are appropriate in any proceeding requiring the valuation of a closely held corporation. It seems that the debate is sometimes led astray

> by the application of broad generalizations that do not differentiate between the types of proceedings within which valuations are required, nor acknowledge that the appropriate analysis for the valuation of a business may change depending upon the specific legal and factual context presented. What is appropriate in the oppressed shareholder or minority appraisal rights cases may not necessarily be desirable in a judicial dissolution of a corporation or in an action for dissolution of marriage involving equitable distribution.
>
> In the context of judicial dissolution of corporations, the context perhaps most analogous to the scenario presented in this particular action for dissolution of marriage, Florida courts have generally accorded discretion to the trial court to determine, based upon the evidence and circumstances presented, whether a marketability discount should be applied in the valuation of a closely held corporation.

Erp v. Erp, 976 So. 2d 1234, 1239 (Fla. 2d DCA 2008) (internal citations omitted). In other words, the Court has discretion.

Here, the Court cannot totally agree with Mr. Berberian's analysis on this point because, taken literally, there always is a willing buyer due to the statutory election of purchase. If that position were correct, it would seem the Court should never exercise any discretion in applying a reduction for lack of marketability because the election must be made to trigger the valuation process. That position is at odds with case law providing the Court with discretion.

The Third District in Munshower concluded the trial court in its discretion may properly consider a lack of marketability reduction. 732 So. 2d at 386 (explaining the "discount for lack of marketability is properly factored into the equation because the shares of a closely held corporation cannot be readily sold on a public market."). The Middle District in Cox, cited to Munshower, and found on the facts of that case no lack of marketability discount would be applied. In Cox, Judge Antoon found there was no reliable methodology had been provided to the court to apply, which is why the court declined to apply one in that case. 469 F. Supp. 2d at 1108-1109.

In the current case, there is evidence that Smart Communications is not the only company in the jail inmate communication space. In fact, Smart Communications believes itself to be one of the smaller competitors. And we know Smart Communications holds valuable contracts with many jail and prison institutions throughout the country, which contracts produce a reliable and growing revenue stream. During Jim Logan's life, Jon Logan and Jim Logan discussed Smart Communications as a potential acquisition target with merger and acquisition specialists at UBS and Truist. This evidence suggests that Smart Communications could one day be acquired.

Mr. Sly testified that he based his 20% determination on two separate methodologies. First, he relied on the Stout restricted stock study, in which Mr. Sly testified, measures an implied discount on restricted stock to fully marketable stock. That delta, according to Mr. Sly, is 19.8%. There was no determination, though, whether the restricted stock were from companies

functionally equivalent or otherwise an appropriate comparison. Instead, this appears to run directly into Judge Antoon's criticism in Cox that a generic contention that shares of a closely held corporation are less liquid, and therefore less marketable than shares of a publicly traded corporation, as justification to apply this reduction. 469 F. Supp. 2d at 1108.

Mr. Sly also testified that he used a Quantitative Marketability Discount Study that is based on using an income approach. The QMDM amount was between 21.3% to 31.7%. Of course, Mr. Sly's opinion of the value of Smart Communications using an income approach was **negative $12.4M**, with the Trustee's value of her shares as a **negative $6.2M**—this is *before* the application of any lack of marketability discount! Mr. Sly rejected the use of the income approach for valuation purposes given that it resulted in no value. Reliance on the QMDM based on an income approach under this circumstance is dubious at best. The Court cannot credit that approach in this case.

Mr. Sly made a further comment concerning the lack of marketability that continues to bother the Court:

> Q.      What else did you consider in estimating a discount for lack of marketability?
>
> A.      Well, I considered the fact that SmartComm is a closely-held entity. So if they were to sell a 50% interest or they were to sell even 100 percent interest, that would take a lot of time and a lot of money to sell.

(Trans. 1387).

The Court sees no principled basis, explanation, or foundation for this statement. This is nothing tying "a lot of time" or "a lot of money" to the realities of this company. Again, Smart Communications is a smaller player in the existing inmate communication space, with valuable contracts. In other words, there are existing players that makes Smart Communications a potential acquisition target.

The Court specifically rejects Mr. Sly's conclusion that a 20% reduction is appropriate here under these facts. With respect to the restricted stock study, there simply is no credible evidence that the implied value of restricted stock sales has any connectively to the facts and circumstances of this case. With respect to the QMDM based on an income approach, Mr. Sly rejected his own income approach due to the nonsensical negative value of Smart Communications as an enterprise, even before the application of a reduction. The Court, too, dismisses this opinion based on an income approach as not credible.

Having said all of that, the Court believes there should be some recognition of a lack of marketability. But it is nowhere close to 20%, and the Court has no credible evidence suggesting it is. Instead, under the facts of this case, the Court finds that a 5% reduction to the enterprise value is appropriate. The Court believes that, with existing valuable contracts, being a smaller player in the inmate communication space, and prior favorable consideration by merger and

acquisition bankers, Smart Communications would be a viable target for acquisition. The Court acknowledges that out of all rulings made in this Order, though, the Court has the least confidence in this determination because this percentage is not firmly rooted in expert testimony (although it is between the range set by the two experts). Instead, it is based on the Court's assessment of all evidence in the case.

If the Court were in error at 5%, the Court would follow Judge Antoon's lead in Cox and find that Smart Communications failed to supply the Court with credible tools to evaluate a lack of marketability discount and therefore would not apply one. Again, though, that is an alternative ruling only if the Court is in error in its application of a 5% lack of marketability reduction.

### 4. *Nonoperating assets.*

The parties spent much time discussing how Jon Logan and Jim Logan decided to run Smart Communications. Included in this discussion involved the acquisition of several valuable nonoperating assets. At trial, much attention was spent on the various claims of unjust enrichment, conversion, breach of fiduciary duty, fraudulent transfer, director liability, conspiracy, and related theories. The Court as part of the valuation does not need to address each claim; however, the Court's discussion will be informed by those claims that do not survive valuation.

Before proceeding further, the Court agrees with the values Mr. Berberian assigned to nonoperating assets as of the date of valuation. Thus, the Court will not get into a discussion of competing valuation of each of those nonoperating assets. Instead, the focus will be on whether to include it within Smart Communications' assets and its disposition. The answer for these nonoperating assets is yes. The Court included them as presented by Mr. Berberian.

*a.*
*Homes and Condominium*

On the valuation date, Smart Communications owned two homes and one condominium. Those properties are the Tierra Verde home on the water in Pinellas County, valued at $4,060,333; the Ranch Club home in Sarasota, valued at $2,591,000; and the Brickell Avenue condominium in Miami-Dade County, valued at $1,882,667. The Brickell Avenue condominium has since been sold with a small gain, and those sale proceeds were deposited into Smart Communications accounts. The Court finds all three of these homes are appropriately valued and includable as Smart Communications assets as of August 28, 2023.

Jon Logan and Jim Logan agreed that the company would pay for a home for each. At all relevant times, Jon Logan lived in the Tierra Verde waterfront home, and he continues to live there today. Jim Logan and Janice Logan lived in the Ranch Club home, although there were times he stayed elsewhere. Janice Logan today continues to live in the Ranch Club home. Smart Communications paid all expenses with the upkeep and repair of both home.

Based on the practice of Jon Logan and Jim Logan, the Court will not require any adjusting entries relating to their personal use (and the Trustee's use) of either the Tierra Verde

or Ranch Club home through August 28, 2023. Each shareholder will be allowed to receive the home. For all expenses for those two homes occurring *after* August 28, 2023, they will be the responsibility of each shareholder.

The Trustee at her election within 30 days of the entry of final judgment may require Smart Communications to distribute the Ranch Club to her. This election will reduce the amount Smart Communications owes the Trustee by $2,591,000. Regardless of whether the Trustee elects to receive the Ranch Club home, all expenses that Smart Communications paid for the Ranch Club beginning on August 29, 2023, through the date it deeds ownership to the Trustee (or the date the Trustee moves out and returns possession to Smart Communications) are to be paid by the Trustee to Smart Communications by means of setoff against the value of the shares. The final amount still needs to be calculated. The Court anticipates the parties to address this during the December 19 hearing. (Within this category, the Court also would include those amounts attributable to wrongful injunction, such as the health insurance premiums.)

Jon Logan at his election within 30 days may require Smart Communications to distribute the Tierra Verde to him without further liability to Jon Logan. However, all expenses Smart Communications has paid for the Terrie Verde beginning on August 29, 2023, and continuing will be carried on the books of Smart Communications as a shareholder's loan to Jon Logan. This requirement to categorize as a shareholder's loan any funds Smart Communications expends for upkeep or repair of the Tierra Verde home will remain until Smart Communications completes payment to the Trustee of the value of her shares.

That leaves the Brickell Avenue condominium, paid for by Smart Communications funds. The Court cannot find this condominium to be compensation to Jon Logan. The evidence is that title was transferred back to Smart Communications and sold, with the proceeds being deposited into Smart Communications accounts. Smart Communications already removed reference to a shareholder's loan from Jon Logan's column. No further action is necessary with respect to this already sold condominium. No adjustment is necessary to Mr. Berberian's model.

*b.*
<u>The Yacht</u>

Smart Communications purchased a new 2020 100' Riva Corsaro ("the Yacht") for approximately $9.6M. ($5M down; financed $4.6M.) Smart Communications paid the downpayment and pays all debt associated with the Yacht. Smart Communications pays all on-going expenses associated with the Yacht. At the valuation date, the value of the Yacht was $7,950,000, with $4,800,000 in then existing debt. (Since valuation, there has been a restructuring of the debt, but the annual payments for debt service is $1M a year. This is before the first penny is paid to dock the Yacht or its upkeep.)

The Yacht, though, is not titled in Smart Communications' name. The evidence, though, firmly establishes that the Yacht was for Smart Communications' corporate use. In December 2021, Jim Logan wrote in search of financing: "Jon Logan, the President of Smart Communications Holding, Inc. is seeking financing to acquire a yacht for corporate endeavors. In the regular course of business, we bring in clients from around the country to our corporate

Page 26 of 49

office in Florida for training and research purposes. This vessel will aid in the rounding of the total experience." (Ex. 5373). Despite all of this, Smart Communications pays Yacht Holdings rent to allow Smart Communications to use the Yacht occasionally.

There is no credible evidence that the Yacht was to be a personal asset of Jon Logan, however it would be titled.

At a minimum, an action by Smart Communications against Yacht Holding for unjust enrichment would be successful. (The Trustee filed a derivate action against Yacht Holdings and Jon Logan.) The elements of unjust enrichment are:

> An action for unjust enrichment exists to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity. The elements of such a claim are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Essentially, the doctrine operates to imply a contract where none otherwise exists so as to ensure equity between the parties.

Kenf, L.L.C. v. Jabez Restorations, Inc., 303 So. 3d 229, 231 (Fla. 2d DCA 2019) (internal citations and quotations omitted).

Here, Yacht Holding is paying nothing, and Smart Communications is paying everything. It is entirely inequitable for Yacht Holdings to retain the Yacht in its name under these circumstances. In this section, the Court does not need to address a transfer of title to the Yacht, as the Court can simply include the value of the Yacht in Smart Communications' assets. No adjustment is necessary to Mr. Berberian's model due to the Yacht.

The Court notes that because the Court concludes the Trustee would have prevailed on an unjust enrichment claim behalf of Smart Communications relative to the Yacht, the Court does not need to address the other theories raised by Trustee relative to the Yacht.

The Court makes one further observation. The Court will address the Yacht again in the discussion of security for payment of the Trustees' shares. Spoiler alert: the Yacht needs to be sold. (The Court retains the ability under its authority to provide security the ability to direct Smart Communications to pursue Yacht Holdings for return of the Yacht, should it become necessary to do so.)

*c.*
*The Nor-Tech 450 Center Console boat*

Smart Communications also bought a $939,000 Nor-Tech 450 Center Console boat, which is docked at the Tierra Verde home. At the date of valuation, that vessel is worth $887,500.

Page 27 of 49

The Court finds this purchase was not substitute salary for Jon Logan. The vessel belongs to the Company. The Court will include this vessel within Smart Communication's value at the value on the date of the purchase price. No adjustment is necessary to Mr. Berberian's model.

The Court will give Jon Logan 30 days from the entry of the final judgment to elect whether he wishes to purchase this vessel from the Company for the amount identified on the valuation date. If Jon Logan wishes to purchase this vessel, he may do so either in cash or by shareholders loan from the Company. Otherwise, this vessel needs to be sold in a commercial reasonable means at the first opportunity to a bona fide third-party purchaser. At least 50% of those proceeds will be used to reduce the Company's outstanding obligation to the Trustee.

*d.*
*Exotic Cars*

Smart Communications has purchased several exotic cars, which are garaged at the Tierra Verde home and under Jon Logan's exclusive control.

- 2020 Lamborghini Huracan – purchase price $356,931; the value at valuation date $130,000

- 2017 Ferrari 488 Spider $354,990; the value at valuation date $265,000.

- 2015 Rolls Royce Wraith – purchase price $239,579; the value at valuation date $140,000.

The Court finds these purchases were not substitute salary for Jon Logan. The vehicles belong to the Company. The Court will include those nonoperating assets within Smart Communication's value at the value on the date of the purchase price. No adjustment is necessary to Mr. Berberian's model due to the exotic cars.

With respect to the Corvette that went to Jim Logan, the Court notes its reclassification as a shareholder loan by Jim Logan. As the Court is requiring the Trustee to repay the shareholders loan, title to this vehicle can remain in the Trustee or Personal Representative's name, and its ultimately disposition is of no concern to the Court as the Trustee is paying the value for it.

As for the Lamborghini, Ferrari, and Rolls Royce, the Court will give Jon Logan 30 days from the entry of the final judgment to elect whether he wishes to purchase one, two, or all three of those vehicles from the Company for the amount identified on the valuation date. If Jon Logan wishes to purchase those vehicles, he may do so either in cash or by shareholders loan from the Company.

If Jon Logan does not make the election within 30 days, the Court directs the remaining exotic cars to be sold in a commercial reasonable means at the first opportunity to a bona fide third-party purchaser. At least 50% of those proceeds will be used to reduce the Company's outstanding obligation to the Trustee.

*e.*
*Everyday Cars*

Jon Logan daily drives a Land Rover. The Trustee daily drives a Cadillac Escalade. At the option of each shareholder, each shareholder may require the Company to distribute the vehicle they currently drive into their personal possession without further accounting adjustment or payment.

### 5.   *Corporate headquarters building.*

The Court finds that the source of the $1.4M in funds for Smart Communications' corporate headquarters was Smart Communications. When the building was purchased, it was titled into a separate entity, Loco Florida, LLC, a Florida limited liability company. The Court further finds the ownership structure mirrored Smart Communications—i.e., 50%/50%.

On August 29, 2023, Jon Logan without any knowledge by, or consent of, the Trustee, purported to convert the Florida entity into a Delaware entity.

Mr. Sly's model relating to Loco Florida was that Smart Communications was not entitled to any recovery of the $1.4M purchase price of the building and that Smart Communications was obligated to also pay rent to Loco. Mr. Berberian disagreed with Mr. Sly relating to the value Smart Communications paid for the building. Mr. Berberian credibly explained how Smart Communications should be repaid by Loco Florida for the building cost while at the same time acknowledging rent payments to Loco Florida.

