IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                Chapter 11

SMART COMMUNICATIONS HOLDING, INC.    Case No. 8:25-bk-09473

SMART COMMUNICATIONS COLLIER, INC.    *Jointly Administered with*
Case No. 8:26-bk-00146

**Debtors.**
_____/

**CREDITOR JANICE LOGAN'S LIMITED OBJECTION TO THE
FIRST INTERIM APPLICATION FOR COMPENSATION TO
GILBERT HARRELL SUMERFORD & MARTIN, P.C.,
AS SPECIAL COUNSEL TO THE DEBTORS-IN-POSSESSION
FOR THE PERIOD FEBRUARY 18, 2026 THROUGH MAY 31, 2026**

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "Trust"), and as former 50% shareholder of Smart Communications Holding, Inc. ("Smart Comm"), by and through undersigned counsel, hereby files this limited Objection to the Debtors' First Interim Application for Compensation to Gilbert Harrell Sumerford & Martin, P.C. (the "Application") [ECF No. 270] and in support states as follows:

1.     The Trust objects to the Application because GHSM appears to represent only a non-debtor entity.  Thus, the Debtors have failed to demonstrate how GHSM's services have benefited their estate or why their non-debtor affiliate should not otherwise pay for its own legal expenses.

2.     According to a Petition for Review to Superior Court that GHSM filed on May 26, 2026, GHSM represents only a non-debtor entity named Smart Communications Holding Georgia, LLC.  Ex. A.

3.      According to the Georgia Secretary of State's website, this entity is a Delaware limited liability company.   Ex. B.   Neither of the Debtors are Delaware entities.

4.      To extent that the Debtors argue that GHSM's representation of a non-debtor benefits the estate, they should produce unredacted documents in support of the same.

**WHEREFORE**, the Trust respectfully requests that this Court sustain this objection and grant further relief as it deems just and proper.

DATED:  July 6, 2026.

/s/ Edward J. Peterson
Edward J. Peterson
Florida Bar No. 0014612
BERGER SINGERMAN LLP
101 E. Kennedy Boulevard, Suite 1165
Tampa, FL 33602
813.498.3400
epeterson@bergersingerman.com
*Attorneys for Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Objection* was served on July 6, 2026, by the Court's CM/ECF system upon all parties registered to receive electronic noticing as noted below:

John A Anthony on behalf of Creditor Melvin Engelke
janthony@anthonyandpartners.com,
efilings@anthonyandpartners.com;cfosdick@anthonyandpartners.com;eleith@anthonyandpartners.com

Brad F. Barrios on behalf of Debtor Smart Communications Holding, Inc.
bbarrios@tcb-law.com

Paul J Battista on behalf of Debtor Smart Communications Holding, Inc.
pjbattista@venable.com,
cascavone@venable.com;IMalcolm@venable.com;jnunez@venable.com;hburke@venable.com

Eyal Berger on behalf of Debtor Smart Communications Holding, Inc.
eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com

Teresa Marie Dorr on behalf of U.S. Trustee United States Trustee - TPA
teresa.dorr@usdoj.gov,
brandy.gasaway@usdoj.gov;Dionne.Rumper@usdoj.gov;Juanita.Diaz@usdoj.gov

Michael J. Harwin on behalf of Debtor Smart Communications Holding, Inc.
mharwin@stearnsweaver.com

Eric D Jacobs on behalf of Debtor Smart Communications Holding, Inc.
edjacobs@venable.com,
btraina@venable.com;bmtraina@venable.com;bmtraina@ecf.courtdrive.com;ipmalcolm@venable.com;tmpetrie@venable.com;imalcolm@ecf.courtdrive.com;brhand@venable.com

Anne Krache on behalf of Creditor Janice Logan
akrache@shb.com, anne-krache-9629@ecf.pacerpro.com;rdevaney@shb.com

John W Landkammer on behalf of Creditor Melvin Engelke
jlandkammer@anthonyandpartners.com,
efilings@anthonyandpartners.com,crodriguez@anthonyandpartners.com

Marc L. Levine on behalf of Creditor Janice Logan
mlevine@bergersingerman.com

Anthony P. Marzocca on behalf of Creditor Florida Custom Mold, Inc.
amarzocca@trenam.com,
amarzocca@ecf.courtdrive.com;cminott@trenam.com;amatos@ecf.courtdrive.com;mmosbach@trenam.com;mmosbach@ecf.courtdrive.com;cminott@ecf.courtdrive.com

Megan Wilson Murray on behalf of Creditor Swank Motion Pictures, Inc.
mmurray@underwoodmurray.com,
dstrand@underwoodmurray.com;mmurray@ecf.courtdrive.com;euzonwanne@underwoodmurray.com;vburbano@underwoodmurray.com;jpatterson@underwoodmurray.com

Peter Francis O'Neill on behalf of Creditor Janice Logan
pfoneill@shb.com

Todd Ruskamp on behalf of Creditor Janice Logan
truskamp@shb.com, tpistora@shb.com;todd-ruskamp-9657@ecf.pacerpro.com

R Scott Shuker on behalf of Interested Party Jon Logan
rshuker@shukerdorris.com,
mfranklin@shukerdorris.com;lstricker@shukerdorris.com;mdorris@shukerdorris.com;atillman@shukerdorris.com;wtownsend@shukerdorris.com

3

United States Trustee - TPA
USTPRegion21.TP.ECF@USDOJ.GOV

Kimberly A Walsh on behalf of Creditor Texas Comptroller of Public Accounts, Revenue Accounting Division
bk-kwalsh@oag.texas.gov, sherri.Simpson@oag.texas.gov


                */s/ Edward J. Peterson*
                Edward J. Peterson

EXHIBIT A

Fulton County Superior Court
***EFILED***LW
Date: 5/26/2026 2:01 PM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **SMART COMMUNICATIONS HOLDING GEORGIA, LLC,** ) <br><br> **Petitioner,** ) <br><br> **v.** ) <br><br> **GEORGIA DEPARTMENT OF ADMINISTRATIVE SERVICES, GEORGIA DEPARTMENT OF CORRECTIONS,** ) <br><br> **Respondents.** ) | **Civil Action No:** _26CV007556_ |

**PETITION FOR REVIEW TO SUPERIOR COURT**

Pursuant to O.C.G.A. § 5-3-1 *et seq.*, SMART COMMUNICATIONS HOLDING

GEORGIA, LLC ("SmartComm") petitions the Superior Court of Fulton County for

review of the final order rendered by the Georgia Department of Administrative

Services ("DOAS") on May 20, 2026 in DOAS Protest No. 2026-PRO-00029 (the "Final

Amended Protest Decision"). The Final Amended Protest Decision, attached as Exhibit

8, denies SmartComm's protest of the qualification restrictions contained in RFP 46700-

GDC-0001179 for Offender Communication Services (the "RFP"). SmartComm's protest

showed by clear and convincing evidence that the qualification restrictions in the RFP,

which allow only the two large, legacy providers in the industry to submit bids, are

unduly restrictive, anti-competitive, not reasonably related to successful contract

performance, and contrary to the fiduciary duty requirement contained in the Georgia Procurement Manual.

**THE RECORD BELOW**

The record below consists of:

- SmartComm's Initial Protest filed on January 14, 2026, attached as Exhibit 1;

- DOAS Initial Protest Decision entered on February 16, 2026, attached as Exhibit 2;

- SmartComm's Request for Formal Review of Initial Protest Decision filed on February 19, 2026, attached as Exhibit 3; including:

  - Declaration from Jon Logan, attached as Exhibit 3-1, and an;

  - Expert Declaration from Dr. Nathan Miller, Professor at the McDonough School of Business and the Department of Economics at Georgetown and former Chief Economist of the U.S. Department of Justice Antitrust Division, attached as Exhibit 3-2.

  - SmartComm's Presentation to DOAS during the March 9, 2026 hearing, attached as Exhibit 3-3;

- DOAS Remand Order entered on April 9, 2026, attached as Exhibit 4;

- SmartComm's Amended Protest filed on April 17, 2026, attached as Exhibit 5;

- DOAS Amended Protest Decision entered on April 30, 2026, attached as Exhibit 6;

- SmartComm's Request for Formal Review of Amended Protest Decision filed on May 4, 2026, attached as Exhibit 7, including:

2

- Supplemental Declaration of Jon Logan, attached as Exhibit 7-1;

- Reincorporating Expert Declaration of Dr. Nathan Miller, attached as Exhibit 3-2;

- SmartComm's Second Presentation to DOAS during the May 18, 2026 hearing, attached as Exhibit 7-2;

- DOAS Final Decision on Amended Protest entered on May 20, 2026, attached as Exhibit 8.

## PARTIES, JURISDICTION, AND VENUE

1. SmartComm is a nationally established correctional technology provider delivering secure inmate communications, messaging, mail processing, and digital engagement. It serves over 180,000 inmates in more than 200 facilities, ranging from small jails to large prison systems ranging in population from 200 inmates to over 40,000 inmates. SmartComm's solutions provide agencies with more features, more security, and more intelligence than any other phone, tablet, or kiosk platform offered in corrections. It has frequently replaced and upgraded agency solutions from legacy providers such as the ones that qualify for the RFP. SmartComm has repeatedly shown not only that it can compete with incumbent providers, but it can offer better solutions and technology for agencies. SmartComm filed an Initial Protest, Amended Protest, and Requests for Formal Review of both of those protests in the proceedings below.

2. Respondent Georgia Department of Administrative Services ("DOAS") is the state agency responsible for providing business services and solutions to Georgia's state and local government entities, O.C.G.A. § 50-5-1. DOAS is a proper respondent

3

in this action pursuant to O.C.G.A. § 5-3-7(c). DOAS maintains its principal office at 200 Piedmont Avenue SE, West Tower, Suite 1804, Atlanta, Fulton County, Georgia 30334. Under O.C.G.A. § 50-21-35, DOAS may be personally served with process at its principal office address to designee Gwen Middleton, Executive Business Operations Manager of DOAS.

3.      Respondent Georgia Department of Corrections ("GDC") administers Georgia's corrections institutions and rehabilitative programs conducted therein. O.C.G.A. § 42-2-5. GDC is a proper respondent to this action pursuant to O.C.G.A. § 5-3-7(c). GDC maintains its principal address at 300 Patrol Road, Forsyth, Monroe County, Georgia 31029. Under O.C.G.A. § 50-21-35, GDC may be served at its principal office address to designees Bryan Wilson, Interim General Counsel; Charles Hodges, Assistant General Counsel; Timothy Duff, Assistant General Counsel; Vicki Judd, Assistant General Counsel; McCall Trammell, Assistant General Counsel; Valerie Gordon, Assistant General Counsel; Jodi Peyton, Paralegal; Elaine Whisnant, Paralegal; Mary Drew, Paralegal; Alicia Mandin, Legal Analysis Specialist; or Connie Moncrief, Legal Secretary.

4.      This Court has subject matter jurisdiction pursuant to O.C.G.A. § 5-3-4(a).

5.      Venue is proper in this Court because DOAS's principal office is in Fulton County. Ga. Const. Art. VI, § 2, Par. 3; O.C.G.A. 9-10-30.

## PROCEDURAL HISTORY

6.      On December 5, 2025, GDC issued the RFP seeking to establish a contract with one or more qualified suppliers who will provide offender communications

services, including telephone, video visitation, and tablets, to Georgia's inmate population.

7. On January 14, 2026, SmartComm filed a timely protest challenging the competitive solicitation process in accordance with the Georgia Procurement Manual ("GPM").

8. On February 16, 2026, DOAS denied the protest.

9. On February 19, 2026, Petitioner submitted a Request for Formal Review of the protest, including a hearing, to DOAS.

10. A hearing was conducted on March 9, 2026.

11. On April 8, 2026, GDC amended the RFP, assumedly in response to the issues raised in SmartComm's protest (hereafter, "Amended RFP"). But the Amended RFP did not actually allow for any increased competition. It merely served to shore up the qualifications of the two legacy providers as the only vendors who would be able to respond to the RFP, including the incumbent provider to GDC who failed to fully implement the required services in accordance with the prior RFP it was awarded.

12. On April 9, 2026, due to the Amended RFP, DOAS remanded SmartComm's Initial Protest to the DOAS Deputy Commissioner, expressly stating that SmartComm could file an amended protest if desired.

13. On April 17, 2026, SmartComm submitted an amended protest to the Amended RFP pointing out that the Amended RFP still unnecessarily and unreasonably restricts competition and violates the fiduciary duty requirement.

14.     The Amended Protest was denied by the Deputy Commissioner of DOAS on April 30, 2026.

15.     SmartComm submitted a Request for Formal Review of the Amended Protest Denial on May 4, 2026, and a virtual hearing took place on May 18, 2026.

16.     On May 20, 2026, DOAS issued a final decision denying SmartComm's Amended Protest.

**THE RFP RESTRICTIONS**

17.     On April 8, 2026, in response to SmartComm's protest pointing out just how restrictive the initial requirements of the RFP were, the minimum requirements were amended. Initially, the RFP required that to be eligible in Category A of the RFP, the supplier had to have:

> a minimum of five years of current experience in providing all of the required Offender Communication Services to another individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Custom Enforcement) with a minimum [average daily population] of 35,000 offenders.

On April 8, 2024, DOAS issued Addendum 4 to the RFP, which, among other things, changed the minimum requirements for eligibility to Category A to:

> For Tablets, the Supplier must have a minimum of two (2) years of continuous experience within the past ten (10) years providing an offender Tablets solution under a single contract which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of

30,000 offenders. The Supplier must have served as the prime contractor responsible for the provision of these services.

For all other Offender Communications Services, the Supplier must have a minimum of five (5) years of continuous experience within the past ten (10) years providing each of the required Offender Communications Services (with the exception of Tablets) which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders. Experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 30,000 offenders, and contract durations may not be aggregated across multiple contracts or agencies. The Supplier must have served as the prime contractor responsible for the provision of these services.

These Amended Requirements essentially do two things: 1) they lower the average daily population ("ADP") requirement for qualifying contracting vehicles from 35,000 to 30,000, and 2) they allow a vendor to meet the minimum requirements by providing the required services through different state contracts where the previous requirements required a bidder to provide all required services to a single state in a comprehensive contract.

18.     The Amended Requirements do not actually increase competition. Rather, they seem to be designed to respond to the evidence that SmartComm submitted showing that (even though this certainly could not have been the intention) the Initial Requirements were so onerous that no bidders might actually qualify. The Amended Requirements still fail "to foster broad-based competition in the marketplace" and "maximize to the fullest extent possible the purchasing value of public funds" as

7

required by the GPM. GPM, § I.1.1. And the solicitation still unreasonably or unnecessarily restricts competition in violation of GPM § 3.5.4.

19.     Rather than conduct an actual market analysis, GDC uses historical market position based on whether a vendor has held a contract with one of eleven states or two federal agencies as a proxy for operational capability. This is arbitrary and ignores GDC's actual, historical experience (where one of the qualifying vendors failed to successfully implement the inmate communications system from GDC's prior RFP, even though they meet GDC's arbitrary capability measures). GDC fails to specify its needs "in a manner to achieve full and open competition." GPM § 6.5.4.

20.     Procurement professionals in Georgia have a "fiduciary duty" to deliver the best value to Georgia citizens. GPM, § I.4.4.3. As pointed out in Professor Nathan Miller's declaration, "the benefit of soliciting additional bids…is that it induces suppliers to offer more favorable contract terms in response to competitive pressure." Miller Declaration, Ex. 3-2, ¶17. Professor Miller's research on the exact type of solicitation at issue here shows that the same companies submit different proposals when the level of competition increases. In fact, Professor Miller's research conservatively estimates that the revenue to the state would increase $6.7 million annually ($46.9 million over the potential life of the contract) in a five bidder RFP as compared to a two bidder RFP.

21.     A fiduciary duty is the highest standard of care. Structuring a procurement in a way that leaves an estimated $46.9 million on the table during the life of a contract is arbitrary and irrational. It does not come close to meeting the standard

of care required of Georgia's procurement professionals. The Amended Protest Decision finding otherwise is clearly erroneous and an abuse of discretion. It is not sustained by sufficient evidence.

22. SmartComm has exhausted its administrative remedies prior to filing the instant action.

### SUPERSEDEAS AND REQUEST FOR INJUNCTION

23. In accordance with O.C.G.A. § 5-3-17, the filing of this Petition shall act as supersedeas and shall suspend DOAS's Amended Protest Decision for the duration of this proceeding.

24. The GPM makes clear that "the solicitation will not close until a final decision resolving the protest has been issued." GPM § 6.5.8. And since DOAS's Amended Protest Decision is suspended with the filing of this Petition, no final decision has yet been issued. In other proceedings under this section, DOAS has agreed that the closing of a solicitation is stayed during the pendency of this proceeding.

25. The solicitation is currently scheduled to close at 2:00 p.m. on May 22, 2026. This Petition should stay that closing time as a matter of law. If DOAS does not agree to suspend the closing of the solicitation, SmartComm requests that his Court issue an injunction suspending the closing of the solicitation while this Petition is under consideration. Otherwise, SmartComm will be irreparably harmed and the right to appeal decisions of lower judicatories would be illusory.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner prays that this Court reverse the Amended Protest

Decision, or, alternatively, issue a remand to DOAS with further instruction. Further

SmartComm requests that this Court enjoin the closing of the solicitation while during

the pendency of this review.

RESPECTFULLY SUBMITTED this 22nd day of May, 2026.

*/s/ C. Ryan Germany*
C. Ryan Germany
Georgia Bar No. 500691
GILBERT HARRELL SUMERFORD & MARTIN, P.C.
675 Ponce de Leon Ave. NE, Suite 8500
Atlanta, Georgia 30308
Phone (678) 672-9230
*rgermany@ghsmlaw.com*

*/s/ Amber M. Carter*
Amber M. Carter
Georgia Bar No. 631649
GILBERT HARRELL SUMERFORD & MARTIN, P.C.
Post Office Box 190
Brunswick, Georgia 31521-0190
Phone: (912) 265-6700
Fax: (912) 264-0244
*acarter@ghsmlaw.com*

***Attorneys for Petitioner Smart Communications
Holding Georgia, LLC***

# Exhibit 1

*Jon Logan*
*CEO & President*
*Smart Communications*
*10491 72nd St.*
*Seminole, FL  33777*
*jon.logan@smartcommunications.us*

January 14, 2026

**VIA ELECTRONIC MAIL TO PROTESTS@DOAS.GA.GOV**
**COPY VIA US MAIL WITH TRACKING**

Ms. Carrie Steele
Mr. Jim Barnaby
Deputy Commissioners
Department of Administrative Services
State Purchasing Division
200 Piedmont Ave SE, Suite 1804 West Tower
Atlanta, GA 30335-9010
Email: protests@doas.ga.gov

Copy to:
Mr. Ross Barrineau
Georgia Department of Corrections
Purchasing Director
Email: ross.barrineau@gdc.ga.gov

*Re: Smart Communications' Protest of Unduly Restrictive and Anticompetitive Requirements for Georgia Department of Corrections Electronic Request for Proposal Event #GDC0001179 for Offender Communications Services, Category A*

Dear Ms. Steele and Mr. Barnaby:

Pursuant to the Georgia Procurement Manual ("GPM") §6.5, et seq., Smart Communications hereby submits this Protest regarding the Georgia Department of Corrections' Electronic Request for Proposal Event # GDC0001179 for Offender Communications Services (the "RFP"), specifically the Category A portion.

Per GPM § 6.5.1, Types of Challenges, this pre-award protest is a Challenge to the Solicitation.[1] Specifically, Smart Communications challenges the following eligibility requirements contained in the Attachment H-Mandatory Response Worksheet for Category A:

| | |
|---|---|
| M2A | For Category A, Contractor must operate as an Offender Communications Services provider and must have a minimum of five (5) years of current experience in providing all of the required Offender Communications Services to another individual single state's Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders.  Please confirm this statement is applicable to your company. |

| | |
|---|---|
| M4A | For Category A, Contractor must have successfully completed an implementation project to install, provide, and maintain the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation stations and offender tablets with an individual single state's Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders within the past five (5) years.  Please confirm this statement is applicable to your company. |

For the reasons set forth below, these requirements are unduly restrictive, anti-competitive, not reasonably related to successful contract performance, and inconsistent with the Georgia Procurement Manual's requirements for open and fair competition.

**1. Timeliness and Jurisdiction**

This protest is timely and submitted in accordance with GPM §6.5.7, Filing Deadlines, because it is being filed well before the closing date and time receipt of proposals. *See also,* GPM Table 6.8, Protest Filing Deadlines.  Smart Communications is an interested and affected supplier that possesses the technical capability, financial resources, and operational experience to perform the services contemplated by the RFP, but is excluded from participation solely due to the challenged specification.

**2. Violation of GPM §1.3 — Open and Fair Competition**

The Georgia Procurement Manual requires that solicitations be structured to promote open and fair competition and prohibits specifications that unnecessarily restrict competition when such restrictions are not required to meet legitimate agency needs. *See* GPM §1.3.2.

The requirement that qualifying experience be demonstrated **only through a single DOC or federal agency contract with a minimum ADP of 35,000 offenders for a minimum of 5**

---

[1] GPM § 6.5.1 provides in part, "*Challenge to the Solicitation*: Any interested supplier capable of responding to a competitive solicitation may file a protest with respect to the competitive solicitation process, including but not limited to a challenge to specifications or any events or facts arising during the solicitation process."

**years** is unsupported by any articulated operational, technical, empirical or security rationale. The solicitation does not explain why:

∞Experience deployed across multiple large correctional agencies is insufficient;

∞Five-year performance time period requirement is justified by any known or validated empirical key performance indicators;

∞System performance, scalability, cybersecurity, or service reliability are uniquely demonstrated by a single-agency contract of this size; or

∞Equivalent or superior experience cannot be evaluated through objective performance criteria.

Absent such justification, the requirement operates as a structural barrier to competition, rather than a performance-based qualification, in direct conflict with GPM §1.3.

**3. Inconsistency with GPM §3.5.4 — Supplier Qualification Standards and Non-Restrictive Specifications**

Under GPM §3.5.4, supplier qualification criteria must be reasonable, relevant, and directly connected to successful performance of the contract.

The challenged requirement fails this standard because:

∞A single-agency ADP threshold is not a validated proxy for technical capability, operational resilience, or service quality;

∞Comparable or greater operational complexity is routinely demonstrated through **multi-agency statewide deployments, regional jail systems, or large county correctional systems**; and

∞The requirement is structured such that **only one or two incumbent vendors nationwide** can reasonably qualify.

Accordingly, the requirement is not reasonably tailored to assess supplier capability and does not advance the stated objectives of the RFP.

The GPM further requires that RFP specifications be clear, objective, necessary, and "**do not unreasonably or unnecessarily restrict competition**," so that maximum practicable competition is promoted, not impeded.  *See* GPM §3.5.4.