Mr. Berberian's model zeroed out these transactions without having to separately value the Trustee's interest in a receivable from Loco Florida relating to the building expense. Mr. Berberian further credibly testified that "the economics are the same either way." (Trans. 2023). He agreed, though, that use of his model means the Trustee's further ownership claim involving Loco Florida would be extinguished. (Trans. 2023).

The Court agrees with Mr. Berberian's handling of, and accounting for, the corporate headquarters and any receivable Smart Communications has relating to the purchase of the building.

### 6.   *Shareholders loans.*

As explained above, neither Jon Logan nor Jim Logan were particularly fond of creating paper trails or filling out expense reports. There was much testimony—from both sides—about use of corporate funds for personal reasons. The Court need not detail those, suffice it to say both shareholders took full advantage of the Company, and then some.

The general ledger in many respects is vague with expenditures, and corporate justification is lacking. Not unsurprising, Jon Logan's side presented Joint Exhibit 1, which was an effort lead by Noreen Gunning—Smart Communications Director of Accounting and

Finance—to quantify each shareholder's personal expenditures. Ms. Gunning began with the company in March 2022 as a bookkeeper but after Jim Logan's death took on her current, increased role.

The Court makes clear that most of the general ledger entries occurred before Ms. Gunning's involvement with the Company, and the source information from which she has had to retrospectively recharacterize as personal expenses (shareholder loans) is sparse, if it exists at all. The Court does not criticize her or her efforts. After all, in creating Joint Exhibit 1, she did not have access to Jim Logan due to his death, but she did have access to Jon Logan. This means that any questionable expense, i.e., personal or corporate, she could rely on Jon Logan's explanation. And Jon Logan has done everything in his power to eliminate any perceived value flowing to the Trustee.

It is not surprising, then, that Joint Exhibit 1 shows recharacterized shareholders loans attributable to Jim Logan/the Trustee collectively at $1,339,778.37. And at the same time showing a negligible negative shareholder balance in favor of Jon Logan.

Jim Logan's shareholder loans include such things as the Corvette, the $60,000 Jim then lent to Mr. Peterson, and the significant expenses for Alexis Logan's medical issues.

Again, the Court believes that there are substantial personal expenditures to Jon Logan hidden within the general ledger. Absent a forensic evaluation, the Court is not sure how to meaningfully address this disparity. Even if there were such a forensic evaluation, the absence of contemporaneous records may impact the utility of such an investigation. Regardless, the evidence before the Court is the Trustee has a $1.3M shareholder balance that needs to be addressed in valuation.

There certainly is evidence that the shareholders did not anticipate a true-up as between them. And had Jim Logan still been alive today, the Court suspects we would not be here. But this proceeding is a statutory proceeding to determine the fair value of the Trustee's shares. And the Court does not believe it equitable to excuse the Trustee from paying the shareholder's loans on the Trustee's side of the ledger, even if Jon Logan's personal expenditures as shareholder loans seem to be not readily visible on Smart Communication's books and records.

The Court finds that the **$1.3M** in shareholders loans to the Trustee's side will act as a setoff against the value of the Trustee's shares.

### 7.    *Valuation.*

The Court finds that Mr. Berberian's Model 2 is the appropriate methodology, with certain adjustments.

Mr. Berberian's Model 2 values Smart Communications Holding, Inc. as of August 28, 2023, at **$103,872.668**. This enterprise value does not reflect any royalty reduction for future royalties or reduction for lack of marketability. That would mean the Trustee's 50% share, before reductions, is **$51,936,334**.

Using Mr. Berberian's dynamic model, the Court applied a 40.5% Royalty Base and a 5% Royalty Rate, with the start date of the Royalty on August 28, 2023. (Recall, the Court found no further Royalty was due HLFIP from Smart Communications pre-valuation). This results in a total Royalty reduction of $15,617,750, with the Trustee's portion being $7,808,875.

This results in an adjusted value of Smart Communications Holding, Inc. as of August 28, 2023, as **$88,254,918**. That means the Trustee's 50% share, after Royalty but *before* the lack of marketability reduction, is **$44,127,459**.

The Court, though, determined a 5% lack of marketability reduction should be applied. That reduction is **$2,206,373** to the Trustee's share value. This results in the value of the Trustee's shares in Smart Communications Holding, Inc. as of August 28, 2023, to be **$41,921,086**.

From this number, the Court subtracts the Trustee's combined shareholders loans totally **$1,339,778** from this amount.

**The amount Smart Communications Holding, Inc. owes the Trustee for the value of her shares as of August 28, 2023, is $40,581,308.**

The Court notes that the amount Smart Communications paid since August 28, 2023, relating to the Ranch Club home will need to be setoff from this amount as well as the other amounts from the wrongful injunction. As that amount continues to accrue, if the parties are unable to address that amount during mediation, the Court will address it during the December 19, 2025, hearing.

### 8. *Attorney fee claim.*

The Court will reserve on the claim for attorney fees and interest until the December 19, 2025, hearing.

Prior to that hearing, the Court requests a targeted memorandum from each side, limited to no more than 10 pages each, discussing the legal authority as well as the evidence supporting or opposing an award of attorney fees and interest relating to a valuation proceeding. The Court is particularly interested in focusing on the authority for attorney fees for the statutory valuation proceeding, together with the limits of that authority. (Specifically, as the judicial dissolution count that led to the statutory election to purchase occurred after Phase 1 trial, does the valuation attorney fee statute authorize fees associated with Phase 1 trial.)

### 9. *Resolution of claims.*

Having determined the value of the Trustee's shares, the Court notes the disposition of the following claims.

From Janice Logan's (as Trustee) Second Amended Verified Complaint, filed
May 29, 2024 [DIN 680]:

- Count 1, relating to intellectual property transactions, will not
  survive. But the Court will need to enter final judgment relating to
  Part 1, Phase 2 trial, invalidating the transactions identified in that
  Order.

- Count 2, relating to the appointment of a Receiver. The Court
  would like further briefing on this issue. It seems to the Court that
  under its authority in section 607.1436(5), a remedy the Court
  retains to ensure security to assure payment of the purchase price is
  the ability to appoint a receiver, if that is what the Court believes
  appropriate. At present, the Court does not believe a receiver
  appropriate but given the acrimonious history and efforts by Jon
  Logan to avoid payment to the Trustee, the Court does not want to
  foreclose the ability to appoint one in the future to ensure payment.

- Counts 3, 5-8, 10-12, relating to director liability, breach of
  fiduciary duty, aiding and abetting breach of fiduciary duty, fraud,
  unjust enrichment, and conversion.

- The parties agree to the involuntary dismissal of Counts 4 and 9.
  Even if they are not involuntary dismissed, they would not survive
  valuation.

From Janice Logan (as Trustee) Counterclaims, filed October 2, 2024 [DIN 775]:

- Count 1, relating to malicious prosecution and abuse of process was not
  tried and remains pending. The parties shall discuss the appropriate way to
  sever to ensure a final judgment can be entered without delay on
  everything else.

- Count 2, relating to fraudulent transfers relating to IP transactions, will not
  survive. But the Court will need to enter final judgment relating to Part 1,
  Phase 2 trial, invalidating the transactions identified in that Order

- Counts 4-6, relating to breach of fiduciary duty, civil conspiracy, and
  aiding and abetting breach of fiduciary duty.

- The parties agree to the involuntary dismissal of Count 3.

**D.**
**THE SECOND AMENDED COMPLAINT [DIN 891]**
**FILED BY**

**JON LOGAN AND SMART COMMUNICATIONS HOLDINGS, INC.**
**(December 4, 2024)**

Jon Logan and Smart Communications Holdings, Inc. sued Janice Logan, individually, as Trustee, and as the Personal Representative of the Estate of James Logan; Alexis Logan; and Justin Peterson.

Jon Logan and Smart Communications' Second Amended Complaint sounds in 20 separate counts and more than 200 separate paragraphs of allegations. These counts range over multiple matters, although some overlap. For some matters, Jon Logan and Smart Communications raise alternative theories of liability in separate counts. For ease of understanding, the Court attempts to group similar matters together.

The parties agree that if the Court were to find liability, some of these counts operate as a set-off while other counts would lead to entry of judgment in favor of Jon Logan or Smart Communications or both.

### 1.      _Counts 1 and 2 – Unjust Enrichment re: various withdrawals_.

Smart Communications sued the Personal Representative in Count 1 for unjust enrichment and Janice Logan individually in Count 2 for unjust enrichment. Plaintiffs' contention is that James Logan during his life withdrew various funds from Smart Communications that did not benefit Smart Communications. Instead, according to these plaintiffs, those funds personally benefitted James Logan (Count 1) or his wife, Janice Logan (Count 2).

> An action for unjust enrichment exists to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity. The elements of such a claim are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Essentially, the doctrine operates to imply a contract where none otherwise exists so as to ensure equity between the parties.

Kenf, L.L.C. v. Jabez Restorations, Inc., 303 So. 3d 229, 231 (Fla. 2d DCA 2019) (internal citations and quotations omitted).

The funds to which these counts apply were either classified in the first instance or were reclassified as shareholder loans. The Court in its valuation has directed the Trustee to repay the outstanding $1.3M in shareholder loans.

Under these circumstances, the Court finds that this plaintiff failed to establish, at a minimum, element 3. Both Jon Logan and Jim Logan, the then shareholders, regularly used Smart Communications' funds for personal matters. The entire value relating to Jim Logan and

Janice Logan is being repaid by the Trustee by way of set-off from the value of the Trustee's shares. There is nothing inequitable under these circumstances.

As plaintiff is not able to show element 3, the Court does not need to address the other elements of this cause of action.

The Personal Representative and Janice Logan is entitled to judgment.

### 2. *Count 3 – Unjust Enrichment re: the Ranch Club home.*

Smart Communications in Count 3 sued the Trustee for unjust enrichment relating to various expenses associated with the Ranch Club home, which is and has always been titled in the name of Smart Communications.

As the Court previously found, the then shareholders of Smart Communications—Jon Logan and James Logan—had an agreement as shown through historic practice that Smart Communications would pay for a home for each shareholder. There is nothing inequitable about the situation in this case where the two shareholders agreed that each could use a home owned by Smart Communications without personal payment. Thus, Smart Communications failed to demonstrate the third element of the unjust enrichment cause of action, at least for payments through August 28, 2023.

The Court reminds that it did not require any adjustment to Smart Communications' books relative to the Tierra Verde home (through August 28, 2023) or the Ranch Club home (through August 28, 2023). However, the Court agrees that all carrying costs paid by Smart Communications relating to the upkeep of the Ranch Club home after August 28, 2023, through the date Smart Communications deeds that home to the Trustee will the responsibility of the Trustee. The Court further agrees this amount is to be setoff from the value the Court found of the Trustee's interest in Smart Communications. (Parenthetically, the Court is also requiring certain actions relative to the Tierra Verde home, but that is for post-valuation expenses. That issue does not impact this claim.)

No separate judgment will be entered on Count 3 as this will be handled by setoff.

### 3. *Count 4 – Unjust Enrichment re: Alexis Logan distributions.*

Smart Communications in Count 4 sued Alexis Logan for unjust enrichment relating to credit card charges she incurred, and it also referenced a vacation home in Lake Michigan that either was purchased or was to be purchased. At trial, there was also discussion of various funds paid on Alexis Logan's behalf for medical care. If successful, this count would result in a judgment against Alexis Logan.

At trial, there was insufficient information relating to that Michigan home for Smart Communications to succeed as to any Michigan home. And as found above, the medical care matters were shareholder's loans to Jim Logan. Jim Logan then gifted those medical payments to Alexis Logan.

Repayment of Jim Logan's shareholder's loan relating to these medical payments is being handled as a set-off on the value of Trustee's shares. Even if they were not, those payments were gifts by Jim Logan to Alexis Logan, and Smart Communication's recourse would have been against Jim Logan or the Personal Representative or the Trustee. In any event, Alexis Logan is not responsible to Smart Communications for these matters and is entitled to judgment relating to that portion of the claim.

The remaining unjust enrichment claims in Count 4 against Alexis Logan involves approximately $416,912.11 in credit card and bank charges. Smart Communications presented summaries of funds that it contends were provided to Alexis Logan:

- Exhibit 5185, showing $311,572 of various bank transactions between August 3, 2015, and February 19, 2019;

- Exhibit 5186A, showing a net of $98,845.19 in American Express credit card charges ($110,848.06 less $12,002.87 in credits) between July 25, 2016, and July 20, 2023 (with the vast majority occurring in 2016-2018; and

- Exhibit 5187, showing $6,494.92 in Englewood Bank credit card charges between February 23, 2019, and May 18, 2019.

Before proceeding further, the Court finds three facts that implicate the validity of the summaries.

*First*, Alexis indisputably acted as an attorney for Smart Communications (and other entities), and from time to time, there were transfers to Alexis' Law Firm. The Court finds there is no evidence that the Law Firm did not perform the legal services for which it received payment from time to time. Putting that more directly, Alexis Logan credibly testified that the Law Firm received payment for legal services. As those payments were to the Law Firm, they should not have been included. The Law Firm is not a defendant here.

*Second*, the Court finds that multiple employees within Smart Communications had use of, and did use, Alexis Logan's credit cards. And Alexis Logan credibly testified that sizeable charges Smart Communications now seeks from Alexis Logan on these summaries were, in fact, not made by her but presumably by Smart Communications' employees for Smart Communications' business.

*Third*, there is credible evidence that some of the charges were made by or, at the direction of Jim Logan, and had nothing to do with Alexis Logan.

These facts undercut the confidence the Court places in the summaries.

Even without those three facts, there is another compelling fact that persuades the Court as to why Count 4 fails. Alexis Logan personally guaranteed this business from the beginning of

Page 35 of 49

the idea until mid-2023. She physically delivered her property to the bank for collateral. If the business failed in the earlier years, there was no recourse to Jon Logan—after all, he did not execute any personal guarantee until 2017 at the earliest. It would have been Alexis Logan that would have been left personally responsible for the debt had the Logans swung and missed.

Under these circumstances, the Court finds that Smart Communications failed to prove the third element of unjust enrichment: "the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." Kenf, L.L.C., 303 So. 3d at 231. The Court finds that *it is equitable* for Alexis Logan to retain whatever portion of the $417,000 in bank and credit card charges that were personal to her. (Again, Smart Communications also failed to prove to the greater weight of the evidence the actual amount of those bank and credit card charges were benefits Alexis Logan, individually, received.)

Count 4 fails.

Even if the Court erred in its findings and conclusions with respect to Count 4, there are two separate alternate and independent bases that would preclude most of Smart Communications' unjust enrichment claims against Alexis Logan. Those are statute of limitation and release.

A four-year statute of limitation applies to an unjust enrichment claim. Flatirons Bank v. Alan W. Steinberg Limited Partnership, 233 So. 3d 1207, 1213 (Fla. 3d DCA 2017). "The statute of limitations for an unjust enrichment claim begins to run at the time the alleged benefit is conferred and received by the defendant." Id. Smart Communications first sued Alexis Logan on February 27, 2023. (Arguably, the original claim was not based on the same set of facts, conduct, or occurrence upon the action tried in Part 2, Phase 2, to allow the relation-back doctrine could apply to an amended complaint. Kopel v. Kopel, 229 So. 3d 812, 817 (Fla. 2017). Given the low dollar amount that remains, the Court did not engage in any further analysis as to relation-back and simply assumes relation-back exists here.)