The current eligibility requirement violates these provisions by:

∞Imposing a **numerical ADP threshold (35,000)** without demonstrating necessity;

∞Requiring experience under a **single contractual structure**, rather than permitting equivalent demonstrations of scale and performance; and

∞Artificially narrowing the competitive field, contrary to the purposes of competitive procurement.

Georgia procurement policy does not permit specifications that reduce competition absent a documented, performance-based justification.

## 4. Anti-Competitive Effect and Inconsistency with the Georgia Procurement Manual

Consistent with the stated objectives of the RFP, sound public policy, and the express purposes and policies set forth in the Georgia Procurement Manual, the Georgia Department of Corrections should revise the challenged eligibility specifications by relaxing the overly rigid experience requirements to ensure that qualified, competitive suppliers with modern, secure, and innovative offender communication technologies are permitted to participate in the procurement process. While the Department's interest in ensuring that its selected vendor is well-versed in large, similar projects in order to deliver streamlined, cost-effective, and technologically advanced services is reasonable, such capability is not exclusively demonstrated by the narrowly defined experience criteria currently imposed.

Suppliers may demonstrate their ability to successfully perform the scope of this contract through a variety of objectively verifiable means, including comparable deployments across multiple correctional agencies, system-wide implementations serving substantial inmate populations, demonstrated system reliability, cybersecurity posture, service-level performance, and agency references. The Department retains ample authority under the GPM to evaluate the quality, relevance, and sufficiency of a supplier's experience through reference checks, technical scoring, and, where appropriate, the imposition of reasonable contractual performance requirements. These tools provide a lawful and effective means of mitigating performance risk without unnecessarily excluding otherwise qualified suppliers from competition.

By contrast, the current requirement—mandating a single-agency deployment at an extraordinarily high ADP threshold—unfairly reduces competition by erecting artificial and unjustified barriers to entry. Rather than encouraging suppliers to compete on the merits of technology, pricing, service quality, and innovation, the requirement functions to foreclose competition altogether. This result is directly contrary to the Georgia Procurement Manual's mandate that procurements promote open and fair competition, avoid unnecessary restrictions, and ensure that specifications are no more restrictive than necessary to meet legitimate agency needs.

It is particularly concerning that, instead of fostering competition and allowing the State to benefit from improved offerings and competitive pricing, the challenged specification operates to insulate incumbent market participants from meaningful competition. The Georgia Procurement Manual expressly prohibits criteria that are arbitrary or capricious or that provide an unfair competitive advantage. As written, the experience requirement is anti-competitive, inconsistent with the GPM, and contrary to the State's interests, and therefore should be revised.

## 5. Competitive Prejudice of Challenged Requirements

Smart Communications is a highly qualified offeror that would have a substantial chance of receiving an award of the RFP (Category A), but for the Department's unduly restrictive, anti-competitive, and not reasonably related to successful contract performance requirements.

Accordingly, the Department's actions in setting these overly restrictive and anti-competitive requirements have competitively and materially prejudiced Smart Communication and the outcome of this procurement.

## 6. Requested Corrective Action

Pursuant to GPM §6.5.9, Protest Resolution, Smart Communications respectfully requests that the Georgia Department of Corrections, in coordination with DOAS:

A. Amend the eligibility requirement to permit qualification through objective, performance-based alternatives, such as:

"Supplier must demonstrate successful deployment and operation of offender communication services (telephony, video visitation, and tablets) for correctional agencies totaling **at least 3,000 average daily population (ADP)** within the past **two (2) years**."

B. Issue an Addendum reopening the question-and-response period and extend the proposal deadlines as necessary to preserve competitive fairness.

## 7. Conclusion

In conclusion, Smart Communications submits this protest to ensure that the procurement proceeds in accordance with Georgia law, the Georgia Procurement Manual, and fundamental principles of competitive fairness, which further the state's bests interests. The challenged requirement is not necessary to protect the State's interests and materially impairs the State's ability to obtain best value through meaningful competition.

We respectfully request written confirmation of receipt of this Formal Protest and notice of corrective action as required under GPM §6.5, et seq.

Sincerely,

Jon Logan
CEO & President
Smart Communications
10491 72nd St
Seminole, FL 33777

# Exhibit 2



**Brian P. Kemp**
Governor

**Rebecca N. Sullivan**
Commissioner

February 16, 2026

<u>VIA E-MAIL</u>

Mr. David Gann, General Counsel
Smart Communications
10491 72nd St
Seminole, FL 33777
david.gann@smartcommunications.us

**Protest # 2026-PRO-00029**
**RE:  Protest Regarding RFP 46700-GDC0001179 "Offender Communications Services"**

Dear Mr. Gann:

This letter is in response to Smart Communications' pre-award protest of the above-referenced solicitation. For the reasons in this letter, the protest is denied.

On December 5, 2025, the Georgia Department of Corrections issued RFP 46700-GDC0001179 entitled "Offender Communications Services" ("eRFP") seeking to establish a contract with one or more qualified suppliers who will provide Offender Communications Services to the Georgia Department of Corrections ("GDC") as described in the eRFP. The services to be provided pursuant to the eRFP are divided into two (2) categories, Category A and Category B.  Suppliers are required to respond to at least one (1) category, and each category may be awarded to different suppliers. The solicitation will close on February 20, 2026.

Suppliers responding to Category A must be able to provide Offender Communications Services in all GDC facilities that are male only facilities as identified in eRFP Attachment C entitled "GDC Facility Specifications."  To be eligible for award of this category, the supplier must have demonstrable experience in installing, providing, and maintaining the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation stations, and offender tablets with an individual single state's Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum average daily population ("ADP") of 35,000 offenders within the past 5 years.

Suppliers responding to Category B must be able to provide Offender Communications Services in all GDC facilities that are female only facilities as identified in Attachment C.  To be eligible for award of the female offender facilities category, the supplier must have demonstrable experience in installing, providing and maintaining the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation stations and offender Tablets with an individual single County, state's Department of Corrections, or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 3,250 offenders within the past 5 years.

Mr. David Gann
February 16, 2026
Page 2 of 4

As described in the eRFP, obtaining new updated technology and equipment is paramount to securing GDC Facilities and ensuring public safety. The offender communications services provided by the selected supplier(s) shall provide all needed functional, security/investigative, and reporting capabilities that will enhance GDC's accomplishment of its mission by 1) ensuring public safety, 2) creating opportunities through additional communication streams to offenders in order to restore and maintain relationships within their families, 3) promoting self-improvement and reduce recidivism through educational offerings, 4) ensuring safe and secure facilities 5) creating efficiencies for GDC staff and reducing manual processes and 6) facilitating and supporting law enforcement.

On January 14, 2026, Smart Communications filed a timely protest challenging the competitive solicitation process and alleging that the requirements for Category A are unduly restrictive, anti-competitive, not reasonably related to successful contract performance, and inconsistent with the Georgia Procurement Manual's ("GMP") requirements for open and fair competition. Specifically, Smart Communications claims the requirement that qualifying experience be demonstrated through a single Department of Corrections or federal agency contract with a minimum ADP of 35,000 offenders for a minimum of 5 years is not supported by any articulated operational, technical, empirical, or security rationale. Smart Communication also claims that the single-agency ADP threshold is not reasonably tailored to assess supplier capability, does not advance the stated objectives of the eRFP, unreasonably or unnecessarily restricts competition, and operates to insulate incumbent market participants from meaningful competition.

Pursuant to GPM Section 3.5.4, solicitations must identify any relevant qualifications required to perform under the resulting contract, such as previous business experience or licensure requirements. A state entity maintains discretion to determine its needs and the best method to accommodate them, and the responsibility for drafting proper specifications that reflect the state's needs is the procuring entity's.[1] However, those needs must be specified in a manner designed to achieve full and open competition.[2] Where a requirement reflects a procuring entity's minimum needs, the fact that the protester will be unable to meet the requirement does not establish that the specifications unduly restrict competition.[3]

Upon review of the solicitation, it appears the Category A requirement to have demonstrable experience providing Offender Communications Services to a single state's Department of Corrections or federal agency with a minimum ADP of 35,000 offenders is directly related to the Scope of Services[4] and needs identified by GDC. Specifically, the supplier awarded Category A will be required to deploy and implement offender communications equipment and services across fifty-five (55) correctional facilities located throughout Georgia with a total ADP of over 45,000 offenders.[5] In essence, the equipment and services to be delivered under the resulting contract will serve a unified, large-scale enterprise environment with centralized governance and standardized security controls. The successful supplier(s) will be responsible for system availability, security, and compliance without reliance on segmented operational contexts. Despite Smart Communications' contentions, I find that GDC could reasonably determine that experience with separate-entity statewide deployments, regional jail systems, or large county correctional systems is not comparable in nature, scale, scope, or risk to that required to successfully support a single, integrated system spread across 55 facilities maintaining an ADP of over 45,000 offenders.

---

[1] GPM Section 6.5 Step 4.

[2] *Id*.

[3] *Id*.

[4] *See* eRFP Attachment B.

[5] *See* eRFP Attachment C.

Mr. David Gann
February 16, 2026
Page 3 of 4

Likewise, the five-year experience requirement appears reasonable in the context of the Contract Term contemplated in Section 1.7 of eRFP Attachment A, which provides for a total contract term of up to seven (7) years. I find that GCD could reasonably determine that a demonstrated performance window similar in scope to that contemplated in the solicitation is necessary to gauge a supplier's ability to manage technology refresh cycles, respond to security threats, and ensure high-consequence service continuity. Furthermore, it appears that this particular experience requirement reasonably reflects the need for a demonstrated history of successfully implementing and overseeing long-term large, complex projects from planning through completion. I find that five years strikes an appropriate balance between ensuring proven capability and maintaining fair competition, as it sets a meaningful standard without being unnecessarily restrictive.

Smart Communications suggests that suppliers may demonstrate their ability to successfully perform under the resulting contract through "objectively verifiable means," including comparable deployments across multiple, separate correctional entities, system-wide implementations serving "substantial"[6] inmate populations, demonstrated system reliability, cybersecurity posture, service-level performance, and agency references. However, Smart Communications fails to explain how deployments across multiple, separate correctional entities or implementations serving "substantial" inmate populations are more objective evaluation measures than those articulated by GDC. Notably, GDC's Mandatory Scored Questions do seek to evaluate a supplier's ability to perform on additional objective measures.  For example, Question 27 of Attachment I requires suppliers to provide detailed security plans and cybersecurity policies.

As noted above, suppliers have the ability to bid on Category A, Category B, or both.  The supplier awarded Category A will provide equipment and services for fifty-five (55) inter-connected facilities with an ADP of over 45,000 offenders while the supplier awarded Category B will provide equipment and services for eleven (11) inter-connected facilities with an ADP of over 4,000 offenders. By making each category available to a different supplier, it appears GDC has encouraged competition, rather than restricting competition, by reducing the experience qualifications required for Category B based on the scale, scope, and risk involved in providing the necessary equipment and services.

In the solicitation, GDC notes that obtaining new updated technology and equipment is paramount to securing GDC facilities and ensuring public safety and that the offender communications services provided by the selected supplier(s) will provide all needed functional, security/investigative, and reporting capabilities that will enhance GDC's accomplishment of its mission. The qualification thresholds for both Category A and Category B appear to be directly related to the nature, scale, scope, risk, and duration of the services to be provided under the resulting contract. Therefore, I find that such thresholds are not arbitrary and do not unduly or unnecessarily restrict competition.[7]

---

[6] Notably, Smart Communications does not define what would constitute a "substantial" inmate population but appears to suggest, in its "Requested Corrective Action," that a total ADP of 3,000 inmates would be substantial.  However, an ADP of 3,000 would be less than 10% of the total ADP for facilities falling within Category A. In this context, I find that a 3,000 ADP is not a "substantial" inmate population.

[7] Smart Communications requests that GDC amend the eligibility requirement for Category A to "[s]upplier must demonstrate successful deployment and operation of offender communication services (telephony, video visitation, and tablets) for correctional agencies totaling at least 3,000 average daily population (ADP) within the past two (2) years." However, Smart Communications presents no argument or evidence as to why such qualifications more accurately demonstrate a supplier's ability to successfully meet the performance requirements for Category A.  As Smart Communications' metrics bear no meaningful relation to the unified nature of the system to be served, the ADP to be served, or the ability to successfully implement and oversee a long-term large, complex contract, I find no reason to substitute the requested qualifications for those articulated by GDC.

Mr. David Gann
February 16, 2026
Page 4 of 4

Accordingly, your protest is denied.

Sincerely,

Carrie Steele
Deputy Commissioner

cc: Ross Barrineau, ross.barrineau@gdc.ga.gov

# Exhibit 3

# GILBERT, HARRELL, SUMERFORD & MARTIN

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW

ESTABLISHED 1871

---

www.gilbertharrelllaw.com
DIRECT DIAL – (678) 672-9230
EMAIL: rgermany@ghsmlaw.com

February 19, 2026

VIA ELECTRONIC MAIL

Rebecca Sullivan
Commissioner
Georgia Department of Administrative Services
200 Piedmont Ave. SE
Suite 1804, Wet Tower
Atlanta, Georgia 30334
*protests@doas.ga.gov*

> **Re:    Smart Communications Request for Formal Review of Protest #2026-PRO-0029 (RFP 46700-GDC0001179—Offender Communication Services)**

Dear Commissioner Sullivan:

I represent Smart Communications ("SmartComm"). Pursuant to Georgia Procurement Manual Section 6.5.11, SmartComm requests a formal review of the February 16, 2026 denial (the "Initial Decision") of its protest to RFP 46700-GDC0001179 (Offender Communication Services) (the "RFP") and a hearing before the DOAS Commissioner. Because the State Purchasing Division Deputy Commissioner did not make a written determination that the closing of the solicitation without delay is necessary to protect the interests of the state in her Initial Decision, SmartComm requests that the RFP not close until a final decision on this protest has been reached.

The Initial Decision errs because it does not seem to grasp just how limiting the requirements in the RFP are given the market realities for inmate communications services, which are well known to be a competition-restricting duopoly, and how negative the consequences for the state will be to not engage in an actually competitive RFP, potentially even violating the fiduciary duty to the state in a revenue-sharing contract like this one. Once those realities are understood, it is clear that the existing requirements "unreasonably and unnecessarily restrict competition" in violation of the Georgia Procurement Manual. *See* GPM § 3.5.4.

The Initial Decision and the requirements in the RFP also misunderstand the technical and operational realities that actually exist in providing the requested services and equipment. While it is certainly understandable that the Georgia Department of Corrections ("DOC") wants to ensure that any supplier is able to provide, implement, and maintain the requested solution at the scope required by DOC, it still has to specify those needs "in a manner designed to achieve full and open competition." GPM § 6.5, Step 4. Here, the clear and convincing evidence will show that the RFP restrictions do not meet the standard required by the GPM.

## BACKGROUND

SmartComm is a nationally established correctional technology provider delivering secure inmate communications, messaging, mail processing, and digital engagement. It serves over 180,000 inmates in more than 200 facilities, ranging from small jails to large prison systems ranging in population from 200 inmates to over 40,000 inmates. SmartComm's solutions provide agencies with more features,

more security, and more intelligence than any other phone, tablet, or kiosk platform offered in corrections. Over the past three years, SmartComm has been the fastest growing company in the industry. It has and frequently replaced and upgraded agency solutions from incumbent providers such as Securus, which currently services DOC. SmartComm has repeatedly shown not only that it can compete with incumbent providers, but it can offer better solutions and technology for agencies.

On December 5, 2025, DOC issued the RFP for Offender Communication Services, seeking proposals to replace its existing inmate communication systems, including offender telephones, video visitation stations, and tablets and supporting financial systems. The RFP points out that the DOC currently provides those services through Securus/JPay, but that the contracted services were never fully provided "due to an unforeseen occurrence that caused a pause in the implementation of [video visitation stations] at more than half of the facilities as well as tablet deployment across the entire state. At current, only a small amount of JPay tablets still exist throughout the state which has caused a significant decrease in revenue." RFP, pg. 2.

According to DOC, "obtaining new updated technology and equipment is paramount to securing GDC facilities and ensuring public safety. The offender communications services provided… shall provide *all* needed functional, security/investigative and reporting capabilities that will enhance GDC's accomplishment of its mission." *Id.* (emphasis added). Despite the apparent issues

3

with the incumbent provider actually providing *all*[1] of the contracted equipment in a way that was operational pursuant to the prior RFP issued in 2020, the current RFP includes restrictions that only the incumbent Securus and the other member of the duopoly in this industry, ViaPath, could possibly meet.[2]

**THE RFP RESTRICTIONS**

Specifically, the RFP requires:

> To be eligible for award in Category A,[3] the supplier must have a minimum of five years of current experience in providing all of the required Offender Communication Services to another individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Custom Enforcement) with a minimum [average daily population] of 35,000 offenders.

Attachment H- Mandatory Response Worksheet for Category A. And:

> For Category A, Contractor must have successfully completed an implementation project to install, provide, and maintain the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation services, and offender tablets with an individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Custom Enforcement) with a minimum [average daily population] of 35,000 offenders.

---

[1] The 2020 RFP contained the exact same language that the selected supplier needed to provide *all* needed functional, security/investigative, and reporting capabilities that will enhance GDC's accomplishment of its mission.

[2] Although based on how the RFP restrictions are worded, it is not even clear that Securus and ViaPath would meet them.

[3] Category A is the 55 men's facilities operated by DOC, with a total average daily population of 37,860.

4

*Id.* (collectively referred to as "the RFP Restrictions"). As explained below, these requirements are so restrictive (even more so than the Initial Decision was likely aware) that they fail to meet the purposes of the GPM to "foster effective broad-based competition in the marketplace" and "maximize to the fullest extent possible the purchasing value of public funds." GPM § I.1.1. They further fail to meet the requirements of the GPM that "the procurement professional must ensure that identified qualification requirements do not unreasonably or unnecessarily restrict competition." GPM § 3.5.4. The Initial Decision points out that the state entity, DOC in this case, "maintains discretion to determine its needs and the best method to accommodate them." GPM § 6.5, Step 4. But, "those needs must be specified in a manner to achieve full and open competition." *Id.* In this case, they are clearly not.

## I.    The Severely Restrictive Nature of the RFP Restrictions

Upon information and belief, there are only six U.S. states that have an inmate average daily population ("ADP") over 35,000.[4] Those states are Texas, California, Florida, Georgia, Ohio, and Pennsylvania. And there are only two federal correctional agencies with ADP's over 35,000—the Bureau of Prisons and Immigrations and Customs Enforcement. So the entire universe of previous contracts that can qualify a supplier for this RFP consists of only eight entities. But some of those eight entities do not all combine all of their inmate communication services into one contract, which is required to meet the qualifications of the RFP.

---

[4] Prison Policy Initiative. *States of Incarceration: The Global Context 2024.* Appendix 1: State Data.
https://www.prisonpolicy.org/global/appendix_states_2024.html

Upon information and belief, neither the Bureau of Prisons, ICE, nor Pennsylvania combine all services into one contract. So that means that in order to qualify to bid for this RFP, a potential supplier had to hold one of maybe five contracts in the largest prison population states for the past five years. That ridiculously narrow requirement gets even more narrow when you consider that due to the problems alluded to in the RFP, Georgia's implementation may not be considered "successful" and thus would not itself qualify.

II. **The RFP Restrictions Are Not Good Proxies for DOC's Actual Minimum Needs**

In this instance, DOC's minimum need is to ensure that any selected supplier can perform at the capacity needed by DOC. Georgia has a large prison population, and DOC wants to ensure that any selected supplier can handle that large of a population across many different facilities. That is a valid consideration by DOC, but the proxies they have come up with to reflect that minimum need do not actually do that. Instead of focusing on ability to actually service a large population across multiple facilities, the RFP Restrictions benefit holders of large, legacy contracts. But, in contrast, the DOC seeks "new updated technology and equipment." Limiting responses to only the two largest legacy providers in a duopoly, which are well-known to succumb to increased prices, reduced innovation, and old technology, does not help DOC accomplish its goals. In fact, it directly hurts those goals. Because the RFP Restrictions do not reasonably relate to DOC's actual minimum needs, they unduly restrict competition in contravention of the GPM.

## THE WELL-KNOWN DUOPOLY IN
## INMATE COMMUNICATION SERVICES

The well-known duopoly in the market for inmate communication services makes it even more clear that the RFP Restrictions unreasonably and unnecessarily restrict competition. In a well-functioning market, even DOC's severely restrictive RFP requirements could have enough qualifiers to actually ensure sufficient competition for the state. But that is not the case in this industry. The market for inmate communication services is a duopoly, with Securus and ViaPath (formerly Global Tel*Link) accounting for about 80% of the market.[5] Of course, duopolies are well-known to lead to higher costs for consumers, less innovation, and poor service. As previously pointed out, the GPM "seeks to foster effective-based competition in the marketplace." GPM § I.1.1. DOAS should not countenance reinforcing a duopoly, especially when there is no actual need to do so in order to meet DOC's needs.

### III.   Reinforcing a Duopoly Will Lead to Worse Outcomes for DOC and Georgia taxpayers.

The duopoly in inmate communication services is so well-known that academic research has been conducted on the subject. That research has shown that procurements with increased competition lead to higher revenue shares for states.[6] Conversely, procurements with only two firms responding, as this one would be if it

---

[5] "The Prison Phone Industry Has Quietly Become Even More of a Duopoly." *Prison Legal News*. July 1, 2018. https://www.prisonlegalnews.org/news/2018/jul/1/prison-phone-industry-has-quietly-become-even-more-duopoly/

[6] Marra, Miller, and Sileo. *Phoning Home: The Procurement of Telecommunications for Incarcerated Individuals in the United States*. January 24, 2025. https://liberalarts.temple.edu/sites/liberalarts/files/documents/prisonphones.pdf

goes forward with the RFP restrictions, result in the lowest revenue-sharing for states. *Id.*, Figure 7. So, the RFP Restrictions are literally costing Georgia taxpayers money. Even if opening up the RFP to reasonable competition does not change the actual winner of the contract, the deal for the state will be worse if the solicitation proceeds with the RFP Restrictions. Procurement professionals are responsible for developing contracts at competitive prices to avoid waste and deliver the best value to the employer and Georgia citizens. GMP § I.4.4.3. If the Initial Decision is allowed to stand and the RFP Restrictions remain in place, this procurement will not meet that standard.

The RFP itself recognizes the importance of creating a competitive environment in a revenue sharing contract for the state such as this one. Section 5.2 of the RFP states:

> The State Entity's intent is to structure the Revenue Share Proposal format in order to facilitate comparison among all suppliers and foster competition to obtain the best market value.