The invocation of the statute of limitation to Smart Communications' Count 4 against Alexis Logan means any benefit Alexis Logan receive before February 27, 2019, is beyond the limitation period and cannot be recovered by Smart Communications under an unjust enrichment claim. That wipes away almost all Smart Communications' claims of unjust enrichment against Alexis Logan, leaving less than $21,000 in charges against her. Assuming relation-back to February 27, 2023, the only claims that could remain are:

- **$14,926.94** in American Express charges ($1,398.12 in 2019; $2,696.18 in 2020; $6,196.71 in 2021; $4,164.51 in 2022; and ($471.42 in 2023).

- **$5,945.64** in Englewood Bank charges.

In addition to the prior factual findings relating to unjust enrichment, the Court would specifically find there is nothing inequitable about Alexis Logan retaining less than $21,000 over the four-year period beginning February 27, 2019, forward. Recall, some of these charges came

from others who had access to the credit cards, and some charges were to benefit Jim Logan. And, even if all the charges were attributable to Alexis Logan, she continued to personally guaranteed hundreds of thousands of dollars in ongoing transactions for Smart Communications through mid-2023.

Even if the delayed discovery doctrine applied here—which it legally does not, seeFlatirons Bank, 233 So. 3d at 1213, n.14—that doctrine could not be successfully or factually invoked here because Smart Communications by looking at its own books and records knew or should have known precisely any charge or benefit to Alexis Logan. The credible evidence before the Court is that Jon Logan knew precisely what was occurring from a financial standpoint. As his own emails tell us, Jon Logan knew of funds flowing to Alexis in the lead up to 2019. In fact, Jon specifically complained to Alexis in March 2019 about funds being transferred to her. (Ex. 5005). He knew, and he had full access to Smart Communications books and records, so Smart Communications cannot credibly assert any coverup.

There is yet another reason why most of Smart Communications' unjust enrichment claims in Count 4 fails. They were released by Smart Communications.

In August 2017, Alexis Logan, Jon Logan, and Jim Logan began the process of transferring title of the stock of Smart Communications Holding, Inc. to Jon Logan (50%) and Jim Logan (50%). As part of the corporate paperwork signed to effectuate the share transfer, these parties signed a Mutual General Release: (1) Smart Communications Holdings, Inc.; (2) Smart Communications US, Inc.; (3) Jim Logan; (4) Jon Logan; (5) Alexis Logan; and (6) Law Office of Alexis Logan, PLLC. (JX-40). The Carlton Fields law firm represented the Company and drafted the documents. Alexis Logan was represented by separate counsel. There were some follow-up matters that did not get resolved into early 2018.

The recitals to the Mutual General Release reflected that Alexis Logan had been involved in the ownership, management, and/or operation of the companies and that she and her law firm performed legal service for the companies. Additionally, the parties acknowledged that Alexis Logan remained parties to then pending litigation concerning the companies. The recitals also reflected the parties' intent to "broadly release each other" and to "indemnify" them. The Court notes those recitals because within the body of the Mutual General Release each party acknowledged that the "background recitals are true and correct and are incorporated in this Release as a material and substantive part hereof." (JX-40).

The effective portion of the release provided:

> **2.    Mutual General Release.** Effective upon their receipt of a copy of this Release fully executed by all Parties hereto, the Parties, on behalf of themselves and their agents, employees, members, managers, officers, directors, attorneys, insurers, predecessors, successors, heirs and assigns, are hereby deemed to release, waive, acquit, forever discharge, and to covenant never to sue any of the other Parties, or any of their lawyers, agents, employees, members, managers, officers, directors, insurers, privies, predecessors, successors, heirs or assigns, for, from and

against any and all claims, actions, causes of action, demands, damages, suits, costs, expenses, liabilities or other losses, of any kind whatsoever, whether known or unknown, foreseen or unforeseen, direct or consequential, legal or equitable, matured or unmatured, under any theory in contract, statute, tort or otherwise, including, but not limited to breach of fiduciary duty and professional negligence, which exists or may exist from the beginning of time up to and including the date of the last Party's execution of this Release, which in any way arise from, grow out of, or are related to the Parties' conduct and services with respect to the ownership, management, and/or operation of the Companies and with respect to services provided to the Companies.

(JX-40, pp. 1-2, ¶2).

The application of that Mutual General Release means that Smart Communications released any claim it had against Alexis Logan for anything occurring before August 31, 2017. Because the statute of limitation period expired after the release date, the Court did not go back and determine the precise dollar amount that was not released. But that amount is not much more than the $21,000 that remained after the limitation period expired.

Count 4 fails. Alexis Logan is entitled to judgment in her favor.

### 4.    *Count 5 – Unjust Enrichment against Mr. Peterson.*

In Count 5 of the Second Amended Complaint, Smart Communications Holdings, Inc. sued Mr. Peterson for unjust enrichment. If successful, this count would result in a judgment against Mr. Peterson.

The operative complaint alleged that on or about June 23, 2022, approximately $109,070 of Smart Communications funds were used to purchase a 2019 BMW. That vehicle was then registered in Mr. Peterson's name and primarily used by him.

The Court finds that Mr. Peterson in June 2022 purchased a 2019 BMW. As part of that purchase, Jim Logan obtained a $60,000 countercheck from a local bank drawn on a Smart Communications' account. Jim Logan then personally paid the dealership directly $60,000 towards the purchase price of the vehicle. Smart Communications booked this transaction as a $60,000 shareholder's loan to Jim Logan.

The Court further finds that Jim Logan personally loaned Mr. Peterson $60,000 for the purchase of the vehicle. While the funds may have originated from Smart Communications, Jim Logan took a shareholder's loan from Smart Communications.

Mr. Peterson agrees that he still owes the $60,000 but to the Personal Representative. He testified that he and the Personal Representative will address the loan made between Jim Logan and Mr. Peterson after this lawsuit is concluded. There was no lawsuit by the Personal Representative against Mr. Peterson.

As noted above, the first prong of an unjust enrichment claim is that plaintiff—here, Smart Communications—conferred a benefit on the defendant—here, Mr. Peterson. Smart Communications failed to show that first element. Jim Logan, individually, not Smart Communications, lent Mr. Peterson the $60,000. Further, Smart Communications failed to prove either elements 2 or 3 as well. Smart Communications' Count 5 fails.

The Court specifically denies the request for constructive trust.

Mr. Peterson is entitled to judgment in his favor on this count.

**5.      *Count 6 – Constructive fraud re: Jim Logan's withdrawals <u>against the Personal Representative.</u>***

In Count 6, Jon Logan sued the Personal Representative relating to withdrawals made by Jim Logan from Smart Communications. As previously found, Jon Logan knew precisely Jim Logan's activities, and Jon Logan personally participated in them, too.

Jon Logan failed to prove this claim or any special injury to him as a shareholder. Jon Logan is not entitled to any relief on this claim.

The Personal Representative is entitled to judgment.

**6.      *Count 7 – Conversion re: Jim Logan's withdrawals against the <u>Personal Representative.</u>***

In Count 7, Jon Logan and Smart Communications sued the Personal Representative alleging that Jim Logan converted Smart Communications' corporate funds for various personal purchases, including purchases James Logan made for others. This is yet another repackaging of prior claims rejected.

"Conversion occurs when a person asserts a right of dominion over chattel which is inconsistent with the right of the owner and deprives the owner of the right of possession. The question of whether [an item] has been the subject of a conversion is a factual one based on the distinct circumstances of each individual case." <u>Estate of Villanueva ex rel. Villanueva v. Youngblood</u>, 927 So. 2d 955, 959 (Fla. 2d DCA 2006) (internal quotation, citation, and alternation omitted); <u>Hannah v. Malk Holdings</u>, LLC, 368 So. 3d 1087, 1091 (Fla. 6th DCA 2023) ("The elements of conversion are: 1) a taking of chattels; 2) with intent to exercise ownership over them an ownership inconsistent with the real owner's right of possession.").

"The tort may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." <u>Seymour v. Adams</u>, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994). Money removed from a bank account can be the subject of conversion if the money is specific and identifiable. <u>Allen v. Gordon</u>, 429 So. 2d 369, 371 (Fla. 4th DCA 1983). "In Florida, an action for conversion is regarded as a possessory action and the plaintiff must have a present

or immediate right of possession of the property in question." Page v. Matthews, 386 So. 2d 815, 816 (Fla. 5th DCA 1980).

This count fails as to both Jon Logan and Smart Communications.

As it relates to Jon Logan, Jon Logan personally did not own Smart Communications' corporate funds. Jon Logan did not prove an entitlement to immediate possession of Smart Communications' funds. Additionally, as Jon Logan and Jim Logan knew and allowed the other to take loans from the company, there was specific authorization for those loans. Jon Logan's claim also fails because he failed to demonstrate that those funds were traceable to specific items.

Smart Communications' conversion claims also fails. With Jon Logan and Jim Logan authorizing the shareholders to take shareholder loans, any action by Jim Logan in taking a loan is not an action inconsistent with Smart Communications' right of possession. After all, those loans were booked, and the Trustee is having to pay the loan.

The Court also notes that the Trustee is paying Jim Logan's shareholder loans as setoff. Thus, even if the Court erred on the conversion finding relative to Smart Communications, Smart Communications cannot be compensated twice for the same distributions.

The Personal Representative is entitled to judgment.

### 7.    Count 8 – Conspiracy to Commit Conversion against the Janice Logan, the Personal Representative, Alexis Logan, and <u>Mr. Peterson</u>.

In Count 8, Jon Logan sued Janice Logan, the Personal Representative, Alexis Logan, and Mr. Peterson for conspiracy to commit conversion. The basis for this count are the same withdrawals by Jim Logan discussed above.

"A cause of action for conspiracy requires showing (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts performed pursuant to the conspiracy." Olson v. Johnson, 961 So. 2d 356, 359 (Fla. 2d DCA 2007) (internal citation, quotation, and alteration omitted).

This count fails for multiple reasons.

*First*, Jon Logan is not the proper plaintiff for a conversion claim of Smart Communications' property. That would have been Smart Communications.

*Second*, the Court already determined that both Jon Logan's and Smart Communication's conversion claim based on Jim Logan's withdrawals from Smart Communications failed factually.

*Third*, there is no credible evidence of any conspiracy sufficient for the Court to find the first element—a conspiracy between two or more parties.

*Fourth*, there is no unlawful act or lawful act by unlawful means. Jim Logan had the authority to take shareholder loans.

*Fifth*, Jon Logan is not damaged. The fact that the Trustee as a matter of setoff is repaying Jim Logan's shareholder loans means Jon Logan can show no damage.

Each of these defendants is entitled to judgment.

### 8. *Counts 9, 10, and 12 – breach of fiduciary duty against the <u>Personal Representative (9 and 10) and Everyone (12)</u>.*

Both Jon Logan and Smart Communications sued the Personal Representative for breach of statutory fiduciary duty (Count 9) and breach of common law fiduciary duty (Count 10). In Count 11, Smart Communications sued Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson for a claim of aiding and abetting breach of fiduciary duty.

In Counts 9 and 10, Jon Logan and Smart Communications repackage the Jim Logan withdrawal claims, which Jon Logan knew about and approved. The Court finds these plaintiffs failed as a matter of fact to prove the elements as to either count.

As this claim continues to get repackaged, the Court also states that there can be no breach of fiduciary duty when Jon Logan knew about, consented to, and participated in the shareholder's loans. Also, those Jim Logan's shareholders' loans are being repaid.

In Count 12, Smart Communications attempts to further pursue a breach of fiduciary duty claim as an aiding and abetting claim. However, not only is there no evidence of a breach of fiduciary duty, but there is also no duty that any of these defendants aided or abetted Jim Logan in breaching any of his fiduciary duties. Further, there is no damage.

The Personal Representative is entitled to judgment on Counts 9 and 10. Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson are entitled to judgment on Count 12.

### 9. *Count 11 – conspiracy to commit unjust enrichment against <u>Everyone</u>.*

In Count 11, Smart Communications sued Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson for conspiracy to commit unjust enrichment.

This claim also fails. Not only did Smart Communications fail to prove unjust enrichment relating to Jim Logan's withdrawals against any of the defendants, but Smart Communications also failed to prove the existence of the first element of conspiracy—i.e., a conspiracy between two or more parties. Further, it also failed to demonstrate any unlawful act or lawful act by

unlawful means. Jim Logan had the authority to take shareholder loans. This claim fails based on the plaintiff's failure to prove it factually.

Janice Logan, the Trustee, the Personal Representative, Alexis Logan, and Mr. Peterson are entitled to judgment on Count 11.

### 10. Count 13 – negligence against the Personal Representative.

Both Jon Logan and Smart Communications in Count 13 next attempt to repackage the Jim Logan withdrawal claims as a negligence claim brought against the Personal Representative.

Both plaintiffs failed to establish any element of negligence, including damage.

The Personal Representative is entitled to judgment.

### 11. Count 14 – breach of fiduciary duty re: tax liabilities against the Personal Representative.

In Count 14, Jon Logan and Smart Communications shift their focus. They now claim that Jim Logan's conduct relative to not causing Smart Communications to pay royalties to HLFIP as accrued may result in tax liability to Smart Communications. This was discussed in both Part 1 and Part 2 of Phase 2.

As it relates to Jon Logan, the Court questions whether he really is a proper plaintiff. The theoretical tax liability as presented would be to either of, or both of, Smart Communications or HLFIP. The Court in the abstract can see that Jon Logan through his 100% ownership of HLFIP may be able to claim some injury distinct from Smart Communications. For that reason, the Court will not conclude that Jon Logan is an improper plaintiff.

Having said that, though, the Court finds a failure of proof. The Court finds that Jon Logan participated equally in the decision to have Smart Communications pay all HLFIP's expenses in lieu of distributing funds and having HLFIP paying its own expenses. As found as fact, Smart Communications through the date of valuation has actually paid expenses on behalf of HLFIP in an amount that is *more than* the royalty that otherwise would have been paid to HLFIP.

Further, both Jon Logan and HLFIP failed to prove the fact that Jim Logan breached any fiduciary duty owed to Jon Logan or Smart Communications. The theory seems to be that Jim Logan either knew or should have known that the structure that Jon Logan and Jim Logan jointly set up could expose Smart Communications and HLFIP to taxes on the royalty payment. At best for plaintiffs, Jim Logan did not know or understand this nuance of tax law. But that does not translate to a breach of a fiduciary duty. In essence, Jon Logan and Smart Communications seek to transform Jim Logan and his Estate into an insurer for any error made in business judgment under the guise of a breach of fiduciary duty. That simply is not the case.

Further, there simply has been a total failure of proof on their alternative theory that Jim Logan's actions were intentional or so grossly negligent that they constitute a conscious disregard or indifference to plaintiffs' rights.

The Personal Representative is entitled to judgment.

### 12.    *Counts 15 and 17 – breach of fiduciary duty and fraudulent inducement re: compensation, against the Personal Representative.*

In Count 15, Jon Logan sued the Personal Representative for breach of common law fiduciary duty by Jim Logan relating to Jon Logan's compensation. In Count 17, Jon Logan repackaged this claim against the Personal Representative as a fraudulent inducement claim.

Fundamentally, Count 15 fails because Jon Logan failed to demonstrate as fact that Jim Logan was a fiduciary to Jon Logan relating to how the two shareholders structured Smart Communications and what that entity would or would not pay. Failing to demonstrate the existence of a fiduciary relationship defeats this claim. This count is also defeated for other reasons, too.