RFP § 5.2. However, despite this recognition in the actual RFP, the RFP Restrictions mean that a competitive environment will almost certainly not exist in this RFP. Similar to what occurs in most duopolies, there have been allegations and even settlements that the two dominant providers illegally colluded to inflate prices in violation of federal antitrust law and RICO.[7]

---

[7] *See Albert v. Global Tel*Link and Securus*, United States District Court for the District of Maryland. Case 8:20-cv-01936. https://www.classaction.org/media/albert-et-al-v-global-tel-link-corp-et-al.pdf.

**REMEDY**

The Initial Decision disagreed with SmartComm's requested remedy of modifying the requirements of the RFP to demonstrate successful deployment of the requested services to correctional agencies totaling at least 3000 ADP during the past two years. SmartComm respectfully disagrees. However, there are other remedies that could address the violations of the RFP and ensure robust competition. For example, DOC could modify the RFP to, instead of focusing on size of single contracts, setting a minimum for inmates and facilities served. SmartComm recognizes that DOC should be able to require some showing of viability, but submits that a company like SmartComm that serves over 180,000 inmates at over 200 locations meets any standard that could be rationally related to DOC's actual minimum need.

Further, the RFP already contains a provision to protect the state from awarding a contract to a supplier that cannot perform. Section 2.1.5 of the RFP states:

> Prior to contract award, the State Entity must be assured that the selected supplier has all of the resources to successfully perform under the contract. This includes, but is not limited to, adequate number of personnel with required skills, availability of appropriate equipment in sufficient quantity to meet the on-going needs of the State Entity, financial resources sufficient to complete performance under the contract, and experience in similar endeavor… The State Entity has the option of requesting from the supplier any information deemed necessary to determine the supplier's responsibility.

9

RFP § 2.1.5. DOC could simply waive the RFP Restrictions and require whatever documentation it determines it needs to ensure a supplier's ability to successfully perform as part of any response.

## CONCLUSION

The RFP Restrictions violate Georgia procurement law, and they should be modified or waived to ensure competitive fairness and compliance with Georgia law. The clear and convincing evidence shows that the RFP Restrictions unduly restrict competition as they do not adequately portray DOC's actual minimum needs. SmartComm requests that DOAS reverse or modify the Initial Decision and stay the closing of the solicitation until after a final decision on this protest is reached. SmartComm requests a hearing in front of the DOAS Commissioner.

Sincerely,

C. Ryan Germany
Georgia Bar No. 500691
GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.
675 Ponce de Leon Ave NE
Suite 8500
Tel: (678) 672-9230
rgermany@ghsmlaw.com

10

CERTIFICATION PURSUANT TO GEORGIA PROCUREMENT MANUAL SECTION 6.5.6

_____

Jon Logan, CEO & President
Smart Communications
104941 72nd St.
Seminole, FL 33777

# Exhibit 3-1

**IN THE DEPARTMENT OF ADMINISTRATIVE SERVICES
STATE OF GEORGIA**

In re:

Smart Communications Protest to
RFP 46700-GDC0001179
Offender Communication Services

Protest No. 2026-PRO-00029

**DECLARATION OF JON LOGAN**

1.    My name is Jon Logan. I am the founder and CEO of Smart Communications ("SmartComm"). I have served as the leader of Smart Communications for over 16 years and have developed numerous innovative technologies and services during that time that have revolutionized the corrections industry.

**SMARTCOMM HAS THE TECHNICAL ABILITY AND RESOURCES TO IMPLEMENT THE SOLUTIONS IN BOTH CATEGORIES OF THE RFP**

2.    SmartComm is a nationally established correctional technology provider delivering secure inmate communications, messaging, mail processing, and digital engagement. It serves over 180,000 inmates in more than 200 facilities, ranging from small jails to large prison systems ranging in population from 200 inmates to over 40,000 inmates. The solutions offered by SmartComm provide agencies with more features, more security, and more intelligence than any other phone, tablet, or kiosk platform offered in corrections.

1

3.      Over the past three years, SmartComm has been the fastest growing company in the industry, and it has frequently replaced and upgraded agency solutions from incumbent providers.

4.      SmartComm has the technical ability and resources to provide the solution requested in both Category A and Category B of Georgia RFP 46700-GDC0001179 (Offender Communication Services) ("the RFP").

**THE RFP RESTRICTIONS**

5.      In order to qualify to submit a proposal to Category A of the RFP:

Contractor…must have a minimum of five (5) years of experience within the last 10 years in providing all of the required Offender Communications Services to another individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders.

*See* Question M2A, Mandatory Response Worksheet (Attachment H).

6.      "All of the required Offender Communication Services" are set forth in Attachment A of the RFP as including:

- Turn-key offender telephone system (OTS) which shall allow collect, debit and pre-paid collect calls;
- Turn-key video visitation system (VVS) which shall include automated scheduling software and completion of remote video visitation sessions;
- Correctional-grade mobile device/tablet solution ("Tablets") that shall allow offenders access to various applications including electronic messaging, education, instructional material, entertainment, media, offender requests, medical requests, grievances and commissary ordering;

2

- Electronic trust account deposit application that allows the general public to deposit funds into an offender's trust account while providing reporting, visibility and accessibility to GDC; and
- Debit release card program wherein offender trust account balances are transferred to debit release cards for released offenders.

*See* RFP, Attachment A, § 1.1. That same section goes on to state:

> To be eligible for award [in Category A], the supplier must have demonstrable experience in installing, providing and maintaining the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation stations, and offender Tablets with an individual single state's Department of Corrections or Federal correctional agency (i.e., Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offender within the past 5 years.

*Id.* In other words, a company must have provided—at a minimum—phone, video visitation, and tablets for a period of at least five years to a single state or federal agency for with a minimum ADP of 35,000 inmates.

**DUE TO THE RFP RESTRICTIONS, ZERO VENDORS MAY ACTUALLY QUALIFY TO SUBMIT A PROPOSAL**

7.    As CEO of SmartComm, I keep up with industry news, procurements, and competitors. Because our industry provides services to government agencies, the structure, timing, and providers are generally part of the public record. I am generally aware of the provider(s) different states use and whether the company provides all three services—phone, video visitation, and

3

tablets—or if the state uses a collection of different vendors to provide those services.

8.      According to publicly available data, there are only seven states, including Georgia, that have average daily populations of at least 35,000 inmates. Those states are Texas, California, Florida, Georgia, Ohio, Pennsylvania, and most recently, Arizona. The only federal agencies that have average daily populations of more than 35,000 inmates are the Bureau of Prisons ("BOP") and Immigration and Customs Enforcement ("ICE"). Even though there are almost 5,000 detention centers in the United States, the RFP limits the universe of possible qualification paths to potential vendors of only nine agencies. But some of those agencies do not structure their contracts in a way that would allow any vendor for those agencies to qualify for the Georgia RFP. And many of the ones that do structure their contract in the way that Georgia envisions (by having all required services provided by one vendor in a single, comprehensive offering), have not had any one vendor provide all of those services for the minimum of five years as currently required by the RFP.

**Four of the Nine Potential Qualification Paths Do Not Use a Single Vendor for All Inmate Communication Services, Meaning No Vendors Can Qualify Through Those Contracts**

9.      Not all of those seven states and two federal agencies combine all three aspects of inmate communications into one contract. Under the RFP

restrictions, providing only a portion of the required inmate communication services is not a path to qualification.

10.     For example, in Florida, inmate phone services are provided by ViaPath and tablet services are provided by JPay. *See* Florida Department of Corrections Contract with ViaPath (formerly Global Tel*Link) for Inmate Telephone Services, attached hereto as Exhibit 1, and Florida Department of Corrections Contract with JPay for Tablet and Kiosk Services, attached hereto as Exhibit 2. Therefore, no companies qualify based on their work in Florida.

11.     Similar situations exist in Pennsylvania and at the BOP and ICE. In Pennsylvania, Securus provides the inmate telephone system,[1] while ViaPath provides inmate tablets.[2] Therefore, no vendor qualifies based on their work in Pennsylvania.

12.     The federal BOP also has different vendors for the different buckets of inmate communication services. The BOP's electronic messaging system, called TRULINCS, is run by Advanced Technologies Group. Inmate phone systems at the BOP are operated by IC Solutions. The BOP is in the process of

---

[1] Pennsylvania Department of Corrections. https://www.pa.gov/services/cor/contact-an-inmate. Accessed March 4, 2026.

[2] Pennsylvania Department of Corrections. https://www.pa.gov/agencies/cor/find-or-contact-inmate/commissary-lists/tablets. Accessed March 4, 2026.

procuring a standalone tablet solution. So, there is no single vendor that has provided all three buckets of inmate communications to BOP.

13.     ICE is similarly situated. While Talton Communications is the prime contractor for ICE, ViaPath provides the payment portal for ICE, which is a necessary piece in providing "all required offender communication services" per the RFP. Therefore, no potential vendor qualifies based on their work for ICE.

14.     Out of nine possible qualification paths, four of them—Florida, Pennsylvania, BOP, and ICE— cannot satisfy the Georgia requirements for any vendor because they do not combine all three buckets of inmate communication services into one contract with one vendor.

**Another Four of the Five Remaining Possible Qualification Paths Do Not Have Any Vendor Who Has Provided All Required Services for Five Years.**

15.     Some states do utilize one vendor for all of their inmate communication services, but in order to qualify for the RFP, the single vendor in those states has to have provided all required services, successfully, for five of the last ten years. RFP, Mandatory Response Worksheet, Attachment H, Question M2A. But four of the five remaining qualification paths do not have a single vendor who has provided those services for five years.

16.     Securus provides telephone, video visitation, and tablets to Texas, but Securus's contract to provide tablets did not begin until August 2021 (and its tablets were not successfully installed as of that date, if ever). *See* Securus

6

Contract to Provide Tablet Services to Texas, attached hereto as Exhibit 3. Because August 2021 is only four and half years ago, Securus cannot meet the Georgia qualifications based on the date of their contract with Texas (successful or not).

17.    Similarly, Ohio transitioned all of its inmate communication services, including tablets, to ViaPath in June 2023, only two and half years ago. ViaPath cannot meet the Georgia requirements based on its work for Ohio.[3]

18.    Arizona transitioned all of its inmate communication services to a single provider, Securus, in September 2024.[4] Prior to that, phone services were provided by IC Solutions. September 2024 was only one and half years ago, so Securus cannot meet the Georgia requirements based on its work for Arizona.

19.    Georgia awarded a contract for all three inmate communication services to Securus on January 31, 2022, also less than five years ago. *See* Notice of Award, January 31, 2022, attached hereto at Exhibit 4.

---

[3] Ohio Department of Rehabilitation and Correction. "Ohio Transitions Communications Provider for the Incarcerated Population and their Loved Ones," June 30, 2023. https://drc.ohio.gov/home/news-and-events/all-news/ohio-transitions-communications-provider. Accessed March 4, 2026.

[4] Arizona Department of Corrections, Rehabilitation, and Reentry. "ACCDR Inmate Phone System Update," August 28, 2024. https://corrections.az.gov/news/adcrr-inmate-phone-system-update-093024. Accessed March 4, 2026.

As noted in Attachment A to the RFP, tablet deployment in Georgia was halted across the entire state in 2022 "due to an unforeseen occurrence." RFP, Attachment A, § 1.1. The RFP further notes that "only a small amount of JPay tablets still exist throughout the state." *Id.* The RFP requires that:

> Contractor must have **successfully completed an implementation project** to install, provide, and maintain the required Offender Communication Services to include, at a minimum, offender telephones, offender video visitation stations and offender tablets… within the past 10 years.

RFP, Attachment H, Mandatory Response Worksheet, Question M4A (emphasis added). Given the facts as set forth in the RFP, Securus's implementation of tablets in Georgia was not successful. As such, Securus cannot meet the requirements of the RFP through its work in Georgia, regardless of the contract date for that work.

20.    That leaves only California as a potential path to meet the requirements of the RFP. On February 21, 2025, following a court ruling that vacated its award to ViaPath, California awarded a contract to provide inmate communications services to Securus.[5] That transition is currently underway. However, it does appear that ViaPath provided all three buckets of inmate communication services to California prior to the ongoing transition to Securus.

---

[5] California Department of Corrections and Rehabilitation. "Tablets and Telephones." September 2025-February 2026. https://www.cdcr.ca.gov/family-resources/tablets/. Accessed March 4, 2026.

But California only rolled out statewide tablet implementation in May 2021, less than five years ago.[6] Given that timeline, even ViaPath does not meet the requirements of "providing all of the required Offender Communications Services" for a minimum of five years.

## THE BUREAU OF PRISONS TABLET INITIATIVE APPROACH

21.     On March 5, 2026, the Federal Bureau of Prisons ("BOP") released a revised RFP for their tablet implementation initiative. This initiative is to provide a correctional grade tablet and supporting infrastructure to all 153,104 federal inmates (more than three times the size of Georgia's inmate population).[7] *See* Statement of Objectives for: Inmate Tablet Initiative, attached hereto as Exhibit 5.

22.     While earlier versions of the BOP RFP included restrictive experience requirements to even qualify to submit a proposal, the current version scrapped that approach to instead focus on qualitative analysis of each offeror's relevant experience, giving preference in scoring to proposals "that

---

[6] California Department of Corrections and Rehabilitation. "Tablet Project Enhances Communication for Incarcerated." March 1, 2021. https://www.cdcr.ca.gov/insidecdcr/2021/03/01/tablet-project-enhances-communications-for-incarcerated-population/. Accessed March 6, 2026. ("It is expected that tablets will be distributed on a phased basis beginning in mid-May 2021.")

[7] Federal Bureau of Prisons Inmate Tablet Implementation Initiative. "Population Information." https://sam.gov/workspace/contract/opp/c086f72ffa7b40dda9ad969ad5c92da7/view. Accessed March 6, 2026.

demonstrate a proven approach to managing projects of comparable size and scope." *See* Federal Bureau of Prisons RFP 15BPCC26R00000001-0003, pg. 148 (Past Performance Evaluation), attached hereto as Exhibit 6. If Georgia took a similar approach to the BOP, they could increase the number of qualified offerors to their RFP to likely at least five responders while still being able to assess an offeror's ability to implement a project of the RFP's size and scope.

I, Jon Logan, declare under penalty of perjury that the foregoing statements were prepared with the assistance of counsel and the assistance of employees of Smart Communications, upon which I have relied, and are true and correct to the best of my knowledge, information, and belief.

_____

JON LOGAN

Sworn to and subscribed before me
this 6th day of March , 2026.

_____
Notary Public
My commission expires: 4/27/2026

NOREEN A. GUNNING
Notary Public
State of Florida
Comm# HH257915
Expires 4/27/2026

10

# Exhibit 3-2

**IN THE DEPARTMENT OF ADMINISTRATIVE SERVICES**

**STATE OF GEORGIA**

| | |
|---|---|
| In re: | |
| Smart Communications Protest to RFP 46700-GDC0001179 Offender Communication Services | Protest No. 2026-PRO-00029 |

**EXPERT DECLARATION OF NATHAN MILLER**

**March 6, 2026**

**I.    INTRODUCTION AND ASSIGNMENT**

**A.    Qualifications**

1.    My name is Nathan Miller.  I am a Professor at the McDonough School of Business and the Department of Economics at Georgetown University.  I am also a Founding Partner at Econic Partners, an international economics consulting firm.

2.    I previously served as Chief Economist of the U.S. Department of Justice Antitrust Division.  As Chief Economist, I oversaw the work of more than fifty economists, statisticians, and data scientists.  My portfolio covered nearly all matters in front of the Antitrust Division, including cases

1

regarding monopolization, conduct, and mergers across a number of industries.

3.    I have consulted and testified on issues of competition and antitrust in the context of mergers, including on behalf of competition authorities in the U.S. and Canada.  I served as the government expert in cases involving mergers, for example, in transportation and energy services industries.

4.    My research covers topics in industrial organization and antitrust economics, including oligopoly price-setting, procurement, competition with transportation costs, and strategic investment decisions. It has won numerous awards, including the Robert L. Lanzilotti Prize for Best Paper in Antitrust Economics (2015 and 2022) and Jerry S. Cohen Award for Best Antitrust Article on Merger Retrospectives (2022).  I teach graduate courses on industrial organization, microeconomics, econometrics, and strategy at Georgetown.

5.    Along with researchers at Temple University and Sciences Po (France), I recently co-authored a study of the procurement process for inmate communications services, using data from 37 solicitations across 25 states.[1]

---

[1] Marra, Marleen, Nathan Miller, and Gretchen Sileo (2025). "Phoning Home: The Procurement of Telecommunications Services for Incarcerated Individuals in the United States." Hereinafter, "MMS (2025)." It is also available as a working paper from the National Bureau of Economic Research; see https://www.nber.org/papers/w33292.

The Federal Communications Commission ("FCC") cited our study repeatedly in its 2024 and 2025 notices implementing reforms of the Martha Wright-Reed Just and Reasonable Communications Act of 2022, placing limits on the rates that correctional authorities can charge for inmate communications services.[2]

6. I am also a member of the Editorial Board at the *Review of Industrial Organization*, an associate editor at the *International Journal of Industrial Organization*, and a Research Associate at the National Bureau of Economic Research. I earned a Ph.D. in economics from the University of California, Berkeley, and a B.A. from the University of Virginia. My curriculum vitae is attached as Appendix A.

### B. Assignment

7. I have been asked by counsel for Smart Communications to assess the economic impact of certain provisions of the request for proposals issued by the Georgia Department of Corrections for offender communications

---

[2] *In the Matter of Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services,* Order on Reconsideration, FCC 24-75, WC Docket Nos. 12-375, 23-62, 39 FCC Rcd 7647 (2024). Hereinafter, "FCC (2024)." See also *Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act*, FCC 25-75, WC Docket Nos. 12-375, 23-62, (adopted Oct. 28, 2025, released Nov. 6, 2025). Hereinafter, "FCC (2025)."

3

services (hereinafter, "the RFP").[3]  The RFP seeks a provider of telephone services, a video visitation system, and a mobile tablet solution, along with associated payments system services.  Bidders who respond to the RFP must satisfy specific criteria to be considered.

8.   In particular, I have been requested to:

- Assess whether the specific criteria in the RFP will meaningfully reduce the competitiveness of the bidding process; and
- Apply findings from my study of the inmate communications services procurement process to estimate, to the extent possible, any potential impact that the reduction in competition might have on commissions paid to the DOC by the winning bidder.

9.   As I explain in more detail in the remainder of this declaration, I have preliminarily reached the following opinions:

- The RFP includes requirements that only a small number of providers may be able to satisfy, and relaxing those requirements could increase the number of qualified bidders from as few as 1 or 2 to as many as 5 or more.  My experience as an economist, including empirical research involving some of the products at issue, indicates there are likely to be significant benefits for the correctional authority when the number of bidders increases beyond a small number.

---

[3] Georgia Department of Corrections Electronic Request for Proposals, Offender Communications Services, Event No. GDC0001179.

4

- Applying the findings from the empirical model in my study to the RFP indicates that commissions paid to the correctional authority could increase by $2.3 million to $6.7 million per year, or from $9.2 million to $26.8 million over the course of a four-year contract. I view this range as conservative for reasons that I describe below.

10. The opinions offered in this declaration are based on my experience as an industrial organization economist, the relevant economics literature, and my knowledge of the supply and demand conditions for inmate communications services. Appendix B presents a list of the materials upon which I have relied in forming my opinions for this declaration. I reserve the right to update these opinions in response to additional relevant information.

## II.    BACKGROUND

11. In 2022, Congress passed the Martha Wright-Reed Act authorizing the FCC to enact regulations placing limits on the per-minute price of inmate phone calls, as well as limits on other ancillary fees and on the amount of revenue sharing that can occur between ICS providers and correctional authorities. FCC (2024) and FCC (2025) implemented these changes, which will begin to take effect on April 6, 2026.

12. The nature of ICS has also evolved over time. ICS now includes phone calls, video visitation, and the provision of tablets that inmates can use for

electronic messaging and consumption of other media.  Correctional authorities contracting with ICS providers generally seek to obtain all three categories of services, either in one comprehensive contract or with separate contracts for different sets of services.

13.   Two of the key components in bids for ICS services are the prices that the provider will charge inmates for particular services, such as the per-minute rate for phone calls, and payments from the provider to the correctional authority, which may include a share of the provider's revenue.   Thus, correctional authorities face a tradeoff when soliciting bids from providers: low prices can benefit inmates, but high prices can generate higher shared revenues (often referred to as commissions).  These commissions can help correctional authorities cover the costs they incur and can also be designated to fund inmate welfare programs.[4]

14.   A basic insight from industrial organization economics is that competition tends to yield lower prices and higher consumer surplus.[5]  This holds in

---

[4] See FCC (2024) ¶ 251.

[5] Carlton, Dennis & Jeffrey Perloff, *Modern Industrial Organization*, 4th edition, 2015 at p. 194. ("Consumers are better off (lower prices, higher consumer surplus) and firms are worse off (lower profits) as the number of firms increases.")  See also U.S. Department of Justice and the Federal Trade Commission (2023), *Merger Guidelines*, at p. 1. ("Competition is a process of rivalry that incentivizes businesses to offer lower prices, improve wages and working conditions, enhance quality and resiliency, innovate, and expand choice, among many other benefits.")

procurement settings, where more competition among prospective suppliers tends to generate more favorable contract terms for the procuring entity.[6]  In particular, a supplier that does not face competition may be able to win a contract without compromising on contract terms; however, as competition strengthens, the same supplier has an incentive to provide more favorable contract terms because doing so improves its chances of winning.  One way a procuring entity can increase competition is by designing a procurement process that admits a greater number of qualified suppliers; as the number of qualified suppliers increases, each may perceive a greater risk of losing, and adjust their proposals accordingly. In ICS specifically, more favorable contract terms could imply higher commissions for the correctional authority.

## III.   ANALYSIS

15.   The RFP issued by the Georgia DOC is consistent with the characteristics I have just described.  The RFP requires each bidder to submit a proposal to provide phone services (an offender telephone system, or "OTS"), a video

---

[6] Hendricks, Ken & Robert H. Porter (2007). "An Empirical Perspective on Auctions," in *Handbook of Industrial Organization*, edited by Mark Armstrong and Robert H. Porter, vol. 3, at p. 2082. ("In an independent private values environment, the standard logic of competitive markets prevails and more competition raises bids and increases revenues.")

visitation system ("VVS"), tablets that "allow offenders to access various applications including electronic messaging," and various payments system services.[7] Each bidder must propose prices for different categories of tablet services and propose a commission consisting of revenue sharing amounts (separately for OTS, VVS, electronic messaging on tablets, and media usage on tablets) as well as an "upfront financial incentive" and a monthly "cost recoupment payment," all of which must comply with the price caps and commissions restrictions in FCC (2024) and FCC (2025).[8]

16. This procurement setting is broadly similar to the procurement events I studied in MMS (2025). My co-authors and I collected data on 37 procurement events for inmate calling services between 2000 and 2019. We found that the average commission payment was $11.34 per inmate per month, constituting 67 percent of the provider's revenue. The average number of bids across all procurement events was 4.19. We used the data to estimate an empirical model that allowed us to study the effects of certain counterfactual policy experiments, such as capping rates, banning commissions, and varying the number of bidders.