As it relates to his compensation, Jon Logan seems to contend that he is entitled to all nonproductive assets of the company as compensation. That simply is not correct or the agreement between Jon Logan and Jim Logan. Jon Logan has failed to demonstrate any failed compensation or damage. For that reason, Count 15 for breach of fiduciary duty also fails.

Count 17 also fails for fraudulent inducement relating to compensation. Jon Logan has failed to demonstrate any false statement about compensation made by Jim Logan. Jon Logan also failed to demonstrate Jim Logan knew any statement Jim Logan made about compensation was false. Count 17 fails

The Court also needs to address a separate allegation in Count 15 that Jon Logan also contended in Count 15 that Jim Logan breached a fiduciary duty because his father "misrepresented to Jon that Jon would be compensated for use of his IP." [DIN 891, p. 34, ¶183.]

As it relates to IP, the Court already found the amount Smart Communications paid on behalf of HLFIP through the date of valuation *is more than* HLFIP was entitled to receive from Smart Communications for MailGuard. Jon Logan's claim is factually disproved. The Court also points to its discussion in the next section concerning Count 16 that there was no misrepresentation.

The Personal Representative is entitled to judgment as to both Counts 15 and 17.

### 13.    *Count 16 and 18 – misrepresentation re: IP against the Personal Representative.*

In Count 16, Jon Logan sues the Personal Representative for misrepresentation relating to the intellectual property. In Count 18, Jon Logan sued the Personal Representative for the same

conduct under a fraudulent inducement theory. In essence, Jon Logan contends that he was to own the intellectual property.

The Court previously made factual findings relating to the IP. Jon Logan has failed to demonstrate any false statement about IP made by Jim Logan. Jon Logan also failed to demonstrate Jim Logan knew any statement Jim Logan made about IP was false. (To the extent these claims could be construed as negligent misrepresentation, the Court finds Jon Logan failed to demonstrate any statement Jim Logan made that Jim Logan believed to be true but was, in fact was false, and that he should have known to be false.) And because the Court found that HLFIP through the valuation date had Smart Communications pay more on HLFIP's behalf than any accrued royalty, Jon Logan failed to prove damage.

Jon attempts to revitalize the 40% royalty the Court invalidated in Part 1, Phase 2 due to Jon Logan's director's conflict of interest transaction. The Court continues with its earlier factual findings. There was no "independent valuation" that found a 40% royalty was appropriate.

The Personal Representative is entitled to judgment on Counts 16 and 18.

### 14.    Counts 19 and 20 – indemnification and breach of fiduciary duty relating to broker commission against the Personal <u>Representative</u>.

As it relates to Counts 19 and 20, there was not much discussion concerning these counts. The Court would like further briefing on these counts.

Prior to the December 19, 2025, hearing, the Court requests a targeted memorandum from each side, limited to no more than 10 pages each, discussing the legal authority as well as the evidence supporting or opposing the claims relating to the yacht broker agreement.

### E.
### ALEXIS LOGAN'S COUNTERCLAIMS [DIN 1790]
### (August 4, 2025)

Alexis Logan filed a three-count Counterclaim against Jon Logan and Smart Communications [DIN 1790]. Before trial, she voluntarily dismissed Count 2 for civil conspiracy [DIN 1920].

In Count 1, Alexis Logan sued Jon Logan and Smart Communications Holding, Inc. for malicious prosecution and abuse of process. Before the Part 2, Phase 2 trial, these parties agreed that this claim should be severed and tried later. Thus, the Court makes no rulings as to this claim.

In Count 3, Alexis Logan sued Smart Communications Holding, Inc. for breach of the August 30, 2017, a release and indemnification agreement. That agreement at paragraph 3 entitled "Defense and Indemnification" provides in relevant part that Smart Communications agreed to indemnify Alexis Logan broadly relating to her "conduct and services with respect to

the ownership, management, and/or operation of the Companies; [and] (b) any services provided to the Companies[.]" (JX 40, 41). The Court concludes that the claims against Alexis Logan triggered the indemnity provision. In other words, the Court finds liability against Smart Communications.

By the agreement of the parties, the amount due under this indemnity will be tried separately.

### F.
### HLFIP'S COUNTERCLAIMS [DIN 1863]
### (August 15, 2025)

HLFIP Holding, LLC filed a two-count Counterclaim against Janice Logan, the Trustee, and Alexis Logan [DIN 1863]. In Count 1, HLFIP sued these three for unjust enrichment. In Count 2, HLFIP sued these three for quantum meruit.

The basis of HLFIP's affirmative claims were its allegations that Janice Logan, Jim Logan (prior to his death), and Alexis Logan would take revenues from Smart Communications, while HLFIP was not receiving a royalty from Smart Communications. HLFIP contended that Jon Logan as Smart Communications' management was forced to reinvest royalty payments otherwise due HLFIP because his family members were raiding the company. In other words, HLFIP's theory seemed to be that these three indirectly benefited from HLFIP based on Smart Communication's success in capitalizing on HLFIP's intellectual property. Certainly, there is no evidence that HLFIP provided any of these three with any direct benefits.

The Court's finds HLFIP's underlying indirect delivery of a benefit premise is flawed. The Court already found as fact that a commercially reasonable royalty due HLFIP from Smart Communications for the period 2016-August 28, 2023, to be $3.6M. Between 2019-2023, Smart Communications paid at least $4.8M on behalf of HLFIP. There simply is no further royalty due HLFIP for Smart Communications' use of HLFIP intellectual property through August 28, 2023. If anything, HLFIP would owe Smart Communications more than $1.2M, which the Court already concluded need not be returned to Smart Communications.

Further, the Court already determined the present value of the post-August 28, 2023, royalty due HLFIP resulted in a $15.6M reduction in Smart Communication's enterprise value. Of that amount, the Trustee is responsible for $7.8M. Jon Logan—through his 100% ownership of HLFIP—certainly is receiving substantial value for Smart Communication's use of HLFIP intellectual property.

The Court finds it not credible that Jon Logan on the one hand claimed ignorance of Smart Communications' financial position but asserting through HLFIP that he (Jon Logan) had to reinvest HLFIP royalties in Smart Communications to fund Smart Communication's growth. Not only was Jon Logan aware of Smart Communication's financial position during his father's life, but Jon Logan agreed with his father to have Smart Communications pay HLFIP expenses without a true up.

As a reminder, the elements of unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Kenf, 303 So. 3d at 231.

The Court finds that HLFIP failed to demonstrate that HLFIP conferred any benefit—either direct or indirect—on any of the individuals named or that it sued in Count 1. The Court also finds HLFIP failed to demonstrate the second or third prongs of the unjust enrichment cause of action as well. HLFIP failed to meet its burden. Janice Logan, the Trustee, and Alexis Logan are entitled to judgment in their favor on Count 1.

HLFIP in Count 2 repackaged its unjust enrichment claim using the alternative theory of quantum meruit. "The distinction between quantum meruit and unjust enrichment is often blurred by the potential for both theories to apply to the same factual setting. The doctrine of quantum meruit, also called a contract implied in fact, imposes liability, in the absence of an express agreement, based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." F.H. Paschen, S.N. Nielsen & Associates LLC v. B&B Site Dev., Inc., 311 So. 3d 39, 48 (Fla. 4th DCA 2021).

"To satisfy the elements of quantum meruit, the plaintiff must prove that the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it." Id.

As with unjust enrichment, HLFIP failed to demonstrate that it provided Janice Logan, the Trustee, or Alexis Logan any benefit whatsoever. HLFIP also failed to demonstrate the other prong of this claim. Janice Logan, the Trustee, and Alexis Logan are entitled to judgment in their favor on Count 2.

### G.
### Security to Guarantee Payment of Trustee's

The Court has scheduled a hearing on December 19, 2025, to address payment terms and security, as contemplated by section 607.1436(5), Florida Statutes.

The Court purposely is not detailing much at this time in the light of the upcoming mediation. The Court does, though, provide some preliminary thoughts on a few issues for the type of security the Court is currently envisioning, subject to the parties' discussions and arguments. This is not an exhaustive list. Nor is it a final ruling.

Even though the Court has listed these, the parties, though, are free to agree to different terms.

*1.*   *Jon Logan Salary.*

Until all payments to the Trustee have been made, Jon Logan's base salary will be $120,000 per year. On July 1 of each year, the base salary may be increased by the same percentage increase the Florida Legislature provides for state employees. (Note, this is general state employees and not any specific classification receiving a pay adjustment.) For instance, in fiscal year 2025-2026, the Legislature authorized a 2% pay increase.

The Court authorizes Smart Communications to retroactively provide the 2% pay increase to Jon Logan's salary effective July 1, 2025.

The Court notes that the Yacht was recently refinanced, and the debt service appears to be $1M per year, paid quarterly. There is also either $100,000 or $130,000 monthly expense relating to dockage. That means there is at least $183,333 in monthly expenses for the Yacht. Before any upkeep.

**Smart Communications' current payments with respect to the Yacht need to end. Soon.**

The Court believes it appropriate that when those significant expenses cease, each shareholder should realize some portion of those savings.

With respect to Jon Logan, effective the month after those payments end completely, the Court will authorize his base salary to increase by up to $50,000 per month (assuming a 25% drag due to benefits, this would cost Smart Communications about $62,500 per month). Jon Logan may elect to forego that salary increase, but it cannot be taken as a distribution. As this amount is being added to the base, the yearly pay increase provided to state employees would apply to this amount.

With respect to the Trustee, effective the month after those payments end completely, the Court will direct that, at a minimum, an additional $62,500 payment towards the outstanding amount due the Trustee be paid. This amount will supplement any additional payments Smart Communications is making to the Trustee.

If Jon Logan increases his salary by the maximum permitted, and the parties only pay the Trustee the minimum supplement, that should be at least an additional $58,000 per month available to Smart Communications for corporate purposes.

### 2. *Use of Expense Reports.*

Effective immediately, any payments made to Jon Logan or that benefit Jon Logan must be accompanied by detailed expense reports with receipts justifying the corporate purpose.

### 3. *Car usage.*

Effective immediately, Smart Communications may only provide one vehicle for Jon Logan's company use, which currently is a Land Rover. A replacement car may occur every 5

years. If the company finances or leases a future vehicle, the maximum monthly payment is limited to $1,250.

### 4. *Tierra Verde home.*

The Court is providing Jon Logan a 30-day window within which he can cause Smart Communications to distribute the Tierra Verde home into his private ownership. As previously noted, any payments made by Smart Communications towards the upkeep or repair of that house made after August 28, 2023, will need to be recharacterized as a shareholder's loan. If Jon Logan elects to continue to live in the Tierra Verde home, the Court will allow Smart Communications to continue to make similar payments towards the upkeep and repair of that home, so long as those amounts do not materially change from historical expenses. Those expenses will also need to be characterized as a shareholder's loan.

### 5. *Trustee access to records.*

Until all payments due the Trustee are made, the Court will allow the Trustee comprehensive access to Smart Communications books and records. The Court will need to structure a process to address the corporate changes and transfer of assets without value. Of course, the Trustee and her advisors will have to agree to a confidentiality agreement.

### 6. *Memorandum on payment terms and security.*

In preparation for the December 19 hearing, the Court would like the parties to provide proposed terms for payment as well as security for payment that each side is requesting, and if necessary, the legal authority for the request.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IT IS ORDERED:

1.   In preparation for the hearing on Friday, December 19, 2025, the Court has requested from each side three legal memos as well as a memo outlining proposed terms for payment as well as security for payment. The Court would request these be filed on or before 4:00 p.m. on Tuesday, December 16, 2025.

2.   The parties are advised the Court likely will be requesting the parties the draft a final judgment that effectuates this Order, the payment terms and security, and severs those malicious prosecution/abuse of process and attorney fee issues. Kindly begin working on it so that final judgment can be entered expeditiously.

3.   In the event a party believes the Court has not addressed a pending claim, kindly outline that for the Court in a short memorandum to be filed on or before 4:00 p.m. on Tuesday, December 16, 2025.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on December 09, 2025.

e-Signed 12/9/2025 7:55 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On December 09, 2025, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

Counsel of Record.

EXHIBIT 2

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2026015419   30   PG(S)

2/5/2026 4:53 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CIVIL COURTS          Receipt # 3450948

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
      Plaintiff,

v.

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY TRUST
DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
      Defendant.

CASE NO. 2023 CA 001002 NC
DIVISION C CIRCUIT

_____

## FINAL JUDGMENT
### PHASE 2

This action came before the Court for a bifurcated nonjury trial held on February 10, 11, and 12, 2025 ("Part 1 of Phase 2"), and October 6 through October 16, 2025, and November 12, 2025 ("Part 2 of Phase 2"). Additionally, on January 12, 2026, the Court heard argument and received additional evidence as to entitlement to interest, attorneys' fees and costs, and payment terms and security relating to the purchase of the Trustee's shares.

### The briefest of background and other court proceedings

This case presents an unfortunate intra-family fight. There are many affirmative claims brought by many parties and related entities resolved by this Final Judgment. There are a few claims that have been severed that still pend before this Court.

There have been many visits to other courts throughout the life of this case. The Court only details those most directly relevant, but in doing so, does not mean to suggest there were no other proceedings in other courts.

In Phase 1, the Court resolved a preliminary gating issue: whether the then recently discovered "shareholders agreement" following Jim Logan's death was valid. The Court severed

Page 1 of 15

that issue and tried it over three days in January 2024. At its core, the Court declared as a result of the Phase 1 trial:

- The purported Shareholders Agreement was invalid and unenforceable;

- There was no shareholders agreement between the two 50% shareholders of Smart Communications Holding, Inc.'s stock at the time of James Logan's death;

- The two 50% shareholders of Smart Communications Holding, Inc.'s stock are: (1) Jonathan D. Logan; and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

On February 7, 2024, the Court entered final judgment from Phase 1 trial [DIN 652]. There was no appeal of that final judgment.

Initially, the Court scheduled the remaining claims to be tried in January 2025 in a Phase 2 trial. However, in the lead up to that trial, there was a newly pled count for judicial dissolution, which resulted in Smart Communications Holding, Inc. electing an option to purchase the shares. This changed the nature of the claims presented. As a result, the Court elected to bifurcate the Phase 2 trial into two parts [DIN 870]. The Court directed Part 1 of Phase 2 to be limited to three issues: (1) the proper valuation date; (2) the license/royalty issue; and (3) any issue all parties agree to be heard during Part 1. [DIN 870].

A few weeks before the Part 1 of Phase 2 trial was set to begin, on November 30, 2024, Smart Communications Holding, Inc., and Smart Communications Holding, LLC, each filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Middle District of Florida, in cases *In re: Smart Communications Holding, Inc.*, Case No. 8:24-bk-07106-RCT, and *In re: Smart Communications Holding, LLC*, Case No. 8:24-bk-07108-RCT. The Court will refer to those cases collectively as "the First Bankruptcy Proceeding."

The Bankruptcy Court in the First Bankruptcy Proceeding authorized this Court to proceed in trying the Part 1 of Phase 2 trial, as limited to "the two issues dealing with the validity and extent of the IT agreement and the date on which the valuation should be determined[.]" *In re Smart Communications Holding, Inc.* No. 8:24-bk-07106 (jointly administered with 8:24-bk-07108) (Bankr. M.D. Fla. Jan. 13, 2025) [DIN 928].