---

[7] See Attachment A to the RFP §1.1 at p. 1 (Attachment_A_-
_State_Entity_eRFP_FINAL_v.3.pdf).

[8] See Section 1A of Attachment M to the RFP (Attachment_M_-
_Revenue_Share_Proposal_FINAL_v.2.xlsx).

17. Consistent with the economic incentives described above, the benefit of soliciting additional bids in the empirical model is that it induces suppliers to offer more favorable contract terms in response to competitive pressure. Conversely, a reduction in the number of bidders implies less favorable contract terms.

18. The empirical model in MMS (2025) predicts that increasing the number of bidders from 2 to 3 in a representative auction would increase the commission paid to the correctional authority from around $10 per inmate per month to approximately $22 per inmate per month.[9]  This is an increase of $12 per inmate per month.  Increasing the number of bidders further generates additional incremental commissions for the correctional authority, although at a diminishing rate.  For instance, our model predicts that increasing the number of bidders from 3 to 4 would increase the commission from $22 to $25 per inmate per month, and going from 4 to 5 bidders would increase the commission from $25 to approximately $26.50 per inmate per month.

---

[9] MMS (2025) Figure 7, at p. 34.  I refer to the Adjusted commission in the right panel of Figure 7, to account for the possibility that the third bidder may be less capable than the first and second bidders.

19. Like several of the events studied in MMS (2025), the RFP at issue here contains requirements pertaining to any potential bidder's technical capabilities and evidence of its expertise.  However, the RFP's mandatory requirements appear to be particularly restrictive in certain dimensions, notably with respect to question M2A.[10]  Question M2A requires the bidder to have experience providing all the relevant services to a prison system with an average daily population of 35,000 inmates for five years.[11]  Failing to satisfy any of the 27 mandatory requirements in the RFP means that a bid will be disqualified.[12]  At best, only one or two providers have experience providing the complete ICS suite of services to prison systems of that size.[13]  Moreover, the five-year restriction in the RFP could mean that only one bidder (ViaPath) is capable of qualifying.[14]

---

[10] See Attachment H to the RFP at row 8 (Attachment_H_-_Mandatory_response_Worksheet_FINAL.v2.xlsx) (hereinafter, RFP Attachment H").

[11] Declaration of Jon Logan, March 6, 2026, (hereinafter, "Logan Declaration") ¶¶ 5-6.

[12] See Attachment A to the RFP § 6.2.1 at p. 17 ("Responses to both 'Mandatory' and 'Mandatory Scored' Questions will be evaluated on a pass/fail basis. … A material deviation will be cause for rejection of the proposal.")  In addition, see RFP Attachment H, rows 7-35, noting also that row 3 states "**Any questions you answer with a 'NO' will fail the technical requirements and results in disqualification of the proposal."** (Emphasis in original.)

[13] Logan Declaration ¶ 9-20.

[14] Logan Declaration ¶ 20.

20. Relaxing or eliminating the requirements in Question M2A likely would attract more bidders and increase competition for the contract.[15]   As I have discussed, the economics literature indicates that increasing the number of bidders tends to produce more favorable terms for the procuring entity. MMS (2025) provides real-world empirical evidence in a setting that is closely related to the Georgia DOC's RFP.  While the results in MMS (2025) rely on older data focused on calling services, they are some of the best evidence available to understand the quantitative impact of relaxing participation requirements in the Georgia DOC's RFP.

21. For the purposes of the following quantitative exercise, I assume that relaxing or eliminating the requirements in Question M2A would increase the number of qualified bidders from 2 to 5.[16] This assumption is conservative because larger effects would be obtained if the requirements as currently written in the RFP would result in a single qualified bidder, rather than two bidders.[17] Furthermore, as I show below, most of the competitive

---

[15] Logan Declaration ¶ 22.

[16] Logan Declaration ¶ 22 (noting that "at least five" bidders would likely qualify if Georgia adopted the approach used by the Federal Bureau of Prisons).

[17] MMS (2025) does not present results for the monopoly outcome, but economic theory indicates an increase in the number of bidders from 1 to 2 likely would yield a larger increase than increasing from 2 to 3 bidders, because each additional bidder tends to have a smaller marginal impact on competition. See Figure 2 in Miller, Nathan H. and

benefits are preserved if revising the requirements only increases the number of qualified bidders from 2 to 4 or from 2 to 3.

22. Recall that Figure 7 in MMS (2025) shows that increasing the number of bidders from 2 to 5 is associated with an increase in commissions paid to the correctional authority from $10 to $26.50 per inmate per month. I can equivalently frame this effect in terms of the increased percentage of total revenue that the winning bidder shares with the correctional authority. Specifically, the model shows that increasing the number of bidders from 2 to 5 increases the correctional authority's commission from 30 percent to 79 percent of total (provider) revenue.[18]

23. Applying this result from MMS (2025) in the context of the Georgia RFP requires an estimate the total revenue that the winning bidder can expect to earn. To arrive at this estimate, I note that in evaluating proposals submitted by bidders, the RFP states that it will use certain estimates of

---

Joseph U. Podwol (2020). "Forward Contracts, Market Structure and the Welfare Effects of Mergers," *Journal of Industrial Economics*, 68: 364-407.

[18] The left panel of Figure 7 in MMS (2025) shows that the price of a 15-minute phone call remains constant at $2.50 as the number of bidders increases from 2 to 5. Using the demand curve from p. 16 of MMS (2025), the implied average number of phone calls and total revenue are also unchanged, at 13.45 calls per inmate per month and $33.61 per inmate per month, respectively. Therefore, increasing the number of bidders from 2 to 3 implies an increase in the proportion of revenue shared with the correctional authority from 30 percent ($10/$33.61) to 79 percent ($26.50/$33.61).

revenues for OTS, VVS, and tablet services.[19]  Altogether, these revenues amount to $13.7 million per year.  Applying the MMS (2025) result at this level of revenue, an increase from 2 to 5 bidders in the Georgia RFP would increase the revenue shared with the correctional authority by $6.7 million annually, or $26.8 million over the life of a four-year contract.[20]

24.   However, the regulations in FCC (2024) limit a provider's ability to share revenues from phone calls and video visits.  The portion of the Georgia RFP that applies only to tablets amounts to $4.7 million in annual revenue ($395,000 per month).  Applying the MMS (2025) result to tablets, an increase from 2 to 5 bidders would increase the revenue shared with the correctional authority by $2.3 million annually, or $9.2 million over the life

---

[19] See Attachments D and M to the RFP (Attachment_D_-_Historical_StatsandRatesFees__final.xlsx and Attachment_M_-_Revenue_Share_Proposal_FINAL_v.2.xlsx). Attachment M (cell A115 of the "Section 1A" tab) specifies that "for proposal scoring purposes" the revenue sharing proposals will be evaluated based on "post-FCC" calling statistics for OTS, current monthly statistics for VVS, and historical monthly revenues for tablets. Attachment D ("Calling Stats (Summary)" tab, cell V39) lists $732,792 in average monthly OTS revenues between January and July 2025.  Attachment D ("Current Media Stats (Summary)" tab, cell C31) lists $11,020 in average monthly VVS revenues.  For tablets, Attachment M (cell A115 of the "Section 1A" tab) indicates $395,000 in average monthly revenue ($193,000 for electronic messages and $202,000 for media).  Combined, this amounts to $1.14 million in monthly revenue, or $13.67 million in annual revenue.  This is an underestimate of total revenue to the extent it excludes revenues earned from electronic trust account deposit fees.

[20] Two bidders would yield a revenue share of 30 percent of $13.7 million, or $4.1 million.  Five bidders would yield a revenue share of 79 percent of $13.7 million, or $10.8 million.

of a 4-year contract.[21] This figure likely provides a lower bound on the effect because providers may respond to the FCC (2024) limits by cross-subsidizing among product lines in order to deliver a more competitive overall bid. That is, providers may offer a higher commission on tablets, relative to what MMS (2025) would predict, to compensate for limits on the ability to offer commissions on other services.

25.  Table 1 summarizes these results and provides analogous results covering the scenarios in which revisions to the requirements increase the number of qualified bidders from 2 to 3 and from 2 to 4.

*Table 1: How Annual Commission Payments Vary with the Number of Bidders*

| Number of Bidders | Tablet Revenue | | All Revenue | |
|---|---|---|---|---|
| | Commission Payment | Increase Relative to 2 Bidders | Commission Payment | Increase Relative to 2 Bidders |
| | (million $) | | (million $) | |
| 2 | $1.4 | | $4.1 | |
| 3 | $3.1 | $1.7 | $9.0 | $4.9 |
| 4 | $3.5 | $2.1 | $10.2 | $6.1 |
| 5 | $3.7 | $2.3 | $10.8 | $6.7 |

---

[21] With two bidders, a revenue share of 30 percent of $4.7 million equates to $1.4 million.  With five bidders, a revenue share of 79 percent of $4.7 million equates to $3.7 million.

14

I, Nathan Miller, declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

_____

NATHAN MILLER

March 6, 2026

# Appendix A

# Nathan H. Miller

Georgetown University

37th and O Streets, NW

Washington, DC 20057

nhm27@georgetown.edu

www.nathanhmiller.org

Updated March 2026

## POSITIONS

<u>Current Positions</u>

Professor, Georgetown University, 2022–
  McDonough School of Business (primary)
  Department of Economics (secondary)
Senior Policy Scholar, Georgetown Center for Business and Public Policy, 2017–
NBER, Research Associate, 2024–
Founding Partner, Econic Partners, 2025–
Associate Editor, *International Journal of Industrial Organization*, 2022–
Editorial Board, *Review of Industrial Organization*, 2019-2024, 2025–

<u>Previous Positions</u>

*Georgetown University*

Provost's Distinguished Associate Professor, 2021-2022
Saleh Romeih Associate Professor, McDonough School of Business, 2019-2022
Affiliated Professor, Economics Department, 2019-2022
Associate Professor, McDonough School of Business, 2017-2022
Assistant Professor, McDonough School of Business, 2013-2017

*Other Positions*

Editor, *Journal of Law and Economics*, 2021-2025
Chief Economist, U.S. Department of Justice, Antitrust Division, 2024
Visiting Professor, Toulouse School of Economics, 2019-2020
Economist, U.S. Department of Justice, Antitrust Division, 2008-2013

## DEGREES

Ph.D., Economics, University of California at Berkeley, 2008
B.A., Economics and History, University of Virginia, 2000

## PUBLICATIONS AND RESEARCH PROJECTS

<u>Refereed Publications</u>

"Mergers, Entry, and Consumer Welfare" (with Peter Caradonna and Gloria Sheu), *American Economic Journal: Microeconomics*, Vol. 17, No. 3, 103-130 (2025).

"Rising Markups and the Role of Consumer Preferences" (with Hendrik Döpper, Alexander MacKay, and Joel Stiebale), *Journal of Political Economy*, Vol. 133, No. 8, 2462-2505 (2025).

"Estimating Models of Supply and Demand: Instruments and Covariance Restrictions" (with Alexander MacKay), *American Economic Journal: Microeconomics*, Vol. 17, No. 1, 238-281 (2025).

"Industrial Organization and *The Rise of Market Power*," *International Journal of Industrial Organization*, Vol. 98, 103131 (2025).

"A Price Leadership Model for Merger Analysis" (with Ryan Mansley, Gloria Sheu and Matthew Weinberg), *International Journal of Industrial Organization*, Vol. 89 (2023).

"Oligopolistic Price Leadership and Mergers: The United States Beer Industry" (with Gloria Sheu and Matthew Weinberg), *American Economic Review*, Vol. 111, No. 10, 3123-3159 (2021).

"Finding Mr. Schumpeter: Technology Adoption in the Cement Industry" (with Jeffrey Macher and Matthew Osborne), *RAND Journal of Economics*, Vol 52, No. 1, 78-99 (2021).

"Forward Contracts, Market Structure, and the Welfare Effects of Mergers" (with Joseph Podwol), *Journal of Industrial Economics*, Vol. 68, No. 2, 364-407 (2020).

"Understanding the Price Effects of the MillerCoors Joint Venture" (with Matthew Weinberg), *Econometrica*, Vol. 85, No. 6, 1763-1791 (2017).

"Pass-Through in a Concentrated Industry: Empirical Evidence and Regulatory Implications" (with Matthew Osborne and Gloria Sheu), *RAND Journal of Economics*, Vol. 48, No. 1, 69-93 (2017).

"Upward Pricing Pressure as a Predictor of Merger Price Effects" (with Marc Remer, Conor Ryan and Gloria Sheu), *International Journal of Industrial Organization*, Vol. 52, 216-247 (2017).

"Pass-Through and the Prediction of Merger Price Effects" (with Marc Remer, Conor Ryan and Gloria Sheu), *Journal of Industrial Economics*, Vol. 64, December, 684-709 (2016).

"Spatial Differentiation and Price Discrimination in the Cement Industry: Evidence from a Structural Model" (with Matthew Osborne), *RAND Journal of Economics*, Vol. 45, No. 2, 221-247 (2014).

"Modeling the Effects of Mergers in Procurement," *International Journal of Industrial Organization*, Vol. 37, November, 201-208 (2014).

"Automakers' Short-Run Responses to Changing Gasoline Prices" (with Ashley Langer), *Review of Economics and Statistics*, Vol. 95, No. 4, 1198-1211 (2013).

"Why Do Borrowers Pledge Collateral? New Empirical Evidence on the Role of Asymmetric Information" (with Allen Berger, Marco Espinosa-Vega, and Scott Frame), *Journal of Financial Intermediation*, Vol. 20, No. 1, 55-70 (2011).

"Strategic Leniency and Cartel Enforcement," *American Economic Review*, Vol. 99, No. 3, 750-768 (2009).

"Debt Maturity, Risk, and Asymmetric Information" (with Allen Berger, Marco Espinosa-Vega, and Scott Frame), *Journal of Finance*, Vol. 60, No. 6, 2895-2923 (2005).

"Does Functional Form Follow Organizational Form? Evidence from the Lending Practices of Large and Small Banks" (with Allen Berger, Mitchell Petersen, Raghuram Rajan, and Jeremy Stein), *Journal of Financial Economics*, Vol. 76, No. 2, 237-269 (2005).

"Credit Scoring and the Availability, Price, and Risk of Small Business Credit" (with Allen Berger and Scott Frame), *Journal of Money, Banking, and Credit*, Vol 37, No. 2, 191-222 (2005).


Shorter Refereed Publications

"New Frontiers in Research on Industrial Decarbonization" (with Kenneth Gillingham, Lint Barrage, Sarah Armitage, Dallas Burtraw, Jonathan Colmer, Laure de Preux, Jonathan Hawkins-Pierot, Charles Holt, Valerie J. Karplus, Asa Lofgren, Mirabelle Muûls, Matthew Osborne, Edson Severnini, William Shobe, Gretchen Sileo, Vladimir Smirnyagin, Thomas Stoerk, Aleh Tsyvinski, Katherine Wagner, Ulrich Wagner, and Xi Wu), *Science*, Vol. 390, 338-340 (2025).

2

"On the Misuse of Regressions of Price on the HHI in Merger Review" (with Steven Berry, Fiona Scott Morton, Jonathan Baker, Timothy Bresnahan, Martin Gaynor, Richard Gilbert, George Hay, Ginger Jin, Bruce Kobayashi, Francine Lafontaine, James Levinsohn, Leslie Marx, John Mayo, Aviv Nevo, Ariel Pakes, Nancy Rose, Daniel Rubinfeld, Steven Salop, Marius Schwartz, Katja Seim, Carl Shapiro, Howard Shelanski, David Sibley, and Andrew Sweeting), *Journal of Antitrust Enforcement*, Vol. 10, No. 2, 249-259 (2022).

"Bias in Reduced-Form Estimates of Pass-Through" (with Alexander MacKay, Marc Remer and Gloria Sheu), *Economics Letters*, Vol. 123, No. 2, 200-202 (2014).

"Consistency and Asymptotic Normality for Equilibrium Models with Partially Observed Outcome Variables" (with Matthew Osborne), *Economics Letters*, Vol. 123, No. 1, 70-74 (2014).

"Using Cost Pass-Through to Calibrate Demand" (with Marc Remer and Gloria Sheu), *Economics Letters*, Vol. 118, No. 3, 451-454 (2013).

"The Entry Incentives of Complementary Producers: A Simple Model with Implications for Antitrust Policy" (with Juan Lleras), *Economics Letters*, Vol. 110, No. 2, 147-150 (2011).

Book Chapters and Non-Refereed Publications

"Rising Market Power: Evidence from Industry Studies" *National Law Network* (2025).

"Rising Markups, Rising Prices?" (with Chris Conlon, Tsolmon Otgon, and Yi Yao), *AEA: Papers and Proceedings*, Vol. 113, 279-283 (2023).

"Recent Advances in Economic Methodology for Coordinated Effects" (with Jamie Daubenspeck, Kate Maxewell Koegel, and Joseph Podwol), *Antitrust Chronicle* (2023).

"Price-Fixing Allegations in the Canned Tuna Industry: A Look at the Data" (with Minhae Kim, Ryan Mansley, Marc Remer, and Matthew Weinberg), *Antitrust Bulletin*, Vol. 68, No. 1, 154-163 (2023).

"Mergers – Countervailing Effects" (with Gloria Sheu), *The Elgar Encyclopedia on the Economics of Competition, Regulation and Antitrust*, Michael D. Noel (editor). Cheltingham, UK: Edward Elgar Publishing (2024).

"Quantitative Methods for Evaluating the Unilateral Effects of Mergers" (with Gloria Sheu), *Review of Industrial Organization*, Vol. 58, No. 1, 143-177 (2021). Special Issue: The 2010 Horizontal Merger Guidelines after Ten Years.

"How the MillerCoors Joint Venture Changed Competition in U.S. Brewing" (with Matthew Weinberg), *Microeconomic Insights*, 2017.

"Ex Post Merger Evaluation: How Does It Help Ex Ante?" (with Daniel Hosken and Matthew Weinberg), *Journal of European Competition Law & Practice*, 2016.

"Choosing Appropriate Control Groups in Merger Evaluations" (with Aditi Mehta), in *More Pros and Cons of Merger Control*, Konkurrensverket 2012.

Working Papers and Research Projects

"Technology and Market Power: The United States Cement Industry, 1974-2019" (with Matthew Osborne, Gloria Sheu and Gretchen Sileo), 2025.

"Phoning Home: The Procurement of Telecommunications Services for Prison Systems in the United States" (with Marleen Marra and Gretchen Sileo), 2025.

"The Rise of Market Power and the Macroeconomic Implications: Comment" (with Lanier Benkard and Ali Yurukoglu), 2025.

"Rejoinder to 'The Rise of Market Power and the Macroeconomic Implications: Reply to the Comment of Benark, Miller and Yurukoglu (2025)' " (with Lanier Benkard and Ali Yurukoglu), 2025.

"The Dynamics of Emissions Pricing and Technology Adoption" (with Sarah Armitage, Matthew Osborne, and Gretchen Sileo), in progress.

"Can Divestitures Lessen Competition?  Analyzing the Reynolds/Lorillard Merger and Divestitures" (with Aviv Nevo, Kenneth Rios, Ted Rosenbaum), in progress.

"Modeling the Effects of Mergers in Procurement: Addendum," Working Paper, 2017.

"Cumulative Innovation and Competition Policy" (with Alexander Raskovich), EAG Discussion Paper 10-5, 2010.

"Competition when Consumers Value Firm Scope," EAG Discussion Paper 8-7, 2008.