As permitted by the Bankruptcy Court in the First Bankruptcy Proceeding, this Court tired Part 1 of Phase 2 on February 10, 2025 – February 12, 2025. At its core, the Court decided in Part 1, Phase 2 of the trial:

- The Purported Royalty Transactions constituted "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes. The Court found that Jon Logan failed to prove these transactions were fair to Smart Communications, and the Court further found the Trustee proved the Purported Royalty Transactions were not fair to Smart Communications.

Page 2 of 15

- The Court invalidated the Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, as well as the recognition of a long-term liability relating to the purported 40% royalty as described in footnote I to the financial statements.

- Under the unique circumstances presented in the Court, the Court determined that the Court would value Smart Communications Holding, Inc. as of August 28, 2023, the date immediately before Jon Logan's substantial corporate activity on August 29. In doing so, the Court noted the authority in section 605.0706(4), Florida Statutes, that permits the Court to determine valuation on "such other date as the court deems appropriate under the circumstances."

Order with the Court's Findings from Part 1 of Phase 2 Trial, signed February 17, 2025 [DIN 1189] ("Part 1, Phase 2 Order"). The Court would later enter a partial reconsideration order, signed April 2, 2025 [DIN 1284].

Following the entry of the Court's Order from Part 1 of Phase 2 Trial, the Bankruptcy Court dismissed the First Bankruptcy Proceeding. This Court set the Part 2 of Phase 2 Trial and tried it October 6-October 16, 2025, and November 12, 2025. On December 9, 2025, the Court entered its Order with Findings and Conclusions of Law from Part 2 of Phase 2 Trial [DIN 2254] ("Part 2, Phase 2 Order"). The Court made a host of rulings and requested follow up briefing and evidence relating to issues such as attorney fees, application of interest, and security for payment for the Trustee's shares. (The Court recently entered a limited reconsideration order [DIN 2331].)

On December 16, 2025—one week after entering the Part 2, Phase 2 Order—Smart Communications Holding, Inc., again filed for Chapter 11 bankruptcy relief in the Bankruptcy Court for the Middle District of Florida. (The "Second Bankruptcy Proceeding"). The Bankruptcy Court entered an order partially lifting the stay to permit the Court to conduct the hearing contemplated by the Court's Part 2 of Phase 2 Trial and "hold an evidentiary hearing on payment terms and security, attorneys' fees and interest, and all other evidentiary issues discussed in the State Court's" Part 2 of Phase 2 Order. *In re Smart Communications Holding, Inc.*, 8:25-bk-9473-RCT, Agreed Am. Order Modifying the Automatic Stay (the "Lift Stay Order"), Dkt. No. 55 (Bankr. M.D. Fla. Jan. 9, 2026) [DIN 2301]. The Lift Stay Order further authorized this Court to:

enter a complete final judgment (i) on the amount of the claim for the election to purchase the Trust's shares, (ii) the parties' respective claims of entitlement to attorneys' fees and interest, (iii) the awarded amount of attorneys' fees and interest, if any, and (iv) on all other pending claims in the State Court Case adjudicated during Phase 2. The State Court may, if it elects, to include as part of its judgment proposed findings as to payment terms and security.

*Id.* While the Lift Stay Order permits the Court to enter a Final Judgment and to recommend the terms of a Purchase Order, the Lift Stay Order does not permit current enforcement of the Final Judgment, as that remains subject to the bankruptcy stay.

Based on the Lift Stay Order, the Court on January 12, 2026, conducted the further evidentiary hearing.

The Court now enters Final Judgment as outlined in this judgment. The Second Bankruptcy Proceeding remains pending before the Bankruptcy Court.

Before proceeding further, the Court makes one other note. There have been at least 7 proceedings at the Second District Court of Appeal during the pendency of this case: 2D23-1798; 2D20-2430; 2D25-0262; 2D25-0327; 2D25-0365; 2D25-0700; and 2D25-0843. As relevant to this Final Judgment, a predecessor judge entered a temporary injunction at the beginning of the case imposing certain continuing obligations on Smart Communications Holdings, Inc., which was reversed. *Logan v. Logan*, 397 So. 3d 1144 (Fla. 2d DCA 2024). As part of the Final Judgment, the Court addresses the impact of, and damages from, the reversal of that temporary injunction.

The Court now turns to entry of judgment. The Court will address each operative complaint separately.

The Court incorporates into this judgment the Court's judgment its Part 1, Phase 2 Order, and its Part 2, Phase 2 Order, together with their reconsideration Orders.

## 1.
## VALUATION
## ADDITIONAL FINDINGS AND RULINGS

The Court in its Part 2, Phase 2 Order determined after application of the discount for future Royalty future payments, the adjusted value of Smart Communications Holding, Inc. as of August 28, 2023, was $88,254,918. The value of the Trustee's 50% interest after lack of marketability reduction is $41,921,086. At the time of the Part 2, Phase 2 Order, the Court identified a total of $1,339,778 in shareholder loans that needed to be repaid that would operate as a setoff.

Thus, as of August 28, 2023, Smart Communications Holding, Inc owes the Trustee **$40,581,308** for the Trustee's shares. This amount, though, was subject to additional changes for which the Court requested additional briefing. And there was additional evidence adduced. The Court now addresses those issues and makes its rulings.

## A.
## Ranch Club Home Expenses

The Court in its Part 2, Phase 2 Order determined that the Trustee is responsible for the Ranch Club home expenses beginning on August 29, 2023, and continuing until the date the Trustee either accepts the deed or, if the Trustee does not elect distribution of the Ranch Club home, until the Trustee vacates the premises.

Page 4 of 15

The evidence demonstrates this amount currently stands at $272,348.18, plus 2026 property taxes and ongoing expenses paid by Smart Communications.

The Trustee seeks to offset this amount for the post August 28, 2023, expenses Smart Communications paid on behalf of Jon Logan for the Tierra Verde home. Those expenses, however, do not offset. The Court's valuation was as of August 28, 2023. While the Tierra Verde expenses paid by Smart Communications must be characterized as a shareholder's loan to Jon Logan, those payments do not impact the value as of August 28, 2023. Thus, there is no offset as proposed by the Trustee.

The Trustee's valuation award will be reduced by **$272,348.18**. The Court notes that, technically, there will be a prorated amount of the 2026 property taxes (estimated at $2,500 per month) plus any expenses paid by Smart Communications since the last evidentiary submission. Assuming that the Purchase Order can be effectuated in the near term, and assuming there is no deviation from historical expenditures, the Court would find this amount to be *de minimis* and will not be further addressed or applied as setoff.

One last note. The Court declines to award this amount as injunction damage but instead is the amount the Trustee would have had to pay since August 28, 2023, for the upkeep of the home in which the Trustee has been living.

**B.**
**Wrongful Injunction**

The Court awards Smart Communications salary and health benefits in the amount of $130,182.11 related to wrongful injunction. The Court awards Smart Communications the amount of Ranch Club expenses from the date of the temporary injunction through August 28, 2023, in the amount of $12,889.89. The Court also awards Smart Communications attorney fees and costs relating to the temporary injunction in the amount of $144,697.00.

The Trustees valuation award will be reduced by the summation of these amounts in the total amount of **$287,769**. The Court notes that this amount exceeds the $65,000 bond. However, the Court exercises its discretion in awarding the full amount of Smart Communications' damages as the entire point of the valuation is to arrive at the fair value of the shares, despite the length of time this case remained pending. Further, there was no additional bond hearing to address ongoing potential damage during the life of this case.

**C.**
**Attorney Fees and Costs**

There are a number of claims for attorney fees or costs or both sought by multiple parties. As a reminder, there were two phases and three trials: (1) Phase 1; (2) Part 1 of Phase 2; and (3) Part 2 of Phase 2. The Court will address entitlement. To the extent the Court finds entitlement, the Court will need to conduct further proceedings to determine the amount. The Court, though, would not be offended in the slightest if the Bankruptcy Court proceeded to liquidate the amounts, subject to its jurisdiction. The Bankruptcy Court may be able to do this more quickly

than the Court. However, the Court will adjudicate these amounts subject to permission from the Bankruptcy Court in due course and availability on the Court's calendar.

The Court makes one further observation. The Court would exclude any award of attorney fees or costs associated with proceedings before the Bankruptcy Court for either the First Bankruptcy Proceeding or the Second Bankruptcy Proceeding. Award of those amounts, if any, are within the Bankruptcy Court's jurisdiction.

1.     **DIN 834 – Motion by the Trustee and Personal Representative.** The Court previously awarded the Trustee costs associated with Phase 1 [DIN 878] against both Jon Logan and Smart Communications Holding, Inc. The Court understands that amount has not been liquidated and will need to be liquidated. Those parties are jointly and severally liable for that amount.

The Court now finds both the Trustee and Personal Representative is entitled to attorney fees from Smart Communications Holding, Inc. for Phase 2 (both Parts 1 and 2) attorney fees and costs, pursuant to section 607.0854, Florida Statutes.

2.     **DIN 1597 – Motion by the Trustee.** The Court grants the motion and finds the Trustee is entitled to costs for Part 1, Phase 2. The Court notes, though, that since no final judgment was entered following Part 1, Phase 2, there was no need for this motion as the proper time to file this motion is the filing of this Final Judgment governing all of Phase 2.

3.     **DIN 2263 – Motion by Janice Logan, individually, the Trustee, and the Personal Representative.** Janice Logan, the Trustee, and the Personal Representative move for attorney fees and costs. The Court grants costs to each of Janice Logan, individually, the Trustee, and the Personal Representative, against those persons and entities that sued them: Jon Logan, Smart Communications Holding, Inc., HLFIP Holding, Inc., and HLFIP Holding, LLC.

*a.*
*§607.1436(5), Fla. Stat.*

With respect to attorney fees, the Court finds the Trustee is entitled to an award of attorney fees and costs pursuant to section 607.1436(5) against Smart Communications Holding, Inc., relating to Phase 2 attorney fees commencing on the date of the Smart Communications Holding, Inc's election to purchase the shares. There was evidence presented by both sides concerning how the negotiations relating to determining the valuation amount. To be sure, Jon Logan on behalf of Smart Communications initially offered the Trustee $20M. While this certainly is a significant amount, the Trustee had probable grounds for relief under section 607.1430(1)(b). Further, the evidence convinces the Court that it was Jon Logan, not the Trustee, who engaged in unnecessary and highly destructive litigation. Jon Logan at almost every chance attempted to frustrate, reduce, or eliminate the Trustee's value in Smart Communications as well as to avoid turn over of financial documents to assist the Trustee in evaluating the value of the Trustee's shares. And it was Jon Logan who caused this litigation to be much more aggressive and unnecessarily litigious than necessary. Under these circumstances, the Court exercises its discretion and awards the Trustee her attorney fees and expert costs from the date identified above.

*b.*
*§607.0746(1), Fla. Stat.*

The Trustee also moved for attorney fees and costs pursuant to her derivative claims pursuant to section 607.0746(1). The Court grants entitlement to the Trustee for her attorney fees for both Part 1, Phase 2 and Part 2, Phase 2 under this statute, against Smart Communications Holding, Inc. The Court, though, notes this statute requires this to be paid "from the amount recovered in the derivative proceeding by the corporation." Here, this amount at best for the Trustee would seem to be limited to the amount of Jon Logan's new shareholder loans and, potentially, the nonoperating asset value that ultimately were included within the valuation award. The Court will leave it to the evidentiary hearing to determine the maximum amount available under authority of this statute.

The Court, though, specifically rejects the contention that this statute gives authority for Phase 1 attorney fees. While the motion was timely by virtue of the enlargement of time [DIN 653], the Court would not be able to conclude the determination in Phase 1 of the existence of a shareholder's agreement constituted a return of assets or damage award in favor of Smart Communications Holding, Inc.

4.      **DIN 2291.** Alexis Logan seeks her attorney fees and costs against Smart Communications Holding, Inc. and Jon Logan.

*a.*
*§736.1004, Fla. Stat.*

The Court denies the motion in part to the extent it seeks attorney fees or costs associated with Phase 1 under section 736.1004, Florida Statutes. While the motion was timely by virtue of the enlargement of time [DIN 654], the nature of the declaratory judgment in Phase 1 does not give the Court authority under section 736.1004 to award attorney fees or costs associated with Phase 1. Even if it did, the Court would exercise its discretion and not award Phase 1 attorney fees or costs.

*b.*
*contractual basis*

The Court has already concluded that the Release and Indemnification Agreement Attorney fees and costs applies and that Smart Communications Holding, Inc. is responsible. The Court, therefore, grants the motion in part. The Court concludes entitlement is for both Part 1, Phase 2 and Part 2, Phase 2. The Court has severed the liquidation of the amount of attorney fees and costs to permit finality to this Final Judgment.

5.      **Conclusion on attorney fees and costs.** The Court notes that the issue of attorney fees and costs may not yet be closed, as the parties do have 30 days from the date of entry of judgment to file their motions.

**D.**
**Interest**

Page 7 of 15

A matter of substantial disagreement between the parties involves the application of interest. Under section 607.1436(5), an award of interest is discretionary, unless the Trustee's refusal to accept an offer was arbitrary or not in good faith. Section 607.1436(5) provides in pertinent part:

> Interest may be allowed at the rate and from the date determined by the court to be equitable; however, if the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, no interest shall be allowed.

Jon Logan and Smart Communications make a full throated argument that the Trustee acted unreasonably and arbitrarily. The evidence demonstrates that Jon Logan, on behalf of Smart Communications Holding, Inc., initially offered $20M for the shares. The Court finds the Trustee's rejection of this amount was not arbitrary, and it was not done in bad faith. The Trustee initially had information that suggested a much higher valuation.

After those initial discussions, Jon Logan began an aggressive campaign to eliminate all value of the Trustee's shares. He also actively worked to prevent the Trustee from receiving information to analyze valuation. While Jon Logan suggests that towards the end that he may have been willing to be flexible on valuation, the reality is the length and substantial legal spend in this case is directly attributable to Jon Logan's actions, not the Trustee.

The Court concludes that an award of interest is appropriate in this case, and the Court will impose interest in two parts. First, the Court will award interest beginning August 29, 2023, through the date of the Final Judgment. Second, the Court will award interest on the outstanding amount.

The Court, though, for the most part will not use statutory interest. The Court believes the equities require the Court to impose a lesser rate under these circumstances.

The Court concludes that, except for Default Interest Rate defined in the Purchase Order, the Court will set the interest rate at **5.00%**, calculated using a daily rate as a decimal of **0.000136986**.

### E.
### Conclusion of Valuation Award

Based on the above, the Court now calculates the Valuation Award.

From the Part 2, Phase 2 Order, the valuation amount is $40,581,308. From that amount, the Court sets off the Ranch Club home expenses ($272,348.18) and Wrongful Injunction damage ($287,769.00). This results in **$40,021,190.82**. Accrued interest on this amount at 5.00% since August 28, 2023 through the date of this Final Judgment is **$4,884,776.28**.

The summation of these two amounts is **$44,905,967.10**. This is the amount the Court will include in the Purchase Order as the net value of the Trustee's shares as of August 28, 2023. This amount will accrue interest at 5.00%, unless the Default Interest Rate applies as reflected in

the Purchase Order. The Purchase Order is attached to, and incorporated into, this Final Judgment.