Grants and Awards

Robert F. Lanzillotti Prize for Best Paper in Antitrust Economics, 2022
    *Rising Markups and the Role of Consumer Preferences*
Jerry S. Cohen Award for Best Antitrust Article on Merger Retrospectives, 2022
    *Oligopolistic Price Leadership and Mergers: The United States Beer Industry*
Washington Center for Equitable Growth Grant, AWD-7774872, $75,278, 2021-2022
    *Buyer Power in the Beef Packing Industry*
Concurrences Antitrust Award: Best Academic Economics Article, 2021
    *Mergers, Entry, and Consumer Welfare*
National Science Foundation Grant, SES 2117197, $59,436, 2021-2022
    *An Empirical Study of Inmate Telecommunication Services*
Washington Center for Equitable Growth Grant, AWD-7774249, $51,750, 2020-2021
    *The Evolution of Market Power in the Cement Industry*
National Science Foundation Grant, SES 1824318, $88,635, 2018-2020
    *Market Power in Differentiated Products Industries*
Association of Competition Economics Best Paper Award, 2017
    *Understanding the Price Effects of the MillerCoors Joint Venture*
Robert F. Lanzillotti Prize for Best Paper in Antitrust Economics, 2015
    *Understanding the Price Effects of the MillerCoors Joint Venture*
Assistant Attorney General's Award of Distinction, AT&T/T-Mobile merger, 2013
Jerry S. Cohen Award for Antitrust Scholarship, Honorary Mention, 2009
    *Strategic Leniency and Cartel Enforcement*
COMPASS Prize for Best Paper in Antitrust Economics by Graduate Students, 2007
    *Strategic Leniency and Cartel Enforcement*
UC Berkeley Dean's Normative Time Fellowship, 2006-2007
UC Berkeley Competition Policy Center Dissertation Award, 2006
UC Berkeley Institute of Business and Economic Research Mini-Grant, 2006

## ACADEMIC PRESENTATIONS

Invited Seminar Presentations

2008-2013: Bureau of Economic Analysis, Bureau of Labor Statistics, DOJ ($\times$3), College of William and Mary, Drexel University, Duke University, FTC, Georgetown University ($\times$2), George Washington University, Johns Hopkins University, Michigan State University, Stony Brook

4

University, University of British Columbia, University of Iowa, University of North Carolina (Chapel Hill), University of Virginia

2014: DOJ; University of California, Berkeley; UCLA; University of Virginia

2015: Clemson; FTC; Indiana University; University of Colorado, Boulder; Yale

2016: Boston College; Columbia University; Federal Reserve Board; Harvard University; London School of Economics; University of British Columbia; University of Texas, Austin; University of Toronto

2017: FTC; University of Kentucky; University of Pennsylvania; University of Wisconsin–Madison

2018: FTC; MIT; Texas A&M; Penn State University; University of Maryland

2019: Harvard University; Toulouse School of Economics; MINES ParisTech; KU Leuven; University of Mannheim; Berlin Applied Economics

2020: Research Institute of Industrial Economics (RIFN); Sciences Po; University of Düsseldorf (DICE); Directorate-General for Competition of the European Commission (DG COMP); Hong Kong University of Science and Technology

2021: CBO, Washington University at St. Louis; George Mason University; Joint DOJ/FTC; West Virginia University; FTC; University of Maryland

2022: University of California, Berkeley; University of Pennsylvania; University of Virginia; Iowa State University; Indiana University; University of Delaware; University of Michigan; University of North Carolina; University of Connecticut

2023: University of Rochester; University of Massachusetts Amherst; Pomona College; UCLA

2025: Yale, Chicago Fed

2026: Arizona State University (scheduled), Clemson (scheduled), University of British Columbia (scheduled), University of Florida (scheduled)

## Conference Presentations

AEA (2023); APIOS (2018, 2022); Association of Competition Economics (2018); Barcelona GSE Summer Forum (2018); DC IO Day (2020); EARIE (2019); ESEM (2019); FTC Microeconomics (2010, 2014, 2021); Georgetown Railroad Conference (2017); Hal White Antitrust (2013, 2014, 2017, 2019); HEC Montreal–RIIB Conference on IO (2025); IEF Applied Microeconomics (2016); IIOC (2008, 2009, 2013, 2015, 2016, 2018, 2022); MaCCI Summer Institute (2024); NASMES (2019); NBER IO (2023); Northwestern Antitrust (2013, 2015, 2022); SEA (2013, 2018, 2023); SITE (2025); Triangle Microeconomics (2016)

## Conference Discussions

AEA (2015); Cowles Foundation (2024); DC IO Day (2015); Toulouse Digital Economics Conference (2020); HEC Montreal–RIIB Conference on IO (2018); IIOC (2008, 2009, 2013, 2015, 2016, 2018, 2021, 2022, 2025); NY IO Day (2020); RIDGE IO (2021); SEA (2013, 2018, 2023); Northwestern Antitrust (2018, 2023); WCEG (2020)

## Keynotes

University of Zurich Workshop on Market Power and the Economy, 2023

Association of Competition Economics (ACE) Conference, 2023

Applied Economics Workshop (AEW), 2024

RIDGE Industrial Organization Forum, 2024

Competition & Regulation European Summer School and Conference (CRESSE), 2025

<u>Panels and Other Invited Talks</u>

"Upward Pricing Pressure and Simulation in Merger Review," Economists' Roundtable with the Canadian Competition Bureau, 2017

"Institutional Shareholdings: Is There an Antitrust Issue?" Concurrences Global Antitrust Conference, 2018

"Digital Mergers: Need for Reform?" Concurrences International Mergers Conference, 2020

"Making Competition Work: Promoting Competition in Labor Markets," Joint Hearings of the Department of Justice and Federal Trade Commission, 2021

"Reforming America's Food Retail Markets," Yale University, 2022

"Amendments to the Competition Act," Canadian Economic Association Meetings, 2022

"Buyer Power in the Beef Packing Industry," R-Calf National Convention, 2022

"Coordinated Effects of Mergers," ICN Chief Economist Workshop, 2023

"Evolving Approaches to Mergers Between Rivals," DOJ/FTC Merger Guidelines Workshop, 2023

"Recent Advances in Conduct Estimation," University of Düsseldorf (DICE), 2023

"Agency Economists Roundtable," Fordham Conference on Antitrust Law and Policy, 2024

"Overseeing Big Tech: Antitrust vs. Regulation," Northwestern Conference on Antitrust Economics and Competition Policy, 2024

"The Use of Structural Presumptions in Antitrust," OECD Best Practice Roundtable on Competition, 2024

"Regaining Competitiveness—Boom or Bust for Competition Policy?" Annual CRA Brussels Conference, 2024

"Making Sense of the Monopoly Broth," University of Southern California, 2025

"Antitrust Policy Discussion," Triangle Microeconomics Conference, 2025

"Inflation and Antitrust," ABA Panel, 2025

"Merger Remedies: What Works Best and How Can We Improve?" ABA Panel, 2025

"Market Power in EU and US: What Does the Empirical Evidence Show?" CRESSE Panel, 2025

"Digital Economy and Competition Policy: What's Next?" APIOC Panel, 2025

"Perspectives from Former Federal Antitrust Economics Leaders" National Association of Business Economists Panel, 2026

## TEACHING, ADVISING, AND SERVICE

<u>Courses</u>

Firm Analysis and Strategy, MBA Core Curriculum
Industrial Organization, PhD Economics
Strategic Pricing, MBA Elective
Microeconomics, Executive Education
Causal Inference, MSBA Core Curriculum

<u>Ph.D Advising and Dissertation Committees</u>

Francisco Garrido (co-advisor), 2020, ITAM
Yanyang Wang (committee), 2021, Amazon Web Services
Peter Caradonna (committee), 2022, California Institute of Technology
Ryan Mansley (co-advisor), 2023, Department of Justice Antitrust Division
Gretchen Sileo (co-advisor), 2023, Temple University
Kyle Monk (committee), 2024, Meta
Tianshi Mu (co-advisor), 2024, Tsinghua University
Pedro Roje-Larreboure (co-advisor), 2024, Banco Central de Chile

Yidi Wu (committee), 2024, Cornerstone Research
Chengjun Zhang (committee), 2024, Morgan Stanley
Cam Healy (advisor), 2025, Congressional Joint Economic Committee
Yi Yao (advisor), 2025, Charles River Associates

Service

Co-organizer, NBER Winter Meetings, 2026, scheduled
Organizer, DC IO Day, 2017
Program Committee, DC IO Day, 2015-2016 and 2018-2019
Program Committee, International Industrial Organization Conference, 2019-2021

Referee Reports

*American Economic Review; Econometrica; European Economic Review; International Journal of Industrial Organization; Journal of Economics & Management Strategy; Journal of the European Economics Association; Journal of Finance; Journal of Industrial Economics; Journal of Law and Economics; Journal of Political Economy; Management Science;* National Science Foundation; *The RAND Journal of Economics; Review of Economic Studies; Review of Economics and Statistics; Review of Industrial Organization; Quarterly Journal of Economics,* others.

## CONSULTING AND TESTIMONY

Recognition

Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, 2023. *U.S. and Plaintiff States v. American Airlines Group Inc. and JetBlue Airways Corp.*

Selected Industry Experience

agriculture, airlines, consumer products, distribution networks, energy and electricity, health insurance, industrial metals, office products, telecommunications, railroads, hazardous waste, others

Live Testimonial Experience

Testified on behalf of CSX Transportation in *Norfolk Southern Railway Company—Acquisition of Control—Norfolk & Portsmouth Belt Line Railroad Company*, Finance Docket No. FD 36836. Deposition: October 30, 2025.

Testified on behalf of U.S. Department of Justice, *United States et al. v. American Airlines Group Inc. and JetBlue Airways Corporation*, U.S District Court, Eastern District of New York, Case No. 1:22-cv-07374-AMD-TAM. Deposition: August 17, 2022. Trial testimony: October 2022.

Testified on behalf of Competition Bureau Canada, *Canada (Commissioner of Competition) v. Secure Energy Services Inc. of Tervita Corporation*, Canadian Competition Tribunal, Case No. CT-2021-002. Trial testimony: May 2022.

Testified on behalf of Competition Bureau Canada, *Canada (Commissioner of Competition) v. Rogers Communications Inc. and Shaw Communications Inc.*, Canadian Competition Tribunal, Case No. CT-2022-002. Trial testimony: November 2022.

Testified on behalf of Competition Bureau Canada, *Canada (Commissioner of Competition) v. Parrish & Heimbecker, Limited*, Canadian Competition Tribunal, Case No. CT-2019-005. Trial testimony: January 2021.

7

Expert Reports, Declarations, and Verified Statements

*Norfolk Southern Railway Company—Acquisition of Control—Norfolk & Portsmouth Belt Line Railroad Company*, Finance Docket No. FD 36836. Verified Statements: June 19, 2025 and September 18, 2025.

*Canada (Commissioner of Competition) v. Rogers Communications Inc. and Shaw Communications Inc.*, Canadian Competition Tribunal, Case No. CT-2021-002. Expert Report: September 26, 2022. Rebuttal Expert Report: October 19, 2022.

*Canada (Commissioner of Competition) v. Secure Energy Services Inc. of Tervita Corporation*, Canadian Competition Tribunal, Case No. CT-2021-002. Expert Report: February 28, 2022. Expert Rebuttal Report: April 11, 2022. Affidavit: July 19, 2021.

*Canada (Commissioner of Competition) v. Parrish & Heimbecker, Limited*, Canadian Competition Tribunal, Case No. CT-2019-005. Expert Report: September 11, 2020. Reply Expert Report: October 23, 2020.

Selected Other Experience

Consulted for LS Power during transaction with NRG Energy, 2025-2026

Consulted for Alaska Airlines and Hawaiian Airlines during their merger, 2024

Consulted for the FTC on the abandoned acquisition of Harry's by Edgewell, 2019-2020

Consulted for the FTC on the abandoned acquisition of TriZir by Tronox, 2020

Consulted for the FTC on the acquisition of Services Group of America by US Foods, 2019

Consulted for Cigna and Express Scripts during their merger, 2018

# Appendix B

**Materials Relied Upon**

*Declarations*

Declaration of Jon Logan, March 6, 2026.

*Legal Filings*

*In the Matter of Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services,* WC Docket Nos. 12-375, 23-62, FCC 24-75, 39 FCC Rcd 7647 (2024) ("IPCS Order on Reconsideration").

*In the Matter of Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act*, WC Docket Nos. 12-375, 23-62, FCC 25-75 (Adopted Oct. 28, 2025; Released Nov. 6, 2025) ("2025 IPCS Order").

*Academic Articles*

Nathan H. Miller, Marleen Marra & Gretchen Sileo, "Phoning Home: The Procurement of Telecommunications for Incarcerated Individuals in the United States", 2025.

Nathan H. Miller & Joseph U. Podwol, "Forward Contracts, Market Structure and the Welfare Effects of Mergers," *Journal of Industrial Economics*, vol. 68, 2020, pp. 364–407.

*Books*

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization*, 4th ed. (Boston: Pearson Education, 2015).

Ken Hendricks & Robert H. Porter, "An Empirical Perspective on Auctions," in *Handbook of Industrial Organization*, vol. 3 (edited by Mark Armstrong & Robert H. Porter, Elsevier, 2007).

*Publicly Available Resources*

Georgia Department of Corrections Electronic Request for Proposals, Offender Communications Services, Event No. GDC0001179, Attachment_A_-_State_Entity_eRFP_FINAL_v.3.pdf.

Georgia Department of Corrections Electronic Request for Proposals, Offender Communications Services, Event No. GDC0001179, Attachment_D_-_Historical_StatsandRatesFees__final.xlsx.

Georgia Department of Corrections Electronic Request for Proposals, Offender Communications Services, Event No. GDC0001179, Attachment_H_-_Mandatory_Response_Worksheet_FINAL_v2.xlsx.

Georgia Department of Corrections Electronic Request for Proposals, Offender Communications Services, Event No. GDC0001179, Attachment_M_-_Revenue_Share_Proposal_FINAL_v.2.xlsx.

U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023.

# Exhibit 3-3

# Smart Communications Request for Formal Review

RFP 46700-GDC0001179

OFFENDER COMMUNICATION SERVICES

# RFP is Highly Restrictive

Contractor...must have a minimum of five (5) years of experience within the last 10 years in providing all of the required Offender Communications Services to another individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders.

Question M2A, Mandatory Response Worksheet (Attachment H).

Contractor must have **successfully completed an implementation project** to install, provide, and maintain the required Offender Communication Services to include, at a minimum, offender telephones, offender video visitation stations and offender tablets... within the past 10 years.

Question M4A, Mandatory Response Worksheet, , (Attachment H).





# Relevant Portions of Georgia Procurement Manual

# GPM Prioritizes Competition

The purpose of the GPM is to…

- Provide increased economy in state procurement activities and **maximize to the fullest extent possible the purchasing value of public funds**.

- Foster **effective broad-based competition** in the marketplace.

    Section I.1.1

# Fiduciary Duty

I.4.4.3. Fiduciary Duty

All procurement professionals play an important role in ensuring needed goods and services are procured in an efficient and economical manner while gaining and retaining public trust and confidence. The procurement professional is responsible for developing contracts at competitive prices to avoid waste and deliver the best value to the employer and Georgia citizens.

# Other Areas Where GPM Clearly Shows Bias should be Toward More Competition

## 3.5.4. Supplier Qualification Requirements

Whether the state entity intends to prequalify suppliers (through use of the RFQC process or other SPD-approved methods) or review suppliers' qualifications as part of evaluating the supplier's response to an RFQ or RFP, the solicitation must identify any relevant qualifications required to perform under the resulting contract, such as previous business experience or licensure requirements. **The procurement professional must ensure that identified qualification requirements do not unreasonably or unnecessarily restrict competition.**

## 3.5.5.1. RFQ Specifications and Requirements

For RFQs, identifying the minimum products and/or service requirements may include use of any of the following: performance specifications, design specifications, references to particular products for reference purposes, use of qualified products lists, and performance and service requirements. To be considered responsive, the supplier's bid must meet all of the identified specifications and requirements. Therefore, **the procurement professional must use caution in developing and writing specifications and requirements to ensure competition is not unreasonably or unnecessarily restricted.**

# Relevant Sections of 6.5, Step 4

A state entity maintains discretion to determine its needs and the best method to accommodate them and the responsibility for drafting proper specifications that reflect the state's needs is the procuring entity's. **However, those needs must be specified in a manner designed to achieve full and open competition**.

Where a requirement reflects a procuring entity's minimum needs, the fact that the protester will be unable to meet the requirement does not establish that the specifications are impossible to meet or that the specifications unduly restrict competition.

# Substantial Lost Revenue to the State

Table 1: How Commission Payments Vary with the Number of Bidders

| Number of Bidders | Tablet Revenue | | All Revenue | |
| --- | --- | --- | --- | --- |
| | Commission Payment (million $) | Increase Relative to 2 Bidders | Commission Payment (million $) | Increase Relative to 2 Bidders |
| 2 | $1.4 | | $4.1 | |
| 3 | $3.1 | $1.7 | $9.0 | $4.9 |
| 4 | $3.5 | $2.1 | $10.2 | $6.1 |
| 5 | $3.7 | $2.3 | $10.8 | $6.7 |

# Fiduciary Duty to the State Does Not Allow this Amount of Lost Revenue

- Applying the findings from the empirical model in my study to the relevant population of inmates in Georgia indicates that commissions paid to the correctional authority could increase by as much as $2.3 to $6.7 million per year, or from $9.2 million to $26.8 million over the course of a four-year contract.  I view this range as conservative for reasons that I describe below.

# Bureau of Prisons RFP

**2.0 Past Performance Evaluation**

The Past Performance area addresses the Government's confidence in the offeror's probability of successfully performing the effort as proposed based on their record of performance in current and past relevant contract efforts. The Past Performance evaluation will be accomplished by reviewing aspects of an offeror's relevant present and recent past performance, focusing on and targeting performance that is relevant to the Past Performance factors outlined below.

# Exhibit 4



**Brian P. Kemp**                                                                                                    **Rebecca N. Sullivan**

---

April 9, 2026

**VIA-EMAIL**

C. Ryan Germany
Gilbert, Harrell, Sumerford & Martin, P.C.
675 Ponce de Leon Ave NE, Suite 8500
Atlanta, Georgia 30308
rgermany@ghsmlaw.com

RE:      Request for Formal Review Regarding RFP 46700-GDC0001179 "Offender Communication Services"
         Protest # 2026-PRO-00029

This letter responds to Smart Communications' Request for Formal Review of the Deputy Commissioner of the State Purchasing Division's ("Deputy Commissioner") February 16, 2026, Protest Decision ("Protest Decision").

On December 5, 2025, the Georgia Department of Corrections ("GDC") issued RFP 46700-GDC0001179 entitled "Offender Communications Services" ("eRFP") seeking to establish a contract with one or more qualified suppliers who will provide Offender Communications Services to GDC as described in the eRFP. The services to be provided pursuant to the eRFP are divided into two (2) categories, Category A and Category B.  Suppliers are required to respond to at least one (1) category, and each category may be awarded to different suppliers.  The eRFP explained that to be eligible for award in Category A:

> [t]he supplier must have demonstrable experience in installing, providing and maintaining the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation stations and offender Tablets with an individual single state's Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders within the past 10 years.

On January 14, 2026, Smart Communications filed a timely protest challenging the competitive solicitation process and alleging that the qualification requirements for Category A are unduly restrictive, anti-competitive, not reasonably related to successful contract performance, and inconsistent with the Georgia Procurement Manual's ("GPM") requirements for open and fair competition. Based on the limited information and evidence presented by Smart Communications in its protest, the Deputy Commissioner denied Smart Communications' protest finding that the qualification requirements were not arbitrary and did not unduly or unnecessarily restrict competition.

Smart Communications filed a Request for Formal Review of the Protest Decision on February 19, 2026, and a hearing was conducted on March 9, 2026. At the hearing, Smart Communications submitted additional information and evidence relating to the contested qualification requirements, arguing that the requirements are highly restrictive and artificially narrow the pool of potential suppliers.

On April 8, 2026, GDC amended the eRFP, including the qualification requirements for both Category A and Category B, and extended the closing date of the eRFP to April 20, 2026. The qualification requirements for Category A were amended as follows:

---

C. Ryan Germany
RE: Request for Formal Review
April 9, 2026
Page 2 of 2

"To be eligible for award in Category A, the supplier must meet the following minimum eligibility requirements:

1. For Tablets, the Supplier must have a minimum of two (2) years of continuous experience within the past ten (10) years providing an offender Tablets solution under a single contract which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders. The Supplier must have served as the prime contractor responsible for the provision of these services.

2. For all other Offender Communications Services, the Supplier must have a minimum of five (5) years of continuous experience within the past ten (10) years providing each of the required Offender Communications Services (with the exception of Tablets) which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders. Experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 30,000 offenders, and contract durations may not be aggregated across multiple contracts or agencies. The Supplier must have served as the prime contractor responsible for the provision of these services.

Please confirm that your company meets all of these requirements."

Considering the amended qualification requirements are materially different from the qualification requirements protested by Smart Communications, I hereby **remand** this matter to the Deputy Commissioner. Smart Communications may withdraw its protest or amend its protest with the Deputy Commissioner. Any amended protest relating to the April 8, 2026, eRFP amendment must be submitted by April 20, 2026, pursuant to GPM Section 6.5.7 and O.C.G.A. § 1-3-1(d)(3).[1]

Sincerely,

Rebecca N. Sullivan
Commissioner

cc:  Ross Barrineau, ross.barrineau@gdc.ga.gov

---

[1] Under GPM Section 6.5.7, the applicable filing deadline would be Saturday, April 18, 2026. However, considering the last day for filing falls on a Saturday, interested parties shall have through the following Monday to submit protests relating to the amended eRFP pursuant to O.C.G.A. § 1-3-1(d)(3).

# Exhibit 5

# GILBERT, HARRELL, SUMERFORD & MARTIN

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW

ESTABLISHED 1871

www.gilbertharrelllaw.com
DIRECT DIAL – (678) 672-9230
EMAIL: rgermany@ghsmlaw.com

April 17, 2026

VIA ELECTRONIC MAIL

Carrie Steele
Deputy Commissioner
Georgia Department of Administrative Services
200 Piedmont Ave. SE
Suite 1804, West Tower
Atlanta, Georgia 30334
*protests@doas.ga.gov*

> **Re:    Smart Communications Amended Protest re. RFP 46700-GDC0001179—Offender Communication Services**

Dear Deputy Commissioner Steele:

Pursuant to Commissioner Sullivan's April 9, 2026 Order remanding Smart Communication's protest, Smart Communications ("SmartComm") submits this Amended Protest. As explained below, the changes to the minimum requirements of the RFP still result in a solicitation that violates the Georgia Procurement Manual ("GPM"). The Amended Requirements remain unduly restrictive, anti-competitive, arbitrary, and violative of the fiduciary duty requirement in the GPM.

## THE AMENDED REQUIREMENTS

On April 8, 2026, in response to SmartComm's protest pointing out just how restrictive the initial requirements of the RFP were, the minimum requirements were amended. Initially, the RFP required that to be eligible in Category A of the RFP, the supplier had to have:

a minimum of five years of current experience in providing all of the required Offender Communication Services to another individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Custom Enforcement) with a minimum [average daily population] of 35,000 offenders.

Attachment H, Mandatory Response Worksheet, Version 2. On April 8, 2024, DOAS issued Addendum 4 to the RPF, which, among other things, changed the minimum requirements for eligibility to Category A to:

1.  For Tablets, the Supplier must have a minimum of two (2) years of continuous experience within the past ten (10) years providing an offender Tablets solution under a single contract which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders. The Supplier must have served as the prime contractor responsible for the provision of these services.

2.  For all other Offender Communications Services, the Supplier must have a minimum of five (5) years of continuous experience within the past ten (10) years providing each of the required Offender Communications Services (with the exception of Tablets) which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders. Experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 30,000 offenders, and contract durations may not be aggregated across multiple contracts or agencies. The Supplier must have served as the prime contractor responsible for the provision of these services.

Attachment H, Mandatory Response Worksheet, Version 3. These Amended Requirements essentially do two things: 1) they lower the average daily population ("ADP") requirement for qualifying contracting vehicles from 35,000 to 30,000, and 2) they allow a vendor to meet the minimum requirements by providing the

required services through different state contracts where the previous requirements required a bidder to provide all required services to a single state.

The Amended Requirements do not actually increase competition. Rather, they seem to be designed to respond to the evidence that SmartComm submitted showing that (even though this certainly could not have been the intention) the Initial Requirements were so onerous that no bidders might actually qualify. The Amended Requirements still fail "to foster broad-based competition in the marketplace" and "maximize to the fullest extent possible the purchasing value of public funds" as required by the GPM. GPM, § I.1.1. And the solicitation still unreasonably or unnecessarily restricts competition in violation of GPM § 3.5.4. The Georgia Department of Corrections ("GDC") of course "maintains discretion to determine its needs and the best method to accommodate them." GPM § 6.5.4, Step 4. But "those needs must be specified in a manner to achieve full and open competition." *Id.* The Amended Requirements fail to meet that threshold.

## I.     The RFP is Still Severely Restrictive

### a.  Lowering the ADP Threshold to 30,000 Does Not Increase Competition

As pointed out in Jon Logan's Declaration in Support of SmartComm's Request for Formal Review, there are only six or possibly seven states and two federal agencies that met the 35,000 inmate ADP threshold under the RFP's Initial Requirements. The only qualifying states were Texas, California, Florida, Georgia, Ohio, Pennsylvania, (potentially) Arizona, and two federal agencies—the Bureau of Prisons ("BOP") and Immigration and Customs Enforcement ("ICE"). By lowering

the ADP threshold to 30,000, the Amended Requirements add only four additional states as potential contracting vehicles to qualify to submit a response to the RFP—Michigan, New York, Illinois, and North Carolina. The reduction in ADP requirement does not remedy any of the issues raised in SmartComm's Initial Protest and Request for Formal Review. There are over 5000 jurisdictions in the United States that use the types of services that the RFP solicits, including all 50 states and many large county jurisdictions. The Amended Requirements allow potential vendors to qualify only if they have legacy contracts with one of thirteen options out of that 5000-jurisdiction universe. Said differently, rather than analyze the market for inmate communication services, GDC is limiting the field to holders of only a handful of legacy contracts, representing a small sliver of the actual market for the services.