**Based on the evidence and testimony presented—**

IT IS ADJUDGED that:

Pursuant to section 607.1436, Florida Statutes, the Court enters judgment that **SMART COMMUNICATIONS HOLDING, INC.**, whose address is 10491 72nd Street North, Seminole, Florida 33777; owes to, and shall pay to, **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; according to the terms of the Purchase Order, the total amount of **$44,905,967.10**, which amount will bear interest at **5.00%** (and calculated using the daily rate as a decimal of **0.000136986**), until paid, for the fair value of her 50% equity interest in Smart Communications Holding, Inc. as of August 28, 2023, for which let execution issue. The Purchase Order is attached to, and incorporated into, this Final Judgment. Pursuant to section 607.1436(6), Florida Statutes, the Purchase Order "shall be enforceable in the same manner as any other judgment."

Pursuant to the terms of the Bankruptcy Court's Lift Stay Order, enforcement of this Final Judgment is not permitted during the existence of the existing automatic bankruptcy stay.

**2.**
**SECOND AMENDED VERIFIED COMPLAINT [DIN 680]**
**FILED BY**
**JANICE LOGAN, AS TRUSTEE**
**(May 29, 2024)**

Based upon the evidence and testimony presented—

IT IS ADJUDGED that:

1.    **Count 1 (§86.011, Fla. Stat. Declaratory Judgment).** The Court concludes the Trustee is entitled to entry of declaratory judgment against Jon Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; HLFIP Holding, Inc.; and HLFIP Holding, LLC. The Court declares the Purported Royalty Transactions are "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes, and that they are invalid and of no legal force or effect. This declaration also includes declaring the accrual of the liability and associated interest expense as invalid.

2.    **Count 2 (§607.0748, Action to Appoint a Custodian or Receiver).** The Court notes that contained with the Purchase Order is the authority for the Court to appoint a Custodian or Receiver. Bases on the history in this case, the Court remains concerned that Jon Logan will operate outside of business judgment in a manner that adversely impacts Smart Communications Holding, Inc.'s ability to pay the Trustee according to the Purchase Order.

In the light of the Purchase Order, though, the Court dismisses this count without prejudice.

3.      **Count 3 (§607.1430, Action for Judicial Dissolution).** Upon entry of the Purchase Order contemplated by section 607.1436(5), Florida Statutes, the Court is required by section 607.1436(6) to "dismiss the petition to dissolve the corporation . . . ." Attached to this Final Judgment is the Court's proposed Purchase Order, which, but for the automatic bankruptcy stay.

Because there is no further judicial labor by the Court associated with the Purchase Order, though, the Court dismisses Count 3 in compliance with section 607.1436(6)

4.      **Count 4 (§607.0831, Director Liability) and Count 9 (Unjust Enrichment).** The parties agreed to the involuntary dismissal of these counts with prejudice.

5.      **Count 5 (Breach of Fiduciary Duty), Count 6 (Aiding and Abetting Breach of Fiduciary Duties), Count 7 (Fraud), Count 8 (Aiding and Abetting Fraud), Count 10 (Unjust Enrichment – Headquarters Building), Count 11 (Conversion - Yacht), and Count 12 (Unjust Enrichment - Yacht).**

The Court concludes these claims do not survive the valuation together with the Purchase Order. The Court dismisses these claims with prejudice.

The Court notes, though, that it expressly determined in its Part 2, Phase 2 Order that the Trustee would have prevailed on at least Count 12 relating to the Yacht. The Court further notes that while it did not expressly reference the same regarding the headquarters building, the Court now expressly states that the Trustee would have prevailed against Loco Florida, as the entity holding title to the building, despite all payments for that building coming from Smart Communications. The Court included the value of those assets in the valuation order.

The Court in making these references relating to the Yacht and Headquarters Building should not be read as an indication the other defendants to these counts would have prevailed. They would not.

**3.**
**TRUSTEE'S COUNTERCLAIMS [DIN 775]**
**FILED BY**
**THE TRUSTEE**
**(October 2, 2024)**

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

**Count 1 (Malicious Prosecution and Abuse of Process).** The Court by separate Order severed Count 1 [DIN 2330]. This Final Judgment does not address that Count, and it remains pending against Jon Logan and Smart Communications, Inc.

**Count 2 (§726.105(1)(a) and (1)(b), Fla. Stat., Uniform Fraudulent Transfer Act).** The Court's Declaration in Count 1 of the Trustee's Second Amended Verified Complaint resolved this issue favorable to the Trustee. The Court, therefore, dismisses this Count.

**Count 3 (§607.0831, Director Liability).** The parties agreed to the involuntary dismissal of this count with prejudice.

**Count 4 (Breach of Fiduciary Duty), Count 5 (Civil Conspiracy), and Count 6 (Aiding and Abetting Breach of Fiduciary Duties).** The Court concludes these claims do not survive the valuation together with the Purchase Order. The Court dismisses these claims with prejudice.

**4.**
**THE SECOND AMENDED COMPLAINT [DIN 891]**
**FILED BY**
**JON LOGAN AND SMART COMMUNICATIONS, HOLDING, INC.**
**(December 4, 2024)**

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1. **Count 1 (Unjust Enrichment v. the Personal Representative and Count 2 (Unjust Enrichment v. Janice Logan, individually)**. Smart Communications Holdings, Inc. sued the Personal Representative (Count 1) and Janice Logan, individually (Count 2) for unjust enrichment. Smart Communications failed to prove these counts, and the Court enters judgment in favor of the Personal Representative (Count 1) and Janice Logan, individually (Count 2).

2. **Count 3 (Unjust Enrichment).** The Court addressed this matter in the valuation award by setoff. No separate judgment is entered. The Court dismisses this count with prejudice.

3. **Count 4 (Unjust Enrichment – Alexis Logan distributions).** Smart Communications Holdings, Inc. sued Alexis Logan for unjust enrichment relating to various distributions. Smart Communications failed to prove this count, and the Court enters judgment in favor of Alexis Logan.

4. **Count 5 (Unjust Enrichment – Justin Peterson re BMW).** Smart Communications Holdings, Inc. sued Justin Peterson relating to funds associated with the purchase of a BMW. Smart Communications failed to prove this count, and the Court enters judgment in favor of Justin Peterson.

5. **Count 6 (Constructive Fraud).** Jon Logan sued the Personal Representative relating to withdrawals made by Jim Logan. Jon Logan failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

6.      **Count 7 (Conversion – Jim Logan's withdrawals).** Jon Logan and Smart Communications Holding, Inc. sued the Personal Representative relating to withdrawals of corporate funds made by Jim Logan. Jon Logan and Smart Communications failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

7.      **Count 8 (Conspiracy to Commit Conversion).** Jon Logan sued Janice Logan, individually, the Personal Representative, Alexis Logan, and Justin Peterson for conspiracy to commit conversion. Jon Logan failed to prove this count, and the Court enters judgment in favor of Janice Logan, individually, the Personal Representative, Alexis Logan, and Justin Peterson.

8.      **Count 9 (Breach of Fiduciary Duty), Count 10 (Breach of Fiduciary Duty), and Count 12 (Breach of Fiduciary Duty).** Jon Logan and Smart Communications Holdings, Inc. sued the Personal Representative for breach of statutory fiduciary duty in Count 9 and for common law breach of fiduciary duty in Count 10. Jon Logan and Smart Communications failed to prove these counts, and the Court enters judgment in favor of the Personal Representative.

9.      **Count 11 (Conspiracy to Commit Unjust Enrichment).** In Count 11, Smart Communications Holding, Inc. sued Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson for conspiracy to commit unjust enrichment. Smart Communications failed to prove this count, and the Court enters judgment in favor of Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson.

10.     **Count 12 (Aiding and Abetting Breach of Fiduciary Duty).** In Count 12, Jon Logan and Smart Communications Holding, Inc. sued Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson for aiding and abetting breach of fiduciary duty. Smart Communications failed to prove this count, and the Court enters judgment in favor of Janice Logan, individually, the Trustee, the Personal Representative, Alexis Logan, and Justin Peterson.

11.     **Count 13 (Negligence).** Jon Logan and Smart Communications Holding, Inc. sued the Personal Representative relating to withdrawals of corporate funds made by Jim Logan in a negligence claim. Jon Logan and Smart Communications failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

12.     **Count 14 (Breach of Fiduciary Duty re: Tax Liabilities).** Jon Logan and Smart Communications Holding, Inc. sued the Personal Representative for breach of fiduciary duty relating to exposing Smart Communications to potential tax liabilities. Jon Logan and Smart Communications failed to prove this count, and the Court enters judgment in favor of the Personal Representative.

13.     **Count 15 (Breach of Fiduciary Duty re: Compensation) and Count 17 (Fraudulent Inducement re: Compensation).** Jon Logan sued the Personal Representative relating to Jon Logan's compensation (Count 15, for breach of fiduciary duty; and Count 17 for fraud in the inducement). Jon Logan failed to prove these counts, and the Court enters judgment in favor of the Personal Representative.

14. **Count 16 (Misrepresentation re: IP) and Count 18 (Fraudulent Inducement re: IP).** Jon Logan sued the Personal Representative relating to intellectual property (Count 16, for misrepresentation; and Count 18 for fraud in the inducement). Jon Logan failed to prove these counts, and the Court enters judgment in favor of the Personal Representative.

15. **Count 19 (Indemnification – Yacht Broker) and Count 20 (Breach of Fiduciary Duty re: Yacht Broker).** Based on the agreement of the parties [DIN 2274], the Court previously dismissed these counts without prejudice.

16. **JONATHAN LOGAN**, whose address is 10491 72nd Street North, Seminole, Florida 33777; and **SMART COMMUNICATIONS HOLDING, INC.**, whose address is 10491 72nd Street North, Seminole, Florida 33777; shall take nothing by this action and that each of **JANICE LOGAN, individually**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **JANICE LOGAN, as Personal Representative of the Estate of JAMES LOGAN**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **ALEXIS LOGAN**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; and **JUSTIN PETERSON**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; shall go hence without day.

17. The Court reserves jurisdiction to award attorney fees or costs or both, if any, upon a timely filed motion.

## 5.
## JON LOGAN'S COUNTERCLAIM [DIN 1861]
## FILED BY
## JON LOGAN AND SMART COMMUNICATIONS, HOLDING, INC.
## (August 15, 2025)

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1. **Count 1 (§86.011, Fla. Stat. Declaratory Judgment).** Jon Logan and Smart Communications Holding, Inc. sued Janice Logan, individually, and the Trustee for declaratory relief that the interest is not available under section 607.1436(5), where the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, then no interest shall be allowed. In the Additional Findings section above in this Final Judgment, the Court resolved this issue against Jon Logan and Smart Communications Holding, Inc. The Court found the Trustee did not arbitrarily refuse to accept an offer of payment, and the Court further found the Trustee acted in good faith. The Court exercised its discretion to and awarded interest. The Court declares that the Trustee's refusal to accept the offer of payment was not arbitrary, and the Trustee operated in good faith.

2. **JONATHAN LOGAN**, whose address is 10491 72nd Street North, Seminole, Florida 33777; and **SMART COMMUNICATIONS HOLDING, INC.**, whose address is 10491 72nd Street North, Seminole, Florida 33777; shall take nothing by this action and that

each of **JANICE LOGAN, individually**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; and **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; shall go hence without day.

3. The Court reserves jurisdiction to award attorney fees or costs or both, if any, upon a timely filed motion.

**6.**
**ALEXIS LOGAN COUNTERCLAIMS [DIN 1790]**
**FILED BY**
**ALEXIS LOGAN**
**(August 4, 2025)**

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1. **Count 1 (Malicious Prosecution and Abuse of Process).** The Court by separate Order severed Count 1 [DIN 2330]. This Final Judgment does not address that Count, and it remains pending against Jon Logan and Smart Communications, Inc.

2. **Count 2 (Conspiracy).** Before trial, Alexis Logan voluntarily dismissed Count 2 [DIN 1920]. Thus, that Count was not tried and no longer pends.

3. **Count 3 (Contractual Indemnity).** In Count 3, Alexis Logan sued Smart Communications, Inc. for contractual indemnity. The Court found in Part 2, Phase 2 that Smart Communications, Inc. breached its indemnity obligation. The Court concludes that Alexis Logan is entitled to recover her attorney fees pursuant to the contract. The amount of attorney fee damage due to Alexis Logan will be tried separately. To the extent necessary to ensure the finality of this Final Judgment, the Court would sever the attorney fee matter in Count 3. Generally, attorney fees are collateral and do not affect the finality of the judgment. The Court will enter a separate final judgment as to Count 3 attorney fees following the determination of those amounts.

**7.**
**HLFIP'S COUNTERCLAIMS [DIN 1863]**
**FILED BY**
**HLFIP HOLDING, LLC**
**(August 15, 2025)**

Based upon the evidence and testimony presented—

**IT IS ADJUDGED** that:

1.      **Count 1 (Unjust Enrichment).** In Count 1, HLFIP Holding, LLC sued Janice Logan, individually, the Trustee, and Alexis Logan for unjust enrichment. The Court concluded that HLFIP failed to prove this count.

2.      **Count 2 (Quantum Meruit).** In Count 2, HLFIP sued Janice Logan, individually, the Trustee, and Alexis Logan for quantum meruit. The Court concluded that HLFIP failed to prove this count.

3.      **HLFIP HOLDING, LLC**, whose address is 10491 72nd Street North, Seminole, Florida 33777; shall take nothing by this action and that each of **JANICE LOGAN, individually**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; **JANICE LOGAN, as Trustee of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; and **ALEXIS LOGAN**, whose address is 1660 Ranch Club Blvd, Sarasota, Florida 34240; shall go hence without day.

4.      The Court reserves jurisdiction to award attorney fees or costs or both, if any, upon a timely filed motion.

**THE COURT RETAINS JURISDICTION TO ENFORCE
THIS FINAL JUDGMENT AS WELL AS THE PURCHASE ORDER**

DONE AND ORDERED in Sarasota County, Florida, on February 05, 2026.

e-Signed 2/5/2026 4:03 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

**SERVICE CERTIFICATE**

On February 05, 2026, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individual who do not have an email address on file with the Clerk of Court.

Counsel of Record.

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
      Plaintiff,

v.

          CASE NO.  2023 CA 001002 NC
          DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
      Defendant.

_____

**PURCHASE ORDER**
**WITH PAYMENT TERMS AND SECURITY**

**This Purchase Order is \*Proposed\***
**due to the scope of the Lift Stay Order**
**but are the terms the Court would impose in its**
**Purchase Order contemplated by section 607.1436(5), Florida Statutes**

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "Trustee" and "Trust," respectively) filed a Second Amended Complaint [DIN 680] seeking, among other things, judicial dissolution under section 607.1430, Florida. The Trustee is a 50% shareholder of Smart Communications Holding, Inc. ("Smart Communications"). In response, Smart Communications filed an election to purchase the Trustee's shares pursuant to section 607.1436, Florida Statues [DIN 696/TX438]. The parties were unable to reach agreement on the fair value of the shares pursuant to section 607.1436(3). Therefore, this Court held a ten-day bench trial, the focus of which was determining the fair value of the Trustee's shares.

Page 1 of 15

Filed 02/05/2026 04:01 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

That trial was preceded by a previous bench trial that addressed other matters that served as gatekeeping issues for the valuation trial.