Reducing the ADP threshold to 30,000 does not increase competition. The market for inmate communication services is essentially a duopoly, with Securus and ViaPath being the two dominant providers. Upon information and belief, Michigan's telephone and video visitation are provided by ViaPath and tablets are provided by Securus subsidiary JPay. All of New York's inmate communication services are provided by Securus. Illinois recently switched all of its services to ICSolutions, but that switch only occurred in October 2024, meaning that ICSolutions has not met the timing requirement of the Amended Requirements through its Illinois contract. North Carolina's services are provided by ViaPath.

4

Rather than increasing competition, the Amended Requirements only serve to solidify the qualifications of the two duopoly providers—Securus and ViaPath.

### b. Dividing Up the Contract Requirements and Lowering the Time Threshold for Tablets Does Not Increase Competition.

Similar to the reduction of the ADP threshold, the Amended Requirements allowance to demonstrate the required experience across one or more contracts does not actually increase competition either. Neither does lowering the time threshold for providing tablets to another state from five years to two years. SmartComm's Request for Formal Review explained that the initial requirements were so onerous that arguably no potential vendor met them. Rather than an attempt to increase competition, the goal of the Amended Requirements seems to be to cure that flaw and ensure that Securus and Viapath are qualified to bid.

## II.   The Amended Requirements Are Arbitrary Compared to GDC's Minimum Needs

SmartComm understands and appreciates that GDC wants to ensure that any winning bidder has the operational capability and reliability to perform the contract at the scale needed in a state like Georgia, that is large both geographically and in prisoner ADP. However, using historical market position as a stand-in for operational capability, especially when that market is a known duopoly, is nonsensical and arbitrary. GDC has wide discretion to determine its own needs, but the minimum requirements to meet those needs cannot be arbitrary. The minimum requirements must be related to the agency's legitimate needs. In this case, limiting the "competition" to only the two duopoly providers harms GDC's minimum needs.

GDC should realize this based on its own experience given that one of these large legacy providers has alraedty failed to implement the required services in Georgia. Because the Amended Requirements do not reasonably relate to GDC's actual minimum needs, they unduly restrict competition in contravention of the GPM.

**THE DUOPOLY PROBLEM**

The market for inmate communication services is a well-known duopoly. The Amended Requirements seem to be surgically designed to ensure that only the two duopoly providers qualify, notwithstanding the well-documented negative impacts of duopolies on consumer costs and innovation. The general economic principle disfavoring duopolies applies even more so in this instance where the two duopoly providers have been accused of colluding with each other to avoid price competition. *See Albert v. Global Tel*Link Corp.*, Civil Action No. 20-cv-01936 (D. Md). The Second Amended Complaint in that case, filed October 29, 2025, is instructive.[1] That complaint alleges that "according to a former manager of GTL [now Viapath], the CEOs of GTL and Securus held private, in-person dinners during the relevant time at which they 'shared strategic information' and discussed 'what prices should be charged for ICS calls.'" Second Amended Complaint, ¶¶ 15, 78, 114, 186. The Complaint also alleges "Misrepresentations and Omissions to Contracting Governments and Consumers about Transaction Fees," including specific misrepresentations to governments in procurement negotiations and written

---

[1] The Second Amended Complaint is attached hereto as Exhibit 1.

responses. Complaint, ¶¶ 139-175. The cure for any collusion that may occur in a duopoly is to open the competition to other vendors as well.

### III. Reinforcing a Duopoly Will Lead to Worse Outcomes for GDC and Georgia taxpayers.

Given that the Amended Requirements do not change the number of potential vendors that may qualify, Dr. Nathan Miller's Expert Declaration presented at the Request for Formal Review remains instructive. Dr. Miller's analysis assumed a minimum of two bidders and showed how much the financial impact to the state would improve with more bidders, potentially increasing commission payments to the state by a total of $26.8 million over the first four years of the contract. The fact that the market for inmate communication services is a duopoly cannot be ignored when determining whether the RFP unreasonably restricts competition.

A recent procurement in Pennsylvania illustrates this point well. That procurement is currently being challenged by both SmartComm and Securus, and documents that have been made public as part of that challenge showed that SmartComm's proposal offered better prices to inmates and their families and more generous commissions to the state. *See* SmartComm's Supplement to Renewed Protest, attached hereto as Exhibit 2, pp. 10-12.

Allowing more than just the two duopoly providers to submit a response to the RFP will lead to better outcomes for GDC and for Georgia taxpayers. And as Dr. Miller explains—the more vendors that can be included, the better the options for the state will be. Allowing more bidders to respond will likely lead to more

7

competitive bids from every potential bidder, even the vendors that would qualify under the Amended Requirements. If this solicitation continues as it is currently structured, with only the two duopoly providers likely to qualify, Georgia will be stuck with choosing from more expensive, less innovative options. Procurement professionals have a fiduciary duty to deliver the best value to Georgia citizens. GPM, § I.4.4.3. Leaving a potential $26.8 million on the table does not meet that standard.

**REMEDY**

GDC can and should amend the minimum requirements so that they actually relate to its minimum needs of inmate communication services that can be operationalized at scale with reliability, security, and speed while also obtaining the "new and updated technology" that they seek. GDC could follow BOP's example in its ongoing tablet procurement and simply score successful experience on large projects as part of its overall evaluation of bids. GDC can require certain experience and size hurdles, but that experience should not be limited to just 0.26% of customers of the U.S. market for these services. GDC can even require experience with large jurisdictions, but it should do so in a way that allows actual competition instead of artificially limiting it.

For example, SmartComm currently has (and has had for over eight years) a statewide contract with Pennsylvania, one of the largest jurisdictions in the U.S., to provide digitized mail services, but the Amended Requirements do not allow digitized mail services to count as relevant experience even though it is now part of

8

most inmate communication services packages. SmartComm has successfully provided all of the required services—tablets, phone service, video visitation, and the required financial infrastructure for those services—to many customers with large inmate populations, just not the right customers per the Amended Requirements. A competitive RFP would weigh that experience as part of a proposal.  Any minimum requirements in the RFP should seek to determine the vendor's operational capability, reliability, and ability to scale to meet Georgia's needs, not whether or not they have held one of a small handful of legacy contracts.

## CONCLUSION

The Amended Requirements still violate Georgia procurement law, and they should be modified or waived to ensure competitive fairness and compliance with Georgia law. The clear and convincing evidence shows that the Amended Requirements unduly restrict competition as they are not reasonably related to GDC's actual minimum needs. The evidence further shows that the RFP as currently constituted will lead to substantially worse options for Georgia to consider than a truly competitive RFP, violating the fiduciary duty requirement in the GPM. SmartComm requests that DOAS grant its protest and instruct GDC to revise its minimum requirements in a manner that reflects its minimum needs without restricting competition in violation of the GPM. SmartComm further requests that DOAS stay the closing of the solicitation until after a final decision on this protest is reached.

Sincerely,

C. Ryan Germany
Georgia Bar No. 500691
GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.
675 Ponce de Leon Ave NE
Suite 8500
Tel: (678) 672-9230
rgermany@ghsmlaw.com

10

CERTIFICATION PURSUANT TO GEORGIA PROCUREMENT MANUAL SECTION 6.5.6

_____
Jon Logan, CEO & President
Smart Communications
104941 72nd St.
Seminole, FL 33777

11

# Exhibit 6



Brian P. Kemp                                                                                          Rebecca N. Sullivan

---

April 30, 2026

**VIA-EMAIL**

C. Ryan Germany
Gilbert, Harrell, Sumerford & Martin, P.C.
675 Ponce de Leon Ave NE
Suite 8500
rgermany@ghsmlaw.com

**Protest # 2026-PRO-00029**
**RE:  Amended Protest Regarding RFP 46700-GDC0001179 "Offender Communications Services"**

Dear Mr. Germany:

This letter is in response to Smart Communications' amended pre-award protest of the above-referenced solicitation. For the reasons in this letter, the protest is denied.

> A.        Background and Procedural History

On December 5, 2025, the Georgia Department of Corrections ("GDC") issued RFP 46700-GDC0001179 entitled "Offender Communications Services" ("eRFP") seeking to establish a contract with one or more qualified suppliers who will provide Offender Communications Services to GDC as described in the eRFP.  The services to be provided pursuant to the eRFP are divided into two (2) categories, Category A and Category B.  Suppliers are required to respond to at least one (1) category, and each category may be awarded to different suppliers.

The eRFP explained that to be eligible for award in Category A:

> [t]he supplier must have demonstrable experience in installing, providing and maintaining the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation stations and offender Tablets with an individual single state's Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders within the past 10 years.

To be eligible for award in Category B:

> [t]he supplier must have demonstrable experience in installing, providing and maintaining the required Offender Communications Services to include, at a minimum, offender telephones, offender video visitation stations and offender Tablets with an individual single County, state's Department of Corrections, or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 3,250 offenders within the past 5 years.

---

C. Ryan Germany
RE: Request for Formal Review
April 30, 2026
Page 2 of 8

On January 14, 2026, Smart Communications filed a protest challenging the competitive solicitation process and alleging that the qualification requirements for Category A are unduly restrictive, anti-competitive, not reasonably related to successful contract performance, and inconsistent with the Georgia Procurement Manual's ("GPM") requirements for open and fair competition. Based on the limited information and evidence presented by Smart Communications in its protest, on February 16, 2026, I issued a Protest Decision denying Smart Communications' protest and finding that the qualification requirements were not arbitrary and did not unduly or unnecessarily restrict competition.

Smart Communications filed a Request for Formal Review of the Protest Decision on February 19, 2026, and a hearing was conducted on March 9, 2026.  At the hearing, Smart Communications submitted additional information and evidence relating to the contested qualification requirements, arguing that the requirements are highly restrictive and artificially narrow the pool of potential suppliers.

On April 8, 2026, GDC amended the eRFP, including the qualification requirements for both Category A and Category B, and extended the closing date of the eRFP to April 20, 2026.[1] The qualification requirements for Category A ("Amended Requirements") were amended to the following:

> To be eligible for award in Category A, the supplier must meet the following minimum eligibility requirements:
>
> 1. For Tablets, the Supplier must have a minimum of two (2) years of continuous experience within the past ten (10) years providing an offender Tablets solution under a single contract which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders.  The Supplier must have served as the prime contractor responsible for the provision of these services.
>
> 2. For all other Offender Communications Services, the Supplier must have a minimum of five (5) years of continuous experience within the past ten (10) years providing each of the required Offender Communications Services (with the exception of Tablets) which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders.  Experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 30,000 offenders, and contract durations may not be aggregated across multiple contracts or agencies.  The Supplier must have served as the prime contractor responsible for the provision of these services.

The qualification requirements for Category B were similarly amended to the following:

> To be eligible for award in Category B, the supplier must meet the following minimum eligibility requirements:
>
> 1. For Tablets, the Supplier must have a minimum of two (2) years of continuous experience within the past ten (10) years providing an offender Tablets solution under a single contract

---

[1] The solicitation has since been extended through May 4, 2026.

C. Ryan Germany
RE: Request for Formal Review
April 30, 2026
Page 3 of 8

which includes installation and maintenance for a County/Regional correctional agency, state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 2,800 offenders. The Supplier must have served as the prime contractor responsible for the provision of these services.

2. For all other Offender Communications Services, the Supplier must have a minimum of five (5) years of continuous experience within the past ten (10) years providing each of the required Offender Communications Services (with the exception of Tablets) which includes installation and maintenance for a County/Regional correctional agency, state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 2,800 offenders. Experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 2,800 offenders, and contract durations may not be aggregated across multiple contracts or agencies. The Supplier must have served as the prime contractor responsible for the provision of these services.

Considering the Amended Requirements were materially different from the qualification requirements originally protested by Smart Communications, the DOAS Commissioner remanded the matter, allowing Smart Communications to withdraw or amend its protest. Smart Communications filed an Amended Protest on April 17, 2026.

B.      Smart Communications' Arguments

In its Amended Protest, Smart Communications argues that the Amended Requirements remain unduly restrictive, anti-competitive, arbitrary, and violative of the fiduciary duty requirement in the Georgia Procurement Manual ("GPM").

The mission of the GDC is "to protect Georgians by operating secure facilities and providing opportunities for offender rehabilitation." As explained in the eRFP, "[o]btaining new updated technology and equipment is paramount to securing GDC Facilities and ensuring public safety."[2] Furthermore, the offender communications services to be provided by the selected supplier(s) shall provide all needed functional, security/investigative and reporting capabilities that will enhance GDC's accomplishment of its mission by 1) ensuring public safety, 2) creating opportunities through additional communication streams to offenders in order to restore and maintain relationships within their families, 3) promoting self-improvement and reduce recidivism through educational offerings, 4) ensuring safe and secure facilities, 5) creating efficiencies for GDC staff and reducing manual processes, and 6) facilitating and supporting law enforcement.[3]

With regard to supplier qualification requirements, a solicitation must identify any relevant qualifications required to perform under the resulting contract, such as previous business experience or licensure requirements.[4] A state entity maintains discretion to determine its needs and the best method to accommodate them; however, those needs must be specified in a manner designed to achieve full and open competition.[5] DOAS will not substitute its judgment for that of the procuring entity or sustain a protest in the absence of clear and convincing evidence that the specifications are in fact

---

[2] Section 1.1 of Attachment A of the eRFP.
[3] *Id*.
[4] GPM Section 3.5.4.
[5] GPM Section 6.5. Step 4.

C. Ryan Germany
RE: Request for Formal Review
April 30, 2026
Page 4 of 8

impossible to meet or unduly restrict competition.[6] A protester's disagreement with the agency's judgment concerning the agency's needs and how to accommodate them does not show that the agency's judgment is unreasonable.[7] Furthermore, the prohibition against undue restriction of competition does not require that a state entity's needs be compromised in order to accommodate all potential offerors.[8] The GPM is clear that where a requirement reflects a procuring entity's minimum needs, the fact that the protester will be unable to meet the requirement does not establish that the specifications are impossible to meet or that the specifications unduly restrict competition.[9]

1. Smart Communications' argument that the eRFP is still severely restrictive

Smart Communications claims that lowering the ADP threshold from 35,000 to 30,000 does not increase competition. However, Smart Communications admits that the amended requirements add four additional states as potential contracting vehicles to qualify to submit a response to the RFP. Smart Communications compares that to "over 5,000 jurisdictions in the United States that use the types of services solicited in the eFRP" and alleges that, rather than analyze the market for inmate communication services, the "GDC is limiting the field to holders of only a handful of legacy contracts, representing a small sliver of the actual market for the services."

As noted in the February 16, 2026, Protest Decision, the supplier awarded Category A will be required to deploy and implement offender communications equipment and services across up to fifty-five (55) correctional facilities located throughout Georgia with a total ADP of over 45,000 offenders.[10] More specifically, as of August 2025, the 12-Month GDC ADP Trend lists a total ADP of 49,173 across all Category A facilities.[11] The current bed count across all Category A facilities is just over 49,200.[12] In essence, the 30,000 ADP threshold identified in the amended eRFP represents approximately sixty-percent (60%) of GDC's operational capacity.

First, as acknowledged by Smart Communications, there are six or possibly seven states and two federal agencies that met the 35,000 inmate ADP threshold under the eRFP's Initial Requirements. The qualifying states were Texas, California, Florida, Georgia, Ohio, Pennsylvania, (potentially) Arizona, in addition to two federal agencies—the Bureau of Prisons ("BOP") and Immigration and Customs Enforcement ("ICE"). By lowering the ADP threshold to 30,000, the Amended Requirements do add four additional states as potential contracting vehicles to qualify to submit a response to the eRFP—Michigan, New York, Illinois, and North Carolina. As such, the Amended Requirements open the field of competition to account for contracts with at least four (4) additional states. However, regardless of whether the Amended Requirements actively increase competition, as noted above, GDC is not required to compromise its needs, or increase its risk, to accommodate all potential offerors. As further discussed below, GDC's requirements have a rational basis, are not arbitrary, and do not unduly or unnecessarily restrict competition.

The GDC consistently maintains one of the highest offender populations in the nation. The operational complexity and risks involved with managing integrated systems at such scale are inherently different from that of local, regional, and state correctional institutions with smaller populations. As noted above, a state entity maintains discretion to determine its needs and the best method to accommodate them, and those needs must be specified in a manner designed to achieve

---

[6] *Id*.
[7] *Armstrong Elevator Co.*, B-415809, Mar. 28, 2018.
[8] *Illinois Bell Telephone Co.*, B-202238, Oct. 20, 1981.
[9] *Id*.
[10] *See* eRFP Attachment C.
[11] *Id*.
[12] *Id*.

C. Ryan Germany
RE: Request for Formal Review
April 30, 2026
Page 5 of 8

full and open competition.[13] However, fostering broad-based competition must be balanced with the needs of the agency. Here, GDC has determined that demonstrated experience supporting correctional institutions with an ADP of at least 30,000 is reasonably necessary to ensure the successful supplier can manage high-volume, real-time communications systems; maintain system availability and performance at scale; and support investigative monitoring across large populations and multiple facilities. DOAS must defer to GDC that such threshold represents a reasonable and proportionate proxy for required services and scalability. Accordingly, I find that that the ADP requirement is not arbitrary and does not unduly or unnecessarily restrict competition.

Smart Communications also alleges that allowing suppliers to demonstrate the required experience across one or more contracts and lowering the time threshold for providing tablets does not increase competition. I disagree. The amendments would now allow suppliers who have provided the required services to States or federal institutions with the required ADP and for the required time under separate contracts to aggregate such experience to meet the qualification requirements of the eRFP. Likewise, the reduced time threshold for providing tablets would allow more suppliers to potentially meet the qualification requirements. Again, regardless of whether the amended requirements actively increase competition,[14] the qualification requirements have a rational basis, are not arbitrary, and do not unduly or necessarily restrict competition.

Under the Amended Requirements, for tablets, experience must be demonstrated under a single contract. For all other Offender Communications Services, experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 30,000 offenders, and contract durations may not be aggregated across multiple contracts or agencies. Smart Communications appears to suggest that suppliers should be allowed to combine multiple, smaller contracts to meet the experience qualification requirements. However, the services sought by GDC require centralized monitoring, uniform policy enforcement, and immediate system-wide response. Such capabilities can only be proven through single, large-scale operational environments. Managing multiple smaller contracts does not demonstrate simultaneous system-wide control, unified security enforcement, or real-time integration across services. Therefore, GDC requires a supplier with experience managing large-scale systems under unified control. Limiting aggregation of contracts is reasonably related to integration risk and ensures suppliers can operate at the required scale as a unified system. Accordingly, I find that that this requirement has a rational basis, is not arbitrary, and does not unduly or unnecessarily restrict competition.

Likewise, the five-year experience requirement, and the two-year experience requirement for tablets, are reasonable in the context of the Contract Term contemplated in Section 1.7 of eRFP Attachment A, which provides for a total contract term of up to seven (7) years. GDC has determined that a demonstrated performance window similar in scope to that contemplated in the solicitation is necessary to gauge a supplier's ability to manage technology refresh cycles, respond to security threats, and ensure service continuity in an environment where there are severe consequences for service disruption. Such requirement reasonably reflects the need for a demonstrated history of successfully implementing and overseeing long-term large, complex projects from planning through completion with consideration to continuous operations and monitoring as well as ongoing maintenance to ensure operational stability and sustained performance over time. I again find that this requirement strikes an appropriate balance between ensuring proven capability and maintaining fair competition, as it sets a meaningful standard without being unnecessarily restrictive.

Finally, as noted above and in my February 19, 2026, Protest Decision, suppliers may bid on Category A, Category B, or both. By making each category available to a different supplier, GDC has encouraged competition, rather than restricting

---

[13] GPM Section 6.5. Step 4.

[14] As established above, the Amended Requirements did, in fact, open the field of competition to account for contracts with at least four (4) additional states.

C. Ryan Germany
RE: Request for Formal Review
April 30, 2026
Page 6 of 8

competition, by reducing the required experience qualifications for Category B based on the scale, scope, and risk involved in providing the necessary Offender Communication Services.

Based on my review of the entirety of the eRFP, GDC analyzed the degree of acceptable risk for performance under the contract and exercised its discretion in developing requirements that have a rational basis to meet its reasonable needs. Accordingly, I find no merit in these arguments.

2. Smart Communications' argument that the Amended Requirements are arbitrary compared to GDC's minimum needs

In its Amended Protest, Smart Communications argues that the Amended Requirements do not reasonably relate to GDC's actual minimum needs and therefore unduly restrict competition. Smart Communications claims the GDC is using "historical market position" as a stand-in for operational capacity and that such is nonsensical and arbitrary. As this issue substantially overlaps with the initial argument that the eRFP is overly restrictive, the following response is provided on that same basis.

First, I must note that requiring prior contract experience and performance is a common approach for determining a supplier's ability to perform under a comparable contract. With this eRFP, GDC seeks to procure, among other things, a turn-key offender telephone system, a turn-key video visitation system, and a correctional-grade mobile device/tablet solution that will allow offenders access to various applications. For Category A, the system must support calls, video sessions, messaging, payments, and tablets for all Category A facilities and up to an ADP of 49,200 offenders with a required uptime of 99.9% availability. The services to be provided serve as primary investigative and monitoring tools, must operate continuously, and must be fully integrated across all facilities. Any failure, compromise, outage, or disruption of the integrated system would present significant public safety risks, institutional security risks, investigative risks, and cybersecurity risks. In essence, this procurement involves a high-risk, mission-critical system where any failure, compromise, outage, or disruption at even a single facility could result in loss of control, intelligence gaps, safety incidents, external criminal coordination, or institutional disruption across all facilities.

The Scope of Services detailed in Attachment B of the eRFP makes clear the extensive operational risks, security risks, and public safety risks associated with the services to be provided under the eRFP and directly supports the need for high vendor qualifications. As described above, the challenged qualification requirements are directly tied to the identified operational, security, and public safety risks; reflect the scale and complexity of the State's correctional environment; and are not arbitrary but rather necessary to ensure suppliers have demonstrated experience that will allow them to successfully perform under the contract.

Accordingly, I find that the Amended Requirements are reasonable and justified to protect public safety and maintain secure corrections operations at this scale. As noted above, DOAS will not substitute its judgment for that of the procuring entity or sustain a protest in the absence of clear and convincing evidence that the specifications are in fact impossible to meet or unduly restrict competition.[15] The fact that some suppliers, including Smart Communications, may be unable to meet the protested qualification requirements does not establish that the same are impossible to meet or unduly restrict competition.[16]

3. Smart Communications' argument that reinforcing a duopoly will lead to worse outcomes for GDC and Georgia taxpayers

---

[15] *Id.*
[16] GPM Section 6.5. Step 4.