In its Order with Findings and Conclusions of Law from Part 2 of Phase 2 Trial [DIN 2254] ("Part 2 of Phase 2 Order"), the Court determined that the fair value of the Trustee's shares in Smart Communications as of August 28, 2023, was $41,921,086. After applying an offset, the Court determined the Trust is ultimately owed $40,581,308  for the fair value of its shares, subject to various adjudgments outlined within Part 2 of Phase 2 Order. The Court directed the parties to submit memoranda setting forth their positions as to reasonable terms of purchase. The parties submitted these memoranda. The Court then received evidence and oral argument regarding the payment terms on January 12, 2026.

The Court pauses to note that Smart Communications filed for Chapter 11 bankruptcy on December 16, 2025, following the entry of the Part 2 of Phase 2 Order. The Bankruptcy Court for the Middle District of Florida modified the automatic stay to allow this Court to "hold an evidentiary hearing on payment terms and security, attorneys' fees and interest, and all other evidentiary issues discussed in the State Court's" Part 2 of Phase 2 Order. *In re Smart Communications Holding, Inc.*, 8:25-bk-09473-RCT, Agreed Am. Order Modifying the Automatic Stay (the "Lift Stay Order"), Dkt. No. 55 (Bankr. M.D. Fla. Jan. 9, 2026) [DIN 2301]. The Lift Stay Order further authorized this Court to:

> enter a complete final judgment (i) on the amount of the claim for the election to purchase the Trust's shares, (ii) the parties' respective claims of entitlement to attorneys' fees and interest, (iii) the awarded amount of attorneys' fees and interest, if any, and (iv) on all other pending claims in the State Court Case adjudicated during Phase 2. The State Court may, if it elects, to include as part of its judgment proposed findings as to payment terms and security.

*Id.*

Returning to the issue of set-off and valuation, the Court now finds there should be a total further set-off of $560,117.18. This reduced the valuation as of August 23, 2023, to **$40,021,190.82**.

The Court then applied a 5.00% interest rate to this new amount, resulting in accrued interest from August 23, 2023, through and inclusive of February 5, 2026, of **$4,884,776.28**.

The Valuation Award as of February 5, 2026, is **$44,905,967.10** for the fair value of her 50% equity interest in Smart Communications Holding, Inc. as of August 28, 2023. This amount will accrue interest at **5.00%** (and calculated using the daily rate as a decimal of **0.000136986**) until paid, unless Default Interest Rate applies.

Based on the evidence, testimony, and arguments of the parties, the Court notes Jon Logan's substantial history in attempting to evade payment of any value to the Trustee for the Trustee's shares. This includes taking actions that are inconsistent with ordinary business judgment. The Court includes additional provisions in this Purchase Order to guard against Jon Logan attempting to use Smart Communications or any of its subsidiaries, affiliates, or related entities in which Jon Logan

owns a 10% or greater legal or beneficial interest to avoid payment to the Trustee. Even with those additional measures, the Court remains concerned that he will attempt to evade payment.

Although no receiver or custodian is currently recommended, the Court will not hesitate to appoint a receiver or custodian (or if the case remains in Bankruptcy Court, to recommend to the Bankruptcy Court to appoint a receiver or custodian) should it be found that Jon Logan is attempting to avoid paying the Trustee according to the Final Judgment and Purchase Order or otherwise operating outside of normal business judgment.

**IT IS ORDERED AND ADJUDGED** that:

The findings, analysis, and conclusions of law from the Part 1 of Phase 2 Order [DIN 1189] and Part 2 of Phase 2 Order [DIN 2254] with limited reconsideration [DIN 2331] are incorporated into this order as if fully set forth. Pursuant to section 607.1436, the Court directs the purchase by Smart Communications of the Trustee's Smart Communications shares on the following terms:

1.  **Definition.**

    a.   "HLFIP" means HLFIP Holding, Inc. and HLFIP Holding, LLC.

    b.   "Smart Communications" means Smart Communications Holding, Inc.

    c.   "Subsidiaries, Affiliates, and Related Entities" means the subsidiaries, affiliates, and related entities of Smart Communications Holding, Inc., including but not limited to Smart Communications Holdings, LLC; Smart Communications DeSoto, Inc.; Smart Communications Lee, Inc.; Smart Communications West, Inc.; Smart Communications Collier, Inc.; Smart Communications Pasco, Inc.; Smart Communications Yacht Holdings, LLC; Loco Florida, LLC; and Smart Communications US, Inc. The definition specifically excludes HLFIP

2.  **Valuation Award.** The Court determines the value of the Trustee's 50% interest in Smart Communications Holding, Inc., as of August 28, 2023, after all set-offs, is $40,021,190.82. Accrued interest since that date through February 5, 2026, is $4,884,776.28, making the total Valuation Award on February 5, 2026, to be **$44,905,967.10**. This amount will accrue interest at **5.00%**(and calculated using the daily rate as a decimal of **0.000136986**) until paid, unless Default Interest Rate applies.

3.  **Share Transfer.** The Trustee shall transfer the Trustee's 50% equity interest in Smart Communications within 10 days after the date the Purchase Order becomes final.

4.  **Installment Payments Subject to Distribution Solvency Analysis.** The Court finds it equitable and necessary to direct the payment of the Value Award, interest, and attorney fees and costs in installments under section 607.1436(5), Florida Statutes. Each installment payment will be made only if, and to the extent of, Smart Communications' ability to make a distribution to a shareholder under section 607.0641, Florida Statutes, as required by section 607.1436(8).

5.    **Shareholder Rights Extinguished.** Pursuant to section 607.1436(6): "Upon entry of an order under subsection (3) or subsection (5), the court shall dismiss the petition to dissolve [Smart Communications] under section 607.1430(1)(b) and the petitioning shareholder shall no longer have any rights or status as a shareholder of the [Smart Communications], except the right to receive the amounts awarded by the order of the court, which shall be enforceable in the same manner as any other judgment." Although the Trustee's rights and status of a shareholder, the Court finds the terms and conditions of the Purchase Order are necessary to protect the Trustee's interests and are appropriate under the facts of this case.

6.    **Payments.**

    a.    **Start Date.** The first payment must be made within 10 days of entry of the Purchase Order or other date directed by the Bankruptcy Court.

    b.    **Frequency.** Payments shall be made monthly.

    c.    **Amount.** 3.2% of annual net revenue, plus the additional amounts required once the Yacht is sold. ($750,000 yearly, payable $62,500 per month, effective the first month after the Yacht is sold and all recurring expenses end). For the avoidance of doubt, the $750,000 (payable $62,5000 monthly) is in addition to the 3.2% annual net revenue amount, payable monthly.

    d.    **True-up.** Within 45 days after issuance of Smart Communications' consolidated audited year-end financials, 80% of available cash flows (excluding extraordinary expenses and transactions) less that year's net revenue amount will be devoted for the true-up. In the event the true-up payment would result in a violation of section 607.06401, Smart Communications will pay only that portion of the true-up amount that would not result in a section 607.06401 violation.

    e.    **Compliance with section 607.06401.** If Smart Communications contends a monthly payment or true-up would violate section 607.06401, Smart Communications must still pay that portion of principal, interest, and attorneys' fees due each month or the true-up that it contends does not violate section 607.0641. The remainder of that monthly payment or true-up is deferred (not waived) and accrues interest at the Default Interest Rate and immediately triggers Enhanced Protections.

    f.    **Default Interest Rate.** The Default Interest Rate will be the greater of 5.00% or the then current statutory interest rate as determined by Florida's Chief Financial Officer by section 55.03, Florida Statutes, then in effect on the date of default, and that rate will remain the same until the default is cured. There may be separate defaults from time to time, and each separate default will bear the Default Interest Rate at the statutory interest rate then in effect.

g.   **Enhanced Protections.** If Enhanced Protections are triggered, Smart Communications shall immediately provide an officer's certificate and auditor/reviewer attestation to the Trustee demonstrating the specific section 607.06401 impediment and a plan to cure (e.g., identified asset sales and timing). A payment, either in part or totally, that is not made due to a section 607.0641 concern does not constitute a payment default initially. If the inability to pay the balance of the payment together with accrued interest persists for more than 90 days (the Cure Period), it triggers a default and the accompanying remedies provided below.

7.   **Security.**

a.   **Lien.** A lien (of highest priority permissible by law) exists in favor of the Trustee on all tangible and intangible assets and equity interests of Smart Communications and its Subsidiaries, Affiliates, and Related Entities used or held for use in the business, including, without limitation, revenue, cash flow, chattel, inventory, and intellectual property. For the avoidance of doubt, this includes the nonoperating assets discussed in the Valuation Order unless and until disposed in a manner authorized by the Part 2 of Phase 2 Order or Purchase Order. Further, the Court specifically rejects Smart Communications' position that the Trustee becomes an unsecured creditor with no priority.

b.   **Equity Pledge.** Smart Communications shall pledge 100% of its equity and 100% of the equity it holds in its Subsidiaries, Affiliates, and Related Entities as collateral until the Purchase Order is paid in full.

c.   **Asset Pledge.** Smart Communications shall additionally pledge its headquarters building, which it purchased, but which is held by Loco Florida, LLC; the Riva Corsaro Yacht, which it purchased, but which is held by Smart Communications Yacht Holding, LLC; and the promissory notes relating to any assets Jon Logan elects to receive in exchange for shareholder loans (until such loans are paid off) pursuant to the Purchase Order as collateral until the Purchase Order is paid in full.

d.   **Requirement to retitle assets.** The Court notes that the headquarters building and the Yacht were paid for by Smart Communications, and the value of that building and Yacht has been included in the Valuation Award. The Court is not requiring Smart Communications to seek to cause those assets to be retitled at this time. However, the Court retains the right to direct Smart Communications to institute and pursue legal proceedings to have those assets returned to Smart Communications as those assets indisputably were paid by Smart Communications and it would be inequitable under the circumstances to allow Loco Florida, LLC and Smart Communications Yach Holding, LLC to retain those assets without paying full value for the assets.

Page 5 of 15

8. **Nonoperating Asset Disposition.**

    a.      **Tierra Verde Property.** Within 30 days of entry of the Final Judgment, as provided in Part 2 of the Phase 2 Order, Jon Logan is permitted to require Smart Communications to distribute the Tierra Verde home in Pinellas County to Jon Logan. If Jon Logan timely elects distribution of the Tierra Verde home, he will not need to pay Smart Communications the $4,060,333 in value. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not timely elect distribution of the Tierra Verde home, Jon Logan would then need to vacate the Tierra Verde home immediately, and Smart Communications will then proceed to sell it immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. Note: all expenses for upkeep and repair associated with the Tierra Verde home beginning August 29, 2023, through the date the deed is delivered to Jon Logan or Jon Logan vacates the home is the responsibility of Jon Logan, even if Smart Communications paid for the expense in the first instance. Jon Logan may either repay Smart Communications for these expenses or they must be carried on the books of Smart Communications as a shareholder loan and must remain on the books until either paid by Jon Logan or Smart Communications completes payment to the Trustee of the value of the Trustee's shares. If Jon Logan elects to continue to live in the Tierra Verde home, Smart Communications may continue to make ordinary course upkeep and repair payments so long as those amounts do not materially change from historical expenses. Those expenses will also need to be characterized, or recharacterized, as shareholder loans.

    b.      **Ranch Club Property.** Within 30 days of entry of the Final Judgment, as provided in the Part 2 of the Phase 2 Order, the Trustee is permitted to require Smart Communications to distribute the Ranch Club home in Sarasota County to the Trustee. If the Trustee timely elects distribution of the Ranch Club home, the election will reduce the amount Smart Communications owes the Trustee by $2,591,000. If the Trustee does not timely elect distribution of the Ranch Club home, the Trustee would then need to vacate the Ranch Club home immediately, and Smart Communications shall then proceed to sell it immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. Note: all expenses for upkeep and repair associated with the Ranch Club home beginning August 29, 2023, through the date the deed is delivered to the Trustee or the Trustee vacates the home is the responsibility of the Trustee, even if Smart Communications paid for the expense.

c.     **Brickell Avenue Condominium.** The evidence is that the title was transferred back to Smart Communications, which then sold the Brickell Avenue condominium. Smart Communications received the proceeds from sale and then used them for company purposes. No further action or adjustment is necessary.

d.     **Riva Corsaro Yacht.** Smart Communications shall cause the Yacht to be sold immediately using commercially reasonable means at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell the Yacht soon. After retiring the debt and paying broker commission, at least 50% of the net proceeds will be paid to the Trustee. Effective the first month after the Yacht is sold and the recurring expenses for the Yacht cease: (1) Smart Communications will pay the Trustee a minimum of $62,500 additional per month, which is in addition to the 3.2% of annual net revenue; and (2) Smart Communications may increase Jon Logan's base salary by up to $50,000 per month.

e.     **Nor-Tech Center Console Boat.** Within 30 days of entry of the Final Judgment, Jon Logan may elect to purchase the Nor-Tech Center Console Boat for $887,500. If he does so, he may pay Smart Communications in cash or via shareholder loan, with a signed promissory note in favor of Smart Communications repayable over 6 years (72 monthly payments) in even amortized payments at 5% interest annually. Smart Communications will have a first position lien on that vessel until the promissory note is satisfied. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not make this election, the vessel needs to be sold in a commercially reasonable manner at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell that vessel in a timely manner. At least 50% of the proceeds from the sale of the vessel will be used to reduce Smart Communications' outstanding obligation to the Trustee. In the event Smart Communications made a promissory note, at least 50% of the monthly payments received by Smart Communications must be provided to the Trustee. This amount is in addition to 3.2% of annual net revenue as well as any additional amounts authorized by the Part 2 of Phase 2 Order or the Purchase Order. There will be no docking fees or charges or any kind associated with the vessel being docked or kept at the Tierra Verde home.

f.     **The Exotic Cars.** Within 30 days of entry of the Final Judgment, Jon Logan may elect to purchase any or all of the following exotic cars: (1) the 2020 Lamborghini Huracan for $130,000; (2) the 2017 Ferrari 488 Spider; or (3) 2015 Rolls Royce Wraith for $140,000. If he elects to

purchase one, two, or all three of these exotic cars, he may pay Smart Communications in cash or via shareholder loan, with a signed promissory note in favor of Smart Communications repayable over 6 years (72 monthly payments) in even amortized payments at 5% interest annually. Smart Communications will have a first position lien on each exotic car for which it made a promissory note until the promissory note is satisfied. Smart Communications must notify the Trustee of Jon Logan's election or nonelection within 5 days of his election or nonelection. If Jon Logan does not make this election, or if he only elects to purchase only one of two exotic cars, the remaining exotic car or cars need to be sold in a commercially reasonable manner at the first opportunity to a bona fide third-party purchaser. The Court would consider directing an absolute auction in the event of the failure to sell the remaining exotic car or cars. At least 50% of the proceeds from the sale of the exotic cars will be used to reduce Smart Communications' outstanding obligation to the Trustee. In the event Smart Communications made a promissory note, at least 50% of the monthly payments received by Smart Communications must be provided to the Trustee. This amount is in addition to 3.2% of annual net revenue as well as any additional amounts authorized by the Part 2 of Phase 2 Order or the Purchase Order. There will be no garage fees or charges or any kind associated with the exotic cars being garaged or kept at the Tierra Verde home.

g. **Everyday Cars.** Jonathan Logan and the Trustee may require Smart Communications to distribute the vehicle they currently drive into their personal possession without further accounting adjustment or payment. For Jon Logan, this is the Land Rover. For the Trustee, this is the Cadillac Escalade.