C. Ryan Germany
RE: Request for Formal Review
April 30, 2026
Page 7 of 8

In its Amended Protest, Smart Communications alleges that the market for inmate communication services is "a well-known duopoly" and that "allowing more bidders to respond will likely lead to more competitive bids from every potential bidder."

First, the GPM's purpose of fostering effective broad-based competition in the marketplace does not mean that a state entity is required to structure its solicitation requirements such that any supplier interested in bidding on a procurement is able to do so. In fact, the GPM contemplates that receipt of only a single responsive and responsible bid is sufficient for competitive procurements if the issuing officer determines that the price submitted is fair and reasonable.[17] Therefore, the GPM also implicitly acknowledges that responsive and responsible responses from two suppliers can likewise satisfy the competition requirements of the GPM.

As described above, the qualification requirements reflect GDC's reasonable needs for this procurement and are based on operational risks, security risks, and system complexity rather than supplier market share. Ultimately, GDC seeks a responsible supplier who can successfully deliver and perform the required Offender Communication Services, and GDC bears the risks and effects of any difficulties experienced in obtaining the required performance. The claim that the market for inmate communications services may be concentrated does not invalidate GDC's legitimate qualification requirements, and GDC is not required to lower standards, and therefore increase risks, to increase competition.

Smart Communications notes that procurement professionals have a fiduciary duty to deliver the "best value" to Georgia citizens and claims that potentially leaving money on the table does not meet that standard. However, the "best value" in Georgia is not simply a matter of cost or revenue. Rather, it is a combination of vendor performance capability, quality, services, time, and cost considerations. The "best value" to the state is that which appropriately balances cost with all needs and duties imposed on GDC in the context of the procurement, and GDC is charged with providing necessary services for its inmate populations while protecting Georgians by operating secure facilities.  Here, I must defer to GDC's reasonable conclusion that the potential consequences of failed performance by an under-qualified supplier outweigh the potential for increased costs or reduced revenues.

Furthermore, I must note that Smart Communications' argument that the eRFP will reinforce a duopoly is actively undermined by the eRFP's structure, which allows for different suppliers to be awarded Category A and Category B.  The supplier awarded Category B will be required to deploy and implement offender communications equipment and services across up to eleven (11) facilities with an ADP of over 4,000 offenders. Accordingly, the qualification requirements for Category B may be demonstrated through contracts with a County/Regional correctional agency, state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 2,800 offenders. These requirements are structured to allow multiple other suppliers who may not otherwise qualify for contract award under Category A to enter the State government correctional space and gain necessary experience for future contracting opportunities.

In both its Protest of the original qualification requirements and its Request for Formal Review, Smart Communications requested that the eligibility requirements for Category A be amended to allow suppliers to demonstrate experience through contracts with correctional agencies with a total ADP of 3,000 offenders within the past two (2) years. Based on the Remedy previously requested by Smart Communications, which suggested GDC modify the eRFP to focus on a

---

[17] GPM Section 5.9.3. Furthermore, the GPM contemplates that there will be instances when only one source is capable of meeting the needs of a state entity. Where only one source is capable of meeting the applicable specifications, there is no need to solicit bids from other suppliers. This is confirmed by O.C.G.A § 50-5-67, which states that contracts shall be awarded on the basis of competitive bids "whenever possible."

C. Ryan Germany
RE: Request for Formal Review
April 30, 2026
Page 8 of 8

minimum for inmates and facilities served rather than focusing on ADP of a single contract, it appears the ADP requirement is Smart Communications' primary requirement of concern. The ADP required for Category B is lower than that requested by Smart Communications. Therefore, it appears that Smart Communications, and multiple other suppliers, likely have the experience required to compete for, and potentially be awarded, a contract under Category B.

C.      Decision

In the eRFP, GDC notes that obtaining new updated technology and equipment is paramount to securing GDC facilities and ensuring public safety. GDC has also explained that the offender communications services provided by the selected supplier(s) will provide all needed functional, security/investigative, and reporting capabilities that will enhance GDC's accomplishment of its mission. The qualification requirements for both Category A and Category B are directly related to the nature, scale, scope, risk, and duration of the services to be provided under the resulting contract.

As explained above, DOAS will not substitute its judgment for that of the procuring entity or sustain a protest in the absence of clear and convincing evidence that the specifications are in fact impossible to meet or unduly restrict competition. It is also not DOAS's role to recommend that GDC assume greater risk by lowering its qualification requirement thresholds. Based on my review of the record, I find that the Amended Requirements have a rational basis, are not arbitrary, and do not unduly or unnecessarily restrict competition.  Although Smart Communications may disagree with the GDC's assessment of its needs, its disagreement with GDC's qualification assessments, without more, does not render GDC's determination unreasonable. I further find that the qualifications requirements do not violate any fiduciary duties imposed on GDC.

Accordingly, your protest is denied.

Sincerely,

Carrie Steele
Deputy Commissioner

cc: Ross Barrineau, ross.barrineau@gdc.ga.gov

---

# Exhibit 7

# GILBERT, HARRELL, SUMERFORD & MARTIN

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW

ESTABLISHED 1871

www.gilbertharrelllaw.com
DIRECT DIAL – (678) 672-9230
EMAIL: rgermany@ghsmlaw.com

May 4, 2026

VIA ELECTRONIC MAIL

Rebecca Sullivan
Commissioner
Georgia Department of Administrative Services
200 Piedmont Ave. SE
Suite 1804, West Tower
Atlanta, Georgia 30334
*protests@doas.ga.gov*

> **Re:    Smart Communications Request for Formal Review of**
> **Amended Protest #2026-PRO-0029 (RFP 46700-GDC0001179—**
> **Offender Communication Services)**

Dear Commissioner Sullivan:

Smart Communications ("SmartComm") respectfully requests a Formal Review of the April 30, 2026 denial of its Amended Protest and a hearing before the DOAS Commissioner. Because the State Purchasing Division Deputy Commissioner did not make a written determination that the closing of the solicitation without delay is necessary to protect the interests of the state in her Initial Decision, SmartComm requests a stay of the closing of the RFP until a final determination of this protest.

Even after amending the RFP restrictions in response to SmartComm's Initial Protest, those requirements remain unduly restrictive, anti-competitive,

Request for Formal Review of Amended Protest
May 4, 2026

arbitrary, and violative of the fiduciary duty requirement in the Georgia

Procurement Manual ("GPM").

The minimum requirements in the RFP are specifically described in

SmartComm's Amended Protest. Essentially, GDC's requirement of providing the

requested services to a customer with an average daily population ("ADP") of at

least 30,000 inmates means that potential suppliers must have had a contract with

one of eleven states or two federal agencies for five of the past ten years (two years

for tablets) (hereinafter referred to as the "RFP Restrictions"). The Amended

Protest Decision states "DOAS must defer to [Georgia Department of Corrections]

that such threshold represents a reasonable and proportionate proxy for required

services and scalability." But any proxy must actually be tied to GDC's needs. For

the reasons set forth in SmartComm's Initial Protest, Initial Request for Formal

Review (including the declarations of Jon Logan and Professor Nathan Miller),

Amended Protest, and this Request for Formal Review of the Amended Protest

Decision,[1] GDC's requirements are not a reasonable and proportionate proxy to its

actual needs. They are not even a rational proxy, and they certainly do not allow for

the full and open competition required by the GPM.

I.    **The RFP Restrictions lack a rational basis because they are
      contradicted by GDC's own actual experience.**

SmartComm does not dispute that GDC needs a supplier that "can manage

high-volume, real-time communications systems, maintain system availability and

---

[1] Each of the previous filings are incorporated herein by reference.

2

Request for Formal Review of Amended Protest
May 4, 2026

performance at scale, and support investigative monitoring across large populations and multiple facilities." In fact, SmartComm is more than able to fulfill those needs and simply asks for a chance to make a proposal that demonstrates and confirms its capabilities.

While GDC's needs as articulated by the Amended Protest Decision are rational, the RFP Restrictions that GDC has put in place are not rationally related to those needs because they ignore GDC's actual, historical experience. When distilled to its essence, GDC's basis for the RFP Restrictions is that the size and complexity of Georgia's prison system requires a supplier that has provided those services to a single customer before. As pointed out in the Amended Protest, the RFP Restrictions mean that likely only the two historically dominant providers of inmate communication services (in a market that is well-known duopoly) will qualify to submit proposals to Georgia. One of those providers is Georgia's current provider, Securus/JPay, who by GDC's own admissions had a failed implementation after being awarded the most recent RFP.

If GDC's logic actually reflected reality, the fact that its current provider holds contracts with multiple customers with an ADP greater than 30,000 would have led to a successful implementation of the inmate communications system that Georgia awarded in 2020. But that was not case. The RFP itself states that tablet implementation under its current contract was paused in 2022 "due to an unforeseen occurrence" and that "only a small amount of JPay tablets still exist

3

Request for Formal Review of Amended Protest
May 4, 2026

throughout the state which has caused a significant decrease in revenue." RFP, pg. 2.

Other issues that Georgia had with implementation of its current inmate communication services are well-covered in the public record. According to public reports, GDC told Securus in December 2022 that "it wanted to cancel its tablet deal due to concerns about 'tablet security, scheduling delays, and other requirements under the contract,' according to emails and contract drafts obtained via an open records request."[2] That same reports points out that GDC and Securus negotiated a settlement in 2023 that resulted in cancelling that portion of the contract, returning tablets to the company, and included a non-disparagement clause.[3] Prior to cancellation of that portion of the contract, other public reports disclosed that Securus/JPay was unable to fulfill tablet orders "due a depletion in tablet inventory,"[4] that tablets were easily hacked to allow inmates internet access,[5] and that "many Georgia prisoners have been without electronic communication with their loved ones for over six months during the merger of JPay and Securus."[6]

---

[2] Walk-Morris, Tatiana, *Prison telecom providers are shifting strategy by exploiting tablet services*, Prism (December 9, 2024), https://prismreports.org/2024/12/09/prison-telcom-providers-exploit-tablet-services/.
[3] Id.
[4] Perez, Christy, *How Exactly Are Tablets Supposed to Solve Georgia's Prisons Crisis?,* Filter Magazine (April 6, 2022), https://filtermag.org/georgia-department-corrections-jpay-tablets/.
[5] Perez, Christy, *How Tablets Changed Georgia Prisons More Than GDC Intended*, Filter Magazine (November 19, 2024), https://filtermag.org/prison-internet-tablets-cellphones/.
[6] Perez, Christy, *Delays and Obstacles Disrupt Communications for Georgia Prisoners*, Shadowproof (January 30, 2023),

Request for Formal Review of Amended Protest
May 4, 2026

GDC now posits that it can only accept proposals from its current provider who failed to perform according to the last RFP, and the other member of the duopoly, and that to do otherwise "would present significant public safety risks, institutional security risks, investigative risks, and cybersecurity risks. But every one of those risks that GDC says they seek to avoid is exactly what occurred with the legacy provider of the current system. If the RFP Restrictions were a good proxy for operational capability, Georgia would not have experienced those issues. GDC's own historical experience shows that the RFP Restrictions are not rationally related to their stated goals. Ignoring the actual evidence of what occurred in the previous implementation makes the RFP Restrictions arbitrary.

In their market research, GDC certainly would have seen that the other legacy provider that would qualify under the RFP Restrictions, ViaPath (formerly Global Tel*Link) has faced similar issues in states as Securus/JPay has in Georgia. In terms of cybersecurity risk, the FTC alleged and reached a consent order with Global Tel*Link that it "failed to implement adequate security safeguards to protect personal information they collect from users of its services, which enabled bad actor to gain access to unencrypted personal information."[7]

---

https://shadowproof.com/2023/01/30/delays-and-obstacles-disrupt-communications-for-georgia-prisoners/.

[7] *FTC Takes Action Against Global Tel*Link Corp. for Failing to Adequately Secure Data, Notify Consumers After Their Personal Data Was Breached*, Federal Trade Commission (November 16, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/11/ftc-takes-action-against-global-tellink-corp-failing-adequately-secure-data-notify-consumers-after.

Request for Formal Review of Amended Protest
May 4, 2026

The RFP Restrictions do not exist in a vacuum. GDC seeks to ignore the failures it has experienced with a vendor who meets its qualifications and preclude other well-qualified suppliers based on extraordinarily heightened requirements that have no relation to GDC's actual needs. That is exactly what makes the RFP Restrictions arbitrary and unduly restrictive.

## II.   The RFP Restrictions Violate GDC's Fiduciary Duty

The Amended Protest Decision states that GDC's fiduciary duty to deliver the best value to Georgia citizens "is not simply a matter of cost or revenue." "Rather, it is a combination of vendor performance capability, quality, services, time, and cost considerations." *Id*. But this is exactly why the RFP as currently configured does violate the fiduciary duty requirement in the GPM. As pointed out in Professor Nathan Miller's declaration, attached hereto as Exhibit 1, "the benefit of soliciting additional bids…is that it induces suppliers to offer more favorable contract terms in response to competitive pressure." Miller Declaration, ¶17. Professor Miller's research on the exact type of solicitation at issue here shows that the same companies submit different proposals when the level of competition increases. In fact, Professor Miller's research conservatively estimates that the revenue to the state would increase $6.7 million annually, or $46.9 million over the potential life of the contract, in a five bidder RFP as compared to a two bidder RFP.

SmartComm does not propose that GDC change its standards one iota in terms of vendor performance capability, quality, services, time, or cost

6

Request for Formal Review of Amended Protest
May 4, 2026

considerations. SmartComm simply proposes, and Georgia law requires, that GDC structure the procurement in a way that incentivizes potential suppliers to submit their most competitive offers. For example, Securus and ViaPath will almost certainly submit proposals responding to the RFP. Professor Miller's clear and uncontroverted research shows that those proposals will contain significantly lower revenue sharing back to GDC in a two bidder RFP than they would in a five bidder RFP. The vendor performance capability, quality, services, time, and any other considerations other than cost will not change, and if Securus or ViaPath present the most attractive bids, they could be awarded the contract in either situation. The only difference will be the significant amount of revenue, conservatively estimated at $46.9 million over the potential life of the contract, that the RFP Restrictions would require Georgia taxpayers to pick up. If the fiduciary duty requirement has any meaning at all, it cannot allow the RFP Restrictions to stand.

## REMEDY

There are numerous ways that GDC could amend the structure of the solicitation so that it ensures any successful supplier will be able to "manage high-volume, real-time communications systems, maintain system availability and performance at scale, and support investigative monitoring across large populations and multiple facilities." And other large jurisdictions have recently issued RFPs that do just that. The Bureau of Prisons tablet solicitation began by setting restrictive requirements to qualify to submit a bid but changed course and now is evaluating past performance and giving a preference "to proposals that demonstrate

7

Request for Formal Review of Amended Protest
May 4, 2026

a proven approach to managing projects of comparable size and scope." BOP RFP at

pg. 145. The relevant language from the Bureau of Prisons, which houses a

significantly larger population and more geographic diverse population that

Georgia, RFP states:

> Recent and relevant past performance shall be evaluated on its performance under
> existing and prior contracts for similar services, with an emphasis on the similarity of the
> Offeror's experience to the Request for Proposal (RFP). Preference will be given to
> proposals that demonstrate a proven approach to managing projects of comparable size
> and scope, including the ability to effectively oversee multiple concurrent installations, as
> well as the operation and management of the physical tablet and its operating
> environment across numerous correctional institutions. The purpose of Past Performance
> is to allow the government to review the Offeror's recent and historical probability of
> meeting the solicitation requirements.
>
> An Offeror's past performance information shall include a minimum of three (3) of the
> offeror's most recent contracts occurring during the past five years that are similar and
> relevant in nature to the services required in the Statement of Objectives. Contracts listed
> may include those entered into with the Federal Government, agencies of state and local
> government, and commercial entities.  Offerors shall address any instances of past
> performance problems in the referenced contracts and explain how these problems were
> resolved. The Government may consider efforts performed by the Offeror for agencies of
> the federal, state, or local governments and commercial customers as potentially relevant
> to the Past Performance evaluation.

BOP RFP at pg. 145.

Similarly, South Carolina recently changed course in an ongoing

solicitation for inmate communication services in that state from requiring a

strict ADP requirement in single contracts to looking at the aggregate

population that a potential bidder serves. South Carolina's revised

requirement states:

> *Offeror must currently provide inmate telephone, secure inmate messaging,*
> *inmate trust fund deposit, and inmate tablet services to a combined average daily*
> *inmate population of at least 50,000 inmates in aggregate and to at least one*
> *federal, state, regional, or local department of corrections which operates two or*

8

Request for Formal Review of Amended Protest
May 4, 2026

> *more correctional facilities with average daily inmate populations of 500 or more inmates for at least the last 3 years.*

These are but two examples of the many ways that GDC can ensure that any successful bidder meets the high standards of operational capability that Georgia requires while not unreasonably restricting competition with arbitrary minimum requirements.

## CONCLUSION

The RFP Restrictions violate Georgia procurement law, and they should be modified or waived to ensure competitive fairness and compliance with Georgia law. The clear and convincing evidence shows that the RFP Restrictions unduly restrict competition and are not rationally related to GDCs actual minimum needs. SmartComm requests that DOAS reverse or modify the Amended Protest Decision and stay the closing of the solicitation until after a final decision on this protest is reached. SmartComm requests a hearing in front of the DOAS Commissioner.

Sincerely,

C. Ryan Germany
Georgia Bar No. 500691
GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.
675 Ponce de Leon Ave NE
Suite 8500
Tel: (678) 672-9230
rgermany@ghsmlaw.com

9

Request for Formal Review of Amended Protest
May 4, 2026


CERTIFICATION PURSUANT TO GEORGIA PROCUREMENT MANUAL SECTION 6.5.6


_____
Jon Logan, CEO & President
Smart Communications
104941 72nd St.
Seminole, FL 33777

# Exhibit 7-1

**IN THE DEPARTMENT OF ADMINISTRATIVE SERVICES
STATE OF GEORGIA**

In re:

Smart Communications Amended
Protest to RFP 46700-GDC0001179
Offender Communication Services

Protest No. 2026-PRO-00029

## <u>SUPPLEMENTAL DECLARATION OF JON LOGAN</u>

1. My name is Jon Logan. I am the founder and CEO of Smart Communications ("SmartComm"). I provide this declaration to supplement my March 6, 2026 declaration to add information on the four additional states that are now potential contract vehicles to qualify for the Amended RFP.

**THE AMENDED RFP RESTRICTIONS**

2. On April 8, 2024, DOAS issued Addendum 4 to the RPF, which, among other things, changed the minimum requirements for eligibility to Category A to:

- For Tablets, the Supplier must have a minimum of two (2) years of continuous experience within the past ten (10) years providing an offender Tablets solution under a single contract which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders. The Supplier must have served as the prime contractor responsible for the provision of these services.

- For all other Offender Communications Services, the Supplier must have a minimum of five (5) years of continuous experience within

1

the past ten (10) years providing each of the required Offender Communications Services (with the exception of Tablets) which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders. Experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 30,000 offenders, and contract durations may not be aggregated across multiple contracts or agencies. The Supplier must have served as the prime contractor responsible for the provision of these services.

Attachment H, Mandatory Response Worksheet, Version 3. These Amended Requirements essentially do two things: 1) they lower the average daily population ("ADP") requirement for qualifying contracting vehicles from 35,000 to 30,000, and 2) they allow a vendor to meet the minimum requirements by providing the required services through different state contracts where the previous requirements required a bidder to provide all required services to a single state.

3.     As CEO of SmartComm, I keep up with industry news, procurements, and competitors. Because our industry provides services to government agencies, the structure, timing, and providers for those services are generally a matter of public record. In particular, I am generally aware of the provider(s) different states use for inmate communications, including phone, video visitation, and tablets.

2

4.      The Amended RFP Requirements add only four states as potential contracting vehicles to be eligible for the solicitation—Michigan, New York, Illinois, and North Carolina.

**THE FOUR ADDITIONAL STATES DO NOT INCREASE COMPETITION**

5.      Michigan's telephone and video visitation services are provided by ViaPath.[1] Tablets are provided by a Securus subsidiary, JPay.[2]

6.      New York utilizes Securus for telephone calls[3] and JPay for tablets.[4]

7.      In October 2024, Illinois signed a contract switching all of its inmate communication services to ICSolutions.[5] The transfer to ICSolutions from Securus began taking effect in February 2025, meaning that ICSolutions has not met the minimum service requirements (five years for phone and video visitation

---

[1] Michigan Department of Technology, Management & Budget. Contracts for Electronic Prisoner Service. https://www.michigan.gov/dtmb/procurement/mideal-extended-purchasing-program/mideal-contract-search/categories/folder-2/electronic-prisoner-services. Accessed May 11, 2026.
[2] *See* Note 1, *supra.*
[3] New York State Department of Corrections. Telephone Calls. https://doccs.ny.gov/telephone-calls. Accessed May 11, 2026.
[4] New York State Department of Corrections. Secure Messaging Program. https://doccs.ny.gov/secure-messaging-program. Accessed May 11, 2026.
[5] NASPO ValuePoint. Participating Addendum between Illinois Department of Corrections and ICSolutions. https://s3.documentcloud.org/documents/25471585/il-doc-icsolutions-naspo-participating-addendum-idoc-102224-v3-2-executed.pdf. Accessed May 11, 2026.

3

services and two years for tablets) of the Amended RFP through its Illinois contract.[6]

8.      North Carolina's inmate communication services are provided by ViaPath.[7]

## BOTH THE BUREAU OF PRISONS AND SOUTH CAROLINA HAVE TAKEN A MORE HOLISTIC APPROACH

9.      On March 5, 2026, the Federal Bureau of Prisons ("BOP") released a revised RFP for their tablet implementation initiative. This initiative is to provide a correctional grade tablet and supporting infrastructure to all 153,104 federal inmates (more than three times the size of Georgia's inmate population).[8] *See* Statement of Objectives for: Inmate Tablet Initiative, attached hereto as Exhibit 5.

10.      While earlier versions of the BOP RFP included restrictive experience requirements to even qualify to submit a proposal, the current version scrapped that approach, instead focusing on qualitative analysis of each offeror's relevant experience. BOP's RFP states:

---

[6] Illinois Department of Corrections. Phone Vendor Transition Information. https://idoc.illinois.gov/content/dam/soi/en/web/idoc/familyfriends/documents/Phone-transition-One-PagerFAQ.pdf. Accessed May 11, 2026.
[7] North Carolina Department of Adult Correction. Telephone and Tablet Services. https://www.dac.nc.gov/divisions-and-sections/institutions/telephone-tablet-services. Accessed May 11, 2026.
[8] Federal Bureau of Prisons Inmate Tablet Implementation Initiative. "Population Information." https://sam.gov/workspace/contract/opp/c086f72ffa7b40dda9ad969ad5c92da7/view. Accessed March 6, 2026.