9. **Headquarters Building.** The Trustee's 50% interest in Loco Florida, LLC is extinguished for the reasons stated in the Part 2 of Phase 2 Order. No further rent is owed to Loco Florida, LLC.

10. **Jon Logan's salary.** Until all payments to the Trustee have been made, Jonathan Logan's base salary will be $120,000 per year, subject to adjustment as detailed in the Part 2 of Phase 2 Order and the Purchase Order. On July 1 of each year, Jon Logan's base salary may be increased by the same percentage increase the Florida Legislature provides for state employees. Note this is general state employees and not any specific classification receiving a pay adjustment. For instance, in fiscal year 2025-2026, the Legislature authorized a 2% pay increase. The Court authorizes Smart Communications to retroactively provide the 2% pay increase to Jonathan Logan's salary effective July 1, 2025. As provided above, effective the month after the last of all payments associated with the Yacht are made, Smart Communications may increase Jon Logan's base the salary term by an additional $600,000 per year maximum (payable $50,000 monthly maximum).

11. **Payment of HLFIP Expenses.** Smart Communications and its Subsidiaries, Affiliates, and Related Entities shall pay to HLFIP, from August 29, 2023, through the date of the Purchase Order a Royalty payment using the formula identified in the Part 2 of Phase 2 Order. Thereafter, Smart Communications and its Subsidiaries, Affiliates, and Related Entities shall pay to HLFIP, a Royalty each month, using the same formula. However, no cash will be provided to HLFIP until all "due froms" incurred by HLFIP beginning August 29, 2023, have been satisfied. Smart Communications and its Subsidiaries, Affiliates, and Related Entities ***must immediately*** discontinue paying HLFIP (or on HLFIP's behalf) any amount that exceeds the then current Royalty due.

Smart Communications and its Subsidiaries, Affiliates, and Related Entities ***maynot*** accelerate Royalty payments, and Smart Communications and its Subsidiaries, Affiliates, and Related Entities may not pay HLFIP the amount the Court reduced Smart Communications' valuation based on discounted future payments to HLFIP (as referenced on pages 30-31, and 45 of the Part 2 of Phase 2 Order). The Court specifically rejects HLFIP's position that the discounted future payment amount the Court used to reduce the value of Smart Communications as of August 28, 2023, is currently due HLFIP or that Smart Communications currently owes HLFIP that amount.

To the extent Smart Communications or any of its Subsidiaries, Affiliates, and Related Entities have paid any HLFIP expenses, including attorneys' fees and costs in this proceeding, beginning August 29, 2023, those expenses must be accounted for as shareholder loans taken by Jon Logan and are to be considered as additional security for repayment of the Purchase Order and Final Judgment, and that sum will act as a setoff against any going-forward royalty obligation.

To the extent HLFIP needs cash to pay current creditors, including tax payments, Smart Communications may provide that cash to (or pay on behalf of) HLFIP only with the consent of the Trustee. The Trustee shall not unreasonably withhold the consent where HLFIP's outstanding obligations, especially where the withholding of paying those creditors may adversely impact Smart Communications' operations, including the loss of intellectual property, if not paid.

12. **Positive Covenants.** Unless the Trustee expressly consents in writing (with such consent not unreasonably withheld by the Trustee) or the Court orders otherwise—until the Trustee has received all payments—Smart Communications and its Subsidiaries, Affiliates, and Related Entities will:

    a.    comply with all applicable laws and governmental regulations.

    b.    maintain in effect its corporate existence and good standing in all jurisdictions.

    c.    discharge on a timely basis all ordinary course taxes and material business contract obligations and continue all material contracts in full force and effect.

    d.    do all things necessary to obtain, preserve and renew any permits or licenses used, held for use or necessary for the conduct of business.

    e.    maintain and preserve all property necessary to the conduct of business.

f.      maintain insurance with financially sound and reputable insurers in such amounts and against such risks as is customary for its business.

g.      maintain books and records in accordance with GAAP.

h.      record in writing all actions taken by the board of directors or shareholder of Smart Communications, and provide copies of such records to the Trustee within seven (7) days of the action.

i.      deliver to the Trustee via email monthly a copy of all expense reports submitted by Jon Logan as well as confirmation of all amounts paid to, or on behalf of Jon Logan, each month. To the extent the report would show any private medical information, that information can be redacted. This submission will be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge

j.      deliver to the Trustee via email monthly unaudited consolidated financial statements. Statements reflecting the preceding month shall be delivered no later than thirty (30) days following the end of that month and be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge.

k.      deliver to the Trustee via email quarterly unaudited consolidated financial statements. Statements reflecting the preceding quarter shall be delivered no later than forty-five (45) days following the end of that quarter and be accompanied by a compliance certificate signed by Smart Communications' highest ranking financial officer, currently the Director of Accounting and Finance, under penalties of perjury that the financials are true and accurate to the best of the signor's knowledge.

l.      deliver to the Trustee via email annual audited consolidated financial statements. Annual audited financial statements shall be provided within forty-five (45) days of the finalization of such statements by Smart Communications' third-party accountant.

m.      subordinate any debt of their debt to this Purchase Order and Final Judgment after entry of the Purchase Order and Final Judgment.

n.      notify the Trustee within seven calendar days of the filing of any litigation, breach or alleged breach of any material contracts, defaults or alleged defaults of any material indebtedness, any asserted or alleged violations of law, or any

event that may materially impact the ability to pay any payment to the Trustee when due.

    o.    require and maintain detailed expense reports for any payments made to Jon Logan or that benefit Jon Logan with receipts justifying the corporate purpose of the expense.

13.    **Negative Covenants.** Unless the Trustee expressly consents in writing (with such consent not unreasonably withheld by the Trustee) or the Court orders otherwise—until the Trustee has received all payments—Smart Communications and its Subsidiaries, Affiliates, and Related Entities will not:

    a.    change its name, identity, organizational structure, state of organization, business, or fiscal year.

    b.    make any payment to or on behalf of HLFIP in any manner other than provided in the Purchase Order.

    c.    enter into any transactions with or make any payments or transfers to any affiliates or entities in which Jon Logan possesses an equity or beneficial interest greater than 5% (specifically including without limitation Smart Communications Yacht Holding, LLC; Loco Florida, LLC; and HLFIP Holding, LLC) other than on an arms-length basis except as specifically authorized by the Valuation Order or Purchase Order.

    d.    effect any sales or issuances of equity interests or any warrants, options, or other securities convertible into, or exercisable for, any equity interests, or such other transactions in respect of equity interests.

    e.    merge or consolidate with any person or entity.

    f.    acquire or be acquired by another person or entity.

    g.    sell all or substantially all of the assets used or held for use in business, or sell or license any of such assets, outside the ordinary course of business unless authorized by the Valuation Order or Purchase Order.

    h.    sell lease, assign, transfer, or otherwise dispose of any material portion of its properties and assets to any person or entity in any transaction without unless authorized by the Valuation Order or Purchase Order.

    i.    sell, discount, or otherwise dispose of any notes receivable, accounts receivable, shareholders loan, or other right to receive payment other than in the ordinary course of business consistent with past practice. The "other than in the ordinary course of business consistent with past practice" specifically excludes the ability to sell, discount, or otherwise dispose of any notes

Page 11 of 15

receivable, shareholders loan, or other right to receive payment from Jon Logan or from any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest, and there is no authority to sell, discount, or otherwise dispose of those assets.

j.      subordinate the Purchase Order to any indebtedness.

k.      grant any new liens on their assets to secure any indebtedness.

l.      guarantee the obligations of any other person or entity unless authorized by the Valuation Order or Purchase Order.

m.      incur any new debt for borrowed money where the total amount owed exceeds more than $500,000, cumulatively, at any given time. This amount excludes: (1) on-going or one-time credit card charges or ordered items incurred in the ordinary course that are to be paid in full within 30 days of receipt of the purchased item or received bill; and (2) the existing debt associated with the Yacht.

n.      authorize, create, or issue any securities.

o.      redeem, acquire, or purchase any equity interests unless authorized by the Valuation Order or Purchase Order.

p.      pay or declare any dividend or other distribution on any equity interests.

q.      pay or cause to be made any dividends, redemptions, management fees, or related-party payments unless authorized by the Valuation Order or Purchase Order.

r.      create any non-wholly owned subsidiary.

s.      amend, repeal, or alter the articles of incorporation, bylaws, or other governance documents.

t.      liquidate, dissolve, or wind up unless authorized by the Valuation Order or Purchase Order.

u.      make any material change in accounting policies.

v.      make any material change to the nature of its business.

w.      provide replacement vehicles for Jon Logan's company use more than once every five years, but in all events, such replacement car cannot exceed the type or quality of the existing Land Rover. In the event of a finance or lease of

a future vehicle, the maximum monthly payment is limited to $1,250, adjusted annually by the same percentage used to increase Jon Logan's base salary.

x.  decline to preserve any or all claims for right to payment, under contract or otherwise, against any third party, or settle or compromise any such claims, except in the ordinary course of business and based on good business judgment. For purposes of this covenant, Jon Logan and any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest is not considered a third party.

y.  settle any litigation against Jon Logan or against any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest.

z.  settle any litigation (other than against Jon Logan or any entity in which Jon Logan owns more than a 5% equitable, legal, or beneficial interest) outside of the ordinary course.

aa. engage in any act, or refrain from engaging in any act, whose purpose or effect is to materially impair or prevent the ability to pay the Trustee of any payment when due or otherwise to defeat the Purchase Order or the Final Judgment.

14.  **Acceleration for Liquidity Events.** If at any time before Smart Communications pays the Trustee the full amount due under the Purchase Order, the Trustee or the Court approves of the sale of all or substantially all of Smart Communications' assets; Smart Communications merges or consolidates with another entity; Smart Communications is acquired; or Smart Communications otherwise undergoes a change of control (any of which shall be a "Liquidity Event"), then the entire principal amount of the Purchase Order, together with all accrued interest thereon and all other amounts payable under the Purchase Order, shall become immediately due and payable, and Smart Communications shall pay such amounts to the Trustee.

15.  **Default.** Events of default include without limitation:

a.  any payment block on section 607.06401 grounds not cured within 90 days;

b.  breach of any term of this Purchase Order, specially including but in no way limited to breach of any positive or negative covenant;

c.  default under other secured obligations;

d.  incurrence of a judgment in excess of $100,000;

e.  unauthorized liens or transfers;

f.  false representations to the Trustee or the Trustee's agents;

g.      termination or impairment of any lien or guarantee; or

h.      insolvency events.

16.     **Default remedies.** Remedies for an event of default include without limitation:

a.      appointing a custodian or receiver empowered to oversee Smart Communications and its Subsidiaries, Affiliates, and Related Entities until the Purchase Order and Final Judgment are paid in full.

b.      directing the continued imposition of interest at the Default Interest Rate or any other interest rate provided in the Purchase Order or Final Judgment.

c.      directing of specific performance of the Purchase Order and Final Judgment.

d.      awarding injunctive relief necessary to restore payments under the Purchase Order and Final Judgment.

e.      awarding attorney fees and costs to the Trustee associated with vindicating the Purchase Order or Final Judgment.

f.      directing the turnover of collateral to the Trustee, including pledged equity.

17.     **Entry of confidentiality agreement.** Smart Communications and the Trustee shall enter into a confidentiality agreement that will prohibit the Trustee from making public any Smart Communications information that Smart Communications reasonably designates as confidential. In the event the Trustee seeks Court intervention relating to the Final Judgment or Purchase Order, the Trustee will use the Trustee's best efforts to maintain the confidentiality of the material so designated and request the court to maintain the confidentiality, too. However, this provision does not prohibit the Trustee from seeking court relief even if the court declines to maintain the confidentiality of the designated information.

18.     **Retention of jurisdiction.** The Court retains jurisdiction to enforce the Final Judgment and the Purchase Order until each is fully satisfied.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on February 05, 2026.

e-Signed 2/5/2026 4:01 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

Counsel of Record

EXHIBIT D

| | |
|---|---|
| **From:** | Jacobs, Eric D. <EJacobs@Venable.com> |
| **Sent:** | Friday, May 22, 2026 3:45 PM |
| **To:** | Edward J. Peterson III; R. Scott Shuker (rshuker@shukerdorris.com); Battista, Paul J. |
| **Cc:** | Krache, Anne (SHB) |
| **Subject:** | RE: Yacht/Logan |

**EXTERNAL**

Good afternoon Ed,

As discussed previously, Paul and I stopped having any involvement with Smart Yacht once a deal to using estate funds to conduct a sales process was not going to occur.

Regarding the adversary proceeding, we do think that the Debtors are indispensable parties to that action, as you are seeking to combine non-debtors with the two debtor entities. Please advise if your clients would consent to the Debtors intervening in the adversary proceeding as defendants.

Sincerely,

-Eric

**Eric Jacobs, Esq. | Venable LLP**
**t** 813.439.3122 | **f** 813.439.3110 | **m** 813.784.2719
100 N Tampa Street, Suite 2600, Tampa, FL 33602

EJacobs@Venable.com | www.Venable.com

**From:** Edward J. Peterson III <EPeterson@bergersingerman.com>
**Sent:** Friday, May 22, 2026 11:29 AM
**To:** Jacobs, Eric D. <EJacobs@Venable.com>; R. Scott Shuker (rshuker@shukerdorris.com) <rshuker@shukerdorris.com>; Battista, Paul J. <PJBattista@Venable.com>
**Cc:** Krache, Anne (SHB) <akrache@shb.com>
**Subject:** Yacht/Logan

**Caution: External Email**

Hi, Scott, Paul, and Eric,

It looks like Jon has sold the yacht, and we understood that he was instructed to hold the proceeds in escrow if/when he did. Are those funds in an escrow account, and if so, can we get a copy of that information?

We know the debtors did not join our AP on sub con, so we'd like to know their position on any claim to the proceeds. Please let us know as soon as possible, and thanks.

Edward



**Edward J. Peterson**
**Berger Singerman** *Florida's Business Law Firm*
101 E. Kennedy Boulevard | Suite 1165 | Tampa, FL 33602
O: (813) 498-3400 | D: (813) 498-3401
bergersingerman.com | vCard |

*************************************************************************************

*WARNING! WIRE FRAUD AND EMAIL HACKING/PIRATING ARE ON THE RISE! IF YOU HAVE A CLOSING WITH OUR OFFICE AND YOU RECEIVE AN EMAIL CONTAINING WIRE TRANSFER INSTRUCTIONS, DO NOT RESPOND TO THE EMAIL. INSTEAD, CALL OUR OFFICE USING PREVIOUSLY KNOWN CONTACT INFORMATION FOR OUR OFFICE TO VERIFY OUR WIRE TRANSFER INSTRUCTION PRIOR TO SENDING YOUR FUNDS AND NOT THE INFORMATION PROVIDED TO YOU IN ANY SUCH EMAIL.*

**This transmission is intended to be delivered only to the named addressee(s) and may contain information that is confidential, proprietary, attorney work-product or attorney-client privileged. If this information is received by anyone other than the named and intended addressee(s), the recipient should immediately notify the sender by E-MAIL and by telephone at the phone number of the sender listed on the email and obtain instructions as to the disposal of the transmitted material. In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s). Thank you.**
*************************************************************************************

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * *
This electronic mail transmission may contain confidential or privileged
information. If
you believe you have received this message in error, please notify the
sender by reply
transmission and delete the message without copying or disclosing it.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * *
```