4

Recent and relevant past performance shall be evaluated on its performance under existing and prior contracts for similar services, with an emphasis on the similarity of the Offeror's experience to the Request for Proposal (RFP). Preference will be given to proposals that demonstrate a proven approach to managing projects of comparable size and scope, including the ability to effectively oversee multiple concurrent installations, as well as the operation and management of the physical tablet and its operating environment across numerous correctional institutions. The purpose of Past Performance is to allow the government to review the Offeror's recent and historical probability of meeting the solicitation requirements.

An Offeror's past performance information shall include a minimum of three (3) of the offeror's most recent contracts occurring during the past five years that are similar and relevant in nature to the services required in the Statement of Objectives. Contracts listed may include those entered into with the Federal Government, agencies of state and local government, and commercial entities. Offerors shall address any instances of past performance problems in the referenced contracts and explain how these problems were resolved. The Government may consider efforts performed by the Offeror for agencies of the federal, state, or local governments and commercial customers as potentially relevant to the Past Performance evaluation.

*See* Federal Bureau of Prisons RFP 15BPCC26R00000001-0003, pg. 145 (Past Performance Evaluation). If Georgia took a similar approach to the BOP, they could increase the number of qualified offerors to their RFP to likely at least five responders while still being able to assess an offeror's ability to implement a project of the RFP's size and scope.

5

11.     Similarly, South Carolina recently changed course in an ongoing solicitation for inmate communication services in that state from requiring a strict ADP requirement in single contracts to looking at the aggregate population that a potential bidder serves. South Carolina's revised requirement states:

> *Offeror must currently provide inmate telephone, secure inmate messaging, inmate trust fund deposit, and inmate tablet services to a combined average daily inmate population of at least 50,000 inmates in aggregate and to at least one federal, state, regional, or local department of corrections which operates two or more correctional facilities with average daily inmate populations of 500 or more inmates for at least the last 3 years.*

12.     South Carolina and the BOP are but two examples of the many ways that GDC can ensure that any successful bidder meets the high standards of operational capability that Georgia requires while not unreasonably restricting competition with arbitrary minimum requirements.

SIGNATURE ON FOLLOWING PAGE

6

I, Jon Logan, declare under penalty of perjury that the foregoing statements were prepared with the assistance of counsel and the assistance of employees of Smart Communications, upon which I have relied, and are true and correct to the best of my knowledge, information, and belief.

This 11th day of May, 2026

_____
JON LOGAN

7

# Exhibit 7-2

# Smart Communications Request for Formal Review of Amended Protest

RFP 46700-GDC0001179

OFFENDER COMMUNICATION SERVICES

# First RFP Restrictions

Contractor…must have a minimum of five (5) years of experience within the last 10 years in providing all of the required Offender Communications Services to another individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders.

Question M2A, Mandatory Response Worksheet (Attachment H).

Contractor must have **successfully completed an implementation project** to install, provide, and maintain the required Offender Communication Services to include, at a minimum, offender telephones, offender video visitation stations and offender tablets individual single state's Department of Corrections or Federal correctional agency (i.e., Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 35,000 offenders within the past 10 years.

Question M4A, Mandatory Response Worksheet, , (Attachment H).

# Amended RFP Restrictions

For Tablets:

- minimum of two (2) years of continuous experience within the past ten (10) years providing an offender Tablets solution under a single contract which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders.

- The Supplier must have served as the prime contractor responsible for the provision of these services.

For all other Offender Communications Services:

- minimum of five (5) years of continuous experience within the past ten (10) years providing each of the required Offender Communications Services (with the exception of Tablets) which includes installation and maintenance for a state Department of Corrections or Federal correctional agency (i.e. Federal Bureau of Prisons, US Immigrations and Customs Enforcement) with a minimum ADP of 30,000 offenders.

- Experience may be demonstrated across one or more contracts (for example one contract for telephone and one contract for video visitation services); however, each contract must have supported a minimum ADP of 30,000 offenders, and contract durations may not be aggregated across multiple contracts or agencies.

- The Supplier must have served as the prime contractor responsible for the provision of these services.



Results of Initial RFP Restrictions



# Effects of Amended RFP Restrictions

- Adds 4 more states as potential qualifying vehicles.
  - Does not add any actual competition.

- Removes "successful implementation" requirement.
  - Why?

- Rather than actually increasing competition, only serves to shore up qualifications of duopoly providers.

# Relevant Sections of 6.5, Step 4

A state entity maintains discretion to determine its needs and the best method to accommodate them and the responsibility for drafting proper specifications that reflect the state's needs is the procuring entity's. **However, those needs must be specified in a manner designed to achieve full and open competition**.

The GPM is clear that where a requirement reflects a procuring entity's minimum needs, the fact that the protester will be unable to meet the requirement does not establish that the specifications are impossible to meet or that the specifications unduly restrict competition.

- Amended Protest Decision, pg. 4.

# GDC's Actual Needs vs. Requirements

Amended Protest Decision does a good job setting out GDC's Actual Needs:

- "Deploy and implement inmate communications equipment and services across up to fifty-five (55) correctional facilities located throughout Georgia with a total ADP of over 45,000 inmates."

- "Ensure that successful supplier can manage high-volume, real-time communications systems, maintain system availability and performance at scale, and support investigative monitoring across large populations and multiple facilities."

- "Centralized monitoring, uniform policy enforcement, immediate system-wide response."

- "Simultaneous system-wide control, unified security enforcement, real-time integration across services."

- "Extensive operational risks, security risks, and public safety risks"

- "Necessary to ensure suppliers have demonstrated experience that will allow them to successfully perform under the contract."

# Minimum Requirements are Not Rational Proxy for Actual Needs

GDC's Minimum Requirements Ignore its Actual Experience
• That makes them arbitrary.

GDC's Actual Needs are Measurable Without Need for such harsh restrictions that favor legacy providers.

# GPM Prioritizes Competition

The purpose of the GPM is to…

- Provide increased economy in state procurement activities and **maximize to the fullest extent possible the purchasing value of public funds**.

- Foster **effective broad-based competition** in the marketplace.

Section I.1.1

# Other Areas Where GPM Clearly Shows Bias should be Toward More Competition

### 3.5.4. Supplier Qualification Requirements

Whether the state entity intends to prequalify suppliers (through use of the RFQC process or other SPD-approved methods) or review suppliers' qualifications as part of evaluating the supplier's response to an RFQ or RFP, the solicitation must identify any relevant qualifications required to perform under the resulting contract, such as previous business experience or licensure requirements. **The procurement professional must ensure that identified qualification requirements do not unreasonably or unnecessarily restrict competition.**

### 3.5.5.1. RFQ Specifications and Requirements

For RFQs, identifying the minimum products and/or service requirements may include use of any of the following: performance specifications, design specifications, references to particular products for reference purposes, use of qualified products lists, and performance and service requirements. To be considered responsive, the supplier's bid must meet all of the identified specifications and requirements. Therefore, **the procurement professional must use caution in developing and writing specifications and requirements to ensure competition is not unreasonably or unnecessarily restricted.**

# Fiduciary Duty

I.4.4.3. Fiduciary Duty

All procurement professionals play an important role in ensuring needed goods and services are procured in an efficient and economical manner while gaining and retaining public trust and confidence. The procurement professional is responsible for developing contracts at competitive prices to avoid waste and deliver the best value to the employer and Georgia citizens.

# Fiduciary Duty Requirement

- Amended Protest Decision correctly says:

◦ "'[B]est value' in Georiga is not simply a matter of cost or revenue. Rather, it is a combination of vendor performance capability, quality, services, time, and cost considerations. The best value to the state is that which appropriately balances cost with all needs and duties imposed on GDC in the context of this procurement."

- We are not arguing that revenue should control.

- Dr. Nathan Miller's Expert Report and the body of research that it relies on shows that GDC is structuring this solicitation so that the exact same offerors will submit bids that are worse off to the state.

- GDC could easily get the exact same "performance capability, quality, services, time and cost considerations" with increased revenue to the state. Not doing that violates fiduciary duty.

# Fiduciary Duty to the State Does Not Allow this Amount of Lost Revenue

- Applying the findings from the empirical model in my study to the relevant population of inmates in Georgia indicates that commissions paid to the correctional authority could increase by as much as $2.3 to $6.7 million per year, or from $9.2 million to $26.8 million over the course of a four-year contract.  I view this range as conservative for reasons that I describe below.

- Remember, everything else would remain the same.

# Substantial Lost Revenue to the State

Table 1: How Commission Payments Vary with the Number of Bidders

| Number of Bidders | Tablet Revenue | | All Revenue | |
|---|---|---|---|---|
| | Commission Payment (million $) | Increase Relative to 2 Bidders | Commission Payment (million $) | Increase Relative to 2 Bidders |
| 2 | $1.4 | | $4.1 | |
| 3 | $3.1 | $1.7 | $9.0 | $4.9 |
| 4 | $3.5 | $2.1 | $10.2 | $6.1 |
| 5 | $3.7 | $2.3 | $10.8 | $6.7 |

# SC and BOP Show There is Another Way

**Bureau of Prisons:**

*Recent and relevant past performance shall be evaluated on its performance under existing and prior contracts for similar services, with an emphasis on the similarity of the Offeror's experience to the Request for Proposal (RFP). Preference will be given to proposals that demonstrate a proven approach to managing projects of comparable size and scope, including the ability to effectively oversee multiple concurrent installations, as well as the operation and management of the physical tablet and its operating environment across numerous correctional institutions. The purpose of Past Performance is to allow the government to review the Offeror's recent and historical probability of meeting the solicitation requirements.*

**South Carolina:**

*Offeror must currently provide inmate telephone, secure inmate messaging, inmate trust fund deposit, and inmate tablet services to a combined average daily inmate population of at least 50,000 inmates in aggregate and to at least one federal, state, regional, or local department of corrections which operates two or more correctional facilities with average daily inmate populations of 500 or more inmates for at least the last 3 years.*

# Exhibit 8



Brian P. Kemp                                                                                                    Rebecca N. Sullivan

May 20, 2026

**VIA-EMAIL**

C. Ryan Germany
Gilbert, Harrell, Sumerford & Martin, P.C.
675 Ponce de Leon Ave NE, Suite 8500
Atlanta, Georgia 30308
rgermany@ghsmlaw.com

RE:    Protest #2026-PRO-00029
       Request for Formal Review of Amended Protest Regarding
       RFP 46700-GDC0001179 "Offender Communications Services"

Dear Mr. Germany:

This letter responds to Smart Communications' Request for Formal Review ("Appeal") of the Deputy Commissioner of the State Purchasing Division's ("Deputy Commissioner") April 30, 2026, Amended Protest Decision ("Amended Protest Decision"). For the reasons in this letter, the Appeal is denied.

A.     Background and Procedural History

On December 5, 2025, the Georgia Department of Corrections ("GDC") issued RFP 46700-GDC0001179 entitled "Offender Communications Services" ("eRFP") seeking suppliers to provide comprehensive offender communications services, including telephone systems, video visitation, tablets, and related services.[1] The services to be provided pursuant to the eRFP are divided into two (2) categories, Category A and Category B.  Suppliers are required to respond to at least one (1) category, and each category may be awarded to different suppliers. With regard to Category A, the eRFP contemplates a statewide deployment across numerous correctional facilities supporting tens of thousands of offenders and requiring integrated, real-time communications systems. The Scope of Services found in Attachment B of the eRFP requires, inter alia: system availability of approximately 99.9%; continuous monitoring and recording capabilities; integration across multiple platforms (OTS, VVS, tablets, deposits); and compliance with extensive security, investigative, and operational requirements.

On January 14, 2026, Smart Communications filed a protest challenging the competitive solicitation process and alleging that the qualification requirements for Category A are unduly restrictive, anti-competitive, not reasonably related to successful contract performance, and inconsistent with the Georgia Procurement Manual's ("GPM") requirements for open and fair competition. Smart Communications does not challenge the requirements for Category B. On February 16, 2026, the Deputy Commissioner issued a Protest Decision denying Smart Communications' protest and finding that the qualification requirements were not arbitrary and did not unduly or unnecessarily restrict competition.[2]

---

[1] The full background and procedural history for this matter can be found in the Deputy Commissioner's Amended Protest Decision. Said Background and Procedural History is hereby adopted and incorporated into this decision.

[2] While the Protest Decision initially stated that Smart Communications' protest was timely, I disagree. I note that pursuant to GPM Section 6.5.7, said protest was required to be filed within ten (10) calendar days after Smart Communications knew or should have known of the occurrence of the action which is protested, or the protest filing deadline located in Table 6.8, whichever date is earlier.

C. Ryan Germany
May 20, 2026
Page 2 of 4

Smart Communications filed a Request for Formal Review of the Protest Decision on February 19, 2026, and a hearing was conducted on March 9, 2026. At the hearing, Smart Communications submitted additional information and evidence relating to the contested qualification requirements, arguing that the requirements are highly restrictive and artificially narrow the pool of potential suppliers.

On April 8, 2026, GDC amended the eRFP, and I remanded the matter, allowing Smart Communications to withdraw or amend its protest. Smart Communications filed an Amended Protest on April 17, 2026. The Deputy Commissioner issued an Amended Protest Decision on April 30, 2026, finding that the amended requirements have a rational basis, are not arbitrary, and do not unduly or unnecessarily restrict competition. The Deputy Commissioner further found that the amended requirements do not violate any fiduciary duty imposed on the GDC. Smart Communications filed its Appeal of the Amended Protest Decision on May 4, 2026, and a hearing was conducted on May 18, 2026.

B.      Smart Communications' Arguments

In its Appeal, as in its Amended Protest, Smart Communications claims that the amended requirements remain unduly restrictive, anti-competitive, arbitrary, and violative of the fiduciary duty requirement in the Georgia Procurement Manual ("GPM"). Smart Communications argues that GDC's requirements are not a reasonable, rational, or proportionate proxy to its actual needs and do not allow for the full and open competition required by the GPM. More specifically, Smart Communications alleges that the amended requirements lack a rational basis because they are contradicted by GDC's own actual experience.

1.    Restrictive Requirements

First, Smart Communications acknowledges that GDC's needs are rational but claims that the amended requirements are not rationally related to those needs because they ignore GDC's actual historical experience.[3] According to Smart Communications, there are likely only two suppliers that can meet the eRFP's amended requirements, Securus/JPay and ViaPath. Smart Communications alleges that Securus/JPay previously failed to successfully implement an offender communications services contract with the State of Georgia and that ViaPath has likewise previously experienced operational and cybersecurity failures in other states.[4] Smart Communications argues that if the amended requirements were a good proxy for operational capability, the cited failures would not have occurred.

The standard for review of restrictive requirements is not whether such requirements guarantee successful contract performance; rather, the relevant inquiry is whether the requirements reasonably reflect the state entity's needs.[5] The government's interest in *reducing* the risk of unsuccessful performance is a legitimate basis for including a restrictive solicitation provision.[6] The fact that a prior supplier or another qualified supplier experienced implementation

---

The qualification requirements protested by Smart Communications were published with the solicitation on December 5, 2025. Accordingly, the protest should have been filed by December 15, 2025. Smart Communications filed its protest on January 14, 2026. Therefore, Smart Communications' protest was untimely and is denied on this additional ground

[3] Appeal at Page 3.

[4] Appeal at Pages 3-5.

[5] GPM Section 6.5 Step 4.

[6] *Advanced Commc'n Cabling, Inc.*, B-410898.2, Mar. 25, 2015. See *Valor Constr. Mgmt., LLC*, B-405365, Oct. 24, 2011 (denying challenge to solicitation provision where agency was concerned with "limiting the risk of unsuccessful performance") (emphasis added); *Aljucar, Anvil-Incus & Co.*, B-408936, Jan. 2, 2014, 2014 CPD ¶ 19 at 5 (denying protest where challenged solicitation provision was included to address "the possibility of increased performance risk from newly-formed joint ventures without prior experience operating as a joint entity.") (emphasis added).

C. Ryan Germany
May 20, 2026
Page 3 of 4

difficulties under a similar contract does not render restrictive qualification requirements arbitrary, unreasonable, or irrational. To the contrary, prior operational challenges may reasonably reinforce a state entity's determination that heightened safeguards, including qualification requirements, are necessary given the complexity and risk inherent in the procurement.[7]

Smart Communications does not dispute that the amended requirements were included in the eRFP due to GDC's interest in reducing the risk of unsuccessful performance; rather, Smart Communications claims that GDC could use less restrictive requirements to reduce the risk of unsuccessful performance. However, Smart Communications' disagreement with GDC's judgment concerning its needs and how best to accommodate them does not show that GDC's judgment is unreasonable, and GDC is not required to compromise its needs in order to accommodate all potential offerors.[8] The fact that Smart Communications may be unable to meet the amended requirements does not establish that the same unduly restrict competition or render GDC's need improper.[9] As noted in the Amended Protest Decision, the GPM's purpose of fostering effective broad-based competition in the marketplace does not mean that a state entity is required to structure its solicitation requirements such that *any* supplier interested in bidding on a procurement is able to do so.

Here, the primary question to be addressed is whether the amended requirements reasonably reflect GDC's needs. As extensively discussed in the Protest Decision and Amended Protest Decision, the Scope of Services detailed in Attachment B of the eRFP makes clear the extensive operational risks, security risks, and public safety risks associated with the services to be provided under the resulting contract, and the amended requirements are directly tied to the identified risks as well as the nature, scale, scope, and duration of the services to be provided under the resulting contract.

Specifically, the Category A requirement for experience providing solutions under a single contract to a state Department of Corrections or Federal correctional agency with a minimum ADP of 30,000 offenders is directly related to the operational complexity and risks involved with managing integrated systems at the scale of Georgia's correctional system, which maintains an ADP of over 45,000 offenders across up to fifty-five (55) correctional facilities located throughout Georgia. The requirement is designed to ensure suppliers have experience demonstrating their ability to manage high-volume, real-time communications systems; maintain system availability and performance at scale; support investigative monitoring across large populations and multiple facilities; and provide simultaneous system wide control, unified security enforcement, and integration across services.

Accordingly, I find that the amended requirements are rational and reasonably reflect the GDC's needs, and I find no merit in Smart Communications' argument.

Furthermore, while not addressed in Smart Communications' filings, I would reiterate the point made in the Deputy Commissioner's decisions regarding the opportunity for suppliers to bid on either Category A, Category B, or both. Specifically, the supplier awarded Category B will provide offender communication services to a maximum of eleven (11) facilities with a total ADP of less than 4,500 offenders whereas the supplier awarded Category A will provide offender communication services to up to five times as many facilities and ten times as many offenders. Accordingly, Category B only requires suppliers to have experience providing solutions under a single contract to a County/Regional correctional agency, state Department of Corrections, or Federal correctional agency with a minimum ADP of 2,800 offenders. Such requirements still reflect GDC's need for system wide control, unified security enforcement, and integration across

---

[7] Notably, in addition to the amended qualification requirements, the eRFP significantly expands cyber and operational security requirements, mandates third-party penetration testing, expands staffing requirements, and contains more detailed tablet requirements than the solicitation for the previous "failed" contract referenced by Smart Communications.
[8] *Armstrong Elevator Co.*, B-415809, Mar. 28, 2018; *Illinois Bell Telephone Co.*, B-202238, Oct. 20, 1981.
[9] GPM Section 6.5 Step 4; *Advanced Commc'n Cabling, Inc., B-410898.2, Mar. 25, 2015.*

C. Ryan Germany
May 20, 2026
Page 4 of 4

services but also reflects the lessened risk involved with serving fewer offenders across fewer facilities. By making each category available to a different supplier, it appears GDC has encouraged competition, rather than restricting competition, by reducing the experience qualifications required for Category B based on the scale, scope, and risk involved in providing the necessary equipment and services. These requirements appear structured to allow suppliers who may not otherwise qualify for contract award under Category A to enter the State government correctional space and gain experience for potential future contracting opportunities.

    2.   Fiduciary Duty

Smart Communications argues that the amended requirements violate the fiduciary duty requirement in the GPM because revenues could potentially be significantly increased over the life of the contract if there were more suppliers bidding. Smart Communications claims that it is not proposing that GDC "change its standards one iota in terms of vendor performance capability, quality, services, time, or cost considerations" but "simply proposes…that GDC structure the procurement in a way that incentivizes potential suppliers to submit their most competitive offers" (i.e., by opening the eRFP to additional potential suppliers).[10] However, the very purpose of the challenged qualification requirements is to gauge supplier performance capability to reduce the risks inherent in the services to be provided under the eRFP.

Nothing in the GPM requires a state entity to prioritize cost or revenue potential over its other legitimate needs. Rather, a state entity may reasonably seek arrangements that offer lower gross revenue but also lower risk, stronger protection, or better long-term outcomes. The fact that GDC structured the amended requirements to reduce the risk of unsuccessful performance as well as the risks inherent in the services to be provided under the eRFP has been well established. It appears GDC has reasonably determined that the potential consequences of failed performance by an under-qualified supplier outweigh the theorized potential for increased revenue, and I will not substitute my judgment for that of GDC.[11] Accordingly, I find no merit in this argument.

C.      Decision

For the foregoing reasons, Smart Communications' Appeal is denied.

Sincerely,

Rebecca N. Sullivan
Commissioner

cc:  Ross Barrineau, ross.barrineau@gdc.ga.gov

---

[10] Appeal at Pages 5-6.
[11] Additionally, I am not convinced that a fiduciary duty exists to maximize revenue where the revenue under the contract is generated by user-paid offender communication services.

EXHIBIT B



# GEORGIA
# CORPORATIONS DIVISION

GEORGIA SECRETARY OF STATE

# BRAD RAFFENSPERGER

**HOME (/)**

## BUSINESS SEARCH

### BUSINESS INFORMATION

| | | | |
|---|---|---|---|
| Business Name: | **Smart Communications Holding Georgia, LLC** | Control Number: | **23246396** |
| Business Type: | **Foreign Limited Liability Company** | Business Status: | **Active/Compliance** |
| NAICS Code: | **Information** | NAICS Sub Code: | **All Other Telecommunications** |
| Principal Office Address: | **10491 72nd Street, Seminole, FL, 33777, USA** | Date of Formation / Registration Date: | **11/27/2023** |
| Jurisdiction: | **Delaware** | Last Annual Registration Year: | **2026** |
| Principal Record Address: | **10491 72nd Street, Seminole, FL, 33777, USA** | | |

### REGISTERED AGENT INFORMATION

| | |
|---|---|
| Registered Agent Name: | **Corporation Service Company** |
| Physical Address: | **2 Sun Court, Suite 400, Peachtree Corners, GA, 30092, USA** |
| County: | **Gwinnett** |

Back

Filing History       Name History

Return to Business Search